J. BRUCE ALVERSON, ESQ.
Nevada Bar No. 1339
KARIE N. WILSON, ESQ.
Nevada Bar No. 7957
**ALVERSON TAYLOR & SANDERS**
6605 Grand Montecito Pkwy, Ste. 200
Las Vegas, NV 89149
702-384-7000 Phone
702-385-7000 Fax

MATTHEW G. COOGAN (*pro hac vice*)
mcoogan@lswlaw.com
JOHN S. SIFFERT (*pro hac vice*)
jsiffert@lswlaw.com
BRICE JASTROW (*pro hac vice*)
bjastrow@lswlaw.com
LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue
New York, NY 10110
(212) 921-8399

*Attorneys for Respondent Jing Cao*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| *In re Ex Parte* Application of | Case Number 2:20-cv-02333-KJD-BNW |
| EVENSTAR MASTER FUND SPC for and on Behalf of EVENSTAR MASTER SUB-FUND I SEGRAGATED PORTFOLIO; and EVENSTAR SPECIAL SITUATIONS LIMITED, | **DECLARATION OF MATTHEW G. COOGAN** |
| Applicants, | |
| For an Order Pursuant to 28 U.S.C. 1782 to Obtain Discovery from JING CAO MO for Use in a Foreign Proceeding | |

ALVERSON TAYLOR & SANDERS
LAWYERS
6605 GRAND MONTECITO PKWY STE 200
LAS VEGAS, NV 89149
(702) 384-7000

1

I, MATTHEW G. COOGAN, an attorney admitted to practice in the courts of the State of New York, declare as follows:

1.     I am a member of Lankler Siffert & Wohl LLP ("LSW"), attorneys for Jing Cao in the above matter.

2.     I submit this declaration in support of Ms. Cao's Reply Memorandum of Points and Authorities in Further Support of her Motion to Quash Subpoenas Issued by Evenstar Master Fund SPC and Evenstar Special Situations Limited Pursuant to 28 U.S.C. § 1782 (ECF No. 49). I am familiar with the facts and circumstances set forth herein.

3.     Attached as Exhibit 1 is a true and correct copy of a Fang Holdings Limited press release dated December 24, 2019.

4.     Attached as Exhibit 2 is a true and correct copy of an SEC Schedule 13D filed by Fang Holdings Limited on January 6, 2020.

5.     Attached as Exhibit 3 is a true and correct copy of an SEC Form 20-F filed by Fang Holdings Limited on May 27, 2020.

6.     Attached as Exhibit 4 is a true and correct copy of an SEC Schedule 13D/A filed by Fang Holdings Limited on June 24, 2020.

7.     Attached as Exhibit 5 is a true and correct copy of an SEC Form 20-F filed by Fang Holdings Limited on May 14, 2019.

8.     Attached as Exhibit 6 is a true and correct copy of an IRS Form 990 filed by Research Center on Natural Conservation Inc. on November 14, 2016.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, NY
       June 3, 2021

_____
Matthew G. Coogan

ALVERSON TAYLOR & SANDERS
LAWYERS
6605 GRAND MONTECITO PKWY STE 200
LAS VEGAS, NV 89149
(702) 384-7000

2

# Exhibit 1

# December 24, 2019
# Press Release from
# Fang Holdings Limited

# Fang Enters into an Agreement to Acquire Equity Interests in CIH

NEWS PROVIDED BY
**Fang Holdings Limited →**
Dec 24, 2019, 17:00 ET

BEIJING, Dec. 24, 2019 /PRNewswire/ -- Fang Holdings Limited (NYSE: SFUN) ("Fang"), a leading real estate internet portal in China, today announced that with the approval of the audit committee and the board of directors, it has entered into an agreement (Agreement) with Next Decade Technology Limited and Media Partner Investments Limited (together the "Sellers") which are affiliated companies of Fang's chairman Mr. Vincent Mo to acquire certain equity interests in China Index Holdings Ltd. ("CIH"). Fang agrees to buy and the Sellers agree to sell, within the next 12 months, at a fixed price of US$5.99 per share, in an aggregate up to 15 million ordinary shares (mostly Class B) of CIH beneficially owned by the Sellers in the Agreement. According to the Agreement, Fang will have the absolute and sole discretion to determine the number of shares to purchase, the timing of the purchase, and whether a single or a series of transactions. Both parties also agree that Fang will not seek to gain a controlling voting power in CIH as a result of the proposed transaction, unless it is approved separately by the audit committee and the board of directors of each of Fang and CIH.

## About Fang

Fang operates a leading real estate Internet portal in China in terms of the number of page views and visitors to its websites. Through its websites, Fang provides primarily marketing, listing, leads generation and financial services for China's fast-growing real estate and home furnishing and improvement sectors. Its user-friendly websites support active online communities and networks of users seeking information on, and value-added services for, the real estate and home furnishing and improvement sectors in China. Fang currently maintains

approximately 65 offices to focus on local market needs and its website and database contains real estate related content covering 658 cities in China. For more information about Fang, please visit http://ir.fang.com.

**Safe Harbor Statements**

This press release contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Such forward-looking statements are made under the "safe harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995.

These forward-looking statements can be identified by terminology such as "will," "expects," "is expected to," "anticipates," "aim," "future," "intends," "plans," "believes," "are likely to," "estimates," "may," "should" and similar expressions, and include, without limitation, statements regarding Fang's future financial performance, revenue guidance, growth and growth rates, market position and continued business transformation. Such statements are based upon management's current expectations and current market and operating conditions, and relate to events that involve known or unknown risks, uncertainties and other factors, all of which are difficult to predict and many of which are beyond Fang's control, which may cause its actual results, performance or achievements to differ materially from those in the forward-looking statements. Potential risks and uncertainties include, without limitation, the impact of Fang's transformation back to a technology-driven Internet platform and the impact of current and future government policies affecting China's real estate market. Further information regarding these and other risks, uncertainties or factors is included in Fang's filings with the U.S. Securities and Exchange Commission. Fang does not undertake any obligation to update any forward-looking statement as a result of new information, future events or otherwise, except as required under law.

SOURCE Fang Holdings Limited

Related Links

www.fang.com

# Exhibit 2

January 6, 2020

Fang Holdings Limited

Schedule 13D

SC 13D 1 tm201318d1_sc13d.htm SC 13D

---

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

## SCHEDULE 13D

**Under the Securities Exchange Act of 1934**
**(Amendment No. )***

---

# China Index Holdings Limited

**(Name of Issuer)**

---

## Class A ordinary shares, par value US$0.001 per share
## Class B ordinary shares, par value US$0.001 per share
**(Title of Class of Securities)**

**16954W101****
**(CUSIP Number)**

**Fang Holdings Limited**
**Tower A, No. 20 Guogongzhuang Middle Street**
**Fengtai District, Beijing 100070**
**The People's Republic of China**
**+86-10-5631 8661**
**(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)**

---

**December 27, 2019**
**(Date of Event which Requires Filing of this Statement)**

---

If the filing person has previously filed a statement on Schedule 13G to report the acquisition which is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(e), 1(f) or 1(g), check the following box ☐.

Note: Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See Rule 13d-1(a) for other parties to whom copies are to be sent.

* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

** This CUSIP applies to the American Depositary Shares of the issuer, evidenced by American Depositary Receipts, each representing one of one Class A ordinary share. No CUSIP has been assigned to the Class A ordinary shares or Class B ordinary shares of the issuer.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

---

CUSIP No. **16954W101**

| 1. | Names of Reporting Persons.<br><br>Fang Holdings Limited |
|---|---|
| 2. | Check the Appropriate Box if a Member of a Group (See Instructions).<br>(a) ☒ (b) ☐ |
| 3. | SEC Use Only |
| 4. | Source of Funds (See Instructions)<br><br>WC |
| 5. | Check if Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e)<br><br>☐ |
| 6. | Citizenship or Place of Organization<br><br>People's Republic of China |

| Number of Shares Beneficially Owned by Each Reporting Person With | 7. | Sole Voting Power<br><br>0 |
|---|---|---|
| | 8. | Shared Voting Power<br><br>2,345,876 Class A Ordinary Shares<br>5,000,000 Class B Ordinary Shares (See Item 5) |
| | 9. | Sole Dispositive Power<br><br>0 |
| | 10. | Shared Dispositive Power<br><br>2,345,876 Class A Ordinary Shares<br>5,000,000 Class B Ordinary Shares (See Item 5) |

| 11. | Aggregate Amount Beneficially Owned by Each Reporting Person<br><br>2,345,876 Class A Ordinary Shares<br>5,000,000 Class B Ordinary Shares (See Item 5) |
|---|---|
| 12. | Check if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions)<br><br>☐ |
| 13. | Percent of Class Represented by Amount in Row (11)<br><br>3.2% of the Class A Ordinary Shares<br>21.2% of the Class B Ordinary Shares (See Item 5) [1] |
| 14. | Type of Reporting Person (See Instructions)<br><br>CO |

---

(1) The percentage of the class of securities beneficially owned by the reporting person is calculated based on (i) 72,475,630 Class A ordinary shares and 23,636,706 Class B ordinary shares actually issued and outstanding of the Issuer as of June 11, 2019.

## Item 1. Security and Issuer.

This Schedule 13D (this "<u>Schedule</u>") is being filed by the Reporting Person (as defined in Item 2 below) and relates to Class A ordinary shares, par value $0.001 per share (the "<u>Class A Ordinary Shares</u>") and Class B ordinary shares, par value $0.001 per share (the "<u>Class B Ordinary Shares</u>", together with Class A Ordinary Shares, the "<u>Ordinary Shares</u>") of China Index Holdings Limited, an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "<u>Issuer</u>"). The address of the principal executive offices of the Issuer is Tower A, No. 20 Guogongzhuang Middle Street, Fengtai District, Beijing 100070, the People's Republic of China.

The Issuer's American depositary shares (the "<u>ADSs</u>"), evidenced by American Depositary Receipts, each representing one Class A Ordinary Share, are listed on the NASDAQ Global Market under the symbol "CIH." As used in this Schedule 13D, the term "Ordinary Shares" includes Class A Ordinary Shares and Class B Ordinary Shares.

Certain information contained in this Schedule relates to share ownership of persons other than the Reporting Person. The Reporting Person expressly disclaim any liability for any such information and for any other information provided in this Schedule that does not expressly pertain to a Reporting Person.

## Item 2. Identity and Background.

This Schedule is being filed by Fang, as an individual filing, pursuant to Rule 13d-1 of the General Rules and Regulations promulgated under the Securities Exchange Act of 1934, as amended (the "<u>Act</u>").

Fang Holdings Limited ("<u>Fang</u>"), an exempted company incorporated under the laws of the Cayman Islands with limited liability, with its registered office is at P.O. Box 31119 Grand Pavilion, Hibiscus Way, 802 West Bay Road, Grand Cayman, KY1-1205 Cayman Islands, and its principal business address at Tower A, No. 20 Guogongzhuang Middle Street, Fengtai District, Beijing, 100070, PRC. Fang operates a leading real estate Internet portal in China in terms of the number of page views and visitors to its websites. Through its websites, Fang provides primarily marketing, listing, leads generation and financial services for China's fast-growing real estate and home furnishing and improvement sectors. Please refer to the Form 20-F filed by Fang on May 14, 2019 for its shareholding information. Mr. Tianquan Mo ("<u>Mr. Mo</u>"), a PRC citizen, is the Chairman of the board of directors of Fang.

-2-

**Item 3. Source and Amount of Funds or Other Consideration.**

Between August 29, 2019 and December 30, 2019, Fang purchased an aggregate of 2,345,876 ADSs representing 2,345,876 Class A Ordinary Shares in open market purchases as set forth in the table below. Fang obtained the funds to purchase the ADSs from its working capital.

| Date | ADSs Purchased | Underlying Class A Ordinary Shares | Price per ADS |
|---|---|---|---|
| 08/29/2019 | 706 | 706 | US$3.0245 |
| 08/30/2019 | 4,900 | 4,900 | US$3.2069 |
| 09/03/2019 | 82,196 | 82,196 | US$3.0429 |
| 09/04/2019 | 163,387 | 163,387 | US$3.0602 |
| 09/05/2019 | 66,311 | 66,311 | US$3.2716 |
| 09/06/2019 | 53,820 | 53,820 | US$3.6587 |
| 09/06/2019 | 23,364 | 23,364 | US$3.5659 |
| 09/09/2019 | 32,001 | 32,001 | US$3.5996 |
| 09/10/2019 | 260,000 | 260,000 | US$3.5483 |
| 09/11/2019 | 70,664 | 70,664 | US$3.6946 |
| 09/12/2019 | 164,501 | 164,501 | US$4.0883 |
| 09/13/2019 | 190,600 | 190,600 | US$4.4423 |
| 09/16/2019 | 215,939 | 215,939 | US$4.8552 |
| 09/17/2019 | 407,323 | 407,323 | US$4.9712 |
| 09/18/2019 | 163,400 | 163,400 | US$5.0181 |
| 09/19/2019 | 60,000 | 60,000 | US$5.0172 |
| 09/20/2019 | 25,001 | 25,001 | US$4.9863 |
| 09/23/2019 | 8,000 | 8,000 | US$4.8985 |
| 11/22/2019 | 13,900 | 13,900 | US$3.5112 |
| 11/25/2019 | 9,500 | 9,500 | US$3.705 |
| 11/26/2019 | 17,600 | 17,600 | US$3.611 |
| 11/27/2019 | 38,920 | 38,920 | US$3.5555 |
| 11/29/2019 | 16,900 | 16,900 | US$3.5652 |
| 12/02/2019 | 13,500 | 13,500 | US$3.6865 |
| 12/03/2019 | 33,700 | 33,700 | US$3.5835 |
| 12/26/2019 | 156,935 | 156,935 | US$3.0724 |
| 12/27/2019 | 7,100 | 7,100 | US$3.1232 |
| 12/30/2019 | 45,708 | 45,708 | US$3.3726 |

On December 24, 2019, Fang (the "Buyer") entered into a purchase and sales agreement (the "Purchase and Sales Agreement") with Next Decade Investments Limited ("Next Decade") and Media Partner Technology Limited ("Media Partner", collectively with Next Decade, the "Sellers") to purchase up to 15 million Ordinary Shares (primarily consisting of Class-B Ordinary Shares) beneficially owned by the Sellers.

On December 27, 2019, Fang purchased in aggregate 5 million Class B Ordinary Shares from the Sellers, among which, 2.5 million Class B Ordinary Shares from Next Decade and 2.5 million Class B Ordinary Shares from Media Partner. Fang obtained the funds to purchase the Class B Ordinary Shares from its working capital.

**Item 4. Purpose of Transaction.**

The Reporting Person acquired the Class A Ordinary Shares and Class B Ordinary Shares reported herein for investment purposes. The Reporting Person may, from time to time, make additional purchases of Ordinary Shares or ADSs either in the open market or in privately-negotiated transactions, depending upon the Reporting Person's evaluation of the Issuer's business, prospects and financial condition, the market for the Ordinary Shares and the ADSs, other opportunities available to the Reporting Person, general economic conditions, stock market conditions and other factors. Depending upon the factors noted above, the Reporting Person

may also decide to hold or dispose of all or part of their investments in the Ordinary Shares and/or enter into derivative transactions with institutional counterparties with respect to the Issuer's securities, including the Ordinary Shares and the ADSs.

---

-3-

**Item 5. Interest in Securities of the Issuer.**

(a) As of the date hereof, Fang is the record holder of (i) 2,345,876 Class A Ordinary Shares, evidenced by ADSs, representing 3.2% of the issued and outstanding Class A Ordinary Shares, and (ii) 5,000,000 Class B Ordinary Shares, representing 21.2% of the issued and outstanding Class B Ordinary Shares. Each Class B ordinary share is entitled to ten votes per share, whereas each Class A ordinary share is entitled to one vote per share.

(b) See Items 7 through 10 of the cover pages to this Schedule for the number of Ordinary Shares that are beneficially owned by the Reporting Person as of the date hereof as to which there is sole or shared power to vote or direct the vote, and sole or shared power to dispose or direct the disposition.

(c) Except as set forth in this Schedule, to the knowledge of the Reporting Person with respect to the persons named in response to Item 5(a), none of the persons named in response to Item 5(a) has effected any transactions in the Ordinary Shares during the past 60 days.

(d) No person is known to the Reporting Person to have the right to receive or the power to direct the receipt of dividends from, or the proceeds from the sale of, any securities covered by this Schedule.

(e) Not applicable.

**Item 6. Contracts, Arrangements, Understandings or Relationships with Respect to the Issuer.**

The information set forth in or incorporated by reference in Item 2, 3, 4 and 5 of this Schedule 13D is incorporated by reference into this Item 6.

**Item 7. Materials to be Filed as Exhibits.**

Exhibit 99.1: Purchase and Sales Agreement dated December 24, 2019 between the Buyer and the Sellers

-4-

**SIGNATURES**

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Date: January 6, 2020

**FANG HOLDINGS LIMITED**

By:  /s/ Tianquan Mo
          Name:    Tianquan Mo
          Title:     Director

-5-

**Schedule A**

| Name | Present Principal Occupation or Employment and Business Address |
|------|-------------------------------------------------------------|
| Tianquan Mo (PRC citizen) | Chairman of Fang Holdings Limited and China Index Holdings Limited, c/o Tower A, No. 20 Guogongzhuang Middle Street, Fengtai District, Beijing 100070, PRC |

-6-

EX-99.1 2 tm201318d1_ex99-1.htm EXHIBIT 99.1

**Exhibit 99.1**

**SALE AND PURCHASE AGREEMENT**

**AMONG**

**NEXT DECADE TECHNOLOGY LIMITED**

**MEDIA PARTNER INVESTMENTS LIMITED**

**AND**

**FANG HOLDINGS LIMITED**

**Dated December 24, 2019**

## TABLE OF CONTENT

| | | |
|---|---|---:|
| 1. | INTERPRETATION | 3 |
| 2. | SALE, PURCHASE, and CONSIDERATION | 5 |
| 3. | CONDITIONS PRECEDENT TO COMPLETION | 5 |
| 4. | REPRESENTATIONS, WARRANTIES AND COVENANTS | 7 |
| 5. | CONFIDENTIALITY | 9 |
| 6. | NOTICES | 9 |
| 7. | INDEMNITY | 10 |
| 8. | FURTHER ASSURANCES | 10 |
| 9. | AMENDMENTS | 11 |
| 10. | WAIVERS | 11 |
| 11. | ENTIRE AGREEMENT | 11 |
| 12. | SEVERABILITY | 11 |
| 13. | COUNTERPARTS | 11 |
| 14. | ASSIGNMENT | 11 |
| 15. | CONSENT TO SPECIFIC PERFORMANCE | 11 |
| 16. | GOVERNING LAW AND DISPUTE RESOLUTION | 12 |

- 2 -

https://www.sec.gov/Archives/edgar/data/1294404/000110465920001596/tm201318d1_ex99-1.htm

# SALE AND PURCHASE AGREEMENT

**THIS SALE AND PURCHASE AGREEMENT** (this "**Agreement**"), dated as of December 24, 2019, by and among:

(1)     **Next Decade Technology Limited**, a company incorporated in British Virgin Islands whose registered office is at P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands ("**Seller 1**");

(2)     **Media Partner Investments Limited**, a company incorporated in British Virgin Islands whose registered office is at P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands. ("**Seller 2**" and, together with Seller 1, the "**Sellers**");

(3)     **Fang Holdings Limited**, a company incorporated in Cayman Islands whose registered office is at P. O. Box 31119 Grand Pavilion, Hibiscus Way, 802 West Bay Road, Grand Cayman, KY1 - 1205 Cayman Islands (the "**Purchaser**"),

(together the "**Parties**", and individually, a "**Party**").

**1.      INTERPRETATION**

1.1.     Definitions. In this Agreement where the context so admits, the following words and expressions shall have the following meanings:

"**Affiliate**" in relation to any person, means any person that directly or indirectly Controls such person or is directly or indirectly Controlled by such person, or any person that is under direct or indirect common Control with such person.

"**Business Day**" means a day (excluding Saturday and Sunday or a bank or public holiday) on which licensed banks are generally open for business in United States.

"**Charter Documents**" means the currently-in-effect Memorandum and Articles of Association of Next Decade Technology Limited and Media Partner Investments Limited.

"**Control**" means possession, directly or indirectly, of the power to direct or cause the direction of the operations and management or policies of a person, whether through the ownership of voting securities, power to control, direct or appoint a majority of the directors to the board, by contract or otherwise, and "**Controlling**", "**Controlled**" and "**Controls**" shall be construed accordingly.

"**Encumbrance**" means any security interest, pledge, mortgage, lien, charge, claim, hypothecation, title defect, right of first option or refusal, right of pre-emption, third-party right or interests, put or call right, lien, adverse claim of ownership or use, or other encumbrance of any kind.

- 3 -

"**Governmental Authority**" means the government of any nation, state, city, locality or other political subdivision thereof; any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to the government; and the governing body of any securities exchange, in each case having competent jurisdiction.

"**Losses**" means all judgments, fines, penalties, damages, losses, liabilities, costs (including without limitation legal costs), charges, expenses, actions, proceedings, claims and demands.

"**Party**" or "**Parties**" means a party or the parties to this Agreement.

"**Person**" includes any individual, firm, corporation, partnership, company, trust, association, joint venture, Governmental Authority or other entity of any kind, whether or not having separate legal personality.

"**SEC**" means the U.S. Securities Exchange Commission.

"**Stock Exchange**" means The Stock Exchange of National Association of Securities Dealers Automated Quotations (NASDAQ).

"**US$**" means United States dollars, the lawful currency of United States.

"**United States**" means United States of America.

1.2.    In this agreement, unless the contrary intention appears,

(a)    <u>Headings</u>. Headings are included for convenience only and shall not affect the construction of any provision of this Agreement.

(b)    <u>Include not Limiting</u>. "Include," "including," "are inclusive of" and similar expressions are not expressions of limitation and shall be construed as if followed by the words "without limitation."

(c)    <u>Law</u>. References to "law" shall include all applicable laws, regulations, rules and orders of any Governmental Authority, any common or customary law, constitution, code, ordinance, statute or other legislative measure and any regulation, rule, treaty, order, decree or judgment; and "lawful" shall be construed accordingly and any reference to "applicable law" with respect to a Person means laws that are legally binding on such Person.

(d)    <u>References to Documents</u>. A reference to any Section is, unless otherwise specified, to such Section of this Agreement. The words "hereof," "hereunder" and "hereto," and words of like import, refer to this Agreement as a whole and not to any particular Section hereof. A reference to any document (including this Agreement) is to that document as amended, consolidated, supplemented, novated or replaced from time to time.

- 4 -

## 2. SALE, PURCHASE, and CONSIDERATION

Upon the terms and subject to the conditions set out herein,

2.1. The Purchaser agrees to buy, and the Sellers, agree to sell, starting from the date hereof and until the elapse of twelve (12) calendar months thereafter, at a fixed price of US$5.99 per share, any amount and at any time, in the aggregate up to 15,000,000 ordinary shares (mainly Class B shares] ("**Shares**") of China Index Holdings Limited (CIH) beneficially owned by each Seller. The Purchaser shall have the absolute and sole discretion to determine the number of Shares to purchase, the timing of each purchase, and the number of transactions to effect such purchase(s). The Parties hereby agree and covenant that the Purchaser shall not obtain a controlling voting power in CIH as a result of the transactions contemplated hereunder, and that the maximum number of Shares that may be purchased by the Purchaser hereunder shall be adjusted downward if the Purchaser would have obtained a controlling voting power in CIH in the event that the maximum number of Shares are purchased by the Purchaser, unless such transactions are pre-approved by the audit committee and the board of directors of each of CIH and the Purchaser.

2.2. Transfer Taxes. The Purchaser and the relevant Sellers shall share in equal portions any and all transfer, stamp, conveyance, registration, recording or any other similar fees or taxes, and all documentary or other stamp taxes, arising out of or related to the relevant transactions contemplated by this Agreement. Each Seller shall be responsible for its own income, revenue, profits, capital gain tax or any other similar tax or duty arising out of or related to the transactions contemplated by this Agreement.

2.3. At the Completion,

(a) The Sellers shall respectively deliver to the Purchaser one or more original share certificates representing such number of purchased shares in the Purchaser's name, accompanied by duly executed instruments of transfer and bought and sold note in forms approved by the Purchaser;

(b) the Purchaser shall pay to the Sellers to accounts designated by each seller prior to completion respectively, each by wire transfer of immediately available funds in US$. The Sellers and the Purchaser shall execute and deliver such additional documents as may reasonably be necessary or appropriate to effect the purchase and sale contemplated by this Agreement.

## 3. CONDITIONS PRECEDENT TO COMPLETION

3.1. <u>Conditions Precedent to the Obligation of the Purchaser to Close</u>. The obligation of the Purchaser to consummate initially a transaction contemplated under this Agreement (the "**Completion**", and each date on which a transaction contemplated hereunder is consummated, a "**Completion Date**") is conditional upon satisfaction of all of the following conditions:

(a) the representations and warranties of the Sellers set forth in Sections 4.1 and 4.2 remaining true and correct in all material respects;

(b) each of the Sellers having performed and complied in all material respects with all covenants, obligations and agreements required by this Agreement to be performed or complied with by such Party on or prior to the completion;

- 5 -

(c)     all consents, authorizations, approvals, exemptions and waivers required by the Sellers from their respective board of directors or shareholder or any Governmental Authority for the consummation of the transactions contemplated by this Agreement having been obtained and all necessary filings, notifications and other regulatory requirements to which any Seller is subject having been made or satisfied;

(d)     Sellers having delivered a certificate, dated the Completion Date and signed by a director of each Seller, confirming the satisfaction of the conditions set forth in Sections 3.13.1(a) and 3.1 (c) above.

(e)     the passing of resolutions (special resolution or ordinary resolution, as the case may be) by the independent directors or the audit committee of Sellers approving the transactions contemplated by this Agreement.

3.2.    <u>Conditions Precedent to the Obligation of the Sellers to Close</u>. The obligation of each Seller to consummate the Completion of this Agreement is conditional upon satisfaction of all of the following conditions:

(a)     the representations and warranties of the Purchaser set forth in Sections 4.1 and 4.2 remaining true and correct in all material respects;

(b)     the Purchaser having performed and complied in all material respects with all covenants, obligations and agreements required by this Agreement to be performed or complied with by the Purchaser on or prior to the Completion Date;

(c)     all consents, authorizations, approvals, exemptions and waivers required by the Purchaser from any Governmental Authority for the consummation of the transactions contemplated by this Agreement having been obtained and all necessary filings, notifications and other regulatory requirements to which the Purchaser is subject having been made or satisfied;

(d)     the Purchaser having delivered a certificate, dated the Completion Date and signed by a director of the Purchaser, confirming the satisfaction of the conditions set forth in Sections 3.2(a) and 3.2(c) above by the Purchaser;

(e)     the passing of resolutions (special resolution or ordinary resolution, as the case may be) by the independent directors or the audit committee and the board of directors of the Purchaser approving the transactions contemplated by this Agreement.

3.3.    <u>Completion Notice</u>.

(a)     The Sellers shall notify the Purchaser in writing immediately upon the satisfaction of all the conditions in Section 3.1.

(b)     The Purchaser shall notify the Sellers in writing immediately upon the satisfaction of all the conditions in Section 3.2.

- 6 -

3.4. <u>Survival After Termination</u>. If the conditions set forth in Sections 3.1 and 3.2 are not fulfilled by December 25, 2019 or any other date agreed upon in writing by the Parties,

    (a)    this Agreement shall become null and void and have no further force or effect, except that any such termination shall be without prejudice to the rights of any Party in respect of any breach of this Agreement prior to such termination; and

    (b)    notwithstanding anything in this Agreement to the contrary, the provisions of Section 5 (Confidentiality), 15 (Consent to Specific Performance) and 16 (Governing Law and Submission to Jurisdiction) shall survive any termination of this Agreement.

## 4. REPRESENTATIONS, WARRANTIES AND COVENANTS.

4.1. <u>General Representations and Warranties</u>. Each Party represents to the other Parties, unless otherwise specified below, as of the date hereof and as of each Completion Date, as follows:

    (a)    Each Party has full power and authority to enter into and perform its obligations under this Agreement, and this Agreement constitutes a binding obligation of such Party, enforceable against such Party in accordance with its terms, except to the extent that the enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditor's rights generally, or (ii) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity);

    (b)    To the extent applicable, the execution, delivery and performance of this Agreement by such Party, and the consummation by such Party of the transactions contemplated hereby, do not and will not (i) violate, conflict with or result in the breach of any provision of the memorandum and articles of association or similar organizational documents of such Party, or (ii) conflict with or violate, in any material respects, any law, permit or governmental order applicable to such Party; and

    (c)    All authorizations required by such Party from any Governmental Authority or, to the extent applicable, from any of its shareholders, board of directors, independent directors/audit committee, or creditors for or in connection with the execution, validity and performance of this Agreement have been obtained (or will be obtained prior to such Completion Date) and are (or will be on such Completion Date) in full force and effect.

4.2. <u>Sellers' Specific Representations and Warranties</u>. Sellers represent and warrant to the Purchaser that, except for any Encumbrance arising under the Charter Documents,

    (a)    as of the date hereof and as of each Completion Date, the Sellers are the legal and beneficial owner of the Shares free and clear of any Encumbrance.

- 7 -

4.3.     <u>Purchaser' Specific Representations and Warranties</u>. The Purchaser represents and warrants to the Sellers, as of the date hereof and as of each Completion Date, that

(a)     the Purchaser has, and as of each Completion Date it shall have, access to the funds necessary to pay the Shares it may and elect to purchase in accordance with the terms and conditions of this Agreement;

(b)     the Purchaser is either (i) an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act of 1933, as amended (the "**Securities Act**") or (ii) not a "U.S. person" within the meaning of Regulation S under the Securities Act;

(c)     the Purchaser has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Shares, and is capable of bearing the economic risks of such investment, including a complete loss of its investment;

(d)     the Purchaser is acquiring the Shares for its own account and not with a view towards, or for resale in connection with, the public sale or distribution thereof, except pursuant to sales registered or exempted under the Securities Act, and it does not presently have any agreement or understanding, directly or indirectly, with any Person to distribute any of the Shares; the Purchaser is not a broker-dealer registered with the SEC under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**") or an entity engaged in a business that would require it to be so registered as a broker-dealer;

(e)     the Purchaser was not identified or contacted through the marketing of the transactions contemplated by this Agreement, and it did not contact the Sellers as a result of any general solicitation or directed selling efforts, and the transactions contemplated hereunder was not solicited by or through anyone other than the Sellers;

(f)     the Purchaser has been advised and acknowledges that in effecting the transactions contemplated hereunder, the Sellers are relying upon the exemption from registration provided by Regulation S under the Securities Act, and the Purchaser is acquiring the Shares in offshore transaction(s) executed in reliance upon the exemption from registration provided by Regulation S under the Securities Act;

(g)     the Purchaser acknowledges that the Shares are "restricted securities" that have not been registered under the Securities Act or any applicable state securities Law, and the Purchaser further acknowledges that, absent an effective registration under the Securities Act, the Shares may only be offered, sold or otherwise transferred (i) to Sellers, (ii) outside the United States in accordance with Rule 904 of Regulation S under the Securities Act or (iii) pursuant to an exemption from registration under the Securities Act;

(h)     neither the Purchaser nor any of its affiliates is a party to any agreement, arrangement or understanding with any Person that would give rise to any valid right, interest or claim against or upon the Sellers or the Purchaser for any brokerage commission, finder's fee or other similar compensation, as a result of the transactions contemplated hereunder.

- 8 -

## 5.    CONFIDENTIALITY

5.1.    Each Party undertakes that as from the date of this Agreement it will not, and will procure that its subsidiaries will not, in each case save as required by law or any rule of the Stock Exchange, make any announcement in connection with this Agreement unless the other Parties have given their consent to such announcement (which consent may not be unreasonably withheld and may be given either generally or in a specific case or cases and may be subject to conditions), provided that the restrictions contained in this Section 5 shall not apply so as to prevent any Party from making any disclosure required by law or by the Stock Exchange or the SEC or any supervisory or regulatory or Governmental Authority to which the such Party is subject so long as the Party(ies) concerned shall, if practicable, supply an advance copy of the required disclosure to the other Parties and incorporate any additions or amendments reasonably requested by them.

5.2.    Each Party undertakes to the other Parties that it will not, at any time after the date of this Agreement, divulge or communicate to any Person any confidential information concerning the business, accounts, finance or contractual arrangements or other dealings, transactions or affairs of the Company which may be within or may come to its knowledge and it shall use its best endeavours to prevent the publication or disclosure of any such confidential information concerning such matters provided that the obligations of this Section 5.2 shall not apply to:

(a)    the disclosure of the confidential information which the relevant Party(ies) can reasonably demonstrate is in the public domain through no fault of its own;

(b)    the disclosure of the confidential information where the disclosure is required by law, pursuant to a court order or by any Governmental Authority, provided, however, that each Party concerned shall, if practicable, supply an advance copy of the required disclosure to the other Party(ies) and incorporate any additions or amendments reasonably requested by them;

(c)    the disclosure of the confidential information in confidence to any professional adviser or lender by any Party for the purposes of obtaining advice or assistance in connection with its obligations or rights or in connection with the obtaining of financing in connection with the transactions contemplated by this Agreement; or

(d)    the disclosure of the confidential information in confidence to or by any adviser to any of the Parties for the purposes of giving or obtaining advice or acting on behalf of such Party in connection with a matter where disclosure of information is permitted pursuant to the provisions hereof.

## 6.    NOTICES

6.1.    Each notice, demand or other communication given or made under this Agreement shall be in writing and delivered or sent to each relevant Party at its address or fax number set out below (or such other address or fax number as the addressee has by 5 (five) days' prior written notice specified to the other Party(ies)).

- 9 -

6.2.    Any notice, demand or other communication so addressed to the relevant Party(ies) shall be deemed to have been delivered, (a) if delivered in person or by messenger, when proof of delivery is obtained by each delivering Party; (b) if sent by post within the same country, on the third day following posting, and if sent by post to another country, on the seventh day following posting; and (c) if given or made by fax, upon dispatch and the receipt of a transmission report confirming dispatch.

6.3.    The address and facsimile number for each Party for the purposes of this Agreement are:

|  |  |
|---|---|
| If to Seller 1: | Next Decade Technology Limited.<br>上海浦东新区浦明路258弄1号3901室<br>Fax number: (8621) 5047 1513<br>Attention: Ms. Jing Cao |
| If to Seller 2: | Media Partner Investments Limited<br>上海浦东新区浦明路258弄1号3901室<br>Fax number: (8621) 5047 1513<br>Attention: Ms. Jing Cao |
| If to the Purchaser: | |
| Address: | Tower A, Beijing Fang Xiang,<br>No.20, Guo Gong Zhuang Middle Street,<br>Fengtai District, Beijing, China   100070<br>Fax number: (8610)56318000<br>Attention: Dr. Hua Lei |

## 7.    INDEMNITY

The Purchaser and the Sellers shall respectively indemnify and hold harmless each other, their Affiliates and any of their respective representatives, agents, directors, officers, shareholders and employees from and against all Losses which arise from any breach by any Party of any of their representations, warranties, undertakings and covenants under this Agreement.

## 8.    FURTHER ASSURANCES

The Parties hereby agree that at any time or from time to time after the execution of this Agreement and the Completion, respectively, each Party shall take such actions and execute and deliver such documents as shall be reasonably necessary to effectuate the purposes of this Agreement.

- 10 -

9.      **AMENDMENTS**

This Agreement may not be amended, modified or supplemented except by a written instrument executed by each of the Parties.

10.     **WAIVERS**

No waiver of any provision of this Agreement shall be effective unless set forth in a written instrument signed by the Party(ies) waiving such provision. No failure or delay by a Party in exercising any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of the same preclude any further exercise thereof or the exercise of any other right, power or remedy. Without limiting the foregoing, no waiver by a Party of any breach by any other Party of any provision hereof shall be deemed to be a waiver of any subsequent breach of that or any other provision hereof.

11.     **ENTIRE AGREEMENT**

This Agreement constitutes the whole agreement among the Parties relating to the subject matter hereof and supersedes any prior agreements or understandings relating to such subject matter.

12.     **SEVERABILITY**

Each and every obligation under this Agreement shall be treated as a separate obligation and shall be severally enforceable as such and in the event of any obligation or obligations being or becoming unenforceable in whole or in part. To the extent that any provision or provisions of this Agreement are unenforceable they shall be deemed to be deleted from this Agreement, and any such deletion shall not affect the enforceability of this Agreement as remain not so deleted.

13.     **COUNTERPARTS**

This Agreement may be executed in one or more counterparts including counterparts transmitted by telecopier or facsimile or other electronic means, each of which shall be deemed an original, but all of which signed and taken together, shall constitute one document.

14.     **ASSIGNMENT**

This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the Parties. No Party may assign its rights or obligations under this Agreement without the prior written consent of each other Party.

15.     **CONSENT TO SPECIFIC PERFORMANCE**

The Parties declare that it is impossible to measure in monetary terms the damages that would be suffered by a party by reason of the failure by any other Party to perform any of the obligations hereunder. Therefore, if any Party shall institute any action or proceeding to enforce the provisions hereof, any Party against whom such action or proceeding is brought hereby waives any claim or defense therein that the other Party has an adequate remedy at law.

- 11 -

**16.**       **GOVERNING LAW AND DISPUTE RESOLUTION**

This Agreement shall be governed by, and construed in accordance with, the laws of Cayman Island, without regard to the principles of conflicts of law of any jurisdiction.

*[Signature Page To Follow]*

- 12 -

**IN WITNESS WHEREOF**, the undersigned have executed and delivered this Agreement as of the date first above written.

**NEXT DECATE TECHNOLOGY LIMITED.**

By: /s/ Jing Cao
     Name: Jing Cao
     Title: Director

**MEDIA PARTNER INVESTMENTS LIMITED**

By: /s/ Jing Cao
     Name: Jing Cao
     Title: Director

**FANG HOLDINGS LIMITED**

By: /s/ Hua Lei
     Name: Hua Lei
     Title: CIO

# Exhibit 3

May 27, 2020

Fang Holdings Limited

Form 20-F

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

_____

# FORM 20-F

_____

**(Mark One)**

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**

**OR**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2019**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

**OR**

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of event requiring this shell company report:**

**Commission file number: 001-34862**

## Fang Holdings Limited
(Exact name of registrant as specified in its charter)

**N/A**
(Translation of Registrant's name into English)

**Cayman Islands**
(Jurisdiction of incorporation or organization)

**Tower A, No. 20 Guogongzhuang Middle Street**
**Fengtai District, Beijing 100070**
**The People's Republic of China**
(Address of principal executive offices)

**Vincent Tianquan Mo, Executive Chairman**
**Telephone: +86-10-5631 8000**
**Fax: +86-10-5631 8010**
(Telephone, E-mail and/or Facsimile Number of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol | Name of Each Exchange on Which Registered |
|---|---|---|
| American depository shares (each American depositary share representing one Class A ordinary share, par value HK$1.00 each) | SFUN | The New York Stock Exchange |
| Class A ordinary shares, with a par value of HK$1.00 each* | | The New York Stock Exchange |

* Not for trading, but only in connection with the listing on the New York Stock Exchange of American depositary shares

Securities registered or to be registered pursuant to Section 12(g) of the Act:

**None**

(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:

**None**
(Title of Class)

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

| | |
|---|---|
| Class A ordinary shares, par value HK$1.00 each | 65,403,527 |
| Class B ordinary shares, par value HK$1.00 each | 24,336,650 |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act

☐ Yes   ☒ No

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

☐ Yes   ☒ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.

☒ Yes   ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 229.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).

☒ Yes   ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or non-accelerated filer. See definition of "large accelerated filer," "accelerated filer" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐          Accelerated filer ☒          Non-accelerated filer ☐
Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards † provided pursuant to Section 13(a) of the Exchange Act. ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☒          International Financial Reporting Standards as issued          Other ☐
by the International Accounting Standards Board ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow:

☐ Item 17   ☐ Item 18

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

☐ Yes   ☒ No

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.

☐ Yes   ☐ No

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| INTRODUCTION | | 1 |
| FORWARD-LOOKING STATEMENTS | | 3 |
| PART I | | 4 |
| ITEM 1. | IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS | 4 |
| ITEM 2. | OFFER STATISTICS AND EXPECTED TIMETABLE | 4 |
| ITEM 3. | KEY INFORMATION | 4 |
| ITEM 4. | INFORMATION ON THE COMPANY | 37 |
| ITEM 4A. | UNRESOLVED STAFF COMMENTS | 59 |
| ITEM 5. | OPERATING AND FINANCIAL REVIEW AND PROSPECTS | 59 |
| ITEM 6. | DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES | 77 |
| ITEM 7. | MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS | 92 |
| ITEM 8. | FINANCIAL INFORMATION | 99 |
| ITEM 9. | THE OFFER AND LISTING | 99 |
| ITEM 10. | ADDITIONAL INFORMATION | 100 |
| ITEM 11. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 108 |
| ITEM 12. | DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES | 110 |
| PART II | | 112 |
| ITEM 13. | DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES | 112 |
| ITEM 14. | MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS | 112 |
| ITEM 15. | CONTROLS AND PROCEDURES | 112 |
| ITEM 16A. | AUDIT COMMITTEE FINANCIAL EXPERT | 113 |
| ITEM 16B. | CODE OF ETHICS | 113 |
| ITEM 16C. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 113 |
| ITEM 16D. | EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES | 113 |
| ITEM 16E. | PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS | 114 |
| ITEM 16F. | CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT | 114 |
| ITEM 16G. | CORPORATE GOVERNANCE | 114 |
| ITEM 16H. | MINE SAFETY DISCLOSURE | 115 |
| PART III | | 116 |
| ITEM 17. | FINANCIAL STATEMENTS | 116 |
| ITEM 18. | FINANCIAL STATEMENTS | 116 |
| ITEM 19. | EXHIBITS | 116 |
| SIGNATURES | | 121 |

Table of Contents

## INTRODUCTION

Except where the context otherwise requires and for purposes of this annual report on Form 20-F only:

- "we," "us," "our company," "our," "SouFun" or "Fang" refers to Fang Holdings Limited (formerly known as SouFun.com Limited and SouFun Holdings Limited), its subsidiaries, and, in the context of describing our operations and consolidated financial information, our consolidated controlled entities in China;

- "ADSs" refers to our American depositary shares, with each ADS representing one Class A ordinary share, and "ADRs" refers to American depositary receipts, which, if issued, evidence our ADSs;

- "CIH" refers to China Index Holdings Limited a company listed on the NASDAQ Stock Market under the ticker symbol ''CIH,'' which was separated from our company, via a stock distribution on June 11, 2019, and its subsidiaries and variable interest entity, Beijing Zhong Zhi Hong Yuan Data Information Technology Co., Ltd.;

- "CSRC" refers to the China Securities Regulatory Commission;

- "China" or "PRC" or "Chinese" refers to the People's Republic of China, excluding, for the purpose of this annual report only, the Hong Kong Special Administrative Region, the Macau Special Administrative Region and Taiwan;

- "Exchange Act" refers to the Securities Exchange Act of 1934, as amended;

- "Hong Kong dollars" or "HK$" refers to the legal currency of the Hong Kong Special Administrative Region;

- "MIIT" refers to the Ministry of Industry and Information Technology and its compete local branches;

- "MOFCOM" refers to the Ministry of Commerce and its competent local branches;

- "MOHURD" refers to the Ministry of Housing and Urban-Rural Development and its competent local branches;

- ''monthly unique visitors'' in a given month, refers to the aggregate number of daily unique visitors to our websites, mobile apps or mobile WAP websites in such month. Once a visitor has visited a website, mobile app or mobile WAP website in a given day, all subsequent visits from the same IP address or device to a specific channel during such day do not count towards the daily unique visitor number for such specific channel. The combined number of monthly unique visitors to our websites, mobile apps and mobile WAP websites is the sum of the monthly unique visitors for each website, mobile app and mobile WAP website. The average number of monthly unique visitors for a given year is the average of the monthly unique visitors in each month in such year;

- "PBOC" refers to People's Bank of China;

- "RMB" or "Renminbi" refers to the legal currency of China;

- "SAFE" refers to the State Administration of Foreign Exchange and its competent local branches;

- "SAIC" refers to the State Administration for Industry and Commerce and its competent local branches;

- "SAT" refers to the State Administration of Taxation and its competent local branches;

- "SEC" refers to the U.S. Securities and Exchange Commission;

- "Securities Act" refers to the Securities Act of 1933, as amended;

- "shares" or "ordinary shares" refers to our ordinary shares, including both Class A ordinary shares and Class B ordinary shares;

- "sq.m." refers to square meter(s); and

- "U.S. dollars," "US$" or "$" refers to the legal currency of the United States of America.

Table of Contents

This annual report includes our audited consolidated statements of comprehensive income (loss) for 2017, 2018 and 2019, our audited consolidated balance sheets as of December 31, 2018 and 2019, our audited consolidated statements of shareholders' equity and our audited consolidated statements of cash flows for 2017, 2018 and 2019.

2

Table of Contents

## FORWARD-LOOKING STATEMENTS

This annual report contains forward-looking statements that involve risks and uncertainties. All statements other than statements of historical facts are forward-looking statements. These forward-looking statements are made under the "safe harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. These statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements.

You can identify these forward-looking statements by words or phrases such as "may," "will," "expect," "is expected to," "anticipate," "aim," "estimate," "intend," "plan," "believe," "are likely to" or other similar expressions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements include, but are not limited to:

- our anticipated business activities and the expected impact of these actions on our results of operations and financial condition;

- expected changes in our revenues and certain cost or expense items;

- our ability to attract clients and further enhance our brand recognition;

- trends and competition in the real estate, home furnishings and improvement sites and online advertising industries;

- PRC laws, regulations and policies relating to the real estate, home furnishings and improvement sites and advertising and financing industries and the use of the Internet to conduct these activities; and

- the length and severity of the recent COVID-19 outbreak and its impact on our business and industry.

You should read this annual report and the documents that we refer to in this annual report thoroughly and with the understanding that our actual future results may be materially different from and worse than what we expect. We qualify all of our forward-looking statements by these cautionary statements. Other sections of this annual report, including the section titled "Risk Factors", include additional factors which could adversely impact our business and financial performance. Moreover, we operate in an evolving environment. New risk factors and uncertainties emerge from time to time and it is not possible for our management to predict all risk factors and uncertainties, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements.

You should not rely upon forward-looking statements as predictions of future events. Except as required by law, we undertake No obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

## MARKET AND INDUSTRY DATA

Market data and certain industry forecasts used in this annual report were obtained from internal surveys, market research, publicly available information and industry publications. Industry publications generally state that the information contained therein has been obtained from sources believed to be reliable, but that the accuracy and completeness of such information is not guaranteed. Similarly, internal surveys, industry forecasts and market research, while believed to be reliable, have not been independently verified, and we make No representation as to the accuracy of such information.

Table of Contents

PART I

**ITEM 1.  IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS**

Not applicable.

**ITEM 2.  OFFER STATISTICS AND EXPECTED TIMETABLE**

Not applicable.

**ITEM 3.  KEY INFORMATION**

*A. Selected Financial Data*

We have derived our selected consolidated statement of comprehensive income (loss) data (except for ADS information) for 2017, 2018 and 2019 and our selected consolidated balance sheet data as of December 31, 2018 and 2019, from our audited consolidated financial statements included in this annual report. Our selected statement of comprehensive income (loss) data (except for ADS information) for 2016 and our selected consolidated balance sheet data as of December 31, 2016 and 2017 are based on the unaudited financial data derived from our management accounts, which were adjusted to retrospectively present discontinued operations as described below. Our financial statements have been prepared in accordance with U.S. GAAP. We have omitted the selected financial data as of and for the year ended December 31, 2015, as the provision of the information retrospectively adjusted to present our discontinued operations would take a significant amount of time and cause us to incur unreasonable effort and expense.

On June 11, 2019, we completed the separation of CIH from us into an independent publicly traded company via a dividend distribution of all the CIH's ordinary shares owned by us to our equity holders. The business of CIH comprises (1) certain information and analytics services, initially operated as part of our value-added services, and (2) certain marketplace services, initially operated as part of our listing services. Following the spin-off of CIH, we have retained our business operating a real estate Internet portal focusing primarily on serving the residential property sector. Consequently, certain of our value-added services, listing services and other related services were accounted for as discontinued operations in accordance with U.S. GAAP in our consolidated financial statements. As required by U.S. GAAP, we have presented the assets and liabilities of the discontinued operations separately on the consolidated balance sheets as of December 31, 2016, 2017 and 2018, and the results of the discontinued operations, less income taxes, as a separate component of income, which is income from discontinued operations, on the consolidated statements of comprehensive income (loss) for the fiscal years ended December 31, 2016, 2017, 2018 and 2019.

You should read the following information in conjunction with our audited consolidated financial statements and related notes and "Item 5. Operating and Financial Review and Prospects" in this annual report. Our historical operating results presented below are not necessarily indicative of the results to be expected for any future fiscal period.

4

Table of Contents

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2016[1] | 2017[1] | 2018[1] | 2019 |
| | (U.S. dollars in thousands, except share data and ADS data) | | | |
| Consolidated statement of comprehensive income (loss) data: | | | | |
| **Revenues:** | | | | |
| Marketing services | 147,418 | 149,267 | 98,377 | 94,639 |
| Listing services | 96,802 | 141,454 | 81,741 | 63,471 |
| Leads generation services[2] | — | — | 21,303 | 43,300 |
| Financial services | 29,602 | 12,055 | 18,060 | 9,561 |
| E-commerce services | 577,684 | 87,809 | 15,384 | 2,847 |
| Value-added services | 25,559 | 4,753 | 5,182 | 5,893 |
| **Total revenues** | **877,065** | **395,338** | **240,047** | **219,711** |
| **Cost of revenue:** | | | | |
| Cost of services | (677,738) | (163,598) | (46,392) | (28,260) |
| **Gross profit** | **199,327** | **231,740** | **193,655** | **191,451** |
| **Operating income (expenses):** | | | | |
| Selling expenses | (223,357) | (83,579) | (59,064) | (73,662) |
| General and administrative expenses | (147,175) | (129,719) | (129,224) | (99,442) |
| Other income | 415 | 699 | 4,427 | 6,518 |
| **Operating income (loss) from continuing operations** | **(170,790)** | **19,141** | **9,794** | **24,865** |
| Foreign exchange gain (loss) | (1,882) | 15 | (598) | 154 |
| Interest income | 11,361 | 11,052 | 10,202 | 9,038 |
| Interest expense | (20,477) | (16,153) | (21,174) | (25,402) |
| Change in fair value of securities | — | 518 | (167,402) | (46,062) |
| Realized gain on available-for-sale securities | 10,583 | 2,421 | 761 | 861 |
| Government grants | 6,223 | 3,025 | 1,224 | 927 |
| Investment income, net | 3,281 | 6,692 | 6,816 | 2,644 |
| Other non-operating loss | — | (4,562) | (30) | — |
| Impairment on investments | (2,232) | (2,768) | — | — |
| **Income (loss) from continuing operations before income taxes [1]** | **(163,933)** | **19,381** | **(160,407)** | **(32,975)** |
| Income tax benefit (expenses) | (22,236) | (18,352) | 18,989 | 9,544 |
| **Income (loss) from continuing operations, net of income taxes [1]** | **(186,169)** | **1,029** | **(141,418)** | **(23,431)** |
| **Income from discontinued operations, net of income taxes [1]** | **16,534** | **20,675** | **26,509** | **13,181** |
| **Net income (loss)** | **(169,635)** | **21,704** | **(114,909)** | **(10,250)** |
| Net (loss) income attributable to noncontrolling interests from continuing operations[1] | — | (3) | 2 | (1) |
| Net income (loss) attributable to Fang Holdings Limited's shareholders | (169,635) | 21,707 | (114,911) | (10,249) |
| Net income (loss) attributable to Fang Holdings Limited's shareholders from continuing operations[1] | (186,169) | 1,032 | (141,420) | (23,430) |
| Net income attributable to Fang Holdings Limited's shareholders from discontinued operations[1] | 16,534 | 20,675 | 26,509 | 13,181 |
| **Other comprehensive income (loss), before tax:** | | | | |
| Foreign currency translation adjustments | (60,732) | 56,571 | (46,648) | (26,703) |
| Amounts reclassified from accumulated other comprehensive income | (10,583) | (2,736) | (1,493) | (861) |
| Unrealized gain (loss) on available-for-sale securities | 7,326 | 212,838 | 1,493 | 861 |
| Gain (loss) on intra-entity foreign transactions of long-term-investment nature | (6,996) | 1,872 | (3,034) | 497 |
| Separation of real estate information, analytics and marketplace services business | — | — | — | 3,672 |
| **Other comprehensive income (loss), before tax** | **(70,985)** | **268,545** | **(49,682)** | **(22,534)** |
| Income tax expense related to components of other comprehensive income | — | (49,566) | — | — |
| **Other comprehensive income (loss), net of tax** | **(70,985)** | **218,979** | **(49,682)** | **(22,534)** |
| **Comprehensive income (loss)** | **(240,620)** | **240,683** | **(164,591)** | **(32,784)** |
| Comprehensive income (loss) attributable to noncontrolling interests from continuing operations | — | (3) | 2 | (1) |
| Comprehensive income (loss) attributable to Fang Holdings Limited's shareholders | (240,620) | 240,686 | (164,593) | (32,783) |
| **Earnings (loss) per share for Class A and Class B ordinary shares and per ADS[3]** | | | | |
| Basic | (1.81) | 0.24 | (1.29) | (0.11) |
| Diluted | (1.81) | 0.24 | (1.29) | (0.11) |
| **Earnings (loss) per share for Class A and Class B ordinary shares and per ADS from continuing operations[1][3]** | | | | |
| Basic | (1.99) | 0.01 | (1.59) | (0.26) |
| Diluted | (1.99) | 0.01 | (1.59) | (0.26) |
| **Earnings per share for Class A and Class B ordinary shares and per ADS from discontinued operations[1][3]** | | | | |
| Basic | 0.18 | 0.23 | 0.30 | 0.15 |
| Diluted | 0.18 | 0.23 | 0.30 | 0.15 |
| **Weighted average number of Class A and Class B ordinary shares outstanding and ADSs outstanding:** | | | | |
| Basic | 93,605,749 | 88,475,665 | 88,749,432 | 89,511,052 |
| Diluted | 93,605,749 | 91,585,677 | 88,749,432 | 89,511,052 |

Table of Contents

(1) Financial data for 2016, 2017 and 2018 has been recast to present the results of the separation of CIH as discontinued operations.
(2) We launched our leads generation services in late 2017 and began to recognize revenue from our leads generation services in 2018.
(3) Earnings (loss) per share for Class A and Class B ordinary shares (diluted) and earnings (loss) per ADS (diluted) for each year from 2016 to 2019 have been computed, after considering the potential dilutive effect of the shares underlying employees' share options, restricted shares and convertible senior notes. We changed our ADS share ratio from five ADSs representing one Class A ordinary share to one ADS representing one Class A ordinary share effective from July 8, 2019, and such ADS share ratio change has been retrospectively applied for each year indicated in this table.

|  | As of December 31, | | | |
|  | 2016 | 2017 | 2018 | 2019 |
|  | (U.S. dollars in thousands) | | | |
| **Consolidated balance sheet data:** | | | | |
| Cash and cash equivalents and short-term investments | 325,834 | 248,696 | 187,226 | 300,002 |
| Total current assets | 793,210 | 748,412 | 668,837 | 686,680 |
| Total assets | 1,614,813 | 2,000,255 | 1,824,436 | 1,812,902 |
| Long term loans, less current portion | 65,190 | 114,109 | 123,215 | 184,158 |
| Convertible senior notes | 295,268 | 291,365 | 254,435 | 168,929 |
| Total Fang shareholder's equity | 487,130 | 739,583 | 594,506 | 589,759 |

### B. Capitalization and Indebtedness

Not applicable.

### C. Reasons for the Offer and Use of Proceeds

Not applicable.

### D. Risk Factors

*An investment in our ADSs or notes involves risks. You should carefully consider the risks described below, as well as the other information included or incorporated by reference in this annual report, before making an investment decision. Our business, financial condition or results of operations could be materially adversely affected by any of these risks. The market or trading price of our ADSs or notes could decline due to any of these risks, and you may lose all or part of your investment. In addition, the risks discussed below also include forward-looking statements and our actual results may differ substantially from those discussed in these forward-looking statements. You should also review the section of this annual report captioned "Forward-Looking Statements." Please note that additional risks not presently known to us, that we currently deem immaterial or that we have not anticipated may also impair our business and operations.*

Table of Contents

**Risks related to our business**

***We may continue to incur losses in the future, and may not be able to return to profitability, which may cause the market price of our ADSs to decline.***

We incurred net loss from continuing operations of US$23.4 million in 2019, primarily due to the combined effect of the decrease in our revenues and the change in fair value of securities. Our ability to achieve profitability in the future depends on our ability to control costs and to provide products and services to meet the market demands and attract new customers, the competitiveness of our products and services, and the regulatory environment in China's real estate market. Due to the numerous risks and uncertainties associated with the development of our business and the regulatory environment, we cannot guarantee that we may be able to return to profitability in the short-term or long-term, which may cause the market price of our ADSs to decline.

***Our business could be materially and adversely affected by fluctuations in, and government measures influencing, China's real estate industry.***

We conduct our real estate services business primarily in China, and our business depends substantially on conditions of the PRC real estate market. In particular, our new home business, which accounted for 40.0%, 50.8% and 59.5% of our total revenues in 2017, 2018 and 2019, respectively, depends upon growth in the real estate-related industry nationwide and in specific regions in China. Demand for private residential property in China has grown rapidly in recent years, but such growth is often coupled with volatility in market conditions and fluctuation in property prices. Fluctuations of supply and demand in China's real estate market are caused by economic, social, political and other factors. To the extent fluctuations in the real estate market adversely affect the demand for real estate and home-related products and services and for real estate- and home-related advertising and financing, demand for our products and services, as well as the level of our growth and profitability, may be materially reduced.

The real estate market in China is typically affected by changes in government policies affecting the real estate and financial markets and related areas. In the past, the PRC government has adopted various administrative measures to curb what it perceived as unsustainable growth in the real estate market, particularly when the real estate market in China experienced rapid and significant increases in home sales as well as prices. In February 2013, for example, the State Council announced certain plans to address the rapid increase in property prices in certain cities since late 2012, including raising minimum down-payments and loan rates for second home buyers in cities where prices experienced a rapid increase and enforcing a 20% capital gains tax on the sale of existing homes. In part due to these policies, the real estate market in China experienced a slowdown and real estate development declined in 2014. In March 2015, the PRC government issued a new policy to reduce the down-payment requirements and exempt certain home owners from paying sales taxes if they sell after owning the property for two years. Beginning in September 2016, certain cities, such as Beijing and Shanghai, increased the down-payment requirements again and tightened the determination of first home buyers who are eligible for relaxed regulations. Relevant government authorities have recently also promulgated legislations to ban financings to home buyers for down-payment and ceased granting or renewing real estate broker licenses in certain cities. Beginning in March 2017, certain cities, such as Beijing and Guangzhou, further increased the minimum down-payments for second home buyers. In April 2019, Housing Fund Management Center of the Central Government Organs issued Circular on Matters relating to Adjusting the Policy for Individual Housing Loans via the Housing Provident Fund to Further Upgrade Services, which adjusts the proportion of down-payment. Under the circular, if the first house that a loan applicant purchases is not an economically affordable house, the down-payment shall not be lower than 30% of the total purchase price. The circular also adjusts the maximum limit of loan for the second house purchase. The maximum limit of loan for the first house purchase shall be RMB1.2 million, and the benchmark interest rate of loan shall apply; the maximum limit of loan for the second house purchase shall be RMB600,000, and the loan interest rate shall be 1.1 times of the benchmark interest rate of loan for the same period.

In addition to government policies aimed specifically at controlling growth in real estate markets in China, our business, financial condition and results of operations may also be negatively affected by other macroeconomic and regulatory measures. Any future policies in the following areas could cause a decline in home sales and prices, which in turn could affect the demand for our services and negatively impact our business, financial condition and results of operation:

- restrictive monetary policies adopted by the PRC government, including any significant increase in interest rates;

- adverse developments in the credit markets and/or mortgage financing markets resulting from PRC government policies;

- policies regarding land supply;

- significant increases in transaction costs as a result of changes in PRC government policies regarding transaction taxes, such as the sales tax on residential property sales by individuals within two years of purchase;

Table of Contents

- adverse changes in PRC government policies regarding the acquisition and/or ownership of real estate;

- adverse changes in PRC national or local government policies or practices regarding brokerage, referral or related fees and commissions; or

- other PRC government policies or regulations that burden real estate transactions or ownership.

***Our business depends substantially on revenues from our marketing services, and participants in the real estate and home-related sectors may choose other advertising media over online advertising or other online advertisers, which could lead to a decline in our revenues.***

All of our marketing service revenues are generated through our websites and mobile apps, and we expect to continue to derive a significant portion of our revenues from marketing services. Marketing services accounted for 37.8%, 41.0% and 43.1% of our revenues in 2017, 2018 and 2019, respectively, constituting our largest source of revenues in 2019. In particular, our new home business accounted for 81.4%, 99.7% and 100.0% of our marketing service revenues in 2017, 2018 and 2019, respectively. Our new home business primarily consists of sales of marketing services to residential property developers and their sales agents who are promoting newly developed properties for sale.

Although the online marketing industry in China has been growing, advertisers in the real estate sector in China have typically relied on traditional forms of advertising media, such as newspapers, magazines and outdoor advertising. If we are unable to retain and develop our base of advertising customers, including real estate developers, our business may not grow as quickly as we expect. Moreover, advertisers may not continue to do business with us if they do not perceive our marketing services to be effective or our user demographics to be desirable.

Our ability to continue to generate and maintain marketing service revenues depends on a number of factors, many of which are beyond our control, including:

- overall demand from property developers for online advertising;

- the amount of user traffic on our websites and mobile apps, our ability to achieve user demographic characteristics that are attractive to advertisers, and our ability to demonstrate such user traffic and demographic characteristics through our website traffic tracking tools and reporting systems;

- potential downward pressure on online marketing pricing due to increased competition from other online advertisers and traditional advertising media;

- widespread adoption of technologies that permit Internet users to selectively block unwanted web views, including advertisements on web pages; and

- emergence and user acceptance of new marketing channels, including social networking platforms and "We Media."

If we are unable to remain competitive and provide value to our advertisers, they may stop placing advertisements with us, which would have a material adverse effect on our business, financial condition and results of operations.

***If we are unable to continue to obtain listings from our key customer groups, including real estate developers, agents, brokers and property owners and managers, our business, financial condition and results of operations could be materially and adversely affected.***

We derive a significant portion of our revenues from our listing services. In 2017, 2018 and 2019, listing service revenues represented approximately 35.8%, 34.1% and 28.9% of our total revenues, respectively. The success of the listing service business depends on our ability to persuade real estate developers, real estate agents, brokers, developers and property owners and managers to list their properties on our websites and mobile apps. We believe having large numbers of high-quality listings from such real estate professionals attracts users to our websites and mobile apps, thereby enhancing our attractiveness to advertisers and other real estate market participants. However, substantially all of our listing agreements are nonexclusive. Our listing customers may stop using our listing services and may choose to use the services of one or more of our competitors or seek alternative means of listing, such as real estate magazines or newspapers. If owners of large numbers of property listings, such as major developers or large brokers or property owners in key real estate markets, choose not to renew their existing agreements with us, our websites and mobile apps could become less attractive to users. If we experience reduced user traffic on our websites and mobile apps, advertisers and other real estate market participants may discontinue the use of or be unwilling to pay for our services. In such an event, our competitive position could be significantly weakened and our business, financial condition and results of operations could be materially and adversely affected.

Table of Contents

*Our future growth depends in part on our ability to continue to operate the retained business after the separation of CIH.*

On June 11, 2019, we completed a spin-off of our wholly-owned subsidiary, CIH, via a dividend distribution of all the CIH's ordinary shares owned by us to our equity holders, and the associated business comprising (1) certain information and analytics services, initially operated as part of our value-added services, and (2) certain marketplace services, initially operated as part of our listing services. Following the spin-off of CIH, we have retained our business operating a real estate Internet portal focusing primarily on serving the residential property sector, while CIH strategically focuses on serving the commercial property sector in China, allowing each company to more effectively pursue its own distinct operating priorities and strategies. See "Item 7.B. Major Shareholders and Related Party Transactions—Related Party Transactions—Separation and Distribution Related Agreements in connection with the Separation of CIH."

Whether we can continue to grow the retained business depends on our ability to manage and develop these services effectively. If we are not successful in assuring our employees of our prospects after the separation and distribution, our employees may seek other employment, which could materially and adversely affect our business operation. If we fail to retain our qualified personnel or replace them when they leave, we may be unable to continue our development, which may cause the price of our ADSs to fall.

*We derive a substantial portion of our revenues from several major urban centers in China, in particular, Beijing, Shanghai, Chengdu, Chongqing, Tianjin and Shenzhen and we face market risks due to concentration of our revenues in these major urban areas.*

We derive a substantial portion of our revenues from several major urban centers in China, including Beijing, Shanghai, Chengdu, Chongqing, Tianjin and Shenzhen. In 2019, we generated revenues of US$68.6 million from these six urban centers, representing 31.2% of our total revenues. We expect these six urban centers to continue to be important regional sources of revenues in all of our revenue categories. If any of these major urban centers experience events which negatively impact the real estate industry or online advertising, such as a serious economic downturn or contraction, a natural disaster, or slower growth due to adverse governmental policies or otherwise, demand for our services could decline significantly and our business and revenue growth prospects could be materially and adversely impacted.

*We may fail to compete successfully against current or future competitors, which could significantly reduce our market share and materially and adversely affect our business, financial condition and results of operations.*

We face competition from other companies in each of our primary business activities. In particular, the online real estate Internet service market in China is becoming increasingly competitive. For example, in March 2015, 58.com, an online marketplace, acquired Anjuke.com, an online real estate sales and rental service provider in China, which will likely increase competition in our market. The barriers of entry for establishing Internet-based businesses are low, thereby allowing new entrants to emerge rapidly. As the online real estate Internet service industry in China is relatively new and constantly evolving, our current or future competitors may be able to better position themselves to compete as the industry matures. We also face competition from companies in other media that offer online advertising, online listing and similar services. Any of these competitors may offer products and services that provide significant advantages over those offered by us in terms of performance, price, scope, creativity or other advantages. These products and services may achieve greater market acceptance than our service offerings, and thus weaken our brand. Increased competition in the online real estate Internet service industry in China could make it difficult for us to retain existing customers and attract new customers, and could lead to a reduction in our fees. Furthermore, our current competitors include major Internet portals in China that provide real estate Internet services, such as Sina.com, 58.com, ke.com and Tencent's house.qq.com, which may have more established brand names, larger visitor numbers and more extensive Internet distribution channels than we do.

In addition, we have faced and may continue to face strong competition from regionally focused websites and mobile apps providing regional real estate listings together with localized services, as well as other emerging channels, including social network platforms and "We Media." Any of our current or future competitors may also receive investments from or enter into other commercial or strategic relationships with larger, well-established and well-financed companies and obtain significantly greater financial, marketing and content licensing and development resources than us. Furthermore, some of our competitors receive support from local governments, which may place us at a disadvantage when competing with them in their local markets. We cannot assure you that we will be able to compete successfully against our current or future competitors. Any failure to compete effectively in the real estate Internet services market in China would have a material adverse effect on our business, financial condition and results of operations.

*Failure to maintain and enhance brand awareness for our websites and mobile apps could lead to loss of existing customers and qualified personnel.*

We believe maintaining and enhancing our brand name as a leading real estate Internet company in China is a critical part of our strategy. In July 2014, we changed the address of our principal website from www.soufun.com to www.fang.com. "Fang" means "home" in Chinese. In conjunction with our change of web address, we also launched our new "Fang Tian Xia" brand ("房天下" in Chinese, which can be approximately translated as "world of homes" in English). In September 2016, we changed our name to Fang Holdings Limited. We believe that this new and simplified address will be much easier for Chinese users to remember and access, thereby improving our brand recognition. In addition to promoting our websites and brand through our direct sales force, we also intend to continue to pursue other means to enhance brand awareness, including publication of real estate research reports, event sponsorships, portal collaboration arrangements, and advertising and marketing activities. We cannot assure you that our efforts will be successful in maintaining or enhancing our brand awareness. If our brand enhancement strategy is unsuccessful, or if other brands surpass our brand in market recognition in one or more cities in which we operate, we may fail to attract new or retain existing users, customers or qualified personnel, which could materially decrease our revenues and profitability.

Table of Contents

***Our business, financial condition and results of operations may be adversely affected by the COVID-19 outbreak.***

The recent outbreak of COVID-19 has and is continuing to spread rapidly throughout the world. The epidemic has resulted in quarantines, travel restrictions, and the temporary closure of facilities in China and many other countries for the past few months. On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. Government efforts to contain the spread of COVID-19 through city lockdowns or "stay-at-home" orders, widespread business closures, restrictions on travel and emergency quarantines, among others, have caused significant and unprecedented disruptions to the global economy and normal business operations across sectors and countries. Many businesses and social activities in China and other countries and regions were severely disrupted.

Such disruption and the potential slowdown of China's economy in 2020 and beyond could have a material adverse effect on our business, financial condition and results of operations. In particular, potential impacts include, but are not limited to, the following:

- The outbreak of COVID-19 may result in a general slowdown in China's real estate industry, adversely affecting the demand for our services.

- Our customers may not have sufficient budget or cashflow to pay for the services provided by us, or may fail to make the payment in a timely manner, or at all.

- Some of our customers may not be well capitalized and may be vulnerable to the COVID-19 outbreak and the slowdown of the macroeconomic conditions, and if they cannot resume their business for a prolonged virus outbreak, the demand for our services may be negatively affected.

- We may experience lower work efficiency and productivity, which may adversely affect its service quality.

We have adopted business contingency plans, which include, among others, telecommuting and daily monitoring of employees' health condition and travel activities, to reduce the risk of infection and continuously develop our business. We have experienced business disruptions due to quarantine measures to contain the spread of COVID-19, and has experienced a delay in the collection of accounts receivables from our customers, especially those in Wuhan, where the strictest quarantine measures were implemented in China. We may experience similar delay or even default from our customers in the near future, which could materially and adversely affect our business, financial condition and results of operations. In addition, our investment portfolio has experienced significant decrease in fair value as a result of the market volatility due to the COVID-19 outbreak. Moreover, if the outbreak persists or escalates, we may be subject to further negative impact on our business operations.

***Unauthorized use of our intellectual property by third parties, and the expenses incurred in protecting our intellectual property rights, may materially and adversely affect our business, financial condition, results of operations, reputation and competitive advantage.***

Our copyrights, trademarks, trade secrets, domain names and other intellectual property are important to our business. Unauthorized use of such intellectual property, whether owned by us or licensed to us, may materially and adversely affect our business, financial condition, results of operations, reputation and competitive advantages. We rely on intellectual property laws and contractual arrangements with our key employees and certain of our customers, collaborators and others to protect our intellectual property rights. The measures we take to protect our intellectual property rights may not be adequate and policing the unauthorized use of our intellectual property is difficult and expensive.

In addition, the validity, enforceability and scope of protection of intellectual property in Internet-related industries in China are uncertain and still evolving, and could involve substantial risks. The laws and enforcement procedures in China are not yet well developed, and do not protect intellectual property rights to the same extent as laws and enforcement procedures in the United States and other jurisdictions. Furthermore, litigation may be necessary in the future to enforce our intellectual property rights, which could result in substantial costs and diversion of our resources and have a material adverse effect on our business, financial condition and results of operations. If we are unable to adequately protect the intellectual property rights that we own or use, we may lose these rights and our business, growth prospects and profitability may suffer.

Table of Contents

***Regulation of the Internet industry in China, including censorship of information distributed over the Internet, may materially and adversely affect our business.***

China has enacted laws, rules and regulations governing Internet access and the distribution of news, information or other content, as well as products and services, through the Internet. In the past, the PRC government has prohibited the distribution of information through the Internet that it deems to be in violation of applicable PRC laws, rules and regulations. In particular, under regulations promulgated by the State Council, the MIIT, the General Administration of Press, Publication , Radio, Film and Television (formerly the State Press and Publications Administration) and the Ministry of Culture, Internet content providers and Internet publishers are prohibited from posting or displaying content over the Internet that, among other things: (1) opposes the fundamental principles of the PRC constitution, (2) compromises state security, divulges state secrets, subverts state power or damages national unity, (3) disseminates rumors, disturbs social order or disrupts social stability, (4) propagates obscenity, pornography, gambling, violence, murder or fear or incites the commission of crimes, or (5) insults or slanders a third party or infringes upon the lawful right of a third party.

If any Internet content we offer through our consolidated controlled entities were deemed by the PRC government to violate any of such content restrictions, we would not be able to continue such offerings and could be subject to penalties, including confiscation of illegal revenues, fines, suspension of business and revocation of required licenses, which could have a material adverse effect on our business, financial condition and results of operations. We may also be subject to potential liability for any unlawful actions of our customers or affiliates or for content we distribute that is deemed inappropriate. It may be difficult to determine the type of content that may result in liability to us, and if we are found to be liable, we may be forced to cease operation of our websites and mobile apps in China.

***If we fail to maintain the applicable licenses and approvals under the complex regulatory environment for Internet-based businesses and online advertising businesses in China, or fail to pass annual government inspection or obtain renewal of the business license, our business, financial condition and results of operations would be materially and adversely affected.***

The Internet and online advertising industries in China are still at a relatively early stage of development and are highly regulated by the PRC government. Various regulatory authorities of the PRC government, such as the State Council, the MIIT, the SAIC, the National Radio and Television Administration (or the NRTA, formerly known as the State Administration of Press, Publication, Radio, Film and Television, or the SARFT), and the Ministry of Public Security, are empowered to issue and implement regulations governing various aspects of the Internet and advertising industries. Moreover, new laws, rules and regulations may be adopted, or new interpretations of existing laws, rules and regulations may be released, to address issues that arise from time to time. As a result, substantial uncertainties exist regarding the interpretation and implementation of any current and future PRC laws, rules and regulations applicable to the Internet and online advertising industries.

We are required to obtain applicable licenses or approvals from various regulatory authorities in order to provide advertising and value-added services and products. These licenses or approvals are essential to the operation of our business and are generally subject to annual review by the relevant PRC governmental authorities. For example, both Beijing SouFun Science and Technology Development Co., Ltd. ("Beijing Technology") and Beijing Century Jia Tian Xia Technology Development Co., Ltd. ("Beijing JTX Technology") hold the ICP license, as required under the applicable PRC laws, rules and regulations; and both Beijing Technology and Beijing JTX Technology hold the approval for operating electronic bulletin board services as required under the applicable PRC laws, rules and regulations. Beijing Advertising, Shanghai Century JTX Network and certain other consolidated controlled entities are allowed to provide marketing services in accordance with the business scope indicated in each of their respective business licenses.

Pursuant to the relevant regulations promulgated by the NRTA, any company engaged in Internet broadcasting activities must obtain an Internet Audio/Video Program Transmission License issued by the NRTA and operate in accordance with the scope as stipulated in such license. Some of our consolidated controlled entities provide certain Internet live-streaming services. We have obtained for such consolidated controlled entities Internet Culture Operation License for exhibitions and competitions of online cultural products, Internet Audio/Video Program Transmission License for professional (real estate information) audio program production (excluding interviews) and broadcasting services, and Operating Permit for producing radio and television program. However, due to the uncertainties of interpretation and implementation of existing and future laws and regulations, the licenses we held may be deemed insufficient by governmental authorities, which may subject us to fines or other regulatory actions by relevant regulators if our practice is deemed as violating relevant laws and regulations.

Some of our consolidated controlled entities, however, may be required to obtain additional licenses. For example, since our websites and mobile apps include online residential communities that allow visitors to post information, including graphics or weblinks to videos, other websites and mobile apps or data in microblogs or online discussion forums, on our websites and mobile apps for discussion with other users, the release of such information on our websites and mobile apps may be deemed as providing Internet publication services and therefore require Internet publication licenses. Similarly, if we or third parties post information that may be viewed as news information, the release of such information on our websites and mobile apps may be deemed as Internet news information services and therefore require Internet news information licenses. We, like many other similarly situated business operators, have been operating our businesses without such licenses. Certain of our relevant consolidated controlled entities have applied to the relevant government authorities for Internet publication licenses again in accordance with applicable PRC laws, rules and regulations, and pursuant to the request by the relevant governmental authorities, we are now preparing the relevant supplementary materials for such application. In addition, we are still in discussions with the relevant government authorities on our application for, and the authorities' issuance of, Internet news information service licenses.

Table of Contents

Moreover, certain services licenses, including, for example, the financing guarantee license, the online video recording and broadcasting license and real estate service licenses, held by certain of our subsidiaries, have expired, and the holders have applied for renewals, which are currently awaiting approval from the relevant regulators.

Under the applicable PRC laws, rules and regulations, the failure to obtain and/or maintain business licenses, an Internet publication licenses and/or Internet news information service licenses may subject the entity to various penalties, including confiscation of revenues, imposition of fines and/or restrictions on the entity conducting such activities' business operations, or the discontinuation of their operations. Although our relevant consolidated controlled entities have not received any revenues directly from Internet publication services or Internet news information services, we cannot assure you that the PRC regulatory authorities will not impose any such penalties. Any such disruption in the business operations of our consolidated controlled entities could materially and adversely affect our business, financial condition and results of operations.

***Unexpected network interruptions or security breaches, including "hacking" or computer virus attacks, may cause delays or interruptions of service, resulting in reduced use and performance of our websites and mobile apps and damage our reputation and brands.***

Our business depends heavily on the performance and reliability of China's Internet infrastructure, the continued accessibility of bandwidth and servers on our service providers' networks and the continuing performance, reliability and availability of our technology platform. Any failure to maintain the satisfactory performance, reliability, security and availability of our computer and hardware systems may cause significant harm to our reputation and our ability to attract and maintain customers and visitor traffic. Major risks related to our network infrastructure include:

- any breakdown or system failure resulting in a sustained shutdown of our servers, including failures which may be attributable to sustained power shutdowns, or efforts to gain unauthorized access to our systems causing loss or corruption of data or malfunctions of software or hardware;

- any disruption or failure in the national backbone network, which would prevent our customers and users from accessing our websites and mobile apps;

- any damage from fire, flood, earthquake and other natural disasters; and

- computer viruses, hackings and similar events.

Computer viruses and hackings may cause delays or other service interruptions and could result in significant damage to our hardware, software systems and databases, disruptions to our business activities, such as to our e-mail and other communication systems, breaches of security and inadvertent disclosure of confidential or sensitive information, inadvertent transmissions of computer viruses and interruptions of access to our websites and mobile apps through the use of denial-of-service or similar attacks. In addition, the inadvertent transmission of computer viruses could expose us to a material risk of loss or litigation and possible liability. All of our servers and routers, including back-up servers, are currently hosted by third-party service providers in Beijing and all information on our websites and mobile apps is backed up periodically. Any hacking, security breach or other system disruption or failure which occurs in between our backups could disrupt our business or cause us to lose, and be unable to recover, data such as real estate listings, contact information and other important customer information.

We also do not maintain insurance policies covering losses relating to our systems and do not have business interruption insurance. Moreover, the low coverage limits of our property insurance policies may not be adequate to compensate us for all losses, particularly with respect to any loss of business and reputation that may occur. To improve our performance and to prevent disruption of our services, we may have to make substantial investments to deploy additional servers or create one or more copies of our websites and mobile apps to mirror our online resources, either of which could increase our expenses and reduce our net income.

***Breaches of security in connection with our websites could expose us to potential liability and harm our reputation.***

Ensuring secured transmission of confidential information through public networks is essential to maintaining the confidence of our customers and users. Our existing security measures may not be adequate to protect such confidential information. In addition, computer and network systems are susceptible to breaches by computer hackers. Security breaches could expose us to litigation and potential liability for failing to secure confidential customer information, and could harm our reputation and reduce our ability to attract customers and users. Any future security breaches, if any, may result in a material adverse effect on our business, financial condition and results of operations.

Table of Contents

***The successful operation of our business depends upon the performance and reliability of the Internet infrastructure and telecommunications networks in China.***

Our business depends on the performance and reliability of the Internet infrastructure in China. Substantially all access to the Internet is maintained through state-controlled telecommunication operators under the administrative control and regulatory supervision of MIIT. In addition, the national networks in China are connected to the Internet through international gateways controlled by the PRC government. These international gateways are generally the only channels through which a domestic user can connect to the Internet. We cannot assure you that more sophisticated Internet infrastructure will be developed in China. We may not have access to alternative networks in the event of disruptions, failures or other problems with China's Internet infrastructure. In addition, the Internet infrastructure in China may not support the demands associated with the continued growth in Internet usage.

We also rely on China Telecommunications Corporation ("China Telecom") and China United Network Communications Group Co., Ltd. ("China Unicom") to provide us with data communications capacity primarily through local telecommunications lines and Internet data centers to host our servers. We do not have access to alternative services in the event of disruptions, failures or other problems with the fixed telecommunications networks of China Telecom and China Unicom, or if China Telecom or China Unicom otherwise fails to provide such services. Any unscheduled service interruption could disrupt our operations, damage our reputation and result in a decrease in our revenues. Furthermore, we have No control over the costs of the services provided by China Telecom and China Unicom. If the prices that we pay for telecommunications and Internet services rise significantly, our gross margins could be significantly reduced. In addition, if Internet access fees or other charges to Internet users increase, our user traffic may decrease, which in turn may cause our revenues to decline.

***You should not rely on our quarterly operating results as an indication of our future performance because our quarterly financial results are subject to fluctuations.***

The real estate sector in China is characterized by seasonal fluctuations, which may cause our revenues to fluctuate significantly from quarter to quarter. The first quarter of each year generally contributes the smallest portion of our annual revenues due to reduced advertising and marketing activity of our customers in the PRC real estate industry during and around the Chinese Lunar New Year holiday, which generally occurs in January or February of each year. Furthermore, as we are substantially dependent on sales of listing and marketing, our quarterly revenues and results of operations are likely to be affected by:

- seasonality of the real estate market and real estate consumers' purchasing patterns;

- our ability to retain existing customers and attract new customers for our listing, marketing and e-commerce services;

- our ability to successfully introduce new service offerings on our platform;

- the amount and timing of our operating expenses and capital expenditures;

- the adoption of new, or changes to existing, governmental regulations;

- a shortfall in our revenues relative to our forecasts and a decline in our operating results; and

- economic conditions in general and specific to the real estate industry and to China.

As a result, you should not rely on our quarter-to-quarter comparisons of our results of operations as indicators of likely future performance.

***Failure to continue to develop and expand our content, service offerings and features, and to develop or incorporate the technologies that support them, could jeopardize our competitive position.***

As an Internet portal company, we participate in an industry characterized by rapidly changing technology and new products and services. To remain competitive, we must continue to develop and expand our content and service offerings. We must also continue to enhance and improve the user interface, functionality and features of our websites and mobile apps. These efforts may require us to develop internally, or to license, increasingly complex technologies. In addition, many of our competitors are continually introducing new Internet-related products, services and technologies, which will require us to update or modify our own technology to keep pace. Developing and integrating new products, services and technologies into our existing businesses could be expensive and time-consuming. Furthermore, such features, functions and services may not achieve market acceptance or serve to enhance our brand loyalty. We may not succeed in incorporating new Internet technologies, or, in order to do so, we may incur substantial expenses. If we fail to develop and introduce or acquire new features, functions, services or technologies effectively and on a timely basis, we may not continue to attract new users and may be unable to retain our existing users, which could affect our marketability as a popular advertising and listing media. If we are not successful in incorporating new Internet technologies, our future profitability and revenue growth could be materially and adversely affected.

Table of Contents

***Our revenues and profitability could suffer if we are unable to successfully implement our growth strategies or manage our growth effectively.***

We intend to grow our business by rolling out our full suite of services to more cities across China. We also plan to expand into new sectors. We intend to improve our open platform business by introducing a number of cloud products empowered by our big data capabilities. However, some of our growth strategies relate to new services and technologies for which there are No established markets in China or relate to services, technologies, new geographic markets or new businesses in which we have limited or No experience. We do not have experience providing these services and may not select the right third parties to partner with or establish or maintain some business relationship with them at commercially reasonable terms. Moreover, due to the breadth and diversity of the PRC real estate market and the PRC microfinance market as well as other industries and sectors we plan to expand into, our business model may not be successful in new and untested markets as demand and preferences may vary significantly by region. As a result, we may not be able to leverage our experience to expand into other parts of China or to enter into businesses with respect to new products or services. We cannot assure you that we will be able to successfully grow our business in our existing cities. There can be No assurance that we will be able to enter new geographic markets or deliver new services and technologies on a commercially viable basis or in a timely manner, or at all. If we are unable to successfully implement our growth strategies, our revenues and profitability may not grow as we expect, and our competitiveness may be materially and adversely affected.

Increases in the volume of our website traffic as a result of our expansion into new geographic regions could also strain the capacity of our existing computer systems, which could lead to slower response times or system failures. This would cause the number of real estate search inquiries, advertising impressions, other revenue producing offerings and our informational offerings to decline, any of which could significantly reduce our revenue growth and our brand loyalty. We may need to incur additional costs to upgrade our computer systems in order to accommodate increased demand if our systems cannot handle current or higher volumes of traffic. Mismanagement of any of our services in new or existing markets or the deterioration of the quality of our services could significantly damage our brand names and reputation and adversely impact our ability to attract and retain customers and visitor traffic.

Our growth plans place a significant demand on our management, systems and other resources. In addition to training and managing a growing workforce, we will need to continue to develop and improve our financial and management controls and our reporting systems and procedures. We cannot assure you that we will be able to efficiently or effectively manage the growth of our operations, and any failure to do so may limit our future growth and have a material adverse effect on our business, financial condition and results of operations.

***We rely on the creditworthiness of our borrowers, which may limit our ability to recover from a defaulting borrower.***

We launched our financial services focusing on the provision of loans to home buyers and other borrowers in 2015. A significant portion of our loan portfolio consists of secured loans. As of December 31, 2019, 7.3% of our outstanding loans receivable were unsecured. We have implemented credit evaluation procedures to enable us to select borrowers based on their creditworthiness. However, we do not have significant experience with assessing creditworthiness and loan underwriting and, as a result, our evaluation may not be reliable. We also do not have experience in collecting loans in default or working with borrowers to resolve payment difficulties with their loans. Our ability to recover payments from defaulting borrowers of unsecured loans may be more limited than those secured by collateral or mortgage. For our secured loans, the value of collateral securing our loans is subject to change, and may fall below the outstanding amount of the loans and thus be insufficient to cover our loss in the event of a customer default.

Our borrowers' ability to repay our loans is affected by a number of factors, including economic development in the regions where these borrowers reside or operate, market conditions in the industries where these borrowers conduct business, development of these borrowers' businesses, borrowers' employment situations and, in particular, as well as the conditions of the real estate market in China. If our borrowers default, we may apply to enforce our claims against the defaulting borrowers and their assets, including the collateral pledged to us, through court proceedings. However, the procedures for enforcing the assets and liquidating or otherwise realizing the value of the assets may be protracted or ultimately unsuccessful, and the enforcement process may be difficult for various reasons. As a result, if our borrowers default for any reason, our business, results of operations and financial condition may be materially and adversely affected.

***Our financial services are subject to various regulatory restrictions.***

We obtained approvals to engage in the microfinancing business from government authorities of four cities, including Beihai, Shanghai, Chongqing and Tianjin. Pursuant to Notice on Regulating the "Cash Loan" Business, issued by Office of the Leading Group for the Special Campaign against Internet Financial Risks and the Office of the Leading Group for the Special Campaign against Peer-to-peer Lending Risks on December 1, 2017, or Notice on Regulating Cash Loan, internet microfinance businesses is strictly regulated. According to the Notice on Regulating Cash Loan, among other requirements, microfinance companies are required to suspend distribution of internet microloans that are not supported by specific scenarios and No specific purpose, gradually reduce the outstanding loan balance within the prescribed time limit and complete rectifications within the prescribed time limit. Our subsidiaries with microfinancing approvals in Shanghai provide a small amount of unsecured loans for our employees, which may be deemed as "cash loans" and be prohibited under the Notice on Regulating Cash Loan.

Table of Contents

According to the Guiding Opinions on the Pilot Operation of Microfinance Companies, or the Guiding Opinions jointly issued by the China Banking Regulatory Commission and the PBOC on May 4, 2008, microfinance companies are limited liability companies or joint stock companies established with the capital contribution from natural persons, legal persons and other organizations, which do not accept public deposits and engage in the microfinance business. To set up a microfinance company, an applicant shall submit a formal application to the competent administrative departments at the provincial level. Upon approval, the applicant shall apply to the local branch of the SAIC to obtain a business license for the microfinance company. In addition, the applicant shall complete certain filings with the local police department, the local office of the China Banking Regulatory Commission and the local branch of the PBOC. According to the Guiding Opinions, a provincial government may launch pilot programs for microfinance companies within prefectural regions of the province only after it designates a department (finance office or other relevant institutions) to be in charge of supervision and administration of microfinance companies and is willing to be responsible for risk management and disposals with respect to microfinance companies. Consequently, microfinance companies are primarily regulated locally by provincial governments under rules and regulations promulgated by the provincial governments.

In November 2009, the provincial government of the Guangxi Zhuang Autonomous Region issued the Management Measures of Microfinance Companies in Guangxi Zhuang Autonomous Region. In 2014, we obtained approvals to engage in the microfinancing business from government authorities of Beihai city, Guangxi Zhuang Autonomous Region. Pursuant to the Management Measures of Microfinance Companies in Guangxi Zhuang Autonomous Region, Beihai Tian Xia Dai Microfinance Co., Ltd. ("Beihai Tian Xia Dai Microfinance") with microfinancing approvals cannot conduct microfinancing business outside Beihai city. However, Beihai Tian Xia Dai Microfinance provided loans outside Beihai city, and as a result, it may face the risk of being rectified by the relevant authorities.

*Changes in the interest rates and spread could negatively affect the revenue generated from our financial services.*

Our financial services generate revenue primarily from interest income. The interest rates we charge the borrowers are linked to the PBOC benchmark rate, which may fluctuate significantly due to changes in the PRC government's monetary policies. If we are required to lower the interest rates we charge our borrowers to reflect the decrease in the PBOC benchmark interest, the interest earned from our loans will decline. Furthermore, we may face fierce price competition, and as a result we may also lower our interest rates. Either case could negatively affect the revenue generated from our financial services.

*The members of our senior management team, in particular, Mr. Vincent Tianquan Mo ("Mr. Mo"), our founding shareholder, director and executive chairman, have played an important role in the growth and development of our business, and if we are unable to continue to retain their services, our business, financial condition and results of operations could be materially and adversely affected.*

Our future success is significantly dependent upon the continued services of our senior management. In particular, Mr. Mo has played an important role in the growth and development of our business. To date, we have relied heavily on the expertise and experience of Mr. Mo and other senior management personnel in our business operations, including their extensive knowledge of the PRC real estate market, their strong reputation in the PRC real estate industry, and their relationships with our employees, relevant regulatory authorities and many of our customers. If Mr. Mo or other senior management personnel are unable or unwilling to continue in their present positions, we may not be able to locate suitable or qualified replacements and may incur additional expenses to identify their successors. In addition, if Mr. Mo or other senior management personnel joins a competitor or forms a competing company, we may lose our customers, and our collaboration arrangements may be disrupted, which would have a material adverse effect on our business, financial condition and results of operations. We do not maintain key-man insurance for Mr. Mo or other senior management personnel.

*Failure to attract and retain qualified personnel could jeopardize our competitive position.*

As our industry is characterized by high demand and intense competition for talent, we may need to offer higher compensation and other benefits in order to attract and retain quality sales, technical and other operational personnel in the future. We have from time to time in the past experienced, and we expect in the future to continue to experience, difficulty in hiring and retaining highly skilled employees with appropriate qualifications. We cannot assure you we will be able to attract or retain the quality personnel that we need to achieve our business objectives. If we fail to successfully attract new personnel or retain and motivate our current personnel, we may lose competitiveness and our business, financial condition and results of operations could be materially and adversely affected.

Table of Contents

***We may be subject to intellectual property infringement or misappropriation claims by third parties, which may force us to incur substantial legal expenses and, if determined adversely against us, could materially disrupt our business.***

We cannot be certain that our services and information provided on our websites and mobile apps do not or will not infringe patents, copyrights or other intellectual property rights held by third parties. From time to time, we may be subject to legal proceedings and claims alleging infringement of patents, trademarks or copyrights, or misappropriation of creative ideas or formats, or other infringement of proprietary intellectual property rights.

We have applied to register in China the Chinese and English dual-language "SouFun" trademark as well as "SouFun" in English and "搜房" ("SouFun" in Chinese) individually, and have successfully registered such trademarks in some industry categories, but our applications for certain other industry categories conflict with existing registrations or applications for similar trademarks by another PRC company in such industry categories, which have resulted in litigations. In April 2014, the Higher People's Court of Beijing Municipality reversed a lower court's judgment in favor of us and ordered the PRC Trademark Review and Adjudication Board of SAIC to reconsider another PRC company's trademark application for "SOFANG" that it had previously rejected. In April 2015, the Supreme People's Court of the PRC accepted our application for retrial over the judgment of the Higher People's Court of Beijing Municipality but ultimately denied our application. Nevertheless, in 2015, we obtained new trademarks "Fang.com" in English and "房天下" ("Fang Tian Xia" in Chinese) and began to market our services under these new brands in connection with the transformation of our business model. We therefore do not currently expect our business would be materially and adversely affected even if we lose the right to use the trademark relating to "SouFun" in certain limited industry categories.

Moreover, we have previously been involved in disputes arising from alleged infringement of third parties' copyrights on our websites and mobile apps, such as the use of photos or articles to which we did not have the rights, which led to judgments against us. We could be subject to similar claims, suits or judgments in the future if we post information to which we do not have the rights. Any such claims, regardless of merits, may involve us in time-consuming and costly litigation or investigation and divert significant management and staff resources. If we are found to have violated the intellectual property rights of others, we may be enjoined from using such intellectual property and may also be ordered to pay fines or monetary damages. As a result, we would be required to enter into expensive royalty or licensing arrangements or to develop alternative technologies, business methods, content or other intellectual property. We expect that the likelihood of such claims may increase as the number of competitors in our markets grows and as related patents and trademarks are registered and copyrights are obtained by such competitors. In addition, as we have expanded, and may continue to expand, our business into new geographical markets, we may be exposed to such claims in jurisdictions other than China and the scope of intellectual property protection in these overseas jurisdictions may be different from or greater than that in China. The intellectual property laws in overseas jurisdictions may also impose more stringent compliance requirements and cause more potential damages or penalties than those in China. Such claims in overseas jurisdictions, if successful, could require us to pay significant compensatory and punitive damage awards as well as expose us to costly and time-consuming litigation or investigations, all of which could materially disrupt our business and have a material adverse effect on our growth and profitability.

***We are exposed to potential liability for information on our websites and mobile apps and for products and services sold through our websites and mobile apps and we may incur significant costs and damage to our reputation as a result of defending against such potential liability.***

We provide third-party content on our websites and mobile apps such as real estate listings, links to third-party websites, advertisements and content provided by customers and users of our community-oriented services. We could be exposed to liability with respect to such third-party information. Among other things, we may face assertion that, by directly or indirectly providing such third-party content or links to other websites, we should be liable for defamation, negligence, copyright or trademark infringement, or other actions by parties providing such content or operating those websites. We may also face assertions that content on our websites, including statistics or other data we compile internally, or information contained in websites linked to our websites and mobile apps contains false information, errors or omissions, and users and our customers could seek damages for losses incurred as a result of their reliance upon or otherwise relating to incorrect information. We may also be subject to fines and other sanctions by the government for such incorrect information, misleading information and other information prohibited by the PRC laws and regulations. Moreover, our relevant consolidated controlled entities, as Internet advertising service providers, are obligated under PRC laws and regulations to monitor the advertising content shown on our websites and mobile apps for compliance with applicable law. Violation of applicable law may result in penalties, including fines, confiscation of advertising fees, orders to cease dissemination of the offending advertisements and orders to publish advertisements correcting the misleading information. In case of serious violations, the PRC authorities may revoke the offending entities' advertising licenses and/or business licenses. In addition, our websites and mobile apps could be used as a platform for fraudulent transactions and third-party products and services sold through our websites and mobile apps may be defective. The measures we take to guard against liability for third-party content, information, products and services may not be adequate to exonerate us from relevant civil and other liabilities.

16

Table of Contents

Any such claims, with or without merit, could be time-consuming to defend and result in litigation and significant diversion of management's attention and resources. Even if these claims do not result in liability to us, we could incur significant costs in investigating and defending against these claims and suffer damage to our reputation.

***Potential acquisitions and office, training facility and land purchases, which form part of our strategy, may disrupt our ability to manage our business effectively, including our ability to successfully integrate acquired businesses into our existing operations.***

Potential acquisitions form part of our strategy to further expand and operate our business. Acquisitions and the subsequent integration of new companies or businesses will require significant attention from our management, in particular to ensure that the acquisition does not disrupt any existing collaborations, or affect our users' opinion and perception of our services and customer support. In addition, our management will need to ensure that the acquired business is effectively integrated into our existing operations.

The diversion of our management's attention and any difficulties encountered in integration could have a material adverse effect on our ability to manage our business. In addition, acquisitions could expose us to potential risks, including:

- risks associated with the assimilation of new operations, services, technologies and personnel;

- unforeseen or hidden liabilities;

- the diversion of resources from our existing businesses and technologies;

- the inability to generate sufficient revenues to offset the costs and expenses of acquisitions; and

- potential loss of, or harm to, relationships with employees, customers and users as a result of the integration of new businesses.

In addition, in connection with our business expansion, we have acquired office space and training facilities as well as commercial land and may continue to do so in the future if suitable opportunities arise. For more details on our recent office, training facility and land acquisitions, see "Item 5.A. Operating and Financial Review and Prospects—Operating Results" and "Item 4.B. Information on the Company—Business Overview—Facilities" in this annual report. Acquisition of property has inherent risks, including the fluctuation of property value, which could potentially lead to potential asset write-off if the value of such properties were to substantially decrease.

***If we fail to achieve and maintain an effective system of internal control over financial reporting, we may be unable to accurately report our financial results or prevent fraud, which could result in harm to our business, loss of investor confidence in our financial reporting and a lower trading price of our ADSs or notes.***

Effective internal controls are necessary for us to provide accurate and timely financial reports and effectively prevent fraud. We discovered in 2019 and in the past, and may in the future discover, areas of our internal controls involving deficiencies, significant deficiencies or material weaknesses that have required or will require improvements in our procedures on the preparation, review, approval and disclosure of financial reports.

In the course of preparing and auditing our consolidated financial statements for the year ended December 31, 2019, we and our independent registered public accounting firm, respectively, identified one material weakness in our internal control over financial reporting as of December 31, 2019. A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis. The material weakness identified is that we did not have sufficient financial reporting and accounting personnel to formalize, design, implement and operate key controls over financial reporting process in order to report financial information in accordance with U.S. GAAP and SEC reporting requirements. To remedy our identified material weakness subsequent to December 31, 2019, we plan to undertake steps to strengthen our internal control over financial reporting, including: (1) hiring more qualified resources including financial director and financial controller, equipped with relevant U.S. GAAP and SEC reporting experience and qualifications to strengthen the financial reporting function and to set up a financial and system control framework, (2) implementing regular and continuous U.S. GAAP accounting and financial reporting training programs for our accounting and financial reporting personnel, (3) establishing effective oversight and clarifying reporting requirements for non-recurring and complex transactions to ensure consolidated financial statements and related disclosures are accurate, complete and in compliance with SEC reporting requirements, and (4) upgrading our operating and accounting systems to prevent systematic errors.

Our internal control over financial reporting will not prevent or detect all errors and all fraud. A control system, No matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Because of the inherent limitations in all control systems, No evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud will be detected.

Table of Contents

A lack of effective internal control over financial reporting could result in the loss of investor confidence in the reliability of our financial statements and negatively impact the trading price of our ADSs. In addition, if we fail to achieve and maintain the adequacy of our internal controls, as such standards are modified, supplemented or amended from time to time or as necessary to correct deficiencies or weaknesses in our controls, we may not be able to provide accurate financial statements, which could cause us to fail to meet our reporting obligations or provide accurate financial statements, and cause investors to lose confidence in our reported financial information and have a negative effect on the trading price of our ADSs.

***Certain of our leased property interests may be defective and we may be forced to relocate operations affected by such defects, which could cause significant disruption to our business.***

As of December 31, 2019, we had leased properties in approximately 60 cities in China in addition to our principal executive offices in Beijing, China. A number of these leased properties, all of which were used as offices, contained defects in the leasehold interests. Such defects included the lack of proper title or right to lease and the landlords' failure to duly register the leases with the relevant PRC government authority. A number of lease agreements were not renewed timely.

In situations where a tenant lacks evidence of the landlord's title or right to lease, the relevant lease agreement may not be valid or enforceable under PRC laws, rules and regulations, and may also be subject to challenge by third parties. In addition, under PRC laws, rules and regulations, the failure to register the lease agreement will not affect its effectiveness between the tenant and the landlord, however, such lease agreement may be subject to challenge by and unenforceable against a third party who leases the same property from the landlord and has duly registered the lease with the competent PRC government authority. Furthermore, the landlord and the tenant may be subject to administrative fines for such failure to register the lease.

We have taken steps to renew lease agreements and cause our landlords to procure valid evidence as to the title or right to lease, as well as to complete the lease registration procedures. However, we cannot assure you that such defects will be cured in a timely manner or at all. Our business may be interrupted and additional relocation costs may be incurred if we are required to relocate operations affected by such defects. Moreover, if our lease agreements are challenged by third parties, it could result in diversion of management attention and cause us to incur costs associated with defending such actions, even if such challenges are ultimately determined in our favor.

***We have limited business insurance coverage in China.***

The insurance industry in China is still at an early stage of development and PRC insurance companies offer only limited business insurance products. As a result, we do not have any business disruption insurance or litigation insurance coverage for our operations in China. Any business disruption, litigation or natural disaster may cause us to incur substantial costs and result in the diversion of our resources, as well as significantly disrupt our operations, and have a material adverse effect on our business, financial position and results of operations.

***Certain of our loans may be declared immediately repayable.***

Certain of our consolidated controlled entities obtained from a PRC commercial bank loans in the aggregated principal amount of approximately RMB422.3 million (US$60.5 million) as of December 31, 2019. According to loan agreement, if the borrowers fail to maintain certain financial indicators, the bank will be entitled to declare the loans immediately repayable. Even though we obtained a waiver from the lender indicating that the lender permanently gave up its right to demand payment as a result of the violation as of December 31, 2019, we would be in default at the December 31, 2019 balance sheet date and it is probable that we will be unable to comply with all provisions of the debt agreement for a period of one year from the balance sheet date. As of the date of this annual report, the bank has not indicated its intention for us to immediately repay such loans; however, we cannot assure you that the bank would not change its position and declare such loans immediately repayable in the future, which may adversely affect our liquidity position.

***We may be subject to liabilities as a result of the separation and distribution.***

We have entered into various business, financing and other contracts in the ordinary course of business. Some of the contracts require us to notify or seek prior consent from the counterparties in connection with material changes to our business operations or corporate structure. We believe that we have carried out our contractual obligations and are not otherwise in material default or violation of those contracts. However, if any contractual counterparties find us in default or violation due to failure to notify them or seek their prior consent in connection with the separation of CIH or otherwise, they may terminate their business relationship with us, declare any repayment obligations immediately due and/or pursue legal actions against us, which may materially and adversely affect our business operations, financial condition and results of operations.

18

Table of Contents

***CIH and we may fail to perform under certain transaction agreements that are executed as part of the separation and distribution, and we may not have necessary systems and services in place when these transaction agreements expire.***

In connection with the separation and distribution, CIH and we have entered into several agreements, including separation and distribution agreement and related ancillary agreements. The separation and distribution agreement and related ancillary agreements determine, among other things, the allocation of business, assets and liabilities between us and CIH following the separation and distribution for those respective areas and include any necessary indemnifications related to liabilities and obligations. CIH and we have also entered into a business cooperation agreement, which establishes a business cooperation between us and CIH in connection with the listing service business for an initial term of ten years commencing from its signing date. See "Item 4.B. Information on the Company—Business Overview—Separation of CIH" and "Item 7.B. Major Shareholders and Related Party Transactions—Related Party Transactions—Separation and Distribution Related Agreements in connection with the Separation of CIH—Separation and Distribution Agreement" for details of the agreements between CIH and us in connection with the separation and distribution. If CIH is unable to satisfy its obligations under these agreements, we could incur operational difficulties or losses that could have a material and adverse effect on our business, financial condition and results of operations.

***Potential indemnification liabilities owing to CIH pursuant to the separation and distribution agreement could materially and adversely affect our business, financial condition and results of operations.***

The separation and distribution agreement provides for, among other things, indemnification obligations generally designed to make us financially responsible for, among others, certain liabilities associated with our business, certain guarantee, indemnification and tax liabilities, as well as any breach by us of the separation and distribution agreement and related ancillary agreements as well as any untrue statement or alleged untrue statement of a material fact or omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, with respect to all information contained in any disclosure document that describes the separation or the distribution or us and our subsidiaries or primarily relates to the transactions contemplated by the separation and distribution agreement, subject to certain exceptions. If we are required to indemnify CIH under the circumstances set forth in the separation and distribution agreement, we may be subject to substantial liabilities. See "Item 7.B. Major Shareholders and Related Party Transactions—Related Party Transactions— Separation and Distribution Related Agreements in connection with the Separation of CIH—Separation and Distribution Agreement."

***Third party claims, litigation or government investigations to which we may be subject or in which we may be involved may significantly increase our expenses and adversely affect our stock price.***

We may be or may be expected to be a party to various third-party claims, lawsuits, or government investigations from time to time. For example, in February 2019, we were served with a subpoena from a court in Beijing, in which a third party claimed that a contract we entered into was invalid. Pursuant to such contract, we received certain assets from a debtor's nominee to discharge its indebtedness. The debtor subsequently alleged that such contract was invalid because the transfer price of such assets was below the fair market value. We vigorously contested the allegation and the received a judgment in our favor. Such third party appealed to a higher court, and the case is still under review as of the date of this annual report. Any lawsuits or government investigations, whether actual or threatened, in which we may be involved, whether as plaintiff or defendant, could cost us a significant amount of time and money, could distract management's attention away from operating our business, could result in negative publicity and could adversely affect our stock price. In addition, if any claims are determined against us or if a settlement requires us to pay a large monetary amount or take other action that materially restricts or impedes our operations, our profitability could be significantly reduced and our financial position could be adversely affected. Our insurance may not be sufficient to cover any losses we incur in connection with litigation claims.

***Our leads generation business has a limited operating history, which makes it difficult to evaluate its value.***

In late 2017, we launched our real estate consumer mining services, or our leads generation services, which, we believe, has enjoyed a rapid growth since its launch. However, the historical growth of our leads generation business may not be indicative of its future performance, and we cannot assure you that any significant growth of the past will be sustainable or achievable at all in the future. The growth prospects of our leads generation business involve risks and uncertainties that fast-growing businesses with a limited operating history in our industry may encounter. We cannot assure you that we will be able to effectively manage the growth of our leads generation. If the market for such services does not develop as we expect or if we fail to address the needs of this dynamic market, the growth prospects of our leads generation business will be materially and adversely affected.

***We may not be able to ensure the conversion rate of the leads we generate from our leads generation services.***

The acceptance and popularity of our leads generation services is premised on the conversion rate of the leads we generate into deal successes. We strive to provide the best content and services to attract potential consumers and secure quality leads for our customers. However, the successful conversion of a business lead into a paying customer also implicates many other factors, such as the sales capacity and product quality of our customers, the macro economy downturn, and a shift in policy affecting the real estate related sectors, most of which are beyond our control. If the conversion rate of the leads we generate is not to the satisfaction of our customers, the need for such services may diminish or vanish, which would harm our business, financial condition and results of operations.

19

Table of Contents

***Any catastrophe, including natural catastrophes and outbreaks of health pandemics, such as the recent outbreak of COVID-19, and other extraordinary events, could disrupt our business operation.***

The occurrence of unforeseen or catastrophic events, including extreme weather events and other natural disasters, man-made disasters, or the emergence of epidemics or pandemics, depending on their scale, may cause different degrees of damage to the national and local economies and could cause a disruption in our operations and have a material adverse effect on our financial condition and results of operations. Natural disaster, health pandemic, or other event beyond our control may give rise to server interruptions, breakdowns, system failures or Internet failures, which could cause the loss or corruption of data or malfunctions of software or hardware as well as adversely affect our ability to provide products or services.

Our business operations could also be disrupted if any of our employees has contracted or is suspected of contracting any contagious disease or condition, such as COVID-19, Ebola virus disease, H1N1 flu, H7N9 flu, avian flu, Severe Acute Respiratory Syndrome, or SARS, or other epidemics, since it could require our employees to be quarantined and/or our offices to be closed down and disinfected. In addition, our business, results of operations and financial condition could be adversely affected to the extent that any of these epidemics harms the Chinese economy, China's real estate industry and business operations of our customers in general.

**Risks related to our corporate structure**

***If the PRC government determines that the structure contracts that establish the structure for our business operations do not comply with applicable PRC laws, rules and regulations, we could be subject to severe penalties or be forced to restructure our ownership structure.***

As we are a Cayman Islands company and our PRC subsidiaries and their branch companies in China are treated as foreign-invested enterprises under applicable PRC laws, we are subject to ownership limitations as well as special approval requirements on foreign investment. We used to operate under a tighter regulatory regime which was restrictive of foreign investment in advertising and Internet content distribution businesses, except for the further lifting up of value-added telecommunication services by foreign enterprises in China (Shanghai) Pilot Free Zone as otherwise provided. Under the current regulatory regime, Internet content distribution is permitted to operators with less than 50.0% foreign investment and advertising is permitted to all qualified operators. We may consider further optimizing our corporate structure in light of the evolving regulatory environment.

To comply with applicable PRC laws, rules and regulations, we conduct our operations in China primarily through our wholly-owned PRC subsidiaries and our consolidated controlled entities. Our wholly-owned PRC subsidiaries, our consolidated controlled entities (excluding their subsidiaries) and their respective shareholders have entered into a series of contractual arrangements, which consist of exclusive technical consultancy and service agreements, equity pledge agreements, operating agreements, shareholders' proxy agreements, loan agreements and exclusive call option agreements (collectively, the "Structure Contracts"). See "Item 7.B. Major Shareholders and Related Party Transactions— Related Party Transactions—Structure Contracts" of this annual report. As a result of these contractual arrangements, we exercise the ability to control the consolidated controlled entities through our power to direct the activities of consolidated controlled entities that most significantly impact their economic performance, and the obligation to absorb losses of or the right to all the residual benefits of the consolidated controlled entities that could potentially be significant to these entities. Accordingly, we consolidate their results in our financial statements. Our consolidated controlled entities hold the licenses and approvals that are essential to the operation of our Internet content distribution business. As certain agreements with our customers for Internet content distribution were entered into directly with our PRC subsidiaries and not our consolidated controlled entities, there can be No assurance that the PRC government will not deem our Internet content distribution to be in violation of applicable PRC laws, rules and regulations.

On July 13, 2006, MIIT publicly released the Notice on Strengthening the Administration of Foreign Investment in Operating Value-Added Telecommunications Business (the "MIIT Notice"), which reiterates certain provisions under China's Administrative Rules on Foreign-Invested Telecommunications Enterprises prohibiting, among others, the renting, transferring or sale of a telecommunications license to foreign investors in any form. Under the MIIT Notice, holders of valued-added telecommunications business operating licenses, or their shareholders, must also directly own the domain names and trademarks used by such license holders in their daily operations. To comply with this requirement under the MIIT Notice, we have assigned all registered trademarks, trademark applications and domain names relating to "SouFun," "Jia Tian Xia," "Fang.com" and "Fang Tian Xia" to the relevant majority-owned subsidiary or consolidated controlled entities in order to maintain their respective ICP licenses to operate as value-added telecommunication service providers. Due to a lack of interpretative materials from the authorities, we cannot assure you that MIIT will not consider our corporate structure and the contractual arrangements as a kind of foreign investment in telecommunication services, in which case we may be found in violation of the MIIT Notice.

In 2011, various media sources reported that the CSRC prepared a report proposing pre-approval by a competent central government authority of offshore listings by China-based companies with variable interest entity structures, such as ours, that operate in industry sectors subject to foreign investment restrictions. However, it is unclear whether the CSRC officially issued or submitted such a report to a higher level government authority or what any such report provides, or whether any new PRC laws or regulations relating to variable interest entity structures will be adopted or what they would provide.

Table of Contents

On March 15, 2019, the Foreign Investment Law was formally passed by the thirteenth National People's Congress and it took effect on January 1, 2020. For further details of the Foreign Investment Law, please see "—Substantial uncertainties exist with respect to the adoption of new or revised PRC laws relating to our corporate structure, corporate governance and business operations."

If the past or current ownership structures, Structure Contracts and businesses of our company, our PRC subsidiaries and our consolidated controlled entities are found to be in violation of any existing or future PRC laws, rules or regulations, MIIT and other relevant PRC regulatory authorities would have broad discretion in dealing with such violations, including:

- revoking the business and operating licenses of our PRC subsidiaries or consolidated controlled entities, whose business and operating licenses are essential to the operation of our business;

- levying fines and/or confiscating our income or the income of our PRC subsidiaries and/or consolidated controlled entities;

- shutting down our servers or blocking our websites;

- discontinuing or restricting our operations or the operations of our PRC subsidiaries and/or consolidated controlled entities;

- imposing conditions or requirements with which we, our PRC subsidiaries and/or consolidated controlled entities may not be able to comply;

- requiring us, our PRC subsidiaries and/or consolidated controlled entities to restructure the relevant ownership structure, operations or contractual arrangements; and

- taking other regulatory or enforcement actions that could be harmful to our business.

We cannot assure you that the relevant PRC regulatory authorities will not require that we amend our Structure Contracts to comply with the MIIT Notice or that we can restructure our ownership structure without material disruption to our business. In addition, new PRC laws, rules and regulations may be introduced to impose additional requirements that may be applicable to our corporate structure and contractual arrangements. The imposition of any of these penalties and the effect of any new PRC laws, rules and regulations applicable to our corporate structure and contractual arrangements could materially disrupt our ability to conduct our business and have a material adverse effect on our financial condition and results of operations.

We cannot assure you that we will be able to enforce the Structure Contracts. Although we believe we are in compliance with current PRC regulations, we cannot assure you that the PRC government would agree that these contractual arrangements comply with PRC licensing, registration or other regulatory requirements, with existing policies or with requirements or policies that may be adopted in the future. PRC laws and regulations governing the validity of these contractual arrangements are open to varying interpretations and the relevant government authorities have broad discretion in interpreting these laws and regulations.

***Substantial uncertainties exist with respect to the adoption of new or revised PRC laws relating to our corporate structure, corporate governance and business operations.***

On March 15, 2019, the National People's Congress promulgated the Foreign Investment Law, which became effective on January 1, 2020 and replaced the trio of existing laws regulating foreign investment in China, namely, the Sino-foreign Equity Joint Venture Law, the Sino-foreign Cooperative Joint Venture Enterprise Law and the Wholly Foreign-invested Enterprise Law. The Foreign Investment Law embodies an expected PRC regulatory trend to rationalize its foreign investment regulatory regime in line with prevailing international practice and the legislative efforts to unify the corporate legal requirements for both foreign and domestic investments. However, since it is relatively new, uncertainties still exist in relation to its interpretation and implementation, and failure to take timely and appropriate measures to cope with the regulatory-compliance challenges could result in material and adverse effect on us. For instance, though the Foreign Investment Law does not explicitly classify contractual arrangements as a form of foreign investment, it contains a catch-all provision under the definition of "foreign investment", which includes investments made by foreign investors in China through means stipulated in laws or administrative regulations or other methods prescribed by the State Council. Therefore, it still leaves leeway for future laws, administrative regulations or provisions promulgated by the State Council to provide for contractual arrangements as a form of foreign investment, at which time it will be uncertain whether our contractual arrangements will be deemed to be in violation of the market access requirements for foreign investment in the PRC and if yes, how our contractual arrangements should be dealt with. In addition, if future laws, administrative regulations or provisions prescribed by the State Council mandate further actions to be taken by companies with respect to existing contractual arrangements, we may face substantial uncertainties as to whether we can complete such actions in a timely manner, or at all. In the worst-case scenario, we may be required to unwind our existing contractual arrangements and/or dispose of the relevant business operations, which could have a material adverse effect on our current corporate structure, our listing service business and results of operations.

Table of Contents

***We may lose the ability to utilize assets held by our consolidated controlled entities that are important to the operation of our business if any of these entities goes bankrupt or becomes subject to a dissolution or liquidation proceeding.***

Our wholly-owned PRC subsidiaries are considered foreign-invested enterprises in China and are, therefore, not permitted under PRC law to hold the ICP licenses and to operate the online advertising businesses that are critical to our operations. As a result, our consolidated controlled entities are the holders of the ICP licenses required for operating our websites and our advertising business in China. We do not have any direct or indirect shareholding interests in these consolidated controlled entities. They are instead held directly or indirectly by Mr. Mo, our founder and executive chairman, together with Mr. Jiangong Dai, our former director and former chief executive officer, or Mr. Jianning Dai, our general manager for asset management. Mr. Jiangong Dai and Mr. Jianning Dai are nephews of Mr. Mo. Each of Mr. Mo, Mr. Jiangong Dai and Mr. Jianning Dai is a PRC citizen. Through the Structure Contracts, we exercise management, financial and voting control over these consolidated controlled entities through our rights to all the residual benefits of the consolidated controlled entities and our obligation to fund losses of the consolidated controlled entities and also have a contractual right, to the extent permitted by PRC laws, rules and regulations, to acquire the equity interests in these entities. Consequently, if any of these consolidated controlled entities goes bankrupt and all or part of its assets become subject to liens or rights of third-party creditors, we may be unable to continue some or all of our business activities, which could materially and adversely affect our business, financial condition and results of operations. If any of our consolidated controlled entities undergoes a voluntary or involuntary liquidation proceeding, the shareholders or unrelated third-party creditors may claim rights to some or all of these assets, thereby hindering our ability to operate our business, which could materially and adversely affect our business, financial condition and results of operations.

***Contractual or other arrangements among our affiliates may be subject to scrutiny by PRC tax authorities, and a finding that we or our affiliates owe additional taxes could substantially reduce our profitability and the value of your investment.***

As a result of the Structure Contracts, we are entitled to substantially all of the economic benefits of ownership of the consolidated controlled entities and also bear substantially all of the economic risks associated with consolidated controlled entities. If the PRC tax authorities determine that the economic terms, including pricing, of our arrangements with our consolidated controlled entities were not determined on an arm's length basis, we could be subject to significant additional tax liabilities. In particular, the PRC tax authorities may perform a transfer pricing adjustment, which could result in a reduction, for PRC tax purposes, of deductions recorded by our consolidated controlled entities. Such a reduction could increase the tax liabilities of our consolidated controlled entities without reducing the tax liabilities of our PRC subsidiaries. This increased tax liability could further result in late payment fees and other penalties to our consolidated controlled entities for underpaid taxes. Any of these events could materially reduce our net income.

***Contractual arrangements, including voting proxies, with our consolidated controlled entities for our Internet content distribution and marketing businesses may not be as effective in providing operational control as direct or indirect ownership.***

Since the applicable PRC laws, rules and regulations restrict foreign ownership in the Internet content distribution and marketing businesses, we conduct our Internet content distribution and advertising businesses and derive related revenues through the Structure Contracts with our consolidated controlled entities. As we have No direct or indirect ownership interest in our consolidated controlled entities, these Structure Contracts, including the voting proxies granted to us, may not be as effective in providing us with control over these companies as direct or indirect ownership. If we were the controlling shareholders of these companies with direct or indirect ownership, we would be able to exercise our rights as shareholders to effect changes in the board of directors, which in turn could effect change, subject to any applicable fiduciary obligations, at the management level. However, if any of our consolidated controlled entities or their shareholders fail to perform their obligations under these contractual arrangements, or if they were otherwise to act in bad faith towards us, we may be forced to (1) incur substantial costs and resources to enforce such arrangements, including the voting proxies, and (2) rely on legal remedies available under PRC law, including exercising our call option right over the equity interests in our consolidated controlled entities, seeking specific performance or injunctive relief, and claiming monetary damages.

Furthermore, pursuant to the equity interest pledge agreements between certain of our PRC subsidiaries and the individual shareholders of our consolidated controlled entities, each individual shareholder of our consolidated controlled entity agrees to pledge his equity interests in the consolidated controlled entities to our subsidiaries to secure the relevant consolidated controlled entities' performance of their obligations under the exclusive technical consultancy and service agreements of the Structure Contracts. The equity interest pledges of shareholders of consolidated controlled entities under these equity pledge agreements have been registered with the relevant local branch of SAIC. The equity interest pledge agreements with the consolidated controlled entities' individual shareholders provide that the pledged equity interest shall constitute security for consulting and service fees under the exclusive technical consultancy and service agreements. The scope of pledge is not limited by the amount of the registered capital of that consolidated controlled entity. However, it is possible that a PRC court may take the position that the amount listed on the equity pledge registration forms represents the full amount of the collateral that has been registered and perfected. If this is the case, the obligations that are supposed to be secured in the equity interest pledge agreements in excess of the amount listed on the equity pledge registration forms could be determined by the PRC court as unsecured debt, which takes last priority among creditors. Such a decision could materially and adversely affect our liquidity and our ability to fund and expand our business.

Table of Contents

In anticipation of our originally proposed acquisition of a controlling stake in Chongqing Wanli New Energy Co., Ltd., a PRC company listed on the Shanghai Stock Exchange (stock code: 600847) ("Wanli") and the sale of a portion of our equity interest in five wholly-owned subsidiaries that operate as our service platforms for online advertising business to Wanli (which was terminated in February 2017), in December 2015, we underwent an internal restructuring, whereby we terminated all of our previous structure contracts and caused Beijing Zhong Zhi Shi Zheng and Jia Tian Xia Network, our wholly-owned PRC subsidiaries, to enter into a series of structure contracts in 2016, or the 2016 Structure Contracts, with our consolidated controlled entities, with terms and conditions substantially similar to those of our previous structure contracts. In February 2017, we terminated the transaction with Wanli in light of substantial regulatory uncertainties in China. Among the 2016 Structure Contracts, Beijing Zhong Zhi Shi Zheng entered into a series of contractual arrangements with certain of our consolidated controlled entities and their nominee shareholders. In anticipation of the separation and distribution in relation to CIH, which is the parent company of Beijing Zhong Zhi Shi Zheng, we terminated the foregoing contractual arrangements between our group and these entities on May 15, 2018, and subsequently caused Beijing Tuo Shi Huan Yu Network Technology Co., Ltd. ("Beijing TuoShi"), our wholly-owned PRC subsidiary, to enter into a new series of contractual arrangements with these consolidated controlled entities in 2018, with terms and conditions substantially similar to the 2016 Structure Contracts. In 2019, we entered into a supplemental agreement with Beijing TuoShi, Beijing Technology, Mr. Mo, Mr. Jiangong Dai and Mr. Jianning Dai to transfer all the rights, obligations and responsibilities of Mr. Jiangong Dai under certain Structure Contracts to Mr. Jianning Dai. See "Item 7.B. Major Shareholders and Related Party Transactions—Related Party Transactions—Structure Contracts" of this annual report. We believe that our contractual arrangements with our consolidated controlled entities for our Internet content distribution and marketing businesses are not materially affected by our internal restructuring. We cannot assure you, however, that our current Structure Contracts are as effective as the previous ones in terms of controlling our Internet content distribution and marketing businesses, nor can we assure you that these contractual arrangements will not be further modified. Any modification could potentially adversely affect our control, or result in our loss of control, over the Internet content distribution and marketing businesses. In the event that we are unable to enforce these contractual arrangements, or if we experience significant delays or other obstacles in the process of enforcing these contractual arrangements, our business, financial condition and results of operations could be materially and adversely affected.

***Our business may suffer if we fail to carry out our business arrangements related to online video broadcasting related business with certain consolidated controlled entities of our company.***

Beijing Technology, which holds licenses of online video recording and broadcasting, entered into a cooperation agreement with certain of our wholly-owned subsidiaries, under which Beijing Technology is responsible for the operation of online video broadcasting, while those subsidiaries are responsible for relevant technical support. During its possession of the domain name "fang.com," Beijing Technology published online videos by embedding videos on webpages or placing video links on "fang.com."

Although such business cooperation agreement does not violate current PRC laws and regulations regarding online broadcasting and recording, we cannot assure you that due to any change of laws and regulatory policies, the abovementioned business cooperation agreement will not be deemed void, revocable or unenforceable under then applicable PRC laws amended from time to time or by regulatory authorities in the future. Should any of the above occur, the relevant business of the relevant subsidiaries will be impaired, which would have a material adverse effect on our business, financial condition and results of operations.

Moreover, under the applicable PRC laws, rules and regulations, the failure to maintain licenses of online video recording and broadcasting may subject the entity to various penalties, including confiscation of revenues, imposition of fines and/or restrictions on the entity conducting such activities' business operations, or the discontinuation of their operations.

***The shareholders of our consolidated controlled entities may have potential conflicts of interest with us, and if any such conflicts of interest are not resolved in our favor, our business may be materially and adversely affected.***

We operate through a number of consolidated controlled entities in China. Mr. Mo, Mr. Jiangong Dai and Mr. Jianning Dai together hold 100.0% of the equity interest in these consolidated controlled entities. The interests of Mr. Mo, Mr. Jiangong Dai and Mr. Jianning Dai as the nominee shareholders of the consolidated controlled entities may differ from the interests of our company as a whole, as what is in the best interests of our consolidated controlled entities may not be in the best interests of us and our other shareholders. We cannot assure you that when conflicts of interest arise, Mr. Mo, Mr. Jiangong Dai or Mr. Jianning Dai will act in the best interests of our company or that conflicts of interest will be resolved in our favor. In addition, Mr. Mo, Mr. Jiangong Dai and Mr. Jianning Dai may breach or cause our consolidated controlled entities and their respective subsidiaries to breach or refuse to renew the existing contractual arrangements with us. We rely on Mr. Mo, Mr. Jiangong Dai and Mr. Jianning Dai to comply with the laws of China, which protect contracts and provide that directors and executive officers owe a duty of loyalty to our company and require them to avoid conflicts of interest and not to take advantage of their positions for personal gains. We also rely on Mr. Mo to abide by the laws of the Cayman Islands, which provide that directors have a duty of care and a duty of loyalty to act honestly in good faith with a view to our best interests. However, the legal frameworks of China and the Cayman Islands do not provide guidance on resolving conflicts in the event of a conflict between the laws of China and the Cayman Islands regarding which corporate governance regime controls. If we cannot resolve any conflicts of interest or disputes between us and Mr. Mo, Mr. Jiangong Dai or Mr. Jianning Dai, we would have to rely on legal proceedings, which could result in disruption of our business and subject us to substantial uncertainty as to the outcome of any such legal proceedings.

Table of Contents

In addition, Mr. Jiangong Dai continued to be a nominee shareholder of our certain consolidated controlled entities following his resignation from our board of directors in February 2016. We did not exercise, nor did we designate any third party to exercise, the call option under the Structure Contracts to acquire from Mr. Jiangong Dai the equity interests he holds in our consolidated controlled entities. Although the relevant Structure Contracts to which Mr. Jiangong Dai is a party remain to be effective and binding, we cannot assure you that we will be able to fully exercise our contractual rights against Mr. Jiangong Dai (e.g., to request him to sell his equity interests in our consolidated controlled entities to us when permitted by applicable PRC laws). Nor can we assure you that Mr. Jiangong Dai will not act against the best interests of us and our other shareholders in the future since he No longer owes any fiduciary duties to our company. Should we encounter any difficulties in exercising our contractual rights under the Structure Contracts against Mr. Jiangong Dai to retain our control over such consolidated controlled entities, our business, financial condition and results of operations will be materially and adversely affected.

***We are controlled by our significant shareholders and their affiliated entities, whose interests may differ from our other shareholders.***

As of April 30, 2020, Mr. Mo may be deemed to have voting and dispositive power with respect to: (1) 510,994 Class A ordinary shares represented by ADSs and 11,355,645 Class B ordinary shares owned by Media Partner Technology Limited ("Media Partner"), with respect to Mr. Mo and his family members, (2) 1,138,132 Class A ordinary shares, including 14,177 Class A ordinary shares represented by ADSs, and 10,230,645 Class B ordinary shares owned by Next Decade Investments Limited ("Next Decade"), with respect to Mr. Mo and his family members, (3) 957,265 Class A ordinary shares owned by Safari Group Holdings Limited ("Safari"), (4) 1,472,298 Class A ordinary shares owned by Deanhale Limited, (5) 926,461 Class A ordinary shares owned by Karistone Limited, and (6) 441,656 Class A ordinary shares represented by ADSs owned by Open Land Holdings Limited, collectively presenting approximately 30.1% of our outstanding share capital and approximately 71.7% of our voting power under our dual-class ordinary share structure. The shares in Media Partner and Next Decade are held in irrevocable discretionary trusts, for which Mr. Mo acts as a protector. Media Partner and Next Decade could exert substantial influence over the outcome of any corporate transaction or other matters submitted to the shareholders for approval, including mergers, consolidations, the sale of all or substantially all of our assets, election of directors and other significant corporate actions. This concentration of ownership may also discourage, delay or prevent a change in control of our company, which could deprive our shareholders of an opportunity to receive a premium for their shares as part of a sale of our company and might reduce the price of our ADSs or notes. These actions may be taken even if they are opposed by our other shareholders, including the investors in the ADSs.

The continuing cooperation of our significant shareholders on an on-going basis, including Media Partner and Next Decade, is important to our businesses. Without their consent or cooperation, we could be prevented from entering into transactions or conducting business that could be beneficial to us. We cannot assure you, however, that the interests of our significant shareholders would not differ from the interests of our other shareholders, including investors in the ADSs.

**Risks related to doing business in China**

***China's economic, political and social conditions, as well as government policies, could have a material adverse effect on our business, financial condition and results of operations.***

Our business and operations are primarily conducted in China. Accordingly, our financial condition and results of operations have been, and are expected to continue to be, affected by the economic, political and social developments in relation to the Internet, online marketing and real estate industries in China. A slowdown of economic growth in China could reduce the sale of real estate and related products and services, which in turn could materially and adversely affect our business, financial condition and results of operations.

The PRC economy differs from the economies of most developed countries in many respects, including: a higher level of government involvement; the on-going development of a market-oriented economy; a rapid growth rate; a higher level of control over foreign exchange; and a less efficient allocation of resources.

While the PRC economy has experienced significant growth since the late 1970s, growth has been uneven, both geographically and among various sectors of the economy. Growth rates in China have lowered in recent years. The PRC government has implemented various measures to encourage economic growth and guide the allocation of resources. These measures are intended to benefit the overall PRC economy, but may also have a negative effect on us. For example, our business, financial condition and results of operations could be adversely affected by PRC government control over capital investments or changes in tax regulations that are applicable to us.

Table of Contents

The PRC economy has been transitioning from a centrally-planned economy to a more market-oriented economy. Although the PRC government has implemented measures since the late 1970s which emphasize the utilization of market forces for economic reform, the PRC government continues to play a significant role in regulating industry development by imposing industrial policies. The PRC government also exercises significant control over China's economic growth through the allocation of resources, controlling payment of foreign currency-denominated obligations, setting monetary policy and providing preferential treatment to particular industries or companies.

According to the Guiding Opinions on the Pilot Operation of Microfinance Companies (the "Guiding Opinions") jointly issued by the China Banking Regulatory Commission and the PBOC on May 4, 2008, microfinance companies are limited liability companies or joint stock companies established with the capital contribution from natural persons, legal persons and other organizations, which do not accept public deposits and engage in the microfinance business. To set up a microfinance company, an applicant shall submit a formal application to the competent administrative departments at the provincial level. Upon approval, the applicant shall apply to the local branch of the SAIC to obtain a business license for the microfinance company. In addition, the applicant shall complete certain filings with the local police department, the local office of the China Banking Regulatory Commission and the local branch of the PBOC.

According to the Guiding Opinions, a provincial government may launch pilot programs for microfinance companies within prefectural regions of the province only after it designates a department (finance office or other relevant institutions) to be in charge of supervision and administration of microfinance companies and is willing to be responsible for risk management and disposals with respect to microfinance companies. Consequently, microfinance companies are primarily regulated by provincial governments under rules and regulations promulgated by the provincial governments.

In November 2009, the provincial government of the Guangxi Zhuang Autonomous Region issued the Management Measures of Microfinance Companies in Guangxi Zhuang Autonomous Region. In 2014, we obtained approvals to engage in the microfinancing business from government authorities of Beihai city, Guangxi Zhuang Autonomous Region. Pursuant to the Management Measures of Microfinance Companies in Guangxi Zhuang Autonomous Region, Beihai Tian Xia Dai Microfinance Co., Ltd. ("Beihai Tian Xia Dai Microfinance") with microfinancing approvals cannot conduct microfinancing business outside Beihai city. However, Beihai Tian Xia Dai Microfinance has provided loans outside Beihai city. Beihai Tian Xia Dai Microfinance may face the risk of being rectified by relevant authorities.

***The discontinuation of any of the preferential tax treatments currently available to us in China could materially and adversely affect our financial condition and results of operations.***

In March 2007, the National People's Congress of China enacted the PRC Enterprise Income Tax Law (the "New EIT Law"), which became effective on January 1, 2008 and was amended in February 2017 and December 2018. In April 2008, the relevant PRC governmental authorities issued the Administrative Measures for Certification of High and New Technology Enterprises which was amended in January 2016. "High and new technology enterprises" would be entitled to a statutory tax rate of 15.0%. Currently, eight of our PRC subsidiaries or consolidated controlled entities are qualified as "high and new technology enterprises." We cannot assure you that our PRC subsidiaries or consolidated controlled entities will continue to be entitled to preferential tax rates as qualified "high and new technology enterprises" under the New EIT Law. We also cannot assure you that the tax authorities will not, in the future, discontinue any of our preferential tax treatments, potentially with retroactive effect. In the event that preferential tax treatment for any of our subsidiaries or consolidated controlled entities is discontinued, the affected entity will become subject to a 25.0% standard enterprise income tax rate, which would increase our income tax expenses and could materially reduce our net income and profitability. See also "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Components of our Results of Operations—Taxation—China" of this annual report.

***We may be treated as a resident enterprise for PRC tax purposes under the New EIT Law and therefore be subject to PRC taxation on our worldwide income.***

We are incorporated under the laws of the Cayman Islands. Under the New EIT Law and its implementation rules, an enterprise incorporated in a foreign country or region may be classified as either a "non-resident enterprise" or a "resident enterprise." If any enterprise incorporated in a foreign country or region has its "de facto management bodies" located within the PRC territory, such enterprise will be considered a PRC tax resident enterprise and thus will normally be subject to enterprise income tax at the rate of 25.0% on its worldwide income. The relevant implementing rules provide that "de facto management bodies" means the bodies which exercise substantial and overall management and control over the manufacturing and business operations, personnel, accounting, properties and other factors of an enterprise. In April 2009, the SAT issued the Notice Regarding the Determination of Chinese-Controlled Offshore-Incorporated Enterprises as PRC Tax Resident Enterprises on the Basis of De Facto Management Bodies ("Circular 82"), which sets forth certain specific criteria for determining whether the "de facto management body" of a Chinese-controlled offshore-incorporated enterprise is located in China. However, Circular 82 only applies to offshore enterprises controlled by PRC enterprises and not those controlled by PRC individuals or foreigners in China, such as our company. See "Item 10.D. Additional Information—Exchange Controls—Regulations relating to Foreign Exchange, Taxation and Dividend Distribution—Taxation and Dividend Distribution" of this annual report. Substantially all of the members of our management are currently located in China and we expect them to continue to be located in China. Due to the lack of clear guidance on the criteria pursuant to which the PRC tax authorities will determine our tax residency under the New EIT Law, it remains unclear whether the PRC tax authorities will treat us as a PRC resident enterprise. As a result, our PRC legal counsel is unable to express an opinion as to the likelihood that we will be subject to the tax applicable to resident enterprises or non-resident enterprises under the New EIT Law. If we are deemed to be a PRC tax resident enterprise, we will be subject to an enterprise income tax rate of 25.0% on our worldwide income, which would have an impact on our effective tax rate and an adverse effect on our net income and results of operations. The New EIT Law provides that dividend income between qualified resident enterprises is exempt income, which the implementing rules have clarified to mean a dividend derived by a resident enterprise on an equity interest it directly owns in another resident enterprise. It is possible, therefore, that dividends we receive through our offshore subsidiaries from our PRC subsidiaries, would be exempt income under the New EIT Law and its implementing rules if our offshore subsidiaries are deemed to be a "resident enterprise." If we are deemed to be a PRC tax resident enterprise, we would then be obliged to withhold PRC withholding income tax on the gross amount of dividends we pay to shareholders who are non-PRC tax residents. The withholding income tax rate is 10.0% for non-resident enterprises and 20.0% for non-resident individuals, unless otherwise provided under the applicable double tax treaties between China and the governments of other jurisdictions.

Table of Contents

***We rely primarily on dividends and other distributions on equity paid by our subsidiaries, and any limitation on the ability of our subsidiaries to make payments to us could have a material adverse effect on our ability to conduct our business as well as our liquidity.***

As a holding company, we rely primarily on dividends and other distributions on equity paid by our subsidiaries for our cash and financing requirements, which include funds necessary to pay dividends and other cash distributions to our shareholders, service any debt we may incur and to pay our operating expenses. If our subsidiaries incur debt in the future, the instruments governing the debt may restrict their ability to pay dividends or make other distributions to us.

Our subsidiaries are primarily entities incorporated and established in China and therefore, are subject to certain limitations with respect to dividend payments. PRC regulations currently allow payment of dividends only out of accumulated profits determined in accordance with accounting standards and regulations in China. Each year, our subsidiaries in China and our consolidated controlled entities are required to allocate a portion of their after-tax profits to their respective reserve funds, until the reserves reach 50.0% of their respective registered capital. Allocations to these reserves and funds can only be used for specific purposes and are not transferable to us in the form of loans, advances or cash dividends. Such restrictions on the ability of our subsidiaries and consolidated controlled entities to transfer funds to us could adversely limit our ability to grow, pay dividends, make investments or acquisitions that could benefit our businesses or otherwise fund and conduct our businesses.

Under the relevant PRC tax law applicable to us prior to January 1, 2008, dividend payments to foreign investors made by foreign-invested enterprises were exempted from PRC withholding tax. However, under the New EIT Law and its implementing rules, non-resident enterprises without an establishment in China, or whose income has No connection with their institutions and establishment inside China, are subject to withholding tax at the rate of 10.0% with respect to their PRC-sourced dividend income, subject to applicable tax agreements or treaties between the PRC and other tax jurisdictions. Similarly, any gains realized on the transfer of shares by such investors are also subject to a 10.0% PRC income tax if such gains are regarded as income from sources within China.

According to the Mainland and Hong Kong Special Administrative Region Arrangement on the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income (the "Avoidance of Double Taxation Arrangement"), dividends derived by a Hong Kong resident enterprise from a PRC resident enterprise are subject to withholding tax at the rate of 5.0%, provided that such Hong Kong resident enterprise directly owns at least 25.0% of the equity interest in the PRC resident enterprise. However, under the New EIT Law and its implementation rules, as well as Circular No. 9 issued by SAT in February 2018 ("Circular 9"), dividends from our PRC subsidiaries paid to us through our Hong Kong subsidiaries may be subject to withholding tax at a rate of 10.0% if our Hong Kong subsidiaries cannot be considered as a "beneficial owner" or the main purpose test clause of Avoidance of Double Taxation Arrangement may apply to us.

We hold equity interests in several of our major PRC subsidiaries indirectly through subsidiaries incorporated in Hong Kong. Neither we nor our PRC legal counsel is certain as to whether it is more likely than not that PRC tax authorities would require or permit our Hong Kong-incorporated subsidiaries to be treated as PRC resident enterprises. To the extent that such Hong Kong-incorporated subsidiaries are each considered a "non-resident enterprise" under the Avoidance of Double Taxation Arrangement, dividends derived by such Hong Kong-incorporated subsidiaries from our PRC subsidiaries may be subject to a maximum withholding tax rate of 10.0%. See "Item 10.D. Additional Information—Exchange Controls—Regulation relating to Foreign Exchange, Taxation and Dividend Distribution—Taxation and Dividend Distribution" of this annual report.

The discontinuation of the previously available exemption from withholding tax as a result of the New EIT Law and its implementing rules have and will increase our income tax expenses and reduce our net income, and may materially reduce our profitability.

26

Table of Contents

***PRC regulations on loans to PRC entities by offshore holding companies may affect our ability to capitalize or otherwise fund our PRC operations.***

On August 29, 2008, SAFE promulgated the Circular on the Relevant Operating Issues Concerning the Improvement of the Administration of the Payment and Settlement of Foreign Currency Capital of Foreign Invested Enterprises ("SAFE Circular 142"), regulating the conversion by a foreign-invested enterprise of foreign currency registered capital into RMB by restricting how the converted RMB may be used. SAFE Circular 142 provides that the RMB capital converted from foreign currency registered capital of a foreign-invested enterprise may only be used for purposes within the business scope approved by the applicable governmental authority and may not be used for equity investments within China. In addition, SAFE strengthened its oversight of the flow and use of the RMB capital converted from foreign currency registered capital of a foreign-invested company. The use of such RMB capital may not be altered without SAFE approval, and such RMB capital may not in any case be used to repay RMB loans if the proceeds of such loans have not been used. Violations of SAFE Circular 142 could result in severe monetary or other penalties.

On March 30, 2015, SAFE promulgated the Circular on the Reform of Administration of the Payment and Settlement of Foreign Currency Capital of Foreign Invested Enterprises ("SAFE Circular 19"), which became effective on June 1, 2015. SAFE Circular 19 abolishes the SAFE Circular 142, providing that the RMB capital converted from foreign currency registered capital of a foreign-invested enterprise shall be used for purposes within its approved business scope, and allows a foreign-invested enterprise to use the RMB capital converted from its foreign currency registered capital for equity investments within China. However, such converted RMB capital still cannot be used to repay RMB loans between enterprises under SAFE Circular 19. However, the Circular of the State Administration of Foreign Exchange on Reforming and Regulating Policies on the Control over Foreign Exchange Settlement of Capital Accounts ("SAFE Circular 16") implemented in June 2016 removes the prohibition of using the RMB capital converted from foreign currency registered capital to repay RMB loans between enterprises.

On October 23, 2019, SAFE promulgated the Circular of the State Administration of Foreign Exchange on Further Promoting Cross-border Trade and Investment Facilitation, regulating the reforming measures on the registration management of corporate foreign loans, including (1) canceling the management requirement for a non-bank debtor to conduct foreign debt deregistration with a local foreign exchange bureau and replacing with a bank within the jurisdiction of the foreign exchange management department, (2) canceling the time limit for a non-bank debtor conducting foreign debt deregistration, and (3) conducting the pilot cancelation of foreign debt registration of non-financial enterprises.

In light of the various requirements imposed by PRC regulations on loans to PRC entities by offshore holding companies, we may not be able to obtain the necessary government approvals with respect to future loans by us to our wholly-owned subsidiaries or consolidated controlled entities or with respect to future capital contributions by us to our PRC subsidiaries. If we fail to complete such registrations or obtain such approvals, our ability to capitalize or otherwise fund our PRC operations may be negatively affected, which could adversely affect our liquidity and our ability to fund and expand our business.

***We may be subject to fines and legal or administrative sanctions in connection with certain historical intra-group funding transactions.***

We have occasionally engaged in intra-group funding transactions, including dividend distributions from our consolidated controlled entities and payment advances made by one subsidiary on behalf of another. These transactions are typically deemed as non-interest-bearing loans and receivables from the relevant "debtors."

Pursuant to the General Lending Code implemented in August 1996 by the PBOC, the central bank of China, commercial lending in China must be made by or through a PRC-qualified financial institution as defined under the General Lending Code. As none of the payors in our intra-group transactions is or was at the relevant time a PRC qualified financial institution as defined under the General Lending Code, the PBOC may impose a fine for non-compliance on each of the payors in an amount equal to one to five times the value of any income received from its non-compliance, and the payors may be required to terminate such loans. On August 6, 2015, the Supreme People's Court issued the Provisions of the Supreme People's Court on Several Issues concerning the Application of Law in the Trial of Private Lending Cases (the "Provisions"), which provide that if the purpose of a lending contract concluded between two enterprises is for their business operation, and the lending contract does not contain the circumstances as stipulated in Article 52 of the PRC Contract Law and Article 14 of the Provisions, i.e., those that will result in contracts being null and void, the people's court shall consider such lending contract to be effective. As the General Lending Code has not been repealed and the Provisions were issued by the Supreme People's Court as guidance for courts' trial in private lending cases, it remains uncertain how the General Lending Code will be interpreted and implemented. If the PBOC and/or other governmental authorities decide to apply the General Lending Code and thereby instruct the payors to terminate such transactions, we have to fully repay the funds advanced in such transactions.

Table of Contents

Moreover, pursuant to the PRC Foreign Currency Administration Regulations promulgated by the State Council in January 1996, and amended in August 2008, a PRC entity is required to apply for SAFE approval prior to extending commercial loans to offshore entities such as our company. As there is No specific definition of "commercial loans" under the Foreign Currency Administration Regulations and PRC governmental authorities have not issued any implementation rules with respect to the provision of commercial loans to offshore entities, it is not clear whether such provision will be applied to the non-interest bearing loans described above. Under the Foreign Currency Administration Regulations, an entity may be required to correct the violation and be subject to a warning and/or a fine for the violation of the foreign registration administrative regulations. If SAFE determines that the PRC Foreign Currency Administration Regulations do apply to us, it may require us to register the deemed overseas loans and rectify any prior non-compliance by properly obtaining SAFE approval. SAFE may also impose a warning and/or fine based on the PRC Foreign Currency Administration Regulations. We cannot assure you that we will be able to complete the necessary registration and filing procedures required by the PRC Foreign Currency Administration Regulations. In addition, it is not clear whether SAFE may consider the making of payments in Renminbi which should have been made in foreign currency to be foreign currency arbitrage, which may be deemed a violation and may subject a violator to warnings, penalties or other sanctions. Due to a general uncertainty over the interpretation and implementation of the PRC Foreign Currency Administration Regulations as well as the broad enforcement discretion granted to SAFE, we cannot assure you that we will not be subject to such warnings, penalties or other administrative penalties resulting from our intra-group transactions that may be deemed as overseas loans.

According to the New EIT Law, loan arrangements between related parties without interest are not considered arms-length transactions. Therefore, the PRC taxation authorities could impose enterprise income and VAT on the payors for the deemed interest income that would have been derived from our intra-group transactions. The deemed interest rate would be determined by reference to the lending rate over the relevant period published by the PBOC. We cannot assure you that we will not be subject to fines, or legal or administrative sanctions as a result of non-compliance with the General Lending Code and the Foreign Currency Administration Regulations. Further, we cannot assure you that the PRC taxation authorities will not impose enterprise income and VAT taxes on the payors for any deemed interest income with respect to our intra-group transactions. Because the applicable PRC laws, rules and regulations do not provide clear definitions for several key terms and because the relevant PRC regulatory authorities have significant discretion on the interpretation of such matters, we cannot predict the likelihood that the risks described here will materialize.

***The PRC legal system embodies uncertainties, which could limit the legal protections available to you and us.***

In 1979, the PRC government began to promulgate a comprehensive system of laws and regulations governing economic matters in general. The overall effect of such legislation has significantly enhanced the protections afforded to various forms of foreign investment in China. Our PRC operating subsidiaries are subject to laws and regulations applicable to foreign-invested enterprises in China. In particular, they are subject to PRC laws, rules and regulations governing foreign companies' ownership and operation of Internet content distribution and advertising businesses as well as of the real estate and microfinancing sectors. Such laws and regulations are subject to change, and their interpretation and enforcement involve uncertainties, which could limit the legal protections available to us and our investors. In addition, we cannot predict the effect of future developments in the PRC legal system, including the promulgation of new laws, changes to existing laws or the interpretation or enforcement of such laws, or the preemption of local regulations by PRC laws, rules and regulations.

Moreover, China has a civil law system based on written statutes, which, unlike common law systems, is a system in which decided judicial cases have little precedential value. Furthermore, interpretation of statutes and regulations may be subject to government policies reflecting domestic political changes. The relative inexperience of China's judiciary in many cases creates additional uncertainty as to the outcome of litigation. In addition, enforcement of existing laws or contracts based on existing laws may be uncertain and sporadic, and it may be difficult to obtain swift and equitable enforcement within China. All such uncertainties could materially and adversely affect our business, financial condition and results of operations.

***Government control of currency conversion may limit our ability to utilize our revenues effectively.***

Substantially all of our revenues and operating expenses are denominated in Renminbi. Under applicable PRC law, the Renminbi is freely convertible into foreign currencies with respect to "current account" transactions, but not with respect to "capital account" transactions. Current account transactions include ordinary course import or export transactions, payments for services rendered and payments of license fees, royalties, interest on loans and dividends. Capital account transactions include cross-border investments and repayments of the principal of loans.

Accordingly, our PRC subsidiaries currently may purchase foreign currencies for settlement of current account transactions, including payment of dividends to us, without prior SAFE approval by complying with certain procedural requirements. However, we cannot assure you that the relevant PRC governmental authorities will not limit or eliminate the ability of our PRC subsidiaries to purchase and retain foreign currencies in the future. Foreign exchange transactions under the capital account are still subject to limitations and require approvals from or registration with relevant government authorities or pilot banks. This could affect our PRC subsidiaries' ability to obtain debt or equity financing from outside China, including by means of loans or capital contributions from us.

Since substantially all of our revenues are denominated in Renminbi, including fees and payments from our PRC consolidated controlled entities pursuant to the Structure Contracts, existing and future restrictions on currency exchange may limit our ability to utilize revenues generated in Renminbi to fund expenditures denominated in foreign currencies, including any dividends that our PRC subsidiaries may pay to us in the future.

Table of Contents

***PRC regulations relating to the establishment of offshore special purpose companies by PRC residents may subject our PRC resident beneficial owners or our PRC subsidiaries to liability or penalties, limit our ability to inject capital into our PRC subsidiaries, limit our PRC subsidiaries' ability to increase their registered capital or distribute profits to us, or may otherwise adversely affect us.***

SAFE promulgated the Circular on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Offshore Investment and Financing and Roundtrip Investment through Special Purpose Vehicles ("SAFE Circular 37") on July 4, 2014, which replaced the former circular commonly known as Circular 75 promulgated by SAFE on October 21, 2005. SAFE Circular 37 requires PRC residents to register with local branches of SAFE in connection with their direct establishment or indirect control of an offshore entity, for the purpose of overseas investment and financing, with such PRC residents' legally owned assets or equity interests in domestic enterprises or offshore assets or interests, referred to in SAFE Circular 37 as a "special purpose vehicle." Pursuant to SAFE Circular 37, "control" refers to the act through which a PRC resident obtains the right to carry out business operation of, to gain proceeds from or to make decisions on a special purpose vehicle by means of, among others, shareholding entrustment arrangement. SAFE Circular 37 further requires amendment to the registration in the event of any significant changes with respect to the special purpose vehicle, such as increase or decrease of capital contributed by PRC individuals, share transfer or exchange, merger, division or other material event. In the event that a PRC shareholder holding interests in a special purpose vehicle fails to fulfill the required SAFE registration, the PRC subsidiaries of that special purpose vehicle may be prohibited from making profit distributions to the offshore parent and from carrying out subsequent cross-border foreign exchange activities, and the special purpose vehicle may be restricted in its ability to contribute additional capital into its PRC subsidiaries. Moreover, failure to comply with the various SAFE registration requirements described above could result in liability under PRC law for evasion of foreign exchange controls. According to the Notice on Further Simplifying and Improving Policies for the Foreign Exchange Administration of Direct Investment released on February 13, 2015 by SAFE, local banks will examine and handle foreign exchange registration for overseas direct investment, including the initial foreign exchange registration and amendment registration, under SAFE Circular 37 from June 1, 2015.

We are aware that Mr. Vincent Tianquan Mo, controlling shareholder of Fang and a PRC resident, has not completed the registration as of the date of this annual report. We have notified all PRC residents or entities who directly or indirectly hold shares in our Cayman Islands holding company and who are known to us as being PRC residents to complete the foreign exchange registrations. However, we may not be informed of the identities of all the PRC residents or entities holding direct or indirect interest in our company, nor can we compel our beneficial owners to comply with SAFE registration requirements. As a result, we cannot assure you that all of our shareholders or beneficial owners who are PRC residents or entities have complied with, and will in the future make, obtain or update any applicable registrations or approvals required by, SAFE regulations. Failure by such shareholders or beneficial owners to comply with SAFE regulations, or failure by us to amend the foreign exchange registrations of our PRC subsidiaries, could subject us to fines or legal sanctions, restrict our overseas or cross-border investment activities, limit our PRC subsidiaries' ability to make distributions or pay dividends to us or affect our ownership structure, which could adversely affect our business and prospects.

***Regulations in China may make it more difficult for us to pursue growth through acquisitions.***

On August 8, 2006, six PRC regulatory agencies jointly promulgated the Regulations on Mergers and Acquisitions of Domestic Companies by Foreign Investors (the "M&A Rules"), which became effective on September 8, 2006 and was amended on June 22, 2009. The M&A Rules and other regulations and rules concerning mergers and acquisitions established additional procedures and requirements that could make merger and acquisition activities by foreign investors more time-consuming and complex. For example, the M&A Rules require that MOFCOM be notified in advance of any change-of-control transaction in which a foreign investor takes control of a PRC domestic enterprise or a foreign company with substantial PRC operations, if certain thresholds under the Provisions on Thresholds for Prior Notification of Concentrations of Undertakings, issued by the State Council on August 3, 2008 and was amended on September 18, 2018, are triggered. According to the Notice regarding the Establishment of the Security Review System for Mergers and Acquisitions of Domestic Enterprises by Foreign Investors issued by the General Office of the State Council in February 2011 and the Implementing Rules Concerning Security Review on the Mergers and Acquisitions by Foreign Investors of Domestic Enterprises issued by MOFCOM in August 2011, mergers and acquisitions by foreign investors involved in an industry related to national security are subject to strict review by MOFCOM. These rules also prohibit any transactions attempting to bypass such security review, including by controlling entities through contractual arrangements. We believe that our business is not in an industry related to national security. However, we cannot preclude the possibility that MOFCOM or other government agencies may publish interpretations contrary to our understanding or broaden the scope of such security review in the future. Although we have No current plans to make any acquisitions, we may elect to grow our business in the future in part by directly acquiring complementary businesses in China. Complying with the requirements of these regulations to complete such transactions could be time-consuming, and any required approval processes, including obtaining any required MOFCOM approvals, may delay or inhibit our ability to complete such transactions.

Table of Contents

***We may be subject to fines and legal or administrative sanctions if we or our PRC citizen employees fail to comply with PRC regulations with respect to the registration of such employees' share options and restricted share units.***

In February 2012, SAFE promulgated the Notices on Issues concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Publicly-Listed Company (the "Stock Option Rule"). Under the Stock Option Rule, a Chinese entity's directors, supervisors, senior management officers, other staff, or individuals who have an employment or labor relationship with such Chinese entity and who are granted stock options by an overseas publicly listed company are required, through a PRC agent or PRC subsidiary of such overseas publicly listed company, to register with SAFE and complete certain other procedures. Our local employees who have been granted stock options are subject to these regulations. We have designated our relevant PRC subsidiaries to handle the registration and other procedures required by the Stock Option Rule. If we or our PRC option holders fail to comply with these rules, we and our PRC option holders may be subject to fines and other legal or administrative sanctions. See "Item 4.B. Information on the Company—Business Overview—Regulation—Regulations relating to Employee Share Options" of this annual report.

***We face uncertainties with respect to indirect transfers of equity interests in PRC resident enterprises by their non-PRC holding companies. Enhanced scrutiny over acquisition transactions by the PRC tax authorities may have a negative impact on potential acquisitions we may pursue in the future.***

On February 3, 2015, the SAT issued the Public Notice Regarding Certain Corporate Income Tax Matters on Indirect Transfer of Properties by Non-Tax Resident Enterprises ("Public Notice 7"). According to Public Notice 7, where a non-resident enterprise investor transfers taxable assets through the offshore transfer of a foreign intermediate holding company, the non-resident enterprise investor, being the transfer, may be subject to PRC enterprise income tax, if the indirect transfer is considered to be an abusive use of company structure without reasonable commercial purposes. As a result, gains derived from such indirect transfer may be subject to PRC withholding tax at the rate of up to 10.0%. In addition, Public Notice 7 provides clearer criteria than Circular 698 on how to assess reasonable commercial purposes and has introduced safe harbors for internal group restructurings and the purchase and sale of equity through a public securities market. Public Notice 7 also brings challenges to both the foreign transferor and transferee (or other person who is obligated to pay for the transfer) of the taxable assets. Where a non-resident enterprise conducts an "indirect transfer" by transferring the taxable assets indirectly by disposing of the equity interests of an overseas holding company, the non-resident enterprise being the transferor, or the transferee, or the PRC entity which directly owned the taxable assets may report to the relevant tax authority such indirect transfer. Using a "substance over form" principle, the PRC tax authority may re-characterize such indirect transfer as a direct transfer of the equity interests in the PRC tax resident enterprise and other properties in China. As a result, gains derived from such indirect transfer may be subject to PRC enterprise income tax, and the transferee or other person who is obligated to pay for the transfer is obligated to withhold the applicable taxes, currently at a rate of up to 10.0% for the transfer of equity interests in a PRC resident enterprise. Both the transferor and the transferee may be subject to penalties under PRC tax laws if the transferee fails to withhold the taxes and the transferor fails to pay the taxes.

Pursuant to the Notice on Issues Relevant to Withholding of Non-PRC Resident Enterprises Income Tax at Source ("SAT Circular 37") issued by the SAT, which became effective as of December 1, 2017, transferees are subject to filing obligations and withholding obligations. Both the transferor and the transferee may be subject to penalties under PRC tax laws if the transferee fails to withhold the taxes and the transferor fails to pay the taxes.

We face uncertainties with respect to the reporting and consequences of private equity financing transactions, share exchange or other transactions involving the transfer of shares in our company by investors that are non-PRC resident enterprises, or sale or purchase of shares in other non-PRC resident companies or other taxable assets by us. Our company and other non-resident enterprises in our group may be subject to filing obligations or being taxed if our company and other non-resident enterprises in our group are transferors in such transactions, and may be subject to filling obligations and withholding obligations if our company and other non-resident enterprises in our group are transferees in such transactions, under SAT Circular 37 and Public Notice 7. For the transfer of shares in our company by investors that are non-PRC resident enterprises, our PRC subsidiaries may be subject to filing obligations and withholding obligations under SAT Circular 37 and Public Notice 7. As a result, we may be required to expend valuable resources to comply with SAT Circular 37 and Public Notice 7 or to request the relevant transferors from whom we purchase taxable assets to comply with these circulars, or to establish that our company and other non-resident enterprises in our group should not be taxed under these circulars. The PRC tax authorities have the discretion under SAT Circular 37 and Public Notice 7 to make adjustments to the taxable capital gains based on the difference between the fair value of the taxable assets transferred and the cost of investment. If the PRC tax authorities make adjustments to the taxable income of the transactions under SAT Circular 37 and Public Notice 7, our income tax costs associated with such transactions will be increased, which may have an adverse effect on our financial condition and results of operations. We have made acquisitions in the past and may conduct additional acquisitions in the future. We cannot assure you that the PRC tax authorities will not, at their discretion, adjust any capital gains and impose tax return filing obligations on us or require us to provide assistance to them for the investigation of any transactions we were involved in. Heightened scrutiny over acquisition transactions by the PRC tax authorities may have a negative impact on potential acquisitions we may pursue in the future.

***Our independent registered public accounting firm is located in China, a jurisdiction where PCAOB is currently unable to conduct inspections without the approval of the PRC authorities, and as such, investors may be deprived of the benefits of such inspection.***

Our independent registered public accounting firm that issues the audit reports included in our annual reports filed with the SEC, as an auditor of companies that are traded publicly in the United States and a firm registered with the Public Company Accounting Oversight Board (United States), or PCAOB, is required by the laws of the United States to undergo regular inspections by PCAOB to assess its compliance with the laws of the United States and professional standards. Our auditor is located in China, a jurisdiction where PCAOB is currently unable to conduct inspections without the approval of the PRC authorities, our auditor is not currently inspected by the PCAOB.

On December 7, 2018, the SEC and the PCAOB issued a joint statement highlighting continued challenges faced by the U.S. regulators in their oversight of financial statement audits of U.S.-listed companies with significant operations in China. On April 21, 2020, the SEC and the PCAOB issued another joint statement highlighting the significant disclosure, financial reporting and other risks associated with emerging market investments, including the PCAOB's continued inability to inspect audit work papers in China. These joint statements reflect a heightened interest in an issue that has vexed U.S. regulators in recent years. However, it remains unclear what further actions the SEC and the PCAOB will take to address the problem and its impact on Chinese companies listed in the United States.

Inspections of other firms that PCAOB has conducted outside of China have identified deficiencies in those firms' audit procedures and quality control procedures, which may be addressed as part of the inspection process to improve future audit quality. This lack of PCAOB inspections in China prevents the PCAOB from regularly evaluating our auditor's audits and its quality control procedures. As a result, investors may be deprived of the benefits of PCAOB inspections. The inability of the PCAOB to conduct inspections of auditors in China makes it more difficult to evaluate the effectiveness of our auditor's audit procedures or quality control procedures as compared to auditors outside of China that are subject to PCAOB inspections. Investors may lose confidence in our reported financial information and procedures and the quality of our financial statements.

In June 2019, a bipartisan group of lawmakers introduced bills in both houses of the U.S. Congress, which if passed, would require the SEC to maintain a list of issuers for which the PCAOB is not able to inspect or investigate an auditor report issued by a foreign public accounting firm. The proposed Ensuring Quality Information and Transparency for Abroad-Based Listings on our Exchanges (EQUITABLE) Act prescribes increased disclosure requirements for these issuers and, beginning in 2025, the delisting from U.S. national securities exchanges of issuers included on the SEC's list for three consecutive years. On May 20, 2020, the U.S. Senate passed the Holding Foreign Companies Accountable Act, which in effect would prohibit securities of any registrant from being listed on any of the U.S. securities exchanges or traded "over-the-counter" if registrant's financial statements have, for a period of three years, been audited by an accounting firm branch or office that is not subject to PCAOB inspection. Enactment of any of such legislations or other efforts to increase U.S. regulatory access to audit information could cause investor uncertainty for affected issuers, including us, and the market price of the ADSs could be adversely affected. There is uncertainty as to whether and when these bills or legislations will be enacted in the proposed form, or at all.

*Proceedings instituted by the SEC against certain China-based accounting firms, including our independent registered public accounting firm, could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act.*

In January 2014, Judge Cameron Elliot, a SEC administrative law judge, issued an initial decision suspending the Chinese member firms of the "Big Four" accounting firms, including our independent registered public accounting firm, from, among other things, practicing before the SEC for six months. In February 2014, the initial decision was appealed. While under appeal and in February 2015, the Chinese member firms of "Big Four" accounting firms reached a settlement with the SEC. As part of the settlement, each of the Chinese member firms of "Big Four" accounting firms agreed to settlement terms that include a censure; undertakings to make a payment to the SEC; procedures and undertakings as to future requests for documents by the SEC; and possible additional proceedings and remedies should those undertakings not be adhered to.

Had the settlement terms not been adhered to, Chinese member firms of "Big Four" accounting firms could have been suspended from practicing before the SEC which could in turn delay the timely filing of our financial statements with the SEC. In addition, it could be difficult for us to timely identify and engage another registered public accounting firm to audit and issue an opinion on our financial statements. A delinquency in our filings with the SEC may result in the delisting of our shares from The New York Stock Exchange or deregistration from the SEC, or both, which would substantially reduce or effectively terminate the trading of our shares in the United States and could adversely harm our reputation and adversely affect our business and prospects.

*Fluctuations in the exchange rates of the Renminbi could materially and adversely affect the value of our shares, ADSs or notes and result in foreign currency exchange losses.*

Substantially all of our revenues, costs and expenses, are denominated in Renminbi, and the functional currency of our principal operating subsidiaries and consolidated controlled entities is the Renminbi. On the other hand, a portion of our expenditures are denominated in foreign currencies, primarily the U.S. dollar, and we use the U.S. dollar as our reporting currency. The ADSs and our convertible senior notes are also denominated in U.S. dollars. As a result, the value of your investment in our ADSs or notes will be affected by fluctuations in exchange rates, particularly appreciation or depreciation in the value of the Renminbi relative to the U.S. dollar and other foreign currencies, without giving effect to any underlying change in our business or results of operations.

Table of Contents

The exchange rates between the Renminbi and the U.S. dollar and other foreign currencies are affected by, among other things, changes in China's political and economic conditions. In July 2005, the PRC government discontinued pegging the Renminbi to the U.S. dollar. However, the PBOC regularly intervenes in the foreign exchange market to prevent significant short-term fluctuations in the exchange rate. Between July 2008 and June 2010, the exchange rate between the Renminbi and the U.S. dollar had been stable and traded within a narrow range. However, the Renminbi fluctuated significantly during that period against other freely traded currencies, in tandem with the U.S. dollar. Since June 2010, the Renminbi had started to slowly appreciate against the U.S. dollar, though there have been periods when the U.S. dollar has appreciated against the Renminbi. On August 11, 2015, the PBOC allowed the Renminbi to depreciate by approximately 2% against the U.S. dollar. Since October 1, 2016, the Renminbi has joined the International Monetary Fund (IMF)'s basket of currencies that make up the Special Drawing Right (SDR), along with the U.S. dollar, the Euro, the Japanese yen and the British pound. In the fourth quarter of 2016, the Renminbi has depreciated significantly in the backdrop of a surging U.S. dollar and persistent capital outflows of China. While appreciating approximately by 7% against the U.S. dollar in 2017, the Renminbi in 2018 depreciated approximately by 5% against the U.S. dollar. With the development of the foreign exchange market and progress towards interest rate liberalization and Renminbi internationalization, the PRC government may in the future announce further changes to the exchange rate system and we cannot assure you that the Renminbi will not appreciate or depreciate significantly in value against the U.S. dollar in the future. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the Renminbi and the U.S. dollar in the future.

There remains significant international pressure on the PRC government to adopt a flexible currency policy. Any significant appreciation or depreciation of the Renminbi may materially and adversely affect our revenues, earnings and financial position, and the value of, and any dividends payable on, our ADSs in U.S. dollars. For example, to the extent that we need to convert U.S. dollars we receive from offshore financing transactions into Renminbi to pay our operating expenses, appreciation of the Renminbi against the U.S. dollar would have an adverse effect on the Renminbi amount we would receive from the conversion. Conversely, a significant depreciation of the Renminbi against the U.S. dollar may significantly reduce the U.S. dollar equivalent of our earnings, which in turn could adversely affect the price of our ADSs. Fluctuations in the exchange rate will also affect the relative value of any dividend we declare and distribute that will be exchanged into U.S. dollars and earnings from and the value of any U.S. dollar-denominated investments we make in the future. To the extent that we need to convert future financing proceeds into Renminbi for our operations, any appreciation of the Renminbi against the relevant foreign currencies would materially reduce the Renminbi amounts we would receive from the conversion. On the other hand, if we decide to convert our Renminbi into U.S. dollars for the purpose of making payments of dividends on our shares or for other business purposes when the U.S. dollar appreciates against the Renminbi, the amounts of U.S. dollars we would receive from such conversion would be reduced. In addition, any depreciation of our U.S. dollar-denominated monetary assets could result in a charge to our income statement and a reduction in the value of our assets.

In addition, very limited hedging transactions are available in China to reduce our exposure to exchange rate fluctuations.To date, we have not entered into any hedging transactions to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedging transactions may be limited and we may not be able to successfully hedge our exposure at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert Renminbi into foreign currency.

***You may experience difficulties in effecting service of legal process, enforcing foreign judgments or bringing original actions in China based on United States or other foreign laws against us or our management.***

We are an exempted company incorporated under the laws of the Cayman Islands. We conduct our operations in China and substantially all of our assets are located in China. In addition, certain of our directors and executive officers reside in China, and most of the assets of these persons are located within China. As a result, it may not be possible to effect service of process within the United States or elsewhere outside China upon these directors and executive officers, including with respect to matters arising under U.S. federal securities laws or applicable state securities laws. Our PRC legal counsel has advised us that the recognition and enforcement of foreign judgments are provided for under the PRC Civil Procedure Law. PRC courts may recognize and enforce foreign judgments in accordance with the requirements of the PRC Civil Procedure Law based either on treaties between China and the country where the judgment is made or on reciprocity between jurisdictions. Currently, there are No treaties between the United States and China for the recognition or enforcement of U.S. court judgments in China. As a result, recognition and enforcement in China of judgments of a court in the United States or any other jurisdiction in relation to any matter not subject to a binding arbitration agreement may be difficult. Pursuant to the PRC Civil Procedure Law, any matter, including matters arising under U.S. federal securities laws, in relation to assets or personal relationships may be brought as an original action in China, only if the institution of such action satisfies the conditions specified in the PRC Civil Procedure Law. As a result of the conditions set forth in the PRC Civil Procedure Law and the discretion of the PRC courts to determine whether the conditions are satisfied and whether to accept the action for adjudication, there remains uncertainty as to whether an investor will be able to bring an original action in a PRC court based on U.S. federal securities laws. In addition, in the event that foreign judgments contravene the basic principles of laws of China, endanger PRC state sovereignty or security, or are in conflict with the public interest of China, PRC courts will not recognize and enforce such foreign judgments.

***You may face difficulties in protecting your interests, and your ability to protect your rights through U.S. courts may be limited, because we are incorporated under Cayman Islands law and conduct our operations primarily in China.***

We are an exempted company with limited liability incorporated under the laws of the Cayman Islands. Our corporate affairs are governed by our memorandum and articles of association, the Companies Law (2020 Revision) of the Cayman Islands and the common law of the Cayman Islands. The rights of shareholders to take action against the directors, actions by minority shareholders and the fiduciary duties of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from the common law of England, the decisions of whose courts are of persuasive authority, but are not binding, on a court in the Cayman Islands. The rights of our shareholders and the fiduciary duties of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands have a less developed body of securities laws than the United States. Some states in the United States, such as Delaware, have more fully developed and judicially interpreted bodies of corporate law than the Cayman Islands. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action in a federal court of the United States.

Table of Contents

Shareholders of Cayman Islands exempted companies like us have No general rights under Cayman Islands law to inspect corporate records (other than our memorandum and articles of association) or to obtain copies of lists of shareholders of these companies. Our directors have discretion to determine whether or not, and under what conditions, our corporate records may be inspected by our shareholders, but are not obliged to make them available to our shareholders. This may make it more difficult for you to obtain the information needed to establish any facts necessary for a shareholder resolution or to solicit proxies from other shareholders in connection with a proxy contest.

Certain corporate governance practices in the Cayman Islands, which is our home country, differ significantly from requirements for companies incorporated in other jurisdictions such as the United States. If we choose to follow home country practice in the future, our shareholders may be afforded less protection than they otherwise would under rules and regulations applicable to U.S. domestic issuers.

In addition, we conduct substantially all of our business operations in China, and substantially all of our directors and senior management are based in China. The SEC, U.S. Department of Justice and other authorities often have substantial difficulties in bringing and enforcing actions against non-U.S. companies and non-U.S. persons, including company directors and officers, in certain emerging markets, including China. Additionally, our public shareholders may have limited rights and few practical remedies in emerging markets where we operate, as shareholder claims that are common in the United States, including class action securities law and fraud claims, generally are difficult or impossible to pursue as a matter of law or practicality in many emerging markets, including China.

As a result of all of the above, our public shareholders may have more difficulty in protecting their interests in the face of actions taken by management, members of the board of directors or controlling shareholders than they would as public shareholders of a company incorporated in the United States.

**Risks related to our ADSs, ordinary shares and notes**

*The market price movement of our ADSs and notes may be volatile.*

The market prices of our ADSs and/or notes may be volatile and subject to wide fluctuations. Among the factors that could affect the prices of our ADSs and/or notes are risk factors described in this section and other factors, including:

- announcements of competitive developments;

- regulatory developments in our target markets in China which affect us, our users, our customers or our competitors;

- actual or anticipated fluctuations in our quarterly results of operations;

- market acceptance of our existing and new services and our expansion from a media platform to media, transaction and financial platforms;

- failure of our quarterly financial and results of operations to meet market expectations or failure to meet our previously announced guidance;

- changes in financial estimates by securities research analysts;

- changes in the economic performance or market valuations of other online or offline real estate and home-related services companies;

- additions or departures of our executive officers and other key personnel;

Table of Contents

- announcements regarding intellectual property litigation (or potential litigation) involving us or any of our directors and officers;

- negative publicity and short seller reports that make allegations against us or our affiliates, even if unfounded;

- fluctuations in the exchange rates between the U.S. dollar and the Renminbi;

- fluctuations in short or long-term interest rates; and

- sales or perceived sales of additional ordinary shares, ADSs or notes, including under the registration statement we have on file with the SEC to enable certain of our affiliates to sell their shares.

In addition, the securities markets have from time to time experienced significant price and volume fluctuations that are not related to the operating performance of particular industries or companies. For example, the capital and credit markets have experienced significant volatility and disruption in recent years. In September 2008, such volatility and disruption reached extreme levels and developed into a global crisis. As a result, stock prices of a broad range of companies worldwide, whether or not they were related to financial services, declined significantly. Future market fluctuations may also have a material adverse effect on the market prices of our ADSs and/or notes.

***We may need additional capital, and the sale of additional ADSs, convertible notes or other equity securities could result in additional dilution to our shareholders, while the incurrence of debt may impose restrictions on our operations.***

We believe that our current cash and cash equivalents and anticipated cash flow from operations will be sufficient to meet our anticipated cash needs for the foreseeable future. We may, however, require additional cash resources due to changed business conditions or other future developments, including any investments or acquisitions we may decide to pursue and the expansion of our financial services. If these resources are insufficient to satisfy our cash requirements, we may seek to sell equity or debt securities or obtain a credit facility. The sale of equity securities would result in dilution to our shareholders. The incurrence of indebtedness would result in increased debt service obligations and could require us to agree to operating and financing covenants that would restrict our operations.

***As a foreign private issuer, we are permitted to, and we rely on exemptions from certain corporate governance standards of The New York Stock Exchange applicable to U.S. issuers, including the requirement that a majority of an issuer's directors consist of independent directors. This may afford less protection to holders of our ordinary shares, ADSs and notes.***

We are a "foreign private issuer" under the securities laws of the United States and the rules of The New York Stock Exchange. Under the securities laws of the United States, "foreign private issuers" are subject to different disclosure requirements than U.S. domiciled registrants, as well as different financial reporting requirements. Under the rules of The New York Stock Exchange, a "foreign private issuer" is subject to less stringent corporate governance requirements. Subject to certain exceptions, the rules of The New York Stock Exchange permit a "foreign private issuer" to follow its home country practice in lieu of the listing requirements of The New York Stock Exchange. The corporate governance practice in our home country, the Cayman Islands, does not require a majority of our board to consist of independent directors or that we have annual meetings to elect directors. We currently rely on the exemptions provided by The New York Stock Exchange to a foreign private issuer and have an audit committee comprised of independent directors, a compensation committee with one non-independent director and a nominating and corporate governance committee with one non-independent director. As a result, you may not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of The New York Stock Exchange.

***As a foreign private issuer, we are exempt from certain disclosure requirements under the Exchange Act, which may afford less protection to our shareholders than they would enjoy if we were a U.S. company.***

As a foreign private issuer, we are exempt from, among other things, the rules prescribing the furnishing and content of proxy statements under the Exchange Act. In addition, our executive officers, directors and principal shareholders are exempt from the reporting and short-swing profit and recovery provisions contained in Section 16 of the Exchange Act. We are also not required under the Exchange Act to file periodic reports and financial statements with the SEC as frequently or as promptly as U.S. companies whose securities are registered under the Exchange Act. As a result, our shareholders may be afforded less protection than they would under the Exchange Act rules applicable to U.S. companies.

***The voting rights of holders of ADSs are limited by the terms of the deposit agreement.***

A holder of our ADSs may only exercise the voting rights with respect to the underlying Class A ordinary shares in accordance with the provisions of the deposit agreement. Upon receipt of voting instructions of a holder of ADSs in the manner set forth in the deposit agreement and the restricted deposit agreement pursuant to which ADSs are issuable upon conversion of the notes, the depositary will endeavor to vote the underlying ordinary shares in accordance with these instructions. Under our amended and restated articles of association and Cayman Islands law, the minimum notice period required for convening a general meeting is 10 clear days. When a general meeting is convened, you may not receive sufficient notice to permit you to withdraw the underlying Class A ordinary shares represented by your ADSs and allow you to cast your vote as a direct shareholder with respect to any specific matter. In addition, the depositary and its agents may not be able to send voting instructions to you or carry out your voting instructions in a timely manner. We will make all reasonable efforts to cause the depositary to extend voting rights to you in a timely manner, but we cannot assure you that you will receive the voting materials in time to ensure that you can instruct the depositary to vote your shares. Furthermore, the depositary and its agents will not be responsible for any failure to carry out any instructions to vote, for the manner in which any vote is cast or for the effect of any such vote. As a result, you may not be able to exercise your right to vote and you may lack recourse if the underlying Class A ordinary shares represented by your ADSs are not voted as you requested.

Table of Contents

***You may not be able to participate in rights offerings and may experience dilution of your holdings.***

We may, from time to time, distribute rights to our shareholders, including rights to acquire securities. We cannot offer or sell securities in the United States unless we register those securities under the Securities Act or unless an exemption from the registration requirements of the Securities Act is available. Under the deposit agreement, the depositary will not distribute rights to holders of ADSs unless the distribution and sale of rights and the securities to which these rights relate are either exempt from registration under the Securities Act with respect to all holders of ADSs, or are registered under the Securities Act. The depositary may, but is not required to, attempt to sell such undistributed rights to third parties in this situation. We can give No assurances that we will be able to establish an exemption from registration under the Securities Act, and we are under No obligation to file a registration statement with respect to these rights or underlying securities or to endeavor to have a registration statement declared effective. Accordingly, holders of ADSs may be unable to participate in any rights offerings and may experience dilution of their holdings as a result.

If the depositary is unable to sell rights that are not exercised or not distributed or if the sale is not lawful or reasonably practicable, it will allow the rights to lapse, in which case you will receive No value for these rights.

***You may not receive distributions on ordinary shares or any value for them if it is illegal or impractical to make them available to you.***

The depositary for our ADSs has agreed to pay to you the cash dividends or other distributions it or its custodian receives on ordinary shares or other deposited securities after deducting its fees and expenses. You will receive these distributions in proportion to the number of ordinary shares your ADSs represent. For example, as of the date of this annual report, each ADS represents one Class A ordinary share. However, the depositary is not required to make such distributions if it decides that it is unlawful or impractical to make a distribution available to any holder of ADSs. For example, it would be unlawful to make a distribution to holders of ADSs if it consisted of securities that required registration under the Securities Act, but were not properly registered or distributed pursuant to an applicable exemption from registration. It could also be impracticable to make a distribution if doing so would entail fees and expenses that would exceed the value of the distribution or the distribution consisted of property that could not be transported or transferred. We have not undertaken any obligation to register under U.S. securities laws any ADSs, ordinary shares, rights or other securities that may be distributed to our shareholders. We also have not undertaken any obligation to take any other action to permit the distribution of ADSs, ordinary shares, rights or anything else to holders of ADSs. This means that you may not receive any distribution we make on our ordinary shares or any value for it if it is illegal or impractical for us to make such distribution available to you, such as if an exemption from registration under the U.S. securities laws is not available. These restrictions may decrease the value of your ADSs.

***We may be required to withhold PRC income tax on any dividend we pay you, and any gain you realize on the transfer of our ordinary shares and/or ADSs may also be subject to PRC withholding tax.***

Pursuant to the New EIT Law, we and our offshore subsidiaries may be treated as a PRC resident enterprise for PRC tax purposes. See "—Risks related to doing business in China—We may be treated as a resident enterprise for PRC tax purposes under the New EIT Law and therefore be subject to PRC taxation on our worldwide income." If we and our offshore subsidiaries are so treated by the PRC tax authorities, we would be obligated to withhold a 10.0% PRC withholding tax for non-resident enterprises or a 20.0% PRC withholding tax for non-resident individuals, or a withholding tax at a reduced rate as provided under the applicable double tax treaty between China and the governments of other jurisdictions on any dividend we pay to you, subject to completion of the record-filing procedures and approval from the relevant tax authorities, pursuant to a Circular No. 124 issued by SAT in August 2009 ("Circular 124").

On November 1, 2015, Circular 124 was repealed by the Administrative Measures for Tax Convention Treatment for Non-resident Taxpayers issued by SAT ("Circular 60"). Circular 60 provides that non-resident taxpayers are not required to obtain pre-approval from the relevant tax authority in order to enjoy the reduced withholding tax rate. Instead, they may, upon self-assessment that the prescribed criteria are met, submit the relevant statements and materials directly to the competent tax authorities for the tax return filing, which will be subject to post-filing examinations by the relevant tax authorities.

Table of Contents

In addition, any gain realized by any investors who are non-resident enterprises or non-resident individuals of China from the transfer of our ordinary shares, ADSs and/or notes could be regarded as being derived from sources within China and be subject to a 10.0% or 20.0% PRC withholding tax, respectively. Such PRC withholding tax would reduce your investment return on our ordinary shares, ADSs and/or notes and may also materially and adversely affect the prices of our ADSs and/or notes.

***Our dual-class ordinary share structure with different voting rights could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial.***

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to 10 votes per share. Each ADS represents one Class A ordinary share and the number of votes to which each ADS would be entitled to is the number of Class A ordinary shares it represents. A number of our shareholders, including primarily Media Partner and Next Decade, whose shares are held in irrevocable discretionary trusts established by Mr. Mo, hold Class B ordinary shares. We intend to maintain the dual-class ordinary share structure. Each Class B ordinary share is convertible into one Class A ordinary share at any time by its holder and Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any sale, transfer or disposition of Class B ordinary shares by a Class B ordinary shareholder to any person or entity which is not a majority-owned and majority-controlled subsidiary of certain of our shareholders as set forth in our amended and restated articles of association, such Class B ordinary shares will be automatically and immediately converted into the equal number of Class A ordinary shares.

Due to the disparate voting powers attached to these classes of shares, our shareholders holding Class B ordinary shares have significant voting power over matters requiring shareholder approval, including election of directors and significant corporate transactions, such as a merger or sale of our company or our assets. This concentrated control could discourage others from pursuing any potential merger, takeover or other change-of-control transactions that holders of Class A ordinary shares and ADSs may view as beneficial.

***Our articles of association contain anti-takeover provisions that could adversely affect the rights of holders of our ordinary shares and ADSs***

We have included certain provisions in our current articles of association that would limit the ability of others to acquire control of our company. These provisions could deprive our shareholders of the opportunity to sell their ordinary shares at a premium over the prevailing market price by discouraging third parties from seeking to obtain control of our company in a tender offer or similar transactions. These provisions include the following:

- A dual-class ordinary share structure; and

- Our board of directors, without further action by our shareholders, may issue preferred shares with special voting rights compared to our ordinary shares.

***Servicing our debt requires a significant amount of cash, and we may not have sufficient cash flow from our business to pay our substantial debt.***

Our ability to make scheduled payments of the principal of, to pay interest on or to refinance our indebtedness, including the notes, depends on our future performance, which is subject to economic, financial, competitive and other factors beyond our control. Our business may not continue to generate cash flow from operations in the future sufficient to service our debt and make necessary capital expenditures. If we are unable to generate such cash flow, we may be required to adopt one or more alternatives, such as selling assets, restructuring debt or obtaining additional equity capital on terms that may be onerous or highly dilutive. Our ability to refinance our indebtedness will depend on the capital markets and our financial condition at such time. We may not be able to engage in any of these activities or engage in these activities on desirable terms, which could result in a default on our debt obligations.

***We may incur more debt or take other actions which would intensify the risks discussed above.***

We and our subsidiaries and consolidated controlled entities may incur substantial additional debt in the future, some of which may be secured debt. We will not be restricted under the terms of the indenture governing the notes from incurring additional debt, securing existing or future debt, recapitalizing our debt or taking a number of other actions that are not limited by the terms of the indenture governing the notes that could have the effect of diminishing our ability to make payments on the notes when due.

Table of Contents

***We may not have the ability to raise the funds necessary to repurchase the 2022 Notes upon a fundamental change (as defined in the relevant note documents), and our future debt may contain limitations on our ability to repurchase the notes.***

Holders of certain of our outstanding notes will have the right to require us to repurchase their notes upon the occurrence of a fundamental change (as defined in the relevant note documents) at a repurchase price equal to 100.0% of the principal amount of the notes to be repurchased, plus accrued and unpaid interest under certain circumstances. However, we may not have enough available cash or be able to obtain financing at the time we are required to make repurchases of notes surrendered therefor. In addition, our ability to repurchase the notes may be limited by law, by regulatory authority or by agreements governing our future indebtedness. Our failure to repurchase notes at a time when the repurchase is required by the relevant note documents would constitute a default under such documents. A default under the relevant note documents or the fundamental change itself could also lead to a default under agreements governing any future indebtedness. If the repayment of any future indebtedness were to be accelerated after any applicable notice or grace periods, we may not have sufficient funds to repay the indebtedness and repurchase the notes.

***The future sale of substantial amounts of ADSs and/or convertible notes could lower the market price for the ADSs and/or our outstanding notes, as the case may be.***

Sales of substantial amounts of ADSs and/or notes that may be converted or exchanged into ADSs or ordinary shares in the public market, or the perception that these sales could occur, could adversely affect the market price of our ADSs, could materially impair our ability to raise capital through equity offerings in the future and could adversely impact the trading price of the ADSs and/or the notes. The ADSs outstanding not held by our affiliates are freely tradable without restriction or further registration under the Securities Act, and shares held by our affiliates may also be sold in the public market in the future subject to the restrictions in Rule 144 under the Securities Act. We may also issue additional options in the future which may be exercised for additional ordinary shares and additional restricted shares and restricted share units. We cannot predict what effect, if any, market sales of securities held by our significant shareholders or any other shareholder or the availability of these securities for future sale will have on the market price of the ADSs or the trading price of the notes.

***We may be or become a passive foreign investment company ("PFIC"), which could result in adverse U.S. tax consequences to U.S. investors.***

A non-U.S. corporation is deemed a PFIC for any taxable year if either (1) at least 75% of its gross income for such year is passive income, or (2) at least 50% of the value of its assets (based on an average of the quarterly values of the assets) during such year is attributable to assets that produce passive income or are held for the production of passive income. We operate an active real estate Internet portal in China. Based on the market price of our ADSs, the value of our assets, and the composition of our income and assets, we may have been a PFIC for the taxable year ended December 31, 2019. The determination of whether a non-U.S. corporation is a PFIC is made on an annual basis after the close of each tax year. There can be No assurance that we will not be a PFIC for our current taxable year or any future tax year. One consequential factor affecting the outcome of annual PFIC determination in current and future tax years will be our market capitalization. Because items of working capital are generally treated as passive assets for PFIC purposes, accumulating cash, cash equivalents and other assets such as short-term and long-term investments that are readily convertible into cash increases the risk that we will be classified as a PFIC for U.S. federal income tax purposes. A determination that we are a PFIC could result in adverse U.S. tax consequences to you if you are a U.S. taxpayer and own our ADSs or ordinary shares, in the form of increased tax liabilities and burdensome reporting requirements. For example, if we were a PFIC, you would generally be taxed at the higher ordinary income rates, rather than the lower capital gain rates, if you dispose of ADSs or ordinary shares at a gain in a later year, even if we are not a PFIC in that year. In addition, a portion of the tax imposed on your gain would be increased by an interest charge. Certain elections may be available to certain of our holders, however, that would mitigate these adverse tax consequences to varying degrees. Also, if we were classified as a PFIC in any taxable year, you would not be able to benefit from any preferential tax rate (if any) with respect to any dividend distribution that you may receive from us in that year or in the following year. Since our business and assets may evolve over time in ways that are different from what we currently anticipate, we cannot assure you that we will not be a PFIC for our current taxable year or any future taxable year. For more information on the tax consequences to you if we were treated as a PFIC, see "Item 10.E. Additional Information—Taxation—U.S. Federal Income Taxation" of this annual report.

## ITEM 4.  INFORMATION ON THE COMPANY

### A. History and Development of the Company

We were incorporated on June 18, 1999 as Fly High Holdings Limited, under the laws of the British Virgin Islands, and on July 14, 1999, we changed our name to SouFun.com Limited. On June 17, 2004, we changed our corporate domicile to the Cayman Islands, becoming a Cayman Islands exempted company with limited liability. On June 22, 2004, we changed our name to SouFun Holdings Limited. On September 23, 2016, we changed our name to Fang Holdings Limited. Since our inception, we have conducted our operations in China primarily through our PRC subsidiaries and consolidated controlled entities.

On September 17, 2010, we completed our initial public offering and listing of 2,933,238 ADSs, each representing four Class A ordinary shares, on the New York Stock Exchange, which are traded under the symbol of "SFUN." Concurrently with our initial public offering, our majority shareholder, Telstra International Holdings Ltd. ("Telstra International"), an indirect, wholly owned subsidiary of Telstra Corporation Limited, a Fortune Global 500 company, sold to General Atlantic Mauritius Limited ("General Atlantic"), Hunt 7-A Guernsey L.P. Inc. ("Hunt 7-A"), Hunt 7-B Guernsey L.P. Inc. ("Hunt 7-B"), Hunt 6-A Guernsey L.P. Inc. ("Hunt 6-A," together with Hunt 7-A and Hunt 7-B, "Apax"), Next Decade and Digital Link Investments Limited ("Digital Link"), all of its remaining shares in our company in a private sale at the initial public offering price.

Table of Contents

On February 18, 2011, we changed our ADS share ratio from one ADS representing four Class A ordinary shares to one ADS representing one Class A ordinary share.

On April 7, 2014, we changed our ADS share ratio from one ADS representing one Class A ordinary share to five ADSs representing one Class A ordinary share.

On July 19, 2018, we entered into definitive agreements to acquire a 10% equity interest in Wanli from a shareholder of Wanli for a cash consideration of RMB500 million, of which RMB200 million will compensate the seller in connection with the Business Disposal (defined below). In connection with the acquisition, the seller agrees agreed (1) to enter into an irrevocable voting proxy agreement with a term of three years to adhere to our action in Wanli's future meetings of shareholders and board of directors and (2) to purchase from Wanli its battery business for a price of No less than RMB680 million within three years after the consummation of the acquisition (the "Business Disposal"). Following the completion of the acquisition on August 10, 2018, we have become the largest shareholder of Wanli.

On June 11, 2019, we completed the separation of CIH from us into an independent publicly traded company via a dividend distribution of all the CIH's ordinary shares owned by us to our equity holders. The business of CIH comprises (1) certain information and analytics services, initially operated as part of our value-added services, and (2) certain marketplace services, initially operated as part of our listing services. Following the spin-off of CIH, we have retained our business operating a real estate Internet portal focusing primarily on serving the residential property sector, while CIH strategically focuses on serving the commercial property sector in China, allowing each company to more effectively pursue its own distinct operating priorities and strategies.

On July 8, 2019, we changed our ADS share ratio from five ADSs representing one Class A ordinary share to one ADS representing one Class A ordinary share.

Our principal executive offices are located Tower A, No. 20 Guogongzhuang Middle Street, Fengtai District, Beijing 100070, the People's Republic of China. Our telephone number at this address is +8610 5631 8000. Our website address is www.fang.com. We do not incorporate the information on our website into this annual report.

***B. Business Overview***

**Overview**

We believe we operate a leading real estate Internet portal in China in terms of the number of page views and visitors to our websites in 2019. Our user-friendly websites and mobile apps support active online communities and networks of users seeking information on, and services for, the real estate and home-related sectors in China. Our service offerings include:

- *Marketing services*: We offer advertisement services via our online platform to real estate developers in the marketing phase of new property developments as well as real estate brokers and suppliers of home furnishing and improvement-related products and services. Marketing services were our largest source of revenues in 2019.

- *Listing services*: We offer listing services via our online platform to real estate developers, real estate agents and brokers, property managers, property owners, and suppliers of home furnishing and improvement-related products and services to allow them to post information related to properties and home furnishing and improvement-related products and services on our online platform. Listing services were our second largest source of revenues in 2019.

- *Leads generation services:* Our leads generation services connect our customers with scattered demand for real estate and home furnishing and improvement-related services by extending their reach and visibility from a limited number of local consumers to a large number of users and user communities on our online platform to generate sales leads for our customers. Leads generation services were our third largest source of revenues in 2019.

- *Financial services*: We provide financial services primarily though our offline micro loan subsidiaries. We provide primarily secured consumer loans to individuals that meet our credit assessment requirements. We launched financial services in August 2014.

- *E-commerce services*: Our e-commerce services primarily include Fang membership services and direct sales services for new homes. We provide both free and paid Fang membership services to our registered members. Our free services include primarily regular updates regarding local property developments, tours to visit property developments and other services relating to property purchases. Our paid services primarily include offers to purchase properties at a discount from our partner developers and dedicated information and related services to facilitate property purchases. We ceased entering into new contracts for our direct sales services for new homes, online home-decorating services and online real estate brokerage services in 2018 due to the change in our business development strategies.

- *Value-added services:* We provide value-added services primarily including portal collaboration.

Table of Contents

We have built a large and active community of users, who are attracted by the comprehensive real estate and home related content available on our portal that forms the foundation of our service offerings. We currently maintain approximately 74 offices across China to focus on local market needs. Our user base has also attracted numerous customers, which include real estate developers, real estate agents and brokers, property owners, property managers, mortgage brokers, lenders and suppliers of home furnishing and improvement and other home-related products and services. Our diverse offerings and broad geographic coverage have resulted in an active and dynamic online community that provides an effective and targeted channel for advertisers to market their products and services, and serves as a centralized source of information, products and services for consumers in the real estate and home furnishing and improvement and other home-related markets. With our leading Internet portal, we believe that we are well positioned to develop integrated media and financing platforms, increase synergy and capture additional growth opportunities in the real estate market in China.

On June 11, 2019, we completed the separation of CIH from us to form two independent, publicly traded companies with differing business objectives and opportunities, via a dividend distribution of all the CIH's ordinary shares owned by us to our equity holders. Following the completion of the separation of CIH from us, CIH has the exclusive right to operate the spun-off business comprising certain portions of our listing and value-added services, and we have the exclusive right to operate the retained business. In particular, the spun-off business comprises (1) certain information and analytics services, initially operated as part of our value-added services, and (2) certain marketplace services, initially operated as part of our listing services. Following the separation and distribution, CIH strategically focuses on serving the commercial property sector in China to capture the enormous market opportunity from its rapid development, while we retain our business operating a real estate Internet portal focusing primarily on serving the residential property sector.

## Our Services

We provide (1) marketing services, (2) listing services, (3) leads generation services, (4) financial services, (5) e-commerce services and (6) value-added services to participants in the PRC real estate and home-related sectors primarily through our websites and our mobile apps.

### *Marketing Services*

We target our marketing services toward participants in China's real estate and home-related sectors. Marketing is one of our most important businesses. Our revenues generated from marketing services were US$149.3 million, US$98.4 million and US$94.6 million in 2017, 2018 and 2019, respectively, representing 37.8%, 41.0% and 43.1% of our revenues, respectively. Our marketing services are delivered through our website www.fang.com and our mobile apps, which can be downloaded for both iOS- and Android-based operating systems, and include traditional Internet advertisements such as banners, links, logos and floating signs, as well as featured promotions, which are specially-tailored packages of traditional online advertising tools. Customers of our marketing services include a broad range of participants in the PRC real estate and home-related sectors, such as:

- real estate developers;

- real estate professionals, such as agents and brokers;

- retailers and other suppliers of home furnishing and improvement products and services; and

- home design, decoration and re-modeling companies.

We also combine traditional online advertising tools with new marketing strategies to create featured promotion packages for our customers. Using the inherent flexibility of website advertising, we create customized marketing and promotional packages with additional features at the request of our customers to meet the different needs of various customers operating in diverse geographic markets in China. We believe that we have the opportunity to provide additional features to generate additional revenues without incurring significant additional costs. Marketing services have been and will continue to be a growth area for us, as we believe that participants in China's real estate and home-related sectors are increasingly looking to the Internet and mobile apps as an additional vehicle through which to attract customers.

We generally enter into two main types of marketing contracts with our customers. The first type is a framework contract prescribing the total payment amount and price of products. The second type is an order contract with payment due within 90 days of the execution of the contract. Our marketing framework contracts generally have a one-year term.

39

Table of Contents

### Listing Services

Prior to the separation of CIH, our listing services included basic listing services and special listing services on our websites and mobile apps. Following the spin-off of CIH, we retained our basic listing services, while the special listing services, namely the specialized marketing campaigns provided primarily to developers through online channels and offline themed events, are operated by CIH. Revenue from special listing services have been classified and reported under discontinued operations for all the periods presented. Our revenues generated from listing services were US$141.5 million, US$81.7 million and US$63.5 million in 2017, 2018 and 2019, respectively, representing 35.8%, 34.1% and 28.9% of our revenues, respectively.

Real estate agents, brokers, managers, developers, owners and suppliers of home furnishing and improvement products and services subscribe to our basic listing services for a fee, which allow them to post listings for properties or home furnishing and improvement products and services over the subscription periods. All visitors to our websites and mobile apps have access to listing information free of charge.

Most of our basic listing subscription contracts are one to three months in duration. We typically collect payments for such subscriptions for our basic listing services before the signing of a subscription contract. We also offer longer arrangements, such as to certain large real estate agencies. For subscription contracts with longer terms, the contract prices are generally payable in installments every one to three months until the end of the contract term.

We offer free trials of our basic listing services. These free trials allow users to experience our basic listing services and high user traffic. While there is No time restriction on our free trials, there are incentives for free trial users to upgrade their free trial accounts to paid subscriptions for our basic listing services because listings posted through free trial accounts are featured in less prominent positions and rankings than those of subscribers. The average number of paying subscribers to our basic listing services was approximately 265,650, 206,250 and 160,050 in 2017, 2018 and 2019, respectively.

In addition, we allow individual property owners to list their own properties for sale or rent on our property listing sections without charge. Such free listings do not enjoy prime positioning and are strictly limited to individual, non-real estate professional home owners. To help prevent real estate professionals from abusing the individual property owner basic listing service, we have created a customer hotline for our users to report any abuse.

Our basic listing services help us build our comprehensive database of information regarding new, secondary and rental properties as well as home furnishing and improvement products and services in major urban centers across China. The large amount of our basic listings attracts significant user traffic on our websites and mobile apps, which we believe can be leveraged to yield more marketing customers and higher marketing fees from our institutional customers.

We update the listing data on our websites and mobile apps on a daily basis through our proprietary content management process and software. This proprietary content management process is monitored by our listing monitoring team and allows our customers to submit listing information in a specific format. Our listing monitoring team periodically checks all listing information uploaded to our websites and mobile apps to identify common anomalies in posted information in order to limit unreliable data. Once we discover false information in a listing, we liaise with the real estate agent or broker to rectify the listing immediately. If such listing information is not revised on a timely basis, we will move it into a database that cannot be accessed by our users.

### Leads Generation Services

We launched our leads generation services in late 2017 and began to recognize revenue in 2018. Our revenues generated from leads generation services were US$21.3 million and US$43.3 million in 2018 and 2019, respectively, representing 8.9% and 19.7% of our revenues, respectively. We provide leads generation services to real estate developers, real estate brokers and, to a lesser extent, suppliers of home furnishing and improvement-related products and services by connecting our customers with scattered demand for real estate and home furnishing and improvement-related services. We charge the service fee based on the number of sales leads we delivered during a certain period of time. We recognize revenues upon our delivery of the sales leads to our customers.

### Financial Services

Our revenues generated from financial services were US$12.1 million, US$18.1 million and US$9.6 million in 2017, 2018 and 2019, respectively, representing 3.0%, 7.5% and 4.3% of our revenues, respectively.

We primarily provide secured consumer loans to individuals that meet our credit assessment requirements. We generally charge borrowers both interest and service fees. We assess each individual loan receivable for impairment on a quarterly basis. As part of our impairment assessment, we consider the timeliness of collection to date, changes in the value of collateral provided by the borrowers and expected default rates.

We obtained approvals to engage in the microfinancing business from government authorities of four cities, including Beihai, Shanghai, Chongqing and Tianjin.

Table of Contents

### E-commerce Services

Our e-commerce services, first launched in 2011, primarily include Fang membership services and direct sales services for new homes. Our revenues generated from e-commerce services were US$87.8 million, US$15.4 million and US$2.8 million in 2017, 2018 and 2019, respectively, representing 22.2%, 6.4% and 1.3% of our revenues, respectively. We ceased entering into new contracts for our direct sales services for new homes, online home-decorating services and online real estate brokerage services in early 2018 due to the change in our business development strategies.

*Fang Membership Services.* We provide both free and paid membership services to the registered members of our Fang cards on our websites and mobile apps. Our free services include primarily regular updates regarding local property developments, tours to visit property developments and other services relating to properties purchases. Our paid services primarily include offers to home buyers to purchase properties with discounts from our partner developers and dedicated information and related services to facilitate property purchases, which we began to offer in 2011. Our membership fees for paid services generally range from RMB500 to RMB50,000. The discount is reflected as a fixed amount off, or a percentage discount to, the total purchase price paid by a home buyer for a specified property, or a combination of both, which is determined by us and our partner developers. The discounts are significantly higher than our membership fees, resulting in net savings for our members. Membership fees are refundable until our members use the discounts to purchase properties or pursuant to our refund policy. Our members pay a specified fee each time in order to be eligible for the discount provided for a particular property. To promote our services and reach additional customers, we may promote the property developments through other advertising channels and pay real estate agents for customer referrals. In 2019, we offered paid Fang membership services covering approximately 143 property developments in 34 cities in China. Our revenues from Fang membership services totaled US$10.3 million, US$2.8 million and US$0.6 million in 2017, 2018 and 2019, respectively, or 11.7%, 17.9% and 22.3%, respectively, of our total revenues generated from e-commerce for the same periods.

*Direct Sales Services.* We launched our direct sales services in August 2014. We promote property developments of our developer clients primarily through our websites and mobile apps. Different from our Fang membership services, potential individual buyers can register with us free of charge if they are interested in any real estate properties covered by our direct sales services. In addition, individual buyers can enjoy discounted prices for properties that we offer from our developer clients. We charge our developer clients a fee for each property they sold through our direct sales services. Our fee generally is a predetermined percentage of the value of the individual transaction and is refundable pursuant to our refund policy. Our revenues from direct sales services totaled US$26.9 million, US$5.3 million and US$0.9 million in 2017, 2018 and 2019, respectively, or 30.6%, 34.4% and 30.5%, respectively, of our total revenues generated from e-commerce for the same periods.

*Online Sublease Services.* We launched our online sublease services in the second quarter of 2015. We promote and market real properties leased from third parties on our websites and mobile apps, and sublease such properties to our customers for rental fees. We suspended our online sublease services in 2019 due to our transformation back to a technology-driven open platform and our business development strategies.

### Value-added Services

In addition to listing, marketing, e-commerce and financial services, we also provide value-added services which primarily include portal collaboration. Prior to the separation of CIH, our value-added services also included data and analytics services, which has been operated by CIH following the spin-off of CIH. Revenue from data and analytics services have been classified and reported under discontinued operations for all the periods presented.

## Our Websites

Our principal website, www.fang.com, is the leading real estate Internet portal and one of the leading home furnishing and improvement websites in China in terms of visitor traffic. As part of our effort to promote our brand recognition, we changed the address of our principal website from www.soufun.com to www.fang.com in July 2014. "Fang" means "home" in Chinese. We believe that this new and simplified address will be much easier for Chinese users to remember and access, thereby improving our brand recognition. According to our own records, our websites, including www.fang.com received a monthly average of approximately 100 million unique visitors in the fourth quarter of 2019. In addition, we had approximately 110 million registered members of our www.fang.com website and had about 25 million registered members of our free and paid Fang membership services as of December 31, 2019.

As of December 31, 2019, our www.fang.com website contained contents covering 665 cities across China, as well as Hong Kong, Taiwan, Singapore, Japan, United States, Canada, Australia, United Kingdom and Spain. This website also contains links to other specialized real estate and home furnishing and improvement websites, including our www.jiatx.com website, our e-commerce transaction and payment platform.

41

Table of Contents

We believe user satisfaction ultimately rests on the appeal, attraction and functionality of our websites. Our Internet technology and sales and marketing teams spend considerable time and resources upgrading and enhancing our websites based on market trends and feedback from users and our marketing and listing customers. We distinguish ourselves from other websites focused on real estate and home-related products and services through the quality and breadth of our content. We also maintain a centralized customer service hotline and e-mail reporting system through which users can obtain assistance or otherwise contact us.

Our www.fang.com website covers a wide spectrum of PRC real estate and home furnishing and improvement and other home-related information and constitutes the foundation and gateway for our primary business activities. We aim at providing a central forum of reliable information regarding China's real estate and home-related markets that is helpful to market participants in the transaction process. Our content, which is generally free to our website users, is designed to assist users with each step of the real estate and home furnishing and improvement and other home-related transaction process. Our extensive home-related content and information is organized into the following sections and categories on our website, which are intended to address the individual needs of our users.

### Online Property Listings and Search Engines for New Home and Secondary and Rental Properties

Our www.fang.com website contains databases for new home, secondary and rental properties, and provides search engines on such properties in our databases.

With our on-the-ground capabilities in approximately 74 offices in China, we devote significant resources to collect first-hand real estate market intelligence and listing information in such markets and to update such information on a regular basis. Our user-friendly search engines and website interfaces allow users to tailor their searches to specific types of properties by using search criteria. Users seeking information on properties in specific geographic locations can narrow their searches to a specific city and often to specific districts or areas in the vicinity of a particular subway line within that city by using pull-down menus. Users can further refine their searches using selection criteria, including price range, type of property, number of rooms and size. After selecting search parameters, users are directed to a page listing available properties as well as basic information about each individual property, including location, price, number of rooms and the source of the listing.

### Information on Home Related Products and Services

Our www.fang.com website contains information regarding design firms, contractors, do-it-yourself projects, building materials and a wide range of products and services relevant to home decoration and re-modeling, furniture and other home furnishing and services. We provide an efficient platform for companies in the home-related sector, which primarily include suppliers of furnishing and improvement products and services and are usually small in size, to promote their brands and establish their presence on the Internet. We also provide search tools enabling visitors to search for specific businesses by area of expertise, product or service category. For example, a visitor interested in searching for suppliers and installers of window products in Beijing can use our pull-down search tools to focus their search for businesses providing such products and services.

Other pull-down menus allow visitors to view numerous design concepts, model interior decoration plans or other home improvement ideas. After selecting search parameters, users are directed to a page listing applicable home furnishing and improvement products and services as well as basic information about each home furnishing and improvement product or service, including price, product and service information and the source of the information. Much of the content, pictures and graphics are provided by other users of the website, which allows people interested in home decoration and furnishing to share ideas and information online. Users can also use this section to find and compare the work and experience of architects and interior designers.

### Online Residential Communities

We offer online residential community services through our website,www.fang.com. Such online residential community services provide a forum for visitors to share personal views, anecdotes and other information regarding different aspects of the PRC real estate market, specific property developments and residential communities and other subjects. They also provide a platform for conducting real estate and home furnishing and improvement and other home-related transactions online. We believe our electronic bulletin board forums, blogs and other online community-oriented services are valuable means for enhancing loyalty and brand awareness among our users by creating virtual communities sharing a common interest in PRC real estate and home-related topics. In addition to using such forums to increase website traffic, we are also exploring ways to generate new revenue streams from our online forums and community-oriented services.

## Our Mobile Channels

We have developed a comprehensive real-estate mobile platform comprising our own mobile app, "Fang Tian Xia," our mobile WAP websites and New Media Matrix, primarily to provide content to and attracts consumers in China's real estate and home furnishing and improvement-related sectors.

Table of Contents

*Mobile apps and WAP websites*

We have developed a series of mobile apps to meet the diverse needs of home buyers, renters and real estate agents. As of April 30, 2020, we had approximately 17 iOS and 17 Android-based mobile apps, respectively. These mobile apps are downloadable through our websites and major app stores in China.

*New Media Matrix*

We also actively explore and develop new types of mobile channels to expand our mobile access points and user base. Launched in November 2017, our New Media Matrix is a flexible and dynamic communication channel, which includes various self-owned or self-operated programs and media accounts on popular third-party mobile platforms in China, such as Tencent, Baidu, Weibo, Alibaba and Toutiao, to provide frequent, up-to-date property and home furnishing and improvement-related information to home buyers, renters, and real estate agents.

## Our National Coverage

As of December 31, 2019, we provided advertisement, property listing, search services, and other real estate-related content in 665 cities in China. We believe this extensive nationwide coverage enhances our national brand image, which enables us to deliver consistent, high-quality services to customers. The real estate industry is inherently a local business, and online marketing and listing services targeted at the real estate industry are most effective when delivered by personnel familiar with and experienced in the relevant local markets. Our network of branch offices enables us to tailor our services to local conditions and the needs of local property developers and real estate professionals. Our local personnel also provide our headquarters with valuable data insights regarding these local real estate markets, which contributes to our collective knowledge and expertise about real estate markets throughout China.

We derive a substantial portion of our revenues from several major urban centers in China, including Beijing, Shanghai, Chengdu, Chongqing, Tianjin and Shenzhen. We also offer limited listing and other information relating to the real estate markets in Hong Kong, Taiwan, Singapore, Japan, United States, Canada, Australia, United Kingdom and Spain, but these markets do not constitute a material part of our business.

## Brand Awareness and Marketing

We employ a variety of marketing and branding promotion methods to promote our online platform and brands recognition and attract our customers, including our directed selling efforts and other methods, such as cooperation with affiliated or third-party partners in the areas of research, academic organizations and the publication of various research reports, event sponsorships, portal collaboration arrangements and marketing alliances. We believe we have become commonly associated with China's growing real estate and home furnishing and improvement-related sectors.

*Real estate knowledge base.* Our knowledge of China's real estate and home furnishing and improvement-related sectors provides a valuable competitive advantage and helps promote our brand names in China's real estate and furnishing and improvement-related markets. We promote our brand and marketing our service offerings by enhancing the comprehensiveness of our listing data and real estate information on our online platform. We strategically cooperate with our affiliates, including CIH, to improve both the quality and quantity of content and information on our online platform. We also seek to recruit and retain employees well-versed in China's real estate and home furnishing and improvement-related sectors through a variety of incentive measures, including share-based compensation plans.

*Collaboration arrangements with third-parties.* We cooperate with well-known third-party online platforms in China to effectively promote our brand and marketing our service offerings by providing valuable real estate and home furnishing and improvement-related data and information to the consumers on these platforms. We operate various mini programs and media accounts on WeChat and Weibo to promote our brand and market our services. Our collaboration arrangements with these online platforms through our New Media Matrix have contributed the rapidest growth of our user base.

*Advertising and marketing.* We also conduct both online and offline marketing and advertising activities to promote awareness of our online platform and service offerings, "Fang Tian Xia" and "Fang.com" brands, such as advertisements on billboards or online channels with high traffic.

Table of Contents

**Our Sales Force**

We have built a sales and marketing team experienced in the online advertising, Internet and real estate industries. As of December 31, 2019, our sales and marketing team consisted of over 2,000 members. We also occasionally engage sales agents to collect information on local markets or for specific business lines within local markets. Our sales and marketing team, together with these sales agents, work closely with our customers in local markets and help us gain insight into developments in these local markets, the competitive landscape and new market opportunities, which assists us in setting our prices and strategies for each locality.

Our sales and marketing personnel are divided into the new home group, secondary and rental properties group, home furnishing and improvement group. This structure allows our sales and marketing personnel to gain expertise with a specific subset of customers within the market sectors that we target, and effectively design market-tailored services to customers within each subset.

To motivate our sales and marketing personnel, a majority of their compensation consists of performance incentives such as commissions and bonuses. Sales quotas are assigned to all sales personnel according to monthly, quarterly and annual sales plans. We also apply a merit-based promotion system to motivate our sales personnel.

We are focused on training programs designed to improve the sales and marketing skills of our staff. We provide three types of training to our sales and marketing personnel: (1) mandatory onboarding training for each new sales and marketing employee during a three-month probationary period, (2) rotation training that places every sales and marketing employee in different posts for a certain period of time, and (3) regular training in which weekly seminars and case studies are conducted for sales and marketing personnel. The combination of our training, performance-based compensation, and merit-based promotion system have been effective in identifying, motivating and retaining strong performers.

**Our Technology**

The key components of our technology platform include:

*Large-scale system infrastructure.* We have designed our system to handle large amounts of data flow with a high degree of scalability and reliability. Our distributed architecture uses parallel computing technology and clusters of low-cost computers to handle high-volume visitor traffic and process large amounts of information.

*Anti-fraud and anti-spam technology.* We have also developed a proprietary anti-fraud and anti-spam system through which we are able to detect and monitor fraudulent activities and identify and filter spam messages. We seek to continuously improve the accuracy and effectiveness of this technology through machine-learning capability and customizable rules.

*Data mining technology.* Our big data storage and distribution system stores and processes a large amount of multi-dimensional user data, including time and location, user behavior, consumption and social data, which serve as the foundation of our big data technology. Synthesizing a wide variety of data from our users, we have built our recommendation model through machine learning. The model can predict a user's preference for types of properties or home furnishing and improvements-related services and products, such as location, price range and room size, which allows us to make accurate and personalized recommendations of real estate agents, brokers, properties, services and products to our users.

**Seasonality**

The real estate sector in China is characterized by seasonal fluctuations, which may cause our revenues to fluctuate significantly from quarter to quarter. The first quarter of each year generally contributes the smallest portion of our annual revenues due to reduced advertising and marketing activity of our customers in the PRC real estate industry during and around the Chinese Lunar New Year holiday, which generally occurs in January or February of each year. In contrast, the third quarter of each year generally contributes the largest portion of our annual revenues due to increased advertising and marketing activity of our customers in the PRC real estate industry as most property purchases take place in September and October of each year in terms of monthly transaction volumes. See "Item 3.D. Key Information—Risk Factors—Risks related to our business—You should not rely on our quarterly operating results as an indication of our future performance because our quarterly financial results are subject to fluctuations."

**Competition**

We face competition from other companies in each of our primary business activities. We compete with these companies primarily on our ability to attract users to our online platform and attract customers using our service offerings and on the basis of the quality and quantity of real estate listings and other content and services. We compete for developers' business on the basis on online traffic volume, customer loyalty, geographic coverage and service offerings. We also compete for qualified employees with skills and experience related to sales, real estate services, advertising, technology and the Internet industry.

Our competitors may have more established brand names, larger visitor numbers and more extensive distribution channels than we do, either overall, or in specific regions in which we operate. Some of our competitors may have greater access to capital markets, more financial and other resources and a longer operating history than us.

Table of Contents

Other existing and potential competitors primarily include:

- real estate and home furnishing and improvement websites and mobile apps offering listing and marketing services in China including real estate websites and mobile apps sponsored or supported by local governments in China, which may be able to use such government connections to develop relationships with locally-active real estate developers;

- traditional advertising media such as general-purpose and real estate-focused newspapers, magazines, television and outdoor advertising that compete for overall advertising spending; and

- online listing service providers, including general-purpose Internet portals and regional websites and mobile apps dedicated to online listing. We believe the key players in the markets for online real estate marketing and listing services in China include *58.com* and *Anjuke.com*. We also compete with general-purpose advertising media, such as Toutiao and WeChat.

**Intellectual Property**

Our copyrights, trademarks, trade secrets, domain names and other intellectual property are important to our business. We rely on intellectual property laws and contractual arrangements with our key employees and certain of our customers, collaborators and others to protect our intellectual property rights. Despite these measures, we cannot assure you that we will be able to prevent unauthorized use of our intellectual property, which would adversely affect our business.

Our applications for the "SouFun" trademark for certain industry categories in China conflict with existing registrations of or applications for similar trademarks, which have resulted in litigations. In April 2014, the Higher People's Court of Beijing Municipality reversed a lower court's judgment in favor of us and ordered the PRC Trademark Review and Adjudication Board of SAIC to reconsider another PRC company's trademark application for "SOFANG" that it had previously rejected. In April 2015, the Supreme People's Court of the PRC accepted our application for retrial over the judgment of the Higher People's Court of Beijing Municipality but ultimately denied our application. See "Item 3.D. Key Information—Risk Factors—Risks related to our business—Unauthorized use of our intellectual property by third parties, and the expenses incurred in protecting our intellectual property rights, may materially and adversely affect our business, financial condition, results of operations, reputation and competitive advantage" and "—We may be subject to intellectual property infringement or misappropriation claims by third parties, which may force us to incur substantial legal expenses and, if determined adversely against us, could materially disrupt our business." In 2015, we obtained new trademarks "Fang.com" in English and "房天下" ("Fang Tian Xia" in Chinese) and began to market our services under these new brands in connection with the transformation of our business model. We therefore do not currently expect our business would be materially and adversely affected even if we lose the right to use the trademark relating to "SouFun" in certain limited industry categories.

As of December 31, 2019, we held 351 registered copyrights and owned or licensed 801 registered trademarks in China. As of the same date, we had 235 trademark applications in various industry categories, pending with the PRC Trademark Office.

We have also filed applications to register certain trademarks in a number of other jurisdictions, including Hong Kong, Macao, Taiwan, Canada, Australia, France, Japan, Singapore, Spain, the United Kingdom and the United States.

As of December 31, 2019, we owned or licensed 1,066 registered domain names, including our official website,www.fang.com, and domain names registered in connection with www.jiatx.com and www.fangtx.com.

As of December 31, 2019, we had four registered patents and six patent applications relating to database maintenance and computer data backup under review by the State Intellectual Property Office of the PRC.

Table of Contents

**Facilities**

Our principal executive offices are located at Tower A, No. 20 Guogongzhuang Middle Street, Fengtai District, Beijing 100070, the People's Republic of China, with approximately 69,313 sq.m. of office space. As of December 31, 2019, we leased or owned properties with an aggregate gross floor area of approximately 49,674 sq.m. for our local offices across China in addition to our principal executive offices in Beijing. Our leased properties mainly consist of office premises, all of which are leased from independent third parties. We believe our existing leased and owned premises are adequate for our current business operations and that additional space can be obtained on commercially reasonable terms to meet our future requirements. See "Item 3.D. Key Information—Risk Factors—Risks related to our business—Certain of our leased property interests may be defective and we may be forced to relocate operations affected by such defects, which could cause significant disruption to our business."

We own an office building with a total usable office space of approximately 69,313 sq.m. in Beijing as our headquarters.

We own an office building with a gross floor area of 325,000 square feet at 72 Wall Street, New York. It is currently under major refurnishment work.

We own certain commercial properties of approximately 3,111 sq.m and 22,064.8 sq.m, in Sanya, Hainan province and Wuhan, Hubei province, China, respectively. We also own office space of 46,681 sq.m, together with 373 parking spaces, in an office building in Chengdu, Sichuan province, 1264.67 sq.m, in an office building in Changzhou, Jiangsu province, as well as office space of 30,843 sq.m in an office building in Chongqing. We primarily use these properties as our local offices.

We own certain Meilin lake villa properties of 10,308 sq.m. in Changzhou, Jiangsu province, China.

In addition, we own a portion of a building known as the BaoAn Building located at 800 Dongfang Road, Pudong, Shanghai. The property has usable space of approximately 42,000 sq.m. and is currently used for offices, retail space and a hotel. We acquired the property to support our expansion in Shanghai and the East China region, which consists of 15 cities including Jiangsu provincial capital Nanjing and Zhejiang provincial capital Hangzhou.

We own a building in Hangzhou with usable space of approximately 27,030 sq.m. as our branch office in Hangzhou.

We also purchased a total net rentable area of 264,964 square feet in an office building in San Francisco. Our San Francisco office is primarily used as our technology and research center in the US.

**Insurance**

We maintain property insurance to cover potential damages to a portion of our property. In addition, we provide medical, unemployment and other insurance to our employees in compliance with applicable PRC laws, rules and regulations. We do not maintain insurance policies covering losses relating to our systems and do not have business interruption insurance.

**Legal Proceedings**

In January 2018, we applied for an arbitration at China International Economic and Trade Arbitration Commission as a claimant for the indebtedness owed to us and breach of contract by a third party. According to the award made by the arbitral tribunal on September 6, 2019, the arbitral tribunal supported our claims.

In April and May 2018, we were involved in suits as one of the defendants for trade mark infringement claimed by a third party, alleging RMB99.9 million, RMB300 million, and RMB500 million, respectively. In March 2019, the People's High Court of Beijing ruled that we were not the proper defendant for the suits involving RMB300 million and RMB500 million. In June 2019, the Supreme People's Court upheld the ruling of the People's High Court of Beijing for the cases involving RMB300 million and RMB500 million. The suit involving RMB99.9 million is still ongoing and we are vigorously contesting the allegations.

In February 2019, we were served with a subpoena from a court in Beijing, in which a third party claimed that a contract we entered into was invalid. Pursuant to such contract, we received certain assets from a debtor's nominee to discharge its indebtedness. The debtor subsequently alleged that such contract was invalid because the transfer price of such assets was below the fair market value. We vigorously contested the allegation and received a judgment in our favor. Such third party appealed to a higher court and the case is still under review as of the date of this annual report.

Saved as disclosed above, we are currently not involved in any material legal or arbitration proceedings. From time to time, we may be subject to claims and legal actions arising in the ordinary course of business, such as intellectual property infringement claims against us for use of others' articles or photographs and employment disputes. Such claims or legal actions, even if without merit, could result in the expenditure of significant financial and management resources and potentially result in civil liability for damages.

Table of Contents

**Regulation**

Our business is subject to substantial regulation by the PRC government. This section sets forth a summary of certain significant PRC regulations that affect our business and the industries within which we operate. See "Item 3.D. Key Information—Risk Factors" which discusses risks related to regulation of our business and industry.

*General*

The telecommunications industry, including Internet information services and Internet access services, is highly regulated by the PRC government. Regulations issued or implemented by the State Council, MIIT and other relevant government authorities cover virtually every aspect of telecommunications network operations, including entry into the telecommunications industry, the scope of permissible business activities, interconnection and transmission line arrangements, tariff policy and foreign investment.

MIIT, under the leadership of the State Council, is responsible for, among other things:

- formulating and enforcing telecommunications industry policy, standards and regulations;

- granting licenses to provide telecommunications and Internet services;

- formulating tariff and service charge policies for telecommunications and Internet services;

- supervising the operations of telecommunications and Internet service providers; and

- maintaining fair and orderly market competition among telecommunications and Internet service providers.

In addition to the regulations promulgated by the central PRC government, some local governments have also promulgated local rules applicable to Internet companies operating within their respective jurisdictions.

In 1994, the Standing Committee of the National People's Congress promulgated the PRC Advertising Law. In addition, SAIC and other ministries and agencies have issued regulations that further regulate our advertising business, as discussed below.

***Restrictions on Foreign Ownership in the Online Advertising Industry***

*Internet Content Provision and Wireless Value-Added Services*

In September 2000, the State Council promulgated the Telecommunications Regulations, amended in July 2014 and February 2016, which categorize all telecommunications businesses in China as either basic telecommunications businesses or value-added telecommunications businesses. In February 2003, MIIT amended the original classification of telecommunications business with Internet content provision services and wireless value-added services being classified as value-added telecommunications businesses. In December 2015, MIIT further amended the classification of telecommunications business, which sets out in details of the information service business classification under the category of value-added telecommunications businesses. In June 2019, MIIT further amended the classification of basic telecommunications businesses. The Telecommunications Regulations also set forth extensive guidelines with respect to different aspects of telecommunications operations in China.

In order to comply with China's commitments with respect to its entry into the World Trade Organization, the State Council promulgated the Administrative Rules on Foreign-invested Telecommunications Enterprises in December 2001, as amended in September 2008 and February 2016. The Administrative Rules on Foreign-invested Telecommunications Enterprises set forth detailed requirements with respect to capitalization, investor qualifications and application procedures in connection with the establishment of a foreign-invested telecommunications enterprise. Pursuant to these administrative rules, the ultimate capital contribution ratio of the foreign investor or investors in a foreign-invested telecommunications enterprise that aims to provide value-added telecommunications services may not exceed 50.0%. In addition, pursuant to the Foreign Investment Industrial Guidance Catalog issued by the PRC government, the permitted foreign investment in value-added telecommunications service providers may not be more than 50.0%. However, for a foreign investor to acquire any equity interest in a value-added telecommunications business in China, it must satisfy a number of stringent performance and operational experience requirements, including demonstrating a track record and experience in operating a value-added telecommunications business overseas. Moreover, foreign investors that meet these requirements must obtain approvals from MIIT and MOFCOM or their authorized local counterparts, which retain considerable discretion in granting approvals.

In July 2006, MIIT publicly released the Circular on Strengthening the Administration of Foreign Investment in Value-Added Telecommunications Services, or the MIIT Notice. According to the MIIT Notice, if any foreign investor intends to invest in a PRC telecommunications business, a foreign-invested telecommunications enterprise must be established and such enterprise must apply for the relevant telecommunications business licenses. Under the MIIT Notice, domestic telecommunications enterprises may not rent, transfer or sell a telecommunications license to foreign investors in any form, nor may they provide any resources, premises, facilities and other assistance in any form to foreign investors for their illegal operation of any telecommunications business in China.

Table of Contents

As a result of current PRC laws, rules and regulations that impose substantial restrictions on foreign investment in the Internet business in China, we conduct this portion of our operations through a series of contractual arrangements among our PRC subsidiaries and our consolidated controlled entities.

In the opinion of our PRC legal counsel:

- each of the Structure Contracts is legal, valid and binding on the contracting parties under applicable PRC laws, rules and regulations;

- the execution, delivery, effectiveness, enforceability and performance of each of the Structure Contracts do not violate any published PRC laws, rules and regulations currently in force and effect;

- none of our Structure Contracts contravenes any published PRC laws, rules and regulations currently in force and effect; and

- No filings, registrations, consents, approvals, permits, authorizations, certificates and licenses of any PRC government authorities are currently required in connection with the execution, delivery, effectiveness, performance and enforceability of each Structure Contract, provided that the pledges of equity interests under the Structure Contracts should be registered with competent PRC government authorities, and provided further that the exercise of the call option in the future must be approved and registered by competent PRC government authorities.

However, there are substantial uncertainties regarding the interpretation and application of current or future PRC laws, rules and regulations, including the laws and regulations governing the enforcement and performance of our Structure Contracts in the event of any imposition of statutory liens, bankruptcy and criminal proceedings. Accordingly, we cannot assure you that the PRC regulatory authorities will not ultimately take a contrary view from that of our PRC legal counsel. See "Item 3.D. Key Information—Risk Factors—Risks related to our corporate structure—If the PRC government determines that the structure contracts that establish the structure for our business operations do not comply with applicable PRC laws, rules and regulations, we could be subject to severe penalties or be forced to restructure our ownership structure" and "Item 3.D. Key Information—Risk Factors—Risks related to our corporate structure—Substantial uncertainties exist with respect to the adoption of new or revised PRC laws relating to our corporate structure, corporate governance and business operations."

***Regulations relating to Our Business***

*Internet Content Provision Services*

The provision of real estate and home-related and other content on Internet websites is subject to applicable PRC laws, rules and regulations relating to the telecommunications industry and the Internet, and regulated by various government authorities, including MIIT and SAIC. The principal regulations governing the telecommunications industry and the Internet include:

- The Telecommunications Regulations (Revised in 2016);

- The Catalog of Classes of Telecommunications Business (Revised in 2019);

- The Administrative Measures for Telecommunications Business Operating Licenses (2017); and

- The Internet Information Services Administrative Measures (2011).

Under these regulations, Internet content provision services are classified as value-added telecommunications businesses, and a commercial operator must obtain a telecommunications and information services operating license, or ICP license, from the appropriate telecommunications authority in order to carry out commercial Internet content provision operations in China. If an Internet content provider is not engaged in commercial Internet content operations, it is only required to file a record with the appropriate telecommunications authority. In addition, the regulations also provide that operators involved in Internet content provision in sensitive and strategic sectors, including news, publishing, education, health care, medicine and medical devices, must obtain additional approvals from the relevant authorities in relation to those sectors.

Two of our consolidated controlled entities, Beijing Technology and Beijing JTX Technology, each hold an ICP license issued by the Beijing Telecommunications Administration Bureau, a municipal branch of MIIT.

On December 21, 2013, the State Council promulgated the Decision of the State Council on Temporary Adjustments to the Administrative Approval Items or Special Administrative Measures on Access Prescribed in the Relevant Administrative Regulations or State Council's Documents in China (Shanghai) Pilot Free Trade Zone, which provides that temporary adjustments shall be made to special administrative measures on access in respect of qualification requirements and restrictions on shareholding proportion under the Administrative Rules on Foreign-invested Telecommunications Enterprises.

Table of Contents

Pursuant to the Opinions of the MIIT and the People's Government of Shanghai Municipality on Further Opening Up Value-added Telecommunications Business in China (Shanghai) Pilot Free Trade Zone ("Pilot Opinions"), which were jointly issued by the MIIT and People's Government of Shanghai Municipality on January 6, 2014, foreign ownership in telecommunications service business (only include apps stores), which China has committed to opening-up after its WTO entry, may exceed 50% on a pilot basis. Foreign ownership in online data processing and transaction processing (operational electronic commerce) shall not exceed 55%. Except for the Internet connection service business (provision of internet connection service for online users), the scope for other businesses services specified by the Pilot Opinions can be nationwide. On April 15, 2014, MIIT promulgated the Circular on Printing and Distributing the Administrative Measures of China (Shanghai) Pilot Free Trade Zone for the Pilot Operation of Value-added Telecommunications Business by Foreign Investment, which further provides the requirements and procedures for foreign-invested enterprises to apply for and obtain the approval to conduct value-added telecommunications business based in the China (Shanghai) Pilot Free Trade Zone.

On May 29, 2015, MIIT promulgated the Circular on Relaxing the Geographical Restrictions Imposed on Certain Service Facilities Providing Value-added Telecommunication Services in the China (Shanghai) Pilot Free Trade Zone, which extends the geographical scope of establishing an agent of call center business and edge routers for domestic Internet virtual private network business from the China (Shanghai) Pilot Free Trade Zone to Shanghai Municipality. On June 19, 2015, MIIT further issued the Circular of the MIIT on Removing the Restrictions on Shareholding Ratio Held by Foreign Investors in Online Data Processing and Transaction Processing (Operational E-commerce) Business, which liberalizes the foreign ownership restrictions in online data processing and transaction processing (operational electronic commerce) business by expanding the business areas from the China (Shanghai) Pilot Free Trade Zone to nationwide, and the foreign ownership may be up to 100%.

The MIIT Notice requires that a value-added telecommunications business operator (or its shareholders) must own domain names and trademarks used by it in the value-added telecommunications business, and have premises and facilities appropriate for such business. To comply with the MIIT Notice, all of our related trademarks and domain names are owned directly by Beijing Technology and Beijing JTX Technology.

Furthermore, according to the Administrative Provisions on Online Publishing Services, jointly issued by the MIIT and the SARFT in February 2016, all entities that are engaged in Internet publication services in China must be approved by competent publication administrative department and acquire an Online Publishing Service License. The online publishing services defined in the Administrative Provisions on Online Publishing Services refer to the provision of online publications to the public through information networks while the Online Publications refer to digitized works with characteristics of publishing, such as editing, production or processing provided to the public through information networks.

*Advertising Services*

SAIC is responsible for regulating advertising activities in China. The principal regulations governing advertising in China, including online advertising, include:

- the Advertising Law (Revised in 2018); and

- the Administration of Advertising Regulations (1987).

These regulations stipulate that companies that engage in advertising activities in China must obtain from SAIC or its local branches a business license which specifically includes operating an advertising business within its business scope. Companies conducting advertising activities without such a license may be subject to penalties, including fines, confiscation of illegal revenues and orders to cease advertising operations. The business license of an advertising company is valid for the duration of its existence, unless the license is suspended or revoked due to a violation of any relevant law or regulation.

The business scope of each of Beijing Advertising, Beijing Technology, Beijing JTX Technology, Shanghai Century JTX Network and Beijing Yi Ran Ju Ke includes operating an advertising business, which allows them to engage in the advertising business.

*Electronic Bulletin Board Services*

In November 2000, MIIT adopted the Administrative Regulations on Internet Electronic Bulletin Board Services, which required that an Internet content service provider providing online bulletin board service register with, and obtain approval from, local telecommunications authorities. The Administrative Regulations on Internet Electronic Bulletin Board Services was abolished by MIIT on September 23, 2014, and the management of Internet electronic bulletin board services is currently governed by the Telecommunications Regulations, the Internet Information Services Administrative Measures and the Administrative Measures for Telecommunications Business Operating Licenses, which provide that an Internet content provider that intends to provide online bulletin board services shall fulfill the approval formalities.

49

Table of Contents

On November 6, 2006, the Beijing Telecommunications Administration Bureau issued to Beijing Technology, respectively, an approval for operating electronic bulletin board services on www.fang.com, respectively. Beijing JTX Technology also obtained approval for operating electronic bulletin board services on www.jiatx.com on June 15, 2007. These approvals each have an original validity which is keyed to the corresponding ICP license and their continued validity is subject to the fulfillment of certain conditions and qualifications.

*Internet Live-Streaming Services*

On July 6, 2004, the SARFT promulgated the Rules for the Administration of Broadcasting of Audio/Video Programs through the Internet and Other Information Networks, or the A/V Broadcasting Rules, which were replaced by Provisions on the Administration of Private Network and Targeted Communication Audiovisual Program Services which took effect on June 1, 2016. For an entity that engages in content delivery, integrated broadcast control, transmission distribution and other private network and targeted communication to send audio-visual program service, an Internet Audio/Video Program Transmission License is required.

On April 13, 2005, the State Council announced Several Decisions on Investment by Non-state-owned Companies in Culture-related Business in China. These decisions encourage and support non-state-owned companies to enter certain culture-related business in China, subject to restrictions and prohibitions for investment in audio/video broadcasting, website news and certain other businesses by non-state-owned companies. These decisions authorize the SARFT, the Ministry of Culture and Tourism and the GAPP to adopt detailed implementation rules according to these decisions.

On December 20, 2007, the SARFT and the MIIT jointly issued the Rules for the Administration of Internet Audio and Video Program Services, commonly known as Circular 56, which came into effect as of January 31, 2008 and was amended in August 2015. Circular 56 reiterates the requirement set forth in the A/V Broadcasting Rules that online audio/video service providers must obtain an Internet Audio/Video Program Transmission License from the SARFT. Furthermore, Circular 56 requires all online audio/video service providers to be either wholly state-owned or state-controlled companies. According to relevant official answers to press questions published on the SARFT's website dated February 3, 2008, officials from the SARFT and the MIIT clarified that online audio/video service providers that already had been operating lawfully prior to the issuance of Circular 56 may re-register and continue to operate without becoming state-owned or controlled, provided that such providers have not engaged in any unlawful activities. This exemption will not be granted to online audio/video service providers established after Circular 56 was issued. These policies have been reflected in the Application Procedure for Audio/Video Program Transmission License. Failure to obtain the Internet Audio/Video Program Transmission License may subject an online audio/video service provider to various penalties, including fines of up to RMB30,000, seizure of related equipment and servers used primarily for such activities and even suspension of its online audio/video services.

In addition, the Cyberspace Administration promulgated the Administrative Provisions on Internet Live-Streaming Services, or Internet Live-Streaming Services Provisions, on November 4, 2016, which came into effect on December 1, 2016. According to the Internet Live-Streaming Services Provisions, an Internet live-streaming service provider shall (1) establish a live-streaming content review platform, (2) conduct authentication registration of Internet live-streaming issuers based on their identity certificates, business licenses and organization code certificates, (3) follow the principle of "background real name, foreground voluntary", conduct verification of online live-streaming users based on valid identity information such as mobile phone number, and validate registration of online live-streaming publishers based on their identity documents, business licenses, organization code certificates, and so forth, and (4) enter into a service agreement with Internet live-streaming services user to specify both parties' rights and obligations.

In March 2018, the Office for SARFT issued the Notice on Further Regulating the Transmission Order of Internet Audio-Visual Programs, which requires that, among others, audio-visual platforms shall (1) not to produce or transmit programs intended to parody or denigrate classic works, (2) not to re-edit, re-dub, re-caption or otherwise ridicule classic works, radio and television programs, or original Internet audio-visual programs without authorization, (3) not to transmit re-edited programs which unfairly distort the original content, (4) strictly monitor the adapted content uploaded by platform users and not provide transmission channels for illicit content, (5) immediately take down unauthorized content upon receipt of complaints from copyright owners, radio and television stations, or film and television production institutions, (6) strengthen the administration of movie trailers and prevent improper broadcasting of movie clips and trailers prior to authorized release, and (7) strengthen the administration of sponsorship and endorsement for Internet audio-visual programs. Pursuant to this notice, the provincial branches of SAPPRFT shall have the authority to supervise radio and television stations and websites that offer audio-visual programs within its jurisdiction and require them to further improve their content management systems and implement relevant management requirements.

Table of Contents

*Regulations on the Real Estate Service Industry*

The principal regulations governing the real estate service industry in China include the Law on the Administration of the Urban Real Estate, as amended in August 2019, the Real Estate Brokerage Administration Measures issued by the MOHURD, the NDRC, and the PRC Ministry of Human Resources and Social Security on January 20, 2011, which became effective on April 1, 2011, and was further amended on March 1, 2016 and became effective on April 1, 2016.

*Real Estate Service Companies*

In accordance with the Law on the Administration of the Urban Real Estate and the Real Estate Brokerage Administration Measures, real estate services refer to services of real estate consultation, appraisal and brokerage. A real estate service company is required to meet certain financial and personnel requirements and register with the SAIC or its local counterpart. To be qualified to engage in real estate services, a company is required to file with the relevant local branch of SAIC. Pursuant to the Real Estate Brokerage Administration Measures, a real estate brokerage company must have a certain number of real estate brokers and real estate broker assistants, and shall file with the local real estate regulatory authority within thirty days following the issuance of its business license. Local authorities have specific requirements on employing such brokers and the registration formalities.

On May 11, 2011, the MOHURD and the NDRC jointly issued the Notice of Strengthening the Real Estate Brokerage Administration and Further Standardizing the Order of Real Estate Transactions. On June 13, 2013, the MOHURD and the SAIC jointly issued the Notice of Focusing on Special Administration on Market of Real Estate Agencies. According to these notices, a real estate brokerage company is forbidden to display any false or unverified information. The real estate brokerage company and its brokers shall not conceal transaction price and other transaction information from the transacting parties. Such entities are also prohibited from obtaining any gains by purchasing or renting a property at a lower price and then selling or leasing such property at a higher price. The real estate brokerage company is also required to establish a separate account for transaction settlement if the real estate brokerage company is responsible to collect and pay the transaction amount on behalf of the transaction parties.

*Real Estate Service Brokers*

In accordance with the Real Estate Brokerage Administration Measures, the PRC government implemented the occupational qualification system for real estate broker personnel.

Pursuant to the Interim Regulations on Professional Qualification for Real Estate Brokerage Professionals and the Implementation Rules on the Examinations of Real Estate Brokerage Professional Qualification issued by the PRC Ministry of Human Resources and Social Security and the MOHURD on December 18, 2001 and the relevant circulars, to practice as a qualified real estate broker, an individual was required to pass an exam and obtain a qualification certificate for real estate brokers, However, the State Council issued the Decision of the State Council on Canceling and Adjusting a Batch of Administrative Examination and Approval Items on July 22, 2014, which eliminated the qualification certificate requirement for real estate brokers. On June 25, 2015, the PRC Ministry of Human Resources and Social Security and the MOHURD further jointly issued Interim Provisions on the Occupational Qualification System of Professional Real Estate Brokers and the Implementing Measures for Occupational Qualification Exams of Professional Real Estate Brokers, which provide that real estate brokerage professional qualifications are divided into three levels, namely associate real estate broker, real estate broker and senior real estate broker. The associate real estate broker and real estate broker shall pass the examination as a method to evaluate their professional skills.

*Real Estate Service Charges*

According to the Notice on Release of Management of Real Estate Consultant and Brokerage Charges jointly issued by the NDRC and the MOHURD which became effective on July 1, 2014, a real estate service company must display its service charges, or commissions. The commissions for the real estate brokerage services are subject to the regulation of the local branch of the MOHURD and the competent pricing department of people's government at the provincial level, the local authorities may decide to apply "government-guided" prices or "market-adjusted" prices according to the local situation. The commissions for the real estate consulting services shall be based on "market-adjusted" prices, and the real estate consulting service providers may negotiate and determine their commission rates with clients.

*Regulations on Microfinance Companies*

According to the Guiding Opinions on the Pilot Operation of Microfinance Companies (the "Guiding Opinions") jointly issued by the China Banking Regulatory Commission and the PBOC on May 4, 2008, microfinance companies are limited liability companies or joint stock companies established with the capital contribution from natural persons, legal persons and other organizations, which do not accept public deposits and engage in the microfinance business. To set up a microfinance company, an applicant shall submit a formal application to the competent administrative departments at the provincial level. Upon approval, the applicant shall apply to the local branch of the SAIC to obtain a business license for the microfinance company. In addition, the applicant shall complete certain filings with the local police department, the local office of the China Banking Regulatory Commission and the local branch of the PBOC. According to the Guiding Opinions, the aggregate balance of the loans granted to any single borrower may not exceed 5% of the net capital of the microfinance company. The PBOC is responsible for monitoring the interest rates and fund flows of microfinance companies and record the relevant information into the PBOC's credit information system. Microfinance companies are required to provide information regarding their borrowers, loan amounts, guarantees for loans and loan repayment to the credit information system.

Table of Contents

According to the Guiding Opinions, a provincial government may launch pilot programs for microfinance companies within prefectural regions of the province only after it designates a department (finance office or other relevant institutions) to be in charge of supervision and administration of microfinance companies and is willing to be responsible for risk management and disposals with respect to microfinance companies. Consequently, microfinance companies are primarily regulated locally by provincial governments under rules and regulations promulgated by the provincial governments.

Pursuant to Notice on Regulating the "Cash Loan" Business, issued by Office of the Leading Group for the Special Campaign against Internet Financial Risks and the Office of the Leading Group for the Special Campaign against Peer-to-peer Lending Risks on December 1st, 2017 ("Notice on Regulating Cash Loan"), internet microfinance businesses are strictly regulated. According to the Notice on Regulating Cash Loan, among other requirements, microfinance companies are required to suspend distribution of internet microloans that are not supported by specific scenarios and No specific purpose, gradually reduce the inventory business within a time limit and rectification shall be completed within the prescribed time limit. Issuing "campus loans" and "down payment loans" are also prohibited.

According to Notice on Regulating Cash Loan, microfinance companies may not sell, transfer, and disguise the company's credit assets through Internet platforms or local trading venues. Providing real property financing and other debt financing matchmaking services in relation to the purchase of real properties are also prohibited. Violation of these requirements may subject the relevant authorities to various penalties, including restrictions on the entity conducting such activities' business operations, or canceling business qualifications and/or closing the entity.

### *Regulations on Entrusted Loans*

The General Lending Code was promulgated by the PBOC on June 28, 1996 and came into effect on August 1, 1996. The General Lending Code defines a "loan provider" as a PRC owned financial institution established in China that engages in the provision of interest bearing loans. One type of loan defined in and regulated in accordance with the General Lending Code is the entrusted loan. Entrusted loans are arrangements whereby the capital for a loan is supplied by a government department, an enterprise or a natural person (the "capital provider") and entrusted to a financial institution as the loan provider. Entrusted loans are made by the loan provider to a specified borrower for a particular purpose and in an amount, for a term and at an interest rate determined by the capital provider. The term "specified borrower" describes the party specified by the capital provider as the person who will receive the amount of an entrusted loan (the "loan recipient"). While the loan provider exercises supervision over and receives repayment from the loan recipient, the loan provider does not assume any risk of default in repayment by the loan recipient. In accordance with the General Lending Code and the relevant judicial interpretation from the Supreme People's Court of the PRC, in an entrusted loan arrangement, the relationship between the loan provider and the capital provider is that of trustee and trustor; and the relationship between the loan provider and the loan recipient is that of lender and borrower. No creditor/debtor relationship exists between the capital provider and the loan recipient. The General Lending Code requires that loan providers must be authorized by and have been granted a financial institution license or a financial institution operation license from the PBOC; and must have registered with the SAIC. The General Lending Code further stipulates that enterprises which are not authorized and registered as loan providers must not breach the laws of the PRC by engaging in intercompany loan transactions or the provision of loans through unauthorized means. An intercompany loan is a loan provided directly from one company to another where the loan provider is not authorized and registered as a loan provider.

According to the Opinions of the Ministry of Housing and Urban-Rural Development and other Authorities on Strengthening the Administration Over the Real Estate Agencies to Promote the Healthy Development of the Industry issued by the MOHURD, the MIIT, the SAT, the SAIC, the PRC National Development and Reform Commission, the CSRC and the PBOC on July 29, 2016, real estate service companies, which prepare the housing loan applications on behalf of clients, shall not compel clients to choose financial institutions designated by them, nor shall they associate the loan application services with other services. A real estate service company shall not, by itself or cooperating with other entities, offer illegal financial products and services, or receive any commissions from financial institutions. In addition, financial institutions are strictly prohibited from cooperating with real estate service companies which have not gone through the filing formalities with competent real estate authorities.

### *Regulations relating to Information Security and Confidentiality of User Identity and Information*

Internet content in China is also regulated and restricted from a state security standpoint. Based on the Decision of the Standing Committee of the National People's Congress on Internet Security Protection enacted by the Standing Committee of the National People's Congress, any effort to undertake the following actions may be subject to criminal punishment in China:

- gain improper entry into a computer or system of national strategic importance;

52

Table of Contents

- disseminate politically disruptive information;

- leak government secrets;

- spread false commercial information; or

- infringe intellectual property rights.

The Ministry of Public Security has also promulgated measures that prohibit the use of the Internet in ways that, among other things, result in the leakage of government secrets or the spread of socially destabilizing content. The Ministry of Public Security has supervision and inspection powers in this regard, and we may be subject to the jurisdiction of the local security bureaus. If an ICP license holder violates these measures, the PRC government may revoke its license and shut down its website.

The security and confidentiality of information on the identity of Internet users are also regulated in China. The Administrative Measures on Internet Information Service promulgated by the PRC State Council in September 2000 and revised in January 2011 require Internet content service providers to maintain an adequate system that protects the security of user information. In January 2006, the Ministry of Public Security promulgated the Regulations on Technical Measures of Internet Security Protection, requiring Internet service providers to utilize standard technical measures for Internet security protection.

On December 29, 2011, the MIIT promulgated the Several Provisions on Regulating the Market Order of Internet Information Services, effective on March 15, 2012. It stipulates that ICP operators may not, without a user's consent, collect the user's information that can be used alone or in combination with other information to identify the user and may not provide any such information to third parties without the user's prior consent. ICP operators may only collect users' personal information that is necessary to provide their services and must expressly inform the users of the method, content and purpose of the collection and use of such personal information. In addition, an ICP operator may only use users' personal information for the stated purposes under the ICP operator's scope of service. ICP operators are also required to ensure the proper security of users' personal information, and take immediate remedial measures if users' personal information is suspected to have been inappropriately disclosed. If the consequences of any such disclosure are expected to be serious, ICP operators must immediately report the incident to the telecommunications regulatory authority and cooperate with the authorities in their investigations.

On December 28, 2012, the Standing Committee of the National People's Congress of the PRC issued the Decision on Strengthening the Protection of Online Information. Most requirements under this decision relevant to ICP operators are consistent with the requirements already established under the MIIT provisions discussed above, but are often stricter and broader. Under this decision, ICP operators are required to take such technical and other measures necessary to safeguard information against inappropriate disclosure. To further implement this decision and relevant rules, the MIIT issued the Regulation of Protection of Telecommunication and Internet User Information on July 16, 2013, effective on September 1, 2013, which contains detailed requirements on the use and collection of personal information as well as security measures required to be taken by telecommunications business operators and Internet information service providers.

In addition, the Standing Committee of the National People's Congress promulgated the Cyber Security Law of the People's Republic of China, or the Cyber Security Law, effective June 2017, to protect cyberspace security and order. Pursuant to the Cyber Security Law, any individual or organization using the network must comply with the constitution and the applicable laws, follow the public order and respect social moralities, and must not endanger cyber security, or engage in activities by making use of the network that endanger the national security, honor and interests, or infringe on the fame, privacy, intellectual property and other legitimate rights and interests of others. The Cyber Security Law sets forth various security protection obligations for network operators, which are defined as ''owners and administrators of networks and network service providers,'' including, among others, complying with a series of requirements of tiered cyber protection systems, verifying users' real identity, localizing the personal information and important data gathered and produced by key information infrastructure operators during operations within the PRC, and providing assistance and support to government authorities where necessary for protecting national security and investigating crimes. Furthermore, on October 1, 2019, Cyberspace Administration of China issued Provisions on the Cyber Protection of Personal Information of Children to protect the security of personal information of children and promote the healthy growth of children.

***Regulations relating to Trademarks***

Both the PRC Trademark Law, last amended on November 1, 2019, and the Implementation Regulation of the PRC Trademark Law, effective on May 1, 2014, provide protection to the holders of registered trademarks and trade names. The PRC Trademark Office handles trademark registrations and grants a renewable term of rights of 10 years to registered trademarks. In addition, trademark license agreements must be filed with the Trademark Office.

After receiving a trademark registration application, the PRC Trademark Office will make a public announcement with respect to the proposed trademark registration application if the relevant trademark passes the preliminary examination. Any person may, within three months after such public announcement, object to such trademark application. The PRC Trademark Office will then decide who is entitled to the trademark registration, and its decisions may be appealed to the PRC Trademark Review and Adjudication Board, whose decision may be further appealed through judicial proceedings. If No objection is filed within three months after the public announcement period or if the objection has been overruled, the PRC Trademark Office will approve the registration and issue a registration certificate, upon which the trademark is registered and will be effective for a renewable 10-year period, unless otherwise revoked.

53

Table of Contents

### Regulations relating to Patents

According to the Patent Law of the PRC promulgated by the Standing Committee of the National People's Congress on March 12, 1984, as last amended on December 27, 2008, and effective from October 1, 2009, and the Implementation Rules of the Patent Law of the PRC, promulgated by the State Council on June 15, 2001 and as last amended on January 9, 2010, there are three types of patents in the PRC, including invention patents, utility model patents and design patents. The protection period is 20 years for an invention patent and 10 years for a utility model patent and a design patent, commencing from their respective application dates. Any individual or entity that utilizes a patent or conducts any other activity in infringement of a patent without prior authorization of the patent holder shall pay compensation to the patent holder and is subject to a fine imposed by relevant administrative authorities, and, if constituting a crime, shall be held criminally liable in accordance with the law. According to the PRC Patent Law, for public health purposes, the State Intellectual Property Office of the PRC may grant a compulsory license for manufacturing patented drugs and exporting them to countries or regions covered under relevant international treaties to which PRC has acceded. In addition, according to the Patent Law, any organization or individual that applies for a patent in a foreign country for an invention or utility model patent established in China is required to report to the State Intellectual Property Office for confidentiality examination.

### Regulations relating to Copyrights

According to the Copyright Law of the PRC, which took effect on June 1, 1991, and was last amended February 26, 2010 and subsequently enforced on April 1, 2010, copyright includes computer software, and the Copyright Protection Centre of China provides a voluntary register system for copyright.

According to the Regulation on Computer Software Protection, which took effect on October 1, 1991 and was last amended on January 30, 2013 and subsequently enforced on March 1, 2013, the software copyright shall exist from the date on which its development has been completed, and software copyright owner may register with the software registration institution recognized by the copyright administration department of the State Council. On February 20, 2002, the National Copyright Administration of the PRC issued the Measures on Computer Software Copyright Registration, which outlines the operational procedures for registration of software copyright, as well as registration of the license for the software copyright and software copyright transfer contracts. The Copyright Protection Center of the PRC is mandated as the software registration agency under the regulations.

### Regulations relating to Domain Names

Domain names are protected under the Administrative Measures on the Internet Domain Names issued by the MIIT, on August 24, 2017 and effective from November 1, 2017, and the Implementing Rules on Registration of Country Code Top Level Domain issued by China Internet Network Information Center on June 18, 2019. The MIIT is the main regulatory body responsible for the administration of PRC internet domain names. Domain name registrations are handled through domain name service agencies established under the relevant regulations, and the applicants become domain name holders upon successful registration.

### Regulations relating to Employee Share Options

Under the Stock Option Rule promulgated by SAFE in February 2012, a PRC entity's directors, supervisors, senior management officers, other staff or individuals who have an employment or labor relationship with a Chinese entity and are granted stock options by an overseas publicly listed company are required, through a PRC agent or PRC subsidiary of such overseas publicly listed company, to register with SAFE and complete certain other procedures. We and our PRC resident employees who have been granted stock options are subject to these regulations. We have designated our PRC relevant subsidiaries to handle the registration and other procedures required by the Stock Option Rule. If we or our PRC option holders fail to comply with these regulations in the future, we or our PRC option holders may be subject to fines and legal sanctions.

### Regulations relating to Employees

The principal PRC laws and regulations that govern employment include:

- the PRC Labor Law which became effective on January 1, 1995 and was amended on August 27, 2009 and December 29, 2018; and

Table of Contents

- the PRC Labor Contract Law which became effective on January 1, 2008, and its amendments which became effective on July 1, 2013.

Pursuant to the PRC Labor Law and the PRC Labor Contract Law, employers must execute written labor contracts with full-time employees. All employers must compensate their employees with wages equal to at least the local minimum wage standards. All employers are required to establish a system for labor safety and sanitation, strictly abide by state rules and standards and provide employees with workplace safety training. Violations of the PRC Labor Contract Law and the PRC Labor Law may result in the imposition of fines and other administrative liabilities. Criminal liability may arise for serious violations.

In addition, employers in China are obliged to provide employees with welfare schemes covering pension insurance, unemployment insurance, maternity insurance, work-related injury insurance, medical insurance and housing funds.

### Regulations relating to Foreign Investment

On March 15, 2019, the National People's Congress promulgated the Foreign Investment Law, which came into effect on January 1, 2020 and replaced the trio of existing laws regulating foreign investment in China, namely, the Sino-foreign Equity Joint Venture Enterprise Law, the Sino-foreign Cooperative Joint Venture Enterprise Law and the Wholly Foreign-invested Enterprise Law. The existing foreign-invested enterprises established prior to the effective of the Foreign Investment Law may keep their corporate forms within five years. The implementing rules of the Foreign Investment Law will be stipulated separately by State Council. Pursuant to the Foreign Investment Law, ''foreign investors'' means natural person, enterprise, or other organization of a foreign country; ''foreign-invested enterprises'' means any enterprise established under PRC law that is wholly or partially invested by foreign investors and ''foreign investment'' means any foreign investor's direct or indirect investment in mainland China, including: (1) establishing FIEs in mainland China either individually or jointly with other investors; (2) obtaining stock shares, stock equity, property shares, other similar interests in Chinese domestic enterprises; (3) investing in new projects in mainland China either individually or jointly with other investors; and (4) making investment through other means provided by laws, administrative regulations, or State Council provisions.

The Foreign Investment Law stipulates that China implements the management system of pre-establishment national treatment plus a negative list to foreign investment and the government generally will not expropriate foreign investment, except under special circumstances, in which case it will provide fair and reasonable compensation to foreign investors. Foreign investors are barred from investing in prohibited industries on the negative list and must comply with the specified requirements when investing in restricted industries on that list. When a license is required to enter a certain industry, the foreign investor must apply for one, and the government must treat the application the same as one by a domestic enterprise, except where laws or regulations provide otherwise. In addition, foreign investors or foreign-invested enterprises are required to file information reports and foreign investment which affects or is likely to have effect on the national security shall be subject to the national security review.

The Implementing Regulations of the Foreign Investment Law of the PRC was promulgated on December 26, 2019 by the State Council and became effective on 1 January 2020, which replaced the Regulations on Implementing the Sino-Foreign Equity Joint Venture Enterprise Law, the Provisional Regulations on the Duration of Sino-Foreign Equity Joint Venture Enterprises, the Regulations on Implementing the Wholly Foreign-Owned Enterprise Law and the Regulations on Implementing the Sino-Foreign Cooperative Joint Venture Enterprise Law. The Implementing Regulation of the Foreign Investment Law specifies that No foreign investor may invest in any industry forbidden by the negative list and foreign investors making investments the restricted industry shall comply with the special administrative measures for restricted access as requirements on shareholding and senior executives as stipulated in the negative list. In addition, foreign investors or foreign-invested enterprises are required to file information reports and foreign investment which affects or is likely to have effect on the national security shall be subject to the national security review. Pursuant to the Implementing Regulation of the Foreign Investment Law, foreign investors or foreign-invested enterprises shall submit the investment information to the competent department of commerce through the enterprise registration system and the National Enterprise Credit Information Publicity System. The competent department of commerce and the department for market regulation under the State Council shall effectively ensure the linkage of relevant business systems, and provide guidance for foreign investors or foreign-invested enterprises on submission of investment information. On December 26, 2019, the Supreme People's Court issued the Interpretations of the Foreign Investment Law. Both the Implementing Regulations of the Foreign Investment Law and the Interpretations of the Foreign Investment Law came into effect since January 1, 2020.

### Regulations relating to Foreign Investment in Value-Added Telecommunications Industry

According to the Administrative Rules on Foreign-invested Telecommunications Enterprises issued by the State Council effective in January 2002, as amended in September 2008 and February 2016, a foreign investor may hold No more than a 50% interest in a value-added telecommunications services provider in China and such foreign investor must have experience operating in such industry.

Pursuant to the Opinions of the MIIT and the People's Government of Shanghai Municipality on Further Opening Up Value-added Telecommunications Business in China (Shanghai) Pilot Free Trade Zone ("Pilot Opinions"), which were jointly issued by the MIIT and People's Government of Shanghai Municipality on January 6, 2014, foreign ownership in telecommunications service business (only include apps stores), which China has committed to opening-up after its WTO entry, may exceed 50% on a pilot basis. Foreign ownership in online data processing and transaction processing (operational electronic commerce) shall not exceed 55%. Except for the Internet connection service business (provision of internet connection service for online users), the scope for other businesses services specified by the Pilot Opinions can be nationwide. On April 15, 2014, MIIT promulgated the Circular on Printing and Distributing the Administrative Measures of China (Shanghai) Pilot Free Trade Zone for the Pilot Operation of Value-added Telecommunications Business by Foreign Investment, which further provides the requirements and procedures for foreign-invested enterprises to apply for and obtain the approval to conduct value-added telecommunications business based in the China (Shanghai) Pilot Free Trade Zone.

Table of Contents

On May 29, 2015, MIIT promulgated the Circular on Relaxing the Geographical Restrictions Imposed on Certain Service Facilities Providing Value-added Telecommunication Services in the China (Shanghai) Pilot Free Trade Zone, which extends the geographical scope of establishing an agent of call center business and edge routers for domestic Internet virtual private network business from the China (Shanghai) Pilot Free Trade Zone to Shanghai Municipality. On June 19, 2015, MIIT further issued the Circular of the MIIT on Removing the Restrictions on Shareholding Ratio Held by Foreign Investors in Online Data Processing and Transaction Processing (Operational E-commerce) Business, which liberalizes the foreign ownership restrictions in online data processing and transaction processing (operational electronic commerce) business by expanding the business areas from the China (Shanghai) Pilot Free Trade Zone to nationwide, and the foreign ownership may be up to 100%.

The MIIT Notice requires that a value-added telecommunications business operator (or its shareholders) must own domain names and trademarks used by it in the value-added telecommunications business, and have premises and facilities appropriate for such business. To comply with the MIIT Notice, all of our related trademarks and domain names are owned directly by Beijing Technology and Beijing JTX Technology.

### Regulations relating to the Establishment of Offshore Special Vehicle by PRC Residents

Pursuant to the Circular 37 promulgated by SAFE, which became effective on July 4, 2014, a PRC resident, including a PRC resident natural person or a PRC company, shall register with the local SAFE branch before it contributes assets or its equity interests into an overseas SPV established or controlled by the PRC resident for the purpose of investment and financing. When the overseas SPV that fulfilled the initial registration formalities undergoes certain major changes, including but not limited to, the change in the PRC-resident shareholder of the overseas SPV, name of the overseas SPV, term of operation, or any increase or reduction of the registered capital of the overseas SPV, share transfer or swap, and merger or division, the PRC resident shall timely register such change with the local SAFE branch.

We have requested our beneficial owners who are PRC residents to make the necessary applications, filings and amendments required by SAFE. However, we cannot provide any assurances that all of our beneficial owners who are PRC residents will continue to make, obtain or amend any applicable registrations or approvals required by these SAFE regulations. The failure or inability of our PRC resident beneficial owners to comply with the registration procedures set forth therein may subject us to fines and legal sanctions, restrict our cross-border investment activities, or limit our ability to contribute additional capital into our PRC subsidiaries, or limit our PRC subsidiaries' ability to pay dividends or make other distributions to our company or otherwise adversely affect our business. Moreover, failure to comply with the SAFE registration requirements could result in liability under PRC laws for evasion of foreign exchange restrictions.

### C. Organizational Structure

We conduct substantially all of our operations in China through our PRC subsidiaries and consolidated controlled entities. For more information regarding the contractual arrangements among our PRC subsidiaries and consolidated controlled entities, see "Item 7.B. Major Shareholders and Related Party Transactions—Related Party Transactions—Structure Contracts."

The following is a list of our principal subsidiaries and consolidated controlled entities as of the date of this annual report:

| Name | Place of Formation | Relationship |
|---|---|---|
| Beijing Hong An Tu Sheng Network Technology Co., Ltd. ("Beijing Hong An") | China | Wholly-owned subsidiary |
| Beijing Li Man Wan Jia Network Technology Co., Ltd. ("Beijing Li Man Wan Jia") | China | Wholly-owned subsidiary |
| Beijing SouFun Network Technology Co., Ltd. ("Soufun Network") | China | Wholly-owned subsidiary |
| Beihai Tian Xia Dai Microfinance Co., Ltd. ("Beihai Tian Xia Dai Microfinance") | China | Wholly-owned subsidiary |
| Beijing Tuo Shi Huan Yu Network Technology Co., Ltd. ("Beijing Tuo Shi") | China | Wholly-owned subsidiary |
| Best Work Holdings (New York) LLC | United States | Wholly-owned subsidiary |
| Best Fang Holdings LLC | United States | Wholly-owned subsidiary |
| Chongqing Tian Xia Dai Microfinance Co., Ltd. ("Chongqing Tian Xia Dai Microfinance") | China | Wholly-owned subsidiary |
| Hangzhou SouFun Network Technology Co., Ltd. ("Hangzhou SouFun Network") | China | Wholly-owned subsidiary |
| Hong Kong Property Network Limited | Hong Kong | Wholly-owned subsidiary |
| Shanghai BaoAn Enterprise Co., Ltd. ("Shanghai BaoAn Enterprise") | China | Wholly-owned subsidiary |
| Shanghai BaoAn Hotel Co., Ltd. ("Shanghai BaoAn Hotel") | China | Wholly-owned subsidiary |
| Shanghai SouFun Microfinance Co., Ltd. ("Shanghai SouFun Microfinance") | China | Wholly-owned subsidiary |
| SouFun Media Technology (Beijing) Co., Ltd. ("SouFun Media") | China | Wholly-owned subsidiary |
| Tianjin Jia Tian Xia Microfinance Co., Ltd. ("Tianjin Jia Tian Xia Microfinance") | China | Wholly-owned subsidiary |
| Beijing Hua Ju Tian Xia Network Technology Co., Ltd. ("Beijing Hua Ju Tian Xia") | China | Consolidated controlled subsidiary |
| Beijing SouFun Science and Technology Development Co., Ltd. ("Beijing Technology") | China | Consolidated controlled subsidiary |
| Beijing Yi Ran Ju Ke Technology Development Co., Ltd. ("Beijing Yi Ran Ju Ke") | China | Consolidated controlled subsidiary |
| Fang Tian Xia Financial Information Service (Beijing) Ltd. (previously known as Beijing Tianxia Dai Information service Co., Ltd.) ("Tianxia Dai Information") | China | Consolidated controlled subsidiary |
| Hangzhou Nuo Guan Real Estate Broking Co., Ltd. ("Hangzhou Nuo Guan") | China | Consolidated controlled subsidiary |
| Shanghai Jia Biao Tang Real Estate Broking Co., Ltd. ("Shanghai JBT Real Estate Broking") | China | Consolidated controlled subsidiary |
| Shenzhen Yi Ran Ju Ke Real Estate Broking Co., Ltd. ("Shenzhen Yi Ran Ju Ke") | China | Consolidated controlled subsidiary |
| Wuhan SouFun Yi Ran Ju Ke Real Estate Agents Co., Ltd. ("Wuhan Yi Ran Ju Ke") | China | Consolidated controlled subsidiary |

Table of Contents

The following diagram illustrates our corporate structure including our principal subsidiaries and consolidated controlled entities as of the date of this annual report:



---

\*   The diagram above omits the names of subsidiaries and consolidated controlled entities that are insignificant individually and in the aggregate.

(1) Each of Shanghai BaoAn Enterprise and Shanghai BaoAn Hotel is owned as to 25.0% by Shanghai China Index, one of our consolidated controlled entities.

(2) Shanghai SouFun Microfinance is owned as to 20.0% by Beijing Technology and as to 10.0% by Beijing JTX Technology, both of which are our consolidated controlled entities.

(3) Shanghai JBT Real Estate Broking is owned as to 30.0% by Beijing Jia Tian Xia Advertising Co., Ltd. which is our consolidated controlled entity.

Table of Contents

***D. Property, Plant and Equipment***

See "Item 4.B. Information on the Company—Business Overview—Facilities."

## ITEM 4A. UNRESOLVED STAFF COMMENTS

None.

## ITEM 5. OPERATING AND FINANCIAL REVIEW AND PROSPECTS

The following discussion of our financial condition and results of operations is based upon and should be read in conjunction with our consolidated financial statements and their related notes included elsewhere in this annual report. This discussion contains forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. See "Forward-Looking Statements." In evaluating our business, you should carefully consider the information provided under "Item 3.D. Key Information—Risk Factors." We caution you that our businesses and financial performance are subject to substantial risks and uncertainties.

## A. OPERATING RESULTS

### Overview

We believe we operate a leading real estate Internet portal in China in terms of the number of page views and visitors to our websites in 2019. Our user-friendly websites and mobile apps support active online communities and networks of users seeking information on, and services for, the real estate and home-related sectors in China. Our service offerings include:

- *Marketing services*: We offer advertisement services via our online platform to real estate developers in the marketing phase of new property developments as well as real estate brokers and suppliers of home furnishing and improvement-related products and services.

- *Listing services*: We offer listing services via our online platform to real estate developers, real estate agents and brokers, property managers, property owners, and suppliers of home furnishing and improvement-related products and services to allow them to post information related to properties and home furnishing and improvement-related products and services on our online platform.

- *Leads generation services:* Our leads generation services connect our customers with scattered demand for real estate and home furnishing and improvement-related services by extending their reach and visibility from a limited number of local consumers to a large number of users and user communities on our online platform to generate sales leads for our customers.

- *Financial services*: We provide financial services primarily though our offline micro loan subsidiaries. We provide primarily secured consumer loans to individuals that meet our credit assessment requirements. We launched financial services in August 2014.

- *E-commerce services*: Our e-commerce services primarily include Fang membership services and direct sales services for new homes. We provide both free and paid Fang membership services to our registered members. Our free services include primarily regular updates regarding local property developments, tours to visit property developments and other services relating to property purchases. Our paid services primarily include offers to purchase properties at a discount from our partner developers and dedicated information and related services to facilitate property purchases. We ceased entering into new contracts for our direct sales services for new homes, online home-decorating services and online real estate brokerage services in 2018 due to the change in our business development strategies. We suspended our online sublease services in 2019 due to our transformation back to a technology-driven open platform and our business development strategies.

59

Table of Contents

- *Value-added services*: We provide value-added services including portal collaboration.

We have built a large and active community of users who are attracted by the comprehensive real estate and home-related content available on our portal that forms the foundation of our service offerings. According to our own records, in the fourth quarter of 2019, our websites, including www.fang.com, received a monthly average of approximately 100 million unique visitors and generated a monthly average of approximately 140 million website visits. We currently maintain approximately 74 offices to focus on local market needs.

Our revenues, net loss from continuing operations attributable to our shareholders in 2019 were US$219.7 million and US$23.4 million, respectively. Marketing, listing, leads generation, financial, value-added and e-commerce services accounted for 43.1%, 28.9%, 19.7%, 4.3%, 2.7% and 1.3%, respectively, of our revenues in 2019.

**Key Operating and Financial Performance Metrics**

We monitor the key operating and financial performance metrics set forth in the tables below to help us evaluate growth trends, establish budgets, measure the effectiveness of our sales and marketing efforts and assess our operational efficiencies.

| | Year Ended December 31 | |
| --- | --- | --- |
| **Selected Metrics** | **2018** | **2019** |
| Average monthly unique visitors (million)*[1] | 152 | 115 |
| Average monthly mobile unique visitors (million)*[2] | 117 | 86 |

* Source: Internal records for data in 2018 and 2019
(1) Refers to the number of combined average monthly unique visitors for our websites, mobile apps and WAP websites, which includes the number of average monthly mobile unique visitors.
(2) Refers to the number of combined average monthly unique visitors for our mobile apps and WAP websites.

**Factors Affecting Our Results of Operations**

*Economic growth in China and in the PRC real estate market*

We conduct substantially all of our business and operations in China. Accordingly, our results of operations have been, and are expected to continue to be, affected by the general performance of China's economy. As a leading real estate Internet portal, our financial results have also been affected by the performance of the real estate and home furnishing and improvement sectors in China.

The recent outbreak of COVID-19 has and is continuing to spread rapidly throughout China and other parts of the world since January 2020. The disruption and the potential slowdown of China's economy in 2020 and beyond could have a material adverse effect on the performance of the real estate and home furnishing and improvement sectors in China, and ultimately, on our results of operations. See "Item 3.D. Key Information—Risk Factors—Risks related to our business—Our business, financial condition and results of operations may be adversely affected by the COVID-19 outbreak."

*Growth in China's Internet and online marketing sectors*

We are an Internet portal company and a majority of our revenues are generated from our marketing and listing services. As such, our results of operations are heavily dependent on the successful and continued development of China's Internet and online marketing sectors. The Internet has emerged as an increasingly attractive and cost-effective advertising channel in China, especially as the number of Internet users, disposable income of urban households and network infrastructure in China have increased.

*Performance of certain geographic areas and urban centers in China*

A substantial portion of our revenues are concentrated in China's major urban centers including Beijing, Shanghai, Chengdu, Chongqing, Tianjin and Shenzhen. Although our percentage of revenues from these six urban centers has decreased as we expanded our operations elsewhere in China, we expect customers in these cities to continue to represent a significant portion of our revenues in the near term. We may also expand into new geographic areas and sectors. As of December 31, 2019, we had established real estate-related content, search services, marketing and listing coverage of 665 cities across China. The financial performance of newly penetrated cities will have a substantial impact on our results of operations as we expand into new markets, as we may incur significant additional operating expenses, including hiring new sales and other personnel, in order to expand our operations.

Table of Contents

*Competition in China's online real estate and home-related Internet services*

We face competition from other companies in each of our primary business activities. In particular, the online real estate and home-related Internet service market in China has become increasingly competitive, and such competition may continue to intensify in future periods. As the barriers to entry for establishing Internet-based businesses are typically low, it is possible for new entrants to emerge and rapidly scale up their operations. We expect additional companies to enter the online real estate and home-related Internet service industry in China and a wider range of online services in this area to be introduced.

We expect to face additional competition as we develop and offer new services. For example, we launched our leads generation services in late 2017. Some of our customers offer the same or similar services. Accordingly, we may face competition from these customers. In addition, such competition may adversely affect our relationships with these customers and our business.

*PRC regulations affecting the Internet, online marketing, real estate and financing industries*

The Internet, online marketing, real estate and financing industries in China are heavily regulated. PRC laws, rules and regulations cover virtually every aspect of these industries, including entry into the industry, the scope of permissible business activities and foreign investment. The PRC government also exercises considerable direct and indirect influence over these industries by imposing industry policies and other economic measures. Many of these regulations have recently been implemented and are expected to be refined and adjusted over time. Moreover, the PRC government regulates interest rates, real estate transaction taxes and the acquisition and ownership of real estate. It also regulates Internet access and the distribution of news, information or other content, as well as products and services, through the Internet. The PRC government also levies business taxes, value-added taxes, surcharges and cultural construction fees on advertising-related sales in China, such as sales of our marketing, listing, leads generation, financial, e-commerce and value-added services. In addition, because certain of our PRC subsidiaries and consolidated controlled entities currently qualify as "high and new technology enterprises" or "Software Enterprise," they enjoy tax holidays or lower rates from the relevant PRC tax authorities or under local governmental policies. If we were to lose such preferential tax treatment, we would be subject to a higher enterprise income tax rate, which would have a material adverse effect on our financial condition, results of operations and profitability. See "Item 4.B. Information on the Company—Business Overview—Regulation." Political, economic and social factors may also lead to further policy refinement and adjustments. The imposition of new laws and regulations, or changes to current laws and regulations, could have a material impact on our business, financial condition and results of operations.

*Our ability to grow financial services while maintaining effective risk management*

We began to offer financial services in the third quarter of 2014. We offer secured entrusted loans, mortgage loans as well as unsecured loans to real estate developers, property buyers and other borrowers and charge interest, service fees and guarantee fees. In 2019, our financial services primarily focused on secured business loans and consumer loans to individual borrowers. As of December 31, 2019, we had loans receivable with a principal balance of US$63.4 million. The lending market has historically been dominated by commercial banks and other financial institutions. Compared with these market participants, we have significant less experience in managing the lending business. The growth of our financial services will depend on our ability to develop attractive loan products and services and manage related credit risk.

*Demand for home furnishing and improvement information and products*

As China's real estate market has expanded and matured, the ancillary home furnishing and improvement industry has also been growing to meet rising consumer demand. Similarly, we have expanded our marketing and listing services to suppliers of home furnishing and improvement products and services. By adding this category of advertisers and clients, we have been able to expand our sources of marketing and listing service revenues and, accordingly, expect the rate of increase in our revenues to continue to benefit from the continued growth of China's home furnishing and improvement sectors.

*Our ability to grow the retained business following the completion of the separation of CIH from us*

On June 11, 2019, we completed the separation of CIH from us into an independent publicly traded company, whose business comprises (1) certain information and analytics services, initially operated as part of our value-added services, and (2) certain marketplace services, initially operated as part of our listing services. Following the completion of the separation and distribution, we continue to retain our business operating a real estate Internet portal in China and pursue our strategy of enhancing our online operations and residential property-related business. We anticipate dedicating our managerial attention and resources to developing the retained business in light of the distinct needs of China's residential property market, and whether we can continue to grow the retained business depends on our ability to manage and develop such business effectively.

Table of Contents

**Basis of Presentation**

To comply with applicable PRC laws, rules and regulations restricting foreign ownership of companies that operate Internet content provision and online advertising services, we operate our websites and mobile apps and provide such services in China through contractual arrangements with our consolidated controlled entities. Under the current regulatory regime, Internet content distribution is permitted to operators with less than 50.0% foreign investment and advertising is permitted to all qualified operators. We may consider further optimizing our corporate structure in light of the evolving regulatory environment. The equity interests of the consolidated controlled entities are held directly or indirectly by Mr. Mo, our founder and executive chairman, together with Mr. Jiangong Dai and Mr. Jianning Dai, but the effective control of the consolidated controlled entities has been transferred to us through a series of Structure Contracts. We have funded these consolidated controlled entities' paid-in capital by extending loans to Mr. Mo, Mr. Jiangong Dai and Mr. Jianning Dai. Pursuant to the terms of the Structure Contracts, we are obligated to bear substantially all of the risk of losses from our consolidated controlled entities' activities and are entitled to receive substantially all of their profits, if any. See "Item 7.B. Major Shareholders and Related Party Transactions—Related Party Transactions—Structure Contracts" and our consolidated financial statements included elsewhere in this annual report.

Based on these Structure Contracts, we believe that, notwithstanding our lack of equity ownership, the arrangements provide us with effective control over our consolidated controlled entities. Accordingly, the financial results of these entities are included in our consolidated financial statements.

We refer to our consolidated controlled entities as PRC entities we control through contractual arrangements together with their subsidiaries, or the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries in our consolidated financial statements and related notes included elsewhere in this annual report.

On June 11, 2019, we completed the separation of CIH from us into an independent publicly traded company via a dividend distribution of all the CIH's ordinary shares owned by us to our equity holders. The business of CIH comprises (1) certain information and analytics services, initially operated as part of our value-added services, and (2) certain marketplace services, initially operated as part of our listing services. Following the spin-off of CIH, we have retained our business operating a real estate Internet portal focusing primarily on serving the residential property sector, while CIH strategically focuses on serving the commercial property sector in China. Consequently, certain of our value-added services, listing services and other related services were accounted for as discontinued operations in accordance with U.S. GAAP in our consolidated financial statements. For the periods presented, the assets and liabilities of the discontinued operations prior to the spin-off of CIH are presented separately on the consolidated balance sheets, and the results of the discontinued operations, less income taxes, are reported as income from discontinued operations, on the consolidated statements of comprehensive income (loss). For more details, see Note 2 and Note 15 to our consolidated financial statements included elsewhere in this annual report.

**Components of our Results of Operations**

*Revenues*

We derive our revenues from marketing services, listing services, leads generation services, financial services, e-commerce services, and value-added services.

*Marketing Services*

Our marketing service revenues consist of revenues derived from the advertising services provided by our new home, secondary and rental properties and home furnishing and improvement businesses. We offer marketing services on our websites and mobile apps, primarily through banner advertisements, floating links, logos and other media insertions. We offer our marketing services to real estate developers as well as real estate brokers and suppliers of home furnishing and improvement-related products and services. Marketing services allow our customers to place advertisements at particular areas on our websites or mobile apps, in particular formats and over particular periods of time.

*Listing Services*

Our listing service revenues consist of revenues derived from our basic listing services. Prior to the separation of CIH, our listing services included basic listing services and special listing services on our websites and mobile apps. Following the spin-off of CIH, we retained our basic listing services, while the special listing services, namely the specialized marketing campaigns provided primarily to developers through online channels and offline themed events, are operated by CIH. Basic listing services are targeted at real estate agents, brokers, developers, property owners, property managers and others seeking to sell or rent new and secondary properties and allow visitors to our websites and mobile apps to search for product suppliers and service providers in China's home furnishing and improvement sector. Revenues from basic listing services are predominantly derived from our secondary and rental business.

Table of Contents

*Leads Generation Services*

We provide leads generation services to real estate developers, real estate brokers and, to a lesser extent, suppliers of home furnishing and improvement-related products and services by connecting our customers with scattered demand for real estate and home furnishing and improvement-related services. We charge the service fee based on the number of sales leads we delivered during a certain period of time.

*Financial Services*

Our revenues from financial services consist of interest income and service fees from primarily secured consumer loans to individuals that meet our credit assessment requirements.

*E-commerce Services*

Our e-commerce services, first launched in 2011, primarily include Fang membership services and direct sales services for new homes. Our Fang membership services enable paid members to purchase specified properties from our partner real-estate developers at a discount significantly greater than the membership fees charged by us. We ceased entering into new contracts for our direct sales services for new homes, online home-decorating services and online real estate brokerage services in early 2018 due to the change in our business development strategies.

*Value-added services*

We provide value-added services primarily including portal collaboration.

**Cost of Revenues**

Our cost of revenues includes cost of services. Cost of services primarily consists of staff costs, tax surcharges, rental costs incurred in relation to sublease services, server and bandwidth leasing fees, payments to third-party real estate agents and other direct costs incurred in providing the related services. Prior to January 1, 2018, value-added taxes were also included in cost of revenues. Staff costs include salary and benefits paid to members of our editorial staff, customer service personnel, personnel dedicated to servicing and designing websites and mobile apps for our customers and personnel in the brokerage function. Cost of revenues also includes share-based compensation expenses in connection with share options and other share-based compensation granted to our editorial and production staff. In 2017, 2018 and 2019, our cost of revenues represented 41.4%, 19.3% and 12.9% of our revenues, respectively. We have adopted the new revenue recognition standards, ASC 606, effective January 1, 2018, which relate to the change in the presentation of value-added tax from gross basis to net basis. For the impact of adopting ASC 606 on our cost of revenues, see "—Recent Accounting Pronouncements."

**Operating Expenses**

Our operating expenses consist of selling expenses and general and administrative expenses.

*Selling Expenses*

Our selling expenses primarily consist of staff costs, such as salaries and benefits paid to personnel in our sales and distribution department, costs for promoting our Fang membership services, operating lease expenses, which include rental expenses related to our selling and distribution department, traveling and communication expenses, office expenses and advertising and promotion expenses, including fees we pay to other Internet portals for the purpose of promoting and increasing traffic to our websites and mobile apps. Selling expenses also include other expenses incurred in relation to our selling and distribution activities and share-based compensation costs in connection with share options and other share-based compensation granted to our sales and marketing personnel.

*General and Administrative Expenses*

General and administrative expenses primarily consist of staff costs, such as salaries and benefits paid to our management and general administrative, product and development personnel, bad debt expenses relating to uncollectible accounts and loans receivable, office expenses, communication expenses, professional service fees and other expenses for general and administrative purposes, as well as maintenance expenses. Our general and administrative expenses also include share-based compensation costs in connection with share options and other share-based compensation granted to our general administrative, technical and research personnel.

Table of Contents

*Taxation*

We are subject to income tax on an entity basis on profits arising in or derived from the jurisdictions where we, our subsidiaries or our consolidated controlled entities are domiciled or have operations.

*Cayman Islands*

Under the current laws of the Cayman Islands, the Cayman Islands currently levies No taxes on individuals or corporations based upon profits, income, gains or appreciation and there is No taxation in the nature of inheritance tax or estate duty. There are No other taxes likely to be material to us levied by the government of the Cayman Islands except for stamp duties, which may be applicable on instruments executed in, or after execution, brought within the jurisdiction of the Cayman Islands. In addition, the Cayman Islands does not impose withholding tax on dividend payments.

*British Virgin Islands*

Under the current laws of the British Virgin Islands, or BVI, all dividends, interests, rents, royalties, compensations and other amounts paid by subsidiaries incorporated in the BVI to persons who are not residents in the BVI and any capital gains realized with respect to any shares, debt obligations, or other securities of subsidiaries incorporated in the BVI by persons who are not residents in the BVI are exempt from all provisions of the Income Tax Ordinance in the BVI.

No estate, inheritance, succession or gift tax, rate, duty, levy or other charge is payable by persons who are not residents in the BVI with respect to any shares, debt obligation or other securities of companies incorporated in the BVI.

All instruments relating to transfers of property to or by subsidiaries incorporated in the BVI and all instruments relating to transactions in respect of the shares, debt obligations or other securities of the Company and all instruments relating to other transactions relating to the business of the Company are exempt from payment of stamp duty in the BVI. This assumes that such subsidiaries incorporated in the BVI do not hold an interest in real estate in the BVI.

There are currently No withholding taxes or exchange control regulations in the BVI applicable to subsidiaries incorporated in the BVI.

*Hong Kong*

Under the Hong Kong tax laws, subsidiaries in Hong Kong are subject to the Hong Kong profits tax rate at 16.5% and they are exempted from income tax on their foreign-derived income and there are No withholding taxes in Hong Kong on remittance of dividends. A two-tiered profits tax rates regime was introduced in 2018 where the first HK$2 million of assessable profits earned by a company will be taxed at half of the current tax rate (8.25%) while the remaining profits will continue to be taxed at 16.5%. There is an anti-fragmentation measure where each group will have to nominate only one company in the group to benefit from the progressive rates. No provision for Hong Kong profits tax has been made in the financial statements as the subsidiaries in Hong Kong have No assessable profits for the three years ended December 31, 2019.

*United States*

On December 22, 2017, the Tax Act was enacted and contains significant changes to U.S. income tax law. Effective in 2018, the Tax Act reduces the U.S. statutory tax rate from 35% to 21% and creates new taxes focused on foreign-sourced earnings and related-party payments, including the creation of the base erosion anti-abuse tax and a new tax on global intangible low-taxed income, or GILTI.

The SEC staff issued SAB 118 on December 22, 2017, which allows companies to record provisional amounts during a measurement period not to extend beyond one year of the enactment date.

The Tax Act reduces the U.S. statutory tax rate from 35% to 21% for years after 2017. Accordingly, we re-measured our deferred taxes as of December 31, 2017, to reflect the reduced rate that will apply in future periods when these deferred taxes are settled or realized. As Best Work Holdings (New York) LLC is loss making since incorporated, therefore we recognized a deferred tax asset of US$13.8 million to reflect the reduced U.S. tax rate and full valuation allowance is provided and corresponding remeasurement were made to unrecognized tax benefit and valuation allowance.

*Singapore*

Our Singapore-incorporated subsidiary does not conduct any substantive operations of its own. No provision for Singapore profits tax has been made in the financial statements as this entity has No assessable profits for the three years ended December 31, 2019.

Table of Contents

*China*

In March 2007, a new enterprise income tax law in China was enacted and then amended in February 2017 and December 2018. The New EIT Law applies a unified 25% enterprise income tax, or EIT, rate to both foreign invested enterprises and domestic enterprises, unless a preferential EIT rate is otherwise stipulated. On April 14, 2008, relevant governmental regulatory authorities issued the Administrative Measures for Certification of High and New Technology Enterprises which was amended in January 2016. High and New Technology Enterprise, or HNTE, status under the New EIT Law would entitle qualified and approved entities to a favorable EIT tax rate of 15%. The SAT issued Circular No. 203 in April 2009 and Circular 24 in June 2017 stipulating that entities which qualified for the HNTE status should apply with competent tax authorities to enjoy the reduced EIT rate of 15% provided under the New EIT Law starting from the year when the new HNTE certificate becomes effective. The HNTE certificate is effective for a period of three years and can be renewed for another three years. Subsequently, an entity needs to re-apply for the HNTE status in order to enjoy the preferential tax rate of 15%.

We obtained HNTE certificates for SouFun Media, SouFun Network, Beijing Technology, Beijing JTX Technology and Beijing Hong An Tu Sheng in November 2015 and have subsequently renewed such HNTE certificates in September and October 2018. Therefore, these five subsidiaries can enjoy the preferential tax rate of 15% from 2015 to 2020. Beijing Tuoshi received the HNTE certificate in December 2016 and had subsequently renewed the HNTE certificate in December 2019. Beijing Tuoshi can enjoy the preferential tax rate of 15% from 2016 to 2021. We also applied for the HNTE status for Beijing Li Man Wan Jia and Beijing Hua Ju Tian Xia in 2018 and received the HNTE certificates in September 2018. Beijing Li Man Wan Jia and Beijing Hua Ju Tian Xia can enjoy the preferential tax rate of 15% for 2018, 2019 and 2020.

If any entities fail to maintain the HNTE qualification under the New EIT Law, they will No longer qualify for the preferential tax rate of 15%, which could have a material and adverse effect on our results of operations and financial position provided that they do not qualify for any other preferential tax treatment. Historically, the abovementioned PRC subsidiaries have successfully obtained or renewed their HNTE certificates when the previous certificates had expired.

Subsequent to government approval in May 2014, Beijing Li Man Wan Jia and Beijing Hua Ju Tian Xia obtained the Software Enterprise status with effect from January 1, 2013. Accordingly, these three subsidiaries are entitled to the two-year EIT exemption for years 2013 and 2014 and a reduced EIT rate of 12.5% for years 2015, 2016 and 2017.

Dividends paid by our PRC subsidiaries out of the profits earned after December 31, 2007 to non-PRC tax resident investors are subject to PRC withholding tax. The withholding tax on dividends is 10%, unless a foreign investor's tax jurisdiction has a tax treaty with the PRC that provides a lower withholding tax rate and the foreign investor is recognized as the beneficial owner of the income under the relevant tax rules.

Moreover, the New EIT Law treats enterprises established outside of China with "effective management and control" located in China as PRC resident enterprises for tax purposes. The term "effective management and control" is generally defined as exercising overall management and control over the business, personnel, accounting, properties, etc. of an enterprise. Our company, if considered a PRC resident enterprise for tax purposes, would be subject to the PRC EIT at the rate of 25% on our worldwide income for the period after January 1, 2008. As of December 31, 2018 and 2019, we had not accrued for PRC tax on such basis.

**Critical Accounting Policies**

We prepare our financial statements in conformity with U.S. GAAP, which requires us to make judgments, estimates and assumptions that affect the reported amounts of our assets and liabilities, disclosure of contingent assets and liabilities on the date of each set of financial statements and the reported amounts of revenues and expenses during each financial reporting period. We continually evaluate these estimates and assumptions based on the most recently available information, our own historical experience and various other assumptions that we believe to be reasonable under the circumstances. Since the use of estimates and assumptions is an integral component of the financial reporting process, actual results could differ from those estimates and assumptions.

An accounting policy is considered to be critical if it requires an accounting estimate to be made based on assumptions about matters that are highly uncertain at the time such estimate is made, and if different accounting estimates that reasonably could have been used, or changes in the accounting estimates that are reasonably likely to occur periodically could materially impact the consolidated financial statements. We believe the following critical accounting policies reflect the more significant estimates and assumptions used in the preparation of our consolidated financial statements. The following descriptions of critical accounting policies, judgments and estimates should be read in conjunction with our consolidated financial statements and other disclosures included elsewhere in this annual report.

Table of Contents

***Revenue Recognition***

*Periods prior to January 1, 2018*

Revenue recognition for multiple-element arrangements requires judgment to determine if multiple elements exist, whether elements can be accounted for as separate units of accounting, and if so, the fair value for each of the elements.

We enter into arrangements that can include various combinations of services. Where elements are delivered over different periods of time, and when allowed under U.S. GAAP, revenue is allocated to the respective elements based on their relative selling prices at the inception of the arrangement, and revenue is recognized as each element is delivered. We use a hierarchy to determine the fair value to be used for allocating revenue to elements: (1) vendor-specific objective evidence of fair value, or VSOE, (2) third-party evidence, and (3) best estimate of selling price, or ESP. Generally, VSOE is the price charged when the deliverable is sold separately or the price established by management for a product that is not yet sold if it is probable that the price will not change before introduction into the marketplace. ESPs are established as best estimates of what the selling prices would be if the deliverables were sold regularly on a stand-alone basis. The process of determining ESPs requires our judgment and consideration of multiple factors that may vary over time depending upon the unique facts and circumstances related to each deliverable.

*Adoption of ASC 606, Revenue from Contracts with Customers*

We adopted the new revenue recognition standards, or ASC 606, effective January 1, 2018 using the modified retrospective method for contracts which were not completed at the date of initial adoption.

Our policy before the adoption of ASC 606 was to require written signed contracts by both us and our customers as persuasive evidence of our revenue arrangements. In certain cases where services are being delivered prior to the receipt of the written signed contracts by both parties, revenue had been deferred until such time the written signed contracts are collected. Under the new revenue standard, revenues may be recognized prior to the receipt of the written signed contracts by both parties (assuming all other revenue recognition criteria are satisfied), as long as the revenue arrangements between us and our customers are legally enforceable. As a result, we made an adjustment to increase the opening balance of retained earnings as of January 1, 2018 by US$2.8 million.

Before the adoption of ASC 606, we assessed whether collectability is reasonably assured at the outset of the arrangement, and subsequently reassessed if there was a substantive change in facts and circumstances. If the collectability of all or a portion of the fee is not reasonably assured, all revenue recognition were deferred until payment was received (assuming all of the other revenue recognition criteria have been met). Upon the adoption of ASC 606, if it is not probable that we will collect substantially all of the consideration to which we will be entitled in exchange for the goods or services that will be transferred to the customer, consideration received from the customer is initially recorded as a liability. We will recognize nonrefundable consideration received as revenue only when one of the following events has occurred:

- we have No remaining obligations to transfer goods or services to the customer and all, or substantially all of the consideration has been received;

- the contract has been terminated; or

- we have transferred control of the goods or services to which the consideration that has been received relates, and has stopped transferring (and have No obligation under the contract to transfer) additional goods or services to the customer, if applicable.

As a result, we made an adjustment to decrease the opening balance of retained earnings as of January 1, 2018 by US$0.5 million.

In addition, our revenues are presented net of value-added tax collected on behalf of governments starting from January 1, 2018. Prior to January 1, 2018, value-added tax collected on behalf of governments was presented as gross in both revenues and cost of revenues. We have elected to adopt the practical expedient for incremental costs to obtain a contract with a customer, with amortization periods of one year or less to be recorded in selling and marketing expenses when incurred. We have elected the practical expedient not to disclose the information about remaining performance obligations which are part of the contracts that have an original expected duration of one year or less.

Since the adoption of ASC 606 starting from January 1, 2018, we recognize revenues upon the satisfaction of its performance obligation in an amount that reflects the consideration to which we expect to be entitled to in exchange for those goods or services, excluding amounts collected on behalf of third parties, such as value-added taxes. For each performance obligation satisfied over time, we recognize revenue over time by measuring the progress toward complete satisfaction of that performance obligation. If we do not satisfy a performance obligation over time, the performance obligation is satisfied at a point in time.

Our contracts with customers often include promises to transfer multiple products and services. For these contracts, we account for individual performance obligations separately if they are capable of being distinct and distinct within the context of the contract. Determining whether products and services are considered distinct performance obligations may require significant judgment. Judgment is also required to determine the stand-alone selling price, or SSP, for each distinct performance obligation. In instances where SSP is not directly observable, such as when we do not sell the product or service separately, we determine the SSP using information that may include market conditions and other observable inputs.

Table of Contents

*Accounts Receivable and Allowance for Doubtful Accounts*

We review the accounts receivable on a periodic basis and makes general and specific allowances when there is doubt as to the collectability of individual balances.

We maintain a general and specific allowance for doubtful accounts for estimated losses inherent in our accounts receivable portfolio. Accounts receivable balances with large creditworthy customers and balances which we have registered the pledge of the titles of real estate properties as collateral from customers are reviewed by us individually for collectability. All other balances are reviewed on a pooled basis. A percentage of general allowance is applied to the balances of accounts receivable in each aging category, excluding those which are assessed individually for collectability. We consider various factors, including historical loss experience, current market conditions, the financial condition of our debtors, any receivables in dispute, the fair value of real estate properties whose titles have been pledged as collateral, the aging of receivables and current payment patterns of sour debtors, in establishing the required allowance. Accounts receivable balances are written off after all collection efforts have been exhausted.

*Loans Receivable*

Loans receivable consists primarily of secured consumer loans to individuals that have passed our credit assessment. Such amounts are recorded at the principal amount less impairment as of the balance sheet date. The loan periods extended by us to the borrowers generally range from three to thirty-six months.

An allowance for credit loss is recorded when, based on current information and events, it is probable that we will be unable to collect all amounts due according to the contractual terms of the loan agreement. We assess the allowance for credit loss related to loans receivable on a quarterly basis, either on an individual or collective basis. We consider various factors in evaluating loans receivable for possible impairment on an individual basis. These factors include the amount of the loan, historical experience, value of collateral, if any, credit quality and age of the receivables balances. Impairment is measured on an individual loan basis using either the present value of expected future cash flows discounted at the loan's effective interest rate or the fair value of the collateral if the loan is secured. We evaluate the remainder of our loans receivables portfolio for impairment on a collective basis in accordance with ASC 450-20, "Loss Contingencies" and record an allowance for credit loss at the portfolio segment level.

Loan principal and interest receivables are charged-off when the loan principal and interest receivables are deemed to be uncollectible, which is generally identified if any of the following conditions are met : (1) the borrower is dead, missing or incapacitate and there is No legal heir and presentee or the legal heir and presentee refuse to abide the contract; (2) identification of fraud, and the fraud is officially reported to and filed with relevant law enforcement departments; (3) outstanding amount following 180 days past due after all collection efforts based on management's judgment.

*Income Taxes*

We follow the liability method of accounting for income taxes, whereby deferred tax assets and liabilities are recognized based on the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases, and attributable to operating loss and tax credit carryforwards, if any. We reduce carrying amounts of deferred tax assets by a valuation allowance, if, based on the available evidence, it is "more-likely-than-not" that such assets will not be realized. Accordingly, we assess the need to establish valuation allowances for deferred tax assets at each reporting period based on a "more-likely-than-not" realization threshold. This assessment considers, among other matters, the nature, frequency and severity of current and cumulative losses, forecasts of future profitability, the duration of statutory carryforward periods, our experience with operating loss and tax credit carryforwards, if any, not expiring.

We apply ASC 740, "Income Taxes" to account for uncertainties in income taxes. In accordance with the provisions of ASC 740, we recognize in our financial statements the impact of a tax position if a tax return position or future tax position is "more-likely-than-not" to prevail based on the facts and technical merits of the position. Tax positions that meet the "more-likely-than-not" recognition threshold are measured at the largest amount of tax benefit that has a greater than fifty percent likelihood of being realized upon settlement.

Our estimated liability for unrecognized tax benefits, which is included in "other non-current liabilities," is periodically assessed for adequacy and may be affected by changing interpretations of laws, rulings by tax authorities, changes and/or developments with respect to tax audits and expiration of the statutes of limitation. The outcome for a particular audit cannot be determined with certainty prior to the conclusion of the audit and, in some cases, the appeal or litigation process. The actual benefits ultimately realized may differ from our estimates. As each audit is concluded, adjustments, if any, are recorded in our financial statements. Additionally, in future periods, changes in facts, circumstances and new information may require us to adjust the recognition and measurement estimates with regard to individual tax positions. Changes in recognition and measurement estimates are recognized in the period in which the changes occur.

Interest and penalties arising from underpayment of income taxes are computed in accordance with the relevant tax laws. The amount of interest expense is computed by applying the applicable statutory rate of interest to the difference between the tax position recognized and the amount previously taken or expected to be taken in a tax return. Interest and penalties recognized in accordance with ASC 740 are classified in our consolidated statements of comprehensive income (loss) as income tax expense.

67

Table of Contents

*Recent Accounting Pronouncements*

In June 2016, the FASB issued ASU No. 2016-13, or ASU 2016-13, Financial Instruments — Credit Losses (Topic 326), Measurement of Credit Losses on Financial Instruments. ASU 2016-13 changes the impairment model for most financial assets and certain other instruments. The standard will replace "incurred loss" approach with an "expected loss" model for instruments measured at amortized cost. For available-for-sale debt securities, entities will be required to record allowances rather than reduce the carrying amount, as they do today under the other-than-temporary impairment model. The standard is effective for public business entities for annual periods beginning after December 15, 2019, and interim periods therein. Early adoption is permitted. We are currently evaluating the impact of adopting this standard on our consolidated financial statements.

In August 2018, the FASB issued ASU 2018-13, Fair Value Measurement (Topic 820): Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurement. ASU 2018-13 eliminates, adds and modifies certain disclosure requirements for fair value measurements. The amendments applicable to the disclosures of changes in unrealized gains and losses, the range and weighted average of significant unobservable inputs used to develop Level 3 fair value measurements, and the narrative description of measurement uncertainty should be applied prospectively for only the most recent interim or annual period presented in the initial year of adoption. This ASU is effective for all entities for fiscal years beginning after December 15, 2019, including interim periods therein. All other amendments should be applied retrospectively to all periods presented upon their effective date. Early adoption is permitted, and an entity is also permitted to early adopt any removed or modified disclosures and delay adoption of the additional disclosures until their effective date. We are in the process of evaluating the impact on our consolidated financial statements upon adoption.

**Results of Operations**

The following table sets forth selected financial data from our consolidated statements of comprehensive income (loss) for the periods indicated.

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2017[1] | | 2018[1] | | 2019 | |
| | Amount | Percentage of revenue | Amount | Percentage of revenue | Amount | Percentage of revenue |
| | (US$ in thousands, except percentage) | | | | | |
| **Revenues** | | | | | | |
| Marketing services | 149,267 | 37.8% | 98,377 | 41.0% | 94,639 | 43.1% |
| Listing services | 141,454 | 35.8% | 81,741 | 34.0% | 63,471 | 28.9% |
| Leads generation services[2] | — | — | 21,303 | 8.9% | 43,300 | 19.7% |
| Financial services | 12,055 | 3.0% | 18,060 | 7.5% | 9,561 | 4.3% |
| E-commerce services | 87,809 | 22.2% | 15,384 | 6.4% | 2,847 | 1.3% |
| Value-added services | 4,753 | 1.2% | 5,182 | 2.2% | 5,893 | 2.7% |
| **Total revenues** | **395,338** | **100.0%** | **240,047** | **100.0%** | **219,711** | **100.0%** |
| **Cost of revenues** | | | | | | |
| Cost of revenues | (163,598) | (41.4)% | (46,392) | (19.3)% | (28,260) | (12.9)% |
| **Total cost of revenues** | **(163,598)** | **(41.4)%** | **(46,392)** | **(19.3)%** | **(28,260)** | **(12.9)%** |
| **Gross profit** | **231,740** | **58.6%** | **193,655** | **80.7%** | **191,451** | **87.1%** |
| **Operating income (expenses)** | | | | | | |
| Selling expenses | (83,579) | (21.1)% | (59,064) | (24.6)% | (73,662) | (33.5)% |
| General and administrative expenses | (129,719) | (32.8)% | (129,224) | (53.8)% | (99,442) | (45.3)% |
| Other income | 699 | 0.2% | 4,427 | 1.8% | 6,518 | 3.0% |
| **Operating income from continuing operations** | **19,141** | **4.8%** | **9,794** | **4.1%** | **24,865** | **11.3%** |
| Foreign exchange gain (loss) | 15 | — | (598) | (0.2)% | 154 | 0.1% |
| Interest income | 11,052 | 2.8% | 10,202 | 4.3% | 9,038 | 4.1% |
| Interest expenses | (16,153) | (4.1)% | (21,174) | (8.8)% | (25,402) | (11.5)% |
| Change in fair value of securities | 518 | 0.1% | 167,402 | (69.7)% | (46,062) | (21.0)% |
| Realized gain on available-for-sale securities | 2,421 | 0.6% | 761 | 0.3% | 861 | 0.4% |
| Government grants | 3,025 | 0.8% | 1,224 | 0.5% | 927 | 0.4% |
| Investment income, net | 6,692 | 1.7% | 6,816 | 2.8% | 2,644 | 1.2% |
| Impairment on investments | (2,768) | (0.7)% | — | — | — | — |
| Other non-operating loss | (4,562) | (1.2)% | (30) | 0.0% | — | — |
| **Income (loss) from continuing operations before income taxes** | **19,381** | **4.9%** | **(160,407)** | **(66.8)%** | **(32,975)** | **(15.0)%** |
| Income tax benefit (expenses) | (18,352) | (4.6)% | 18,989 | 7.9% | 9,544 | 4.3% |
| **Income (loss) from continuing operations, net of income taxes** | **1,029** | **0.3%** | **(141,418)** | **(58.9)%** | **(23,431)** | **(10.7)%** |
| **Income from discontinued operations, net of income taxes** | **20,675** | **5.2%** | **26,509** | **11.0%** | **13,181** | **6.0%** |
| **Net income (loss)** | **21,704** | **5.5%** | **(114,909)** | **(47.9)%** | **(10,250)** | **(4.7)%** |
| Net income (loss) attributable to noncontrolling interests from continuing operations | (3) | — | 2 | 0.0% | (1) | — |
| Net income (loss) attributable to Fang Holdings Limited's shareholders | 21,707 | 5.5% | (114,911) | (47.9)% | (10,249) | (4.7)% |
| Net income (loss) attributable to Fang Holdings Limited's shareholders from continuing operations | 1,032 | 0.3% | (141,420) | (58.9)% | (23,430) | (10.7)% |
| Net income attributable to Fang Holdings Limited's shareholders from discontinued operations | 20,675 | 5.2% | 26,509 | 11.0% | 13,181 | 6.0% |

_____

(1)   Financial data for 2017 and 2018 has been recast to present the results of the separation of CIH as discontinued operations.

(2)   We launched our leads generation services in late 2017 and began to recognize revenue from our leads generation services in 2018.

Table of Contents

*Revenues*

Our revenue decreased 8.5% year-over-year in 2019, primarily due to decline in revenue from listing service and e-commerce services, partially offset by an increase in revenue from leads generation services. Our revenues decreased 39.3% year-over-year in 2018, primarily due to decline in revenue from e-commerce services, listing services and marketing services, partially offset by an increase in revenue from leads generation services.

*Marketing Services.* Our marketing service revenues consist of revenues derived from the advertising services provided by our new home, secondary and rental properties and home furnishing and improvement businesses. We offer marketing services on our websites and mobile apps, primarily through banner advertisements, floating links, logos and other media insertions. Revenues from marketing services decreased 3.8% year-over-year in 2019, primarily due to a slowdown in the real estate market and the increased competition for similar services in China. Revenues from marketing services decreased 34.1% year-over-year in 2018, primarily due to (1) the revenues are presented net of value-added tax collected on behalf of government due to the adoption of ASC 606 from January 1, 2018, and (2) a slowdown in the real estate market and the increased competition for similar services in China. In 2017, 2018 and 2019, revenues generated from our marketing services represented 37.8%, 41.0% and 43.1% of our revenues, respectively.

The following table presents our marketing service revenues by our customer category, both in absolute amount and as a percentage of total marketing service revenues, for the periods indicated.

| | Year Ended December 31, | | | | | |
| | 2017 | | 2018 | | 2019 | |
| | Amount | % | Amount | % | Amount | % |
|---|---|---|---|---|---|---|
| | (US$ in thousands, except percentage) | | | | | |
| New home | 121,497 | 81.4% | 98,049 | 99.7% | 94,635 | 100.0% |
| Home furnishing and improvement | — | — | 328 | 0.3% | 4 | 0.0% |
| Secondary and rental | 27,770 | 18.6% | — | — | — | — |
| **Total marketing service revenues** | **149,267** | **100.0%** | **98,377** | **100.0%** | **94,639** | **100.0%** |

New home business accounted for 81.4%, 99.7% and 100.0% of our marketing service revenues in 2017, 2018 and 2019, respectively. New home business primarily consists of marketing services for newly developed properties for sale. Our new home customers are largely real estate developers and their sales agents who are promoting newly developed properties for sale.

*Listing Services.* Revenues from our listing services decreased 22.4% year-over-year in 2019, primarily due to the decrease in number of paying subscribers. Revenues from our listing services decreased 42.2% year-over-year in 2018, primarily due to (1) the presentation on a net basis of value-added tax following the adoption of ASC 606 from January 1, 2018, and (2) the decrease in number of paying subscribers. In 2017, 2018 and 2019, revenues from our listing services represented 35.8%, 34.1% and 28.9% of our revenues, respectively. We believe that listing service revenues will continue to remain a significant source of revenue. However, regulatory efforts to require additional down payments and other actions to dampen the growing market for secondary homes have impacted and may continue to impact our revenues.

The average revenue per paying subscriber was US$623, US$400 and US$397 for 2017, 2018 and 2019, respectively.

The following table presents our listing service revenues by our customer category, both in absolute amount and as a percentage of total listing service revenues, for the periods indicated.

| | Year Ended December 31, | | | | | |
| | 2017 | | 2018 | | 2019 | |
| | Amount | % | Amount | % | Amount | % |
| | (US$ in thousands, except percentage) | | | | | |
| Secondary and rental properties | 141,454 | 100.0% | 81,442 | 99.6% | 63,379 | 99.9% |
| Other | — | — | 299 | 0.4% | 92 | 0.1% |
| **Total listing service revenues** | **141,454** | **100.0%** | **81,741** | **100.0%** | **63,471** | **100.0%** |

Secondary and rental properties business accounted for 100.0%, 99.6% and 99.9% of our listing service revenues in 2017, 2018 and 2019, respectively.

*Leads Generation Services.* We provide leads generation services to real estate developers, real estate brokers and, to a lesser extent, suppliers of home furnishing and improvement-related products and services by connecting our customers with scattered demand for real estate and home furnishing and improvement-related services. We charge the service fee based on the number of sales leads we delivered during a certain period of time. We launched our leads generation services in late 2017 and began to recognize revenue from our leads generation services in 2018. Revenues from leads generation services increased significantly year-over year in 2019, primarily due to (1) our increased efforts to promote our leads generation services in 2019 to attract potential consumers and secure quality leads for our customers, and (2) an increased acceptance and popularity of our leads generation services. In 2018 and 2019, revenues from leads generation services represented 8.9% and 19.7% of our revenues, respectively.

The following table sets forth a breakdown of our leads generation service revenues by our customer category, both in absolute amount and as a percentage of our total leads generation service revenues, for the period indicated.

| | Year Ended December 31, | | | |
| | 2018 | | 2019 | |
| | Amount | % | Amount | % |
| | (US$ in thousands, except percentage) | | | |
| New home | 15,877 | 74.5% | 34,651 | 80.0% |
| Secondary properties | 2,577 | 12.1% | 6,593 | 15.2% |
| Home furnishing and improvement | 2,849 | 13.4% | 2,056 | 4.8% |
| **Total leads generation service revenues** | **21,303** | **100.0%** | **43,300** | **100.0%** |

Our new home business primarily consists of sales to residential property developers and their sales agents who are promoting newly developed properties for sale. Our secondary properties business primarily consists of sales to real estate brokers who are promoting secondary properties for sale. Our home furnishing and improvement business primarily consists of sales to suppliers of home furnishing and improvement-related products and services.

*Financial Services.* Revenues from financial services decreased 47.1% year-over year in 2019, primarily due to decreased average balance of loans receivable. Revenues from financial services increased 49.8% year-over year in 2018, primarily due to increased average balance of loans receivable, partially offset by the presentation on a net basis of value-added tax following the adoption of ASC 606 from January 1, 2018. In 2017, 2018 and 2019, revenues from financial services represented 3.0%, 7.5% and 4.3% of our revenues, respectively.

*E-commerce Services.* Revenues from e-commerce services decreased 81.5% year-over-year in 2019, primarily because (1) we strategically transformed from a transaction-oriented platform back to a technology-driven open platform, and (2) we suspended our online sublease services in 2019 due to our business development strategies. Revenues from e-commerce services decreased 82.5% year-over-year in 2018, primarily due to (1) our business transformation from a transaction-oriented platform back to a technology-driven open platform, and (2) the presentation on a net basis of value-added tax following the adoption of ASC 606 from January 1, 2018. Revenues from e-commerce services represented 22.2%, 6.4% and 1.3% of our revenues in 2017, 2018 and 2019, respectively.

The following table presents our e-commerce service revenues by our customer category, both in absolute amount and as a percentage of total e-commerce service revenues, for the periods indicated.

| | Year Ended December 31, | | | | | |
| | 2017 | | 2018 | | 2019 | |
| | Amount | % | Amount | % | Amount | % |
| | (US$ in thousands, except percentage) | | | | | |
| New home | 36,672 | 41.8% | 8,046 | 52.3% | 1,503 | 52.8% |
| Other | 51,137 | 58.2% | 7,338 | 47.7% | 1,344 | 47.2% |
| **Total e-commerce service revenues** | **87,809** | **100.0%** | **15,384** | **100.0%** | **2,847** | **100.0%** |

Other product groups accounted for a decreasing portion of our e-commerce services revenues from 2017 to 2018 as we discontinued our online real estate brokerage services, and the percentage remained relatively stable in 2019 as compared to 2018.

*Value-Added Services.* Revenues from value-added services increased 13.7% year-over-year in 2019, primarily due to our improved customer management and increase in our product price. Revenues from value-added services increased 9.0% year-over-year in 2018, primarily due to our improved customer management and increase in our product price. In 2017, 2018 and 2019, revenues from value-added services represented 1.2%, 2.2% and 2.7% of our revenues, respectively.

### Cost of Revenues

Our cost of revenues consists of staff costs, rental costs incurred in relation to sublease services, server and bandwidth leasing fees, payments to third-party real estate agents and other direct costs incurred in providing the related services. Our cost of revenues as a percentage of our revenues was 41.4%, 19.3% and 12.9% in 2017, 2018 and 2019, respectively. Prior to January 1, 2018, cost of revenues also included value-added taxes.

Our cost of revenues decreased 39.1% year-over-year in 2019, primarily due to a decline in staff costs from US$12.0 million in 2018 to US$11.3 million in 2019 as a result of the reduction in staff headcount and the optimization in our cost structure under the technology-driven open platform model. Our cost of revenues decreased 71.6% year-over-year in 2018, primarily due to (1) a decline in staff costs from US$56.1 million in 2017 to US$12.0 million in 2018 as a result of the reduction in staff headcount of our brokerage team for secondary properties and the optimization in our cost structure under the technology-driven open platform model, and (2) the decrease in value-added tax as a result of the adoption of ASC 606 from January 1, 2018.

### Gross Profit and Gross Margin

As a result of the foregoing, our gross profit decreased 1.1% year-over-year in 2019 and decreased 16.4% year-over-year in 2018. Our gross margin was 58.6%, 80.7% and 87.1% in 2017, 2018 and 2019, respectively.

### Operating Expenses

Our operating expenses decreased 8.1% year-over-year in 2019, primarily due to the decrease in bad debt expenses and share-based compensation expenses. Our operating expenses decreased 11.7% year-over-year in 2018, primarily due to the decrease in advertising expenses, management staff costs and bad debt expenses. In 2017, 2018 and 2019, our operating expenses represented 54.0%, 78.4% and 78.8% of our revenues, respectively.

The following table sets forth our operating expenses, in absolute amount and as a percentage of our total operating expenses, for the periods indicated.

| | Year Ended December 31, | | | | | |
| | 2017 | | 2018 | | 2019 | |
| | Amount | % | Amount | % | Amount | % |
| | (US$ in thousands, except percentage) | | | | | |
| Selling expenses | 83,579 | 39.2% | 59,064 | 31.4% | 73,662 | 42.6% |
| General and administrative expenses | 129,719 | 60.8% | 129,224 | 68.6% | 99,442 | 57.4% |
| **Total** | **213,298** | **100.0%** | **188,288** | **100.0%** | **173,104** | **100.0%** |

*Selling Expenses.* Our selling expenses increased 24.7% year-over-year in 2019 primarily due to (1) an increase of US$4.5 million in advertising and promotion expenses, primarily due to our increased efforts to promote our leads generation services in 2019 to attract potential consumers and secure quality leads for our customers, and our increased efforts to preserve competitiveness for our marketing services given the increased competition for similar services in China, and (2) an increase of US$3.4 million in staff cost relating to marketing services and leads generation services. Our selling expenses decreased 29.3% year-over-year in 2018, primarily due to the decrease in selling expenses associated with our e-commerce services and advertising and promotional expenses.

*General and Administrative Expenses.* Our general and administrative expenses decreased 23.0% year-over-year in 2019, primarily due to the decrease in management staff costs and bad debt expenses. Our general and administrative expenses decreased 0.4% year-over-year in 2018, primarily due to the decrease in bad debt expenses.

Table of Contents

*Other Income.* Other income in 2019 consisted of rental income of US$5.2 million, income from litigation of US$0.4 million and loss from hotel operation of US$1.7 million. Other income in 2018 consisted of rental income of US$2.6 million, income from litigation of US$1.4 million and loss from hotel operation of US$0.7 million.

### Operating Income (Loss) from Continuing Operations and Operating Margin

As a result of the foregoing, we generated operating income from continuing operations of US$9.8 million and US$24.9 million in 2018 and 2019, respectively. Our operating margin was 4.8%, 4.1% and 11.3% in 2017, 2018 and 2019, respectively.

### Interest Income

Our interest income, consisting primarily of interest income from cash and cash equivalent, restricted cash as well as fixed rate time deposits, remained relatively stable at US$10.2 million and US$9.0 million in 2018 and 2019, respectively.

### Interest Expenses

Our interest expenses consist primarily of interest incurred as a result of our bank borrowings, short-term bond payable and convertible senior notes. Our interest expenses increased 20.0% year-over-year in 2019, primarily due to additional bank borrowings amounted to US$73.1 million and short-term bond payable amounted to US$102.0 million. Our interest expenses increased 31.1% year-over-year in 2018, primarily due to additional bank borrowings amounted to US$76.3 million.

### Change in Fair Value of Securities

Our change in fair value of securities decreased 72.5% from US$167.4 million in 2018 to US$46.1 million in 2019, primarily due to market volatility.

### Investment Income, Net

Our investment income, which primarily consisted of dividends from the respective long-term investments in companies including Color Life, Hopefluent, and World Union totaled US$6.7 million, US$6.8 million and US$2.6 million in 2017, 2018 and 2019, respectively.

### Impairment on Investments

We had US$2.8 million, nil and nil impairment on investments in 2017, 2018 and 2019, respectively. The impairment resulted from the deteriorating financial condition of Sindeo, of which company we held 11.03% equity interest, while Sindeo completed its wind-down procedure in 2017.

### Income Tax (Expenses) Benefit

Our effective tax rate was 94.7%, 11.8% and 28.9% in 2017, 2018 and 2019, respectively. The effective tax rate of 28.9% in 2019 was higher than the statutory income tax rate of 25% primarily due to the effect of (1) reversal of previously recorded unrecognized tax benefits, provision and reversal of related interest and penalty liabilities in the amount of US$20.3 million because of expiration of statutory limitation, and (2) research and development super deduction of US$3.2 million, partially offset by (1) the effect of international tax rate differences in the amount of US$8.2 million, (2) non-deductible expenses in the amount of US$6.4 million, and (3) provision of withholding tax of PRC subsidiaries in the amount of US$4.7 million based on the dividend tax rate applied to the profits generated by these subsidiaries and expected to be distributed. In 2017, 2018 and 2019, we recorded changes in valuation allowances of US$8.8 million, US$1.3 million and US$1.3 million, respectively, primarily attributable to operating losses arising from entities operating online real estate brokerage service and not anticipating sufficient taxable income in foreseeable future.

The effective tax rate of 11.8% in 2018 was lower than the statutory income tax rate of 25% primarily due to (1) non-deductible expenses in the amount of US$16.0 million, (2) provision of withholding tax of PRC subsidiaries in the amount of US$11.7 million based on the dividend tax rate applied to the profits generated by these subsidiaries and expected to be distributed, and (3) the effect of international tax rate differences in the amount of US$6.9 million, partially offset by (1) reversal of previously recorded unrecognized tax benefits in the amount of US$8.9 million because of expiration of statutory limitation, (2) the effect of tax holidays or preferential tax rates in the amount of US$3.5 million, and (3) research and development super deduction of US$2.7 million.

The effective tax rate of 94.7% in 2017 was higher than the statutory income tax rate of 25% primarily due to (1) interest and penalties on unrecognized tax benefits in the amount of US$9.3 million, (2) changes in valuation allowance in the amount of US$8.8 million, and (3) non-deductible expenses in the amount of US$7.7 million, partially offset by (1) the effect of tax holidays or preferential tax rates in the amount of US$9.5 million, and (2) reversal of previously recorded unrecognized tax benefits in the amount of US$4.3 million because of expiration of statutory limitation.

Table of Contents

***B. Liquidity and Capital Resources***

Historically, we have financed our liquidity requirements primarily through cash generated from operations, bank borrowings, short-term bond, convertible senior notes and equity financings. As of December 31, 2019, we had US$105.3 million in cash and cash equivalents, US$219.1 million in current portion of restricted cash and US$194.7 million in short-term investments, compared to US$171.2 million, US$245.5 million and US$16.0 million as of December 31, 2018, respectively. Of our cash and cash equivalents as of December 31, 2019, US$93.9 million was held inside the PRC and US$11.4 million was held outside of the PRC. See "Item 3.D. Key Information—Risk Factors—Risks related to doing business in China—We rely primarily on dividends and other distributions on equity paid by our subsidiaries, and any limitation on the ability of our subsidiaries to make payments to us could have a material adverse effect on our ability to conduct our business as well as our liquidity" and "Item 3.D. Key Information—Risk Factors—Risks related to doing business in China—Government control of currency conversion may limit our ability to utilize our revenues effectively" for additional discussion. All of our investments with original stated maturities of 90 days or less and readily convertible to known amount of cash are classified as cash and cash equivalents. As of December 31, 2017, 2018 and 2019, we had short-term investments of US$55.8 million, US$16.0 million and US$194.7 million, respectively.

On October 29, 2019, Soufun Network, one of our PRC subsidiaries, through a consolidated trust, purchased a 364-day RMB-denominated structured note ("the Structured Note") issued by Guotai Junan Financial Products Limited ("GTJA"), a financial institution in Hong Kong, at a total consideration of RMB720.0 million (equivalent to US$102.0 million). The transaction cost related to the issuance of the Structured Note is US$796,000. In connection with the issuance of the Structured Note, GTJA purchased a 364-day RMB-denominated short-term bond issued by our company with an aggregate principal amount of RMB720.0 million due 2020 (the "2020 Bonds") in reliance on Regulation S under the Securities Act. All the repayments of the principal and interests under the 2020 Bonds received by GTJA are designated to the settlement of the Structured Note. The transfer of the Structured Note is subject to prior written consent of GTJA.

As of December 31, 2019, we had U.S. dollar-denominated short-term borrowings of US$194.8 million and RMB denominated short-term borrowings of US$69.8 million obtained from financial institutions in the United States and the PRC. These bank borrowings are secured by bank deposits of approximately US$258.8 million, placed with financial institutions in China. The cash deposits pledged for these bank borrowings could be released after we repay the bank borrowings in full. These pledged deposits are classified as restricted cash on our consolidated balance sheets. Certain of these bank borrowings included cross default provisions.

As of December 31, 2019, we had U.S.-dollar denominated long-term bank borrowings of US$63.4 million and RMB denominated long-term bank borrowings of US$120.8 million obtained from financial institutions in the United States and PRC, respectively.

These bank borrowings, which totaled US$448.8 million, were incurred to satisfy the operating needs of our company and our offshore subsidiaries outside of the PRC, including repurchase of convertible notes, property acquisitions, leasehold improvement and construction.

In December 2013 and January 2014, we sold an aggregate principal amount of US$350.0 million and US$50.0 million, respectively, of convertible senior notes due 2018 (the "2018 Notes"). The 2018 Notes were offered to qualified institutional buyers pursuant to Rule 144A under the Securities Act and certain non-U.S. persons in compliance with Regulation S under the Securities Act. The 2018 Notes may be converted, under certain circumstances, based on the current conversion rate of 50.9709 ADSs per US$1,000 principal amount of 2018 Notes (after the five-for-one ADS ratio change effected in April 2014 and dividend distributions in August 2014 and March 2015, respectively), which is equivalent to a conversion price of approximately US$19.62 per ADS. The net proceeds to us from the issuance of the 2018 Notes were US$390.5 million. We are required to pay cash interest at an annual rate of 2.00% on the 2018 Notes. Interest is payable semiannually in arrears on June 15 and December 15 of each year, beginning on June 15, 2014. We incurred debt issuance costs of US$9.5 million, which are being amortized to interest expense to the first put date of the 2018 Notes. On November 15, 2016, our company delivered a notice of repurchase right at the option of the holder to the holders of the 2018 Notes. Upon completion of the repurchase on December 15, 2016, an aggregate principal amount of US$394.3 million of the notes was tendered for repurchase, representing approximately 98.6% of the outstanding principal amount of the 2018 Notes prior to such repurchase. The 2018 Notes matured in December 2018, and we repurchased the remaining balance of US$5,700 of the 2018 Notes upon maturity.

In September and November 2015, we sold an aggregate principal amount of US$100.0 million and US$200.0 million, respectively, of convertible notes due 2022 (the "2022 Notes," collective with the 2018 Notes, the "notes"). The 2022 Notes were offered to certain non-U.S. persons in compliance with Regulation S under the Securities Act. The 2022 Notes may be converted, under certain circumstances, based on the current conversion rate of 27.9086 Class A ordinary shares per US$1,000 principal amount of the 2022 Notes, which is equivalent to a conversion price of approximately US$35.83 per Class A ordinary share. The net proceeds to us from the issuance of the 2022 Notes were US$300.0 million. We are required to pay cash interest at an annual rate of 1.5% on the 2022 Notes. Interest is payable semiannually in arrears on March 31 and September 30 of each year, beginning on March 31, 2016. We incurred debt issuance costs of US$1.1 million, which are being amortized to interest expense to the first put date of the 2022 Notes. In October 2018, we repurchased a total of US$50 million of the 2022 Notes, representing approximately 25% of the outstanding principal amount of the 2022 Notes prior to such repurchase, for a consideration of US$38.9 million, and the difference was recorded in convertible notes as unamortized premium. In October 2019 and December 2019, we repurchased from certain holders of the 2022 Notes in an aggregate principal amount of US$82.94 million for a total consideration of US$83.12 million. See "Item 7.B. Major Shareholders and Related Party Transactions—Related Party Transactions—Redemption of convertible notes." As of the date of this annual report, an aggregate principal amount of US$167.06 million of the 2022 Notes remained outstanding.

The notes are senior unsecured obligations and rank (1) senior in right of payment to any of our indebtedness that is expressly subordinated in right of payment to the relevant notes, (2) equal in right of payment to any of our unsecured indebtedness that is not so subordinated, (3) effectively junior in right of payment to any of our secured indebtedness to the extent of the value of the assets securing such indebtedness, and (4) structurally junior to all indebtedness and other liabilities (including trade payables) of our subsidiaries and consolidated controlled entities.

Table of Contents

We believe that our working capital is sufficient for our present requirements, taking into consideration the potential impact the outbreak of COVID-19 may have on our business and operations. We may, however, seek additional cash resources due to changed business conditions or other future developments, including selling debt securities or additional equity securities or obtaining credit facilities to meet our cash needs. See "Item 3.D. Key Information—Risks Factors—Risks related to our ADSs, ordinary shares and notes—We may need additional capital, and the sale of additional ADSs, convertible notes or other equity securities could result in additional dilution to our shareholders, while the incurrence of debt may impose restrictions on our operations."

**Cash Flows**

The following table sets forth information regarding our cash flows for the periods indicated.

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2017** | **2018** | **2019** |
| | (US$ in thousands) | | |
| **Consolidated statements of cash flows data** | | | |
| Net cash generated from operating activities | 126,889 | 55,005 | 69,259 |
| Net cash used in investing activities | (284,512) | (106,665) | (57,003) |
| Net cash generated from (used in) financing activities | 71,969 | 34,700 | (74,116) |
| Exchange rate effect on cash, cash equivalents and restricted cash | 29,302 | (26,728) | (18,882) |
| Net decrease in cash, cash equivalents and restricted cash | (56,352) | (43,688) | (80,742) |
| Cash, cash equivalents and restricted cash at beginning of year | 547,612 | 491,260 | 447,572 |
| Cash, cash equivalents and restricted cash at end of year | 491,260 | 447,572 | 366,830 |

*Net Cash Generated from Operating Activities*

We had net cash generated from operating activities of US$69.3 million in 2019, which was primarily attributable to net loss of US$10.3 million, adjusted for (1) change in fair value of securities in amount of US$45.3 million, (2) the depreciation and amortization expense of US$25.2 million, (3) compensation expenses related to investment in CIH of US$13.6 million, and (4) an increase of deferred revenue of US$12.6 million primarily as a result of an increase in advance from customers, partially offset by an increase of US$19.0 million in accounts receivable.

We had net cash generated from operating activities of US$55.0 million in 2018, which was primarily attributable to net loss of US$114.9 million, adjusted for (1) change in fair value of securities in amount of US$165.9 million, (2) the depreciation and amortization expense of US$25.9 million, and (3) allowance for doubtful accounts of US$24.6 million, partially offset by (1) a decrease of US$42.9 million in accrued expenses and other liabilities primarily due to a decrease in the amount payable to sales and marketing agents and payroll payables, and (2) an increase of US$18.4 million in accounts receivable.

We had net cash generated from operating activities of US$126.9 million in 2017, which was primarily attributable to (1) our net income of US$21.7 million during this period, (2) a decrease in loans receivable of US$45.7 million provided to property buyers, real estate developers and other borrowers primarily as a result of bank loans deposited at relevant banks to secure our loans, and (3) an increase of deferred revenue of US$30.3 million primarily as a result of an increase in advance from customers, partially offset by (1) a decrease of US$39.3 million in accrued expenses and other liabilities primarily due to a decrease in accrued unrecognized tax benefits, and (2) a decrease in customers' refundable fees of US$22.7 million.

*Net Cash Used in Investing Activities*

Our net cash used in investing activities was US$57.0 million in 2019, primarily attributable to (1) acquisition of short-term investment of US$249.9 million, (2) origination of loans receivable of US$118.8 million, (3) acquisition of long-term investments of US$44.4 million, and (4) acquisition of property and equipment of US$12.1 million, partially offset by (1) collection of loans receivable of US$181.8 million, (2) proceeds from short-term investments of US$176.2 million, and (3) proceeds from disposal of equity investments with readily determinable fair value of US$10.3 million.

Our net cash used in investing activities was US$106.7 million in 2018, primarily attributable to (1) acquisition of short-term investment of US$721.7 million, (2) origination of loans receivable of US$134.8 million, (3) acquisition of property and equipment of US$96.1 million, and (4) acquisition of long-term investments of US$84.5 million, partially offset by (1) proceeds from short-term investments of US$759.7 million, (2) repayment of loans receivable of US$149.5 million, and (3) proceeds from government in connection with the purchase of land use right of US$14.4 million.

Table of Contents

Our net cash used in investing activities was US$284.5 million in 2017, primarily attributable to (1) acquisition of short-term investment of US$383.1 million, (2) origination of loans receivable of US$212.8 million, and (3) deposits for non- current assets of US$55.5 million, partially offset by (1) proceeds from maturity of fixed-rate time deposits of US$373.4 million, and (2) repayment of loans receivable of US$86.9 million.

### Net Cash Generated from (Used in) Financing Activities

Our net cash used in financing activities was US$74.1 million in 2019, primarily due to (1) redemption of convertible senior notes in amount of US$83.1 million, (2) repayment of loans in amount of US$43.7 million, and (3) cash disposed in connection with the separation of CIH of US$19.9 million, partially offset by proceeds from issuance of long-term loans of US$71.2 million. In addition, we purchased the Structured Note at a consideration of US$102.8 million in connection with our issuance of the 2020 Bonds with an aggregate principal amount of US$102.0 million.

Our net cash generated from financing activities was US$34.7 million in 2018, primarily due to (1) proceeds of US$36.3 million from short term loans, and (2) proceeds of US$66.8 million from long term loans, partially offset by (1) redemption of convertible senior notes in amount of US$44.6 million, and (2) repayment of US$26.9 million loans.

Our net cash generated from financing activities was US$72.0 million in 2017, primarily due to proceeds from long-term loans of US$111.5 million, partially offset by repayment of loans of US$44.0 million.

### Capital Expenditures

Our capital expenditures were US$100.1 million, US$96.1 million and US$12.1 million in 2017, 2018 and 2019, respectively. There are also constructions as well as development and renovation needs. We bought more land and properties. We expect our capital expenditures to increase in the future as our business continues to develop and expand as we make further improvements to our websites and our services.

### Inflation

According to the National Bureau of Statistics of China, the change in the consumer price index in China was 1.6%, 2.1% and 2.9% in 2017, 2018 and 2019, respectively. Recent inflation has not had a material impact on our results of operations. However, we cannot assure you that we will not be adversely affected by inflation or deflation in China in the future.

### C. Research and Development, Patents and Licenses, etc.

We have a team of experienced engineers who are primarily based at our headquarters in Beijing. We recruit most of our engineers locally and have established various recruiting and training programs with leading universities in China. We compete aggressively for engineering talent to help us address challenges such as Chinese language processing, information retrieval and high-performance computing. See "Item 4. B. Information on the Company—Business Overview—Intellectual Property."

### D. Trend Information

The COVID-19 has resulted in quarantines, travel restrictions, and temporary closure of facilities in China and many other countries since early 2020. Consequently, the COVID-19 outbreak may materially adversely affect our business, results of operations and financial condition for the current fiscal year and beyond, including but not limited to business disturbances, slowdown in revenue growth and delayed collection of accounts receivables from our customers. Because of the significant uncertainties surrounding the COVID-19 outbreak, the extent of business disturbances and related financial impact cannot be reasonably estimated at this time. See "Item 3. D. Key Information—Risk Factors" of this annual report.

Other than as disclosed in this annual report, we are not aware of any trends, uncertainties, demands, commitments or events for the year of 2019 that are reasonably likely to have a material adverse effect on our net revenues, income, profitability, liquidity or capital resources, or that caused the disclosed financial information to be not necessarily indicative of future operating results or financial condition.

### E. Off-Balance Sheet Arrangements

We do not currently have any material outstanding off-balance sheet arrangements or commitments. We have No plans to enter into transactions involving, or otherwise form relationships with, unconsolidated entities or financial partnerships established for the purpose of facilitating off-balance sheet arrangements or commitments.

Table of Contents

**F. Tabular Disclosure of Contractual Obligations**

The following table sets forth our contractual obligations as of December 31, 2019.

| | Total | Less than one year | One to three years | Three to five years | More than five years |
|---|---|---|---|---|---|
| | | | (US$ in thousands) | | |
| Convertible senior notes with principal and interest | 174,438 | 2,506 | 171,932 | — | — |
| Operating leases | 4,903 | 2,940 | 1,963 | — | — |
| Capital commitment | 24,959 | 12,469 | 11,764 | 363 | 363 |
| Loan principal and interest expense obligation | 322,597 | 87,877 | 67,586 | 68,674 | 98,460 |

Payment due by period[1]

(1)   Our estimated liability for unrecognized tax benefits is included in other non-current liabilities. As of December 31, 2019, we had accrued unrecognized tax benefits and related interest and penalties of US$121.9 million. As we are currently unable to make a reasonably reliable estimate of the possible change and the timing of payments in individual years in connection with these tax liabilities, such amounts were not included in the contractual obligation table. For borrowings with a floating interest rate amounted to US$70.6 million, the most recent rates between 4.10% and 4.29% as of December 31, 2019 were applied.

Our 2022 Notes will mature in September and November 2022, respectively, unless earlier repurchased or converted into our ADSs based on the current conversion rate of 27.9086 Class A ordinary shares per US$1,000 principal amount of the 2022 Notes, which is equivalent to a conversion price of approximately US$35.83 per Class A ordinary share. The conversion rate is subject to certain corporate events. The interest is payable semiannually in arrears on March 31 and September 30 of each year, beginning on March 31, 2016. As of the date of this annual report, an aggregate principal amount of US$167.06 million of the 2022 Notes remain outstanding.

Our loan principal and interest expense obligations relate to our U.S.-dollar denominated bank borrowings of US$85.9 million and RMB denominated bank borrowings of US$236.7 million obtained from financial institutions in the United States and PRC. US$90.1 million of bank borrowings are secured by bank deposits of approximately US$36.3 million placed with financial institutions in China. These pledged deposits are classified as restricted cash on our consolidated balance sheets.

US$228.7 million of bank borrowings were secured by building and construction in progress as of December 31, 2019.

Our capital commitments relate primarily to the construction project of a building in Tianjin, respectively. These properties will be used as our new branch offices.

**G. Safe Harbor**

See "Forward-Looking Statements."

**ITEM 6. DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES**

*A. Directors and Executive Officers*

The following table sets forth certain information relating to our directors and executive officers as of the date of this annual report.

| Name | Age | Position |
|---|---|---|
| Vincent Tianquan Mo | 56 | Executive chairman of the board of directors |
| Jian Liu | 44 | Chief executive officer |
| Shaohua Zhang | 56 | Independent director |
| Howard Huyue Zhang | 49 | Independent director |
| Hong Qin | 57 | Independent director |
| Zhizhi Gong | 40 | Director |
| Frank Hua Lei | 40 | Chief investment officer |
| Zijin Li | 35 | Acting chief financial officer and board secretary |
| Zhihong Zhang | 50 | Chief operations officer |

77

Table of Contents

*Vincent Tianquan Mo* is our founder and has served as our executive chairman of our board of directors since 1999. Mo also serves as the chairman of the board of directors of China Index Holdings Limited (NASDAQ: CIH) and a director of the board of directors of Hopefluent Group Holdings Limited (0733.HK). Prior to founding Fang Holdings Limited and China Index Holdings Limited, Mr. Mo served as an Executive Vice President at Asia Development and Finance Corporation from 1996 to 1998, a General Manager for Asia at Teleres, a venture of Dow Jones & Co., and AEGON US which provides online commercial real estate information services from 1994 to 1996. Mr. Mo holds a bachelor's degree in engineering from South China University of Technology, a master's degree of science degree in business administration from Tsinghua University and a master of arts degree and Ph.D candidate in economics from Indianan University. Mr. Mo is the uncle of Mr. Jianning Dai, who is our general manager for asset management.

*Jian Liu* has served as our chief executive officer since January 2019. Mr. Liu joined us in April 2000 and was appointed from our chief operations officer to our president on July 1, 2016. Mr. Liu was also our first chief information officer. Prior to joining us, Mr. Liu worked at the information center of Ningbo Economic Committee in Zhejiang Province. Mr. Liu holds a bachelor's degree in computer science from Ningbo University.

*Shaohua Zhang* has served as an independent director of our company and a member of our audit committee since August 2018. Mr. Zhang served as an executive director and the general manager of Shun Cheong Holdings Ltd. (currently known as IDG Energy Investment Limited), a company listed on the Hong Kong Stock Exchange (stock code: 0650), from March 2008 to August 2016. He was an independent non-executive director of Shun Cheong Holdings Ltd. from September 2006 to March 2008. Mr. Zhang is an entrepreneur with over 20 years of experience in starting up, developing and managing businesses in various industries. Mr. Zhang founded Beijing Beyondal Electric Co., Ltd. and has been the managing director since 2003, a company with a good market share in setting up internet data centers in China. He also served as the general manager of GE Digital Energy (China). Mr. Zhang received a bachelor's degree in science from China University of Technology in 1985 and a master's degree in economics (majoring in business administration) from the Capital University of Economics and Business in 1988.

*Howard Huyue Zhang* has served as an independent director of our company and a member and the chair of our audit committee since May 2019. Mr. Zhang has also served as a managing director of real estate investment division of CITIC Private Equity Funds Management Co., Ltd., a private equity asset management company in China, since March 2018. Mr. Zhang had served as a managing director at Blackstone Group (HK) Limited, a subsidiary of Blackstone Group L.P. (NYSE: BX), from October 2014 to January 2018. Mr. Zhang was the chief investment officer at Infrared NF Investment Advisers Limited, a Hong Kong-based private equity real estate fund, from 2008 to September 2014, and was responsible for acquisitions in the real estate market of China. He had also worked at Citigroup Property Investors, a principal investment firm based in the United States. Mr. Zhang has extensive real estate investment and asset management experience in the Greater China area and the United States. Mr. Zhang received a bachelor's degree from Tsinghua University in architecture and a master's degree from Massachusetts Institute of Technology in real estate. He is also a chartered financial analyst.

*Hong Qin* has served as an independent director of our company, a member of our audit committee and compensation committee, and a member and the chair of our nominating and corporate governance committee since November 2019. Ms. Qin has also served as a senior research fellow at the National Institute of Development and Strategy of Renmin University of China since May 2019. Ms. Qin worked at the Policy Research Center of the Ministry of Housing and Urban-Rural Development of the PRC from May 1992 to April 2019, where she served in various positions and was the director from October 2011 to April 2019. Ms. Qin has extensive real estate policy research experience. Ms. Qin received a bachelor's degree from Shandong University of Finance and Economics in business economics in 1985 and a master's degree from Chinese Academy of Social Sciences in urban economics in 1988.

*Zhizhi Gong* has served as a director of our company since May 2016. Ms. Gong is a managing director of the Carlyle Group where she focuses on Asia private equity investment and buyout opportunities. She joined the Carlyle Group in 2010 and is based in Beijing. Ms. Gong also serves as chairwoman of the supervisory board of Focus Media Information Technology Co., Ltd., a company listed on the Shenzhen Stock Exchange. In 2015, Ms. Gong was also a member of the board of directors of Natural Beauty BioTechnology Limited, a company listed on the Hong Kong Stock Exchange. Prior to joining the Carlyle Group, Ms. Gong was a principal at Apax Partners, where she was a founding member of the Greater China team. Prior to that, Ms. Gong worked at the investment banking department at China International Capital Corporate Limited. Ms. Gong received her M.B.A. from Harvard Business School and B.A. in economics from Peking University.

*Frank Hua Lei* has served as our chief investment officer since January 2019. Mr. Lei had served as the acting chief financial officer of our company since September 2016 and as our chief financial officer from November 2016 to January 2019. He joined us in 2009 and has accumulated extensive experience across multiple functions in our company. Prior to the recent appointments, Mr. Lei had been the managing director of our company's investment management division and the deputy chief financial officer in 2015 and 2014, respectively. Mr. Lei holds a Ph.D. in finance from University of the West of England in the United Kingdom, a master's degree in banking and finance from Loughborough University in the United Kingdom and a bachelor's degree in economics from Beijing Forestry University in China.

*Zijin Li* has served as our acting chief financial officer and board secretary since January 2019. Mr. Li joined us in 2018 as a senior director in charge of reporting and internal control, and then served as our deputy chief financial officer. Prior to joining us, Mr. Li worked for Aofan International Group in Australia for 10 years in financial management positions and worked for Fenghui Leasing Ltd. in China for 3 years as its General Manager of Finance Department. Mr. Li holds a master's degree and a bachelor's degree from Sydney University of Technology.

78

Table of Contents

*Zhihong Zhang* has served as our chief operations officer since July 2016. Ms. Zhang served as senior vice president of our company from April 2016 to July 2016 and was in charge of the financial and operation optimization. Prior to that, she served as the financial director, vice president of the resale group and vice president of the sales department of our company. She holds an MBA degree from China Foreign Economic and Trade University.

**B. Compensation**

**Compensation of Directors and Executive Officers**

Our executive directors and executive officers receive compensation in the form of salaries, annual bonuses and share options. Our independent directors receive annual compensation in connection with the performance of their duties. All directors receive reimbursements from us for expenses necessarily and reasonably incurred by them for providing services to us or in the performance of their duties. We have entered into service contracts with our executive officers. None of these service contracts provide benefits to our directors and executive officers upon termination.

In 2019, we paid aggregate cash compensation of approximately US$14.3 million to our directors and executive officers as a group, including the US$13.6 million compensation expenses recognized related to our purchase of ordinary shares of CIH. See "Item 7.B. Major Shareholders and Related Party Transactions—Related Party Transactions—Sale and Purchase Agreement" and Note 5 to our consolidated financial statements included elsewhere in this annual report for details. Other than the statutory benefits that we are required by the PRC law to contribute for each employee, including pension insurance, we have not set aside or accrued any amount to provide pension, retirement or other similar benefits to our directors and executive officers.

***Share Options***

*1999 Stock Incentive Plan*

At a meeting held on September 1, 1999, our board of directors reserved a total of 12.0% of our fully diluted share capital for issuance upon the exercise of options to be granted to our executive directors, officers and employees or their affiliated entities from time to time. On September 1, 1999, our shareholders approved the stock-related award incentive plan (the "1999 Stock Incentive Plan"). The number of options awarded to a person was based on the person's potential ability to contribute to our success, the person's position with us and other factors deemed relevant and necessary by our board of directors. As of April 30, 2020, we had awarded to several of our employees and directors options to purchase 9,708,100 ordinary shares of our company under the 1999 Stock Incentive Plan. As of April 30, 2020, options to purchase 2,845,170 ordinary shares remained outstanding. Options generally do not vest unless the grantee remains under our employment or in service with us on the given vesting date. However, the 1999 Stock Incentive Plan provides that in circumstances where there is a change in the control of our company, if No substitution or assumption is provided by the successor corporation, the outstanding options will automatically vest and become exercisable for a period of 30 days, after which such options will terminate. The termination date for the options granted is 10 years after the date of grant.

a. *Standard Stock Options*

From September 1, 1999 to September 30, 2006, we awarded standard stock options exercisable to acquire Class A or Class B ordinary shares of our company. All standard stock options were granted to employees and directors and vested over the requisite service periods of three to four years using a graded vesting. The maturity life of the standard stock options was 10 years originally. On April 20, 2010, our board of directors resolved to extend the maturity life of the standard stock option 10 years to 15 years.

From 2001 to 2003, we awarded 1,739,500 standard stock options, classified as liability awards, with exercise prices ranging from HK$1.00 to HK$5.00. In April 2010, we agreed with the grantees to modify the Hong Kong dollar exercise currency to U.S. dollars. The modified exercise prices of these options range from US$0.13 to US$0.64.

b. *Special Stock Options*

As of April 30, 2020, we had awarded 18,327,800 special stock optionsto purchase 9,163,900 ordinary shares to our employees and directors, with exercise prices ranging from US$1.99 to US$10.63, since December 31, 2006. Terms for special stock options are the same as standard stock options, except that two special stock options are exercisable into one Class A ordinary share. These special stock options vest 10.0% after the first year of service, 20.0% after the second year of service, 40.0% after the third year of service and 30.0% after the fourth year of service, except for special stock options granted in September 2010, which vest 20.0% after the first year of service, 20.0% after the second year of service, 30.0% after the third year of service and 30.0% after the fourth year of service. The maturity life of the special stock options is 10 years.

In December 2018, we extended the expiration date of share options to purchase 252,500 ordinary shares granted in 2008 under the 1999 Stock Incentive Plan to certain employees from December 30, 2018 to December 30, 2028. The replacement awards were fully vested as of the replacement date. The total incremental share-based compensation of US$0.6 million resulting from the modification is fully recognized during the year ended December 31, 2018.

Table of Contents

In 2018, we extended the expiration date of share options to purchase 518,175 ordinary shares granted under the 1999 Stock Incentive Plan to certain employees for a term of period ranging from two days to nine years. These stock options had expired prior to December 31, 2017. The awards granted were fully vested as of the extension date. These transactions were accounted for as new grant. The total incremental share-based compensation of US$2.8 million resulting from such new grant is fully recognized in 2018.

In April 2019, we extended the expiration date of share options to purchase 119,920 ordinary shares granted under the 1999 Stock Incentive Plan to certain employees, to July 27, 2019 and March 30, 2020, respectively. These stock options would have been expired between April 27, 2019 and December 30, 2019 if not modified. These options were fully vested as of the date of the modification and US$0.02 million incremental compensation cost was recognized for the year ended December 31, 2019 resulting from the modification.

In June 2019, we extended the expiration date of share options to purchase 119,920 ordinary shares granted under the 1999 Plan to certain employees to July 27, 2020 and March 30, 2021, respectively. These stock options would have been expired between July 27, 2019 and March 30, 2020 if not modified. These options were fully vested as of the date of the modification and US$0.01 million of incremental compensation cost was recognized for the year ended December 31, 2019 resulting from the modification.

In December 2019, we extended the expiration date of share options to purchase 225,000 ordinary shares granted under the 1999 Plan to certain employees to December 30, 2029. These stock options would have been expired on December 30, 2019 if not modified. These options were expected to be vested on November 14, 2020. There was US$0.8 million of incremental compensation cost resulting from the modification, of which US$0.03 million was recognized for the year ended December 31, 2019.

Our board of directors may amend, alter, suspend or terminate the 1999 Stock Incentive Plan at any time, provided, however, that our board of directors must first seek the approval of our shareholders and, if such amendment, alteration, suspension or termination would adversely affect the rights of an optionee under any option granted prior to that date, the approval of such optionee. Without further action by our board of directors, our 1999 Stock Incentive Plan has No specified termination date.

*2010 Stock Incentive Plan*

We adopted our 2010 stock incentive plan (the "2010 Stock Incentive Plan") on August 4, 2010. The purpose of our 2010 Stock Incentive Plan is to recognize and acknowledge the contributions made to our company by eligible participants and to promote the success of our business. By providing an opportunity to have a personal stake in our company, our 2010 Stock Incentive Plan aims to:

- attract and retain the best available personnel;

- to provide an additional incentive to our employees, directors and consultants; and

- to promote the success of our business.

As of April 30, 2020, we had awarded options to purchase 8,969,792 of our ordinary shares under the 2010 Stock Incentive Plan, with an exercise price per share ranging from US$1.99 to US$30.00.

*a. Eligible Participants*

Under the 2010 Stock Incentive Plan, our board of directors or its designated committee may, at its discretion, offer to grant an option to subscribe for such number of our ordinary shares at an exercise price as our directors may determine to the following parties:

- any full-time or part-time employees, executives or officers of us, our parent or any of our subsidiaries;

- any directors, including non-executive directors and independent non-executive directors, of us, our parent or any of our subsidiaries;

- any advisers, consultants and agents to us or any of our subsidiaries; and

- such other persons who, in the sole opinion of our board of directors or its designated committee, has made contributions to the business or other development of us.

Table of Contents

*b. Maximum Number of Ordinary Shares*

The maximum number of ordinary shares in respect of which options may be granted (including ordinary shares in respect of which options, whether exercised or still outstanding, have already been granted) under the 2010 Stock Incentive Plan may not in the aggregate exceed 10.0% of the total number of ordinary shares in issue from time to time, including ordinary shares issuable upon conversion of any preferred shares in issue from time to time. As of April 30, 2020, there were outstanding options to purchase 2,611,570 of our ordinary shares under the 2010 Stock Incentive Plan, of which options to purchase 2,373,970 ordinary shares were exercisable.

*c. Price of Ordinary Shares*

The determination by our board of directors, or its designated committee, of the exercise price will be by reference to the fair market value of the ordinary shares, and the exercise price may be the same as, higher, or lower than the fair market value, except for options or awards which are incentive stock options or subject to Rule 409A of the Internal Revenue Code. If there exists a public market for our ordinary shares, including our ADSs, the fair market value of our ordinary shares will be (1) the closing price for the last market trading day prior to the time of the determination (or, if No closing price was reported on that date, on the last trading date on which a closing price was reported) on the stock exchange determined by our board of directors, or its designated committee, to be the primary market for our ordinary shares or ADSs, or (2) if the ordinary shares are not traded on any such exchange or national market system, the average of the closing bid and asked prices of an ordinary shares on the New York Stock Exchange for the day prior to the time of the determination (or, if not such prices were reported on that date, on the last date on which such prices were reported), in each case, as reported in The Wall Street Journal or such other source as the board of directors or its designated committee deems reliable. If there is No established market for our ordinary shares, our board of directors, or its designated committee, will determine the fair market value of our ordinary shares in good faith by reference to the placing price of the latest private placement of our ordinary shares and the development of our business operations since such latest private placement.

*d. Performance Criteria*

The 2010 Stock Incentive Plan allows our board of directors, or its designated committee, to establish the performance criteria when granting stock options on the basis of any one of, or combination of, increase in our share price, earnings per share, total shareholder return, return on equity, return on assets, return on investment, net operating income, cash flow, revenue, economic value-added, personal management objectives, or other measures of performance selected by our board of directors, or its designated committee. Partial achievement of the specified criteria may result in a vesting corresponding to the degree of achievement as specified in the award agreement with the relevant optionee.

*e. Time of Exercise of Options*

The time and conditions under which an option may be exercised will be determined by the board of directors, or its designated committee, under the terms of the 2010 Stock Incentive Plan and as specified in the award agreement with a grantee. Notwithstanding the foregoing, in the case of any options granted to an officer, director or consultant that may become exercisable, the award agreement governing such grant may provide that the options may become exercisable, subject to reasonable conditions such as the officer, director or consultant's continuous service at any time or during any period established in the award agreement governing such grant.

*f. Administration*

Our board of directors has established a stock option committee, comprised of a single member, Mr. Mo, to administer the 2010 Stock Incentive Plan with respect to option grants to non-officer/director employees as well as consultants. Our compensation committee has the authority under the 2010 Stock Incentive Plan to determine stock option grants to our officers and directors.

*g. Termination*

Unless terminated earlier, the 2010 Stock Incentive Plan will continue for a term of 10 years. Our board of directors has the authority to amend or terminate the 2010 Stock Incentive Plan subject to shareholder approval with respect to certain amendments. However, No such action may impair the rights of any grantee of any options unless agreed by the grantee.

*2015 Stock Incentive Plan*

We adopted our 2015 stock incentive plan (the "2015 Stock Incentive Plan") on July 3, 2015. The purpose of our 2015 Stock Incentive Plan is to recognize and acknowledge the contributions made to our company by eligible participants and to promote the success of our business. By providing an opportunity to have a personal stake in our company, our 2015 Stock Incentive Plan aims to:

- attract and retain the best available personnel;

- to provide an additional incentive to our employees, directors and consultants; and

- to promote the success of our business.

Table of Contents

In August 2017, we replaced share options to purchase 1,377,730 ordinary shares granted during the years ended December 31, 2015 and 2016 under the 2015 Stock Incentive Plan to 200 employees with (i) 153,036 options to purchase 153,036 ordinary shares and (ii) 1,224,694 restricted shares. The exercise price of 153,036 options was reduced from a range of US$27.2 and US$30.0 per share to US$18.1 per ordinary share. The replacement awards were subject to graded vesting over four years from the replacement date, in which 25% of the awards vest at the end of each of the four years. The total incremental share-based compensation of US$12.5 million resulting from the modification is recognized ratably over the new requisite service period. The total unamortized share-based compensation of US$7.4 million resulting from the modification is recognized ratably over the original requisite service period.

In June 2019, we granted options to certain of our officers and employees under the 2015 Stock Incentive Plan to purchase 1,423,337 ordinary shares at exercise prices of US$5.85 per ordinary share. The options were subject to graded vesting over four years from the grant date, in which 25% of the awards vest at the end of each of the four years. The options have a contractual term of ten years.

As of April 30, 2020, we had awarded options to purchase 2,993,537 of our ordinary shares under the 2015 Stock Incentive Plan, with an exercise price per share ranging from US$1.99 to US$27.2, and granted 1,675,525 restricted shares.

*a. Eligible Participants*

Under our 2015 Stock Incentive Plan, our board of directors or its designated committee may, at its discretion, offer to grant an option to subscribe for such number of our ordinary shares at an exercise price as our directors may determine to the following parties:

- any full-time or part-time employees, executives or officers of us, our parent or any of our subsidiaries;

- any directors, including non-executive directors and independent non-executive directors, of us, our parent or any of our subsidiaries;

- any advisers, consultants and agents to us or any of our subsidiaries; and

- such other persons who, in the sole opinion of our board of directors or its designated committee, has made contributions to the business or other development of us.

*b. Maximum Number of Ordinary Shares*

The maximum number of ordinary shares in respect of which options may be granted for each fiscal year during which the 2015 Stock Incentive Plan is effective may be up to 1.5% of our outstanding ordinary shares as of the last day of the previous fiscal year. As of April 30, 2020, there were outstanding options to purchase 1,737,957 of our ordinary shares under the 2015 Stock Incentive Plan, of which options to purchase 273,620 ordinary shares were exercisable.

*c. Price of Ordinary Shares*

The determination by our board of directors, or its designated committee, of the exercise price will be by reference to the fair market value of the ordinary shares, and the exercise price may be the same as, higher, or lower than the fair market value, except for options or awards which are incentive stock options or subject to Rule 409A of the Internal Revenue Code. If there exists a public market for our ordinary shares, including our ADSs, the fair market value of our ordinary shares will be (1) the closing price for the last market trading day prior to the time of the determination (or, if No closing price was reported on that date, on the last trading date on which a closing price was reported) on the stock exchange determined by our board of directors, or its designated committee, to be the primary market for our ordinary shares or the New York Stock Exchange, whichever is applicable, or (2) if the Ordinary Shares are not traded on any such exchange or national market system, the average of the closing bid and asked prices of an ordinary share on the New York Stock Exchange for the day prior to the time of the determination (or, if No such prices were reported on that date, on the last date on which such prices were reported), in each case, as reported in The Wall Street Journal or such other source as the board of directors or its designated committee deems reliable. If there is No established market for our ordinary shares, our board of directors, or its designated committee, will determine the fair market value of our ordinary shares in good faith by reference to the placing price of the latest private placement of our ordinary shares and the development of our business operations since such latest private placement.

82

Table of Contents

### d. Performance Criteria

The 2015 Stock Incentive Plan allows our board of directors, or its designated committee, to establish the performance criteria when granting stock options on the basis of any one of, or combination of, increase in our share price, earnings per share, total shareholder return, return on equity, return on assets, return on investment, net operating income, cash flow, revenue, economic value-added, personal management objectives, or other measures of performance selected by our board of directors, or its designated committee. Partial achievement of the specified criteria may result in a vesting corresponding to the degree of achievement as specified in the award agreement with the relevant optionee.

### e. Time of Exercise of Options

The time and conditions under which an option may be exercised will be determined by the board of directors, or its designated committee, under the terms of the 2015 Stock Incentive Plan and as specified in the award agreement with a grantee. Notwithstanding the foregoing, in the case of any options granted to an officer, director or consultant that may become exercisable, the award agreement governing such grant may provide that the options may become exercisable, subject to reasonable conditions such as the officer, director or consultant's continuous service at any time or during any period established in the award agreement governing such grant.

### f. Dissolution, Liquidation or Change in Control

In the event of the proposed dissolution or liquidation of our company, our board of directors, or its designated committee, will notify the grantee as soon as practicable prior to the effective date of such proposed transaction. Any options will terminate immediately prior to the consummation of such proposed action. In the event of a change in control or a merger of our company, each option may be assumed or an equivalent stock option or right may be substituted by the successor corporation. In the event that No such substitution or assumption occurs, the outstanding options will automatically vest and become exercisable for a limited period of time as determined by our board of directors, or its designated committee, and such options will terminate upon the expiration of such period.

### g. Termination

Unless terminated earlier, the 2015 Stock Incentive Plan will continue for a term of five years. Our board of directors has the authority to amend or terminate the 2015 Stock Incentive Plan subject to shareholder approval with respect to certain amendments. However, No such action may impair the rights of any grantee of any options unless agreed by the grantee.

In connection with separation of CIH from us and in order to make our equity awards holders whole against the adverse changes in the awards' value following the separation, CIH issued the equivalent number of CIH's equity awards to the holders of our equity awards to make them whole under the separation. Such CIH's equity awards have a nominal exercise price and may be exercisable if and to the extent that the corresponding equity awards of our company are exercised. There was US$0.8 million incremental compensation cost resulting from the modification, of which US$0.6 million were recognized for the year ended December 31, 2019.

In November 2019, we reduced the exercise prices of share options to purchase 5,991,867 ordinary shares from the original exercise price ranging from US$5.0 to US$30.0 per share to the new exercise price of $1.99 per share, which were granted to certain of our employees under the 1999 Stock Incentive Plan, 2010 Stock Incentive Plan and 2015 Stock Incentive Plan during the years from 2006 to 2019. In addition to the adjustment of exercise price, we also adjusted the vesting schedules for certain share options. See Note 18 to our consolidated financial statements included elsewhere in this annual report for details. There was US$9.1 million of incremental compensation cost resulting from the modification, of which US$1.1 million were recognized for the year ended December 31, 2019.

The following table summarizes, as of the date of this annual report, the outstanding options and restricted shares that we granted to our current directors and executive officers:

83

**Share options**

| Name | Number of Class A ordinary shares to be issued upon exercise of options | Number of Class B ordinary shares to be issued upon exercise of options | Exercise price per ordinary share (US$) | Date of grant | Date of expiration |
|---|---|---|---|---|---|
| Media Partner / Mr. Mo[1] | | | | | |
| | 112,500 | — | 1.99 | December 30, 2018 | December 30, 2026 |
| | 112,500 | — | 1.99 | December 30, 2018 | December 30, 2027 |
| | 112,500 | — | 1.99 | December 31, 2008 | December 30, 2028 |
| | 112,500 | — | 1.99 | December 31, 2009 | December 30, 2029 |
| | 500,000 | — | 1.99 | September 17, 2010 | September 16, 2030 |
| | 75,000 | — | 1.99 | August 15, 2012 | August 14, 2022 |
| | 50,000 | — | 1.99 | December 1, 2016 | December 1, 2026 |
| | 144,169 | — | 1.99 | June 7, 2019 | June 6, 2029 |
| Next Decade / Mr. Mo[1] | — | 1,754,500 | 1.99 | September 30, 2006 | September 29, 2021 |
| | 112,500 | — | 1.99 | December 30, 2018 | December 30, 2026 |
| | 112,500 | — | 1.99 | December 30, 2018 | December 30, 2027 |
| | 112,500 | — | 1.99 | December 31, 2008 | December 30, 2028 |
| | 112,500 | — | 1.99 | December 31, 2009 | December 30, 2029 |
| | 500,000 | — | 1.99 | September 17, 2010 | September 16, 2030 |
| | 75,000 | — | 1.99 | August 15, 2012 | August 14, 2022 |
| | 50,000 | — | 1.99 | December 1, 2016 | December 1, 2026 |
| | 144,168 | — | 1.99 | June 7, 2019 | June 6, 2029 |
| Qian Zhao[2] | * | — | 30.00 | March 31, 2015 | March 31, 2025 |
| | * | — | 27.2 | February 25, 2016 | February 24, 2026 |
| Sam Hanhui Sun[3] | * | — | 30.00 | March 31, 2015 | March 31, 2025 |
| | * | — | 27.2 | February 25, 2016 | February 24, 2026 |
| Jian Liu | * | — | 1.99 | September 17, 2010 | September 16, 2025 |
| | * | — | 1.99 | August 15, 2012 | August 14, 2022 |
| | * | — | 1.99 | December 1, 2016 | December 1, 2026 |
| | * | — | 1.99 | June 7, 2019 | June 6, 2029 |
| Frank Hua Lei | * | — | 1.99 | September 17, 2010 | September 16, 2020 |
| | * | — | 1.99 | July 26, 2012 | July 25, 2022 |
| | * | — | 1.99 | December 1, 2016 | December 1, 2026 |
| | * | — | 1.99 | June 7, 2019 | June 6, 2029 |
| Zhihong Zhang | * | — | 1.99 | September 17, 2010 | September 16, 2025 |
| | * | — | 1.99 | July 26, 2012 | July 25, 2022 |
| | * | — | 1.99 | December 1, 2016 | December 1, 2026 |
| | * | — | 1.99 | June 7, 2019 | June 6, 2029 |
| Zijin Li | * | — | 1.99 | June 7, 2019 | June 6, 2029 |

---

\*       Upon exercise of all options granted, would beneficially own less than 1.0% of our outstanding ordinary shares.

(1)     Represents options granted to Mr. Mo in his capacity as our executive chairman. Pursuant to resolutions passed by our board of directors on August 4, 2010, our board of directors resolved that such options be assigned and allocated to Media Partner and Next Decade.

(2)     Mr. Qian Zhao resigned from our board of directors, effective from November 18, 2019.

(3)     Mr. Sam Hanhui Sun resigned from our board of directors, effective from May 22, 2019.

Table of Contents

**Restricted shares**

| Name | Number of Class A ordinary shares represented by restricted shares | Date of grant | Date of expiration |
|---|---|---|---|
| Media Partner / Mr. Mo[1] | * | August 29, 2017 | August 28, 2027 |
| Next Decade / Mr. Mo[1] | * | August 29, 2017 | August 28, 2027 |
| Jian Liu | * | August 29, 2017 | August 28, 2027 |
| Frank Hua Lei | * | August 29, 2017 | August 28, 2027 |
| Zhihong Zhang | * | August 29, 2017 | August 28, 2027 |
| **Total** | **260,090** | | |

* Aggregate number of shares represented by all grants of restricted shares to the person accounts for less than 1.0% of our total outstanding shares on an as converted basis or voting power.

(1) Represents restricted shares granted to Mr. Mo in his capacity as our executive chairman.

### *C. Board Practices*

### *Board of Directors*

Our board of directors currently consists of five members. A director is not required to hold any shares in our company by way of qualification. A director may vote with respect to any contract or transaction in which he or she is materially interested provided the nature of the interest is disclosed prior to its consideration and any vote on such contract or transaction. Our board of directors may exercise all the powers of the Company to borrow money, mortgage its business, property and uncalled capital, and issue debentures or other securities whenever money is borrowed or as security for any obligation of the company or of any third party. None of our non-executive directors has a service contract with us that provides for benefits upon termination of employment.

Table of Contents

Mr. Sam Hanhui Sun resigned from our board of directors, effective from May 22, 2019, replaced with Mr. Howard Huyue Zhang, who was appointed as an independent director of our board and a member and the chair of the audit committee of our board, effective from the same date.

Mr. Qian Zhao resigned from our board of directors, effective from November 18, 2019, replaced with Ms. Hong Qin, who was appointed as an independent director of our board, a member of the audit committee, a member of the compensation committee, and a member and the chair of the nominating and corporate governance committee of our board, effective from the same date.

### Duties of Directors

Under Cayman Islands law, our directors have a duty of loyalty to act honestly in good faith with a view to our best interests. Our directors also have a duty to exercise the care, diligence and skills that a reasonably prudent person would exercise in comparable circumstances. In fulfilling their duty of care to us, our directors must ensure compliance with our fifth amended and restated memorandum and articles of association. We have, in certain circumstances, the right to seek damages against our directors if a duty owed by our directors is breached.

Our board of directors has overall responsibility for managing our operations. The functions and powers of our board of directors include, among others:

- convening shareholders' meetings and reporting its work to shareholders at such meetings;

- implementing shareholders' resolutions;

- determining our business plans and investment proposals;

- formulating our profit distribution plans and loss recovery plans;

- determining our debt and finance policies and proposals for the increase or decrease in our registered capital and the issuance of debentures;

- formulating our major acquisition and disposition plans, and plans for merger, division or dissolution;

- proposing amendments to our fifth amended and restated memorandum and articles of association; and

- exercising any other powers conferred by the shareholders' meetings or under our fifth amended and restated memorandum and articles of association.

### Board Committees

*Audit Committee.* Our audit committee consists of Howard Huyue Zhang, who chairs our audit committee, Hong Qin and Shaohua Zhang. Our board of directors has determined that all of our audit committee members are "independent directors" within the meaning of Section 303A of the New York Stock Exchange Listed Company Manual and meet the criteria for independence set forth in Section 10A of the Exchange Act. In addition, our board of directors has determined that Howard Huyue Zhang is qualified as an audit committee financial expert within the meaning of the SEC rules and regulations.

Our audit committee is responsible for, among other things:

- Appointing, retaining, terminating, overseeing and determining compensation of the independent auditor. The independent auditor shall report directly to the Committee. The Committee has the sole authority to approve the hiring and discharging of the independent auditors, all engagement fees and terms thereof and, to the extent permissible under applicable regulatory guidelines, all non-audit engagements of the independent auditors.

- Reviewing the scope and results of the annual audit with the independent auditor.

- Reviewing and discussing, with the internal auditors or the person(s) in the financial department acting as internal auditor(s), the overall scope and plans for their audits and determine whether the internal audit function has the appropriate resources and expertise.

- Reviewing and discussing with management and the independent auditors, the adequacy and effectiveness of our disclosure controls, internal accounting and financial controls, the quality of the financial and accounting personnel, and any relevant recommendations.

Table of Contents

- Discussing our guidelines and policies with respect to risk assessment and risk management, reviewing contingent liabilities and risks that may be material to us, and reviewing major legislative, regulatory and accounting developments which could materially impact our contingent liabilities and risks.

- Reviewing and discussing with management and the independent auditors the annual audited financial statements and unaudited quarterly financial statements and proposed filings with the SEC, including reviewing our specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and among others, discussing the following matter with the independent accountants: (1) the quality as well as acceptability of the accounting principles applied in the financial statements, (2) new or changed regulatory or accounting policies (including an analysis of the effect of alternative GAAP methods); off-balance sheet structures; significant estimates, judgments, uncertainties or unusual transactions; and accounting policies relating to significant financial statement items, and (3) financial statement presentations.

- Reviewing the reports prepared by management and by our independent auditors, assessing the adequacy and effectiveness of our internal controls and procedures, prior to the inclusion of such reports in our periodic filings as required under SEC rules. The Committee reviews disclosures regarding our internal controls that are required to be included in SEC reports.

- Reviewing on a regular basis management's assessment (and the basis therefore) of the adequacy and effectiveness of our system of disclosure controls and procedures, including by meeting periodically with our management, independent auditors and legal counsel to review their assessment of such disclosure controls and procedures and to review, before its release, the disclosure regarding such system of disclosure controls and procedures required under SEC rules to be contained in our periodic filings.

- Recommending to our board of directors whether the audited financial statements are satisfactory to be included in our annual or other reports to the SEC.

- At least annually, reviewing any management letters or internal control reports prepared by the independent auditors or our internal auditors and responses to prior management letters, and reviewing with the independent auditors our internal quality control and financial controls, including the budget, staffing and responsibilities of our financial and accounting staff.

- Reviewing and discussing our earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including the type and presentation of information to be included in earnings press releases.

- Periodically meeting in separate sessions with management, with internal auditors (or other personnel responsible for the internal audit function) and with independent auditors.

- Reviewing with the independent auditor any audit problems or difficulties the independent auditor encountered in the course of audit work (e.g., restrictions on the scope of the independent auditor's activities or access to requested information and any significant disagreements with management) and the management's response. The audit committee shall also be responsible for the resolution of disagreements between management and the independent auditors regarding financial reporting.

- Setting clear hiring policies for employees or former employees of the independent auditors.

- Reviewing and approving or prohibiting all proposed related-party transactions in accordance with our related party transaction policy and procedures.

- Monitoring compliance with and reviewing, and approving or prohibiting, actual and potential conflicts with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of our procedures to ensure proper compliance.

- Establishing procedures for (1) the receipt, retention and treatment of complaints received by us regarding accounting, internal accounting controls, or auditing matters, and (2) the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters. Review periodically with management and our internal accounting department these procedures and any significant complaints received.

- Pre-approving all audit services and permissible non-audit services by the independent auditors, as set forth in Section 10A of the Exchange Act and the rules and regulations promulgated thereunder by the SEC. The audit committee may establish pre-approval policies and procedures, as permitted by Section 10A of the Exchange Act and the rules and regulations promulgated thereunder by the SEC, for the engagement of independent auditors to render services to us, including but not limited to policies that would allow the delegation of pre-approval authority to one or more members of the audit committee, provided that any pre-approvals delegated to one or more members of the audit committee are reported to the audit committee at its next scheduled meeting.

Table of Contents

- Evaluating at least annually, the independent auditors' qualifications, performance and independence, which evaluation shall include a review and evaluation of the lead partner of the independent auditor and consideration whether there should be a rotation of the lead partner or independent auditing firm, and take appropriate action to oversee the independence of the independent auditors.

- At least annually, obtaining and reviewing a report by the independent auditors describing: (1) the audit firm's internal quality-control procedures, (2) any material issues raised by the most recent internal quality-control review, or peer review, of the audit firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the audit firm, and any steps taken to deal with any such issues, (3) all relationships between the independent auditors and us to enable the audit committee to assess the auditors' independence, and (4) any other matters required to be included in a letter from the independent auditors pursuant to applicable requirements of the Public Company Accounting Oversight Board regarding independent auditor's communications with the audit committee concerning independence.

- Reviewing and reassessing, at least annually, the audit committee's performance and the adequacy of its charter and report its conclusion and any recommendations to our board of directors.

- Reporting regularly to the full board of directors.

- Investigating matters came to its attention at the company's expenses.

*Nominating and Corporate Governance Committee.* We have established a nominating and corporate governance committee, which is responsible for identifying individuals qualified to become directors and recommends director nominees to be approved by our board of directors. The members of our nominating and corporate governance committee include Hong Qin, who chairs our nominating and corporate governance committee, and Mr. Mo, our executive chairman.

*Compensation Committee.* Our compensation committee consists of Mr. Mo, who chairs our compensation committee, and Hong Qin.

Our compensation committee is responsible for:

- Establishing our general compensation philosophy, and, in consultation with senior management, overseeing the development and implementation of compensation programs.

- At least annually, reviewing and evaluating and, if necessary, revising our compensation plans, policies and programs adopted by the management.

- At least annually, reviewing and approving corporate goals and objectives relevant to compensation of the CEO and evaluate the CEO's performance in light of those goals and objectives.

- At least annually, either as a committee or together with the other independent directors (as directed by our board of directors), determining and approving, based on the evaluation described above, all compensation arrangements with the CEO including, without limitation: (1) the annual base salary level, (2) the annual incentive opportunity level, (3) the long-term incentive opportunity level, (4) employment agreements, severance arrangements and change-in-control agreements/provisions, in each case as, when and if appropriate, and (5) any special or supplemental benefits. In determining the long-term incentive component of the CEO's compensation, the compensation committee shall consider our performance and relative stockholder return, the value of similar incentive awards to chief executive officers at comparable companies, and the awards given to the CEO in past years. The compensation committee may choose to discuss the CEO's compensation with the board of directors.

- Reviewing and approving, or making recommendations to our board of directors with respect to our non-CEO executive officer compensation, incentive-compensation plans and equity-based plans. The compensation committee shall attempt to ensure that our compensation scheme is effective in retaining and attracting key employees, implements business strategies and objectives for enhanced shareholder value, and is administered in a fair and equitable manner consistent with our compensation philosophy. The compensation committee shall also seek the input of the Chief Executive Officer with respect to the performance evaluation and compensation of executives other than the Chief Executive Officer.

Table of Contents

- Periodically reviewing the compensation of our directors and approving changes or making recommendations to our board of directors with respect thereto.

- Evaluating periodically the internal equity and external competitiveness of compensation of the CEO, the other executive officers, and key management personnel and initiating actions or recommending changes to our board of directors, as appropriate.

- Advising on the setting of compensation for officers whose compensation is not subject to the approval of the compensation committee.

- Managing and reviewing annually and approving any long-term incentive compensation or equity or stock option plans, programs or similar arrangements, annual bonuses, employee pension and welfare benefit plans. With respect to each plan the compensation committee shall have responsibility for:

  - setting performance targets under all annual bonus and long-term incentive compensation plans as appropriate;

  - certifying that any and all performance targets used for any performance-based equity compensation plans have been met before payment of any executive bonus or compensation;

  - approving all amendments to, and terminations of, all compensation plans and any awards under such plans or any inducement grant of options made to a person not previously an employee or director;

  - granting any awards under any performance-based annual bonus, long-term incentive compensation and equity compensation plans to executive officers or current employees with the potential to become the CEO or an executive officer, including stock options and other equity rights (e.g., restricted stock or stock purchase rights);

  - approving which executive officers are entitled to awards under our stock option plan(s);

  - repurchasing securities from terminated employees; and

  - conducting an annual review of all compensation plans, including reviewing each plan's administrative costs, reviewing current plan features relative to any proposed new features, and assessing the performance of each plan's internal and external administrators if any duties have been delegated.

- Reviewing and approving officer and director indemnification and insurance matters.

- Reviewing and approving any employee loan in an amount equal to or greater than US$250,000 unless such transaction is subject to the approval of the audit committee as a related-party transaction.

- Reviewing and considering on an annual basis whether the compensation policies and practices for all employees are reasonably likely to have a material adverse effect on us in accordance with SEC rules.

- Providing the compensation committee reports on executive compensation to our board of directors.

- Receiving, reviewing and conferring with the audit committee with respect to any concerns raised by any parties directly or indirectly to the compensation committee and take action in response to such concerns as may be deemed appropriate by the compensation committee.

- Reviewing and approving the annual report on executive compensation for inclusion in our annual report on Form 20-F filed with the SEC.

- Administering, interpreting and taking all other actions necessary or appropriate as granted to the compensation committee under our executive compensation and other plans.

- Directing any officer or employee or request any employee of our advisors, consultants or counsel or such other individual as it may deem appropriate to attend a compensation committee meeting or meet with any compensation committee members.

- Reviewing the compensation committee's charter on an annual basis and recommend changes, as appropriate, to our board of directors.

Table of Contents

- Evaluating the performance of the compensation committee on an annual basis. In conducting such self-evaluation, the compensation committee shall evaluate whether its charter appropriately addresses the matters that are or should be within its scope and shall recommend such changes as it deems necessary or appropriate to the board for consideration. The compensation committee shall address all matters that it considers relevant to its performance, including at least, the adequacy, appropriateness and quality of the information and recommendations presented by it to the board of directors, the manner in which they were discussed or debated, and whether the number and length of meetings of the compensation committee were adequate for it to complete its work in a thorough and thoughtful manner.

Our board of directors has established a stock option committee, comprised of a single member, Mr. Mo, to administer the 2010 Stock Incentive Plan with respect to option grants to our non-officer/director employees as well as consultants. Our compensation committee is responsible for administering the 2010 Stock Incentive Plan and the 2015 Stock Incentive Plan with respect to option grants to our executive officers and directors.

No director or officer may be directly involved in decisions regarding his or her own compensation.

Pursuant to the subscription agreement by and among our company, Safari Group Holdings Limited, Safari Group CB Holdings Limited, and Safari Parent Limited, dated September 17, 2015, Safari Parent Limited, an affiliate of the Carlyle Group, is entitled to nominate one director to our board of directors so long as the Carlyle Group beneficially owns at least 1.0% of our total outstanding share capital calculated on a fully diluted basis.

***Terms of Directors and Executive Officers***

Each of our directors holds office until a successor has been duly elected and qualified unless the director was appointed by our board of directors, in which case such director holds office until the following annual meeting of shareholders, at which time such director is eligible for reelection. Officers are elected by and serve at the discretion of our board of directors.

***D. Employees***

We had 5,795, 4,367 and 3,359 employees as of December 31, 2017, 2018 and 2019, respectively. The following table sets forth the number of our employees categorized by function as of December 31, 2019:

| Function | Number |
|---|---|
| Editorial and production | 523 |
| Sales and marketing | 2,364 |
| Management and general administrative | 217 |
| Technical and research | 255 |
| **Total** | **3,359** |

We began to downsize our workforce in the fourth quarter of 2016 to transform our online real estate brokerage business to a model of a mix of franchisees and self-owned agencies.

Our employees receive a base salary and are eligible for performance-based bonuses. We have granted share options to certain of our employees. For more information, see "Item 6.B. Directors, Senior Management and Employees—Compensation—Share Options."

As required by PRC regulations, we participate in various employee benefit plans that are organized by municipal and provincial governments, including housing, pension, medical and unemployment benefit plans. We make monthly payments to these plans for each of our employees based on the employee's compensation.

We believe we maintain a good working relationship with our employees and we have not experienced any significant labor disputes. We believe this is primarily attributable to our well-established reputation and brand name within the PRC real estate industry, our strong corporate culture, as well as the positive career development opportunities we provide to our employees. Our employees have not entered into any collective bargaining agreements, and No labor union has been established by our employees.

***E. Share Ownership***

The following table sets forth information concerning the beneficial ownership of our ordinary shares as of April 30, 2020 by:

- each of our directors and executive officers; and
- each person known to us to beneficially own more than 5.0% of our ordinary shares.

90

Table of Contents

The calculation and information provided in the table below is based on our records, information filed with the SEC and information provided to us, except where otherwise noted. The information is based upon in the table below is based upon the fact that there are 89,740,177 ordinary shares, consisting of 65,403,527 Class A ordinary shares and 24,336,650 Class B ordinary shares issued and outstanding as of April 30, 2020.

Beneficial ownership is determined in accordance with the rules and regulations of the SEC. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, we have included shares that the person has the right to acquire within 60 days, including through the exercise of any option, warrant, or other right or the conversion of any other security. These shares, however, are not included in the computation of the percentage ownership of any other person.

| | Ordinary shares beneficially owned | | | | Percentage of Aggregate Voting Power[1] |
| | Class A No. | Percent | Class B No. | Percent | |
|---|---|---|---|---|---|
| **Principal Shareholders**: | | | | | |
| Mr. Vincent Tianquan Mo and his affiliated entities[2] | 5,446,806 | 8.2% | 21,586,290 | 88.7% | 71.7% |
| Digital Link Investments Limited[3] | * | * | 2,750,360 | 11.3% | 9.0% |
| General Atlantic Singapore Fund Pte. Ltd.[4] | 11,106,442 | 17.0% | — | — | 3.6% |
| Safari Group Holdings Limited[5] | 3,418,803 | 5.2% | — | — | 1.1% |
| IDG and its affiliated entities[6] | 8,534,277 | 13.0% | — | — | 2.8% |
| FIL Limited[7] | 1,686,447 | 2.6% | — | — | 0.5% |
| Fosun International Limited[8] | 3,286,208 | 5.0% | — | — | 1.1% |
| **Directors and Executive Officers**: | | | | | |
| Mr. Vincent Tianquan Mo[2] | 5,446,806 | 8.2% | 21,586,290 | 88.7% | 71.7% |
| Qian Zhao | * | * | — | — | * |
| Sam Hanhui Sun | * | * | — | — | * |
| Howard Huyue Zhang | — | — | — | — | — |
| Hong Qin | — | — | — | — | — |
| Jian Liu | * | * | — | — | * |
| Zijin Li | * | * | — | — | * |
| Zhihong Zhang | * | * | — | — | * |
| Frank Hua Lei | * | * | — | — | * |
| Zhizhi Gong | * | * | — | — | * |
| All directors and executive officers as a group | 5,603,943 | 8.6% | 21,586,290 | 88.7% | 71.7% |

---

\*   Less than 1.0% of total outstanding voting securities on an as converted basis.

\*\*  Except where otherwise disclosed in the footnotes below, the business address of our directors and executive officers is Tower A, No. 20 Guogongzhuang Middle Street, Fengtai District, Beijing 100070, People's Republic of China.

(1) For each person and group included in this column, percentage of total voting power represents dividing the voting power beneficially owned by such person or group by the voting power of all of our Class A and Class B ordinary shares as a single class. In respect of all matters upon which the ordinary shares are entitled to vote, each Class A ordinary share is entitled to one vote, and each Class B ordinary share is entitled to ten votes, voting together as one class. Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof. Class A ordinary shares are not convertible into Class B ordinary share unless approved by our board of directors.

(2) Represents ordinary shares held by Media Partner, Next Decade, Ateefa Limited, Deanhale Limited, Karistone Limited, and Open Land Holdings Limited, including (1) 510,994 Class A ordinary shares represented by ADSs and 11,355,645 Class B ordinary shares held by Media Partner; (2) 1,138,132 Class A ordinary shares, including 14,177 Class A ordinary shares represented by ADSs, and 10,230,645 Class B ordinary shares held by Next Decade; (3) 957,265 Class A ordinary shares owned by Ateefa Limited as a shareholder of Safari Group Holdings Limited; (4) 1,472,298 Class A ordinary shares held by Deanhale Limited; (5) 926,461 Class A ordinary shares held by Karistone Limited, a British Virgin Islands company; and (6) 441,656 Class A ordinary shares represented by ADSs held by Open Land Holdings Limited, a Hong Kong company. All of the shares of Media Partner and Next Decade, each a British Virgin Islands company, are held in irrevocable discretionary family trusts established by Mr. Mo. The address of Media Partner is P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands. Mr. Mo acts as a protector of these family trusts, and Deutsche Bank International Trust Co. (Cayman) Limited and Credit Suisse Trust Limited act as the trustee of these trusts, respectively. The address of Mr. Vincent Tianquan Mo and his affiliated entities is c/o Tower A, No. 20 Guogongzhuang Middle Street, Fengtai District, Beijing, People's Republic of China.

(3) Includes 387,561 Class A ordinary shares and 2,750,360 Class B ordinary shares. The address of Digital Link Investments Limited, a British Virgin Islands company, is Apt 3B, Taggart Tower, 109 Repulse Bay Road, Hong Kong. Shan Li (our director until May 2017 when he resigned) is the sole shareholder of Digital Link Investments Limited.

Table of Contents

(4) Represents Class A ordinary shares (as represented by 11,106,442 ADSs) beneficially owned by General Atlantic Singapore Fund Pte. Ltd. as reported in a Schedule 13D/A filed by it and its affiliates on December 10, 2019. General Atlantic Singapore Fund Pte. Ltd. is a Singapore company and its principal address is Asia Square Tower 1, 8 Marina View, #41-04, Singapore 018960.

(5) Represents 3,418,803 Class A ordinary shares beneficially owned by Safari Group Holdings Limited. Safari Group Holdings Limited is owned as to 72.0% by Safari Parent Limited, a Cayman Islands company, and as to 28.0% by Ateefa Limited, a British Virgin Islands company. Safari Parent Limited is affiliated with the Carlyle Group. Mr. Mo is the sole shareholder of Ateefa Limited. The address of Safari Group Holdings Limited is the offices of Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.

(6) Represents Class A ordinary shares beneficially owned by IDG and its affiliates as reported in a Schedule 13D/A filed by it and its affiliates on December 2, 2019, including 8,534,277 Class A ordinary shares held by IDG-Accel China Capital L.P., IDG-Accel China Capital Investors L.P., IDG Alternative Global Limited, Chuang Xi Capital Holdings Limited, Quartz Fortune Limited, IDG Ultimate Global Limited, Velda Power Limited and Clever Sight Limited, including 1,955,277 Class A ordinary shares issuable pursuant to convertible notes beneficially owned by IDG and its affiliated entities. IDG-Accel China Capital L.P. and IDG-Accel China Capital Investors L.P. have the same ultimate general partner, IDG-Accel China Capital GP Associates Ltd., of which Quan Zhou and Chi Sing Ho are directors. Chi Sing Ho is also a director of IDG Alternative Global Limited, Chuang Xi Capital Holdings Limited, Quartz Fortune Limited, IDG Ultimate Global Limited, Velda Power Limited and Clever Sight Limited.

(7) Represents Class A ordinary shares (as represented by 1,686,447 ADSs) beneficially owned by FIL Limited and its affiliates as reported in a Schedule 13G/A filed by it on February 7, 2020. The address of FIL Limited is Pembroke Hall, 42 Crow Lane, Hamilton, Bermuda, HM19.

(8) Represents Class A ordinary shares (as represented by 3,286,208 ADSs) beneficially owned by Fosun International Limited and its affiliates as reported in a Schedule 13G/A filed by it on February 14, 2020. The address of Fosun International Limited is Room 808, ICBC Tower, 3 Garden Road, Central, Hong Kong.

JPMorgan Chase Bank, N.A., the depositary of our ADSs, has advised us that as of April 30, 2020, of the 89,740,177 issued and outstanding ordinary shares, including both Class A ordinary shares and Class B ordinary shares, approximately 88.7% of our outstanding Class A ordinary shares, were in the form of ADSs. None of our outstanding Class B ordinary shares was held by any record holder with an address in the United States.

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to 10 votes per share. We intend to maintain the dual-class ordinary share structure. Each Class B ordinary share is convertible into one Class A ordinary share at any time by its holder and Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon transfer of any Class B ordinary share by its holder to any person or entity that is not a majority-owned and majority-controlled subsidiary of certain of our shareholders as set forth in our amended and restated articles of association, such Class B ordinary share will be automatically and immediately converted into a Class A ordinary share.

On March 18, 2014, we announced the change of the ratio of our American Depositary Receipts representing Class A ordinary shares from one ADS for one Class A ordinary share to five ADSs for one Class A ordinary share. The record date for the ratio change was March 28, 2014. For our ADS holders, this ratio change had the same effect as a five-for-one ADS split. There was No change to our Class A ordinary shares or Class B ordinary shares. The effect of the ratio change on the ADS trading price on New York Stock Exchange occurred on April 7, 2014.

On June 25, 2019, we announced the change of the ratio of our American Depositary Receipts representing Class A ordinary shares from five ADSs for one Class A ordinary shares to one ADS for one Class A ordinary share. For our ADS holders, this ratio change had the same effect as a one-for-five reverse ADS split. There was No change to our Class A ordinary shares or Class B ordinary shares. The effect of the ratio change on the ADS trading price on New York Stock Exchange occurred on July 8, 2019.

Subject to any contractual restrictions and applicable law, we and our subsidiaries, affiliates or significant shareholders may from time to time, in their sole discretion, purchase, repay, redeem or retire any of our outstanding debt or equity securities (including any publicly issued debt or equity securities), in privately negotiated or open market transactions, by tender offer or otherwise.

## ITEM 7. MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS

### A. Major Shareholders

See "Item 6.E. Directors, Senior Management and Employees—Share Ownership."

Table of Contents

**B. Related Party Transactions**

*Structure Contracts*

PRC laws and regulations restrict and impose conditions on foreign investment in certain industries in China. We used to operate under a tighter regulatory regime which was restrictive of foreign investment in Internet content distribution and advertising businesses and adopted a series of Structure Contracts with our consolidated controlled entities (excluding their subsidiaries) and their nominee shareholders to operate our businesses. Under the current regulatory regime, Internet content distribution is permitted to operators with less than 50.0% foreign investment and advertising is permitted to all qualified operators. We may consider further optimizing our corporate structure in light of the evolving regulatory environment.

In anticipation of our originally proposed acquisition of a controlling stake in Wanli and the sale of a portion of our equity interest in our subsidiaries to Wanli (which was terminated in February 2017), in December 2015, we underwent an internal restructuring, whereby we terminated all of our previous structure contracts and caused Beijing Zhong Zhi Shi Zheng and Jia Tian Xia Network, our then wholly-owned PRC subsidiaries, to enter into the 2016 Structure Contracts with our consolidated controlled entities, with terms and conditions substantially similar to those of our previous structure contracts. Under the 2016 Structure Contracts, the equity interests of our consolidated controlled entities were held by our nominee shareholders, i.e., Vincent Tianquan Mo, executive chairman of our board of directors, Richard Jiangong Dai, our director (until February 2016 when Mr. Jiangong Dai resigned) and former chief executive officer, and certain wholly-owned subsidiaries of theirs, and we exercised effective control over our consolidated controlled entities through Beijing Zhong Zhi Shi Zheng and Jia Tian Xia Network.

Among the 2016 Structure Contracts, Beijing Zhong Zhi Shi Zheng entered into a series of contractual arrangements with Shanghai China Index Investment Consulting Co., Ltd., Beijing Yi Ran Ju Ke Technology Development Co., Ltd., Beijing SouFun Technology Development Co., Ltd., Beijing Century Jiatianxia Technology Development Co., Ltd., Shanghai Century Jiatianxia Internet Technology Development Co., Ltd. and their nominee shareholders. In anticipation of the separation and distribution in relation to CIH, which is the parent company of Beijing Zhong Zhi Shi Zheng, we terminated the foregoing contractual arrangements between our group and these entities on May 15, 2018, and subsequently caused Beijing TuoShi, our wholly-owned PRC subsidiary, to enter into a new series of contractual arrangements with these consolidated controlled entities in 2018, with terms and conditions substantially similar to the 2016 Structure Contracts. In 2019, we entered into a supplemental agreement with Beijing TuoShi, Beijing Technology, Mr. Mo, Mr. Jiangong Dai and Mr. Jianning Dai to transfer all the rights, obligations and responsibilities of Mr. Jiangong Dai under certain Structure Contracts to Mr. Jianning Dai.

For a detailed description of the regulatory environment that necessitates the adoption of our corporate structure, see "Item 4.B. Information on the Company—Business Overview—Regulation." For a detailed description of the risks associated with our corporate structure, see "Item 3.D. Key Information—Risk Factors—Risks related to our corporate structure."

The Structure Contracts enable us to:

- receive substantially all of the economic benefits from our consolidated controlled entities in consideration of the services provided by our subsidiaries;

- exercise effective control over our consolidated controlled entities; and

- hold an exclusive option to purchase all or part of the equity interests in our consolidated controlled entities when and to the extent permitted by PRC laws.

We did not separately enter into any Structure Contracts with the subsidiaries of the consolidated controlled entities with which we entered into the Structure Contracts. The following is a summary of the material terms under our Structure Contracts among our wholly-owned PRC subsidiaries, our consolidated controlled entities and the nominee shareholders of these consolidated controlled entities.

*Exclusive Technical Consultancy and Services Agreements*

Under the exclusive technical consultancy and service agreements, our wholly-owned PRC subsidiary has the exclusive right to provide our consolidated controlled entities with relevant technical services relating to their business, such as information technology system operations and maintenance services, or technology supporting services for their advertising products. In exchange for these services, each of the consolidated controlled entities has agreed to make monthly payments to the service provider for such services. The original term of each agreement is 10 years, and our wholly-owned PRC subsidiary can unilaterally extend the term of the exclusive technical consultancy and services agreements and such request will be unconditionally agreed to by the consolidated controlled entities.

*Equity Pledge Agreements*

In order to secure the payment obligations of the consolidated controlled entities under the exclusive technical consultancy and services agreements, except as disclosed below, the nominee shareholders have pledged to our wholly-owned PRC subsidiary their entire equity interests in the consolidated controlled entities. Under these agreements, the nominee shareholders may not transfer the pledged equity interest without the prior written consent of our wholly-owned PRC subsidiary. Our wholly-owned PRC subsidiary also has the right to collect dividends of the consolidated controlled entities from their nominee shareholders. These agreements will remain valid for 10 years and can be extended at the sole discretion of our wholly-owned PRC subsidiary.

Table of Contents

*Operating Agreements*

Under the operating agreements, our wholly-owned PRC subsidiary has undertaken to enter into guarantee contracts with third parties, as required by third parties, to guarantee the performance of the consolidated controlled entities under their business contracts with third parties. In return, the consolidated controlled entities are required to pledge their accounts receivable and mortgage all of their assets as counter-security to our wholly-owned PRC subsidiary. Each of the consolidated controlled entities and the nominee shareholders has agreed not to enter into any transaction that would substantially affect the assets, rights, obligations or operations of the consolidated controlled entities without the prior written consent of our wholly-owned PRC subsidiary. The original term of each agreement is 10 years. These agreements can be extended prior to expiration with written confirmation from our wholly-owned PRC subsidiary, or can be terminated by our wholly-owned PRC subsidiary, upon 30 days' advance notice.

*Shareholders' Proxy Agreements*

Under the shareholders' proxy agreements, the nominee shareholders agreed to irrevocably entrust our wholly-owned PRC subsidiary to exercise their rights as the registered shareholders of the consolidated controlled entities to attend shareholders' meetings and cast votes. Our wholly-owned PRC subsidiary may assign part or all of these proxy rights to its designated employees, and will be indemnified for any loss under these agreements. These agreements will also be binding upon successors of the parties or transferees of the parties' equity interests. These agreements will remain in effect until terminated upon written consent by all the parties to the agreements or by their successors.

*Loan Agreements*

Under the loan agreements and the related transfer agreements, the nominee shareholders received loans from us to make contributions to the registered capital of the consolidated controlled entities between 2004 and 2015, and agreed to repay the loans, upon request, by transferring their entire equity interests in the consolidated controlled entities to our wholly-owned PRC subsidiary or its respective designees, when permitted by applicable PRC laws, rules and regulations.

*Exclusive Call Option Agreements*

Under the exclusive call option agreements, our wholly-owned PRC subsidiary or any third party designated by it has the right to acquire from the nominee shareholders of the consolidated controlled entities their entire equity interests in such consolidated controlled entities when permitted by applicable PRC laws, rules and regulations. The proceeds from the exercise of the call option will be applied to repay the loans under the loan agreements described above. These agreements each has an original term of 10 years and may be extended for another 10 years at our sole discretion.

**Telstra Private Placement**

In connection with the private placement by Telstra International in September 2010, on August 13, 2010, we entered into an investor's rights agreement with General Atlantic, Apax, Next Decade, Media Partner and Digital Link and a registration rights agreement with General Atlantic and Apax. We terminated these agreements on September 23, 2015.

**2015 Registration Rights Agreements**

On September 24, 2015, we entered into a registration rights agreement with Safari and Safari CB, under which each of Safari and Safari CB has demand registration rights pursuant to which we will be required to effect the registration of all or a portion of its Class A ordinary shares (issuable pursuant to the 2022 Notes in the case of Safari CB), provided that the aggregate price of registrable securities to be sold to the public is expected to equal or exceed US$20.0 million.

On November 4, 2015, we entered into a registration rights agreement with IDG Alternative and China Merchants Bank Co., Ltd. Tianjin Pilot Free Trade Zone Branch ("CMB"), under which we are required to file a registration statement on Form F-3 within 45 days after the closing of the private placement transactions in November 2015, in order to effect the registration of all or a portion of Class A ordinary shares held by IDG Alternative or CMB in the case it enforces its security interest on the Class A ordinary shares held by IDG Alternative. In addition, promptly after the offering and sale of any of their Class A ordinary shares, we will be required to file a prospectus to be used for such offering and sale in accordance with the Securities Act.

On November 9, 2015, we and Karistone Limited entered into a registration rights agreement with each of IDG-Accel, IDG-Accel Investors, Winning Star Global Limited, Rainbow Zone Enterprise Inc., Chuang Xi Capital Holdings Limited and Wealth Harvest Global Limited, respectively, under which we are required to file a registration statement on Form F-3 within 45 days after the closing of the private placement transactions in November 2015, in order to effect the registration of all or a portion of Class A ordinary shares held by each of Karistone Limited, IDG-Accel, IDG-Accel Investors, Winning Star Global Limited, Rainbow Zone Enterprise Inc., Chuang Xi Capital Holdings Limited and Wealth Harvest Global Limited (collectively, the "Right Holders"). In addition, promptly after the offering and sale of any of their Class A ordinary shares, we will be required to file a prospectus to be used for such offering and sale in accordance with the Securities Act. Each of the Right Holders also has the right to request that its Class A ordinary shares be included in any registration of our Class A ordinary shares, other than registrations on Form F-4 or S-8 or in compensation or acquisition-related registrations. In addition, the underwriters may, for marketing reasons, cut back all or a part of the shares that any of the Right Holders has requested to be registered in any incidental registration and we will have the right to terminate any registration we initiated prior to its effectiveness regardless of any request for inclusion by any of the Right Holders.

Table of Contents

*Separation and Distribution Related Agreements in connection with the Separation of CIH*

On May 24, 2019, we entered into with CIH a separation and distribution agreement and related ancillary agreements, including intellectual property right license agreement, business cooperation agreement, data service agreement, software license agreement and lease framework agreement in connection with the separation and distribution to provide a framework for our relationship with CIH after the separation and distribution. These agreements provide for the allocation between us and CIH of business, assets, employees, liabilities and obligations (including investments, property and employee benefits and tax-related assets and liabilities) attributable to periods prior to, at and after our separation and distribution and govern certain relationships between us and CIH after the separation and distribution. The summaries of each of the aforementioned agreements are listed as below.

### Separation and Distribution Agreement

We have entered into a separation and distribution agreement with CIH, which sets forth our agreements with CIH regarding the principal transactions necessary to separate CIH from us. It also sets forth other agreements that govern certain aspects of our relationship with CIH after the completion of the separation and distribution.

*Delineation of business.* According to the separation and distribution agreement, CIH has the exclusive right to operate the spun-off business comprising certain portions of our listing and value-added services, and we have the exclusive right to operate the retained business. In particular, the spun-off business comprises (1) certain information and analytics services, initially operated as part of our value-added services, and (2) certain marketplace services, initially operated as part of our listing services. Following the separation and distribution, CIH will strategically focus on serving the commercial property sector in China to capture the enormous market opportunity from its rapid development, while we retain our business operating a real estate Internet portal focusing primarily on serving the residential property sector.

*Transfer of assets and assumption of liabilities.* The separation and distribution agreement identifies assets to be transferred, liabilities to be assumed and contracts to be assigned to CIH as part of the separation of Fang into two independent companies, and describes when and how these transfers, assumptions and assignments will occur. In particular, the separation and distribution agreement provides that, subject to the terms and conditions contained in the agreement: (1) we assigned to CIH all of the assets and liabilities of us related to the spun-off business; and (2) all of the assets and liabilities (including whether accrued, contingent or otherwise) other than the foregoing are retained or assumed by us, including but not limited to the tax liability that may be borne by us in the event that the separation and distribution were considered as not tax-free by competent taxation authorities, and the potential liability associated with the assets retained in us after the separation and distribution.

Except as expressly set forth in the separation and distribution agreement or any ancillary agreement, neither we nor CIH will make any representation or warranty as to the assets, business or liabilities transferred or assumed as part of the separation, as to any approvals or notifications required in connection with the transfers, as to the value of or the freedom from any security interests of any of the assets transferred, as to the absence or presence of any defenses or right of setoff or freedom from counterclaim with respect to any claim or other asset of either us or CIH, or as to the legal sufficiency of any assignment, document or instrument delivered to convey title to any asset or thing of value to be transferred in connection with the separation. All assets will be transferred on an "as is," "where is" basis and the respective transferees would bear the economic and legal risks that any conveyance would prove to be insufficient to vest in the transferee good and marketable title, free and clear of all security interests, that any necessary consents or governmental approval are not obtained or that any requirements of laws, agreements, security interests, or judgments are not complied with.

To the extent that any transfers contemplated by the separation and distribution agreement have not been consummated on or prior to the date of the separation, the parties will agree to cooperate to affect such transfers as promptly as practicable following the date of the separation. In addition, each of the parties will agree to cooperate with each other and use reasonable best efforts to take or to cause to be taken all actions, and to do, or to cause to be done, all things reasonably necessary under applicable law or contractual obligations to consummate and make effective the transactions contemplated by the separation and distribution agreement and the ancillary agreements.

Table of Contents

*The distribution.* The separation and distribution agreement also governs the rights and obligations of the parties regarding the distribution. On the distribution date, we will cause CIH's share registrar and depository to distribute to our equity holders that hold our ordinary shares or ADSs as of the record date all of CIH's issued and outstanding ordinary shares (including those represented by ADSs) prior to the separation and distribution. No fractional ordinary shares will be distributed in the distribution. Our ADSs holders will receive cash in lieu of any fractional ADSs. The separation and distribution agreement provides that the distribution is subject to satisfaction (or waiver by us) of certain conditions. We will have the sole and absolute discretion to determine the terms of, and whether to proceed with, the distribution.

*Settlement of accounts between us and CIH.* The separation and distribution agreement provides that all inter-company receivables and payables as to which there were No third parties and that are between us or our subsidiaries or consolidated affiliated entities, on the one hand, and CIH or its subsidiaries and VIE, on the other hand, other than accounts related to the agreements to be entered into in connection with the separation and distribution and post-separation agreements between CIH and us and other than any accrued liabilities incurred in connection with providing the services that will be memorialized by certain ancillary agreements, in each case existing as of or immediately prior to the completion of the separation and distribution, would be settled, capitalized, cancelled, assigned or assumed by us or one or more of our subsidiaries.

*Releases.* Except as otherwise provided in the separation and distribution agreement or any ancillary agreement, each party will release and forever discharge the other party from all liabilities existing or arising from any acts or events occurring or failing to occur or alleged to have occurred or to have failed to occur or any conditions existing or alleged to have existed on or before the separation and distribution. The releases will not extend to obligations or liabilities under any agreements between the parties that remain in effect following the separation, including the separation and distribution agreement or any ancillary agreement.

*Claims and indemnification.* In general, each party to the separation and distribution agreement will assume or retain liability for all pending, threatened and unasserted legal matters related to its own business or its assumed or retained liabilities and will indemnify the other party for any liability to the extent arising out of or resulting from such assumed or retained legal matters.

*Intellectual property.* Following the distribution, we will continue to own *Fang.com* and other intellectual property rights associated with such brands and will license to CIH certain intellectual property rights for the operation of its business.

*Employee Matters.* We and CIH have agreed to allocate liabilities and responsibilities relating to certain employee benefit matters, including the issuance of share options by CIH to reflect the share options granted under our equity compensation programs.

*Tax Matters.* We and CIH have agreed that after to separation, all tax liabilities (1) resulting or arising from the contribution of the spun-off business to CIH, the distribution of CIH's ordinary shares and the other separation transactions, (2) in the event that the separation and distribution is considered as not tax-free by competent taxation authorities or (3) otherwise attributable to us or relating to the retained business, will be borne by us. Neither we nor CIH will indemnify our equity holders against any tax liability if the distribution, together with certain related transactions, does not qualify as tax-free for U.S. federal income tax or PRC tax purposes. As a result, CIH is generally expected to be liable only for tax liabilities attributable to, or incurred with respect to, the spun-off business or otherwise attributable to CIH after the distribution date.

*Legal matters.* Except as otherwise set forth in the separation and distribution agreement, CIH will assume the liability for, and control of, all pending and threatened legal matters related to the spun-off business or assumed liabilities and CIH will indemnify us for any liability arising out of or resulting from such assumed legal matters. Each party to a claim will agree to cooperate in defending any claims against the other party for events that took place prior to, on or after the date of separation. We will retain liability for pending and threatened legal matters related to the retained business.

*Further assurances.* In addition to the actions specifically provided for in the separation and distribution agreement, except as otherwise set forth therein or in any ancillary agreement, both we and Fang will agree to use reasonable best efforts, prior to, on and after the distribution date, to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws, regulations and agreements to consummate and make effective the transactions contemplated by the separation and distribution agreement and the ancillary agreements.

### Business Cooperation Agreement

CIH and we have entered into a business cooperation agreement in respect of CIH's cooperation on certain commercial property-related business, particularly CIH's listing services, operated through our website, *Fang.com*, after the separation and distribution. The initial term of this agreement is 10 years commencing from the signing date and may be terminated by mutual written agreement between CIH and us.

Table of Contents

*Business Cooperation.* CIH has the exclusive right to operate all the commercial property-related business, such as the online listing of commercial properties and lands as well as the advertising and marketing services provided through our commercial property-related web pages, for which we are responsible for operating and maintaining at CIH's expenses, which includes IT system upgrade, servers maintenance and software upgrade. We have the exclusive right to operate all the residential property-related business, except for those provided by CIH to clients relating to residential property-related business, including the information and analytics services as well as promotion services. CIH historically cooperated with us to operate CIH's commercial property-related business through our web pages and are in the process of migrating such business to CIH's own website, *3fang.com* and 3fang mobile application.

*Intellectual Property Cooperation.* We agree to authorize CIH to use for free certain of our trademarks, copyrights, patents and other intellectual properties in connection with the operation of CIH's commercial property-related business.

*Revenue and Expenses Allocation.* Originally under the business cooperation agreement, during the term of our cooperation, we have the right to receive (1) 100% of the revenue generated by residential property-related business on our residential property-related web pages, (2) 85% of the revenue generated by commercial property-related business on our residential property-related web pages, and (3) 15% of the revenue generated by residential property-related business on our commercial property-related web pages. CIH has the right to receive (1) 100% of the revenue generated by commercial property-related business on our commercial property-related web pages, for which CIH will bear the cost for operating and maintaining the related web pages and servers, (2) 85% of the revenue generated by residential property-related business on our commercial property-related web pages, and (3) 15% of the revenue generated by commercial property-related business on our residential property-related web pages. We and CIH have agreed to terminate, effective from January 1, 2020, such revenue allocation arrangement, and as a result, we will have the right to receive 100% of the revenue generated by business on our residential real estate channel, whereas CIH will have the right to receive 100% of the revenue generated by business on CIH's commercial real estate channel.

### Data License Agreement

We have entered into a data license agreement with CIH, pursuant to which, we agree to license the right of using certain data to CIH for development of CIH's business, and CIH agrees to provide certain data to us, including property appraisal and transaction data. Each of CIH and us will not pay any royalty fees. The term of the data license agreement is 10 years commencing from the signing date and may be terminated by mutual agreement between CIH and us.

### Software License Agreement

We have entered into a software license agreement with CIH, pursuant to which, we agree to license the right of using certain of our software, at annual royalty fee of RMB500,000 (US$71,821), subject to adjustment. The term of the software license agreement is 10 years commencing from the signing date and may be terminated by mutual agreement between CIH and us.

### Intellectual Property License Agreement

In connection with the separation, we have entered into an intellectual property license agreement with CIH, pursuant to which CIH was granted a non-exclusive and royalty-free right to use certain of our intellectual properties in connection with the operation of CIH's business. The intellectual property license agreement is valid for a term of 10 years commencing from the signing date and may be terminated by mutual written agreement between CIH and us.

### Lease Framework Agreement

We and CIH have entered into a lease framework agreement, pursuant to which we agree to lease properties owned by us or our affiliates to CIH at market price. The lessors and lessees have entered into detailed lease agreements in accordance with this framework agreement based on CIH's actual demands. The initial term of this agreement is 10 years commencing from the signing date and may be terminated by mutual written agreement between CIH and us. As of December 31, 2019, we have prepaid rental fees from CIH in the amount of US$1,426.

### Sale and Purchase Agreement

On December 24, 2019, we entered into an agreement with Next Decade and Media Partner, pursuant to which we agreed to buy and the Next Decade and Media Partner agreed to sell, in the future 12 months, at a fixed price of US$5.99 per share, up to 15 million shares of CIH, most of which will be Class B ordinary shares of CIH. According to the agreement, we have the rights to decide how many shares to purchase, when to purchase, and whether it be one transaction or multiple transactions, and we will not seek to have a control stake of CIH through this transaction, unless separately approved by both audit committees and boards of us and CIH. On December 27, 2019, we exercised a portion of the call options and acquired 5 million Class B ordinary shares of CIH from Next Decade and Media Partner. As of December 31, 2019, the fair value of the call option for the remaining 10 million ordinary shares of CIH was US$1,384. Total unrealized gain of US$1,149 was recorded in change in fair value of securities for the year ended December 31, 2019. For more details, see Note 5 to our consolidated financial statements included elselvhere in this annual report.

Table of Contents

*Redemption of convertible notes*

In 2019, pursuant to note repurchase agreements, we repurchased (1) from Safari Group CB Holdings Limited of the 2022 Notes in the principal amount of US$28.0 million to redeem the portion held by Mr. Mo through Ateefa Limited's shareholding in Safari Group CB Holdings Limited, and (2) from IDG Alternative Global Limited of the 2022 Notes in the principal amount of US$54.94 million to redeem the portion held by Mr. Mo through Deanhale Limited's shareholding in IDG Alternative Global Limited. Each of Ateefa Limited and Deanhale Limited is a British Virgin Islands company wholly-owned by Mr. Mo. See "Item 5. B. Operating and Financial Review and Prospects—Liquidity and Capital Resources." For more details, see Note 14 to our consolidated financial statements included elsewhere in this annual report.

*Other Related Party Transactions*

We had relationships with the following related parties in 2017, 2018 and 2019:

| Name of Related Party | Relationship with Fang |
|---|---|
| Vincent Tianquan Mo | Executive chairman of the board of directors and controlling shareholder of our company |
| Richard Jiangong Dai | Former director and former chief executive officer of our company |
| Beihai Silver Beach 1 Hotel and Property Management Company, Ltd. ("Beihai Silver Beach") | A company under the control of Vincent Tianquan Mo |
| Che Tian Xia Company Ltd. ("Che Tian Xia") | A company under the control of Vincent Tianquan Mo |
| CIH and its subsidiaries | A company under the control of Vincent Tianquan Mo and our company can exercise significant influence over |
| Wanli | Equity method investment |
| Media Partner | A company under the control of Vincent Tianquan Mo |
| Next Decade | A company under the control of Vincent Tianquan Mo |
| Shanghai Yuyue Electronic Technology Development Co., Ltd ("Shanghai Yuyue") | A company under the control of Vincent Tianquan Mo |
| Wall Street Global Training Center, Inc. ("Training Center") | A company under the control of Vincent Tianquan Mo |

In 2011, we entered into an agreement with Training Center to lease to it office space of approximately 220 square feet in a building owned by us located in New York City, free of charge. The estimated fair value of the free office space was insignificant for each of the years ended December 31, 2017, 2018 and 2019.

In February 2012, we entered into an agreement with Mr. Mo, our executive chairman, to lease a building owned by him for a 10-year period from March 1, 2012. The deemed rental expense of US$0.2 million, US$0.2 million and US$0.2 million for 2017, 2018 and 2019, respectively, and the corresponding shareholder contribution were included in our consolidated financial statements.

In April 2013, we entered into an agreement with Beihai Silver Beach, pursuant to which Beihai Silver Beach was engaged to manage the hotel and office leasing operations owned by the BaoAn Entities for 10 years. The management fees incurred for the years ended December 31, 2017, 2018 and 2019 were US$0.5 million, US$0.5 million and US$0.7 million, respectively.

In April 2013, we entered into an agreement with Che Tian Xia to use its domain name for seven years free of charge.

We entered into certain agreements with CIH regarding listing services for commercial properties, office building leases, IT services and software licenses. During period from the completion of the separation of CIH from us to December 31, 2019, we made certain cash collections and cash payments on behalf of CIH and vice versa. In November 2019, we entered into an agreement with CIH, according to which, net balances between CIH, its subsidiaries and variable interest entity, on the one hand, and our company, our subsidiaries and consolidated affiliated entities, on the other hand, are to be settled on a quarterly basis. Accordingly, the amounts due to CIH were US$0.3 million, after offsetting amounts due from CIH of US$9.3 million.

In June 2019 and September 2019, we entered into a series of disposal agreement with Shanghai Yuyue to transfer our shareholding in 42 subsidiaries which used to provide marketing, listing, leads generating services and ecommerce business to Shanghai Yuyue. Revenues generated by these entities were US$8.7 million for the year ended December 31, 2018 and US$1.5 million before the disposal in 2019. Upon the disposal, Shanghai Yuyue assumes net liabilities of these entities at carrying amount. Accordingly, there was No disposal gain or loss as a result of the transaction. For the year ended December 31, 2019, noncash net liability distributed to Shanghai Yuyue in connection with the disposal was US$8.8 million.

In 2019, we entered into an agreement with Wanli and its affiliate to purchase data and services for a total consideration of US$0.3 million. We prepaid US$0.3 million to Wanli in 2019.

As of December 31, 2017, 2018 and 2019, we had US$0.2 million, nil and US$0.6 million, respectively, due from our related parties, and had nil, US$19,000 and US$9.2 million, respectively, due to our related parties.

For more details of our related party transactions in 2019, see Note 19 to our consolidated financial statements included elsewhere in this annual report.

Table of Contents

*Stock Incentive Plans*

See "Item 6.B. Directors, Senior Management and Employees—Compensation—Share Options."

*C. Interests of Experts and Counsels*

Not applicable.

## ITEM 8. FINANCIAL INFORMATION

*A. Consolidated Statements and Other Financial Information*

We have appended consolidated financial statements filed as part of this annual report.

*Legal Proceedings*

See "Item 4.B. Information on the Company—Business Overview—Legal Proceedings."

*Dividend Policy*

Our board of directors has the discretion over whether to pay dividends on our ordinary shares. In addition, our shareholders may declare dividends but No dividends shall be declared in excess of the amount recommended by our board of directors. If our board of directors decides to pay dividends on our ordinary shares, the form, frequency and amount will be based upon our future operations and earnings, capital requirements and surplus, general financial condition, shareholders' interests, contractual restrictions and such other factors as our board of directors may deem relevant. For a description of our corporate structure and its potential impact upon our ability to pay dividends, see "Item 3.D. Key Information—Risk Factors—Risks related to doing business in China—We rely primarily on dividends and other distributions on equity paid by our subsidiaries, and any limitation on the ability of our subsidiaries to make payments to us could have a material adverse effect on our ability to conduct our business as well as our liquidity."

Holders of ADSs are entitled to receiving dividends, subject to the terms of the deposit agreement, to the same extent as the holders of our ordinary shares. Cash dividends, if any, will be paid to the depositary in U.S. dollars and paid to holders of ADSs according to the terms of the deposit agreement. Other distributions, if any, will be paid by the depositary to holders of ADSs in any means it deems legal, fair and practical. Under the deposit agreement, the depositary is required to distribute dividends to holders of ADSs unless such distribution is prohibited by law. The amounts distributed to holders will be net of fees, expenses, taxes and other governmental charges payable by holders under the deposit agreement.

In August 2014, we declared a cash dividend of US$1.00 per share on our ordinary shares (US$0.20 per ADS), or an aggregate of US$82.4 million to holders of our ordinary shares and ADSs, payable to shareholders of record on August 18, 2014. As of December 31, 2014, all the declared dividends had been paid.

In March 2015, we declared a cash dividend of US$1.00 per share on our ordinary shares (US$0.20 per ADS), or an aggregate of US$82.8 million to holders of our ordinary shares and ADSs, payable to shareholders of record on March 13, 2015. As of the date of this annual report, all the declared dividends had been paid.

*B. Significant Changes*

Except as disclosed elsewhere in this annual report, we have not experienced any significant changes since the date of our audited consolidated financial statements included in this annual report.

## ITEM 9. THE OFFER AND LISTING

*A. Offer and Listing Details*

Our ADSs have been listed for trading on the New York Stock Exchange under the symbol "SFUN" since September 17, 2010.

*B. Plan of Distribution*

Not applicable.

Table of Contents

*C. Markets*

Our ADSs have been listed for trading on the New York Stock Exchange under the symbol "SFUN" since September 17, 2010.

*D. Selling Shareholders*

Not applicable.

*E. Dilution*

Not applicable.

*F. Expenses of the Issue*

Not applicable.

## ITEM 10. ADDITIONAL INFORMATION

*A. Share Capital*

Not applicable.

*B. Memorandum and Articles of Association*

We incorporated by reference into this annual report the description of our fifth amended and restated memorandum and articles of association contained in our current report on Form 6-K originally filed with the SEC on August 3, 2012. Our shareholders adopted our fifth amended and restated memorandum and articles of association by a special resolution on August 1, 2012.

*C. Material Contracts*

Material contracts other than in the ordinary course of business are described in "Item 4. Information on the Company" and in "Item 7. Major Shareholders and Related Party Transactions" and elsewhere in this annual report.

*D. Exchange Controls*

**Regulations relating to Foreign Exchange, Taxation and Dividend Distribution**

*Foreign Exchange*

The principal regulation governing foreign exchange in China is the Foreign Currency Administration Regulations issued by the State Council in January 1996 and as amended in August 2008 and the Regulations of Settlement, Sale and Payment of Foreign Exchange, which were promulgated by the PBOC on June 20, 1996, and became effective on July 1, 1996. The Renminbi is freely convertible for current account transactions, such as trade and service-related foreign exchange transactions, but not for capital account transactions, such as direct investments, loans or investments in securities outside China, without the prior approval of the relevant government authorities. Pursuant to the Foreign Currency Administration Regulations, foreign-invested enterprises in China may purchase foreign exchange at authorized commercial banks without the approval of SAFE for trade and service-related foreign exchange transactions by providing commercial documents evidencing these transactions. They may also retain foreign exchange, subject to a cap approved by SAFE, to satisfy foreign exchange liabilities or to pay dividends.

According to the Provisions on the Foreign Exchange Administration of Domestic Direct Investment of Foreign Investors promulgated by the SAFE on May 11, 2013, implemented on May 13, 2013 and amended on October 10, 2018 and December 30, 2019, direct investment from foreign investors within the PRC territory shall be subject to registration management. Enterprises involved in domestic direct investment shall register with the SAFE and its branch offices. Banks shall provide the relevant domestic direct investment service in accordance with the registration information filed with the foreign exchange authorities.

According to the Notice of the State Administration of Foreign Exchange on Further Simplifying and Improving Policies for the Foreign Exchange Administration of Direct Investment promulgated by the SAFE on February 13, 2015 and amended on November 10, 2018 and December 30, 2019, policies for the Foreign Exchange Administration of Direct Investment has been improved and simplified as follows: (1) canceling two administrative approval items, including confirmation of foreign exchange registration under domestic direct investment and confirmation of foreign exchange registration under overseas direct investment; instead, banks shall directly examine and handle foreign exchange registration under direct investment pursuant to the Operating Guidelines for Foreign Exchange Business in Direct Investment and the SAFE and its branch offices shall indirectly supervise the foreign exchange registration under direct investment through banks; (2) canceling the registration for confirmation of the non-cash capital contribution of foreign investors under domestic direct investment and the registration for confirmation of the capital contribution made by foreign investors for acquisition of the equity interests from China; (3) canceling the filing of foreign exchange under overseas reinvestment; and (4) canceling the annual foreign exchange inspection of direct investment and changing to the registration of inventory interests.

Table of Contents

On October 23, 2019, the SAFE promulgated Circular of the State Administration of Foreign Exchange on Further Promoting Cross-border Trade and Investment Facilitation, canceling restrictions on domestic equity investments by capital of non-investment foreign-invested Enterprises, foreign exchange settlement by using capital under domestic asset realization accounts, the quantity of opened foreign exchange capital accounts and the security deposit use and foreign exchange settlement of foreign investors. At the same day, the SAFE issued Circular of the State Administration of Foreign Exchange on Streamlining Foreign Exchange Accounts, which became effective on March 2, 2020 to further simplify the foreign exchange accounts.

*Taxation and Dividend Distribution*

We are incorporated in the Cayman Islands. The Cayman Islands currently levies No taxes on individuals or corporations based upon profits, income, gains or appreciation and there is No taxation in the nature of inheritance tax or estate duty. There are No other taxes likely to be material to us levied by the government of the Cayman Islands except for stamp duties, which may be applicable on instruments executed in, or after execution, brought within the jurisdiction of the Cayman Islands. In addition, the Cayman Islands does not impose withholding tax on dividend payments.

In March 2007, the National People's Congress of China enacted the New EIT Law, which took effect on January 1, 2008, as amended in February 2017 and December 2018. Under the New EIT Law, foreign-invested enterprises, such as our subsidiaries and consolidated controlled entities, are subject to enterprise income tax at a uniform rate of 25.0% if No tax preferential policy is applicable. In addition, under the New EIT Law, enterprises organized under the laws of jurisdictions outside China may be classified as either "non-resident enterprises" or "resident enterprises." Non-resident enterprises without an establishment or place of business in China are subject to withholding tax at the rate of 10.0% with respect to their PRC-sourced dividend income, which rate can be reduced under applicable double tax treaties or arrangements. As we are incorporated in the Caymans Islands, we may be regarded as a "non-resident enterprise." We hold equity interests in several of our major PRC subsidiaries indirectly through subsidiaries incorporated in Hong Kong. According to the Avoidance of Double Taxation Arrangement between Mainland China and Hong Kong, dividends declared by a resident enterprise in mainland China to a Hong Kong resident enterprise should be subject to withholding tax at a rate of 5.0%, provided, however, that such Hong Kong resident enterprise directly owns at least 25.0% of the equity interest in the PRC resident enterprise. In September 2013, SouFun Media and SouFun Network were granted a reduced withholding tax rate of 5% on earnings to be distributed to their Hong Kong parent entities between 2013 and 2015.

In August 2009, SAT issued Circular 124. Pursuant to Circular 124, non-tax residents of China who wish to enjoy a treaty benefit on their China-sourced income under a Sino-foreign double tax agreement have to go through either an "approval application" procedure (for passive income—dividends, interest, royalties and capital gains) or "record filing" procedure (for active income—business profits of a permanent establishment, service fees and personal employment income) in which specific forms attached to Circular 124 have to be submitted to the relevant Chinese tax authorities together with the relevant supporting documentation. On November 1, 2015, Circular 124 was repealed by the Administrative Measures for Tax Convention Treatment for Non-resident Taxpayers issued by SAT ("Circular 60"). Circular 60 abolishes the "approval application" procedure and provides that any non-resident taxpayer filing a tax return shall determine whether such taxpayer is entitled to the treaty benefit, and shall submit the relevant statements and materials to the competent tax authority for the tax return filing. In the case of withholding at source and designated withholding, where a non-resident taxpayer who considers it meets the conditions for enjoying the convention treatment needs to be entitled to the convention treatment, the taxpayer shall take the initiative to propose the same to the withholding agent, and provide the withholding agent with the relevant statements and materials for the withholding declaration. The withholding agent shall withhold tax in accordance with the conventions, and forward the relevant statements and materials to the competent tax authority when making the withholding declaration.

In addition, SAT released Circular 9 in February 2018. Circular 9 provides guidance for the determination of "beneficial ownership" for the purpose of claiming benefits under double taxation arrangements by treaty residents in respect of articles of dividends, royalties and interest under double taxation arrangements. Under Circular 9, a "beneficial owner" shall generally engage in "substantive business activities" which is further referred to as manufacturing, trading and management activities under Article 2 of Circular 9. Circular 9 also sets forth several factors, the existence of which generally does not provide support that the treaty resident is a "beneficial owner." According to Circular9, non-resident enterprises which could not provide valid supporting documents as "beneficiary owners" could not be approved to enjoy treaty benefits. Therefore, dividends from our PRC subsidiaries paid to us through our Hong Kong subsidiaries may be subject to a withholding tax rate of 10.0% if our Hong Kong subsidiaries cannot be considered as a "beneficial owner" under Circular 9.

Table of Contents

On November 14, 2019, SAT issued the Administrative Measures for Entitlement to Treaty Benefits for Non-resident Taxpayers, effective on January 1, 2020, which stipulates entitlement to treaty benefits for non-resident taxpayers, who shall be tax residents of the other contracting party in accordance with the provisions of the clauses on residents of the tax treaties, shall be handled by means of "self-judgment of eligibility, declaration of entitlement, and retention of relevant materials for future reference". Where non-resident taxpayers judge by themselves that they meet the conditions for entitlement to treaty benefits, they may obtain such entitlement themselves at the time of making tax declarations, or at the time of making withholding declarations via withholding agents. At the same time, they shall collect, gather and retain relevant materials for future reference in accordance with the provisions of these measures, and shall accept the follow-up administration of tax authorities.

Despite the above, the New EIT Law also provides that an enterprise incorporated outside China with its "de facto management bodies" located within mainland China should be considered a PRC resident enterprise and therefore be subject to enterprise income tax on its worldwide income at the rate of 25.0%.

The implementing rules for the New EIT Law, last amended on April 23, 2019, defines "de facto management organization" as the body that exercises substantial and comprehensive control over the production, operation, personnel, accounting, property and other factors of an enterprise. SAT issued Circular 82 in April 2009. Circular 82 provides certain specific criteria for determining whether the "de facto management bodies" of a Chinese-controlled offshore-incorporated enterprise is located in China. Although Circular 82 only applies to offshore enterprises controlled by PRC enterprises, not those controlled by PRC individuals or foreigners in China, like us, the determining criteria set forth in Circular 82 may reflect SAT's general position on how the "de facto management bodies" test should be applied in determining the tax resident status of offshore enterprises, regardless of whether they are controlled by PRC enterprises, individuals or foreigners. On January 29, 2014, SAT issued the Notice concerning the Determination of Resident Enterprises Based on the Standards of Actual Management Institutions, amended some provisions of Circular 82.

Substantially all members of our management are currently located in China and we expect them to continue to be located in China for the foreseeable future. Therefore, if we are deemed to be a PRC tax resident enterprise, we will be subject to an enterprise income tax rate of 25.0% on our worldwide income if No preferential tax treatment is applicable. According to the New EIT Law and its implementing rules, dividends are exempted from income tax if such dividends are received by a resident enterprise on an equity interest it directly owns in another resident enterprise. Therefore, it is possible that dividends we derive through our Hong Kong subsidiaries from our PRC subsidiaries would be tax exempt income under the New EIT Law if our Hong Kong subsidiaries are also deemed to be "resident enterprises."

If we are deemed to be a PRC tax resident enterprise, we would then be obliged to withhold PRC withholding income tax on the gross amount of dividends declared to shareholders who are non-PRC tax residents. The withholding income tax rate is 10.0% for non-resident enterprises and 20.0% for non-resident individuals, unless otherwise provided under the applicable double tax treaties between China and governments of other jurisdictions.

Significant uncertainties still exist with respect to the interpretation of the New EIT Law and its implementing rules. Any increase in the enterprise income tax rate applicable to us, the imposition of PRC income tax on our global income or the imposition of withholding tax on dividends declared by our subsidiaries to us could have a material adverse effect on our business, financial condition and results of operations.

**Regulations relating to Foreign Exchange in Certain Onshore and Offshore Transactions**

Pursuant to SAFE Circular 37, a PRC resident must register with the local SAFE branch before such PRC resident contributes assets or equity interests in an Overseas SPV that is established or controlled by the PRC resident for the purpose of conducting investment or financing, and following the initial registration, the PRC resident is required to register with the local SAFE branch for any major change in respect of the Overseas SPV, including, among other things, a change in the PRC resident shareholder of the Overseas SPV, the name of the Overseas SPV, its term of operation, or any increase or reduction in the registered capital of the Overseas SPV, any share transfer or swap, and any merger or division.

According to the Notice on Further Simplifying and Improving Policies for the Foreign Exchange Administration of Direct Investment released on February 13, 2015 by SAFE, amended on December 30, 2019, local banks will examine and handle foreign exchange registration for overseas direct investment, including the initial foreign exchange registration and amendment registration, under SAFE Circular 37 from June 1, 2015. Any failure to comply with these registration procedures may result in penalties, including the imposition of fines, criminal liability, and restrictions on the ability of the PRC subsidiary of the Overseas SPV to distribute dividends to its overseas shareholders.

Table of Contents

*E. Taxation*

**Cayman Islands Taxation**

The Cayman Islands currently levies No taxes on individuals or corporations based upon profits, income, gains or appreciation and there is No taxation in the nature of inheritance tax or estate duty. There are No other taxes likely to be material to us levied by the government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in, or, after execution, brought within the jurisdiction of the Cayman Islands. The Cayman Islands is not a party to any double tax treaties that are applicable to any payments made to or by our company. There are No exchange control regulations or currency restrictions in the Cayman Islands.

Payments of dividends and capital in respect of our shares will not be subject to taxation in the Cayman Islands and No withholding will be required on the payment of a dividend or capital to any holder of our shares, nor will gains derived from the disposal of our shares or the ADSs be subject to Cayman Islands income or corporation tax.

No stamp duty is payable in respect of the issue of our shares or on an instrument of transfer in respect of our shares.

**People's Republic of China Taxation**

The PRC enterprise income tax is calculated based on the taxable income determined under the PRC laws and accounting standards. Under the New EIT Law, all domestic and foreign- invested companies in China are subject to a uniform enterprise income tax at the rate of 25% and dividends from a PRC subsidiary to its foreign parent company are subject to a withholding tax at the rate of 10%, unless such foreign parent company's jurisdiction of incorporation has a tax treaty with China that provides for a reduced rate of withholding tax, or the tax is otherwise exempted or reduced pursuant to the PRC tax laws. Our subsidiaries in China are considered foreign investment entities ("FIEs"), and certain of these subsidiaries are directly held by our subsidiaries in Hong Kong. According to the effective tax treaty between China and Hong Kong, dividends payable by an FIE in China to a company in Hong Kong which directly holds at least 25% of the equity interests in the FIE will be subject to a withholding tax of 5%.

In February 2009, SAT issued Circular No. 81. According to Circular No. 81, in order to enjoy the preferential treatment on dividend withholding tax rates, an enterprise must be the "beneficial owner" of the relevant dividend income, and No enterprise is entitled to enjoy preferential treatment pursuant to any tax treaties if such enterprise qualifies for such preferential tax rates through any transaction or arrangement, the major purpose of which is to obtain such preferential tax treatment. The tax authority in charge has the right to make adjustments to the applicable tax rates, if it determines that any taxpayer has enjoyed preferential treatment under tax treaties as a result of such transaction or arrangement.

In February 2018, SAT issued Circular No. 9 to provide guidance on the criteria to determine whether an enterprise qualifies as the "beneficial owner" of the PRC sourced income for the purpose of obtaining preferential treatment under tax treaties. Pursuant to Circular No. 9, the PRC tax authorities will review and grant tax preferential treatment on a case-by-case basis and adopt the "substance over form" principle in the review. Circular 9 specifies that a beneficial owner should generally carry out substantial business activities and own and have control over the income, the assets or other rights generating the income. Therefore, an agent or a conduit company will not be regarded as a beneficial owner of such income. Circular 9 provides that the tax authorities shall make the decision based on a comprehensive consideration of all determining factors provided in Circular 9 rather than the status of a single determining factor. Since the two circulars were issued, it has remained unclear how the PRC tax authorities will implement them in practice and to what extent they will affect the dividend withholding tax rates for dividends distributed by our subsidiaries in China to our Hong Kong subsidiary. If the relevant tax authority determines that any of our Hong Kong subsidiaries is a conduit company and does not qualify as the "beneficial owner" of the dividend income it receives from our PRC subsidiaries, the higher 10% withholding tax rate may apply to such dividends.

On November 14, 2019, SAT issued the Administrative Measures for Entitlement to Treaty Benefits for Non-resident Taxpayers, effective on January 1, 2020, which stipulates entitlement to treaty benefits for non-resident taxpayers, who shall be tax residents of the other contracting party in accordance with the provisions of the clauses on residents of the tax treaties, shall be handled by means of "self-judgment of eligibility, declaration of entitlement, and retention of relevant materials for future reference". Where non-resident taxpayers judge by themselves that they meet the conditions for entitlement to treaty benefits, they may obtain such entitlement themselves at the time of making tax declarations, or at the time of making withholding declarations via withholding agents. At the same time, they shall collect, gather and retain relevant materials for future reference in accordance with the provisions of these measures, and shall accept the follow-up administration of tax authorities.

Under the New EIT Law, an enterprise established outside of China with its "de facto management body" within China is considered a resident enterprise and will be subject to enterprise income tax at the rate of 25% on its worldwide income. The "de facto management body" is defined as the organizational body that effectively exercises overall management and control over production and business operations, personnel, finance and accounting, and properties of the enterprise. It remains unclear how the PRC tax authorities will interpret such a broad definition. If the PRC tax authorities determine that we should be classified as a resident enterprise, our global income will be subject to income tax at a uniform rate of 25%, which may have a material adverse effect on our financial condition and results of operations. Notwithstanding the foregoing provision, the New EIT Law also provides that, if a resident enterprise directly invests in another resident enterprise, the dividends received by the investing resident enterprise from the invested enterprise are exempted from income tax, subject to certain conditions. However, it remains unclear how the PRC tax authorities will interpret the PRC tax resident treatment of an offshore company, like us, having indirect ownership interests in PRC enterprises through intermediary holding vehicles.

Table of Contents

The implementing rules for the New EIT Law defines "de facto management organization" as the body that exercises substantial and comprehensive control over the production, operation, personnel, accounting, property and other factors of an enterprise. SAT issued Circular 82 in April 2009, which provides certain specific criteria for determining whether the "de facto management bodies" of a Chinese-controlled offshore-incorporated enterprise is located in China. Although Circular 82 only applies to offshore enterprises controlled by PRC enterprises, not those controlled by PRC individuals or foreigners in China, like us, the determining criteria set forth in Circular 82 may reflect SAT's general position on how the "de facto management bodies" test should be applied in determining the tax resident status of offshore enterprises, regardless of whether they are controlled by PRC enterprises, individuals or foreigners. On January 29, 2014, SAT issued the Notice concerning the Determination of Resident Enterprises Based on the Standards of Actual Management Institutions, which amended some provisions of Circular 82.

If we were treated as a PRC resident enterprise, any interest payable to non-resident enterprise holders of the notes and dividends payable to non-resident enterprise holders of our ordinary shares or ADSs may be treated as income derived from sources within PRC and therefore subject to a 10% withholding tax (or 20% in the case of non-resident individual holders) unless an applicable income tax treaty provides otherwise. In addition, capital gains realized by non-resident enterprise holders upon the disposition of the notes, our ordinary shares or ADSs may be treated as income derived from sources within China and therefore subject to 10% income tax (or 20% in the case of non-resident individual holders) unless an applicable income tax treaty provides otherwise.

A description of the PRC tax considerations applicable to CIH's separation from us is contained in the registration statement of CIH on Form F-1 (File No. 333-231376) filed with the SEC on May 24, 2019, as amended.

**U.S. Federal Income Taxation**

The following discussion describes the material U.S. federal income tax consequences of the ownership and disposition of our ADSs or ordinary shares under currently applicable law. This discussion does not address any U.S. federal consequences other than U.S. federal income tax consequences (such as the gift or estate tax). This discussion also does not address any state, local or non-U.S. tax consequences of an investment in our ordinary shares or ADSs. This discussion applies to you only if you are a U.S. holder (as defined below) and beneficially own our ordinary shares or ADSs as capital assets for U.S. federal income tax purposes. This discussion does not apply to you if you are a member of a class of holders subject to special rules, such as:

- dealers in securities or currencies;

- traders in securities that elect to use a mark-to-market method of accounting for securities holdings;

- banks or other financial institutions;

- insurance companies;

- tax-exempt organizations;

- partnerships and other entities treated as partnerships for U.S. federal income tax purposes or persons holding ordinary shares or ADSs through any such entities;

- real estate investment trusts;

- regulated investment companies;

- persons that hold ordinary shares or ADSs as part of a hedge, straddle, constructive sale, conversion transaction or other integrated investment;

- U.S. holders (as defined below) whose functional currency for tax purposes is not the U.S. dollar;

- certain former citizens or long-term residents of the United States;

- persons subject to special tax accounting rules as a result of any item of gross income with respect to our ordinary shares or ADSs being taken into account in an "applicable financial statement" as defined in Section 451(b) of the Code (as defined below);

- persons liable for alternative minimum tax; or

- persons who actually or constructively own 10.0% or more of the total combined voting power of all classes of our shares (including ADSs) entitled to vote or 10.0% or more of the total value of our shares (including ADSs.

Table of Contents

This discussion is based on the U.S. Internal Revenue Code of 1986, as amended, or the Code, its legislative history, existing and proposed regulations promulgated thereunder, published rulings and court decisions, all as currently in effect. These laws are subject to change, possibly on a retroactive basis. In addition, this discussion relies in part on our assumptions regarding the projected value of our shares and the nature of our business. Finally, this discussion is based in part upon the representations of the depositary and the assumption that each obligation in the deposit agreement and any related agreement will be performed in accordance with its terms.

We believe that certain of our purchases of CIH's ordinary shares in December 2019 and thereafter from Next Decade and Media Partner do not affect the conclusions regarding the U.S. federal income tax treatment of CIH's separation from us in June 2019 in any material respect. A description of the U.S. federal income tax considerations applicable to CIH's separation from us is contained in the registration statement of CIH on Form F-1 (file No. 333-231376) filed with the SEC on May 24, 2019, as amended. If we were a PFIC for our 2019 taxable year, U.S. holders who held our ADSs or ordinary shares at the time of the separation could recognize gain (but not loss) in a deemed disposition of our ADSs or ordinary shares, and the deemed disposition would be subject to the rules described under "—Status as a PFIC" below.

You should consult your own tax advisor concerning the particular U.S. federal income tax consequences to you of the purchase, ownership and disposition of our ordinary shares or ADSs, as well as the consequences to you arising under the laws of any other taxing jurisdiction.

For purposes of the U.S. federal income tax discussion below, you are a "U.S. holder" if you beneficially own our ordinary shares or ADSs and are:

- a citizen or resident of the United States for U.S. federal income tax purposes;

- a corporation, or other entity taxable as a corporation, that was created or organized in or under the laws of the United States or any political subdivision of the United States;

- an estate the income of which is subject to U.S. federal income tax regardless of its source; or

- a trust, if (1) a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all substantial decisions of the trust, or (2) the trust has a valid election in effect to be treated as a U.S. person.

If a partnership or other flow-through entity holds ordinary shares or ADSs, the tax treatment of a partner or other owner will generally depend on the status of the partner or other owner and the activities of the partnership or other flow-through entity. A holder of ordinary shares or ADSs that is a partnership or a partner in such partnership should consult its own tax advisor regarding the U.S. federal income tax consequences of the purchase, ownership and disposition of the ordinary shares or ADSs.

*ADSs.* If you hold ADSs, for U.S. federal income tax purposes, you generally will be treated as the owner of the underlying ordinary shares that are represented by such ADSs. Accordingly, deposits or withdrawals of ordinary shares for ADSs will not be subject to U.S. federal income tax.

*Dividends on Ordinary Shares or ADSs.* Subject to the passive foreign investment company, or PFIC, discussion below, the gross amount of any distributions (including amounts withheld to reflect PRC withholding taxes, if any) you receive on your ordinary shares or ADSs are generally treated as dividend income if the distributions are made from our current or accumulated earnings and profits, calculated according to U.S. federal income tax principles. Such income (including any withheld taxes) will be includable in your gross income on the day actually or constructively received by you, in the case of ordinary shares, or by the depositary in the case of ADSs. Distributions in excess of current and accumulated earnings and profits will be treated first as a non-taxable return of capital to the extent of your basis in the ordinary shares or ADSs and thereafter as a capital gain. If you are a non-corporate U.S. holder, including an individual, and have held your ADSs for a sufficient period of time, dividend distributions paid on our ADSs (but not our ordinary shares) will generally constitute qualified dividend income taxed at a preferential rate as long as our ADSs continue to be readily tradable on the New York Stock Exchange. Based on existing guidance, it is not clear whether a dividend on an ordinary share will be treated as a qualified dividend, because the ordinary shares are not themselves listed on a U.S. exchange. If, however, we are treated as a PRC "resident enterprise" under PRC law, we may be eligible for the benefits of the income tax treaty between the United States and the PRC, in which case dividends paid on our ordinary shares and ADSs would both be treated as qualified dividends (subject to the relevant holding period requirements). You should consult your own tax advisor as to the rate of tax that will apply to you with respect to dividend distributions, if any, you receive from us.

We do not intend to calculate our earnings and profits according to U.S. tax accounting principles. Accordingly, notwithstanding the discussion in the preceding paragraph, distributions on our ordinary shares or ADSs, if any, will generally be taxed to you as dividend distributions for U.S. tax purposes. If you are a corporation, you will not be entitled to claim a dividends-received deduction with respect to distributions you receive from us. In the event we are treated as a PRC "resident enterprise" under PRC law, we may be required to withhold PRC income tax on dividends paid to you under the New EIT Law. See "Item 3.D. Key Information—Risk Factors—Risks related to our ADSs, ordinary shares and notes—We may be required to withhold PRC income tax on any dividend we pay you, and any gain you realize on the transfer of our ordinary shares and/or ADSs may also be subject to PRC withholding tax." Subject to generally applicable limitations, you may be eligible to claim a deduction or a foreign tax credit for PRC tax withheld at the appropriate rate. Dividends generally will be categorized as "passive category income" or, in the case of some U.S. holders, as "general category income" for foreign tax credit limitation purposes. The rules governing the use of foreign tax credits are very complex, and you are urged to consult your own tax advisor as to your ability, and the various limitations on your ability, to claim foreign tax credits in connection with the receipt of dividends.

Table of Contents

*Sales and Other Dispositions of Ordinary Shares or ADSs.* Subject to the PFIC discussion below, when you sell or otherwise dispose of ordinary shares or ADSs in a taxable transaction, you will generally recognize capital gain or loss in an amount equal to the difference between the amount realized on the sale or other taxable disposition and your adjusted tax basis in the ordinary shares or ADSs, both as determined in U.S. dollars. Any gain or loss you recognize will be long-term capital gain or loss if you have held the ordinary shares or ADSs for more than one year at the time of disposition. If you are an individual, long-term capital gain will be taxed at preferential rates. Your ability to deduct capital losses will be subject to various limitations.

The gain or loss you recognize on a sale or disposition of our ordinary shares or ADSs generally will be treated as arising from sources within the United States for foreign tax credit limitation purposes. However, if gains from the disposition of ordinary shares or ADSs are taxed under the New EIT Law, see "Item 3.D. Key Information—Risk Factors—Risks related to our ADSs, ordinary shares and notes—We may be required to withhold PRC income tax on any dividend we pay you, and any gain you realize on the transfer of our ordinary shares and/or ADSs may also be subject to PRC withholding tax," the income tax treaty between the United States and the PRC may apply, in which case you may elect to treat such gains as arising from sources within China for foreign tax credit limitation purposes. You are urged to consult your own tax advisors regarding the tax consequences to you under your particular circumstances if any PRC withholding tax is imposed on the disposition of ordinary shares or ADSs, including the availability of the foreign tax credit.

*Status as a PFIC.* If we are a PFIC in any taxable year in which you hold ordinary shares or ADSs, you will generally be subject to additional taxes and interest charges on certain "excess distributions" we make and on any gain realized on the disposition or deemed disposition of your ordinary shares or ADSs, regardless of whether we continue to be a PFIC in the year in which you receive an "excess distribution" or dispose of or are deemed to dispose of your ordinary shares or ADSs. Distributions in respect of your ordinary shares or ADSs during a taxable year will generally constitute "excess distributions" if, in the aggregate, they exceed 125% of the average amount of distributions in respect of your ordinary shares or ADSs over the three preceding taxable years or, if shorter, the portion of your holding period before such taxable year.

To compute the tax on excess distributions or any gain, (1) the excess distribution or the gain will be allocated ratably to each day in your holding period, (2) the amount allocated to the current year and any tax year before we first became a PFIC will be taxed as ordinary income in the current year, (3) the amount allocated to other taxable years will be taxable at the highest applicable marginal rate in effect for that year, and (4) an interest charge at the rate for underpayment of taxes for any period described under (3) above will be imposed with respect to any portion of the excess distribution or gain that is allocated to such period. In addition, if we are a PFIC or were in the year prior to a distribution, No distribution that you receive from us will qualify for taxation at the preferential rate discussed in the "—U.S. Federal Income Taxation—Dividends on Ordinary Shares or ADSs" section above.

We will be classified as a PFIC in any taxable year if, after the application of certain look-through rules, either: (1) 75.0% or more of our gross income for the taxable year is passive income (such as certain dividends, interest, rents or royalties), or (2) the average percentage value (determined on a quarterly basis) of our gross assets during the taxable year that produce passive income or are held for the production of passive income is at least 50.0% of the value of our total assets. For purposes of the asset test, any cash, cash equivalents, cash invested in short-term, interest bearing, debt instruments, or bank deposits, and any other current asset that is readily convertible into cash, will generally count as a passive asset.

We may have been a PFIC for our 2019 taxable year and may be a PFIC in the current or future taxable years. Our expectations are based on assumptions as to our projections of the value of our outstanding shares and of the other cash that we will hold and generate in the ordinary course of our business. We have not conducted a separate appraisal of the values of our assets for this purpose. Although the law in this regard is not entirely clear, we treat our consolidated controlled entities as being owned by us for U.S. federal income tax purposes. There can be No assurance that we will not be a PFIC in the current or any future taxable years, as PFIC status is re-tested each year and depends on the actual facts in such year. We could become or remain a PFIC, for example, if our market capitalization (i.e., our share price multiplied by the total number of our outstanding ordinary shares) at any time in the future is sufficiently low, if it is determined that we are not the owner of our consolidated controlled entities for U.S. federal income tax purposes, or if our business and assets evolve. Because items of working capital are generally treated as passive assets for PFIC purposes, accumulating cash, cash equivalents and other assets such as short-term and long-term investments that are readily convertible into cash increases the risk that we will be classified as a PFIC. In addition, there is No assurance that the Internal Revenue Service, or IRS, will agree with our determination as to whether the assets and the income derived from our assets constitute passive assets and income under the PFIC rules.

106

Table of Contents

If we are a PFIC in any year, as a U.S. holder, you will generally be required to file a return on IRS Form 8621 regarding your ordinary shares or ADSs on an annual basis. You should consult your own tax adviser regarding reporting requirements with regard to your ordinary shares or ADSs.

If we are a PFIC in any year, so long as the ADSs are and remain "marketable," you will be able to avoid the excess distribution rules described above by making a timely so-called "mark-to-market" election with respect to such U.S. holder's ADSs. The ADSs will be "marketable" as long as they remain regularly traded on a national securities exchange, such as The New York Stock Exchange. If you make this election in a timely fashion, you will generally recognize as ordinary income or ordinary loss (limited to the amount of prior ordinary gain) the difference between the adjusted tax basis of your ADSs on the first day of any taxable year and their value on the last day of that taxable year. Your basis in the ADSs will be adjusted to reflect any such income or loss. A mark-to-market election will be effective for the taxable year for which the election is made and for all subsequent taxable years, unless the ADSs are No longer regularly traded on a qualified exchange or the IRS consents to the revocation of the election. However, because a mark-to-market election cannot be made for any lower-tier PFICs that we may own, you may continue to be subject to the PFIC rules with respect to any indirect interest in any investments held by us that are treated as an equity interest in a PFIC for U.S. federal income tax purposes, including our subsidiaries. In addition, because our ordinary shares are not regularly traded on a national securities exchange, you will not be able to make a mark-to-market election with respect to any ordinary shares held by such U.S. holder. You should consult your own tax advisors with respect to making a mark-to-market election.

In addition, if we are a PFIC in any year, you might be able to avoid the excess distribution rules described above by making a timely so-called "qualified electing fund," or QEF, election to be taxed currently on your pro rata portion of our income and gain. However, we do not intend to provide the information that would be necessary for you to make a QEF election. Accordingly, you generally will not be able to make or maintain a QEF election with respect to your ADSs or ordinary shares.

You should consult with your tax advisors regarding the U.S. federal income tax consequences of holding ADSs or ordinary shares if we are considered to be a PFIC in any taxable year as well as your eligibility for a "mark-to-market" election and whether making such an election would be advisable to you in your particular circumstances.

*Additional Tax on Net Investment Income*

If you are an individual, estate or trust whose income exceeds certain thresholds, you will be subject to a 3.8% Medicare contribution tax on net investment income, including, among other things, dividends on, and capital gains from, the sale or other disposition of, your ordinary shares or ADSs, subject to certain limitations and exceptions.

*U.S. Information Reporting and Backup Withholding Rules*

In general, dividend payments with respect to the ordinary shares or ADSs and the proceeds received on the sale or other disposition of those ordinary shares or ADSs may be subject to information reporting to the IRS, and to backup withholding (currently imposed at a rate of 24.0%). Backup withholding will not apply, however, if you (1) are a corporation or come within certain other exempt categories and, when required, can demonstrate that fact or (2) provide a taxpayer identification number, certify as to No loss of exemption from backup withholding and otherwise comply with the applicable backup withholding rules. To establish your status as an exempt person, you will generally be required to provide certification on IRS Form W-9. Any amounts withheld from payments to you under the backup withholding rules will generally be allowed as a refund or a credit against your U.S. federal income tax liability, provided that you timely furnish the required information to the IRS.

You may be required to report information with respect to your ordinary shares or ADSs not held through a custodial account with a U.S. financial institution to the IRS. In general, if you hold specified "foreign financial assets" (which generally would include ordinary shares or ADSs) with an aggregate value exceeding $50,000, you will be required to report information about those assets on IRS Form 8938, which must be attached to your annual income tax return. Higher asset thresholds apply if you file a joint tax return or reside abroad. If you fail to report required information, you could become subject to substantial penalties. You should consult your own tax advisor regarding your obligation to file IRS Form 8938.

You should consult your own tax advisor regarding the application of the U.S. federal income tax laws to their particular situations as well as any additional tax consequences resulting from purchasing, holding or disposing of ordinary shares or ADSs, including the applicability and effect of the tax laws of any state, local or foreign jurisdiction and any estate, gift, and inheritance laws.

Table of Contents

*F. Dividends and Paying Agents*

Not applicable.

*G. Statement by Experts*

Not applicable.

*H. Documents on display*

We have previously filed with the SEC our registration statement on Form F-1 (File Number 333-169170), as amended, and a prospectus under the Securities Act with respect to our ordinary shares represented by our ADSs, and a related registration statement on Form F-6 (File Number 333-169176) with respect to our ADSs, as amended. We have also filed with the SEC registration statements on Form S-8 (File Numbers 333-173157 and 333-207182) with respect to our ADSs, as amended. In addition, we have filed with the SEC an automatic shelf registration statement on Form F-3 (File Number 333-208628), as amended, and a prospectus under the Securities Act with respect to our ordinary shares and ADSs.

We are subject to the periodic reporting and other informational requirements of the Exchange Act. Under the Exchange Act, we are required to file reports and other information with the SEC. Specifically, we are required to file annually a Form 20-F within four months after the end of each fiscal year for fiscal years ending on or after December 15, 2011. Copies of reports and other information, when so filed, may be inspected without charge and may be obtained at prescribed rates at the public reference facilities maintained by the SEC at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. The public may obtain information regarding the Washington, D.C. Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains a web site at www.sec.gov that contains reports, proxy and information statements, and other information regarding registrants that make electronic filings with the SEC using its EDGAR system.

As a foreign private issuer, we are exempt from the rules of the Exchange Act prescribing the furnishing and content of quarterly reports and proxy statements, and our executive officers, directors and principal shareholders are exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act. In addition, we are not required under the Exchange Act to file periodic reports and financial statements with the SEC as frequently or as promptly as U.S. companies whose securities are registered under the Exchange Act.

We will furnish JPMorgan Chase Bank, N.A., the depositary, with our annual reports, which include a review of operations and annual audited consolidated financial statements prepared in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP" or "GAAP"), and all notices of shareholders' meeting and other reports and communications that are made generally available to our shareholders. The depositary makes such notices, reports and communications available to holders of ADSs and, upon our request, mails to all record holders of ADSs the information contained in any notice of a shareholders' meeting received by the depositary from us.

*I. Subsidiary Information*

Not applicable.

**ITEM 11. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Our primary market risk exposure is interest rate risk associated with short and long-term borrowings bearing variable interest rates. We are also exposed to foreign currency risk, which can adversely affect our operating profits.

The following discussion should be read in conjunction with the notes to our audited consolidated financial statements contained in this annual report, which provide further information on our debt and derivative instruments contained in this annual report.

*Liquidity Risk*

The principal method we use to manage liquidity risk arising from liabilities is maintaining an adequate level of cash and cash equivalents with different banks. In 2017, 2018 and 2019, we monitored our liquidity risks by considering the maturity of our financial assets and projected cash flows from operations. Our objective is to maintain a balance between a continuity of funding and flexibility through settlement from customers and subsequent payment to vendors to meet our working capital requirements.

Table of Contents

*Interest Rate Risk*

Our earnings are affected by changes in interest rates due to the impact of such changes on interest income and expense from interest-bearing financial assets and liabilities. Our interest-bearing financial assets and liabilities are predominately denominated in Renminbi and U.S. dollars. Our interest-bearing financial assets consist primarily of structured notes, cash deposits with fixed interest rates and loan receivables.

*Foreign Currency Risk*

Substantially all of our revenues, cash and cash equivalent assets, costs and expenses, are denominated in Renminbi, and the functional currency of our principal operating subsidiaries and consolidated controlled entities is the Renminbi. On the other hand, a portion of our expenditures are denominated in foreign currencies, primarily the U.S. dollar, and we use the U.S. dollar as our functional and reporting currency. The ADSs are also traded in U.S. dollars. As a result, the value of your investment in our ADSs will be affected by fluctuations in exchange rates, particularly appreciation or depreciation in the value of the Renminbi relative to the U.S. dollar and other foreign currencies, without giving effect to any underlying change in our business or results of operations. For example, if the Renminbi had weakened 5.0% against the U.S. dollar with all other variables held constant, our profit for 2017 would have been US$0.8 million lower, our loss for 2018 would have been US$2.8 million lower and our loss for 2019 would have been US$2.0 million lower. See "Item 3.D. Key Information—Risk Factors—Risks related to doing business in China—Fluctuations in the exchange rates of the Renminbi could materially and adversely affect the value of our shares, ADSs or notes and result in foreign currency exchange losses."

From time to time we manage to convert Renminbi into foreign currencies for purchases of equipment from overseas suppliers and for certain expenses. The Renminbi is not freely convertible into foreign currencies. In July 2005, the PRC government discontinued pegging the Renminbi to the U.S. dollar. However, the PBOC, regularly intervenes in the foreign exchange market to prevent significant short-term fluctuations in the exchange rate. Nevertheless, under China's current exchange rate regime, the Renminbi may appreciate or depreciate significantly in value against the U.S. dollar in the medium to long term.

Very limited hedging transactions are available in China to reduce our exposure to exchange rate fluctuations. To date, we have not entered into any hedging transactions to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedging transactions may be limited and we may not be able to successfully hedge our exposure at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert Renminbi into other currencies.

*Credit Risk*

Assets that potentially subject us to significant concentration of credit risk primarily consist of cash and cash equivalents, restricted cash, fixed-rate time deposits and structured notes classified as short-term investments, accounts receivable, funds receivable, loans receivable and commitment deposits. As of December 31, 2019, we had US$456.3 million in cash and cash equivalents, restricted cash and fixed-rate time deposits classified as short-term investments, 95.9% and 4.1% of which were held by financial institutions in the PRC and financial institutions outside of the PRC, respectively. Under PRC law, it is generally required that a commercial bank in the PRC that holds third-party cash deposits protect the depositors' rights and interests over their deposited money; PRC banks are subject to a series of risk control regulatory standards; and PRC bank regulatory authorities are empowered to take over the operation and management of any PRC bank that faces a material credit crisis. In the event of bankruptcy of one of the financial institutions in which we have deposits or investments, it may be unlikely to claim our deposits or investments back in full. We selected reputable financial institutions with high credit ratings to deposit its assets. We regularly monitor the ratings of the financial institutions in case of any defaults. There has been No recent history of default in relation to these financial institutions.

As of December 31, 2019, we had US$103.9 million of short-term investment in the Structured Note. The repayments of the principal and interests of the 2020 Bonds received by GTJA are required to settle the Structured Note. We actively monitor the risks of default of the 2020 Bonds to limit the exposure to credit risk of the Structured Note.

Accounts receivable are typically unsecured and are derived from revenue earned from customers in the PRC. The risk with respect to accounts receivable is mitigated by credit evaluations we perform on our customers and our ongoing monitoring of outstanding balances. We regularly review the creditworthiness of our customers and require collateral from our customers in certain circumstances when accounts receivables become long overdue.

Funds receivable represent amounts due from third-party payment service providers. We carefully consider and monitor the credit worthiness of the third-party payment service providers to mitigate any risks associated with funds receivable.

We are also exposed to default risk on our loans receivables. We assess the allowance for credit loss related to loans receivable on a quarterly basis, either on an individual or collective basis. As of December 31, 2018 and 2019, No single borrower comprised a significant portion of our loan portfolio.

Table of Contents

We regularly review the creditworthiness of real estate developers and require collateral from real estate developers in certain circumstances when commitment deposits become overdue.

## ITEM 12. DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES

### A. Debt Securities

Not applicable.

### B. Warrants and Rights

Not applicable.

### C. Other Securities

Not applicable.

### D. American Depositary Shares

On March 18, 2014, we announced the change of the ratio of our American Depositary Receipts representing Class A ordinary shares from one ADS for one Class A ordinary share to five ADSs for one Class A ordinary share. The record date for the ratio change was March 28, 2014. For our ADS holders, this ratio change had the same effect as a five-for-one ADS split. There was No change to our Class A ordinary shares or Class B ordinary shares. The effect of the ratio change on the ADS trading price on New York Stock Exchange occurred on April 7, 2014.

On June 25, 2019, we announced the change of the ratio of our American Depositary Receipts representing Class A ordinary shares from five ADSs for one Class A ordinary share to one ADS for one Class A ordinary share. For our ADS holders, this ratio change had the same effect as a one-for-five reverse ADS split. There was No change to our Class A ordinary shares or Class B ordinary shares. The effect of the ratio change on the ADS trading price on New York Stock Exchange occurred on July 8, 2019.

JPMorgan Chase Bank, N.A., our depositary, may charge each person to whom ADSs are issued, including, without limitation, issuances against deposits of shares, issuances in respect of share distributions, rights and other distributions, issuances pursuant to a stock dividend or stock split declared by us or issuances pursuant to a merger, exchange of securities or any other transaction or event affecting the ADSs or deposited securities, and each person surrendering ADSs for withdrawal of deposited securities in any manner permitted by the deposit agreement or whose ADRs are cancelled or reduced for any other reason, $5.00 for each 100 ADSs (or any portion thereof) issued, delivered, reduced, cancelled or surrendered, the case may be. The depositary may sell (by public or private sale) sufficient securities and property received in respect of a share distribution, rights and/or other distribution prior to such deposit to pay such charge.

The following additional charges shall be incurred by the ADR holders, by any party depositing or withdrawing ordinary shares or by any party surrendering ADSs or to whom ADSs are issued (including, without limitation, issuance pursuant to a stock dividend or stock split declared by us or an exchange of stock regarding the ADRs or the deposited securities or a distribution of ADSs), whichever is applicable:

- a fee of $1.50 per ADR or ADRs for transfers of certificated or direct registration ADRs;

- a fee of up to $0.05 per ADS for any cash distribution made pursuant to the deposit agreement;

- a fee of up to $0.05 per ADS per calendar year (or portion thereof) for services performed by the depositary in administering the ADRs (which fee may be charged on a periodic basis during each calendar year and shall be assessed against holders of ADRs as of the record date or record dates set by the depositary during each calendar year and shall be payable in the manner described in the next succeeding provision);

- reimbursement of such fees, charges and expenses as are incurred by the depositary and/or any of the depositary's agents (including, without limitation, the custodian and expenses incurred on behalf of holders in connection with compliance with foreign exchange control regulations or any law or regulation relating to foreign investment) in connection with the servicing of the ordinary shares or other deposited securities, the delivery of deposited securities or otherwise in connection with the depositary's or its custodian's compliance with applicable law, rule or regulation (which charge shall be assessed on a proportionate basis against holders as of the record date or dates set by the depositary and shall be payable at the sole discretion of the depositary by billing such holders or by deducting such charge from one or more cash dividends or other cash distributions);

110

Table of Contents

- a fee for the distribution of securities (or the sale of securities in connection with a distribution), such fee being in an amount equal to the fee for the execution and delivery of ADSs which would have been charged as a result of the deposit of such securities (treating all such securities as if they were ordinary shares) but which securities or the net cash proceeds from the sale thereof are instead distributed by the depositary to those holders entitled thereto;

- stock transfer or other taxes and other governmental charges;

- cable, telex and facsimile transmission and delivery charges incurred at your request in connection with the deposit or delivery of ordinary shares;

- transfer or registration fees for the registration of transfer of deposited securities on any applicable register in connection with the deposit or withdrawal of deposited securities; and

- expenses of the depositary in connection with the conversion of foreign currency into U.S. dollars.

We will pay all other charges and expenses of the depositary and any agent of the depositary (except the custodian) pursuant to agreements from time to time between us and the depositary. The charges described above may be amended from time to time by agreement between us and the depositary.

Our depositary has agreed to reimburse us for certain expenses we incur that are related to establishment and maintenance of the ADR program, including investor relations expenses and exchange application and listing fees. Neither the depositary nor we can determine the exact amount to be made available to us because (1) the number of ADSs that will be issued and outstanding, (2) the level of fees to be charged to holders of ADSs, and (3) our reimbursable expenses related to the ADR program are not known at this time. The depositary collects its fees for issuance and cancellation of ADSs directly from investors depositing ordinary shares or surrendering ADSs for the purpose of withdrawal or from intermediaries acting for them. The depositary collects fees for making distributions to investors by deducting those fees from the amounts distributed or by selling a portion of distributable property to pay the fees. The depositary may collect its annual fee for depositary services by deduction from cash distributions, or by directly billing investors, or by charging the book-entry system accounts of participants acting for them. The depositary may generally refuse to provide services to any holder until the fees and expenses owing by such holder for those services or otherwise are paid.

111

Table of Contents

## PART II

## ITEM 13. DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES

Not applicable.

## ITEM 14. MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS

### A. Material Modifications to the Rights of Security Holders

None.

### B. Use of Proceeds

Not applicable.

## ITEM 15. CONTROLS AND PROCEDURES

### Disclosure Controls and Procedures

Our management, with the participation of our chief executive officer and acting chief financial officer, has performed an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report, as required by Rule 13a-15(b) under the Exchange Act.

Based upon that evaluation, our management has concluded that, as of December 31, 2019, our disclosure controls and procedures were not effective in certain respects, primarily due to the material weakness in our internal controls, as discussed below, to ensure that the information required to be disclosed by us in the reports that we file and furnish under the Exchange Act was recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our chief executive officer and acting chief financial officer, to allow timely decisions regarding required disclosure.

### Management's Annual Report on Internal Control over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act. Our management evaluated the effectiveness of our internal control over financial reporting, as required by Rule 13a-15(c) of the Exchange Act, based on criteria established in the Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Based on this evaluation, our management has concluded that our internal control over financial reporting was not effective as of December 31, 2018 due to the existence of a material weakness, as described below.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. In addition, projections of any evaluation of effectiveness of our internal control over financial reporting to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's financial statements will not be prevented or detected on a timely basis. Our material weakness is that we did not have sufficient financial reporting and accounting personnel to formalize, design, implement and operate key controls over financial reporting process in order to report financial information in accordance with U.S. GAAP and SEC reporting requirements.

Notwithstanding the identified material weakness, management, including our chief executive officer and acting chief financial officer, believes the consolidated financial statements included in this annual report on Form 20-F present fairly, in all material respects, our financial condition, results of operations and cash flows in conformity with U.S. GAAP.

### Attestation Report of the Registered Public Accounting Firm

Our independent registered public accounting firm, KPMG Huazhen LLP, has audited the effectiveness of our internal control over financial reporting as of December 31, 2019, as stated in its report, which appears on page F-2 of this annual report.

Table of Contents

*Changes in Internal Control over Financial Reporting*

We are currently in the process of remediating the material weakness described above. In 2020, we will continue to implement additional measures to remediate the existing material weakness as discussed above. However, we cannot assure you that we will remediate our material weakness in a timely manner. See "Item 3. D. Key Information—Risk Factors—Risks related to our business—If we fail to achieve and maintain an effective system of internal control over financial reporting, we may be unable to accurately report our financial results or prevent fraud, which could result in harm to our business, loss of investor confidence in our financial reporting and a lower trading price of our ADSs or notes."

## ITEM 16A. AUDIT COMMITTEE FINANCIAL EXPERT

Our board of directors has determined that Howard Huyue Zhang is an "audit committee financial expert" as defined by SEC rules, and that he satisfies the independence requirements of Section 303A of the New York Stock Exchange Listed Company Manual and Rule 10A-3 promulgated under the Exchange Act.

## ITEM 16B. CODE OF ETHICS

Our board of directors has adopted our code of conduct and ethics, a code that applies to members of the board of directors including its chairman and other senior officers, including the chief executive officer, the acting chief financial officer and the chief operations officer. This code is publicly available on our website at ir.fang.com.

## ITEM 16C. PRINCIPAL ACCOUNTANT FEES AND SERVICES

The following table sets forth the aggregate fees by categories specified below in connection with certain professional services rendered by our independent registered public accounting firms, Ernst & Young Hua Ming LLP and KPMG Huazhen LLP, for the years ended December 31, 2018 and 2019, respectively. Save as disclosed below, we did not pay any other fees to Ernst & Young Hua Ming LLP and KPMG Huazhen LLP during the periods indicated below.

|  | 2018 | 2019 |
|---|---|---|
|  | (U.S. dollars in thousands) | |
| Audit fees[1] | 1,741 | 1,493 |
| Audit-related fees[2] | 800 | 750 |
| Total | 2,541 | 2,243 |

_____

(1)  Audit fees are defined as the audit that needs to be performed each year in order to issue opinions on our consolidated financial statements and audit of internal control over financial reporting as well as limited procedures performed in relation to interim financial information. We paid or accrued expenses of US$0.5 million and US$0.1 million for the years ended December 31, 2018 and 2019 related to Ernst & Young Hua Ming LLP. We paid or accrued expenses of US$1.2 million and US$1.35 million to KPMG Huazhen LLP related to its audit of our annual financial statements and audit of our internal control over financial reporting for the years ended December 31, 2018 and 2019, audit of adjustments to the 2017 consolidated financial statements to retrospectively present discontinued operations as described in Note 15 to our consolidated financial statements included elsewhere in this annual report, and limited procedures performed in relation to interim financial information.

(2)  Audit-related fees are related to services that are normally provided by the principal accountant in connection with regulatory filings or engagements for those fiscal years.

*Policy on Pre-Approval of Audit and Non-Audit Services of Independent Auditors*

Our audit committee is responsible for pre-approving all audit and non-audit services provided by our auditor. These services may include audit services, audit related services, tax services and other services, as described above. Pre-approval is detailed as to the particular service or categories of services, and is subject to a specific budget. Our management and our auditor report to the audit committee regarding the extent of services provided in accordance with this pre-approval and the fees for the services performed to date on an annual basis. The audit committee may also pre-approve additional services on a case-by-case basis.

## ITEM 16D. EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES

Not applicable.

Table of Contents

**ITEM 16E. PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS**

Not applicable.

**ITEM 16F. CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT**

We changed our independent registered public accounting firm in July 2018, and the disclosure called for by this item has been previously reported in our annual report on Form 20-F for the fiscal year ended December 31, 2018 filed with the SEC on May 14, 2019.

**ITEM 16G. CORPORATE GOVERNANCE**

As a foreign private issuer with shares listed on the New York Stock Exchange, we are subject to corporate governance requirements imposed by the New York Stock Exchange. Under Section 303A of the New York Stock Exchange Listed Company Manual, New York Stock Exchange listed non-US companies may, in general, follow their home country corporate governance practices in lieu of some of the New York Stock Exchange corporate governance requirements. A New York Stock Exchange listed non-U.S. company is simply required to provide a general summary of the significant differences to its U.S. investors either on the company website or in its annual report distributed to its U.S. investors.

We are committed to a high standard of corporate governance. As such, we endeavor to comply with most of the New York Stock Exchange corporate governance practices. However, the following are ways in which our current corporate governance practices differ from New York Stock Exchange corporate governance requirements since the laws of Cayman Islands do not require such compliance:

- We are not required to schedule an executive session at least once a year to be attended by only independent directors and all directors are currently entitled to attend all of our board meetings.

- We have not yet adopted or disclosed a method for interested parties to communicate directly with the presiding director or with non-management directors as a group.

- We are not required to obtain shareholder approval for the adoption of, or material revisions to, our equity compensation plans and our directors may amend, materially revise, or terminate our equity compensation plans, but No such action will affect any outstanding award in any manner materially adverse to a participant without the consent of the participant.

114

Table of Contents

- Our compensation committee and our nominating and corporate governance committee are comprised with a majority of independent directors and not only independent directors. Our executive chairman, Mr. Mo, who serves on both our compensation committee and nominating and corporate governance committee, is not independent under the relevant New York Stock Exchange rules.

None of the above practices conflicts with the laws of the Cayman Islands or our fifth amended and restated memorandum and articles of association.

We may in the future determine to voluntarily comply with one or more of the foregoing provisions.

**ITEM 16H. MINE SAFETY DISCLOSURE**

Not applicable.

115

**PART III**

## ITEM 17. FINANCIAL STATEMENTS

We have elected to provide financial statements pursuant to Item 18.

## ITEM 18. FINANCIAL STATEMENTS

Our consolidated financial statements are included at the end of this annual report.

## ITEM 19. EXHIBITS

We have filed the following documents as exhibits to this annual report:

| Exhibit No. | Description of Exhibit |
| --- | --- |
| 1.1 | Fifth Amended and Restated Memorandum and Articles of Association (incorporated by reference to Exhibit 99.2 of our Current Report on Form 6-K filed with the SEC on August 3, 2012). |
| 2.1 | Specimen ordinary share certificate (incorporated by reference to our Registration Statement on Form F-1 filed with the SEC on September 2, 2010). |
| 2.2 | Specimen American depositary receipt (incorporated by reference to our Registration Statement on Form F-6 filed with the SEC on March 18, 2014). |
| 2.3 | Form of Deposit Agreement (incorporated by reference to our Registration Statement on Form F-6 filed with the SEC on September 2, 2010). |
| 2.4 | Form of Amendment No. 1 to Deposit Agreement (incorporated by reference to Exhibit (a)(2) of our Registration Statement on Form F-6 filed with the SEC on January 31, 2011). |
| 2.5 | Form of Amendment No. 2 to Deposit Agreement (incorporated by reference to Exhibit (a)(3) of our Registration Statement on Form F-6 filed with the SEC on May 15, 2012). |
| 2.6 | Form of Amendment No. 3 to Deposit Agreement (incorporated by reference to Exhibit (a) of our Registration Statement on Form F-6 filed with the SEC on March 18, 2014). |
| 2.7 | Form of Restricted Deposit Agreement by and among SouFun Holdings Limited, JPMorgan Chase Bank, N.A. and the holders of American depositary receipts issued thereunder (incorporated by reference to Exhibit 99.3 of our Registration Statement on Form 6-K filed with the SEC on December 4, 2013). |
| 2.8 | Form of Indenture by and among SouFun Holdings Limited, JPMorgan Chase Bank, N.A. and the holders of American depositary receipts issued thereunder (incorporated by reference to Exhibit 99.2 of our Current Report on Form 6-K filed with the SEC on December 18, 2013). |
|  | Certain instruments which define rights of holders of long-term debt of Fang and its subsidiaries are not being filed because the total amount of securities authorized under each such instrument does not exceed 10% of the total consolidated assets of SouFun and its subsidiaries. We will furnish a copy of each such instrument to the SEC upon request. |
| 2.9 | Amendment No. 1 to the Amended and Restated Deposit Agreement (incorporated by reference to Exhibit (a)(2) of our Registration Statement on Form F-6 filed with the SEC on June 25, 2019). |
| 2.10* | Description of securities |
| 4.1 | Registration Rights Agreement among SouFun Holdings Limited, Vincent Tianquan Mo, Next Decade, Media Partner, Digital Link, Shan Li, IDG-Accel China Capital L.P., and IDG-Accel China Capital Investors L.P., dated April 11, 2014 (incorporated by reference to Exhibit 4.2 of our Annual Report on Form 20-F filed with the SEC on April 30, 2014). |
| 4.2 | Termination and Release Agreement among SouFun Holdings Limited, General Atlantic and Apax, dated September 23, 2015 (incorporated by reference to Exhibit 4.3 of our Annual Report 20-F filed with the SEC on May 17, 2016). |
| 4.3 | Termination and Release Agreement among SouFun Holdings Limited, General Atlantic, Apax, Next Decade, Media Partner and Digital Link, dated September 23, 2015 (incorporated by reference to Exhibit 4.4 of our Annual Report 20-F filed with the SEC on May 17, 2016). |
| 4.4 | Registration Rights Agreement among SouFun Holdings Limited, Safari Group Holdings Limited and Safari Group CB Holdings Limited, dated September 24, 2015 (incorporated by reference to Exhibit 99.15 to the Schedule 13D filed with the SEC by Vincent Tianquan Mo on October 9, 2015). |
| 4.5 | Supplemental Agreement among SouFun Holdings Limited, IDG Alternative Global Limited and China Merchants Bank Co., Ltd., Tianjin Pilot Free Trade Zone Branch, dated November 4, 2015 (incorporated by reference to Exhibit 99.19 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.6 | Registration Rights Agreement among SouFun Holdings Limited, Karistone Limited and IDG-Accel China Capital L.P., dated November 10, 2015 (incorporated by reference to Exhibit 99.45 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |

Table of Contents

| | |
|---|---|
| 4.7 | Registration Rights Agreement among SouFun Holdings Limited, Karistone Limited and IDG-Accel China Capital Investors L.P., dated November 10, 2015 (incorporated by reference to Exhibit 99.46 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.8 | Registration Rights Agreement among SouFun Holdings Limited, Karistone Limited and Winning Star Global Limited, dated November 10, 2015 (incorporated by reference to Exhibit 99.47 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.9 | Registration Rights Agreement among SouFun Holdings Limited, Karistone Limited and Rainbow Zone Enterprise Inc., dated November 10, 2015 (incorporated by reference to Exhibit 99.48 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.10 | Registration Rights Agreement among SouFun Holdings Limited, Karistone Limited and Chuang Xi Capital Holdings Limited, dated November 10, 2015 (incorporated by reference to Exhibit 99.49 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.11 | Registration Rights Agreement among SouFun Holdings Limited, Karistone Limited and Wealth Harvest Global Limited, dated November 10, 2015 (incorporated by reference to Exhibit 99.50 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.12 | Stock Related Award Incentive Plan of 1999 (incorporated by reference to our Registration Statement on Form F-1 filed with the SEC on September 2, 2010). |
| 4.13 | 2010 Stock Incentive Plan (incorporated by reference to our Registration Statement on Form F-1 filed with the SEC on September 2, 2010). |
| 4.14 | 2015 Stock Incentive Plan (incorporated by reference to Exhibit 99.2 to our Current Report on Form 6-K filed with the SEC on July 6, 2015). |
| 4.15 | Form of Employment Agreement (incorporated by reference to our Registration Statement on Form F-1 filed with the SEC on September 2, 2010). |
| 4.16 | Form of Indemnification Agreement (incorporated by reference to our Registration Statement on Form F-1 filed with the SEC on September 2, 2010). |
| 4.17 | Form of Loan Agreement between and among Beijing Tuo Shi Huan Yu, SouFun Media or SouFun Network, Mr. Mo and/or Mr. Dai as shareholders of a consolidated controlled entity (incorporated by reference to Exhibit 4.19 of our Annual Report 20-F filed with the SEC on May 17, 2016). |
| 4.17.1 | Schedule of Loan Agreements between and among certain PRC subsidiary of Fang Holdings Limited and shareholders of a consolidated controlled entity (incorporated by reference to Exhibit 4.17.1 of our Annual Report on Form 20-F filed with the SEC on May 12, 2017). |
| 4.18 | Form of Creditor's Rights Transfer Agreement among Beijing Zhong Zhi Shi Zheng or Jia Tian Xia Network, Beijing Tuo Shi Huan Yu, SouFun Media or SouFun Network, and Mr. Mo and/or Mr. Dai as shareholders of a consolidated controlled entity (incorporated by reference to Exhibit 4.20 of our Annual Report 20-F filed with the SEC on May 17, 2016). |
| 4.18.1* | Schedule of Creditor's Rights Transfer Agreements among certain PRC subsidiaries of Fang Holdings Limited and shareholders of certain consolidated controlled entity. |
| 4.19 | Form of Equity Pledge Agreement among Beijing Zhong Zhi Shi Zheng or Jia Tian Xia Network, Mr. Mo and/or Mr. Dai and/or other shareholders of a consolidated controlled entity pledging the shares of the consolidated controlled entity (incorporated by reference to Exhibit 4.21 of our Annual Report 20-F filed with the SEC on May 17, 2016). |
| 4.19.1* | Schedule of Equity Pledge Agreements among certain PRC subsidiary of Fang Holdings Limited and shareholders of a consolidated controlled entity. |
| 4.20 | Form of Shareholders' Proxy Agreement among Beijing Zhong Zhi Shi Zheng or Jia Tian Xia Network, a consolidated controlled entity, Mr. Mo and/or Mr. Dai and/or other shareholders of the consolidated controlled entity (incorporated by reference to Exhibit 4.22 of our Annual Report 20-F filed with the SEC on May 17, 2016). |
| 4.20.1* | Schedule of Shareholders' Proxy Agreements among certain PRC subsidiary of Fang Holdings Limited, a consolidated controlled entity and shareholders of the consolidated controlled entity. |
| 4.21 | Form of Operating Agreement among Beijing Zhong Zhi Shi Zheng or Jia Tian Xia Network, a consolidated controlled entity, Mr. Mo and/or Mr. Dai and/or other shareholders of the consolidated controlled entity (incorporated by reference to Exhibit 4.23 of our Annual Report 20-F filed with the SEC on May 17, 2016). |
| 4.21.1* | Schedule of Operating Agreements among certain PRC subsidiary of Fang Holdings Limited, a consolidated controlled entity and shareholders of the consolidated controlled entity. |
| 4.22 | Form of Exclusive Technical Consultancy and Services Agreement between Beijing Zhong Zhi Shi Zheng or Jia Tian Xia Network and a consolidated controlled entity (incorporated by reference to Exhibit 4.24 of our Annual Report 20-F filed with the SEC on May 17, 2016). |
| 4.22.1* | Schedule of Exclusive Technical Consultancy and Services Agreements between certain PRC subsidiary of Fang Holdings Limited and a consolidated controlled entity. |
| 4.23 | Form of Exclusive Call Option Agreement among Fang Holdings Limited, Mr. Mo and/or Mr. Dai and/or other shareholders of a consolidated controlled entity, the consolidated controlled entity and certain PRC subsidiaries of Fang Holdings Limited (incorporated by reference to Exhibit 4.23 of our Annual Report on Form 20-F filed with the SEC on May 14, 2019). |

Table of Contents

| | |
|---|---|
| 4.23.1* | Schedule of Exclusive Call Option Agreements among Fang Holdings Limited, shareholders of a consolidated controlled entity, the consolidated controlled entity and certain PRC subsidiaries of Fang Holdings Limited. |
| 4.24 | Form of Intra-group Memorandum of Understanding between SouFun Network or SouFun Media and a consolidated controlled entity (incorporated by reference to our Registration Statement on Form F-1 filed with the SEC on September 2, 2010). |
| 4.24.1 | Schedule of Intra-group Memorandums of Understanding between certain PRC subsidiary of SouFun Holdings Limited and a consolidated controlled entity (incorporated by reference to Exhibit 4.16.1 of our Annual Report 20-F filed with the SEC on April 26, 2012). |
| 4.25 | Summary Translation of Strategic Cooperation Agreement between Beijing SouFun Network Technology Co., Ltd. and Shenzhen World Union Properties Consultancy Co., Ltd.(incorporated by reference to Exhibit 99.4 of our Current Report on Form 6-K filed with the SEC on July 11, 2014). |
| 4.26 | Summary Translation of Investment and Cooperation Framework Agreement between SouFun Holdings Limited and Hopefluent Group Holdings Limited (incorporated by reference to Exhibit 99.5 of our Current Report on Form 6-K filed with the SEC on July 11, 2014). |
| 4.27 | Summary Translation of Joint Venture Agreement between SouFun Holdings Limited and Tospur Real Estate Consulting Co., Ltd. (incorporated by reference to Exhibit 99.3 of our Current Report on Form 6-K filed with the SEC on November 13, 2014). |
| 4.28 | Summary Translation of Shareholders Agreement among Beijing China Index Information Co., Ltd., Shanghai SouFun Advertising Co., Ltd., Beijing Tian Xia Dai Information Service Co., Ltd., Beijing RunZe Microfinance Co., Ltd. and certain other parties thereto (incorporated by reference to Exhibit 4.36 of our Annual Report on Form 20-F filed with the SEC on April 28, 2015). |
| 4.29 | Summary Translation of Investment and Cooperation Agreement between SouFun Holdings Limited and Colour Life Services Group Co., Limited (incorporated by reference to Exhibit 4.37 of our Annual Report on Form 20-F filed with the SEC on April 28, 2015). |
| 4.30 | Subscription Agreement between SouFun Holdings Limited and IDG Alternative Global Limited, dated September 17, 2015 (incorporated by reference to Exhibit 99.2 of our Current Report on Form 6-K filed with the SEC on September 21, 2015). |
| 4.31 | Subscription Agreement among SouFun Holdings Limited, Safari Group Holdings Limited, Safari Group CB Holdings Limited and Safari Parent Limited, dated September 17, 2015 (incorporated by reference to Exhibit 99.3 of our Current Report on Form 6-K filed with the SEC on September 21, 2015). |
| 4.32 | Subscription Agreement Supplement among SouFun Holdings Limited, Safari Group Holdings Limited and Safari Group CB Holdings Limited, dated November 23, 2015 (incorporated by reference to Exhibit 99.2 of our Current Report on Form 6-K filed with the SEC on November 23, 2015). |
| 4.33 | Convertible Note (US$28.00 million) by SouFun Holdings Limited, dated September 24, 2015 (incorporated by reference to Exhibit 99.3 to the Schedule 13D filed with the SEC by Vincent Tianquan Mo on October 9, 2015). |
| 4.34 | Convertible Note (US$72.00 million) by SouFun Holdings Limited, dated September 24, 2015 (incorporated by reference to Exhibit 99.4 to the Schedule 13D filed with the SEC by Vincent Tianquan Mo on October 9, 2015). |
| 4.35 | Subscription Agreement Supplement between IDG Alternative Global Limited and SouFun Holdings Limited, dated October 29, 2015 (incorporated by reference to Exhibit 99.17 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.36 | Letter Agreement between IDG Alternative Global Limited and SouFun Holdings Limited, dated November 4, 2015 (incorporated by reference to Exhibit 99.18 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.37 | Supplemental Agreement among the IDG Alternative Global Limited, China Merchants Bank Co., Ltd., Tianjin Pilot Free Trade Zone Branch and SouFun Holdings Limited, dated November 4, 2015 (incorporated by reference to Exhibit 99.19 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.38 | Convertible Note (US$200.00 million) by SouFun Holdings Limited, dated November 4, 2015 (incorporated by reference to Exhibit 99.20 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.39 | Subscription Agreement between SouFun Holdings Limited and Karistone Limited, dated November 9, 2015 (incorporated by reference to Exhibit 99.26 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.40 | Subscription Agreement between SouFun Holdings Limited and IDG-Accel China Capital L.P., dated November 9, 2015 (incorporated by reference to Exhibit 99.11 of our Current Report on Form 6-K filed with the SEC on November 23, 2015). |
| 4.41 | Subscription Agreement between SouFun Holdings Limited and IDG-Accel China Capital Investors L.P., dated November 9, 2015 (incorporated by reference to Exhibit 99.12 of our Current Report on Form 6-K filed with the SEC on November 23, 2015). |
| 4.42 | Subscription Agreement between SouFun Holdings Limited and Winning Star Global Limited, dated November 9, 2015 (incorporated by reference to Exhibit 99.13 of our Current Report on Form 6-K filed with the SEC on November 23, 2015). |

118

Table of Contents

| 4.43 | Subscription Agreement between SouFun Holdings Limited and Rainbow Zone Enterprise Inc., dated November 9, 2015 (incorporated by reference to Exhibit 99.14 of our Current Report on Form 6-K filed with the SEC on November 23, 2015). |
|---|---|
| 4.44 | Subscription Agreement between SouFun Holdings Limited and Chuang Xi Capital Holdings Limited, dated November 9, 2015 (incorporated by reference to Exhibit 99.15 of our Current Report on Form 6-K filed with the SEC on November 23, 2015). |
| 4.45 | Subscription Agreement between SouFun Holdings Limited and Wealth Harvest Global Limited, dated November 9, 2015 (incorporated by reference to Exhibit 99.16 of our Current Report on Form 6-K filed with the SEC on November 23, 2015). |
| 4.46 | Summary Translation of Cooperation Framework Agreement among SouFun Holdings Limited, Chongqing Wanli New Energy Co., Ltd. and other relevant parties, dated November 13, 2015 (incorporated by reference to Exhibit 99.3 of our Current Report on Form 6-K filed with the SEC on November 13, 2015). |
| 4.47 | Summary Translation of Share Subscription Agreement among Beijing SouFun Fang Tian Xia Network Technology Co., Ltd., Beijing Fang Tian Xia Network Technology Co., Ltd., Beijing SouFun Decorative Engineering Co., Ltd., Beijing SouFun Science and Technology Development Co., Ltd., Chongqing Wanli New Energy Co., Ltd. and other relevant parties, dated January 19, 2016 (incorporated by reference to Exhibit 99.2 of our Current Report on Form 6-K filed with the SEC on January 22, 2016). |
| 4.48 | Summary Translation of Compensation Agreement among Beijing SouFun Fang Tian Xia Network Technology Co., Ltd., Beijing Fang Tian Xia Network Technology Co., Ltd., Beijing SouFun Decorative Engineering Co., Ltd. and Chongqing Wanli New Energy Co., Ltd., dated January 19, 2016 (incorporated by reference to Exhibit 99.3 of our Current Report on Form 6-K filed with the SEC on January 22, 2016). |
| 4.49 | Summary Translation of the Non-compete Agreement among Vincent Tianquan Mo, SouFun Holdings Limited and Chongqing Wanli New Energy Co., Ltd., dated May 2, 2016 (incorporated by reference to Exhibit 4.58 of our Annual Report 20-F filed with the SEC on May 17, 2016). |
| 4.50 | Summary Translation of Commercial Properties Purchase Agreement between Beijing SouFun Network Technology Co., Ltd. and Beijing Jinyu Dacheng Co., Ltd., dated November 10, 2015 (incorporated by reference to Exhibit 99.24 of our Current Report on Form 6-K filed with the SEC on November 23, 2015). |
| 4.51 | Summary Translation of Share Subscription and Asset Purchase Termination Agreement among Beijing SouFun Fang Tian Xia Network Technology Co., Ltd., Beijing Fang Tian Xia Network Technology Co., Ltd., Beijing SouFun Decorative Engineering Co., Ltd., Beijing SouFun Science and Technology Development Co., Ltd., Chongqing Wanli New Energy Co., Ltd. and other relevant parties, dated February 22, 2017 (incorporated by reference to Exhibit 4.51 of our Annual Report on Form 20-F filed with the SEC on May 12, 2017). |
| 4.52 | Summary Translation of Share Transfer Agreement among Shenzhen Nanfang Tongzheng Investment Co., Ltd., Jia Tian Xia Asset Management Co., Ltd. and Mr. Xicheng Liu in relation to Chongqing Wanli New Energy Co., Ltd, dated July 19, 2018 (incorporated by reference to Exhibit 4.52 of our Annual Report on Form 20-F filed with the SEC on May 14, 2019). |
| 4.53 | Form of separation and distribution agreement between Fang Holdings Limited and China Index Holdings Limited, dated May 24, 2019 (incorporated by reference to Exhibit 10.3 of the registration statement of China Index Holdings Limited on Form F-1 (file No. 333-231376) filed with the SEC on May 24, 2019). |
| 4.54 | English translation of form of business cooperation agreement between Fang Holdings Limited and Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., dated May 24, 2019 (incorporated by reference to Exhibit 10.4 of the registration statement of China Index Holdings Limited on Form F-1 (file No. 333-231376) filed with the SEC on May 24, 2019). |
| 4.55 | English translation of form of data license agreement between Fang Holdings Limited and Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., dated May 24, 2019 (incorporated by reference to Exhibit 10.5 of the registration statement of China Index Holdings Limited on Form F-1 (file No. 333-231376) filed with the SEC on May 24, 2019). |
| 4.56 | English translation of form of intellectual property right license agreement between Fang Holdings Limited and Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., dated May 24, 2019 (incorporated by reference to Exhibit 10.6 of the registration statement of China Index Holdings Limited on Form F-1 (file No. 333-231376) filed with the SEC on May 24, 2019). |
| 4.57 | English translation of form of lease framework agreement between Fang Holdings Limited and Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., dated September 30, 2018 (incorporated by reference to Exhibit 10.7 of the registration statement of China Index Holdings Limited on Form F-1 (file No. 333-231376) filed with the SEC on May 24, 2019). |
| 4.58 | English translation of form of software license agreement between Fang Holdings Limited and Beijing Zhong Zhi Shi Zheng Data Information Technology Co., Ltd., dated May 24, 2019 (incorporated by reference to Exhibit 10.8 of the registration statement of China Index Holdings Limited on Form F-1 (file No. 333-231376) filed with the SEC on May 24, 2019). |
| 4.59 | Sale and purchase agreement among Fang Holdings Limited, Media Partner Technology Limited and Next Decade Investments Limited, dated December 24, 2019 (incorporated by reference to Exhibit 99.1 to our Schedule 13D filed with the SEC on January 6, 2020). |

Table of Contents

| | |
|---|---|
| 4.60* | Form of Supplemental Agreement to the Structure Contracts among Fang Holdings Limited, Mr. Mo and/or Mr. Jiangong Dai and/or Mr. Jianning Dai and/or other shareholders of a consolidated controlled entity, the consolidated controlled entity and certain PRC subsidiaries of Fang Holdings Limited. |
| 4.60.1* | Schedule of Supplemental Agreement to the Structure Contracts among Fang Holdings Limited, Mr. Mo and/or Mr. Jiangong Dai and/or Mr. Jianning Dai and/or other shareholders of a consolidated controlled entity, the consolidated controlled entity and certain PRC subsidiaries of Fang Holdings Limited. |
| 8.1* | List of Principal Subsidiaries and Consolidated Controlled Entities. |
| 11.1 | Code of Business Conduct and Ethics (incorporated by reference to Exhibit 99.1 of our Registration Statement on Form F-1 filed with the SEC on September 2, 2010). |
| 12.1* | CEO Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 12.2* | CFO Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 13.1** | CEO Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 13.2** | CFO Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 15.1* | Consent of Jingtian & Gongcheng. |
| 15.2* | Consent of KPMG Huazhen LLP. |
| 15.3* | Consent of Ernst & Young Hua Ming LLP. |
| 16.1 | Letter dated May 14, 2019 from Ernst & Young Hua Ming LLP to the Securities and Exchange Commission (incorporated by reference to Exhibit 16.1 of our Annual Report on Form 20-F filed with the SEC on May 14, 2019). |
| 101.INS* | XBRL Instance Document. |
| 101.SCH* | XBRL Taxonomy Extension Schema Document. |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document. |

_____

| | |
|---|---|
| * | Filed herewith |
| ** | Furnished herewith |

Table of Contents

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

FANG HOLDINGS LIMITED

|       |                          |
|-------|--------------------------|
| By:   | /s/ Vincent Tianquan Mo  |
| Name: | Vincent Tianquan Mo      |
| Title:| Executive Chairman       |

Date: May 27, 2020

121

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and Board of Directors
Fang Holdings Limited:

*Opinion on the Consolidated Financial Statements*

We have audited the accompanying consolidated balance sheets of Fang Holdings Limited and subsidiaries (the "Company") as of December 31, 2018 and 2019, the related consolidated statements of comprehensive income (loss), shareholders' equity, and cash flows for the years then ended, and the related notes (collectively, the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2019, and the results of its operations and its cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles.

We also have audited the adjustments to the 2017 consolidated financial statements to retrospectively present discontinued operations as described in Note 15. In our opinion, such adjustments are appropriate and have been properly applied. We were not engaged to audit, review, or apply any procedures to the 2017 consolidated financial statements of the Company other than with respect to the adjustments and, accordingly, we do not express an opinion or any other form of assurance on the 2017 consolidated financial statements taken as a whole.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated May 27, 2020 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

*Changes in Accounting Principle*

As discussed in Note 2 to the consolidated financial statements, as of January 1, 2018, the Company has changed its method of accounting for revenue recognition due to the adoption of Accounting Standards Codification ("ASC") Topic 606, *Revenue from Contracts with Customers* and has changed its method of accounting for investments in equity securities due to the adoption of Accounting Standards Update No. 2016-01, *Financial Instruments - Overall (Subtopic 825-10), Recognition and Measurement of Financial Assets and Financial Liabilities.* In addition, as of January 1, 2019, the Company has changed its method of accounting for leases due to the adoption of ASC Topic 842, *Leases.*

*Basis for Opinion*

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ KPMG Huazhen LLP

We have served as the Company's auditor since 2018.

Beijing, China
May 27, 2020

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and Board of Directors
Fang Holdings Limited:

*Opinion on Internal Control Over Financial Reporting*

We have audited Fang Holdings Limited and subsidiaries' (the "Company") internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. In our opinion, because of the effect of the material weakness, described below, on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2018 and 2019, the related consolidated statements of comprehensive income (loss), shareholders' equity, and cash flows for the years then ended, and the related notes (collectively, the "consolidated financial statements"), and our report dated May 27, 2020 expressed an unqualified opinion on those consolidated financial statements.

We also have audited the adjustments to the 2017 consolidated financial statements to retrospectively present discontinued operations, and our opinion was that such adjustments are appropriate and have been properly applied.  We were not engaged to audit, review, or apply any procedures to the 2017 consolidated financial statements of the Company other than with respect to the adjustments and, accordingly, we do not express an opinion or any other form of assurance on the 2017 consolidated financial statements taken as a whole.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. A material weakness related to the lack of sufficient financial reporting and accounting personnel to formalize, design, implement and operate key controls over financial reporting process in order to report financial information in accordance with U.S. GAAP and SEC reporting requirements has been identified and included in management's assessment. The material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2019 consolidated financial statements, and this report does not affect our report on those consolidated financial statements.

*Basis for Opinion*

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

*Definition and Limitations of Internal Control Over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ KPMG Huazhen LLP

Beijing, China
May 27, 2020

Table of Contents

Report of Independent Registered Public Accounting Firm

To the Shareholders and the Board of Directors of Fang Holdings Limited

**Opinion on the Financial Statements**

We have audited, before the effects of the adjustments for the retrospective presentation of discontinued operations as discussed in Note 15 to the consolidated financial statements, the accompanying consolidated statements of comprehensive income, shareholders' equity and cash flows of Fang Holdings Limited (the Company) for the year ended December 31, 2017, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements, before the effects of the adjustments for the retrospective presentation of discontinued operations as discussed in Note 15 to the consolidated financial statements, present fairly, in all material respects, the results of the Company's operations and its cash flows for the year ended December 31, 2017, in conformity with U.S. generally accepted accounting principles.

We were not engaged to audit, review, or apply any procedures to the adjustments for the retrospective presentation of discontinued operations as discussed in Note 15 to the consolidated financial statements and, accordingly, we do not express an opinion or any other form of assurance about whether such adjustments are appropriate and have been properly applied. Those adjustments were audited by other auditors.

**Adoption of New Accounting Standard**

As discussed in Note 2 to the consolidated financial statements, the accompanying consolidated statement of cash flows for the year ended December 31, 2017 has been adjusted for the retrospective application of the authoritative guidance on the presentation and classification of restricted cash which was adopted by the Company on January 1, 2018.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Ernst & Young Hua Ming LLP

We served as the Company's auditor from 2008 to 2018.

Shenzhen, The People's Republic of China
May 15, 2018
except for Note 2, as to which the date is May 14, 2019, related to the effect of the restatement related to the presentation and classification of restricted cash in the consolidated statements of cash flows

F-3

Table of Contents

**FANG HOLDINGS LIMITED**

**CONSOLIDATED BALANCE SHEETS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

| | Notes | As of December 31, | |
| --- | --- | --- | --- |
| | | 2018 | 2019 |
| | | US$ | US$ |
| **ASSETS** | | | |
| **Current assets:** | | | |
| Cash and cash equivalents | | 171,183 | 105,282 |
| Restricted cash, current | | 245,474 | 219,096 |
| Short-term investments | 5 | 16,043 | 194,720 |
| Accounts receivable, net of allowance of US$33,276 and US$21,810 as of December 31, 2018 and 2019, respectively (including account receivable of the People's Republic of China ("PRC") Domestic Entities and the PRC Domestic Entities' subsidiaries that can only be used to settle their own obligations of US$2,988 and US$324 as of December 31, 2018 and 2019, respectively) | 6 | 58,687 | 66,379 |
| Funds receivable | | 5,474 | 8,372 |
| Prepayments and other current assets | 7 | 27,894 | 31,509 |
| Commitment deposits | | 191 | 188 |
| Loans receivable, current (net of allowance of US$3,697 and US$2,905 as of December 31, 2018 and 2019, respectively) | 8 | 117,602 | 60,490 |
| Amounts due from related parties | 19 | — | 644 |
| Current assets of discontinued operations | 15 | 26,289 | — |
| **Total current assets** | | **668,837** | **686,680** |
| | | | |
| **Non-current assets:** | | | |
| Property and equipment, net (including property and equipment, net of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries that can only be used to settle their own obligations of US$324,564 and US$339,407 as of December 31, 2018 and 2019, respectively) | 9 | 727,739 | 695,457 |
| Land use rights | | 33,153 | — |
| Loans receivable, non-current (net of allowance of US$132 and nil as of December 31, 2018 and 2019, respectively) | 8 | 6,249 | — |
| Deferred tax assets | 17 | 2,202 | 6,570 |
| Restricted cash, non-current portion (including restricted cash, noncurrent portion of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries that can only be used to settle their own obligations of nil and US$1,433 as of December 31, 2018 and 2019, respectively) | | 6,990 | 42,452 |
| Deposits for non-current assets | | 902 | 618 |
| Long-term investments | 5 | 373,233 | 341,946 |
| Other non-current assets | 10 | 4,558 | 39,179 |
| Non-current assets of discontinued operations | 15 | 573 | — |
| **Total non-current assets** | | **1,155,599** | **1,126,222** |
| **Total assets** | | **1,824,436** | **1,812,902** |

The accompanying notes are an integral part of the consolidated financial statements.

Table of Contents

**FANG HOLDINGS LIMITED**
**CONSOLIDATED BALANCE SHEETS (continued)**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

| | Notes | As of December 31, 2018 US$ | As of December 31, 2019 US$ |
|---|---|---|---|
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | |
| **Current liabilities:** | | | |
| Short-term loans and current portion of long-term loans (including short-term loans and current portion of long-term loans of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries without recourse to the Company of US$76,267 and US$70,215 as of December 31, 2018 and 2019, respectively) | 11 | 297,811 | 264,624 |
| Short term bond payable | 12 | — | 102,779 |
| Deferred revenue (including deferred revenue of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries without recourse to the Company of US$32,816 and US$32,254 as of December 31, 2018 and 2019, respectively) | | 142,473 | 134,143 |
| Accrued expenses and other liabilities (including accrued expenses and other liabilities of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries without recourse to the Company of US$36,266 and US$54,543 as of December 31, 2018 and 2019, respectively) | 13 | 118,924 | 120,244 |
| Customers' refundable fees (including customers' refundable fees of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries without recourse to the Company of US$3,274 and US$2,209 as of December 31, 2018 and 2019, respectively) | | 3,976 | 4,981 |
| Income tax payable (including income tax payable of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries without recourse to the Company of US$1,982 and US$305 as of December 31, 2018 and 2019, respectively) | | 2,383 | 4,207 |
| Amounts due to related parties | 19 | 19 | 9,227 |
| Current liabilities of discontinued operations | 15 | 35,327 | — |
| **Total current liabilities** | | **600,913** | **640,205** |
| | | | |
| **Non-current liabilities:** | | | |
| Long-term loans, less current portion (including long-term loans, less current portion of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries without recourse to the Company of US$44,891 and US$46,525 as of December 31, 2018 and 2019, respectively) | 11 | 123,215 | 184,158 |
| Convertible senior notes | 14 | 254,435 | 168,929 |
| Deferred tax liabilities (including deferred tax liabilities of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries without recourse to the Company of US$10,488 and US$656 as of December 31, 2018 and 2019, respectively) | 17 | 97,578 | 90,723 |
| Other non-current liabilities (including other non-current liabilities of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries without recourse to the Company of US$51,144 and US$64,456 as of December 31, 2018 and 2019, respectively) | | 150,837 | 138,435 |
| Non-current liabilities of discontinued operations | 15 | 2,258 | — |
| **Total non-current liabilities** | | **628,323** | **582,245** |
| **Total liabilities** | | **1,229,236** | **1,222,450** |
| | | | |
| Commitments and contingencies | 21 | — | — |

The accompanying notes are an integral part of the consolidated financial statements.

F-5

Table of Contents

**FANG HOLDINGS LIMITED**
**CONSOLIDATED BALANCE SHEETS (continued)**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

| | | As of December 31, | |
| --- | :---: | ---: | ---: |
| | **Notes** | **2018** | **2019** |
| | | **US$** | **US$** |
| **Shareholders' equity:** | | | |
| Class A ordinary shares, par value Hong Kong Dollar ("HK$") 1 per share, 600,000,000 shares authorized for Class A and Class B in aggregate; 72,069,645 and 71,775,686 shares issued as of December 31, 2018 and 2019; 65,004,587 and 65,403,527 shares outstanding as of December 31, 2018 and 2019 | 16 | 9,286 | 9,244 |
| Class B ordinary shares, par value HK$1 per share, 600,000,000 shares authorized for Class A and Class B in aggregate; 24,336,650 shares and 24,336,650 shares issued and outstanding as at December 31, 2018 and December 31, 2019, respectively; each Class B ordinary share is convertible into one Class A ordinary share | 16 | 3,124 | 3,124 |
| Additional paid-in capital | | 517,802 | 528,620 |
| Accumulated other comprehensive loss | | (75,837) | (98,371) |
| Retained earnings | | 276,746 | 270,358 |
| Less: Treasury shares (7,065,058 and 6,372,159 shares as of December 31, 2018 and 2019, respectively.) | 16 | (136,615) | (123,216) |
| **Total Fang Holdings Limited shareholders' equity** | | **594,506** | **589,759** |
| Noncontrolling interests | | 694 | 693 |
| **Total shareholders' equity** | | **595,200** | **590,452** |
| **Total liabilities and shareholders' equity** | | **1,824,436** | **1,812,902** |

The accompanying notes are an integral part of the consolidated financial statements.

**FANG HOLDINGS LIMITED**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

| | Notes | For the Years Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2017 | 2018 | 2019 |
| | | US$ | US$ | US$ |
| **Revenues** | | | | |
| Marketing services | | 149,267 | 98,377 | 94,639 |
| Listing services | | 141,454 | 81,741 | 63,471 |
| Leads generation services | | — | 21,303 | 43,300 |
| Financial services | | 12,055 | 18,060 | 9,561 |
| Value-added services | | 4,753 | 5,182 | 5,893 |
| E-commerce services | | 87,809 | 15,384 | 2,847 |
| **Total revenues** | 4 | **395,338** | **240,047** | **219,711** |
| | | | | |
| Cost of services | | (163,598) | (46,392) | (28,260) |
| | | | | |
| **Gross profit** | | **231,740** | **193,655** | **191,451** |
| | | | | |
| **Operating income (expenses)** | | | | |
| Selling expenses (including related party amounts of nil, nil and US$2,311 for the years ended December 31, 2017, 2018 and 2019, respectively) | | (83,579) | (59,064) | (73,662) |
| General and administrative expenses (including related party amounts of US$501, US$685 and US$853 for the years ended December 31, 2017, 2018 and 2019, respectively) | | (129,719) | (129,224) | (99,442) |
| Other income (including related party amounts of nil, nil and US$1,411 for the years ended December 31, 2017, 2018 and 2019, respectively) | | 699 | 4,427 | 6,518 |
| **Operating income from continuing operations** | | **19,141** | **9,794** | **24,865** |
| Foreign exchange gain (loss) | | 15 | (598) | 154 |
| Interest income | | 11,052 | 10,202 | 9,038 |
| Interest expense | | (16,153) | (21,174) | (25,402) |
| Change in fair value of securities | 5 | 518 | (167,402) | (46,062) |
| Realized gain on sale of available-for-sale securities (including accumulated other comprehensive income reclassifications for unrealized gain on available-for-sale securities of US$2,421, US$761 and US$861 for the years ended December 31, 2017, 2018 and 2019, respectively) | | 2,421 | 761 | 861 |
| Government grants | | 3,025 | 1,224 | 927 |
| Investment income, net | 5 | 6,692 | 6,816 | 2,644 |
| Other non-operating loss | | (4,562) | (30) | — |
| Impairment on investments | 5 | (2,768) | — | — |
| **Income (loss) from continuing operations before income taxes** | | **19,381** | **(160,407)** | **(32,975)** |
| Income tax (expense) benefits | 17 | (18,352) | 18,989 | 9,544 |
| **Income (loss) from continuing operations, net of income taxes** | | **1,029** | **(141,418)** | **(23,431)** |
| **Income from discontinued operations, net of income taxes** | 15 | **20,675** | **26,509** | **13,181** |
| **Net income (loss)** | | **21,704** | **(114,909)** | **(10,250)** |
| Net income (loss) attributable to noncontrolling interests from continuing operations | | (3) | 2 | (1) |
| Net income (loss) attributable to Fang Holdings Limited's shareholders | | 21,707 | (114,911) | (10,249) |
| Net income (loss) attributable to Fang Holdings Limited's shareholders from continuing operations | | 1,032 | (141,420) | (23,430) |
| Net income attributable to Fang Holdings Limited's shareholders from discontinued operations | | 20,675 | 26,509 | 13,181 |

The accompanying notes are an integral part of the consolidated financial statements.

Table of Contents

**FANG HOLDINGS LIMITED**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS) (continued)**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

| | Notes | For the Years Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2017 | 2018 | 2019 |
| | | US$ | US$ | US$ |
| **Other comprehensive income (loss), before tax** | | | | |
| Foreign currency translation adjustments | | 56,571 | (46,648) | (26,703) |
| Unrealized gain on available-for-sale securities | | 212,838 | 1,493 | 861 |
| Amounts reclassified from accumulated other comprehensive income | | (2,736) | (1,493) | (861) |
| Gain (loss) on intra-entity foreign transactions of long-term-investment nature | | 1,872 | (3,034) | 497 |
| Separation of real estate information, analytics and marketplace services business | | — | — | 3,672 |
| **Other comprehensive income (loss), before tax** | | **268,545** | **(49,682)** | **(22,534)** |
| Income tax expense related to components of other comprehensive income | | (49,566) | — | — |
| **Other comprehensive income (loss), net of tax** | | **218,979** | **(49,682)** | **(22,534)** |
| **Comprehensive income (loss)** | | **240,683** | **(164,591)** | **(32,784)** |
| Comprehensive income (loss) attributable to noncontrolling interests | | (3) | 2 | (1) |
| Comprehensive income (loss) attributable to Fang Holdings Limited's shareholders | | 240,686 | (164,593) | (32,783) |
| | | | | |
| **Earnings (loss) per share for Class A and Class B ordinary shares** | | | | |
| Basic | 23 | 0.24 | (1.29) | (0.11) |
| Diluted | 23 | 0.24 | (1.29) | (0.11) |
| | | | | |
| **Earnings (loss) per share for Class A and Class B ordinary shares from continuing operations** | | | | |
| Basic | 23 | 0.01 | (1.59) | (0.26) |
| Diluted | 23 | 0.01 | (1.59) | (0.26) |
| | | | | |
| **Earnings per share for Class A and Class B ordinary shares from discontinued operations** | | | | |
| Basic | 23 | 0.23 | 0.30 | 0.15 |
| Diluted | 23 | 0.23 | 0.30 | 0.15 |
| | | | | |
| **Weighted average number of Class A and Class B ordinary shares outstanding:** | | | | |
| Basic | 23 | 88,475,665 | 88,749,432 | 89,511,052 |
| Diluted | 23 | 91,585,677 | 88,749,432 | 89,511,052 |

The accompanying notes are an integral part of the consolidated financial statements.

Table of Contents

**FANG HOLDINGS LIMITED**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2018 | 2019 |
| | US$ | US$ | US$ |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Net income (loss) | 21,704 | (114,909) | (10,250) |
| *Adjustments to reconcile net income (loss) to net cash generated from operating activities:* | | | |
| Share-based compensation | 7,218 | 14,082 | 8,820 |
| Depreciation of property and equipment | 27,589 | 25,923 | 25,247 |
| Amortization of land use rights | 372 | 812 | — |
| Deferred tax benefits | (317) | (21,271) | (10,498) |
| Net allowance for doubtful accounts and loans receivable | 32,614 | 24,598 | 8,784 |
| Realized and unrealized loss (gain) related to investment securities | (3,254) | 165,931 | 45,287 |
| Impairment on investments | 2,768 | — | — |
| Amortization of loan origination costs | 191 | — | 414 |
| Amortization of transaction costs for structured note | — | — | 136 |
| Amortization of issuance costs and unamortized discount (premium) for convertible senior notes | 1,797 | 1,665 | (715) |
| Loss on disposal of property and equipment | 5,571 | 985 | 2,257 |
| Deemed rental expense (Note 19) | 159 | 162 | 156 |
| Allowance of doubtful accounts of commitment deposit | 206 | — | — |
| Compensation expenses related to investment in China Index Holding Limited ("CIH") (Note 5) | — | — | 13,608 |
| Foreign currency exchange gain, net | — | — | 1,192 |
| Reduction in the carrying amount of the right-of-use assets | — | — | 2,511 |
| | | | |
| Changes in operating assets and liabilities, net of effects of spinoff of CIH and disposal of subsidiaries: | | | |
| Accounts receivable | (437) | (18,395) | (18,958) |
| Funds receivable | 2,330 | 509 | (3,021) |
| Prepayments and other current assets | 9,405 | 3,405 | (5,450) |
| Commitment deposits | 816 | 5,608 | — |
| Loans receivable, current | 30,901 | — | — |
| Loans receivable, non-current | 14,800 | — | — |
| Amounts due from related parties | (445) | 167 | (148) |
| Other non-current assets | 5,644 | (3,443) | (1,117) |
| Deferred revenue | 30,260 | 12,644 | 12,604 |
| Accrued expenses and other liabilities | (39,343) | (42,877) | 2,660 |
| Customers' refundable fees | (22,651) | (2,861) | 1,082 |
| Income tax payable | (1,685) | (294) | 1,204 |
| Amounts due to related parties | — | — | 285 |
| Other non-current liabilities | 676 | 2,564 | (6,831) |
| **Net cash generated from operating activities** | **126,889** | **55,005** | **69,259** |

The accompanying notes are an integral part of the consolidated financial statements.

Table of Contents

**FANG HOLDINGS LIMITED**
**CONSOLIDATED STATEMENTS OF CASH FLOWS (continued)**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2018 | 2019 |
| | US$ | US$ | US$ |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| Acquisition of short-term investments | (383,064) | (721,703) | (249,937) |
| Proceeds from maturity and disposal of fixed-rate time deposits and trading securities | 373,363 | 164,350 | 10,118 |
| Proceeds from disposal of available-for-sale securities | 13,931 | 595,363 | 166,032 |
| Acquisition of property and equipment | (65,885) | (96,117) | (12,097) |
| Origination of loans receivable | (212,824) | (134,802) | (118,825) |
| Collection of loans receivable | 86,931 | 149,545 | 181,767 |
| Purchase of land use rights | (34,263) | — | — |
| Proceeds from government in connection of purchase of land use rights | — | 14,368 | — |
| Acquisition of long-term investments | (13,000) | (84,544) | (44,418) |
| Proceeds from disposal of property and equipment | 5,755 | 230 | 10 |
| Proceeds from disposal of equity investments with readily determinable fair value | — | 6,645 | 10,347 |
| Deposits for non-current assets | (55,456) | — | — |
| **Net cash used in investing activities** | **(284,512)** | **(106,665)** | **(57,003)** |
| | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | |
| | | | |
| Proceeds from exercise of share options | 4,785 | 2,974 | 21 |
| Proceeds from short-term loans | — | 36,327 | 2,396 |
| Proceeds from long-term loans | 111,475 | 66,843 | 71,215 |
| Proceeds from issuance of short term bond | — | — | 102,009 |
| Purchase of structured note in connection with issuance of short term bond | — | — | (102,805) |
| Repayment of loans | (43,989) | (26,884) | (43,651) |
| Proceeds from disposal of subsidiaries, net of US$1,378 cash disposed | — | — | 262 |
| Redemption of convertible senior notes | — | (44,560) | (83,118) |
| Payment of loan origination costs | (302) | — | (528) |
| Cash disposed in connection with the spinoff of CIH | — | — | (19,917) |
| **Net cash generated from (used in) financing activities** | **71,969** | **34,700** | **(74,116)** |
| Exchange rate effect on cash, cash equivalents and restricted cash | 29,302 | (26,728) | (18,882) |
| Net decrease in cash, cash equivalents and restricted cash | (56,352) | (43,688) | (80,742) |
| **Cash, cash equivalents and restricted cash at beginning of year** | **547,612** | **491,260** | **447,572** |
| **Cash, cash equivalents and restricted cash at end of year** | **491,260** | **447,572** | **366,830** |
| | | | |
| Supplemental schedule of cash flow information: | | | |
| Income tax paid | 7,979 | 8,218 | 9,597 |
| Interest paid | 16,895 | 12,215 | 20,886 |
| Acquisition of property and equipment through utilization of deposits | 244,568 | 57,102 | 275 |
| Acquisition of property and equipment included in accrued expenses and other liabilities | 6,121 | 10,438 | 3,914 |
| Long-term investments received in settlement of funds receivable | 12,058 | — | — |
| Shareholder contribution of call option (Note 5) | — | — | 693 |

The following table provides a reconciliation of cash, cash equivalents and restricted cash reported within the consolidated balance sheets that sum to the total of the same such amounts shown in the consolidated statements of cash flows.

| | As of December 31, | | |
|---|---|---|---|
| | 2017 | 2018 | 2019 |
| | US$ | US$ | US$ |
| Cash and cash equivalents | 228,276 | 195,108 | 105,282 |
| Restricted cash, current | 223,002 | 245,474 | 219,096 |
| Restricted cash, non-current portion | 39,982 | 6,990 | 42,452 |
| **Total cash, cash equivalents and restricted cash** | **491,260** | **447,572** | **366,830** |

**FANG HOLDINGS LIMITED**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (continued)**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

| | Number of Ordinary Shares | | Ordinary Shares | Additional Paid-in Capital | Treasury stock | Foreign currency translation adjustments | Unrealized gain on available-for-sale securities | Intra-entity foreign currency transaction loss | Total | Retained Earnings | Noncontrolling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Class A | Class B | | | | | | | | | | |
| **Balance as of December 31, 2016** | 64,012,758 | 24,336,650 | 12,281 | 488,943 | (136,615) | (77,602) | 3,249 | (6,996) | (81,349) | 203,870 | 695 | 487,825 |
| Net profit for the year | — | — | — | — | — | — | — | — | — | 21,704 | — | 21,704 |
| Other comprehensive loss: | | | | | | | | | | | | |
| Foreign currency translation adjustments | | — | — | — | — | 56,571 | — | — | 56,571 | — | — | 56,571 |
| Unrealized gain on available-for-sale securities | | — | — | — | — | — | 163,272 | — | 163,272 | — | — | 163,272 |
| Foreign currency transaction gain | | — | — | — | — | — | — | 1,872 | 1,872 | — | — | 1,872 |
| Amounts reclassified from accumulated other comprehensive income | | — | — | — | — | — | (2,736) | — | (2,736) | | — | (2,736) |
| Contribution by noncontrolling interests | | — | — | — | — | — | — | — | — | | (3) | (3) |
| Contribution from shareholder | | — | — | — | 159 | — | — | — | — | — | — | 159 |
| Share-based compensation | | — | — | — | 7,218 | — | — | — | — | — | — | 7,218 |
| Exercise of share options | 347,304 | — | — | 47 | 4,346 | — | — | — | — | — | — | 4,393 |
| **Balance as of December 31, 2017** | 64,360,062 | 24,336,650 | 12,328 | 500,666 | (136,615) | (21,031) | 163,785 | (5,124) | 137,630 | 225,574 | 692 | 740,275 |

The accompanying notes are an integral part of the consolidated financial statements.

F-11

Table of Contents

**FANG HOLDINGS LIMITED**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (continued)**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

| | Total Fang Holdings Limited's Equity | | | | | | | | | | | |
| | Number of Ordinary Shares | | | | | Accumulated Other Comprehensive Income (Loss) | | | | | | |
| | Class A | Class B | Ordinary Shares | Additional Paid-in Capital | Treasury stock | Foreign currency translation adjustments | Unrealized gain on available-for-sale securities | Intra-entity foreign currency transaction loss | Total | Retained Earnings | Noncontrolling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance as of December 31, 2017** | 64,360,062 | 24,336,650 | 12,328 | 500,666 | (136,615) | (21,031) | 163,785 | (5,124) | 137,630 | 225,574 | 692 | 740,275 |
| Cumulative effect of adoption of ASC 606 | — | — | — | — | — | — | — | — | — | 2,298 | — | 2,298 |
| Cumulative effect of adoption of ASU 2016-01 | — | — | — | — | — | — | (163,785) | — | (163,785) | 163,785 | | |
| **Balance as of January 1, 2018** | 64,360,062 | 24,336,650 | 12,328 | 500,666 | (136,615) | (21,031) | — | (5,124) | (26,155) | 391,657 | 692 | 742,573 |
| Net (loss) profit for the year | — | — | — | — | — | — | — | — | — | (114,911) | 2 | (114,909) |
| Other comprehensive loss: | | | | | | | | | | | | |
| Foreign currency translation adjustments | — | — | — | — | — | (46,648) | — | — | (46,648) | — | — | (46,648) |
| Loss on intra-entity foreign transactions of long-term investment nature | — | — | — | — | — | — | — | (3,034) | (3,034) | — | — | (3,034) |
| Unrealized gain on available-for-sale securities | — | — | — | — | — | — | 1,493 | — | 1,493 | — | — | 1,493 |
| Amounts reclassified from accumulated other comprehensive income | — | — | — | — | — | — | (1,493) | — | (1,493) | — | — | (1,493) |
| Contribution from shareholder | — | — | — | 162 | — | — | — | — | — | — | — | 162 |
| Share-based compensation | — | — | — | 14,082 | — | — | — | — | — | — | — | 14,082 |
| Exercise of share options and vesting of unvested shares | 644,525 | — | 82 | 2,892 | — | — | — | — | — | — | — | 2,974 |
| **Balance as of December 31, 2018** | 65,004,587 | 24,336,650 | 12,410 | 517,802 | (136,615) | (67,679) | — | (8,158) | (75,837) | 276,746 | 694 | 595,200 |

The accompanying notes are an integral part of the consolidated financial statements.

F-12

Table of Contents

**FANG HOLDINGS LIMITED**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (continued)**
**(Amounts in thousands of United States Dollars ("US\$"), except for number of shares and per share data)**

| | | | | | | Total Fang Holdings Limited's Equity | | | | | | |
| | | | | | | | Accumulated Other Comprehensive Income (Loss) | | | | | |
| | | | | | | | | Unrealized gain on | Intra-entity | | | | |
| | Number of Ordinary Shares | | Ordinary Shares | Additional Paid-in Capital | Treasury stock | Foreign currency translation adjustments | available-for-sale securities | foreign currency transaction loss | Total | Retained Earnings | Noncontrolling Interests | Total Equity |
| | Class A | Class B | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance as of December 31, 2018** | **65,004,587** | **24,336,650** | **12,410** | **517,802** | **(136,615)** | **(67,679)** | **—** | **(8,158)** | **(75,837)** | **276,746** | **694** | **595,200** |
| Net loss for the year | — | — | — | — | — | — | — | — | — | (10,249) | (1) | (10,250) |
| Other comprehensive loss: | | | | | | | | | | | | |
| Foreign currency translation adjustments | — | — | — | — | — | (26,703) | — | — | (26,703) | — | — | (26,703) |
| Gain on intra-entity foreign transactions of long-term investment nature | — | — | — | — | — | — | — | 497 | 497 | — | — | 497 |
| Unrealized gain on available-for-sale securities | — | — | — | — | — | — | 861 | — | 861 | — | — | 861 |
| Amounts reclassified from accumulated other comprehensive income | — | — | — | — | — | — | (861) | — | (861) | — | — | (861) |
| Contribution from shareholder | — | — | — | 2,014 | — | — | — | — | — | — | — | 2,014 |
| Separation of real estate information, analytics and marketplace services business | — | — | — | — | — | 3,672 | — | — | 3,672 | 17,181 | — | 20,853 |
| Share-based compensation | — | — | — | 8,820 | — | — | — | — | — | — | — | 8,820 |
| Exercise of share options and vesting of unvested shares | 398,940 | — | — | — | 7,714 | — | — | — | — | (7,693) | — | 21 |
| Others | — | — | (42) | (16) | 5,685 | — | — | — | — | (5,627) | — | — |
| **Balance as of December 31, 2019** | **65,403,527** | **24,336,650** | **12,368** | **528,620** | **(123,216)** | **(90,710)** | **—** | **(7,661)** | **(98,371)** | **270,358** | **693** | **590,452** |

The accompanying notes are an integral part of the consolidated financial statements.

F-13

Table of Contents

**FANG HOLDINGS LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

1.      **ORGANIZATION AND BASIS OF PRESENTATION**

The Company was incorporated on June 18, 1999 as Fly High Holdings Limited under the laws of the British Virgin Islands ("BVI"). In June 2004, the Company changed its name to SouFun Holdings Limited and its corporate domicile to the Cayman Islands and became a Cayman Islands company with limited liability under the Companies Law of the Cayman Islands. In 2016, the Company changed its name to Fang Holdings Limited (formerly known as SouFun Holdings Limited). The accompanying consolidated financial statements include the financial statements of (i) Fang Holdings Limited (the "Company"), (ii) its subsidiaries located outside of the People's Republic of China (the "PRC") (the "non-PRC subsidiaries"), (iii) wholly foreign owned entities in the PRC (the "WOFEs") and their subsidiaries, (iv) entities controlled through contractual arrangements (the "PRC Domestic Entities")  and (v) the PRC Domestic Entities' subsidiaries. The Company, and where appropriate, the term "Company" also refers to its non-PRC subsidiaries, WOFEs, PRC Domestic Entities and the PRC Domestic Entities' subsidiaries as a whole.

The Company is principally engaged in the provision of marketing services, listing services, leads generation, financial services, value-added services and e-commerce services to the real estate and home furnishing industries in the PRC. Details of the Company's major subsidiaries, PRC Domestic Entities and the PRC Domestic Entities' subsidiaries as of December 31, 2019 were as follows:

| Company | Date of Establishment | Place of Establishment | Principal Activities |
|---|---|---|---|
| Beijing SouFun Internet Information Service Co., Ltd. ("Beijing Internet") | December 17, 2003 | PRC | Provision of marketing services and listing services |
| SouFun Media Technology (Beijing) Co., Ltd. ("SouFun Media") | November 28, 2002 | PRC | Provision of technology, leads generation and information consultancy services |
| Beijing SouFun Network Technology Co., Ltd. ("SouFun Network") | March 16, 2006 | PRC | Provision of technology, leads generation and information consultancy services |
| Beijing SouFun Science and Technology Development Co., Ltd. ("Beijing Technology") | March 14, 2006 | PRC | Provision of marketing services, leads generation services and listing services |
| Beijing Century Jia Tian Xia Technology Development Co., Ltd. ("Beijing JTX Technology") | December 21, 2006 | PRC | Provision of marketing services and listing services |
| Beijing Hong An Tu Sheng Network Technology Co., Ltd. ("Beijing Hong An") | November 15, 2010 | PRC | Provision of technology, leads generation and information consultancy services |
| Beijing Tuo Shi Huan Yu Network Technology Co., Ltd. ("Beijing TuoShi") | November 19, 2010 | PRC | Provision of technology, leads generation and information consultancy services |
| Beijing Yi Ran Ju Ke Technology Development Co., Ltd. ("Beijing Yi Ran Ju Ke") | July 8, 2011 | PRC | Provision of marketing services, rental services, leads generation services and real estate agency services |
| Beijing Hua Ju Tian Xia Network Technology Co., Ltd. ("Beijing Hua Ju Tian Xia") | July 25, 2012 | PRC | Provision of technology and information consultancy services |

F-14

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

1.     ORGANIZATION AND BASIS OF PRESENTATION (continued)

| Company | Date of Establishment | Place of Establishment | Principal Activities |
|---|---|---|---|
| Beijing Li Man Wan Jia Network Technology Co., Ltd. ("Beijing Li Man Wan Jia") | July 25, 2012 | PRC | Provision of technology, leads generation and information consultancy services |
| Shanghai Jia Biao Tang Real Estate Broking  Co., Ltd. ("Shanghai JBT Real Estate Broking") | July 7, 2005 | PRC | Provision of real estate agency services, marketing services and listing services |
| Tianjin Jia Tian Xia Network Technology Co., Ltd. ("Jia Tian Xia Network Technology") | April 15, 2014 | PRC | Provision of technology and information consultancy services |
| Hangzhou SouFun Network Technology Co., Ltd., ("Hangzhou SouFun Network") | August 27, 2013 | PRC | Provision of technology and information consultancy services |
| Wuhan SouFun Yi Ran Ju Ke Real Estate Agents Co., Ltd. ("Wuhan Yi Ran Ju Ke") | December 13, 2013 | PRC | Provision of real estate agency services, leads generation services and real estate information services |
| Hangzhou Ji Ju Real Estate Agents Co., Ltd. ("Hanzhou Ji Ju") | December 23, 2013 | PRC | Provision of real estate agency services and  real estate information services |
| Fang Tian Xia Financial Information Service (Beijing) Ltd. (previously known as Beijing Tianxia Dai Information service Co., Ltd.) | April 9, 2014 | PRC | Provision of finance information services |
| Shanghai SouFun Microfinance Co.,Ltd. ("Shanghai SouFun Microfinance") | January 19, 2015 | PRC | Provision of Microfinance services |
| Beihai Tian Xia Dai Microfinance Co., Ltd. ("Beihai Tian Xia Dai Microfinance") | September 12, 2014 | PRC | Provision of microfinance services |
| Shanghai BaoAn Enterprise Co., Ltd. ("Shanghai BaoAn Enterprise") | March 31, 2013 | PRC | Lease, resale and management of property |
| Shanghai BaoAn Hotel Co., Ltd. ("Shanghai BaoAn Hotel") | March 31, 2013 | PRC | Operation and management of hotel, restaurant and other catering business |

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**1.      ORGANIZATION AND BASIS OF PRESENTATION (continued)**

| Company | Date of Establishment | Place of Establishment | Principal Activities |
|---|---|---|---|
| Chongqing Tian Xia Dai Microfinance Co., Ltd ("Chongqing Tian Xia Dai Microfinance") | December 11, 2014 | PRC | Provision of microfinance services |
| Tianjin Jia Tian Xia Microfinance Co., Ltd. ("Tianjin Jia Tian Xia Microfinance") | December 5, 2014 | PRC | Provision of microfinance services |
| Guangzhou Fang Tian Xia Real Estate Broking Co., Ltd. ("Guangzhou Fang Tian Xia") | March 9, 2015 | PRC | Provision of real estate agency services |
| Beijing Cun Fang Real Estate Broking Co., Ltd. ("Beijing Cun Fang") | April 7, 2015 | PRC | Provision of real estate agency services |
| Tianjin Fang Tian Xia Real Estate Broking Co., Ltd. ("Tianjin Fang Tian Xia") | May 21, 2015 | PRC | Provision of real estate agency services |
| Nanjing Cun Fang Real Estate Broking Co., Ltd. ("Nanjing Cun Fang") | April 30, 2015 | PRC | Provision of real estate agency services |

F-16

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**1.      ORGANIZATION AND BASIS OF PRESENTATION (continued)**

| Company | Date of Establishment | Place of Establishment | Principal Activities |
|---|---|---|---|
| Nanchang Cun Fang Real Estate Broking Co., Ltd. ("Nanchang Cun Fang") | June 3, 2015 | PRC | Provision of real estate agency services |
| Chongqing Fang Tian Xia Real Estate Broking Co., Ltd. ("Chongqing Fang Tian Xia") | May 27, 2015 | PRC | Provision of real estate agency services |
| Shanghai SouFun Fang Tian Xia Broking Co., Ltd. ("Shanghai Fang Tian Xia") | April 16, 2015 | PRC | Provision of real estate agency services |
| Beijing Li Tian Rong Ze Yi Jia Technology Development Co., Ltd. ("Beijing Li Tian Rong Ze") | September 4, 2015 | PRC | Provision of technology and information consultancy services |
| Hong Kong Property Network Limited ("HK Property") | May 19, 2011 | Hong Kong | Investment holding |
| Best Fang Holdings  LLC | Aug 30, 2017 | United States of America | Investment holding |
| Best Work Holdings (New York) LLC ("Best Work") | March 14, 2011 | United States of America | Investment holding |

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

1.     **ORGANIZATION AND BASIS OF PRESENTATION (continued)**

In order to comply with PRC laws and regulations which restrict foreign control of companies involved in internet content provision ("ICP") and advertising businesses, the Company operates its websites and provides online marketing, listing and leads generation services in the PRC through its PRC Domestic Entities and the PRC Domestic Entities' subsidiaries.

The equity interests of the PRC Domestic Entities are legally held directly by Vincent Tianquan Mo, executive chairman of the board of directors, Richard Jiangong Dai, a director of the board who resigned from the board effective February 25, 2016, or Jianning Dai, general manager of the Company's subsidiary. The effective control of the PRC Domestic Entities is held by the Company through two of its WOFEs, namely, SouFun Network and Jia Tian Xia Network Technology as a result of a series of contractual arrangements and their supplementary agreements signed with each of the PRC Domestic Entities which arrangements and agreements contain similar provisions regarding obligations and rights of the Company and the PRC Domestic Entities (hereinafter, together the "Contractual Agreements"). As a result of the Contractual Agreements, the Company maintains the ability to approve decisions made by the PRC Domestic Entities, is entitled to substantially all of the economic benefits from the PRC Domestic Entities and is obligated to absorb all of the PRC Domestic Entities' expected losses.

Therefore, the Company consolidates the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries in accordance with the United States of America Securities and Exchange Commission ("SEC") Regulation S-X Article 3A-02 and Accounting Standards Codification ("ASC") 810, *Consolidation* ("ASC 810").

The following is a summary of the Contractual Agreements:

***Exclusive Technical Consultancy and Service Agreements***

The WOFEs provide the following exclusive technical services to the PRC Domestic Entities: (i) access to information assembled by the WOFEs concerning the real estate industry and companies in this sector to enable the PRC Domestic Entities to target potential customers and provide research services; and (ii) technical information technology system support to enable the PRC Domestic Entities to service the needs of its customers. The agreements can be extended indefinitely at the sole discretion of the WOFEs.

***Operating Agreements***

Pursuant to the operating agreements, each PRC Domestic Entity and its legal shareholders have agreed not to enter into any transaction that would substantially affect the assets, rights, obligations or operations of the PRC Domestic Entity without prior written consent from the WOFEs. In addition, the PRC Domestic Entities will appoint or remove their directors and executive officers based on instruction from the WOFEs. The agreements can be extended indefinitely at the sole discretion of the WOFEs.

***Equity Pledge Agreements, Shareholders Proxy Agreements and Exclusive Call Option Agreements***

In order to secure the payment obligations of each PRC Domestic Entity under the exclusive technical consultancy and service agreements, the legal shareholders have pledged their entire respective ownership interests in each Domestic PRC Entity to the WOFEs. The legal shareholders shall not transfer the pledged ownership interests without the prior written consent from the WOFEs. The WOFEs are entitled to dividends and funds obtained through conversion, auction or sale of the ownership interests that the legal shareholders pledged to the WOFEs. The agreements can be extended at the sole discretion of the WOFEs.

The legal shareholders irrevocably appoint the WOFEs to act as proxy for the legal shareholders to exercise their respective rights as shareholders of the PRC Domestic Entities to attend shareholders' meetings and cast votes. The agreements will remain valid until terminated upon written consent by the WOFEs, the PRC Domestic Entities and their legal shareholders or by their successors.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

1.　　**ORGANIZATION AND BASIS OF PRESENTATION (continued)**

The legal shareholders granted the Company or any third party designated by the Company the exclusive right to acquire from the legal shareholders the whole or part of the respective equity interests in each PRC Domestic Entity at a price equivalent to the historical cost when permitted by applicable PRC laws and regulations. The legal shareholders shall not sell, transfer or dispose of the equity interests in the PRC Domestic Entities without the prior written consent of the Company or any third party designated by the Company. The proceeds from the exercise of the call option will be applied to repay the loans under the loan agreements. The Company does not have to make any additional payment to the legal shareholders. The PRC Domestic Entities will not distribute any dividend without the prior written consent from the WOFEs. The agreements can be extended indefinitely at the sole discretion of the Company.

***Loan Agreements***

The WOFEs provided loans to the legal shareholders to enable them to contribute the registered capital of the PRC Domestic Entities. Under the terms of the loan agreements, the legal shareholders will repay the loans by transferring their legal ownership in the PRC Domestic Entities to the WOFEs when permitted by applicable PRC laws and regulations. Any gains from the transfer shall be paid back to the WOFEs or any third party designated by the WOFEs. The legal shareholders shall repay the loan by means of transferring their respective equity interests in the PRC Domestic Entities to the WOFEs or any other person designated by the WOFEs.

***Supplementary Agreements***

In addition to the above contractual agreements, the Company, the WOFEs, the PRC Domestic Entities and their legal shareholders entered into supplementary agreements in March 2010 to memorialize certain terms previously agreed amongst the Company, the WOFEs, the PRC Domestic Entities and their legal shareholders. While these supplementary agreements were signed in 2010, the terms, intent and substance of all the agreements above remained unchanged. Pursuant to the supplementary agreements:

- the WOFEs have unilateral discretion in setting the technical service fees charged to the PRC Domestic Entities;

- the WOFEs are obligated to provide financial support to the PRC Domestic Entities in the event the PRC Domestic Entities incur losses;

- the annual budget of the PRC Domestic Entities should be assessed and approved by the WOFEs;

- the legal shareholders agree to remit any profits distributed from the PRC Domestic Entities to the Company upon request by the Company; and

- the PRC Domestic Entities are obligated to transfer their entire retained earnings, after deduction of PRC income tax, to the WOFEs in the form of a donation upon the WOFEs' request.

All of these provisions have been incorporated into the Contractual Agreements signed subsequent to March 2010.

Furthermore, the WOFEs and the PRC Domestic Entities entered into supplementary agreements in March 2013 to memorialize the following terms previously agreed between the WOFEs and the PRC Domestic Entities when the Exclusive Call Option Agreements were entered into:

- the legal shareholders agreed to remit the purchase consideration received from the exercise of the exclusive right to acquire the equity interests in the PRC Domestic Entities to the WOFEs or any entity designated by the WOFEs.

This provision has been incorporated into the Contractual Agreements signed subsequent to March 2013.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

1.        ORGANIZATION AND BASIS OF PRESENTATION (continued)

Through the design of the aforementioned agreements, the legal shareholders of the PRC Domestic Entities effectively assigned their full voting rights to the WOFEs, which give the WOFEs the power to direct the activities that most significantly impact the PRC Domestic Entities' economic performance. The WOFEs obtained the ability to approve decisions made by the PRC Domestic Entities and the ability to acquire the equity interests in the PRC Domestic Entities when permitted by PRC law. The WOFEs are obligated to absorb a majority of the expected losses from the PRC Domestic Entities' activities through providing unlimited financial support to the PRC Domestic Entities and are entitled to receive a majority of profits from the PRC Domestic Entities through the exclusive technical consultancy and service fees. As a result, the Company, through the WOFEs, is the primary beneficiary of the PRC Domestic Entities. Accordingly, in accordance with SEC Regulation S-X Article 3A-02 and ASC 810, the Company, through the WOFEs, has consolidated the operating results of the PRC Domestic Entities in the Company's financial statements.

The carrying amounts of the assets, liabilities, the results of operations and cash flows of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries included in the Company's consolidated balance sheets, consolidated statements of comprehensive income (loss) and consolidated statements of cash flows were as follows:

| | As of December 31, | |
| --- | --- | --- |
| | 2018 | 2019 |
| | US$ | US$ |
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | 34,004 | 13,670 |
| Restricted cash, current | 214,876 | 217,951 |
| Short-term investments | 5,586 | — |
| Accounts receivable (net of allowance of US$12,913 and US$10,978 as of December 31, 2018 and 2019, respectively) | 25,910 | 40,836 |
| Funds receivable | 5,124 | 8,182 |
| Prepayments and other current assets | 25,384 | 27,644 |
| Commitment deposits | 191 | 188 |
| **Total current assets** | **311,075** | **308,471** |
| | | |
| **Non-current assets:** | | |
| Property and equipment, net | 358,432 | 342,146 |
| Land use rights | 32,428 | — |
| Deferred tax assets | 2 | 2,442 |
| Deposits for non-current assets | 95 | 265 |
| Long-term investments | 273,340 | 219,201 |
| Restricted cash, non-current portion | — | 35,363 |
| Other non-current assets | 1,815 | 32,972 |
| **Total non-current assets** | **666,112** | **632,389** |
| **Total assets** | **977,187** | **940,860** |

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

1.   ORGANIZATION AND BASIS OF PRESENTATION (continued)

| | As of December 31, | |
| --- | --- | --- |
| | 2018 | 2019 |
| | US$ | US$ |
| **Current liabilities:** | | |
| Short-term loans and current portion of long-term loans | 76,267 | 70,215 |
| Deferred revenue | 32,816 | 32,254 |
| Accrued expenses and other liabilities | 36,266 | 54,543 |
| Customer's refundable fees | 3,274 | 2,209 |
| Income tax payable | 1,982 | 305 |
| Amounts due to related parties | — | 10,253 |
| Intercompany payable to the non PRC Domestic Entities | 445,556 | 408,775 |
| **Total current liabilities** | **596,161** | **578,554** |
| | | |
| **Non-current liabilities:** | | |
| Long-term loans, less current portion | 44,891 | 46,525 |
| Deferred tax liabilities | 10,488 | 656 |
| Other non-current liabilities | 51,144 | 64,456 |
| **Total non-current liabilities** | **106,523** | **111,637** |
| **Total liabilities** | **702,684** | **690,191** |
| **Net assets** | **274,503** | **250,669** |

Intercompany payable to the non PRC Domestic Entities represents the amounts due to the WOFE and its wholly-owned subsidiaries, which are eliminated upon consolidation.

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2018 | 2019 |
| | US$ | US$ | US$ |
| Total revenues | 91,087 | 89,111 | 102,383 |
| Net loss | (6,484) | (79,229) | (23,543) |

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2018 | 2019 |
| | US$ | US$ | US$ |
| Net cash generated from operating activities | 122,327 | 26,241 | 29,288 |
| Net cash used in investing activities | (99,946) | (9,851) | (3,991) |
| Net cash (used in) generated from financing activities | 8,565 | (25,220) | (2,904) |

As of December 31, 2019, except for the restricted cash, current of US$215,450, accounts receivable of US$324, restricted cash, non-current portion of US$35,363 and property and equipment of US$339,407, which are all pledged to secure bank borrowings (Note 11), there was No other pledge or collateralization of the assets of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

1.   **ORGANIZATION AND BASIS OF PRESENTATION (continued)**

Creditors of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries have No recourse to the general credit of their respective primary beneficiary. The amounts of liabilities of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries have been parenthetically presented on the consolidated balance sheets. The PRC Domestic Entities held certain registered copyrights, trademarks and registered domain names, which are used for the Company's business operations. All of these revenue-producing assets were internally developed, for which the Company did not incur significant development costs. There were No other assets of the PRC Domestic Entities or the PRC Domestic Entities' subsidiaries that can only be used to settle their own obligations except for accounts receivable of US$324, restricted cash - noncurrent portion of US$1,433 and property and equipment of US$339,407 pledged to secure bank borrowings.

*Basis of Presentation*

The accompanying consolidated financial statements have been prepared in accordance with the United States generally accepted accounting principles ("U.S. GAAP").

On June 11, 2019, the Company completed the separation and distribution of its real estate information, analytics and marketplace services business into a separate, independent public company, CIH. The spin-off was completed by way of distribution to Fang's stockholders of all of the then issued and outstanding shares of common stock of CIH on the basis of one share of CIH common stock for every one share of Fang common stock held as of the close of business on May 28, 2019 (the record date for the distribution).  As a result of the distribution, CIH is now an independent public company, and its common stock is listed under the symbol "CIH" on the Nasdaq Global Market. The separation represented a strategic shift that has a major effect on Fang's operations and financial results. As a result, the business operated by CIH has been reclassified as discontinued operations. For the periods presented, the assets and liabilities of the discontinued operations are presented separately on the consolidated balance sheets, and the results of the discontinued operations, less income taxes, are reported as income from discontinued operations, on the consolidated statements of comprehensive income (loss). See note 2-Discontinued Operations and note 15.

2.   **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Use of Estimates*

The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the balance sheet dates and the reported amounts of revenues and expenses during the reporting periods. Significant estimates and assumptions reflected in the Company's financial statements include, but are not limited to, estimated stand-alone selling prices of performance obligations, allowance for doubtful accounts, allowance for credit losses, useful lives of property and equipment, realization of deferred tax assets, impairment of long-lived assets, share-based compensation expense, uncertain income tax positions, fair value of the embedded derivatives in the convertible senior notes and fair value of short term and long term investments. Changes in facts and circumstances may result in revised estimates. Actual results could materially differ from those estimates.

*Principles of Consolidation*

The consolidated financial statements include the financial statements of the Company, its non-PRC subsidiaries, WOFEs, the PRC Domestic Entities in which the Company, through its WOFEs, has a controlling financial interest, and the PRC Domestic Entities' subsidiaries. The Company has determined that it has a controlling financial interest, even though it does not hold a majority of the voting equity interest in an entity, because the Company has the ability to control the PRC Domestic Entities through the WOFEs' rights to all the residual benefits of the PRC Domestic Entities and the WOFEs' obligation to fund losses of the PRC Domestic Entities. As a result, the PRC Domestic Entities are included in the consolidated financial statements. All significant intercompany balances and transactions between the Company, its subsidiaries, the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries have been eliminated in consolidation, except for the intercompany transactions between continuing operations and discontinued operations before the disposal of the discontinued operations, which are considered to continue after the disposal of the discontinued operations are presented separately in continuing operations and discontinued operations in a way that reflects the continuance of those transactions.

F-22

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

2.      SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

*Foreign Currency Translation and Transactions*

The functional currency of the Company and its non-PRC subsidiaries is the United States dollars ("US$"). The WOFEs, PRC Domestic Entities and PRC Domestic Entities' subsidiaries determine their functional currency to be the Chinese Renminbi ("RMB") based on the criteria of ASC 830, *Foreign Currency Matters.* The Company uses US$ as its reporting currency.

Transactions denominated in foreign currencies are remeasured into the functional currency at the exchange rates prevailing on the transaction dates. Foreign currency denominated financial assets and liabilities are remeasured at the exchange rates prevailing at the balance sheet date. Exchange gains and losses are included in the consolidated statements of comprehensive income (loss).

The assets and liabilities of the Company's PRC subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries are translated into US$ at the exchange rates prevailing at the balance sheet date. The consolidated statements of comprehensive income (loss) of these entities are translated into US$ at the weighted average exchange rates for the year. The resulting translation gains (losses) are recorded in accumulated other comprehensive income (loss) as a component of shareholders' equity.

For the purpose of the consolidated statements of cash flows, cash flows of the Company's PRC subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries are translated into US$ at the exchange rates prevailing on the dates of the cash flows. Frequently recurring cash flows of these entities which arise throughout the year are translated into US$ at the weighted average exchange rates for the year.

Transaction gains and losses are recognized in the consolidated statements of operations. Gains and losses on intra-entity foreign currency transactions that are of a long-term-investment nature (that is, settlement is not planned or anticipated in the foreseeable future) between consolidated entities are not recognized in earnings, but are included as a component of other comprehensive income (loss).

*Cash and Cash Equivalents*

Cash and cash equivalents represent cash on hand and demand deposits placed with banks or other financial institutions with original maturity of 90 days or less at the date of purchase which are unrestricted as to withdrawal and use. In addition, all highly liquid investments with original stated maturity of 90 days or less are classified as cash equivalents.

*Restricted Cash*

Restricted cash represents cash pledged to financial institutions as collateral for the Company's bank loans, and cash deposits in banks that are restricted as to withdrawal or usage according to certain contracts with customers. The restricted cash is not available for withdrawal or the Company's general use until after the corresponding bank loans are repaid, or the performance obligation is satisfied.

The Accounting Standards Update ("ASU") 2016-18, *Statement of Cash Flows (Topic 230): Restricted Cash,* required that restricted cash should be included with cash and cash equivalents when reconciling the beginning-of-period and end-of-period total amounts shown on the consolidated statements of cash flows. The guidance was effective as of January 1, 2018 and the Company applied it using a retrospective transition method to each period presented. The adoption of this guidance changed the presentation and classification of restricted cash in the Company's consolidated statements of cash flows. For the year ended December 31, 2017, substantially all of the changes in restricted cash of US$51,900, was previously reported as part of financing activities in the consolidated statement of cash flows.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.      SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Investments*

*Periods prior to January 1, 2018*

All highly liquid investments with original maturities of greater than 90 days but less than 365 days are classified as short-term investments which are stated at their approximate fair value.

The Company accounts for its investments in accordance with ASC 320, *Investments-Debt and Equity Securities* ("ASC 320"). The Company classifies the investments in debt and equity securities as "held-to-maturity", "trading" or "available-for-sale", whose classification determines the respective accounting methods stipulated by ASC 320. Dividend and interest income, including amortization of the premium and discount arising at acquisition, for all categories of investments in securities are included in earnings. Any realized gains or losses on the sale of the investments are determined on a specific identification method, and such gains and losses are reflected in the consolidated statements of comprehensive income (loss).

The securities that the Company has positive intent and ability to hold to maturity are classified as held-to-maturity securities and stated at amortized cost. For individual securities classified as held-to-maturity securities, the Company evaluates whether a decline in fair value below the amortized cost basis is other-than-temporary in accordance with the Company's policy and ASC 320. If the Company concludes that it does not intend or is not required to sell an impaired debt security before the recovery of its amortized cost basis, the impairment is considered temporary and the held-to-maturity securities continue to be recognized at the amortized costs. When the Company intends to sell an impaired debt security or it is more likely than not that it will be required to sell prior to recovery of its amortized cost basis, an other-than-temporary impairment is deemed to have occurred. In these instances, the other-than-temporary impairment loss is recognized in the consolidated statements of comprehensive income (loss) equal to the entire excess of the debt security's amortized cost basis over its fair value at the balance sheet date of the reporting period for which the assessment is made.

The securities that are bought and held principally for the purpose of selling them in the near term are classified as trading securities. Unrealized holding gains and losses for trading securities are included in earnings.

Investments not classified as trading or as held-to-maturity are classified as available-for-sale securities. Available-for-sale securities are reported at fair value, with unrealized gains and losses recorded in accumulated other comprehensive income (loss) in shareholders' equity. Realized gains or losses are charged to earnings during the period in which the gain or loss is realized. An impairment loss on the available-for-sale securities are recognized in the consolidated statements of comprehensive income (loss) when the decline in value is determined to be other-than-temporary. No impairment loss was recognized for the year ended December 31, 2017.

In accordance with ASC 325 *Investments-Other*, for investments in an investee over which the Company does not have significant influence and which do not have readily determinable fair value, the Company carries the investment at cost and only adjusted for other-than-temporary declines in fair value and distributions of earnings that exceed the Company's share of earnings since its investment. Management regularly evaluates the impairment of the cost method investments based on performance and financial position of the investee as well as other evidence of market value. Such evaluation included, but is not limited to, reviewing the investee's cash position, recent financing, projected and historical financial performance, cash flow forecasts and financing needs. An impairment loss is recognized in earnings equal to the excess of the investment's cost over its fair value at the balance sheet date of the reporting period for which the assessment is made. The fair value would then become the new cost basis of investment. An impairment loss of US$2,768 was recognized for the year ended December 31, 2017.

F-24

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.      SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Period commencing January 1, 2018*

The Company adopted ASU 2016-01, *Financial Instruments—Overall (Subtopic 825-10), Recognition and Measurement of Financial Assets and Liabilities* from January 1, 2018, which requires all equity securities with readily determinable fair values, other than those accounted for under equity method of accounting or those that result in consolidation of the investee, to be measured at fair value with changes in the fair value recognized through net income. Change in fair value of available-for-sale equity securities are reported in earnings. Upon the adoption of ASU 2016-01, accumulated unrealized gain, net of income taxes, of US$163,785 was reclassified from accumulated other comprehensive income to retained earnings as of January 1, 2018.

(1)  Debt Securities

The Company accounts for its debt investments in accordance with ASC 320 *Investments-Debt Securities* ("ASC 320"). The Company classifies the debt investments as "held-to-maturity", "trading" or "available-for-sale", whose classification determines the respective accounting methods stipulated by ASC 320. Interest income, including amortization of the premium and discount arising at acquisition, for all categories of debt investments are included in earnings. Any realized gains or losses on the sale of the debt investments are determined on a specific identification method, and such gains and losses are reflected in the consolidated statements of comprehensive income (loss).

The debt securities that the Company has positive intent and ability to hold to maturity are classified as held-to-maturity securities and stated at amortized cost. For individual securities classified as held-to-maturity securities, the Company evaluates whether a decline in fair value below the amortized cost basis is other-than-temporary in accordance with the Company's policy and ASC 320. If the Company concludes that it does not intend or is not required to sell an impaired debt security before the recovery of its amortized cost basis, the impairment is considered temporary and the held-to-maturity securities continue to be recognized at the amortized costs. When the Company intends to sell an impaired debt security or it is more likely than not that it will be required to sell prior to recovery of its amortized cost basis, an other-than-temporary impairment is deemed to have occurred. In these instances, the other-than-temporary impairment loss is recognized in the consolidated statements of comprehensive income (loss) equal to the entire excess of the debt security's amortized cost basis over its fair value at the balance sheet date of the reporting period for which the assessment is made.

The debt securities that are bought and held principally for the purpose of selling them in the near term are classified as trading securities. Unrealized holding gains and losses for trading securities are included in earnings. All highly liquid investments with original maturities of greater than 90 days but less than 365 days are classified as short-term investments which are stated at their approximate fair value.

Investments not classified as trading or as held-to-maturity are classified as available-for-sale securities. Available-for-sale debt securities are reported at fair value, with unrealized gains and losses recorded in accumulated other comprehensive income (loss) in shareholders' equity. Realized gains or losses are charged to earnings during the period in which the gain or loss is realized. An impairment loss on the available-for-sale securities are recognized in the consolidated statements of comprehensive income (loss) when the decline in value is determined to be other-than-temporary. No impairment loss was recognized for the years ended December 31, 2018 and 2019, respectively.

(2)  Equity Securities

All equity investments with readily determinable fair values, other than those accounted for under equity method of accounting or those that result in consolidation of the investee, are measured at fair value with changes in the fair value recognized through net income.

F-25

Table of Contents

Equity investments without readily determinable fair values which do not qualify for net asset value per share (or its equivalent) practical expedient and over which the Company does not have the ability to exercise significant influence through the investments in common stock, are accounted for under the measurement alternative. The carrying values of equity investments without readily determinable fair values are measured at cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for identical or similar investments of the same issuer. All gains and losses on these investments, realized and unrealized, are recognized in the consolidated statements of comprehensive income (loss). The Company makes assessment of whether an investment is impaired at each reporting date, and recognizes an impairment loss equal to the difference between the carrying value and fair value in earnings. No impairment loss was recognized for the years ended December 31, 2018 and 2019, respectively. As a result of adoption of ASU 2016-01, the Company is not required to disclose the fair value for equity investments without readily determinable fair value.

(3) Equity method investments

In accordance with ASC 323 *Investments-Equity Method and Joint Ventures*, the Company applies the equity method of accounting to equity investments in common stock over which it has significant influence but does not own a majority equity interests or otherwise control. Under the equity method, the Company initially records its investment in the common stock of an investee at cost. The excess of the carrying amount of the investment over the underlying equity in net assets of the equity investee represents goodwill and intangible assets acquired. The Company adjusts the carrying amount of an investment for its share of the earnings or losses of the investee after the date of investment and reports the recognized earnings or losses in the consolidated statements of comprehensive income (loss). When the Company's share of losses in the equity investee equals or exceeds its interest in the equity investee, the Company does not recognize further losses, unless the Company has incurred obligations or made payments or guarantees on behalf of the equity investee, or the Company holds other investments in the equity investee.

The equity method investments are subject to periodic testing for other-than-temporary impairment, by considering factors including, but not limited to, stock prices of public companies in which the Company has an equity investment, current economic and market conditions, operating performance of the investees such as current earnings trends and undiscounted cash flows, and other company-specific information, such as recent financing rounds. Changes in these estimates and assumptions could affect the calculation of the fair value of the investments and the determination of whether any identified impairment is other-than-temporary. If any impairment is considered other-than-temporary, the Company will write down the asset to its fair value and take the corresponding charge to the consolidated statements of comprehensive income (loss). No impairment was recorded for equity method investments for the years ended December 31, 2018 and 2019, respectively.

The Company elects fair value measurement for certain investment that would otherwise be accounted for under the equity-method of accounting, in accordance with ASC Topic 825-10, *Financial instruments*. The fair value option is applied to all of the Company's financial interests in the same entity that are eligible items. Such election is irrevocable. Under fair value method, investments are recorded at fair value and any changes in fair value are reported in the consolidated statements of comprehensive income (loss).

***Funds Receivable***

Funds receivable represents cash collection through third-party payment service providers. The Company carefully considers and monitors the credit worthiness of the third-party payment service providers. An allowance for doubtful accounts is recorded in the period in which a loss is determined to be probable. Funds receivable balances are written off after all collection efforts have been exhausted.

F-26

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

2.      SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

*Loans Receivable*

Loans receivable consists primarily of secured loans in the form of mortgage loans and unsecured loans to borrowers that have passed the Company's credit assessment. Such amounts are recorded at the principal amount less impairment as of the balance sheet date. The loan periods extended by the Company to the borrowers generally range from 3 to 36 months.

An allowance for credit loss is recorded when, based on current information and events, it is probable that the Company will be unable to collect all amounts due according to the contractual terms of the loan agreement. The Company assesses the allowance for credit loss related to loans receivable on a quarterly basis, either on an individual or collective basis. The Company considers various factors in evaluating loans receivable for possible impairment on an individual basis. These factors include the amount of the loan, historical experience, value of collateral, if any, credit quality and age of the receivable balances. Impairment is measured on an individual loan basis using either the present value of expected future cash flows discounted at the loan's effective interest rate or the fair value of the collateral if the loan is secured. The Company evaluates the remainder of its loans receivables portfolio for impairment on a collective basis in accordance with ASC 450-20, *Loss Contingencies* and records an allowance for credit loss at the portfolio segment level.

Loan principal and interest receivables are charged-off when the loan principal and interest receivables are deemed to be uncollectible. In general, loan principal and interest receivables are identified as uncollectible if any of the following conditions are met : 1) the borrower is dead, missing or incapacitate and there is No legal heir and presentee or the legal heir and presentee refuse to abide the contract; 2) identification of fraud, and the fraud is officially reported to and filed with relevant law enforcement departments; 3) outstanding amount following 180 days past due after all collection efforts based on management's judgment.

*Property and Equipment, Net*

Property and equipment are stated at cost and are depreciated using the straight-line method over the estimated useful lives of the assets, as follows:

| Category | Estimated Useful Life |
|---|---|
| Office equipment | 3 - 5 years |
| Motor vehicles | 5 - 10 years |
| Leasehold improvement | shorter of lease term or economic lives |
| Buildings | 12 -45 years |

Land is stated at cost and is not depreciated.

Construction in progress represents buildings and related premises under construction, which is stated at actual construction cost less any impairment loss. Construction in progress is transferred to the respective category of property and equipment when completed and ready for its intended use.

Interest associated with major development and construction projects is capitalized and included in the cost of the project. The capitalization of interest cease when the project is substantially completed or the development activity is suspended for more than a brief period. The amount to be capitalized is determined by applying the capitalization rate to the average amount of accumulated qualifying capital expenditures for assets under construction during the year.

Repair and maintenance costs are charged to expense as incurred, whereas the cost of renewals and betterments that extend the useful lives of property and equipment are capitalized as additions to the related assets. Retirements, sales and disposals of assets are recorded by removing the cost and accumulated depreciation from the asset and accumulated depreciation accounts, respectively, with any resulting gain or loss reflected in the consolidated statements of comprehensive income (loss).

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.      SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Impairment of Long-Lived Assets*

The Company evaluates its long-lived assets or asset group with finite lives for impairment whenever events or changes in circumstances, such as a significant adverse change to market conditions that will impact the future use of the assets, indicate that the carrying amount of an asset group may not be fully recoverable. When these events occur, the Company evaluates the impairment by comparing the carrying amount of the assets to future undiscounted cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flows is less than the carrying amount of the assets, the Company recognizes an impairment loss based on the excess of the carrying amount of the asset group over its fair value, but not below the fair values of the individual long-lived assets within the asset group. No impairment charge was recognized for any of the years presented. Asset groups to be disposed of would be reported at the lower of the carrying amount or fair value less costs to sell, and No longer depreciated. The assets and liabilities of a disposal group classified as held for sale would be presented separately in the appropriate asset and liability sections of the consolidated balance sheets.

*Fair Value of Financial Instruments*

Financial instruments of the Company primarily include cash and cash equivalents, restricted cash, accounts receivable, commitment deposits, funds receivable, short-term and long-term investments, loans receivable, short-term and long-term loans, short-term bond payable, convertible senior notes and related derivative liabilities. As of December 31, 2018 and 2019, the carrying values of these financial instruments, other than trading securities and call option included in the short-term investment (see note 5), restricted cash, non-current portion, long-term investments, long-term loans, less current portion, convertible senior notes and related derivative liabilities, approximate their fair values due to the short-term maturity of these instruments. The call option was valued using the Black-Sholes pricing model as of December 31, 2019. The equity investments with readily determinable fair value and trading securities were recorded at fair value based on the quoted price in active markets as of December 31, 2018 and 2019. The equity method investments carried at fair value was recorded at fair value based on the quoted price, adjusted if relevant, for other input that is indirectly observable in the active market as of December 31, 2019. The carrying values of long-term loans, less current portion and restricted cash, non-current portion approximate their fair values, as the loans and restricted cash bear interest at rates determined based on the prevailing interest rates in the market. The convertible senior notes were recognized based on residual proceeds after allocation to the derivative liabilities at fair market value. The estimated fair values of the convertible senior notes based on a market approach were approximately US$199,172 and US$145,437 as of December 31, 2018 and 2019, respectively, and represents a Level 3 valuation in accordance with ASC 820, *Fair Value Measurements and Disclosures* ("ASC 820"). When determining the estimated fair value of the convertible senior notes, the Company used a commonly accepted valuation methodology and market-based risk measurements that are indirectly observable, such as credit risk. The fair value of the bifurcated derivative liabilities was insignificant for the years ended December 31, 2018 and 2019. Prior to January 1, 2018, the Company determined that it was not practicable to estimate the fair value of its cost method investments as of December 31, 2017 and measures the cost method investment at fair value on a nonrecurring basis only if an impairment charge were to be recognized.

The Company applies ASC 820 in measuring fair value. ASC 820 defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements.

ASC 820 establishes a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value as follows:

Level 1 - Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets.

Level 2 - Include other inputs that are directly or indirectly observable in the marketplace.

Level 3 - Unobservable inputs which are supported by little or No market activity.

ASC 820 describes three main approaches to measuring the fair value of assets and liabilities: (1) market approach; (2) income approach and (3) cost approach. The market approach uses prices and other relevant information generated from market transactions involving identical or comparable assets or liabilities. The income approach uses valuation techniques to convert future amounts to a single present value amount. The measurement is based on the value indicated by current market expectations about those future amounts. The cost approach is based on the amount that would currently be required to replace an asset.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.     SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

Assets measured at fair value on a recurring basis as of December 31, 2018 and 2019 are summarized below.

| | Fair Value Measurement as of December 31, 2018 | | | |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) US$ | Significant Other Observable Inputs (Level 2) US$ | Unobservable Inputs (Level 3) US$ | Fair Value at December 31, 2018 US$ |
| --- | --- | --- | --- | --- |
| Equity investments with readily determinable fair value | 181,483 | — | — | 181,483 |
| Trading securities | 1,773 | — | — | 1,773 |

| | Fair Value Measurement as of December 31, 2019 | | | |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) US$ | Significant Other Observable Inputs (Level 2) US$ | Unobservable Inputs (Level 3) US$ | Fair Value at December 31, 2019 US$ |
| --- | --- | --- | --- | --- |
| Call option | — | — | 1,384 | 1,384 |
| Equity investments with readily determinable fair value | 121,841 | — | — | 121,841 |
| Equity method investments carried at fair value | 8,539 | 18,200 | — | 26,739 |

The following table provides additional information about the reconciliation of the fair value measurements of assets and liabilities using significant unobservable inputs (level 3).

| | Call option |
| --- | --- |
| Balance as of December 31, 2018 | — |
| Initial recognition | 693 |
| Decrease as a result of exercise | (458) |
| Change in fair value for the period | 1,149 |
| Balance as of December 31, 2019 | 1,384 |

The call option was valued using the Black-Scholes pricing model at the reporting date. The calculation was based on the exercise price, annual risk-free rate of 1.59%, dividend yield of 0% and volatility of 44%.

***Revenue Recognition***

Revenues are derived from marketing services, listing services, leads generation, financial services, value-added services and E-commerce services.

Revenue generated by CIH, which primarily include special listing services, data and analytics service have been classified and reported under discontinued operations for all the periods presented. See Note 15.

*Periods prior to January 1, 2018*

Revenues for each type of service sales were recognized only when the following criteria are met: (a) persuasive evidence of an arrangement exists; (b) price is fixed or determinable; (c) delivery of services has occurred; and (d) collectability is reasonably assured.

***Listing Services***

Listing services revenues consist of revenues derived from both basic listing services and special listing services.

The Company's basic and special listing services are provided to agents, brokers, property developers, property owners, property managers and others seeking to sell or rent new or secondary residential and commercial properties.

(1)   Basic listing services

Basic listing services entitle customers to post and make changes to information for properties, home furnishings and other related products and services in a particular area on the website and mobile apps for a specified period of time, which typically range from one to 36 months, in exchange for a fixed fee. Written contracts, containing all significant terms, signed by the Company and its customers provide persuasive evidence of the arrangement. The amount of fee to be paid is not subject to change once the contract has been signed. The contracts generally do not contain any specific performance target or refund guarantee. Delivery of services occurs by making access to the websites and mobile apps available for posting by the customers over the specified listing period. The Company

performs credit assessments of its customers prior to signing the written contract to ensure collectability is reasonably assured. In accordance with ASC 605, revenues were recognized ratably over the duration of the service period as the basic listing services were being delivered.

F-29

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.     SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

(2)   Special listing services

Special listing services consist of promotional activities associated with themed marketing campaigns, each generally over a one year duration and designed to recognize the leading companies within a specific real estate sector. For each special listing campaign, targeted leading companies participate in a collective marketing and promotional program for a specified fee, consisting of various online and offline promotional activities tied to the specialized theme of the campaign. Each revenue arrangement may include one or multiple special listing campaigns.

The Company evaluated its special listing revenue arrangements in accordance with ASC 605-25,*Revenue recognition—Multiple-element arrangements*. The promotional services within a special listing program were accounted for as one combined unit of accounting, as each promotional deliverable did not have standalone value to the customer since all the deliverables were tied to the specialized theme of the campaign, and were not sold separately. For contractual arrangements that contain multiple special listing campaigns, the program for each campaign was accounted for as a separate unit of accounting. ASC 605-25 required revenues to be allocated to each unit of accounting on a relative fair value basis based on a selling price hierarchy. The selling price for a deliverable was based on vendor-specific objective evidence ("VSOE") if available, third party evidence ("TPE") if VSOE was not available, or best estimate of selling price ("BESP") if neither VSOE nor TPE was available. The Company allocated total arrangement consideration to each unit of accounting based on its relative selling price, which was determined based on its BESP for that deliverable since neither VSOE nor TPE exist. In determining the BESP for each deliverable, the Company considered its overall pricing model and objectives when sold separately, as well as market or competitive conditions that may impact the price at which the Company would transact if the deliverable were sold regularly on a standalone basis. The Company monitored the conditions that affect its determination of selling price for each deliverable and reassess such estimates periodically. In accordance with ASC 250, "Accounting Changes and Error Corrections," changes in the determination of the BESP were considered a change in accounting estimate and were accounted for on a prospective basis. The effect of changes in the BESP on the allocation of arrangement consideration was insignificant for all periods presented.

Written contracts, containing all significant terms, signed by the Company and its customers provide persuasive evidence of the arrangement. The amount of fee to be paid is not subject to change once the contract has been signed. The contracts do not contain any specific performance, cancellation, termination or refund provisions. The Company performs credit assessments of its customers prior to signing the written contract to ensure collectability is reasonably assured. In accordance with ASC 605, "Revenue Recognition," revenues were recognized ratably over the duration of the campaign period as the special listing services were being delivered.

*Marketing Services*

The Company offers marketing services on the Company's websites and mobile apps, primarily through banner advertisements, floating links, logos and other media insertions. These marketing services are offered to real estate developers and to a lesser extent provider of products and services for home decoration and improvement. Marketing services allow customers to place advertisements on particular areas of the Company's websites and mobile apps, in particular formats and over particular periods of time. Written contracts, containing all significant terms, signed by the Company and its customers provide persuasive evidence of the arrangement. The contracts generally do not contain any specific performance target or refund guarantee.

The service fee is negotiated between the customer and the Company but once a price is agreed to and the written contract is signed by both parties, the price is fixed and not subject to change. The service fee is due and payable in installments over the service period. The marketing services typically last from several days to one year. Delivery of the service occurs upon displaying the agreed forms of services on the Company's websites and mobile apps over the specified service period. The Company performs credit assessments on its customers prior to signing the written contract to ensure collectability is reasonably assured. Revenues were recognized ratably over the contract period, as there was persuasive evidence of an arrangement, the fee is fixed or determinable and collection was reasonably assured, as prescribed by ASC 605.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

Since 2016, the Company began to provide marketing services whereby the sole consideration for the services is in the form of a specifically identified unit of a development. The Company accounts for these arrangements pursuant to ASC 845, *Nonmonetary transactions*, and have determined that the fair value of consideration received, i.e. the specifically identified real estate property, is more readily determinable than the marketing services surrendered. Accordingly, the fair value of property is used for measurement and revenues are recognized ratably over the service period. Revenue recognized under such arrangement was US$1,361 for the year ended December 31, 2017.

For certain arrangements, the Company provides marketing services that contain multiple deliverables, that is, different forms of services to be delivered over different periods of time.

The Company accounted for each deliverable in the arrangement as separate unit of accounting. Revenues were allocated to each unit of accounting on a relative fair value basis based on a selling price hierarchy and was recognized ratably over the duration of the service period. The selling price for a deliverable was based on its vendor-specific objective evidence ("VSOE") if available, third party evidence ("TPE") if VSOE is not available, or BESP if neither VSOE nor TPE is available. The total arrangement consideration was allocated to each unit of accounting based on its relative selling price which is determined based on the Company's BESP for that deliverable because neither VSOE nor TPE exist. In determining its BESP for each deliverable, the Company considered its overall pricing model and objectives, as well as market or competitive conditions that may impact the price at which the Company would transact if the deliverable were sold regularly on a standalone basis. The Company monitored the conditions that affect its determination of selling price for each deliverable and reassesses such estimates periodically.

***E-commerce service***

E-commerce service revenues consist of revenues derived from:

(1)  Fang membership services

The Company enters into arrangements with real-estate developers, pursuant to which the Company charges its customers RMB5,000 to RMB20,000 in order for them to purchase specified properties from the real estate developers at a discount significantly greater than the face value of the fees charged by the Company. The discount is either a fixed amount off or a fixed percentage to the price of the specified property. The fees paid by the customers to the Company are refundable before a purchase of the specified properties at a discount is made by the customers or if after the purchase, only if the customers can fulfil certain requirements under the refund policy. The Company chose to analogize to rights of return guidance in ASC 605-15 when accounting for refundable fees as reliable estimates of refunds can be made based on company-specific historical evidence. Revenues were recognized by the Company when cash consideration of the fees was received and the discount has been applied by the customers to pay for the purchase price of the specified properties, net of estimated refunds. Cash received in advance of the purchase of specified properties and provision for refunds were recorded as "customers' refundable fees" . The provision of refunds was insignificant for the year ended December 31, 2017.

F-31

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.     SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

Additionally, the Company, real-estate developers and marketing agencies entered into tri-party cooperation arrangements for certain Fang membership services. When customers use their Fang membership cards to purchase specified properties in selected advertisements published by the marketing agents, a portion of the proceeds from the Fang membership services is remitted to the marketing agents. The Company recognized revenues from this type of Fang membership services on a net basis, representing the portion of proceeds received from customers that is ultimately retained by the Company as it is an agent in the arrangement. Commencing in 2014, the Company also entered into cooperation arrangements directly with real-estate developers for Fang membership services. The Company either engages third-party real estate agents or places advertisements with marketing agents to promote the real-estate projects. The Company recognized revenues from this type of Fang membership services on a gross basis, representing the proceeds received from the real-estate developers, as the Company is the primary obligor in the arrangement. Payments to third-party real estate agents are recorded as cost of sales, while payments to marketing agents are recorded as selling expenses. The portion to be remitted to third-party real estate agents and marketing agents was recorded as amounts payable to sales and marketing agents in "accrued expenses and other liabilities" on the consolidated balance sheets (Note 13).

 (2)  Direct sales services

The Company promotes property developments of its developer clients primarily through its websites and mobile applications ("mobile apps"). Potential buyers can register with the Company free of charge if they are interested in any real estate properties covered by its direct sales services. After the registration, the Company provides the buyers with additional information about the properties and related services, such as tours to visit the property developments and other services to facilitate property purchases. By using the direct sales services, individual buyers can enjoy discounted prices for properties that the Company offers from its developer clients. The Company charges its developer clients a fee for each property it sold through its direct sales services at a predetermined percentage of the value of the individual transaction. Thereafter, the real estate developers can request for refund only if they can fulfil certain requirements under the refund policy. The Company chose to analogize to rights of return guidance in ASC 605-15 when accounting for refundable fees as reliable estimates of refunds can be made based on company-specific historical evidence. Revenues were recognized by the Company based on total of successful purchase transactions made, net of estimated refunds. The provision of refunds was insignificant for the year ended December 31, 2017.

 (3)  Sublease services

Beginning in 2015, the Company began to provide sublease service through its websites. The Company identifies suitable properties and initially enters into lease agreements with the property owners. The lease agreements allow the Company to sublease the properties. Regardless whether the leased property is subsequently sub-leased by the Company, the lease agreement between the Company and the property owner remains in effect, including the Company's obligation to make fixed rental payments over the non-cancellable lease term. The property owner is not a party to, and therefore not entitled to, any rights or obligations under the sublease agreement. Sublease rental income was recorded as revenue from subleasing services and recognized on a gross basis as the Company is the principal to the sublease arrangements. The sublease income was recognized on a straight-line basis over the lease term. Sublease rental income for the year ended December 31, 2017 was US$15,085.

 (4)  Real estate online brokerage services

Commencing in 2015, the Company provided brokerage services for sellers and buyers of secondary properties. Brokerage services may include property listing services, advisory services, transaction negotiation services and administration services. In addition to secondary property sales, the Company also assists property owners and potential tenants with leasing transactions. Commission revenues derived from brokerage services is recognized upon the execution, fulfillment of all performance obligations specified on the tri-party transaction agreement that is entered into between the seller, buyer and the Company in its capacity as broker, and cash receipt.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

2.      SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

(5)   Online decoration services

Beginning in 2015, the Company launched online decoration services, which includes interior design, remodeling, renovation, furnishing and other home improvement services. The Company generally charges the customers a fixed fee. The Company recognized revenues based on the percentage-of-completion method and measures progress using input measures, i.e., cost-to-cost, in accordance with ASC 605-35, *Revenue Recognition Construction-Type and Production-Type Contracts.* Estimated losses, if any, were recognized during the period in which the loss becomes probable and reasonably estimable.

*Financial Services*

Financial services are provided through the Company's online financial platform www.fangtx.com and offline micro loan subsidiaries. The Company provides secured loans in the form of entrusted loans, mortgage loans and unsecured loans, primarily to borrowers that meet the Company's credit assessment requirements. The Company ceased to provide entrusted loans since 2017. Revenues derived from loan interest income and annual service fees are recognized using the effective interest rate method. The Company does not accrue interest on loans receivable that are considered impaired or more than 90 days past due unless either the receivable has not been collected due to administrative reasons or the receivable is well secured and in the process of collection. Unsecured loans stop accruing interest when 60 days past due and are classified as impaired loan.

*Value-added Services*

The Company generates revenues from value-added services including subscription services for access to the Company's information database and consulting services for customized and industry-related research reports and indices. Revenues derived from subscription services for access to the Company's information database are recognized ratably over the subscription period. Revenues derived from consulting services for customized and industry-related research reports and indices were recognized when the relevant services were completed.

The Company's business was subject to VAT, surcharges or cultural construction fees levied on advertising-related sales in the PRC. In accordance with ASC 605-45, *Revenue Recognition-Principal Agent Considerations,* all such VAT, surcharges and cultural construction fees were presented as cost of revenues in the consolidated statements of comprehensive income (loss). VAT, surcharges and cultural construction fees for the year ended 2017 were US$33,320.

All service fees received in advance of the provision of services were initially recorded as deferred revenues and subsequently recognized as revenues when the related services were performed by the Company.

*Period commencing January 1, 2018*

The Company adopted ASC 606, *Revenue from Contracts with Customers* ("ASC 606"), from January 1, 2018, applying the modified retrospective method to those contracts which were not completed as of January 1, 2018. Accordingly, revenues for the year ended December 31, 2018 were presented under ASC 606, while revenues for the year ended December 31, 2017 were not adjusted and continued to be reported under ASC 605. Upon the adoption of the ASC 606, the Company recognized the cumulative effect of US$2.3 million, net of income taxes, as an increase to the opening retained earnings as of January 1, 2018. The cumulative effect of adoption is primarily related to the following reasons:

(1)   Before the adoption of ASC 606, the Company assessed whether collectability is reasonably assured at the outset of the arrangement, and subsequently reassessed if there was a substantive change in facts and circumstances. If the collectability of all or a portion of the fee is not reasonably assured, all revenue recognition were deferred until payment was received (assuming all of the other revenue recognition criteria have been met). Upon the adoption of ASC 606, if it is not probable that the Company will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer, consideration received from the customer is initially recorded as a liability. The Company will recognize nonrefundable consideration received as revenue only when one of the following events has occurred:

F-33

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

2.      SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

- the Company has No  remaining obligations to transfer goods or services to the customer and all, or substantially all of the consideration has been received;

- the contract has been terminated; or

- the Company have transferred control of the goods or services to which the consideration that has been received relates, and has stopped transferring (and has No  obligation under the contract to transfer) additional goods or services to the customer, if applicable.

As a result, the Company made an adjustment to decrease the opening balance of retained earnings as of January 1, 2018 by US$0.5 million.

(2)   The Company's policy before the adoption of ASC 606 was to require written signed contracts by both the Company and its customers as persuasive evidence of its revenue arrangements. In certain cases where services are being delivered prior to the receipt of the written signed contracts by both parties, revenue had been deferred until such time the written signed contracts are collected. Under the new revenue standard, revenues may be recognized prior to the receipt of the written signed contracts by both parties (assuming all other revenue recognition criteria are satisfied), as long as the revenue arrangements between the Company and its customers are legally enforceable. As a result, the Company made an adjustment to increase the opening balance of retained earnings as of January 1, 2018 by US$2.8 million.

In addition, the Company's revenues are presented net of value-added tax collected on behalf of governments starting from January 1, 2018. Prior to January 1, 2018, value-added tax collected on behalf of governments were presented as gross in both revenues and cost of revenues. The Company has elected to adopt the practical expedient for incremental costs to obtain a contract with a customer, i.e. sales commissions, with amortization periods of one year or less to be recorded in selling expenses when incurred. The Company has elected the practical expedient not to disclose the information about remaining performance obligations which are part of the contracts that have an original expected duration of one year or less.

F-34

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.     SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

Since the adoption of ASC 606 starting from January 1, 2018, the Company recognizes revenues upon the satisfaction of its performance obligation (upon transfer of control of promised goods or services to customers) in an amount that reflects the consideration to which the Company expects to be entitled to in exchange for those goods or services, excluding amounts collected on behalf of third parties, (for example, value-added taxes). For each performance obligation satisfied over time, the Company recognizes revenue over time by measuring the progress toward complete satisfaction of that performance obligation. If the Company does not satisfy a performance obligation over time, the performance obligation is satisfied at a point in time.

The Company's contracts with customers often include promises to transfer multiple products and services. For these contracts, the Company accounts for individual performance obligations separately if they are capable of being distinct and distinct within the context of the contract. Determining whether products and services are considered distinct performance obligations may require significant judgment. Judgment is also required to determine the stand-alone selling price ("SSP") for each distinct performance obligation. In instances where SSP is not directly observable, such as when the Company does not sell the product or service separately, the Company determines the SSP using information that may include market conditions and other observable inputs.

*Marketing Services*

The Company offers marketing services on the Company's websites and mobile apps, primarily through banner advertisements, floating links, logos and other media insertions. These marketing services are offered to real estate developers and to a lesser extent provider of products and services for home decoration and improvement. Marketing services allow customers to place advertisements on particular areas of the Company's websites and mobile apps, in particular formats and over particular periods of time. The marketing services typically last from several days to one year. The Company determines that the customer simultaneously receives and consumes benefits provided by the Company's performance as the Company performs during the term of the contract. Revenues from marketing services are recognized ratably over the service period.

*Listing Services*

Listing services revenues consist of revenues derived from both basic listing services and special listing services.

(1)  Basic listing services

Basic listing services entitle customers to post and make changes to information for properties, home furnishings and other related products and services in a particular area on the website and mobile apps for a specified period of time, which typically range from one to 12 months, in exchange for a fixed fee. Revenues are recognized on a straight line basis over the service period. The Company determines that its performance pattern to be straight line since the customer simultaneously receives and consumes the benefits provided by the Company as the Company performs during the term of the contract and the earning process is straight line.

(2)  Special listing services

The Company offers special listing services, consisting of a number of online and offline themed events, including industry forums, periodic updates and online promotions to its customers to promote their brands. The special listing services contain a number of defined but not identical or similar activities to be performed over the period of one year. These activities are to fulfill the special listing service and are not separate promises in the contract. The Company determines that each day of the promotion service is distinct because the customer can benefit from each increment of service on its own (that is, it is capable of being distinct) and each increment of service is separately identifiable because No day of service significantly modifies or customizes another and No day of service significantly affects either the Company's ability to fulfill another day of service or the benefit to the customer of another day of service. The Company determines that it is providing a series of distinct goods or services because the services provided each day are substantially the same, the customer simultaneously receives and consumes the benefits provided by the Company as the Company performs, and the same measure of progress would be used to measure the Company's progress toward satisfying its promise to provide the promotion services. Revenues of special listing services are recognized on a straight-line basis over the period of one year.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.     SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Value-added Services*

Value-added services consist of revenues derived from:

(1)  Data services

The Company derives revenues by providing access and analytics tools, including appraisal and rating modules, and city maps, based on its proprietary database of commercial real estate information, typically through a fixed monthly fee for its data services. The Company determines that the customer simultaneously receives and consumes benefits provided by the Company's performance as the Company performs during the term of the contract and the earning process is straight-line. Revenues from data services are recognized on a straight-line basis over the subscription period.

(2)  Analytics services

The Company derives revenues by providing customized research reports to customers. There are No contractual customer acceptance provisions. Revenues from customized research reports are recognized when the Company delivers the reports to customers, which is when the control over the report has been transferred to customers.

The Company provides data monitoring and survey services over a period of time, generally less than one year.Revenues are recognized on a straight-line basis over the term of the agreement since the customer simultaneously receives and consumes benefits provided by the Company's performance as the Company performs during the term of the contract and the earning process is straight-line.

*Financial Services*

The Company provides secured loans in the form of mortgage loans and unsecured loans, primarily to borrowers that meet the Company's credit assessment requirements. Revenues derived from loan interest income and annual service fees are recognized using the effective interest rate method. The Company does not accrue interest on loans receivable that are considered impaired or more than 90 days past due unless either the receivable has not been collected due to administrative reasons or the receivable is well secured and in the process of collection. Unsecured loans stop accruing interest when 60 days past due and are classified as impaired loan.

*E-Commerce Services*

E-commerce service revenues consist of revenues derived from:

(1) Fang membership services

For the years ended December 31, 2018 and 2019, the Company enters into arrangements with real-estate developers, pursuant to which the Company charges individual buyers who are interested to purchase specified properties from the real estate developers at a discount significantly greater than the face value of the fees charged by the Company. The discount is either a fixed amount or a fixed percentage to the price of the specified property. The fees paid by the individual buyers to the Company are refundable before a purchase of the specified properties is consummated by the individual buyers. Upon the successful purchase of the specified properties by the individual buyers, a portion of the proceeds from the Fang membership services is remitted to the real-estate developers or its designated marketing agents.

The Company determines real-estate developers as its customers and identifies one single performance obligation as the referral service. The Company determined the referral service to be satisfied at a point in time only when the purchase of the specified properties have been consummated by the individual buyers. Consideration payable to the real-estate developers or its designated marketing agents are accounted for as a reduction of the transaction price.

F-36

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.      SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

(2) Direct sales services

The Company promotes properties of its property developer customers primarily through its websites and mobile applications by providing the potential individual buyers with additional information about the properties and related services, such as tours to visit the properties and other services to facilitate property purchases. In return, the Company charges its property developer customers a fee for each property it sells at a predetermined percentage of the value of the individual transaction. The Company determines real-estate developers as its customers and identifies one single performance obligation as the referral service. The Company determined the referral service to be satisfied at a point in time only when the purchase of the specified properties have been consummated by the individual buyers. Revenues were recognized by the Company based on total of successful purchase transactions made.

(3) Sublease services

The Company identifies suitable properties and initially enters into lease agreements with the property owners. The lease agreements allow the Company to sublease the properties. Regardless whether the leased property is subsequently sub-leased by the Company, the lease agreement between the Company and the property owner remains in effect, including the Company's obligation to make fixed rental payments over the non-cancellable lease term. The property owner is not a party to, and therefore not entitled to, any rights or obligations under the sublease agreement. Sublease rental income is recorded as revenue from subleasing services and recognized on a gross basis. The sublease income is recognized on a straight-line basis over the lease term.

Sublease rental income for the years ended December 31, 2018 and 2019 was US$6,402 and US$1,145, respectively. In 2019, the Company ceased operation of the sublease services.

*Leads Generation Services*

The Company provides leads generation services to real estate developers, real estate agents and to a lesser extent, providers of products and services for home decoration and improvement. The Company's platform generates a list of sales leads regarding potential real estate consumers based on each customer's specific needs. The service fee is charged based on the number of sales leads delivered during a certain period of time. Revenue is recognized at a point in time upon the transfer of control of sales leads to customers.

*Contract Balances*

The timing of revenue recognition, billings and cash collections result in accounts receivable and contract liabilities (i.e. deferred revenue). Accounts receivable are recognized in the period when the Company has provided services to its customers and when its right to consideration is unconditional. The Company reviews the accounts receivable on a periodic basis and makes general and specific allowances when there is doubt as to the collectability of individual balances.

The Company maintains a general and specific allowance for doubtful accounts for estimated losses inherent in its accounts receivable portfolio. Accounts receivable balances with large creditworthy customers and balances which the Company has registered the pledge of the titles of real estate properties as collateral from customers are reviewed by management individually for collectability.  All other balances are reviewed on a pooled basis.  A percentage of general allowance is applied to the balances of accounts receivable in each aging category, excluding those which are assessed individually for collectability.  Management considers various factors, including historical loss experience, current market conditions, the financial condition of its debtors, any receivables in dispute, the fair value of real estate properties whose titles have been pledged as collateral, the aging of receivables and current payment patterns of its debtors, in establishing the required allowance. Accounts receivable balances are written off after all collection efforts have been exhausted.

Amounts collected on accounts receivable are included in net cash provided by operating activities in the consolidated statements of cash flows.

Deferred revenue (a contract liability) is recognized when the Company has an obligation to transfer goods or services to a customer for which the Company has received consideration from the customer, or for which an amount of consideration is due from the customer. The amounts of revenue recognized during the years ended December 31, 2018 and 2019 from the opening balance of deferred revenue as of January 1, 2018 and 2019, was US$46,652 and US$38,123, respectively. Decrease of deferred revenue during the year ended December 31, 2019, in the amount of US$27,120 was attributable to the spinoff of CIH on June 11, 2019.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.      SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Cost of Revenues*

Cost of revenues consists of employee costs, tax surcharges, rental costs incurred in relation to sublease services, server and bandwidth leasing fees, payments to third-party real estate agents and other direct costs incurred in providing the related services. Prior to January 1, 2018, VAT was also included in cost of revenues. These costs are expensed when incurred.

*Advertising Expenses*

Advertising expenses are expensed when incurred and are included in selling expenses in the consolidated statements of comprehensive income (loss). For the years ended December 31, 2017, 2018 and 2019, the advertising expenses charged to both continuing and discontinued operations were US$16,869, US$7,110 and US$11,478, respectively.

*Leases*

Leases are classified at the inception date as either a capital lease or an operating lease. A lease is a capital lease if any of the following conditions exists: (a) ownership is transferred to the lessee by the end of the lease term, (b) there is a bargain purchase option, (c) the lease term is at least 75% of the property's estimated remaining economic life or (d) the present value of the minimum lease payments at the beginning of the lease term is 90% or more of the fair value of the leased property to the lessor at the inception date. The Company does not have capital leases for any of the years presented.

Prior to January 1, 2019, payments made under operating lease, including land use rights, were charged to the consolidated statements of comprehensive income on a straight-line basis over the term of underlying lease.  Leases with escalated rent provisions are recognized on a straight-line basis commencing with the beginning of the lease term. There are No capital improvement funding, lease concessions or contingent rent in the lease agreements. The Company has No legal or contractual asset retirement obligations at the end of the lease term.

The company adopted ASC Topic 842, *Leases* ("ASC 842") on January 1, 2019, using a modified retrospective method for leases that exist at, or are entered into after, January 1, 2019, and has not recast the comparative periods presented in the consolidated financial statements. The adoption of ASC 842 requires the recognition of right-of-use assets and lease liabilities on the balance sheet for both operating and finance leases. The Company elected the package of practical expedients that not to reassess: (1) whether any expired or existing contracts are or contain leases, (2) lease classification for any expired or existing leases, and (3) initial direct costs for any expired or existing leases. The Company also elected the hindsight practical expedient to determine the reasonably certain lease term for existing leases. The Company used its estimated incremental borrowing rate based on information available at the date of adoption in calculating the present value of its existing lease payments. The following table summarizes the effect on the consolidated balance sheet as a result of adopting ASC 842.

| | As of December 31, 2018 US$ | Effect of Adoption US$ | As of January 1, 2019 US$ |
|---|---|---|---|
| Prepayments and other current assets | 27,894 | (254) | 27,640 |
| Other non-current assets | 4,558 | 36,803 | 41,361 |
| Land use rights | 33,153 | (33,153) | — |
| Accrued expenses and other liabilities | (118,924) | (1,668) | (120,592) |
| Other non-current liabilities | (150,837) | (1,728) | (152,565) |

Upon adoption of ASC 842, the lease liabilities are recognized upon lease commencement for operating leases based on the present value of lease payments over the lease term. The right-of-use assets are initially measured at cost, which comprises the initial amount of the lease liability adjusted for lease payments made at or before the lease commencement date, plus any initial direct costs incurred less any lease incentives received. As the rate implicit in the lease cannot be readily determined, the incremental borrowing rate at the lease commencement date is used in determining the imputed interest and present value of lease payments. The incremental borrowing rate was determined using a portfolio approach based on the rate of interest that the Company would have to borrow an amount equal to the lease payments on a collateralized basis over a similar term. The Company recognizes the single lease cost on a straight-line basis over the remaining lease term for operating leases.

F-38

Table of Contents

The Company has elected not to recognize right-of-use assets or lease liabilities for leases with an initial term of 12 months or less; expenses for these leases are recognized on a straight-line basis over the lease term. In addition, the Company has elected not to separate non-lease components (e.g., property management fees) from the lease components.

***Income Taxes***

The Company follows the liability method of accounting for income taxes, whereby deferred tax assets and liabilities are recognized based on the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases, and attributable to operating loss and tax credit carryforwards, if any. The Company reduces the carrying amounts of deferred tax assets by a valuation allowance, if based on the available evidence, it is "more-likely-than-not" that such assets will not be realized. Accordingly, the need to establish valuation allowances for deferred tax assets is assessed at each reporting period based on a "more-likely-than-not" realization threshold. This assessment considers, among other matters, the nature, frequency and severity of current and cumulative losses, forecasts of futures profitability, the duration of statutory carryforward periods, the Company's experience with operating loss and tax credit carryforwards, if any, not expiring.

The Company applies ASC 740, *Income taxes* ("ASC 740"), to account for uncertainties in income taxes. In accordance with the provisions of ASC 740, the Company recognizes in its financial statements the impact of a tax position if a tax return position or future tax position is "more-likely-than-not" to prevail based on the facts and technical merits of the position. Tax positions that meet the "more-likely-than-not" recognition threshold are measured at the largest amount of tax benefit that has a greater than fifty percent likelihood of being realized upon settlement.

The Company's estimated liability for unrecognized tax benefits, which is included in "other non-current liabilities", is periodically assessed for adequacy and may be affected by changing interpretations of laws, rulings by tax authorities, changes and/or developments with respect to tax audits, and expiration of the statutes of limitation. The outcome for a particular audit cannot be determined with certainty prior to the conclusion of the audit and, in some cases, appeal or litigation process. The actual benefits ultimately realized may differ from the Company's estimates. As each audit is concluded, adjustments, if any, are recorded in the Company's financial statements. Additionally, in future periods, changes in facts, circumstances, and new information may require the Company to adjust the recognition and measurement estimates with regard to individual tax positions. Changes in recognition and measurement estimates are recognized in the period in which the changes occur.

Interest and penalties arising from underpayment of income taxes are computed in accordance with the related PRC tax law. The amount of interest expense is computed by applying the applicable statutory rate of interest to the difference between the tax position recognized and the amount previously taken or expected to be taken in a tax return. Interest and penalties recognized in accordance with ASC 740 are classified in the consolidated statements of comprehensive income (loss) as income tax expense.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

2.      SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

*Government Grants*

Government grants primarily consist of financial subsidies received from provincial and local governments for operating a business in their jurisdictions and compliance with specific policies promoted by the local governments. For certain government grants, there are No defined rules and regulations to govern the criteria necessary for companies to receive such benefits, and the amount of financial subsidy is determined at the discretion of the relevant government authorities. The government grants of non-operating nature with No further conditions to be met are recorded as non-operating income in "Other income, net" when received. The government grants with certain operating conditions are recorded as liabilities when received and will be recorded as operating income when the conditions are met. Government grants related to the acquisition of property and equipment and land use rights are recorded as other non-current liabilities on the consolidated balance sheets when the grants become receivable, and recognized as other income in the consolidated statements of comprehensive income (loss) on a straight-line basis over the estimated useful lives of those assets. For the years ended December 31, 2017 ,2018 and 2019, US$3,025, US$1,224 and US$927 respectively, of government grants were recognized in the consolidated statements of comprehensive income (loss).

*Share-based Compensation*

The Company's employees and directors participate in the Company's share-based award incentive plan which is more fully discussed in Note 18. The Company applies ASC 718, *Compensation-Stock Compensation* ("ASC 718"), to account for its employee share-based payments. There were No share-based payments made to non-employees for any of the years presented.

In accordance with ASC 718, the Company determines whether a share option should be classified and accounted for as a liability award or an equity award. All grants of share-based awards to employees classified as equity awards are recognized in the financial statements based on their grant date fair values which are calculated using an option pricing model. All grants of share-based awards to employees and directors classified as liabilities are remeasured at the end of each reporting period with an adjustment for fair value recorded to the current period expense in order to properly reflect the cumulative expense based on the current fair value of the vested rewards over the vesting periods. The Company has elected to recognize compensation expense using the straight-line method for all employee equity awards granted with graded vesting based on service conditions, which were not subject to performance vesting conditions.

Meanwhile, the Company uses the accelerated attribution method for equity awards with performance conditions on a tranche-by-tranche basis based on the probable outcome of the performance conditions. To the extent the required vesting conditions are not met resulting in the forfeiture of the share-based awards, previously recognized compensation expense relating to those awards is reversed.

Cancellation of an award accompanied by the concurrent grant of a replacement award is accounted for as a modification of the terms of the cancelled award ("modified awards"). The compensation costs associated with the modified awards are recognized if the new vesting condition is achieved. Total recognized compensation cost for the awards is at least equal to the fair value of the awards at the grant date unless at the date of the modification the performance or service conditions of the original awards are not expected to be satisfied. The incremental compensation cost is measured as the excess of the fair value of the replacement award over the fair value of the cancelled award at the cancellation date. Therefore, in relation to the modified awards, the Company recognizes share-based compensation over the vesting periods of the replacement award, which comprises, (i) the amortization of the incremental portion of share-based compensation over the remaining vesting term and (ii) any unrecognized compensation cost of the original award over the original term.

In March 2016, the Financial Accounting Standards Board ("FASB") issued a new accounting standard update on simplifying the accounting for share-based payment transactions, including the income tax consequences, classification of awards as either equity or liabilities, and classification on the statement of cash flows. The new guidance also allows an entity to account for forfeitures when they occur. This guidance became effective for reporting periods beginning after December 15, 2016. The Company adopted this new guidance on January 1, 2017. In prior years, excess tax benefits were recognized in additional paid-in capital; tax deficiencies were recognized either as an offset to accumulated excess tax benefits, if any, or in the consolidated statement of comprehensive income (loss). Excess tax benefits were not recognized until the deduction reduces taxes payable.

Upon adoption, all excess tax benefits and tax deficiencies are recognized as income tax expense or benefit in the consolidated statement of comprehensive income (loss). This change was adopted prospectively and did not have a material impact on the Company's consolidated financial statements. The Company elected to account for forfeitures as they occur, rather than estimate expected forfeitures. These changes were adopted on a modified retrospective basis, and resulted in No material cumulative effect adjustment to retained earnings.

A modification to the terms of an award occurs in connection with the event of an equity restructuring (e.g. spin-off) result in the recognition of incremental compensation cost if there are changes in fair value, vesting conditions, or the classification of the award immediately before and after the restructuring. The incremental compensation, if any, is measured as the excess of the fair value of the post-modified award over the fair value of the award before the modification. In connection with spin-off transaction, when employees of the Company receive unvested equity instruments of the former subsidiary, or employees of the former subsidiary retain unvested equity instruments of the Company, compensation cost is recognized by the entity that receives the employee services regardless of which entity's equity instruments the employee holds.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.      SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Earnings (loss) per Share*

The Company computes earnings (loss) per Class A and Class B ordinary shares in accordance with ASC 260 *Earnings Per Share* ("ASC 260"), using the two class method. Under the provisions of ASC 260, basic net income (loss) per share is computed using the weighted average number of ordinary shares outstanding during the period except that it does not include unvested ordinary shares subject to repurchase or cancellation. Diluted net income per share is computed using the weighted average number of ordinary shares and, if dilutive, potential ordinary shares outstanding during the period. Potentially dilutive securities have been excluded from the computation of diluted net income per share if their inclusion is anti-dilutive. Potential ordinary shares consist of the incremental ordinary shares issuable upon the exercise of stock options, contracts that may be settled in the Company's stock or cash and the conversion of the convertible senior notes. The dilutive effect of outstanding stock options, restricted shares and convertible senior notes is reflected in diluted earnings per share by application of the treasury stock method and the if-converted method, respectively. The computation of the diluted net income per share of Class A ordinary shares assumes the conversion of Class B ordinary shares, while the diluted net income per share of Class B ordinary shares does not assume the conversion of those shares.

The liquidation and dividend rights of the holders of the Company's Class A and Class B ordinary shares are identical, except with respect to voting. The Class B ordinary shareholders do not have the legal ability to cause the Company's board of directors to declare unequal dividends to the holders of Class A and Class B ordinary shares. As a result, and in accordance with ASC 260, the undistributed earnings for each year are allocated based on the contractual participation rights of the Class A and Class B ordinary shares as if the earnings for the year had been distributed. As the liquidation and dividend rights are identical, the undistributed earnings are allocated on a proportionate basis. Further, as the conversion of Class B ordinary shares is assumed in the computation of the diluted net income per share of Class A ordinary shares, the undistributed earnings are equal to net income for that computation. For the purposes of calculating the Company's basic and diluted earnings per Class A and Class B ordinary shares, the ordinary shares relating to the options that were exercised are assumed to have been outstanding from the date of exercise of such options.

The Company uses income/(loss) from continuing operations as the control number in determining whether potential common shares are dilutive or antidilutive. That is, the same number of potential common shares used in computing the diluted per-share amount for income from continuing operations shall be used in computing all other reported diluted per-share amounts even if those amounts will be antidilutive to their respective basic per-share amounts.

In connection with spin-off transaction, the Company retrospectively presents the earnings (loss) from continuing operations per share and earnings (loss) from discontinued operations per share separately from earnings (loss) per share for all periods presented.

*Derivative Instruments*

ASC 815, *Derivatives and Hedging*, requires all contracts which meet the definition of a derivative to be recognized on the balance sheet as either assets or liabilities and recorded at fair value. Changes in the fair value of derivative financial instruments are either recognized periodically in earnings or in other comprehensive income (loss) depending on the use of the derivative and whether it qualifies for hedge accounting. Changes in fair values of derivatives not qualified as hedges are reported in earnings. The estimated fair values of derivative instruments are determined at discrete points in time based on the relevant market information.

*Comprehensive Income (Loss)*

Comprehensive income (loss) is defined as the change in equity of the Company during a period from transactions and other events and circumstances excluding transactions resulting from investments from owners and distributions to owners. Accumulated other comprehensive income (loss), as presented on the consolidated balance sheets, includes (i) the cumulative foreign currency translation adjustments, (ii) gains and losses on intra-entity foreign currency transactions that are of a long-term-investment nature (that is, settlement is not planned or anticipated in the foreseeable future) between consolidated entities (iii) changes in unrealized gains on available-for-sale debt securities. Comprehensive income (loss) also included changes in unrealized gains on available-for-sale equity securities for the year ended December 31, 2017, before the adoption of ASU 2016-01. In connection with the spin-off of foreign subsidiaries, the cumulative translation adjustment is reclassified as part of the net adjustment to shareholders' equity.

*Contingencies*

The Company records accruals for certain of its outstanding legal proceedings or claims when it is probable that a liability will be incurred and the amount of loss can be reasonably estimated. The Company evaluates, on a quarterly basis, developments in legal proceedings or claims that could affect the amount of any accrual, as well as any developments that would make a loss contingency both probable and reasonably estimable. The Company discloses the amount of the accrual if it is material.

Table of Contents

**FANG HOLDINGS LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.      SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

When a loss contingency is not both probable and estimable, the Company does not record an accrued liability but discloses the nature and the amount of the claim, if material. However, if the loss (or an additional loss in excess of the accrual) is at least reasonably possible, then the Company discloses an estimate of the loss or range of loss, if such estimate can be made and material, or states that such estimate is immaterial if it can be estimated but immaterial, or discloses that an estimate cannot be made. The assessments of whether a loss is probable or reasonably possible, and whether the loss or a range of loss is estimable, often involve complex judgments about future events. Management is often unable to estimate the loss or a range of loss, particularly where (i) the damages sought are indeterminate, (ii) the proceedings are in the early stages, or (iii) there is a lack of clear or consistent interpretation of laws specific to the industry-specific complaints among different jurisdictions. In such cases, there is considerable uncertainty regarding the timing or ultimate resolution of such matters, including eventual loss, fine, penalty or business impact, if any.

***Discontinued operations***

The Company considers whether the criteria of ASC 205-20, *Discontinued Operations*, has been met, which includes evaluating if the disposal of a component represents a strategic shift that has, or will have, a major effect on the Company.

When a component of the Company's business is expected to be disposed of other than by sale (for example, in a distribution to owners in a spin-off), the component shall continue to be classified as held and used until it is disposed of.  Upon distribution, the Company retrospectively presents the assets and liabilities of the discontinued operation separately from other assets and liabilities on the consolidated balance sheets, and the results of operations of the discontinued operation separately on the consolidated statements of comprehensive income (loss) for all periods presented.

***Recent accounting pronouncements***

In June 2016, the FASB issued ASU No. 2016-13 ("ASU 2016-13"),*Financial Instruments — Credit Losses (Topic 326), Measurement of Credit Losses on Financial Instruments.* ASU 2016-13 changes the impairment model for most financial assets and certain other instruments. The standard will replace "incurred loss" approach with an "expected loss" model for instruments measured at amortized cost. For available-for-sale debt securities, entities will be required to record allowances rather than reduce the carrying amount, as they do today under the other-than-temporary impairment model. The standard is effective for public business entities for annual periods beginning after December 15, 2019, and interim periods therein. Early adoption is permitted. The Company is currently evaluating the impact of adopting this standard on its consolidated financial statements.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.      SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurem*ent. ASU No. 2018-13 eliminates, adds and modifies certain disclosure requirements for fair value measurements. The amendments applicable to the disclosures of changes in unrealized gains and losses, the range and weighted average of significant unobservable inputs used to develop Level 3 fair value measurements, and the narrative description of measurement uncertainty should be applied prospectively for only the most recent interim or annual period presented in the initial year of adoption. This ASU is effective for all entities for fiscal years beginning after December 15, 2019, including interim periods therein. All other amendments should be applied retrospectively to all periods presented upon their effective date. Early adoption is permitted, and an entity is also permitted to early adopt any removed or modified disclosures and delay adoption of the additional disclosures until their effective date. The Company is in the process of evaluating the impact on its consolidated financial statements upon adoption.

**3.      CONCENTRATION OF RISKS**

*Concentration of Credit Risk*

Assets that potentially subject the Company to significant concentration of credit risk primarily consist of cash and cash equivalents, restricted cash, fixed-rate time deposits and structured note classified as short-term investments, accounts receivable, funds receivable, loans receivable and commitment deposits.

As of December 31, 2019, the Company had US$456,287 in cash and cash equivalents, restricted cash and fixed-rate time deposits classified as short-term investments, 95.9% and 4.1% of which were held by financial institutions in the PRC and financial institutions outside of the PRC, respectively. Under PRC law, it is generally required that a commercial bank in the PRC that holds third-party cash deposits protect the depositors' rights and interests over their deposited money; PRC banks are subject to a series of risk control regulatory standards; and PRC bank regulatory authorities are empowered to take over the operation and management of any PRC bank that faces a material credit crisis. In the event of bankruptcy of one of the financial institutions in which the Company has deposits or investments, it may be unlikely to claim its deposits or investments back in full. The Company selected reputable financial institutions with high credit ratings to deposit its assets. The Company regularly monitors the ratings of the financial institutions in case of any defaults. There has been No recent history of default in relation to these financial institutions.

As of December 31, 2019, the Company had US$103,879 of short-investment in structured note which is issued by Guotai Junan Financial Products Limited ("GTJA"), a financial institution in Hong Kong Special Administrative Region ("SAR"). The repayments of the principal and interests of the Company's bond received by GTJA are required to settle the structured note (see Note 5). The Company actively monitors the risks of default of its bond to limit the exposure to credit risk of the structured note.

Accounts receivable are typically unsecured and are derived from revenue earned from customers in the PRC. The risk with respect to accounts receivable is mitigated by credit evaluations the Company performs on its customers and its ongoing monitoring of outstanding balances. The Company regularly reviews the creditworthiness of its customers, and requires collateral from its customers in certain circumstances when accounts receivables become long overdue.

Funds receivable represent amounts due from third-party payment service providers. The Company carefully considers and monitors the credit worthiness of the third-party payment service providers to mitigate any risks associated with funds receivable.

The Company is exposed to default risk on its loans receivable. The Company assesses the allowance for credit loss related to loans receivable on a quarterly basis, either on an individual or collective basis. As of December 31, 2018 and 2019, No single borrower comprised a significant portion of the Company's loan portfolio.

The Company regularly reviews the creditworthiness of real estate developers, and requires collateral from real estate developers in certain circumstances when commitment deposits become overdue.

*Concentration of Customers*

There were No revenues from customers which individually represented greater than 10% of the total revenues for any of the years ended December 31, 2017, 2018 and 2019. There were No accounts receivable of customers which individually accounted for greater than 10% of the total accounts receivable as of December 31, 2018 and 2019.

*Current Vulnerability Due to Certain Other Concentrations*

The Company's operations may be adversely affected by significant political, economic and social uncertainties in the PRC. Although the PRC government has been pursuing economic reform policies for more than 30 years, No assurance can be given that the PRC government will continue to pursue such policies or that such policies may not be significantly altered, especially in the event of a change in leadership, social or political disruption or unforeseen circumstances affecting the PRC's political, economic and social conditions. There is also No guarantee that the PRC government's pursuit of economic reforms will be consistent or effective.

The Company almost transacts all of its business in RMB, which is not freely convertible into foreign currencies. On January 1, 1994, the PRC government abolished the dual rate system and introduced a single rate of exchange as quoted daily by the People's Bank of China (the "PBOC"). However, the unification of the exchange rates does not imply that the RMB may be readily convertible into United States dollars or other foreign currencies. All foreign exchange transactions continue to take place either through the PBOC or other banks authorized to buy and sell foreign currencies at the exchange rates quoted by the PBOC.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

3.      **CONCENTRATION OF RISKS (continued)**

Approval of foreign currency payments by the PBOC or other institutions requires submitting a payment application form together with suppliers' invoices, shipping documents and signed contracts. Additionally, the value of the RMB is subject to changes in central government policies and international economic and political developments affecting supply and demand in the PRC foreign exchange trading system market.

Internet and advertising related businesses are subject to significant restrictions under current PRC laws and regulations. Specifically, foreign investors are not allowed to own more than a 50% equity interest in any ICP business. In 2016, a foreign invested entity mainly owned and ultimately controlled by the WFOEs obtained the ICP to operate www.fang.com.

The Company conducts its operations in the PRC through contractual arrangements entered into between the WOFEs and the PRC Domestic Entities. The relevant regulatory authorities may find the current contractual arrangements and businesses to be in violation of any existing or future PRC laws or regulations. If the Company or any of its current or future PRC Domestic Entities or subsidiaries are found in violation of any existing or future laws or regulations, or fail to obtain or maintain any of the required permits or approvals, the relevant regulatory authorities would have broad discretion in dealing with such violations, including levying fines, confiscating the income of WOFEs, PRC Domestic Entities and the PRC Domestic Entities' subsidiaries, revoking the business licenses or operating licenses of WOFEs, PRC Domestic Entities and the PRC Domestic Entities' subsidiaries, shutting down the Company's servers or blocking the Company's websites, discontinuing or placing restrictions or onerous conditions on the Company's operations, requiring the Company to undergo a costly and disruptive restructuring, or enforcement actions that could be harmful to the Company's business. Any of these actions could cause significant disruption to the Company's business operations and severely damage the Company's reputation, which would in turn materially and adversely affect the Company's business and results of operations. In addition, if the imposition of any of these penalties causes the Company to lose the rights to direct the actives of PRC Domestic Entities or the Company's right to receive their economic benefits, the Company would No longer be able to consolidate the PRC Domestic Entities.

In addition, if the WOFEs, PRC Domestic Entities and the PRC Domestic Entities' subsidiaries or their shareholders fail to perform their obligations under the Contractual Agreements, the Company may have to incur substantial costs and expend resources to enforce the Company's rights under the contracts. The Company may have to rely on legal remedies under PRC law, including seeking specific performance or injunctive relief and claiming damages, which may not be effective. All of these Contractual Agreements are governed by PRC law and provide for the resolution of disputes through arbitration in the PRC. Accordingly, these contracts would be interpreted in accordance with PRC law and any disputes would be resolved in accordance with the PRC legal procedures. The legal system in the PRC is not as developed as in other jurisdictions, such as the United States. As a result, uncertainties in the PRC legal system could limit the Company's ability to enforce these Contractual Agreements. Under PRC law, rulings by arbitrators are final, parties cannot appeal the arbitration results in courts, and prevailing parties may only enforce the arbitration awards in PRC courts through arbitration award recognition proceedings, which would incur additional expenses and delay. In the event the Company is unable to enforce these Contractual Agreements, the Company may not be able to exert effective control over its PRC Domestic Entities, and the Company's ability to conduct its business may be negatively affected.

The Company believes that its corporate structure and Contractual Agreements of the Company's PRC Domestic Entities and WFOEs in China are in compliance with all existing PRC laws and regulations. Therefore, in the opinion of management, (i) the ownership structure of the Company and the PRC Domestic Entities are in compliance with existing PRC laws and regulations; (ii) the Contractual Agreements with PRC Domestic Entities and their nominee shareholder are valid and binding, and will not result in any violation of PRC laws or regulations currently in effect; and (iii) the Company's business operations are in compliance with existing PRC law and regulations in all material respects.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**4.**     **REVENUE**

The following table presents revenue disaggregated by nature of services:

| | For the Years Ended December 31, | |
| --- | --- | --- |
| | **2018** | **2019** |
| Marketing services | 98,377 | 94,639 |
| Listing services | 81,741 | 63,471 |
| Leads generation services | 21,303 | 43,300 |
| Financial services | 18,060 | 9,561 |
| Value-added services | 5,182 | 5,893 |
| E-commerce services | | |
| - Fang membership services | 2,752 | 634 |
| - Direct sales services | 5,294 | 869 |
| - Sub lease services | 6,402 | 1,145 |
| - Other | 936 | 199 |
| **Subtotal** | **15,384** | **2,847** |
| **Total revenues** | **240,047** | **219,711** |

The following table presents revenue disaggregated by categories of customers:

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | **2018** | **2019** |
| **Marketing services** | | |
| - New home (a) | 98,049 | 94,635 |
| - Suppliers of home furnishing and improvement | 328 | 4 |
| **Subtotal** | **98,377** | **94,639** |
| | | |
| **Listing services** | | |
| - Secondary and rental (b) | 81,442 | 63,379 |
| - Other | 299 | 92 |
| **Subtotal** | **81,741** | **63,471** |
| | | |
| **Leads generation services** | | |
| - New home (a) | 15,877 | 34,651 |
| - Secondary and rental (b) | 2,577 | 6,593 |
| - Suppliers of home furnishing and improvement | 2,849 | 2,056 |
| **Subtotal** | **21,303** | **43,300** |
| | | |
| **Financial services** | **18,060** | **9,561** |
| | | |
| **Value-added services** | **5,182** | **5,893** |
| | | |
| **E-commerce services** | | |
| - New home (a) | 8,046 | 1,503 |
| - Other | 7,338 | 1,344 |
| **Subtotal** | **15,384** | **2,847** |
| **Total revenues** | **240,047** | **219,711** |

---

(a)   New home business primarily consists of sales to residential property developers and their sales agents who are promoting newly developed properties for sale.

(b)   Secondary and rental business primarily consists of sales to real estate agents who are promoting secondary properties for sale or rental.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

5.   **INVESTMENTS**

Short-term investments and long-term investments consisted of the following:

| | As of December 31, | |
|---|---|---|
| | 2018 | 2019 |
| | US$ | US$ |
| **Short-term investments** | | |
| Trading securities | 1,773 | — |
| Fixed-rate time deposits | 14,270 | 89,457 |
| Call options | — | 1,384 |
| Structured note | — | 103,879 |
| | **16,043** | **194,720** |
| | | |
| Long-term investments: | | |
| Equity Investments with Readily Determinable Fair Values: | | |
| - Hopefluent Company Holdings Limited ("Hopefluent") | 30,733 | 23,418 |
| - Shenzhen World Union Properties Consultancy Co., Ltd. ("World Union") | 150,750 | 98,423 |
| | **181,483** | **121,841** |
| Equity Investments without Readily Determinable Fair Values: | | |
| - Guilin Bank | 47,664 | 46,892 |
| - Xian Chuangdian Quancheng Real Estate Consultant Limited ("Chuangdian") | 3,330 | 3,276 |
| - Tospur Real Estate Consulting Co., Ltd. ("Tospur") | 55,507 | 54,607 |
| - Foshan Nature Lvke Science | 729 | 717 |
| | **107,230** | **105,492** |
| Equity method investments | | |
| - Chongqing Wanli New Energy Co., Ltd. ("Wanli") | 84,520 | 87,874 |
| | **84,520** | **87,874** |
| | | |
| Equity method investments carried at fair value | | |
| - China Index Holdings Limited ("CIH") | — | 26,739 |
| | **—** | **26,739** |
| | **373,233** | **341,946** |

**Short-term investments**

As of December 31, 2018 and 2019, the Company held fixed-rate time deposits purchased from commercial banks and financial institutions with maturities of less than one year.

As of December 31, 2018, the Company held investments in PRC mutual funds in the amount of US$1,773, which were classified as trading securities as they were held principally for the purpose of selling in the near term. In 2018, the Company sold majority of such trading securities in the amount of US$11,705, and recognized a loss of US$2,091 as change in fair value of securities in the consolidated statements of comprehensive income (loss). In 2019, the Company disposed trading securities in the amount of US$1,648 and recognized a loss of US$116 as change in fair value of securities in the consolidated statements of comprehensive income (loss).

Interest income on the fixed-rate time deposits and cash and cash equivalents and restricted cash of US$11,052, US$10,202 and US$9,038 were recognized for the years ended December 31, 2017, 2018 and 2019, respectively.

The call options were granted by Next Decade Technology Limited and Media Partner Investments Limited (together the "Sellers") which are affiliated companies of Fang's executive chairman, Mr. Vincent Mo in conjunction with the Company's investment in the Class B ordinary shares of CIH in 2019.  Pursuant to the agreement, the Company has the right to request the Sellers to sell within the next 12 months, at a fixed price of USD5.99 per share, in aggregate up to 15 million ordinary shares of CIH. Since the call options were granted to the Company from its controlling shareholder's affiliates, they are considered a contribution by the shareholder and the fair value of the call option at grant date of US$693 was treated as contribution from shareholder and directly recorded as additional paid in capital. On December 27, 2019, the Company exercised a portion of the call options and acquired 5 million Class B ordinary shares of CIH from the Sellers. As of December 31, 2019, the fair value of the call option for the remaining 10 million ordinary shares of CIH was US$1,384. Total unrealized gain of US$1,149 was recorded in change in fair value of securities for the year ended December 31, 2019.

On October 29, 2019, Beijing Soufang Network Technology Co., Ltd. ("Beijing Soufang"), a PRC subsidiary of the Company, through a consolidated trust, purchased a 364 days RMB denominated structured note issued by GTJA in the total consideration of RMB720,000 (equivalent to US$102,009). The transaction cost related to the issuance of the structured note is US$796. In connection with the issuance of the structured note, GTJA purchased the 364 days RMB denominated short-term bond issued by the Company (the "Bond") in the total consideration of RMB720,000 (Note 12).  Pursuant to the agreement, all the repayments of the principal and interests of the Bond received by GTJA are required to settle the structured note with Beijing Soufang. The transfer of the structured note is subject to prior written consent of GTJA. The Company recognized the investment to the structured note at amortized cost.

**Long-term investments**

Dividends from the long-term investments of US$6,692, US$6,838 and US$2,759 were recognized as investment income in the consolidated statements of comprehensive income (loss) for the years ended December 31, 2017, 2018 and 2019, respectively.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**5.     INVESTMENTS (continued)**

**Equity Investments with Readily Determinable Fair Values**

On June 27, 2014, the Company acquired 27,551,733 shares of Color Life, a Hong Kong listed company, for US$13,583. The investment constituted a 2.76% ownership in Color Life and was classified as an available-for-sale security. In 2017, the Company sold 20,705,000 shares for a total consideration of US$12,317, and recognized a gain of US$2,110 in the consolidated statements of comprehensive income (loss). As of December 31, 2017, the market price of the remaining shares decline to US$4,554. Total fair value decrease of US$3,735 was recorded in other comprehensive income (loss) and US$2,110 gain related to the sale was reclassified out of accumulated other comprehensive income for the year ended December 31, 2017. On January 1, 2018, as a result of adoption of ASU 2016-01, the investment was reclassified as equity investment with readily determinable fair value.  In 2018, the Company sold 6,846,733 shares for a total consideration of US$6,645, and recognized a gain of US$2,091 in the consolidated statements of comprehensive income (loss).

In November 2014, the Company acquired an aggregate of 111,935,037 shares of Hopefluent, a Hong Kong listed company, for US$43,361. The investment constituted 17.26% ownership in Hopefluent and was classified as an available-for-sale security. In 2017, the Company sold 3,164,000 shares for a total consideration of US$1,614, and recognized a gain of US$626 in the consolidated statements of comprehensive income (loss). As of December 31, 2017, the market price of the remaining shares increased to US$47,729. Total fair value increase of US$18,309 was recorded in other comprehensive income and US$626 gain related to the sale was reclassified out of accumulated other comprehensive income for the year ended December 31, 2017. On January 1, 2018, as a result of adoption of ASU 2016-01, the investment was reclassified as equity investment with readily determinable fair value.  As of December 31, 2018 and 2019, the market price of the shares declined to US$30,733 and US$23,418, respectively. Total unrealized loss of US$16,996 and US$7,315 were recorded in change in fair value of securities for the years ended December 31, 2018 and 2019.

On May 29, 2015, the Company acquired an aggregate of 145,376,744 shares of World Union, a PRC listed company, at a total consideration of US$121,393. The investment constituted 10.06% ownership in World Union. The investment in World Union was classified as a cost method investment upon acquisition, as the Company could not freely sell the shares due to a lock-up provision of 36 months. On April 8, 2016, World Union declared a stock dividend whereby four shares were distributed to shareholders for every ten shares held. As a result, the Company's shareholding increased from 145,376,744 shares to 203,527,442 shares. As of December 31, 2017, as the lock-up restriction will terminate within one year, the classification of the investment changed from a cost method to an available for sale security, and the fair value of the investment was measured based on the market price, adjusted for the effect of the remaining restriction, in accordance with ASC 820. As of December 31, 2017, the fair value of World Union was US$318,065 and the related tax effect of US$49,566 were recorded in other comprehensive income for the year ended December 31, 2017. As of December 31, 2017 and 2018, the investment constituted 9.96% ownership in World Union. On January 1, 2018, as a result of adoption of ASU 2016-01, the investment was reclassified as equity investment with readily determinable fair value. As of December 31, 2018, the fair value of World Union was US$150,750, total fair value decrease of US$161,039 was recorded in change in fair value of securities for the year ended December 31, 2018. In 2019, the Company sold 20,429,640 shares for a total consideration of US$10,347, and recognized a loss of US$4,702 in the consolidated statements of comprehensive income (loss). As of December 31, 2019, the investment constituted 8.99% ownership in World Union and the market price of the remaining shares decreased to US$98,423. Total unrealized loss of US$35,417 was recorded in change in fair value of securities for the year ended December 31, 2019.

**Equity Investments without Readily Determinable Fair Values**

On October 29, 2015, the Company acquired 11.03% of the share capital of Sinedo, a non-listed company, for US$5,000. The investment in Sinedo was classified as a cost method investment, as the Company does not have significant influence over Sinedo and because there is No readily determinable fair value. During the years ended December 31, 2016 and 2017, the impairment loss of US$2,232 and US$2,768, respectively, was recorded in the statement of comprehensive income (loss) to write down the carrying value of its investment in Sinedo to nil as of December 31, 2017 as Sinedo's financial condition had deteriorated as evidenced by significant operating losses. On January 1, 2018, as a result of adoption of ASU 2016-01, the investment was reclassified as equity investment without readily determinable fair value, and measured at cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for identical or similar investments of the same issuer. There is No orderly transaction for an identical or a similar investment of Sinedo for the years ended December 31, 2018 and 2019. As of December 31, 2018 and 2019, the carrying value of investment in Sinedo is nil.

On July 12, 2016, 30,595,859 shares of Guilin Bank, a PRC non-listed company, was transferred by a third-party to repay a portion of its overdue receivables of US$12,173 owed to the Company. On September 25, 2017, additional 42,834,202 shares of Guilin Bank was transferred by the third-party in full satisfaction of its remaining overdue receivables of US$24,695 to the Company. In October 2017, the Company received 7,343,006 shares of Guilin Bank as a stock dividend and the Company's shareholding increased from 73,430,061 to 80,773,067. On January 1, 2018, as a result of adoption of ASU 2016-01, the investment was reclassified as equity securities without readily determinable fair values, as the Company does not have significant influence over Guilin Bank and because there is No readily determinable fair value. The Company accounts for the investment in Guilin Bank at cost, less any impairment, adjusted for observable price changes for the years ended December 31, 2018 and 2019. In 2018, Guilin Bank entered into a new financing agreement with a group of new investors. The new financing provided the observable price for the Company's investment. The Company evaluated this investment's carrying amount based on the observable price, and recognized a gain of US$10,633 in change in fair value of securities for the year ended December 31, 2018. The total investment constituted 1.79% and 1.62% ownership in Guilin Bank as of December 31, 2018 and 2019 respectively.  There is No orderly transaction for an identical or a similar investment of Guilin Bank for the years ended December 31, 2019. No impairment on the investment in Guilin Bank was recognized for the years ended December 31, 2018 and 2019.

The legal title of investment in Guilin Bank was held by a subsidiary of CIH in the PRC prior to the spinoff of CIH. Pursuant to the transfer agreement between the Company and CIH, CIH is required to transfer the legal title of investment in Guilin Bank to the Company after the spinoff. The Company assumes all the rights and obligations with respect to such assets. As of December 31, 2019, the transfer of the legal title is still in progress.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

On January 21, 2016, the Company acquired an aggregate of 4,411,765 shares of Chuangdian, which is listed on the National Equities Exchange and Quotations ("NEEQ") in the PRC, for a total consideration of US$3,294. As of December 31, 2017, the investment constituted 15% ownership in Chuangdian and was classified as a cost method investment, as the Company does not have significant influence and because there is No readily determinable fair value, as the breadth and scope of NEEQ is not comparable to equivalent U.S markets. The Company received 2,766,177 and 1,378,165 shares as dividends in 2016 and 2017, respectively.

**5.    INVESTMENTS (continued)**

On January 1, 2018, as a result of adoption of ASU 2016-01, the investment was reclassified as equity securities without readily determinable fair values. There is No orderly transaction for an identical or a similar investment of Chuangdian for the years ended December 31, 2018 and 2019. No impairment on the investment in Chuangdian was recognized for the years ended December 31, 2018 and 2019.

On December 10, 2014, the Company acquired 16% of the share capital of Tospur, a non-listed company, for US$62,257. The investment in Tospur was classified as a cost method investment, as the Company does not have significant influence over Tospur and because there is No readily determinable fair value. On January 1, 2018, as a result of adoption of ASU 2016-01, the investment was reclassified as equity securities without readily determinable fair values, and measured at cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for identical or similar investments of the same issuer. There is No orderly transaction for an identical or a similar investment of Tospur for the years ended December 31, 2018 and 2019. No impairment on the investment in Tospur was recognized for the years ended December 31, 2018 and 2019.

**Equity method investments**

In July 2018, the Company has entered into definitive agreements (the Agreement) to acquire a 10% equity interest in Chongqing Wanli New Energy Co., Ltd. ("Wanli"), a company listed on the Shanghai Stock Exchange, from a shareholder of Wanli for a cash consideration of US$72,852, of which US$29,141 will compensate the seller in connection with the Business Disposal (defined below). The difference between the cash consideration of the investment and the amount of underlying equity in net assets of Wanli was US$60,980 as of August 10, 2018, the closing date of the acquisition. In connection with the acquisition, the seller agrees (1) to enter into an irrevocable acting-in-concert agreement with a term of three years to adhere to the Company's action in Wanli's future meetings of shareholders and board of directors, (2) to purchase from Wanli its battery business for a price of No less than US$99,758 within three years after the consummation of the proposed acquisition (the "Business Disposal"), and (3) to ensure the profitability of Wanli measured by the lower of net profit or net profit excluding extraordinary items in three years subsequent to the Agreement. Following the consummation of the acquisition, the Company became the largest shareholder of Wanli.

During the years ended December 31, 2018 and 2019, the Company acquired additional 4.67% and 1.88% equity interest in Wanli through daily transactions in the secondary market with total consideration of US$11,667 and US$4,868, respectively. As at December 31, 2018 and 2019, the Company holds 14.67% and 16.55% equity interest in Wanli.

The investment is accounted for under equity method as the Company can exercise significant influence over operating and financial policies of Wanli.

**Equity method investments carried at fair value**

Between August and December 2019, the Company acquired 2.44% Class A ordinary shares in CIH through daily transactions in the secondary market with total consideration of US$9,600. On December 27, 2019, the Company exercised a portion of the call option received from Mr. Mo's affiliated entities and acquired 5 million Class B ordinary shares from the sellers in exchange for US$29,950. The fair value of the Company's investment in Class B ordinary shares in CIH was approximately US$16,800 as of December 27, 2019 based on its quoted closing price, adjusted for other input that is indirectly observable in the active market. Because Mr. Mo is both an employee and a shareholder of the Company, and the transaction is not commensurate to other non-employee shareholders, the excess of the consideration transferred, which includes the fair value of the call option exercised, over the fair value of the equity interest acquired in the amount of US$13,608 was recognized as compensation expenses in the consolidated statements of comprehensive income (loss) for the year ended December 31, 2019.

Each Class A ordinary share of CIH is entitled to one vote and each Class B ordinary share is entitled to ten votes. As at December 31, 2019, the Company aggregately holds 7.64% equity interest in CIH, and 16.95% voting interest.

The Company determines that it can exercise significant influence over operating and financial policies of CIH, by taking into considerations of 1) material transactions between the Company and CIH; 2) the outstanding call option to purchase additional shares of CIH. The Company elected fair value measurement for investment in CIH that would otherwise be accounted for under the equity method of accounting in accordance with ASC 825-10. As of December 31, 2019, the market price of the shares increased to US$26,739. Total unrealized gain of US$339 was recorded in change in fair value of securities for the year ended December 31, 2019.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

6.    ACCOUNTS RECEIVABLE

Accounts receivable and the related allowance for doubtful accounts were summarized as follows:

| | As of December 31, | |
| --- | --- | --- |
| | 2018 | 2019 |
| | US$ | US$ |
| Accounts receivable | 91,963 | 88,189 |
| Allowance for doubtful accounts | (33,276) | (21,810) |
| **Accounts receivable, net** | **58,687** | **66,379** |

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2018 | 2019 |
| | US$ | US$ | US$ |
| Movement in allowance for doubtful accounts: | | | |
| Balance at beginning of year | 34,366 | 31,127 | 33,276 |
| Additional provision charged to expenses | 31,695 | 28,050 | 9,026 |
| Write-offs | (38,351) | (23,442) | (19,909) |
| Foreign currency translation adjustments | 3,417 | (2,459) | (583) |
| **Balance at end of year** | **31,127** | **33,276** | **21,810** |

 The recoveries of amounts previously charged off were US$2,568 and US$1,651 in 2018 and 2019, respectively.

F-49

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**7.   PREPAYMENTS AND OTHER CURRENT ASSETS**

Prepayments and other current assets consisted of the following:

| | As of December 31, | |
| --- | --- | --- |
| | 2018 | 2019 |
| | US$ | US$ |
| Prepaid expenses | 5,971 | 2,862 |
| Advance to employees | 589 | 311 |
| Dividends receivable | — | 1,389 |
| Rental deposits and others | 2,324 | 1,105 |
| Interest receivable | 3,801 | 3,842 |
| Properties held for sale | 9,906 | 17,410 |
| Others | 5,303 | 4,590 |
| | 27,894 | 31,509 |

**8.   LOANS RECEIVABLE**

Beginning in August 2014, the Company initially provided secured and unsecured loans to both individuals and businesses, but ceased to provide loans to businesses by end of 2015. Loans made to individuals consist of loans secured by pledged properties for consumption and property renovations use, as well as unsecured loans.

**Secured loans**

As of December 31, 2018 and 2019, the duration of secured loans ranged from3 to 36 months, and had interest rates ranging from 7.8% to 18% per annum and 7.8% to 14.4% per annum, respectively. As of December 31, 2018 and 2019, the total outstanding balance is US$123,673 and US$58,754.

**Unsecured loans**

As of December 31, 2018 and 2019, the duration of unsecured loans ranged from 3to 36 months, and had interest rates ranging from 5.4% to 18% per annum and 7% to 21.6% per annum. As of December 31, 2018 and 2019, the total outstanding balance is US$4,007 and US$4,641.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**8.    LOANS RECEIVABLE (continued)**

The Company assesses the allowance for credit loss related to loans receivable on a quarterly basis, either on an individual or collective basis. The Company considers various factors in evaluating loans receivable for possible impairment on an individual basis. These factors include the amount of the loan, historical experience, value of collateral, if any, credit quality and age of the receivables balances. This evaluation is inherently subjective as it requires material estimates that may be susceptible to significant revision as more information becomes available. When the evaluation indicates that it is probable that the scheduled interest and principal payments due per the loan agreement are unlikely to be collected, such loan receivable is considered impaired. Impairment is measured on an individual loan basis using either the present value of expected future cash flows discounted at the loan's effective interest rate or the fair value of the collateral if the loan is secured. The Company evaluates the remainder of its loans receivables portfolio for impairment on a collective basis in accordance with ASC 450-20, *Loss Contingencies*, and records an allowance for credit loss at the portfolio level. When evaluating the loans receivable on a collective basis, the Company applies a formula-based percentage utilizing historical loss data to calculate the collective allowance.

The Company's internal credit risk ratings are categorized into three categories: pass, special attention and non-performing. A "pass" rating represents the highest quality loans receivable. Typically, the Company considers loans receivable with a risk rating of non-performing to be fully impaired, or up to the fair value of collateral, if any.

The Company derives internal credit risk rating by taking into consideration various customer-specific factors, such as the Company's specific historical experience with the borrower. Such credit risk rating is updated when facts or circumstances change. Loans receivable are written off at the point when they are considered uncollectible, and all outstanding balances, including any previously earned but uncollected interest income, will be reversed and charged against the allowance for credit loss.

The internal credit risk rating considerations are as follows:

● Pass: Loans for which borrowers are expected to honor the terms of the contracts. There are No indicators to question the borrowers' ability to repay the principal and accrued interest in full and on a timely basis.

● Special attention: Loans for which borrowers are currently able to repay the principal and No interests are accrued when considered impaired or overdue more than 90 days, the repayment of loans might be adversely affected by some factors.

● Non-performing: Loans for which borrowers may not able to repay the principal and accrued interest in full. These loans are fully provided for unless secured by collateral

The Company does not accrue interest on loans receivable that are considered impaired or more than 90 days past due unless either the receivable has not been collected due to administrative reasons or the receivable is well secured and in the process of collection. After an impaired loans receivable has been placed on nonaccrual status, interest will be recognized when cash is received on a cash basis method-cost recovery. A loan receivable may be returned to accrual status after all of the borrower's delinquent balances of principal and interest have been settled, and the borrower remains current for an appropriate period. The outstanding balance of nonaccrual loans as of December 31, 2018 and 2019 were US$5,749 and US$11,198.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**8.     LOANS RECEIVABLE (continued)**

A summary of the Company's loans receivables is presented as follows:

| | As of December 31, 2018 US$'000 | As of December 31, 2019 US$'000 |
|---|---|---|
| Personal loans | 127,680 | 63,395 |
| **Total Loans receivable** | **127,680** | **63,395** |
| | | |
| Allowance for loan losses | | |
| Individually assessed | 546 | 538 |
| Collectively assessed | 3,283 | 2,367 |
| **Loans receivable, net** | **123,851** | **60,490** |
| | | |
| Current portion | 117,602 | 60,490 |
| Non-current portion | 6,249 | — |

Analysis of loans by credit quality indicator

The following table summarizes the Company's loan portfolio by credit quality indicator as of December 31, 2018 and 2019, respectively:

| Internal credit risk rating | As of December 31, 2018 US$ | % US$ | As of December 31, 2019 | % |
|---|---|---|---|---|
| Pass | 121,931 | 96.0 | 52,197 | 82.3 |
| Special attention | 1,383 | 1.0 | 1,873 | 3.0 |
| Non-performing | 4,366 | 3.0 | 9,325 | 14.7 |
| **Total** | **127,680** | **100** | **63,395** | **100** |

The following tables represent the aging of loans by portfolio segment as of December 31, 2018 and 2019, respectively:

| As of December 31, 2019 | 90-179 days past due US$'000 | 180-365 days past due US$'000 | Over 1 year past due US$'000 | Total US$'000 | Current US$'000 | Total loans US$'000 |
|---|---|---|---|---|---|---|
| Personal loans | 2,283 | 2,669 | 4,998 | 9,950 | 53,445 | 63,395 |
| **Total** | **2,283** | **2,669** | **4,998** | **9,950** | **53,445** | **63,395** |

| As of December 31, 2018 | 90-179 days past due US$'000 | 180-365 days past due US$'000 | Over 1 year past due US$'000 | Total US$'000 | Current US$'000 | Total loans US$'000 |
|---|---|---|---|---|---|---|
| Personal loans | 1,717 | 164 | 3,345 | 5,226 | 122,454 | 127,680 |
| **Total** | **1,717** | **164** | **3,345** | **5,226** | **122,454** | **127,680** |

F-52

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**8.    LOANS RECEIVABLE (continued)**

Allowance for loan losses

The following tables present the activity in the allowance for loan losses in loans receivable by loan portfolio as of and for the years ended December 31, 2017, 2018 and 2019, respectively:

| Personal Loans | For the year ended December 31, | | |
|---|---|---|---|
| | 2017 | 2018 | 2019 |
| Beginning balance | 3,736 | 4,916 | 3,829 |
| Provision | 1,180 | 2,776 | 3,737 |
| Reversal | — | (3,660) | (4,610) |
| Foreign currency translation adjustments | — | (203) | (51) |
| Ending balance | 4,916 | 3,829 | 2,905 |
| Ending balance: individually evaluated for impairment | 574 | 546 | 538 |
| Ending balance: collectively evaluated for impairment | 4,342 | 3,283 | 2,367 |
| Loans | | | |
| Of which individually evaluated for impairment | 4,377 | 546 | 538 |
| Of which collectively evaluated for impairment | 144,551 | 127,134 | 62,857 |

**9.    PROPERTY AND EQUIPMENT, NET**

Property and equipment consisted of the following:

| | As of December 31, | |
|---|---|---|
| | 2018 | 2019 |
| | US$ | US$ |
| Buildings | 723,882 | 741,700 |
| Office equipment | 23,587 | 21,227 |
| Motor vehicles | 1,503 | 1,243 |
| Leasehold improvement | 22,034 | 17,366 |
| Land | 50,731 | 50,731 |
| Total | 821,737 | 832,267 |
| Less: Accumulated depreciation | (128,569) | (147,984) |
| Construction in progress | 34,571 | 11,174 |
| | 727,739 | 695,457 |

F-53

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

9.      PROPERTY AND EQUIPMENT, NET (continued)

Depreciation of property and equipment and amortization of land use rights charged to continuing and discontinued operations were US$27,961 and US$26,735 for the years ended December 31, 2017 and 2018, respectively. Depreciation of property and equipment charged to continuing and discontinued operations was US$25,247 for the year ended December 31, 2019.

As of December 31, 2019, the Company is still in the process of obtaining the property ownership certificates for certain buildings with aggregate net carrying values of US$69,907.

As of December 31, 2019, certain buildings with aggregate net carrying value of US$458,921 were pledged for bank borrowings.

F-54

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**10.    OTHER NON-CURRENT ASSETS**

Other non-current assets consisted of the following:

|  | As of December 31, | |
|---|---|---|
|  | **2018** | **2019** |
|  | **US$** | **US$** |
| Right of use assets | — | 36,269 |
| Rental and other deposits | 1,946 | 382 |
| Others | 2,612 | 2,528 |
| Other non-current assets, net | **4,558** | **39,179** |

The right of use assets and the amortization were summarized as follows:

|  | As of December 31, 2019 |
|---|---|
|  | **US$** |
| Right of use assets | 38,780 |
| Less: accumulated amortization | (2,511) |
| **Right of use assets** | **36,269** |

Cash paid for amounts included in the measurement of operating lease liabilities was US$1,807 for the year ended December 31, 2019. Non-cash transaction amount of lease liabilities arising from acquisition of right-of-use assets was US$2,501.

Operating lease expense was allocated to the following expense items:

|  | For the Year Ended December 31, 2019 |
|---|---|
|  | **US$** |
| Cost of revenues | 374 |
| General and administrative expenses | 951 |
| Selling and marketing expenses | 1,367 |
| Total operating lease expenses | 2,692 |
| Short-term lease expenses | 2,340 |
| Total lease expenses | 5,032 |

The weighted average remaining lease term excluding land-use right as of December 31, 2019 was 1.37 years, and the weighted average discount rate of the operating leases was 6%.

F-55

Table of Contents

Maturities of the lease liabilities as of December 31, 2019 were as follows:

| For the Year Ended December 31 | US$ |
|---|---|
| 2020 | 2,533 |
| 2021 | 1,296 |
| 2022 | 667 |
| 2023 and thereafter | — |
| **Total undiscounted lease payments** | **4,496** |
| Less: Imputed interest | (275) |
| **Present value of lease liabilities balance** | **4,221** |
| Amounts due within 12 months | 2,361 |
| Long-term lease liabilities | 1,860 |

## 11.    SHORT-TERM AND LONG-TERM LOANS

Short-term and long-term loans consisted of the following:

| | As of December 31, | |
|---|---|---|
| | 2018 | 2019 |
| | US$ | US$ |
| Short-term loans and current portion of long-term loans | 297,811 | 264,624 |
| Long-term loans, less current portion | 123,215 | 184,158 |

Short-term loans as of December 31, 2018 and 2019 represents US$ denominated bank borrowings of US$190,000 and US$190,000, respectively obtained from financial institutions in the United States and the current-portion of long-term loans of US$107,811 and US$74,624, respectively. The short-term loan of US$190,000 are repayable on demand and bear interest rates of 3-month London Interbank Offered Rate ("LIBOR") plus 1.30% (2018: 3-month LIBOR plus 1.25%). The short-term bank borrowings were secured by RMB denominated bank deposits placed with financial institutions in the PRC of US$245,474 and US$215,377 as of December 31, 2018 and 2019, respectively, and were classified as restricted cash, current on the consolidated balance sheets. The weighted average interest rate for the short-term borrowings for the years ended December 31, 2018 and 2019 was approximately 3.64% and 3.69%, respectively.

The long-term loan of US$31,353 and US$30,578 as of December 31, 2018 and 2019 represents US$ denominated bank borrowing obtained from financial institutions in the United States. The long-term loan is repayable by installments from December 1, 2017 to November 11, 2027 and bears interest rate of 4.1% for the first 3 years; thereafter the interest rate will be floating at Industrial and Commercial Bank of China (USA) NA Prime plus 1.0%. US$3,218 and US$813 of the bank loan were re-classified to short term loans because they were repayable within twelve months as of December 31, 2018 and 2019. The loan is secured by land and building in the United States with carrying value of US$54,973 as of December 31, 2019. Certain bank account was funded from the loan proceeds and was restricted for use to pay for the tenant improvements of the collateral property and the loan payments. As of December 31, 2018 and 2019, the balance of the account of US$5,989 and US$5,983 were classified as restricted cash (non-current) on the consolidated balance sheets.

F-56

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**11.    SHORT-TERM AND LONG-TERM LOANS, LESS CURRENT PORTION (continued)**

The long-term loans of US$70,640 and US$60,529 as of December 31, 2018 and 2019 represent RMB denominated bank borrowings from financial institutions in China for the purchase of buildings in Beijing, PRC. The long-term loans are repayable by installments from September 23, 2016 to September 22, 2026 and bear interest rate of 4.9%. As of December 31, 2018 and 2019, US$70,640 and US$60,529 of the bank loans were classified as short term loans because the Company did not meet certain loan covenants. Even though the Company obtained a waiver from the lender indicating that the lender permanently gave up its right to demand payment as a result of the violation as of December 31, 2019, the loan was classified as current because without the waiver, the Company would be in default at the December 31, 2019 balance sheet date and it is probable that the Company will be unable to comply with all provisions of the debt agreement for a period of one year from the balance sheet date. The loans were secured by building in the PRC with carrying value of US$206,449 as of December 31, 2019.

The long-term loan of US$19,644 and US$16,983 as of December 31, 2018 and 2019 represent RMB denominated bank borrowings from financial institutions in China for the purchase of buildings in Wuhan, PRC. The long-term loan is repayable by installments from March 21, 2017 to March 21, 2027 and bears interest rate of 4.9%. As of December 31, 2018 and 2019, US$2,381 and US$2,342 of the bank loan were re-classified to short term loans because it was repayable within twelve months. The loan was secured by bank balance of US$1,433, accounts receivable with carrying amount of US$324 and building in the PRC with carrying value of US$43,298 as of December 31, 2019.

The long-term loan of US$45,315 and US$40,009 as of December 31, 2018 and 2019 represent RMB denominated bank borrowings from financial institutions in China for the purchase of buildings in Chongqing, PRC. The long-term loan is repayable by installments from August 2, 2018 to August 1, 2028 and bears floating interest rate at 25% above long-term People's Bank of China benchmark rate ("PBOC rate")  (2018: 40% above PBOC rate).As of December 31, 2018 and 2019, US$4,764 and US$4,572 of the bank loan was re-classified to short term loans because it was repayable within twelve months. The loan was secured by buildings in the PRC with carrying value of US$89,660 as of December 31, 2019.

The long-term loan of US$37,266 and US$37,573 as of December 31, 2018 and 2019 represent US$ denominated bank borrowing obtained from financial institutions in Taiwan. The principal of the long-term loan, in the amount of US$40,000, is repayable by 10% on October 23, 2020 and by 90% on October 23, 2023. The loan bears an annual interest rate of 2.35% plus LIBOR of three months. US$2,820 was paid to the bank as service charges and accounted for as reduction of the long-term loan. As of December 31, 2018 and 2019, nil and US$4,000 of the bank loan were re-classified to short term loans because it was repayable within twelve months. The loan was secured by building in the United States with carrying value of US$7,802 as of December 31, 2019. Certain bank account was restricted for use to pay for interest payments. As of December 31, 2019, the balance of the account of US$1,105 was classified as restricted cash (non-current) on the consolidated balance sheets. The Company met certain covenants in the loan agreement.

The long-term loan of US$43,003 as of December 31, 2019 represents RMB denominated bank borrowings from financial institutions in China. The long-term loan is repayable by installments from March 5, 2020 to April 22, 2029 and bears interest rate of 5.98%. US$2,365 of the bank loan was re-classified to short term loans because it was repayable within twelve months. The loan was secured by buildings in the PRC with carrying value of US$56,739 and an RMB denominated bank deposits placed with financial institutions in the PRC of US$984, as of December 31, 2019.

The long-term loan of US$30,107 as of December 31, 2019 represents RMB denominated bank borrowing obtained from financial institutions in China. The long-term loan is repayable by installments from February 27, 2020 to August 23, 2021 and bears floating interest rate at 5% above two-year People's Bank of China benchmark rate. US$3 of the bank loan was re-classified to short term loans because it was repayable within twelve months. The bank borrowing was secured by RMB denominated bank deposits placed with financial institutions in the PRC of US$33,931 as of December 31, 2019, and was classified as "restricted cash, non-current" on the consolidated balance sheets.

**12.    SHORT-TERM BOND PAYABLE**

On October 29, 2019, Fang issued a 364 days RMB denominated bond ("Bond") at par in the amount of RMB720,000 (equivalent to US$102,009) with an annual interest rate of 4.8%. The issuance cost was US$528. The Company's investment in ordinary shares of Hopefluent in the amount of US$23,418 was pledged as collateral for the Bond.

**13.    ACCRUED EXPENSES AND OTHER LIABILITIES**

Accrued expenses and other liabilities consisted of the following:

|  |  | As of December 31, | |
|---|---|---|---|
|  |  | **2018** | **2019** |
|  |  | **US$** | **US$** |
| Payroll and welfare benefit |  | 5,578 | 17,655 |
| Other taxes and surcharges payable | (1) | 38,935 | 30,527 |
| Amounts payable to employees |  | 2,269 | 2,311 |
| Amounts payable to sales and marketing agents |  | 30,934 | 25,364 |
| Interest payables |  | 1,585 | 4,155 |
| Utility and property management payables |  | 6,538 | 6,508 |
| Construction payables |  | 3,216 | 3,869 |
| Amounts due to foremen and suppliers of decoration services |  | 2,562 | 2,115 |
| Deposits for rental |  | 7,683 | 3,941 |
| Cash incentives payable to home buyers | (2) | 5,893 | 5,378 |
| Lease liability, current |  | — | 2,361 |
| Others |  | 13,731 | 16,060 |
|  |  | **118,924** | **120,244** |

(1)    Other taxes and surcharges payable consist of VAT, cultural construction fee ("CCF"), city construction tax ("CCT") and withholding individual income tax ("IIT").

(2)    Cash incentives payable to home buyers, are payable when home buyers successfully purchase new properties through the Company's platform and successfully registers on the Company's website.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**14.    CONVERTIBLE SENIOR NOTES**

On December 4, 2013, the Company issued US$400,000, including an US$50,000 overallotment option (the "Overallotment Option") which was exercised on January 3, 2014, of convertible senior notes which would mature on December 15, 2018 (collectively the "December 2018 Notes"). The total net proceeds from the December 2018 Notes were US$390,455. The investors may convert the December 2018 Notes to Class A ordinary shares at any time in whole or in part at specified conversion prices. The conversion rate for the December 2018 Notes was initially 9.6839 ADSs per US$1,000 principal amount of notes (equivalent to an initial conversion price of approximately US$103.26 per ADS), subject to adjustment as described in the respective Subscription Agreement.

Investors of the December 2018 Notes had the right to require the Company to repurchase for cash all or part of their notes on December 15, 2016, and this was exercised accordingly. The Company repurchased a total of US$394,300 of the December 2018 Notes, which represents approximately 98.6% of the outstanding principal amount of the Notes prior to such repurchase. In 2018, upon maturity, the Company repurchased the remaining balance of US$5,700 of the December 2018 Notes.

On September 24, 2015, the Company issued (i) 3,418,803 Class A ordinary shares for US$100,000 and (ii) US$100,000 of convertible notes which will mature on September 24, 2022 (the "September 2022 Notes") to Safari Company ("Safari"). The Safari Company is beneficially owned by the Carlyle Company ("Carlyle") (72%) and Ateefa Limited, a company owned by Vincent Tianquan Mo (28%). A representative of Carlyle is entitled to hold a seat on the Company's board of directors so long as Carlyle continues to beneficially own at least 1% of the Company's total outstanding share capital calculated on a fully-diluted basis. The total net proceeds from the Class A ordinary shares and the September 2022 Notes were US$199,645. The investors may convert the September 2022 Notes to Class A ordinary shares at any time in whole or in part at specified conversion prices. The conversion rate for the September 2022 Notes is initially 27.9086 Class A Shares per US$1,000 principal amount of the Note (equivalent to an initial conversion price of approximately US$35.83 per Class A Share), subject to adjustment as described in the respective Subscription Agreement.

On November 4, 2015, the Company issued (i) an aggregate of 8,436,581 Class A shares for a total consideration of US$246,770 and (ii) US$200,000 of convertible notes which will mature on November 3, 2022 (the "November 2022 Notes") to IDG Alternative Global Limited ("IDG Alternative"). IDG Alternative is owned as to 72.53% by IDG Maximum Financial Limited, a British Virgin Islands company, and as to 27.47% by Deanhale Limited, a British Virgin Islands company wholly owned by Mr Mo. IDG Maximum Financial Limited is affiliated with IDG-Accel China Capital GP Associates Ltd. and IDG China Capital Fund GP III Associates Ltd. The total net proceeds from the Class A ordinary shares and the November 2022 Notes were US$446,059. The investors may convert the November 2022 Notes to Class A ordinary shares at any time in whole or in part at specified conversion prices. The conversion rate for the November 2022 Notes is initially 27.9086 Class A Shares, representing Class A ordinary shares at par value HK$1.00 per share, per US$1,000 principal amount of the Note (equivalent to an initial conversion price of approximately US$35.83 per Class A Share), subject to adjustment as described in the respective Subscription Agreement.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**14.    CONVERTIBLE SENIOR NOTES (continued)**

On October 25, 2018, the Company and IDG Alternative entered into a Note Repurchase Agreement ("October 25, 2018 Note Repurchase") pursuant to which the Company issued five replacement notes in the total amount of US$150,000 to the same note holder ("New November 2022 Notes"), together with US$38,860 paid in cash in satisfaction of the November 2022 Notes.  The New November 2022 Notes have the same terms as the November 2022 Notes, except for the change of principal amount from US$200,000 to US$150,000.

Subsequent to the issuance of the New November 2022 Notes, IDG Alternative sold four out of the five New November 2022 Notes, in aggregate of US$95,060, to four different note holders. IDG Alternative also entered into an amendment to shareholder agreement with Deanhale Limited. Pursuant to the amendment and satisfaction of conditions set out in the amendment, the remaining US$54,940 New November 2022 Note is beneficially owned by Deanhale Limited.

In connection with the separation and distribution, on June 11, 2019, CIH agreed to issue a warrant to each of the holders of the September 2022 Notes and the New November 2022 Notes , which entitled them to purchase for nominal consideration such number of CIH's Class A ordinary shares as calculated based on the number of the Company's Class A ordinary shares upon the assumed conversion of the convertible notes immediately prior to or on the record date if and only if such holders subsequently decide to convert the convertible notes. The holders will be able to purchase up to 6,977,150 Class A ordinary shares in the aggregate based on the initial conversion rate into Fang's Class A ordinary shares and a one-for-one distribution rate into CIH's Class A ordinary shares. In the event that holders subsequently decide not to convert the convertible notes, and instead, demand payment of principal and accrued interest upon maturity of the convertible notes, the warrant will be canceled and the right to purchase CIH's Class A ordinary shares will be forfeited. In addition, CIH also agreed to provide a guarantee for the benefit of the holders, under which the CIH is liable to the payment obligations under the convertible notes in the event that the Company fails to discharge its primary payment obligations under the convertible notes or certain circumstances relating to CIH, including, among others, change-in-control transactions or certain fundamental changes to CIH's share capital.

On October 28, 2019 ("October 28, 2019 Note Repurchase"), the Company entered into a Note Repurchase Agreement pursuant to which the Company redeemed the US$54,940 New November 2022 Note beneficially owned by Mr. Mo for a consideration of US$54,940 plus $73 equal to all the accrued and unpaid interest on the repurchase date.

On December 31, 2019 ("December 31, 2019 Note Repurchase"), the Company and Safari entered into a Note Repurchase Agreement pursuant to which the Company redeemed the September 2022 Note in the principal amount of US$28,000 for a consideration of US$28,000 plus $105 equal to all the accrued and unpaid interest on the repurchase date. The US$28,000 note was beneficially owned by Mr. Mo prior to the repurchase.

The December 2018 Notes, the September 2022 Notes, the November 2022 Notes and the New November 2022 Notes bear interest at the rate of 2.00%, 1.50%, 1.50% and 1.50% per annum, respectively, payable semi-annually. The December 2018 Notes, September 2022 Notes, November 2022 Notes and New November 2022 Notes are collectively referred to as the "Notes".

The Notes are senior unsecured obligations and rank (i) senior in right of payment to any of the Company's indebtedness that is expressly subordinated in right of payment to the Notes; (ii) equal in right of payment to any of the Company's unsecured indebtedness that is not so subordinated; (iii) effectively junior in right of payment to any of the Company's secured indebtedness to the extent of the value of the assets securing such indebtedness; and (iv) structurally junior to all indebtedness and other liabilities of the subsidiaries or consolidated controlled entities of the Company.

The issuance costs of US$9,545, US$355 and US$711 of the December 2018 Notes, the September 2022 Notes and the November 2022 Notes, respectively, were amortized as interest expense using the effective interest rate method through the maturity date of the respective Notes.

The principal amount and unamortized premium as of December 31, 2018 and 2019 were as follows:

|  | As of December 31, | |
|---|---|---|
|  | 2018 | 2019 |
|  | US$ | US$ |
| Principal amount | 250,000 | 167,060 |
| Unamortized premium | 4,435 | 1,869 |
|  | 254,435 | 168,929 |

The effective interest rate was 2.86%, 1.56%, 2.46% and 0.69% for the December 2018 Notes, the September 2022 Notes, the November 2022 Notes and the New November 2022 Notes, respectively. For the years ended December 31, 2017, 2018 and 2019, the Company recognized interest expense related to the Notes of US$6,395, US$6,154 and US$2,848, respectively.

*Accounting treatment*

The Notes were originally recorded as long-term debt. The conversion option was not required to be bifurcated because the conversion options of the December 2018 Notes, the September 2022 Notes, the New November 2022 Notes are indexed to the Company's ADSs and Class A ordinary shares, respectively, and meet all additional conditions for equity classification. Since the conversion options were not required to be bifurcated, the Company then determined if there were any beneficial conversion features ("BCF") in accordance with ASC 470-20. The Company assessed the embedded conversion option feature of the December 2018 Notes and the September 2022 Notes and concluded that there is No BCF because the effective conversion price of the December 2018 Notes and the September 2022 Notes exceeded the fair value of the Company's ADSs and Class A ordinary shares at their respective commitment dates. For the November 2022 Notes, the Company recognized a BCF of US$12,113 through a credit to additional paid-in capital because the fair value per Class A ordinary share of US$38.00 exceeded the most favorable conversion price of US$35.83 at the commitment date on November 4, 2015. The resulting discount of US$12,113 to the November 2022 Notes is then accreted to the redemption value as interest expense using the effective interest method through the consolidated statements of comprehensive income (loss) over the term of the November 2022 Notes. The Company did not reassess the BCF upon the exchange of the November 2022 Notes with the New November 2022 Notes since the exchange is not accounted for as an extinguishment.

In connection with the make-whole fundamental change provision within the Notes agreements, the number of ADSs and Class A ordinary shares issuable upon conversion of the Notes will be increased if the Holders decide to convert. As (i) the fair value of the ADSs into which the December 2018 Notes is convertible plus the make-whole ADSs and (ii) the fair value of the Class A ordinary shares into which the September 2022 Notes, the November 2022 Notes and the New November 2022 Notes are convertible plus the make-whole Class A ordinary shares, respectively, do not approximate the fair value at the settlement date, the make-whole features are not indexed to the Company's ADSs for the December 2018 Notes and Class A ordinary shares for the September 2022, the November 2022 Notes and the New November 2022 Notes, and are required to be bifurcated. The fair values of the make-whole features were insignificant for the years ended December 31, 2017, 2018 and 2019.

F-60

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**14.    CONVERTIBLE SENIOR NOTES (continued)**

The Company evaluated the embedded contingent redemption features contained in the Notes in accordance with ASC 815*Derivatives and Hedging*. The contingent redemption features were not required to be bifurcated because they are considered to be clearly and closely related to the debt host, as the Notes were not issued at a substantial discount and are puttable at par.

The Company evaluated the contingent interest features contained in the Notes in accordance with ASC 815 to determine if these features require bifurcation. Certain embedded contingent interest features are not considered to be clearly and closely related to the debt host and met the definition of a derivative. Accordingly, these embedded contingent interest features were bifurcated from the Notes on the issuance date, and their fair values were insignificant for the years ended December 31, 2017, 2018 and 2019. For the embedded contingent interest features not bifurcated from the December 2018 Notes, the September 2022 Notes, the November 2022 Notes and the New November 2022 Notes, the Company determined whether the additional interest payments need to be accrued as a liability in accordance with ASC 450. Since the likelihood of occurrence of such default events is remote, the Company determined that a liability was not probable and No accrual was made as of December 31, 2018 and 2019. The Company will continue to assess the accrual for these additional interest payment liabilities at each reporting date.

In connection with October 25, 2018 Note Repurchase of the November 2022 Note and issuance of New November 2022 Notes, the Company evaluated the contemporaneous exchange of cash between the Company and the note holder from issuance of New November 2022 Notes and satisfaction of the November 2022 Notes pursuant to ASC 470-50 and concluded that they are not substantially different. The Company determined a new effective interest rate at the repurchase date based on the carrying amount and the revised cash flows.

In connection with October 28, 2019 Note Repurchase of the New November 2022 Note for principal amount of US$54,940 and December 31, 2019 Note Repurchase of the September 2022 Note for a principal amount of US$28,000, which were treated as extinguishment of debts, the Company recognized net gain of US$1,165 for the year ended December 31, 2019. Pursuant to ASC 470-50-40-2, such gain was recorded as additional paid-in capital since the transaction with the controlling shareholder is treated as a contribution from shareholder.

As of December 31, 2019, aggregate future principal payments for long-term debt, including long-term loans (Note 11) and convertible senior notes, were as follows:

|  | Long-term loans | Convertible senior notes | Total |
|---|---|---|---|
| 2020 | 74,624 | — | 74,624 |
| 2021 | 40,234 | — | 40,234 |
| 2022 | 10,166 | 167,060 | 177,226 |
| 2023 | 46,204 | — | 46,204 |
| 2024 and thereafter | 89,981 | — | 89,981 |
|  | 261,209 | 167,060 | 428,269 |

F-61

**15.    DISCONTINUED OPERATIONS**

On June 11, 2019, the Company completed the spin-off of CIH into a separate and independent public company. The spin-off was completed by way of distribution to Fang's stockholders of all of the then issued and outstanding shares of common stock of CIH on the basis of one share of CIH common stock for one share of Fang common stock held as of the close of business on May 28, 2019 (the record date for the distribution).  As a result of the distribution, CIH is now an independent public company, and its common stock is listed under the symbol "CIH" on the Nasdaq Global Market.

The separation represented a strategic shift that has a major effect on Fang's operations and financial results, the business operated by CIH has been reclassified as discontinued operations. For all periods presented, the assets and liabilities of the discontinued operations are presented separately on the consolidated balance sheets, and the results of the discontinued operations, less income taxes, are reported as a separate component of income, which is income from discontinued operations, on the consolidated statements of comprehensive income (loss). Intercompany transactions between continuing operations and discontinued operations before the disposal of the discontinued operations, which are considered to continue after the disposal of the discontinued operations are presented separately in continuing operations and discontinued operations in a way that reflects the continuance of those transactions.

The major classes of line items constituting operating results of discontinued operations included in the Company's consolidated statements of comprehensive income (loss) were as follows.

| | For the year ended | | |
|---|---|---|---|
| | 2017 | 2018 | 2019(a) |
| | US$ | US$ | US$ |
| Revenues | 49,606 | 63,656 | 32,934 |
| Cost of revenues | (11,736) | (12,566) | (6,615) |
| Operating expenses | | | |
| Selling expenses | (8,625) | (11,686) | (5,916) |
| General and administrative expenses | (6,195) | (9,395) | (4,753) |
| Interest income | 271 | 100 | 37 |
| Realized gain on sale of available-for-sale securities | 315 | 732 | — |
| Government grants | 129 | 211 | 33 |
| **Income from discontinued operations, before income taxes** | **23,765** | **31,052** | **15,720** |
| Income tax expense | (3,090) | (4,543) | (2,539) |
| **Income from discontinued operations, net of income taxes** | **20,675** | **26,509** | **13,181** |

(a)  CIH financial results from January 1, 2019 to June 11, 2019.

The major classes of line items constituting assets and liabilities of discontinued operations were as follows as of December 31, 2018.

| | As of December 31, 2018 |
|---|---|
| | US$ |
| **ASSETS** | |
| Cash and cash equivalents | 23,925 |
| Accounts receivable, net | 2,263 |
| Prepayment and other current assets | 101 |
| **Total current assets** | **26,289** |
| Property and equipment, net | 573 |
| **Total non-current assets** | **573** |
| **Total assets** | **26,862** |
| | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | |
| Deferred revenue | 20,873 |
| Accrued expenses and other payables | 12,344 |
| Income tax payable | 2,110 |
| **Total current liabilities** | **35,327** |
| Other non-current liabilities | 2,258 |
| **Total non-current liabilities** | **2,258** |
| **Total liabilities** | **37,585** |

Table of Contents

Cash flows of the discontinued operations were as follows.

| | For the year ended | | |
|---|---|---|---|
| | **2017** | **2018** | **2019(a)** |
| | US$ | US$ | US$ |
| Net cash provided by operating activities | 30,143 | 32,119 | 20,271 |
| Net cash provided by (used in) investing activities | 18 | 726 | (1) |
| Net cash used in financing activities | (50,995) | (42,985) | (24,250) |

(a)  CIH financial results from January 1, 2019 to June 11, 2019.

In connection with the spinoff of CIH, noncash net liabilities distributed to the shareholders of the Company were US$40,770.

Certain disclosure of income taxes and EPS for the years ended December 31, 2017 and 2018 were retrospectively adjusted as a result of the discontinued operations.

**16.    SHAREHOLDERS' EQUITY**

*Ordinary Shares*

As of December 31, 2018, the Company has 72,069,645 Class A and 24,336,650 Class B ordinary shares issued. As of December 31, 2019, the Company has 71,775,686 Class A and 24,336,650 Class B ordinary shares issued.   Total outstanding shares of Class A ordinary shares as of December 31, 2018 and 2019 are 65,004,587 and 65,403,527, respectively.  Total outstanding shares of Class B ordinary shares as of December 31, 2018 and 2019 are 24,336,650.

The rights of the holders of Class A and Class B ordinary shares are identical, except with respect to voting rights. Each Class A ordinary share is entitled to one vote per share whereas each Class B ordinary share is entitled to 10 votes per share. Each Class B ordinary share is convertible into one Class A ordinary share at any time by its holder, but Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any transfer of Class B ordinary shares by a Class B ordinary shareholder to any person or entity which is not an affiliate of such holder, such Class B ordinary shares will be automatically and immediately converted into the equal number of Class A ordinary shares.

No class B ordinary shares were converted into Class A ordinary shares for the years ended December 31, 2017, 2018 and 2019.

*Treasury share*

Treasury share represents shares repurchased and held by the Company. These shares have No voting rights and are not entitled to receive dividends and are excluded from the weighted average outstanding shares in calculation of net income per share.  Treasury share is accounted for under the cost method. As of December 31, 2019, under the repurchase plan, the Company has repurchased an aggregate of 7,065,058 Class A ordinary shares on the open market for a total cash consideration of US$136,615.  The Company has used 692,899 Class A treasury shares to settle the exercise of share options as of December 31, 2019.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**16.   SHAREHOLDERS' EQUITY (continued)**

*Statutory reserve*

The Company's ability to pay dividends is primarily dependent on the Company receiving distributions of funds from its subsidiaries. Relevant PRC statutory laws and regulations permit payments of dividends by the Company's PRC subsidiaries only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. The results of operations reflected in the consolidated financial statements prepared in accordance with U.S. GAAP differ from those reflected in the statutory financial statements of the Company's PRC subsidiaries.

In accordance with the PRC Regulations on Enterprises with Foreign Investment and its articles of association, a foreign invested enterprise established in the PRC is required to provide certain statutory reserves, namely general reserve fund, the enterprise expansion fund and staff welfare and bonus fund which are appropriated from net profit as reported in the enterprise's PRC statutory accounts. A foreign invested enterprise is required to allocate at least 10% of its annual after-tax profit to the general reserve until such reserve has reached 50% of its respective registered capital based on the enterprise's PRC statutory accounts. Appropriations to the enterprise expansion fund and staff welfare and bonus fund are at the discretion of the board of directors for all foreign invested enterprises. The aforementioned reserves can only be used for specific purposes and are not distributable as cash dividends. The WOFEs were established as foreign invested enterprises and therefore are subject to the above mandated restrictions on distributable profits.

Additionally, in accordance with the Company Law of the PRC, a domestic enterprise is required to provide a statutory common reserve of at least 10% of its annual after-tax profit until such reserve has reached 50% of its respective registered capital based on the enterprise's PRC statutory accounts. A domestic enterprise is also required to provide a discretionary surplus reserve, at the discretion of the board of directors, from the profits determined in accordance with the enterprise's PRC statutory accounts. The aforementioned reserves can only be used for specific purposes and are not distributable as cash dividends. The PRC Domestic Entities and the PRC Domestic Entities' subsidiaries were established as domestic invested enterprises and therefore are subject to the above mentioned restrictions on distributable profits.

As of December 31, 2018 and 2019, the PRC subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries had appropriated US$15,525 and US$14,307 respectively, to the general reserve fund, which is restricted for distribution to the Company.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**17.    TAXATION**

*Cayman Islands*

Under the current laws of the Cayman Islands, the Company and subsidiaries incorporated in the Cayman Islands are not subject to tax on income or capital gains. In addition, upon payments of dividends by the Company to its shareholders, No Cayman Islands withholding tax will be imposed.

*British Virgin Islands ("BVI")*

Under the current laws of the BVI, subsidiaries incorporated in the BVI are not subject to tax on income or capital gains. In addition, upon payments of dividends by these companies to their shareholders, No BVI withholding tax will be imposed.

*Hong Kong*

Under the Hong Kong tax laws, subsidiaries in Hong Kong are subject to the Hong Kong profits tax rate at 16.5% and they are exempted from income tax on their foreign-derived income and there are No withholding taxes in Hong Kong on remittance of dividends. A two-tiered profits tax rates regime was introduced in 2018 where the first HK$2 million of assessable profits earned by a company will be taxed at half of the current tax rate (8.25%) whilst the remaining profits will continue to be taxed at 16.5%. There is an anti-fragmentation measure where each group will have to nominate only one company in the group to benefit from the progressive rates. No provision for Hong Kong profits tax has been made in the financial statements as the subsidiaries in Hong Kong have No assessable profits for the three years ended December 31, 2019.

*United States of America*

On December 22, 2017, the Tax Act was enacted and contains significant changes to U.S. income tax law.Effective in 2018, the Tax Act reduces the U.S. statutory tax rate from 35% to 21% and creates new taxes focused on foreign-sourced earnings and related-party payments, including the creation of the base erosion anti-abuse tax and a new tax on global intangible low-taxed income ("GILTI").

The Securities and Exchange Commission (SEC) staff issued SAB 118 on December 22, 2017, which allows companies to record provisional amounts during a measurement period not to extend beyond one year of the enactment date.

The Tax Act reduces the U.S. statutory tax rate from 35% to 21% for years after 2017. Accordingly, the Company re-measured its deferred taxes as of December 31, 2017, to reflect the reduced rate that will apply in future periods when these deferred taxes are settled or realized. As Best Work Holdings (New York) LLC. is loss making since incorporated therefor the Company recognized a deferred tax asset of US$13,834 to reflect the reduced U.S. tax rate and full valuation allowance is provided and corresponding remeasurement were made to unrecognized tax benefit and valuation allowance.

*Singapore*

A subsidiary was incorporated in Singapore in November 2014 and does not conduct any substantive operations of its own. No provision for Singapore profits tax has been made in the financial statements as this entity has No assessable profits for the three years ended December 31, 2019.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**17.    TAXATION (continued)**

*China*

In March 2007, a new enterprise income tax law (the "New EIT Law") in the PRC was enacted which became effective on January 1, 2008. The New EIT Law applies a unified 25% enterprise income tax ("EIT") rate to both foreign invested enterprises and domestic enterprises, unless a preferential EIT rate is otherwise stipulated. On April 14, 2008, relevant governmental regulatory authorities released further qualification criteria, application procedures and assessment processes for meeting the High and New Technology Enterprise ("HNTE") status under the New EIT Law which would entitle qualified and approved entities to a favorable EIT tax rate of 15%. In April 2009 and June 2017, the State Administration for Taxation ("SAT") issued Circular Guoshuihan [2009] No. 203 ("Circular 203") and SAT Announcement [2017] No. 24 ("Announcement 24") stipulating that entities which qualified for the HNTE status should apply with in-charge tax authorities to enjoy the reduced EIT rate of 15% provided under the New EIT Law starting from the year when the new HNTE certificate becomes effective. The HNTE certificate is effective for a period of three years and can be renewed for another three years. Subsequently, an entity needs to re-apply for the HNTE status in order to be able to enjoy the preferential tax rate of 15%.

The Company obtained new HNTE certificates for SouFun Media, SouFun Network, Beijing Technology,Beijing JTX Technology and Hong An Tu Sheng in November 2015 and subsequently renewed in September and October 2018. Therefore, these five subsidiaries can enjoy the preferential tax rate of 15% from 2015 to 2020. The Company received the new HNTE certificate for Beijing Tuoshi in December 2016 and subsequently renewed in December 2019. Therefore, Beijing Tuoshi can enjoy the preferential tax rate of 15% from 2016 to 2021. The Company received new HNTE certificates for Beijing Li Man Wan Jia and Beijing Hua Ju Tian Xia in 2018. Beijing Li Man Wan Jia and Beijing Hua Ju Tian Xia hence can enjoy the preferential tax rate of 15% from 2018 to 2020.

If any entities fail to maintain the HNTE qualification under the New EIT Law, they will No longer qualify for the preferential tax rate of 15%, which could have a material and adverse effect on the Company's results of operations and financial position provided that they do not qualify for any other preferential tax treatment. Historically, the abovementioned PRC subsidiaries have successfully obtained or renewed the HNTE certificates when the previous certificates had expired.

Subsequent to government approval in May 2014, Beijing Li Man Wan Jia and Beijing Hua Ju Tian Xia obtained the Software Enterprise status with effect from January 1, 2013. Accordingly, these three subsidiaries are entitled to the two-year EIT exemption for years 2013 and 2014 and a reduced EIT rate of 12.5% for years 2015, 2016 and 2017.

Moreover, the current EIT Law treats enterprises established outside of China with "effective management and control" located in the PRC as PRC resident enterprises for tax purposes. The term "effective management and control" is generally defined as exercising overall management and control over the business, personnel, accounting, properties, etc. of an enterprise. The Company, if considered a PRC resident enterprise for tax purposes, would be subject to the PRC EIT at the rate of 25% on its worldwide income for the period after January 1, 2008. As of December 31, 2018 and 2019, the Company had not accrued for PRC tax on such basis.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**17.    TAXATION (continued)**

Income (loss) from continuing operations before income taxes consisted of:

|  | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2017** | **2018** | **2019** |
|  | **US$** | **US$** | **US$** |
| PRC | 32,423 | (120,523) | 13,094 |
| Non-PRC | (13,042) | (39,884) | (46,069) |
|  | **19,381** | **(160,407)** | **(32,975)** |

Income tax expenses (benefits) from continuing operations comprised:

|  | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2017** | **2018** | **2019** |
|  | **US$** | **US$** | **US$** |
| Current tax expense | 18,669 | 2,282 | 954 |
| Deferred tax benefit | (317) | (21,271) | (10,498) |
|  | **18,352** | **(18,989)** | **(9,544)** |

A reconciliation between the amount of income tax expenses (benefits) and the amount computed by applying the PRC statutory tax rate to income (loss) from continuing operations before income taxes was as follows:

|  | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2017** | **2018** | **2019** |
|  | **US$** | **US$** | **US$** |
| Income (loss) from continuing operations before income taxes | 19,381 | (160,407) | (32,975) |
| Income tax at applicable tax rate of 25% | 4,845 | (40,102) | (8,244) |
| Effect of international tax rate differences | 472 | 6,891 | 8,236 |
| Non-deductible expenses | 7,671 | 16,042 | 6,419 |
| Non-taxable income | — | (1,145) | (535) |
| Effect of tax holidays or preferential tax rates | (9,457) | (3,489) | (756) |
| Effect of tax rate changes | (1,725) | — | 298 |
| Investment basis difference in the PRC Domestic Entities | 2,696 | — | — |
| Withholding tax | — | 11,720 | 4,711 |
| Research and development super-deduction | — | (2,703) | (3,185) |
| Changes in valuation allowance | 8,845 | 1,273 | 1,327 |
| Expiration of loss carry forwards | — | 101 | 124 |
| Expiration of unrecognized tax benefits due to applicable statute of limitations | (4,302) | (8,881) | (13,090) |
| Interest and penalties on unrecognized tax benefits | 9,307 | 1,304 | (7,168) |
| Others | — | — | 2,319 |
|  | **18,352** | **(18,989)** | **(9,544)** |

F-67

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**17.     TAXATION (continued)**

A roll-forward of unrecognized tax benefits, exclusive of related interest and penalties, was as follows:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2017** | **2018** | **2019** |
| | **US$** | **US$** | **US$** |
| Balance at beginning of year | 78,933 | 79,436 | 72,737 |
| Increase relating to prior year tax positions | 4,192 | 577 | 5,451 |
| Increase relating to current year tax positions | 10,666 | 6,925 | 14,818 |
| Decrease relating to reversal of prior years' tax position | (14,102) | (1,821) | (5,548) |
| Decrease relating to expiration of applicable statute of limitations | (4,586) | (9,220) | (13,090) |
| Foreign currency translation adjustments | 4,333 | (3,160) | (1,116) |
| Disposal of subsidiaries | — | — | (2,440) |
| Balance at end of year | **79,436** | **72,737** | **70,812** |

As of December 31, 2018 and 2019, the Company had recorded US$135,646 andUS$121,904 as an accrual for unrecognized tax benefits and related interest and penalties, respectively, which is included in the account of "Other non-current liabilities". As of December 31, 2018 and 2019, unrecognized tax benefits of US$70,350 and US$68,088 respectively, would impact the effective tax rate if recognized. The remaining US$2,387 and US$2,724 unrecognized tax benefit as of December 31, 2018, and 2019, respectively were presented as a reduction of the deferred income tax assets for tax loss carry forwards since the uncertain tax position would reduce the tax loss carry forwards under the tax law. The final outcome of the tax uncertainty is dependent upon various matters including tax examinations, interpretation of tax laws or expiration of statute of limitations. However, due to the uncertainties associated with the status of examinations, including the protocols of finalizing audits by the relevant tax authorities, there is a high degree of uncertainty regarding the future cash outflows associated with these tax uncertainties. The amount of unrecognized tax benefits may change in the next twelve months, pending clarification of current tax law or audit by the tax authorities. However, a reliable estimate of the range of the possible change cannot be made at this time.

For the years ended December 31, 2017, 2018, and 2019, the Company recognized US$9,307, US$1,304 andUS$(7,168) in income tax expenses(benefits) for interest and penalties related to uncertain tax positions. Accrued interest and penalties related to unrecognized tax benefits were US$65,296 and US$53,816 as of December 31, 2018 and 2019, respectively.

The Company's PRC entities have been subject to the New EIT Law since January 1, 2008. The PRC tax authorities, US tax authorities and Hong Kong tax authorities have up to five years, three years and six years, respectively, to conduct examinations of the Company's tax filings. Accordingly, the PRC subsidiaries' tax years 2014 through 2019, the US subsidiaries' tax years 2016 through 2019 and the Hong Kong subsidiaries' tax years 2013 through 2019 remain open to examination by the respective taxing jurisdictions.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**17.    TAXATION (continued)**

The aggregate amount and per share effect of tax holidays and preferential tax rates from continuing operations were as follows:

| | For the Years Ended December 31, | | |
| | 2017 | 2018 | 2019 |
| | US$ | US$ | US$ |
|---|---|---|---|
| The aggregate amount | (9,457) | (3,489) | (756) |
| The aggregate effect on basic and diluted earnings per share for Class A and Class B ordinary shares: | | | |
| -Basic | 0.11 | 0.04 | 0.01 |
| -Diluted | 0.10 | 0.04 | 0.01 |

The components of deferred taxes were as follows:

| | As of December 31, | |
| | 2018 | 2019 |
| | US$ | US$ |
|---|---|---|
| Deferred tax assets | | |
| Net operating losses | 71,297 | 59,374 |
| Lease liability | — | 1,055 |
| Impairment of assets | 933 | 1,153 |
| Overcharged advertising and promotion fee | 1,061 | 1,141 |
| Fixed assets depreciation | 208 | 332 |
| Less: Valuation allowance | (71,297) | (55,430) |
| Total deferred tax assets, net | 2,202 | 7,625 |
| | | |
| Deferred tax liabilities | | |
| Right of use assets | — | (1,055) |
| Investment basis in the PRC entities | (72,088) | (75,774) |
| BaoAn Acquisition — Property | (12,191) | (11,522) |
| Investments | (13,160) | (3,290) |
| Interest capitalization | (139) | (137) |
| Deferred tax liabilities | (97,578) | (91,778) |
| | | |
| **Net deferred income tax assets** | **2,202** | **6,570** |
| **Net deferred income tax liabilities** | **(97,578)** | **(90,723)** |

The rollforward of valuation allowances of deferred tax assets were as follows:

| | As of December 31, | |
| | 2018 | 2019 |
| | US$ | US$ |
|---|---|---|
| Balance as of beginning of year | (73,011) | (71,297) |
| Additions of valuation allowance | (9,868) | (4,433) |
| Utilization of deferred tax assets | 8,595 | 2,651 |
| Change in judgment about the realizability of deferred tax assets | — | 455 |
| Decrease relating to disposal of entities | — | 16,447 |
| Foreign currency translation adjustments | 2,987 | 747 |
| **Balance as of end of year** | **(71,297)** | **(55,430)** |

As of December 31, 2019, the Company had net operating losses of US$41,765 from the Company's subsidiaries incorporated in the US, which can be carried forward indefinitely to offset future taxable income. The remaining accumulated net operating losses of US$41,341, US$131,392, US$23,879, US$27,950 and US$37,464 arose from several of its PRC entities, which can be carried forward to offset future taxable profit and will expire in years 2020, 2021, 2022, 2023 and 2024 if not utilized.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

17.  **TAXATION (continued)**

*Deferred tax liabilities arising from undistributed earnings*

As of December 31, 2018 and 2019, a portion of the aggregate undistributed earnings of the PRC subsidiaries that were available for distribution to non-PRC parent companies was not considered to be indefinitely reinvested under ASC 740-30, "Income Taxes: Other Consideration or Special Areas". In accordance with the New EIT Law, a withholding income tax will be imposed on the PRC subsidiaries when dividends are distributed to their non-PRC parent companies. The withholding tax rate is 10% unless a foreign investor's tax jurisdiction has a tax treaty with the PRC that provides for a lower withholding tax rate and the foreign investor is recognized as the beneficial owner of the income under the relevant tax rules. Deferred tax liabilities amounting to US$40,436 and US$44,635 were provided for the withholding tax of the PRC entities as of December 31, 2018 and 2019, respectively.

The deferred tax liabilities arising from the aggregate undistributed earnings of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries that are available for distribution to the PRC tax resident parent companies, that is, the WOFEs, amounted to US$31,652 and US$31,139 as of December 31, 2018 and 2019, respectively.

As of December 31, 2018 and 2019, the Company did not provide for deferred tax liabilities and foreign withholding taxes on certain undistributed earnings of its PRC subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries that were available for distribution to non-PRC parent companies on the basis of its intent to permanently reinvest these foreign subsidiaries' earnings. The cumulative amount of such temporary difference was US$319,483 and US$305,179 as of December 31, 2018 and 2019, respectively. The amount of the unrecognized deferred tax liability for temporary differences related to investments in PRC subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries that are essentially permanent in duration was US$31,948 and US$30,518 as of December 31, 2018 and 2019, respectively.

18.  **SHARE-BASED PAYMENTS**

*Stock related award incentive plan of 1999*

On September 1, 1999, the Company's shareholders approved the 1999 Stock Related Award Incentive Plan (the "1999 Plan"). Under the 1999 Plan, the Company may issue up to 12% of the fully diluted ordinary shares of the Company to its directors and employees. The purpose of the 1999 Plan is to provide additional incentive and motivation to its directors and employees, through an equity interest in the Company, to work towards increasing the value of the Company. The 1999 Plan provides for accelerated vesting, subject to certain conditions, if there is a change in control. The 1999 Plan has No stated expiry date.

The exercise price, vesting and other conditions of individual awards are determined by the executive chairman of the board of directors. The awards are typically subject to a three-year to a four-year service vesting condition and expire 10 or 15 years after the grant date. In addition, the grantee must return all awards and any proceeds from the sale of the awards if he/she violates certain provisions including a non-compete condition for a period of 2 years after cessation of employment with the Company. The non-compete condition does not give rise to an in-substance service condition.

F-70

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**18.    SHARE-BASED PAYMENTS (continued)**

*Stock related award incentive plan of 2010*

On August 4, 2010, the Company's board of directors and shareholders approved the 2010 Stock Related Award Incentive Plan (the "2010 Plan"). Under the 2010 Plan, the Company may issue up to 10% of the total number of ordinary shares, including ordinary shares issuable upon conversion of any preferred shares to its directors and employees. The purpose of the 2010 Plan was to recognize and acknowledge the contributions made to the Company by eligible employees and to promote the success of the Company's business. The 2010 Plan allows the board of directors, or its designated committee, to establish the performance criteria when granting stock options on the basis of any one of, or combination of, increase in share price, earnings per share, total shareholder return, return on equity, return on assets, return on investment, net operating income, cash flow, revenue, economic value added, personal management objectives, or other measures of performance selected by the Company's board of directors, or its designated committee. Partial achievement of the specified criteria may result in a vesting corresponding to the degree of achievement as specified in the detail rules.

The exercise price, vesting and other conditions of individual awards are determined by the executive chairman of the board of directors, except for awards to officers which are determined by the board of directors or the compensation committee. The awards are typically subject to a four-year service vesting condition and multiple performance conditions with a contractual life of ten years. In addition, the grantee must return all awards and any proceeds from the sale of the awards if he/she violates certain provisions.

*Stock related award incentive plan of 2015*

On June 4, 2015, the Company's board of directors and shareholders approved the 2015 Stock Related Award Incentive Plan (the "2015 Plan"). Under the 2015 Plan, the Company may issue up to 1.5% of the total number of ordinary shares, including ordinary shares issuable upon conversion of any preferred shares to its directors and employees. The purpose of the 2015 Plan was to recognize and acknowledge the contributions made to the Company by eligible employees and to promote the success of the Company's business. The 2015 Plan allows the board of directors, or its designated committee, to establish the performance criteria when granting stock options on the basis of any one of, or combination of, increase in share price, earnings per share, total shareholder return, return on equity, return on assets, return on investment, net operating income, cash flow, revenue, economic value added, personal management objectives, or other measures of performance selected by the Company's board of directors, or its designated committee. Partial achievement of the specified criteria may result in a vesting corresponding to the degree of achievement as specified in the detail rules.

The exercise price, vesting and other conditions of individual awards are determined by the executive chairman of the board of directors, except for awards to officers which are determined by the board of directors or the compensation committee. The awards are typically subject to a four-year service vesting condition and multiple performance conditions with a contractual life of ten years. In addition, the grantee must return all awards and any proceeds from the sale of the awards if he/she violates certain provisions.

*New grant and modification of equity awards*

On August 29, 2017 (the "2017 Replacement Date"), the Company's board of directors approved to replace 1,377,730 share options granted during the years ended December 31, 2015 and 2016 under the 2015 Plan to 200 employees with 153,036 options and 1,224,694 restricted shares (the "Replacement Awards"). The exercise price of 153,036 options was reduced from US$27.2~US$30.0 per share to US$18.1 per share. The replacement awards were subject to graded vesting over four years from the Replacement Date, in which 25% of the awards vest at the end of each of the next four years. The total incremental share-based compensation of US$12,537 resulting from the modification is recognized ratably over the new requisite service period. The total unamortized share-based compensation of US$7,447 resulting from the modification is recognized ratably over the original requisite service period.

On December 30, 2018 (the "2018 Replacement Date"), the Company's board of directors approved to replace 252,500 share options granted during the year ended December 31, 2008 under the 1999 Plan to 5 employees with 252,500 options (the "2018 Replacement Awards"). The expiration date of 252,500 options was extended from December 30, 2018 to December 30, 2028.

Table of Contents

The replacement awards were fully vested as of the replacement date. The total incremental share-based compensation of US$619 resulting from the modification is fully recognized during the year ended December 31, 2018.

During 2018, the Company approved to extend the expiration date of an aggregate number of 518,175 share options granted under the 1999 Plan to 10 employees for terms between 2 days and nine years. These stock options expired prior to December 31, 2017. The awards granted are fully vested as of the grant date. These transactions were accounted for as new grant. The total share-based compensation of US$2,764 resulting is fully recognized during the year ended December 31, 2018.

On April 24, 2019, the Company approved to extend the expiration date of 119,920 share options granted under the 1999 Plan to 2 employees to July 27, 2019 and March 30, 2020, respectively. These stock options would have been expired between April 27, 2019 and December 30, 2019 if not modified. These options were fully vested and US$18 incremental compensation cost was recognized for the year ended December 31, 2019 resulting from the modification.

On June 7, 2019, the Company approved the grant of options to certain officers and employees of the Company under the 2015 Plan to purchase 1,423,337 ordinary shares of The Company at exercise prices of US$5.85 per share. 25% of the awards vest at the end of each anniversary of the grant date over the next four years. The options have a contractual term of ten years.

On June 11, 2019, the Company spun off its real estate information, analytics and marketplace business as a separate public company CIH. To protect all the existing Fang's awards holders from changes in the value of their awards following the spin-off, CIH issued share options to all the existing Fang's awards holders that entitled them to receive an equivalent number of CIH's shares. These CIH's share options have a nominal exercise price of US$0.001 with substantially the same remaining vesting terms and conditions as applied to Fang's equity awards and are exercisable if and to the extent that the corresponding Fang's equity awards are exercised. For purposes of the vesting of these equity awards, continued employment or service with Fang or with CIH is treated as continued employment for purposes of both Fang's and CIH's equity awards and the vesting terms of each converted grant remained unchanged. As of June 11, 2019, the total number of outstanding stock options of Fang is 7,357,154 which includes 6,773,143 and 584,011 share options held by the Company's and CIH's employees, respectively. As of June 11, 2019, the total number of outstanding restricted shares of Fang is 1,029,437 which includes 931,588 and 97,849 restricted shares held by the Company's and CIH's employees. There was US$848 of incremental compensation cost resulting from the modification, of which US$589 were recognized for the year ended December 31, 2019.

On June 28, 2019 the Company approved to extend the expiration date of 119,920 share options granted under the 1999 Plan to 2 employees to July 27, 2020 and March 30, 2021, respectively. These stock options would have been expired between July 27, 2019 and March 30, 2020 if not modified. These options were fully vested and US$13 of incremental compensation cost was recognized for the year ended December 31, 2019 resulting from the modification.

On November 15, 2019, the Company approved to reduce the exercise prices of 5,991,867 share options from US$5.0~US$30.0 per share to $1.99 per share, which were granted to 307 employees of the Company under the 1999, 2010 and 2015 Plan during the years ended December 31, 2006 to 2019. In addition to the adjustment of exercise price, 1) the share options vested at the modification day became subject to one additional year of service condition till November 14, 2020; 2) share options expected to be vested on or before November 14, 2020 became subject to one additional year of service condition following its original term; 3) share options expected to be vested after November 14, 2020 would follow its original term. There was US$9,146 of incremental compensation cost resulting from the modification, of which US$1,069 were recognized for the year ended December 31, 2019.

On December 19, 2019, the Company approved to extend the expiration date of 225,000 share options granted under the 1999 Plan to 2 employees to December 30, 2029. These stock options would have been expired on December 30, 2019 if not modified. These options were expected to be vested on November 14, 2020. There was US$793 of incremental compensation cost resulting from the modification, of which US$26 was recognized for the year ended December 31, 2019.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**18.    SHARE-BASED PAYMENTS (continued)**

A summary of the Company's equity award activity held by both the Company's employees and CIH's employees under the 1999 Plan, 2010 Plan and 2015 Plan for the year ended December 31, 2019 was stated below:

| Options Granted to Employees and Directors | Number of Shares | Weighted-Average per Share Exercise Price | Weighted Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value | |
|---|---|---|---|---|---|
| Outstanding, December 31, 2018 | 6,034,054 | 10.92 | 4.50 | US$ | 5,919 |
| Granted (new options) | 1,423,337 | 5.85 | | | |
| Granted (replacement options) | 6,456,707 | 2.05 | | | |
| Forfeited | (87,950) | 16.94 | | | |
| Expired | (140,446) | 22.27 | | | |
| Exercised | (11,000) | 1.97 | | | |
| Replaced | (6,456,707) | 8.70 | | | |
| Outstanding, December 31, 2019 | 7,217,995 | 3.84 | 5.05 | US$ | 5,299 |
| Vested and expected to vest at December 31, 2019 | 7,217,995 | 3.84 | 5.05 | US$ | 5,299 |
| Exercisable at December 31, 2019 | 636,052 | 16.42 | 4.01 | US$ | 86 |

The aggregate intrinsic value as of December 31, 2019 in the table above represents the difference between the fair value of the Company's ordinary share at December 31, 2019 and the exercise price.

The fair values of the share options granted by Fang to the Company's employees for the years ended December 31, 2019 are as follows:

| | Year Ended December 31, 2019 |
|---|---|
| | US$ |
| Weighted average grant date fair value of option per share | 2.88 |
| Aggregate grant date fair value of options | 4,099 |

Total intrinsic value of options exercised by the Company's employees for the years ended December 31, 2017, 2018 and 2019 was US$2,953, US$3,979 and US$64 respectively.

As of December 31, 2019, there was US$13,314 of unrecognized share-based compensation cost related to the Company's and CIH's equity awards held by the Company's employees that are expected to be recognized over a weighted-average vesting period of 1.52 years.

A summary of CIH's share options activities held by the Company's employees for the year ended December 31, 2019 was as follows:

| Options Granted to Employees and Directors | Number of Shares | Weighted-Average per Share Exercise Price | Weighted Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value | |
|---|---|---|---|---|---|
| Outstanding, December 31, 2018 | — | — | — | | |
| CIH's share options issued [a] | 6,773,143 | 0.001 | | | |
| Forfeited | (59,340) | 0.001 | | | |
| Expired | (76,185) | 0.001 | | | |
| Outstanding, December 31, 2019 | 6,637,618 | 0.001 | 4.78 | US$ | 24,154 |
| Vested and expected to vest at December 31, 2019 | 6,637,618 | 0.001 | 4.78 | US$ | 24,154 |
| Exercisable at December 31, 2019 | 326,165 | 0.001 | 3.12 | US$ | 1,187 |

(a)   reflects CIH's share options issued to the Company's employees upon the separation;

The aggregate intrinsic value in the table above represents the difference between the fair value of CIH's ordinary share as of December 31, 2019 and the exercise price of CIH's share options, which may be exercisable if and to the extent that the corresponding Fang's share options are exercised.

The Company used the Black-Scholes option pricing model for stock options granted and primarily used the Binomial option pricing model for modifications to determine the fair value of the stock options for the years ended December 31, 2018 and 2019. The volatility assumption was estimated based on the price volatility of the shares of the Company and comparable companies in the internet media

business. The expected term was remaining contract life of the share options. The risk-free rates were based on the market yield of US Treasury Bonds and Notes with maturity terms equal to the expected term of the option awards. Forfeitures were estimated based on historical experience. The dividend yield of nil are based on the Company's estimated dividend distribution for the stock options granted during the year ended December 31, 2019.

F-73

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**18.    SHARE-BASED PAYMENTS (continued)**

The assumptions used to estimate the fair values of the share options granted or modified were as follows:

| | For the Years Ended December 31, |
| --- | --- |
| | 2019 |
| Risk-free interest rate | 1.57% to 2.42% |
| Dividend yield | Nil |
| Expected volatility range | 39.00% to 48.06% |
| Weighted average expected life | 0.07 to 10.00 years |
| Estimated forfeiture rate | — |
| Exercise multiple | 2.2-2.8 |
| Fair value of ordinary share | US$1.99 to US$5.80 |

Restricted Shares

A summary of the Company's restricted shares held by both the Company's employees and CIH's employees for the year ended December 31, 2019 was stated below:

| Restricted Shares Granted to Employees and Directors | Number of Shares | Weighted-Average Grant date Fair Value per Share |
| --- | --- | --- |
| Outstanding, December 31, 2018 | 1,066,635 | 17.62 |
| Forfeited | (52,161) | 18.60 |
| Vested | (387,940) | 17.60 |
| Unvested, December 31, 2019 | 626,534 | 17.55 |

A summary of CIH's restricted shares activities held by the Company's employees for the year ended December 31, 2019 was as follows:

| Restricted Shares Granted to Employees and Directors | Number of Shares | Weighted-Average Grant date Fair Value per Share |
| --- | --- | --- |
| Outstanding, December 31, 2018 | — | — |
| CIH's restricted shares issued [a] | 931,588 | 0.34 |
| Forfeited | (17,032) | |
| Vested | (350,829) | |
| Unvested, December 31, 2019 | 563,727 | 0.34 |

---

(a)   reflects CIH's restricted shares issued to the Company's employees upon the separation;

Total intrinsic value of restricted shares exercised by the Company's employees for the year ended December 31, 2019 was US$668.

As of December 31, 2019, there was US$5,033 of unrecognized share-based compensation cost related to the Company's and CIH's restricted shares held by the Company's employees that are expected to be recognized over a weighted-average vesting period of 1.67 years.

Total share-based compensation expense of share-based awards granted to employees and directors charged to both continuing and discontinued operations were US$7,218, US$14,082 and US$8,820, respectively.

F-74

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**19.    RELATED PARTY TRANSACTIONS**

**a)    Related Parties**

| Name of Related Parties | Relationship with the Company |
|---|---|
| Vincent Tianquan Mo | Executive chairman of the board of directors and controlling shareholder of the Company |
| Richard Jiangong Dai | Director of the board up until February 25, 2016 |
| Wall Street Global Training Center, Inc. | A company under the control of Vincent Tianquan Mo |
| Beihai Silver Beach 1 Hotel and Property Management Company, Ltd. ("Beihai Silver Beach") | A company under the control of Vincent Tianquan Mo |
| Che Tian Xia Company Ltd. | A company under the control of Vincent Tianquan Mo |
| Shanghai Yuyue Electronic Technology Development Co., Ltd ("Shanghai Yuyue") | A company under the control of Vincent Tianquan Mo |
| China Index Holdings and its subsidiaries ("CIH") | A company under the control of Vincent Tianquan Mo and the Company can exercise significant influence |
| Next Decade Technology Limited | A company under the control of Vincent Tianquan Mo |
| Media Partner Investments Limited | A company under the control of Vincent Tianquan Mo |
| Chongqing Wanli New Energy CO., LTD("Wanli") | Equity method investment |

**b)    The Company had the following related party transactions for the years ended December 31, 2017, 2018 and 2019:**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2018 | 2019 |
| | US$ | US$ | US$ |
| Office building leased from: | | | |
| -Vincent Tianquan Mo | 159 | 162 | 156 |
| Management fee incurred: | | | |
| -Beihai Silver Beach | 501 | 523 | 697 |
| Listing service fee incurred: | | | |
| -CIH | — | — | 2,331 |
| Office building leased to: | | | |
| -CIH | — | — | 615 |
| IT service income from: | | | |
| -CIH | — | — | 756 |
| Software license income from: | | | |
| -CIH | — | — | 40 |
| Receipt of call option for acquisition of ordinary shares of CIH (Note 5) from: | | | |
| - Next Decade Technology Limited and Media Partner Investments Limited | — | — | 693 |
| Acquisition of Class B ordinary shares of CIH (Note 5) from: | | | |
| - Next Decade Technology Limited and Media Partner Investments Limited | — | — | 29,950 |
| Disposal of subsidiaries to: | | | |
| - Shanghai Yuyue | — | — | 7,394 |

Free rental space to Wall Street Global Training Center, Inc.

Starting from 2011, the Company provided Wall Street Global Training Center, Inc. with office space of approximately 220 square feet in the Company's building located in New York City, United States of America, free of charge. The estimated fair value of the free office space was insignificant for each of the years ended December 31, 2017, 2018 and 2019.

Office building leased from Vincent Tianquan Mo

The Company entered into an agreement with Vincent Tianquan Mo to lease a building owned by him for a 10-year period for nil consideration starting from March 1, 2012. The deemed rental expense of US$159 and US$162 and US$156, and the corresponding contribution from shareholder were included in the consolidated financial statements for the years ended December 31, 2017, 2018 and 2019, respectively.

F-75

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**19.     RELATED PARTY TRANSACTIONS (continued)**

Management service provided by Beihai Silver Beach

On April 1, 2013, the Company and Beihai Silver Beach entered into a contract, pursuant to which Beihai Silver Beach was engaged to manage the hotel and office leasing operations owned by Shanghai BaoAn Enterprise and Shanghai BaoAn Hotel for ten years. The management fees incurred for the years ended December 31, 2017, 2018 and 2019 were US$501 and US$523, and US$697 respectively.  The balance as of December 31, 2018 represented outstanding management fees which were unsecured and interest-free. The balance as of December 31, 2019 represented prepaid management fees.

Use of domain name of Che Tian Xia Company Ltd.

In April 2013, the Company entered into a contract with Che Tian Xia Company Ltd. to use the latter's domain name www.youtx.com for seven years at nil consideration.

Listing service fee provided by CIH

CIH acts as an agent on behalf of the Company on listing services for commercial properties.The Company recorded the service fee from CIH when the Company and its customers enter into a sales contract. Prior to June 11, 2019, these transactions are presented separately in selling expenses and income from discontinued operations. The amounts of service fee were US$561, US$687 and US$1,495 for the years ended December 31, 2017 and 2018, and the period between January 1, 2019 and June 11, 2019. The amount of service fee was US$2,331 for the period between June 12, 2019 and December 31, 2019. On January 1, 2020, the Company and CIH agreed to terminate the cooperation agreement.

Office building leased to CIH

The Company leases out offices to CIH.  Prior to June 11, 2019, these transactions are presented separately in other income and income from discontinued operations. The amounts of lease income were US$1,268, US$1,153 and US$490 for the years ended December 31, 2017 and 2018, and the period between January 1, 2019 and June 11, 2019. The amount of lease income was US$615 for the period between June 12, 2019 and December 31, 2019.

IT service income from CIH

The Company entered into an IT service agreement with CIH, pursuant to which CIH agrees to utilize Fang's server and other IT services. The agreement is effective from June 11, 2019. US$756 of IT service income incurred during the period from June 11, 2019 to December 31, 2019.

Software license income from CIH

The Company entered into a software license agreement with CIH, pursuant to which, Fang agrees to license the right of using certain of its software at annual royalty fee of US$72. The term of the software license agreement is 10 years. The agreement is effective from June 11, 2019. US$40 of IT service income incurred during the period from June 11, 2019 to December 31, 2019.

After the completion of the separation, there were certain cash collections and cash payments on behalf of each other between the Company and CIH from June 11, 2019 to December 31, 2019. In November 2019, the Company entered into an agreement with CIH to settle all such balances with CIH on a quarterly basis in net amounts. The balance of US$317 as of December 31, 2019 represents the net amount due to CIH, after offsetting with an equivalent amount due from CIH of US$9,258.

Disposal of subsidiaries to Shanghai Yuyue

The Company sold 100% equity interest of 42 entities which used to operate the marketing, listing, leads generating services and ecommerce business to Shanghai Yuyue, an entity controlled by Mr. Vincent Tianquan Mo, the controlling shareholder of the Company in 2019. Revenues generated by these entities were US$8,746 for the year ended December 31, 2018 and US$1,450 before their disposal in 2019. Upon the disposal, Shanghai Yuyue assumes net liabilities of these entities at carrying amount. Accordingly, there was No disposal gain or loss as a result of the transaction.

Table of Contents

For the year ended December 31, 2019, noncash net liability distributed to Shanghai Yuyue in connection with the disposal of subsidiaries were US$8,772.

Prepayment for purchase from Wanli

The Company entered into an agreement with Wanli and its affiliate in 2019 to purchase data and services for a total consideration of US$275. The Company has prepaid US$275 in cash in 2019.  As of December 31, 2019, the Company has not received the related data and services from Wanli.

c)   **The Company had the following related party balances as of December 31, 2018 and 2019:**

| | As of December 31, | |
| --- | --- | --- |
| | 2018 | 2019 |
| | US$ | US$ |
| Amounts due from a related party: | | |
| - Beihai Silver Beach | — | 369 |
| - Wanli | — | 275 |
| | — | 644 |

| | As of December 31, | |
| --- | --- | --- |
| | 2018 | 2019 |
| | US$ | US$ |
| Amounts due to a related party: | | |
| - Beihai Silver Beach | 19 | — |
| - Shanghai Yuyue | — | 8,910 |
| - CIH | — | 317 |
| | 19 | 9,227 |

20.   **EMPLOYEE DEFINED CONTRIBUTION PLAN**

Full time employees of the Company in the PRC participate in a government mandated defined contribution plan, pursuant to which certain pension benefits, medical care, employee housing fund and other welfare benefits are provided to employees. Chinese labor regulations require that the PRC subsidiaries of the Company make contributions to the government for these benefits based on certain percentages of the employees' salaries. The Company has No legal obligation for the benefits beyond the contributions made. The total amounts for such employee benefits charged to both continuing and discontinued operations, which were expensed as incurred, were US$21,583, US$20,093 and US$17,624 for the years ended December 31, 2017, 2018 and 2019, respectively.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**21.     COMMITMENTS AND CONTINGENCIES**

*Capital commitment*

The Company has commitments for the construction of fixed assets of US$24,959 as of December 31, 2019. The future payments schedule is presented as follows:

|  | As of December 31 2019, | | | | |
|---|---|---|---|---|---|
|  | Total | Less Than 1 Year | 1–2 Years | 2-5 Years | More Than 5 Years |
| Capital commitment: | 24,959 | 12,469 | 11,764 | 363 | 363 |

*Operating lease commitments*

The Group leases offices and properties under non-cancelable operating lease agreements. Future minimum lease payments under these non-cancelable operating lease agreements with initial terms longer than twelve months are disclosed as maturity of lease liabilities in Note 10.

As of December 31, 2019, the Company had US$407 of short term lease commitments under non-cancellable operating leases.

As previously disclosed in the consolidated financial statements for the year ended December 31, 2018 and under the previous lease standard (Topic 840), future minimum annual lease payments for the year subsequent to December 31, 2018 and in aggregate were as follows:

|  | US$ |
|---|---|
| 2019 | 4,368 |
| 2020 | 2,198 |
| 2021 | 181 |
| 2022 | 18 |
| 2023 and thereafter | 37 |
|  | 6,802 |

Payments under operating leases were expensed on a straight-line basis over the periods of the respective leases. For the years ended December 31, 2017 and 2018, total rental expenses for all operating leases were US$27,832 and US$9,678, respectively.

*Contingencies*

In April and May 2018, the Company was involved in suits as one of the defendants for trade mark infringement claimed by a third party, alleging RMB99,900, RMB300,000, and RMB500,000, respectively. In March 2019, the People's High Court of Beijing ruled that the Company was not the proper defendant for the suits involving RMB300,000 and RMB500,000. In June 2019, the Supreme People's Court upheld the ruling of the People's High Court of Beijing for the cases involving RMB300,000 and RMB500,000. The suit involving RMB99,900 is still ongoing and the Company is vigorously contesting the allegations.

In February 2019, the Company was served with a subpoena from a court in Beijing, in which a third party claimed that a contract the Company entered into was invalid. Pursuant to such contract, the Company received shares of Guilin Bank from a debtor's nominee to discharge its indebtedness (See Note 5). The debtor subsequently alleged that such contract was invalid because the transfer price of such assets was below the fair market value. The Company vigorously contested the allegation and received a judgment in favor of the Company. Such third party appealed to a higher court and the case was still under review.

In accordance with ASC Topic 450, No accrual of loss contingency was accrued as of December 31, 2019 since it is not probable that a liability has been incurred because of these legal proceedings and the amount of loss cannot be reasonably estimated.

*Income taxes*

As of December 31, 2019, the Company had accrued US$121,889 for unrecognized tax benefits (Note 17). The final outcome of the tax uncertainty is dependent upon various matters including tax examinations, interpretation of tax laws or expiration of statute of limitations. However, due to the uncertainties associated with the status of examinations, including the protocols of finalizing audits by the relevant tax authorities, there is a high degree of uncertainty regarding the future cash outflows associated with these tax uncertainties.

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**22.    SEGMENT REPORTING**

In accordance with ASC 280, *Segment Reporting*, the Company's chief operating decision maker has been identified as the executive chairman of the board of directors, who makes resource allocation decisions and assesses performance based on the Company's consolidated results. As a result, the Company has only one reportable segment.

***Geographic disclosures***

As the Company generates substantially all of its revenues from customers domiciled in the PRC, No geographical segments are presented. All of the Company's long-lived assets are located in the PRC except for buildings and land (i.e. including the construction in progress) with net book values of US$112,713 and US$99,685 as of December 31, 2018 and 2019, respectively, which are located in the United States of America.

**23.    EARNINGS (LOSS) PER SHARE**

Basic and diluted earnings (loss) per share for each of the years presented are calculated as follows:

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2017** | **2018** | **2019** |
| | **(In thousands, except share data)** | | |
| **Numerator:** | | | |
| Net income (loss) attributable to Fang Holdings Limited's shareholders from continuing operations | 1,032 | (141,420) | (23,430) |
| Net income attributable to Fang Holdings Limited's shareholders from discontinued operations | 20,675 | 26,509 | 13,181 |
| Net income (loss) attributable to Class A and Class B ordinary shareholders | 21,707 | (114,911) | (10,249) |
| | | | |
| **Denominator:** | | | |
| Weighted average number of Class A and Class B ordinary shares outstanding-basic | 88,475,665 | 88,749,432 | 89,511,052 |
| Potentially dilutive ordinary shares equivalent | 3,110,012 | — | — |
| Weighted average number of Class A and Class B ordinary shares outstanding-dilutive | 91,585,677 | 88,749,432 | 89,511,052 |
| | | | |
| **Basic net income (loss) per share** | | | |
| Earnings (loss) from continuing operations per share - basic | 0.01 | (1.59) | (0.26) |
| Earnings from discontinued operations per share - basic | 0.23 | 0.30 | 0.15 |
| Earnings (loss) per share - basic | 0.24 | (1.29) | (0.11) |
| | | | |
| **Diluted net income (loss) per share** | | | |
| Earnings (loss) from continuing operations per share - diluted | 0.01 | (1.59) | (0.26) |
| Earnings from discontinued operations per share - diluted | 0.23 | 0.30 | 0.15 |
| Earnings (loss) per share - diluted | 0.24 | (1.29) | (0.11) |

Table of Contents

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**23.    EARNINGS (LOSS) PER SHARE (continued)**

The repurchased but not retired ordinary shares are accounted as treasury share which are not considered outstanding and excluded from the calculation of basic earnings (loss) per share since the date of repurchase.

Options to purchase 7,217,995 shares of common stock at US$1.95~US$30 per share and 626,534 restricted shares were outstanding in 2019 but were not included in the computation of diluted EPS due to anti-dilutive effect. In addition, 2,009,489 related to the Company's September 2022 Notes and 2,653,084 related to the Company's New November 2022 Notes were not included in the calculation of diluted earnings (loss) per share because the impact of inclusion would be anti-dilutive.

Options to purchase 6,034,054 shares of common stock at US$1.95~US$30 per share and 1,066,635 restricted shares were outstanding in 2018 but were not included in the computation of diluted EPS due to anti-dilutive effect. In addition, 2,790,860 related to the Company's September 2022 Notes and 4,186,290 related to the Company's New November 2022 Notes were not included in the calculation of diluted earnings (loss) per share because the impact of inclusion would be anti-dilutive.

In 2017, the number of securities that were not included in the calculation of diluted earnings (loss) per share because the impact of inclusion would be anti-dilutive were as follows: 2,961,570 share options, 290,534 related to the Company's December 2018 Notes, 2,790,860 related to the Company's September 2022 Notes and 5,581,720 related to the Company's November 2022 Notes. As of December 31, 2017, the conversion prices for the December 2018 Notes, the September 2022 Notes and the November 2022 Notes were US$19.62 per ADS, US$7.166 per ADS and US$7.166 per ADS, respectively, as of December 31, 2017. There is No cash conversion rate.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

24.   PARENT COMPANY ONLY CONDENSED FINANCIAL INFORMATION

*Condensed balance sheets*

| | As of December 31, | |
| --- | --- | --- |
| | 2018 | 2019 |
| | US$ | US$ |
| **ASSETS** | | |
| Cash and cash equivalents | 2,529 | 13,734 |
| Short-term investments | — | 1,384 |
| Prepayments and other current assets | 98 | 39 |
| Amounts due from subsidiaries | 17,056 | — |
| **Total current assets** | **19,683** | **15,157** |
| **Non-current assets:** | | |
| Restricted cash, non-current portion | 1,001 | 1,106 |
| Long-term investments | 30,733 | 49,006 |
| Investment in subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries | 869,895 | 898,766 |
| **Total non-current assets** | **901,629** | **948,878** |
| **Total assets** | **921,312** | **964,035** |
| | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| | | |
| **Current liabilities:** | | |
| Short-term loans and current portion of long-term loans | 26,808 | 4,003 |
| Short term bond payable | — | 102,779 |
| Accrued expenses and other liabilities | 2,575 | 5,045 |
| Amounts due to subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries | 5,722 | 29,843 |
| **Total current liabilities** | **35,105** | **141,670** |
| **Non-current liabilities:** | | |
| Long-term loans, less current portion | 37,266 | 63,677 |
| Convertible senior notes | 254,435 | 168,929 |
| **Total non-current liabilities** | **291,701** | **232,606** |
| **Total liabilities** | **326,806** | **374,276** |
| | | |
| **Commitments and contingencies** | — | — |
| | | |
| **Shareholders' equity:** | | |
| | | |
| Class A ordinary shares, par value HK$1.00 per share, 600,000,000 shares authorized for Class A and Class B in aggregate; 72,069,645 and 71,775,686 shares issued as of December 31, 2018 and 2019; 65,004,587 and 65,403,527 shares outstanding as of December 31, 2018 and 2019 | 9,286 | 9,244 |
| Class B ordinary shares, par value HK$1 per share, 600,000,000 shares authorized for Class A and Class B in aggregate, 24,336,650 shares and 24,336,650 shares issued and outstanding as at December 31, 2018 and December 31, 2019, respectively | 3,124 | 3,124 |
| Additional paid-in capital | 517,802 | 528,620 |
| Accumulated other comprehensive loss | (75,837) | (98,371) |
| Retained earnings | 276,746 | 270,358 |
| Treasury share (7,065,058 and 6,372,159 shares as of December 31, 2018 and 2019, respectively.) | (136,615) | (123,216) |
| **Total shareholders' equity** | **594,506** | **589,759** |
| **Total liabilities and shareholders' equity** | **921,312** | **964,035** |

Table of Contents

**FANG HOLDINGS LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

24.    **PARENT COMPANY ONLY CONDENSED FINANCIAL INFORMATION  (continued)**

*Condensed statements of comprehensive income (loss)*

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2018 | 2019 |
| | US$ | US$ | US$ |
| Revenues | — | — | — |
| Cost of revenues | — | — | — |
| Gross profit | — | — | — |
| General and administrative expenses | (998) | (9,348) | (26,317) |
| **Operating loss** | **(998)** | **(9,348)** | **(26,317)** |
| Equity in profits (losses) of subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries | 27,339 | (85,190) | 34,397 |
| Foreign exchange gain (loss) | 211 | 7 | (3,998) |
| Interest income | 196 | 73 | 65 |
| Interest expenses | (7,233) | (7,700) | (8,978) |
| Change in fair value of securities | 2,736 | (14,904) | (6,043) |
| Investment income, net | 2,221 | 2,151 | 625 |
| Impairment on investments | (2,768) | — | — |
| **Income (loss) before income taxes** | **21,704** | **(114,911)** | **(10,249)** |
| Income tax expenses | — | — | — |
| **Net income (loss)** | **21,704** | **(114,911)** | **(10,249)** |
| Other comprehensive income (loss), before tax | | | |
| Foreign currency translation adjustments | 56,571 | (46,648) | (26,703) |
| Unrealized gain on available-for-sale securities | 14,575 | 1,493 | 861 |
| Amounts reclassified from accumulated other comprehensive income | (2,736) | (1,493) | (861) |
| Other comprehensive income recorded by subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries | 198,263 | — | — |
| Gain (loss) on intra-entity foreign transactions of long-term-investment nature | — | — | 497 |
| Separation of real estate information, analytics and marketplace services business | 1,872 | (3,034) | 3,672 |
| **Other comprehensive income (loss), before tax** | **268,545** | **(49,682)** | **(22,534)** |
| Income tax expense related to components of other comprehensive income | (49,566) | — | — |
| **Other comprehensive income (loss), net of tax** | **218,979** | **(49,682)** | **(22,534)** |
| **Comprehensive income (loss)** | **240,683** | **(164,593)** | **(32,783)** |

F-82

**FANG HOLDINGS LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**24.    PARENT COMPANY ONLY CONDENSED FINANCIAL INFORMATION  (continued)**

*Condensed statements of cash flows*

|  | 2017 | 2018 | 2019 |
|---|---|---|---|
|  | US$ | US$ | US$ |
| Net cash provided by (used in) operating activities | (67,381) | (3,302) | 9,859 |
| Net cash provided by (used in) investing activities | 13,931 | 8,272 | (25,362) |
| Net cash provided by (used in) financing activities | (31,179) | (13,241) | 26,241 |
| Effect of foreign currency exchange rate changes on cash, cash equivalents and restricted cash | — | — | 572 |
| Net increase (decrease) in cash, cash equivalents and restricted cash | (22,271) | (8,271) | 11,310 |
| Cash and cash equivalents and restricted cash at beginning of year | 34,072 | 11,801 | 3,530 |
| Cash and cash equivalents and restricted cash at end of year | 11,801 | 3,530 | 14,840 |

*Basis of Presentation*

For the presentation of the parent company only condensed financial information, the Company records its investment in subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries which it effectively controls through contractual agreements, under the equity method of accounting as prescribed in ASC 323, *Investments-Equity Method and Joint Ventures*. Such investments are presented on the condensed balance sheets as "Investment in subsidiaries, PRC Domestic Entities, and PRC Domestic Entities' subsidiaries" and the subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries' profit or loss as "Equity in profits (losses) of subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries" on the condensed statements of comprehensive income (loss). The parent company only condensed financial information should be read in conjunction with the Company's consolidated financial statements.

**25.    SUBSEQUENT EVENTS**

The recent outbreak of a novel strain of coronavirus named as COVID-19, has spread rapidly since January 2020. The epidemic has resulted in quarantines, travel restrictions, and the temporary closure of facilities in China and many other countries for the past few months. In March 2020, the World Health Organization declared the COVID-19 a pandemic. Government efforts to contain the spread of COVID-19 through city lockdowns or "stay-at-home" orders, widespread business closures, restrictions on travel and emergency quarantines, among others, have caused disruptions to the Company's business operations. The Company has taken measures to reduce the impact of the COVID-19 outbreak, including monitoring its employees' health on a daily basis and optimizing its technology system to support remote work arrangements. The Company has experienced business disturbance due to quarantine measures to contain the spread of COVID-19, and experienced delayed cash collection of accounts receivables and slowdown of revenue growth in the first quarter of 2020. Especially, there were significant disruption of the operation of the Company's subsidiary and its customers located in Hubei province. The Company has implemented various measurements to control expenditures.

The fair value of equity investments with readily determinable fair values and equity method investments carried at fair value as of April 30, 2020 has dropped by 29% since December 31, 2019, as a result of the market volatility. The Company is uncertain if those values will rebound in the near future.

Given the uncertainty around the extent and timing of the potential future spread or mitigation of the COVID-19 and around the imposition or relaxation of protective measures, the Company cannot reasonably estimate the impact for the remainder of fiscal year 2020.

End of Document

# Exhibit 4

June 24, 2020
Fang Holdings Limited
Schedule 13D/A

SC 13D/A 1 a20-23346_1sc13da.htm SC 13D/A

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

## SCHEDULE 13D

### Under the Securities Exchange Act of 1934
### (Amendment No. 2)*

---

# China Index Holdings Limited

#### (Name of Issuer)

---

**Class A ordinary shares, par value US$0.001 per share**
**Class B ordinary shares, par value US$0.001 per share**
#### (Title of Class of Securities)

#### 16954W101**
#### (CUSIP Number)

**Vincent Tianquan Mo**
**Fang Holdings Limited**
**Tower A, No. 20 Guogongzhuang Middle Street**
**Fengtai District, Beijing 100070**
**The People's Republic of China**
**+86-10-5631 8010**
#### (Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)

---

#### June 22, 2020
#### (Date of Event which Requires Filing of this Statement)

---

If the filing person has previously filed a statement on Schedule 13G to report the acquisition which is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(e), 1(f) or 1(g), check the following box. ☒

Note: Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See Rule 13d-1(a) for other parties to whom copies are to be sent.

\*     The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

\*\*   This CUSIP applies to the American Depositary Shares of the issuer, evidenced by American Depositary Receipts, each representing one of one Class A ordinary share. No CUSIP has been assigned to the Class A ordinary shares or Class B ordinary shares of the issuer.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

CUSIP No. **16954W101**

| 1. | Names of Reporting Persons. Fang Holdings Limited |
|---|---|
| 2. | Check the Appropriate Box if a Member of a Group (See Instructions). (a) ☒ (b) ☐ |
| 3. | SEC Use Only |
| 4. | Source of Funds (See Instructions) WC |
| 5. | Check if Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e) ☐ |
| 6. | Citizenship or Place of Organization People's Republic of China |

| Number of Shares Beneficially Owned by Each Reporting Person With | 7. | Sole Voting Power 0 |
|---|---|---|
| | 8. | Shared Voting Power 6,731,275 Class A Ordinary Shares 11,119,686 Class B Ordinary Shares (See Item 5) |
| | 9. | Sole Dispositive Power 0 |
| | 10. | Shared Dispositive Power 6,731,275 Class A Ordinary Shares 11,119,686 Class B Ordinary Shares (See Item 5) |

| 11. | Aggregate Amount Beneficially Owned by Each Reporting Person 6,731,275 Class A Ordinary Shares 11,119,686 Class B Ordinary Shares (See Item 5) |
|---|---|
| 12. | Check if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions) ☐ |
| 13. | Percent of Class Represented by Amount in Row (11) 9.3% of the Class A Ordinary Shares 47.0% of the Class B Ordinary Shares (See Item 5) [1] |
| 14. | Type of Reporting Person (See Instructions) CO |

---

(1) The percentage of the class of securities beneficially owned by the reporting person is calculated based on (i) 72,475,630 Class A ordinary shares and 23,636,706 Class B ordinary shares actually issued and outstanding of the Issuer as of March 31, 2020.

2

## Item 1. Security and Issuer.

This Amendment No. 2 ("Amendment No. 2") amends the statement on Schedule 13D filed with the Securities and Exchange Commission ("SEC") on January 6, 2020. Except as amended and supplemented herein, the information set forth in the Original Schedule 13D remains unchanged. Capitalized terms used but not defined in this Schedule 13D have the respective meanings set forth in the Original Schedule 13D. The address of the principal executive offices of the Issuer is Tower A, No. 20 Guogongzhuang Middle Street, Fengtai District, Beijing 100070, the People's Republic of China.

The Issuer's American depositary shares (the "ADSs"), evidenced by American Depositary Receipts, each representing one Class A Ordinary Share, are listed on the NASDAQ Global Market under the symbol "CIH."

Certain information contained in this Schedule relates to share ownership of persons other than the Reporting Person. The Reporting Person expressly disclaim any liability for any such information and for any other information provided in this Schedule that does not expressly pertain to a Reporting Person.

## Item 2. Identity and Background.

Item 2 is hereby amended and restated in its entirety to read as follows:

This Schedule is being filed by Fang, as an individual filing, pursuant to Rule 13d-1 of the General Rules and Regulations promulgated under the Securities Exchange Act of 1934, as amended (the "Act").

Fang Holdings Limited ("Fang"), an exempted company incorporated under the laws of the Cayman Islands with limited liability, with its registered office is at P.O. Box 31119 Grand Pavilion, Hibiscus Way, 802 West Bay Road, Grand Cayman, KY1-1205 Cayman Islands, and its principal business address at Tower A, No. 20 Guogongzhuang Middle Street, Fengtai District, Beijing, 100070, PRC. Fang operates a leading real estate Internet portal in China in terms of the number of page views and visitors to its websites. Through its websites, Fang provides primarily marketing, listing, leads generation and financial services for China's fast-growing real estate and home furnishing and improvement sectors. Please refer to the Form 20-F filed by Fang on May 27, 2020 for its shareholding information. Mr. Tianquan Mo ("Mr. Mo"), a PRC citizen, is the Chairman of the board of directors of Fang.

## Item 3. Source and Amount of Funds or Other Consideration.

Item 3 is hereby amended and restated in its entirety to read as follows:

Between June 12, 2020 and June 23, 2020, Fang purchased an aggregate of 1,223,874 ADSs representing 1,223,874 Class A Ordinary Shares in open market purchases as set forth in the table below. Fang obtained the funds to purchase the ADSs from its working capital.

| Date | ADSs Purchased | Underlying Class A Ordinary Shares | Price per ADS |
|---|---|---|---|
| 2020/6/12 | 83,000 | 83,000 | 2.3350 |
| 2020/6/15 | 75,700 | 75,700 | 2.4019 |
| 2020/6/16 | 82,677 | 82,677 | 2.3837 |
| 2020/6/17 | 142,619 | 142,619 | 2.5395 |
| 2020/6/18 | 207,944 | 207,944 | 2.6300 |
| 2020/6/19 | 56,633 | 56,633 | 2.7737 |
| 2020/6/22 | 222,277 | 222,277 | 2.9339 |
| 2020/6/23 | 353,024 | 353,024 | 2.9455 |

3

On December 24, 2019, Fang (the "Buyer") entered into a purchase and sales agreement (the "Purchase and Sales Agreement") with Next Decade Investments Limited ("Next Decade") and Media Partner Technology Limited ("Media Partner", collectively with Next Decade, the "Sellers") to purchase up to 15 million Ordinary Shares (primarily consisting of Class-B Ordinary Shares) beneficially owned by the Sellers.

On June 23, 2020, Fang purchased in aggregate 2,429,563 Class A Ordinary Shares and 6,119,686 Class B Ordinary Shares from the Sellers, among which, 2,429,563 Class A Ordinary Shares and 3,059,843 Class B Ordinary Shares from Media Partner and and 3,059,843 Class B Ordinary Shares from Next Decade. Fang obtained the funds to purchase the Class A and Class B Ordinary Shares from its working capital.

## Item 4. Purpose of Transaction.

Item 4 is hereby amended and restated in its entirety to read as follows:

The Reporting Person acquired the Class A Ordinary Shares and Class B Ordinary Shares reported herein for investment purposes. The Reporting Person may, from time to time, make additional purchases of Ordinary Shares or ADSs either in the open market or in privately-negotiated transactions, depending upon the Reporting Person's evaluation of the Issuer's business, prospects and financial condition, the market for the Ordinary Shares and the ADSs, other opportunities available to the Reporting Person, general economic conditions, stock market conditions and other factors. Depending upon the factors noted above, the Reporting Person may also decide to hold or dispose of all or part of their investments in the Ordinary Shares and/or enter into derivative transactions with institutional counterparties with respect to the Issuer's securities, including the Ordinary Shares and the ADSs.

## Item 5. Interest in Securities of the Issuer.

Item 5(a) of the Original Schedule 13D is hereby amended and restated in its entirety to read as follows:

(a) As of the date hereof, Fang is the record holder of (i) 6,731,275 Class A Ordinary Shares, evidenced by ADSs, representing 9.3% of the issued and outstanding Class A Ordinary Shares, and (ii) 11,119,686 Class B Ordinary Shares, representing 47.0% of the issued and outstanding Class B Ordinary Shares. Each Class B ordinary share is entitled to ten votes per share, whereas each Class A ordinary share is entitled to one vote per share.

## Item 6. Contracts, Arrangements, Understandings or Relationships with Respect to the Issuer.

The information set forth in or incorporated by reference in Item 2, 3, 4 and 5 of this Schedule 13D and Item 5 of the Original Schedule 13D are incorporated by reference into this Item 6.

## Item 7. Materials to be Filed as Exhibits.

Exhibit 99.1:    Purchase and Sales Agreement dated December 24, 2019 between the Buyer and the Sellers (Previously filed)

4

# SIGNATURES

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Date: June 24, 2020

**FANG HOLDINGS LIMITED**

By:   /s/ Tianquan Mo
     Name:    Tianquan Mo
     Title:     Director

5

## Schedule A

| Name | Present Principal Occupation or Employment and Business Address |
| --- | --- |
| Tianquan Mo (PRC citizen) | Chairman of Fang Holdings Limited and China Index Holdings Limited, c/o Tower A, No. 20 Guogongzhuang Middle Street, Fengtai District, Beijing 100070, PRC |

6

# Exhibit 5

May 14, 2019
Fang Holdings Limited
Form 20-F

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

# FORM 20-F

(Mark One)

☐ REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2018

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

OR

☐ SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of event requiring this shell company report: _____

Commission file number: 001-34862

# Fang Holdings Limited

(Exact name of registrant as specified in its charter)

N/A

(Translation of Registrant's name into English)

Cayman Islands

(Jurisdiction of incorporation or organization)

Tower A, No. 20 Guogongzhuang Middle Street
Fengtai District, Beijing 100070
The People's Republic of China

(Address of principal executive offices)

Contact Person: Executive Chairman
Telephone: +86-10-5631 8000
Fax: +86-10-5631 8010

(Telephone, E-mail and/or Facsimile Number of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol | Name of Each Exchange on Which Registered |
|---|---|---|
| American depositary shares, five American depositary shares representing one Class A ordinary share | SFUN | The New York Stock Exchange |
| Class A ordinary shares, with a par value of HK$1.00 each* | | The New York Stock Exchange |

* Not for trading, but only in connection with the listing on the New York Stock Exchange of American depositary shares

**Securities registered or to be registered pursuant to Section 12(g) of the Act: None**
**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act: None**

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

| | |
|---|---|
| Class A ordinary shares, par value HK$1.00 each | 65,004,587 |
| Class B ordinary shares, par value HK$1.00 each | 24,336,650 |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act Yes☒ No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 229.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or non-accelerated filer. See definition of "large accelerated filer," "accelerated filer" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒            Accelerated filer ☐            Non-accelerated filer ☐
                                                                    Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards † provided pursuant to Section 13(a) of the Exchange Act.

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☒            International Financial Reporting Standards as issued            Other ☐
                       by the International Accounting Standards Board ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow: Item 17 ☐ Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes☐ No ☒

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court. Yes ☐ No ☐

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| INTRODUCTION | 1 |
| FORWARD LOOKING STATEMENTS | 3 |
| PART I | 4 |
| ITEM 1.   IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS | 4 |
| ITEM 2.   OFFER STATISTICS AND EXPECTED TIMETABLE | 4 |
| ITEM 3.   KEY INFORMATION | 4 |
| ITEM 4.   INFORMATION ON THE COMPANY | 48 |
| ITEM 4A.   UNRESOLVED STAFF COMMENTS | 79 |
| ITEM 5.   OPERATING AND FINANCIAL REVIEW AND PROSPECTS | 80 |
| ITEM 6.   DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES | 105 |
| ITEM 7.   MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS | 122 |
| ITEM 8.   FINANCIAL INFORMATION | 128 |
| ITEM 9.   THE OFFER AND LISTING | 129 |
| ITEM 10.   ADDITIONAL INFORMATION | 129 |
| ITEM 11.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 140 |
| ITEM 12.   DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES | 142 |
| PART II | 144 |
| ITEM 13.   DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES | 144 |
| ITEM 14.   MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS | 144 |
| ITEM 15.   CONTROLS AND PROCEDURES | 144 |
| ITEM 16A.   AUDIT COMMITTEE FINANCIAL EXPERT | 146 |
| ITEM 16B.   CODE OF ETHICS | 146 |
| ITEM 16C.   PRINCIPAL ACCOUNTANT FEES AND SERVICES | 146 |
| ITEM 16D.   EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES | 147 |
| ITEM 16E.   PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS | 147 |
| ITEM 16F.   CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT | 147 |
| ITEM 16G.   CORPORATE GOVERNANCE | 148 |
| ITEM 16H.   MINE SAFETY DISCLOSURE | 148 |
| PART III | 149 |
| ITEM 17.   FINANCIAL STATEMENTS | 149 |
| ITEM 18.   FINANCIAL STATEMENTS | 149 |
| ITEM 19.   EXHIBITS | 149 |
| SIGNATURES | 155 |

# INTRODUCTION

Except where the context otherwise requires and for purposes of this annual report on Form 20-F only:

- "we," "us," "our company," "our," "SouFun" or "Fang" refers to Fang Holdings Limited (formerly known as SouFun.com Limited and SouFun Holdings Limited), its subsidiaries, and, in the context of describing our operations and consolidated financial information, our consolidated controlled entities in China (also referred to as the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries in our consolidated financial statements and related notes included elsewhere in this annual report);

- "2018 Notes" refers to our $400 million aggregate principal amount of convertible senior notes due 2018;

- "2022 Notes" refers to our $300 million aggregate principal amount of convertible notes due 2022;

- "ADSs" refers to our American depositary shares, with five ADSs representing one Class A ordinary share, and "ADRs" refers to American depositary receipts, which, if issued, evidence our ADSs;

- "CIH" refers to China Index Holdings Limited (formerly known as Selovo Investments Limited), our subsidiary, and its subsidiaries and variable interest entity, Beijing Zhong Zhi Hong Yuan Data Information Technology Co., Ltd., or the proposed spun-off business identified in this annual report, as the context indicates;

- "CSRC" refers to the China Securities Regulatory Commission;

- "China" or "PRC" or "Chinese" refers to the People's Republic of China, excluding, for the purpose of this annual report only, the Hong Kong Special Administrative Region, the Macau Special Administrative Region and Taiwan;

- "Exchange Act" refers to the Securities Exchange Act of 1934, as amended;

- "Hong Kong dollars" or "HK$" refers to the legal currency of the Hong Kong Special Administrative Region;

- "MIIT" refers to the Ministry of Industry and Information Technology and its compete local branches;

- "MOFCOM" refers to the Ministry of Commerce and its competent local branches;

- "MOHURD" refers to the Ministry of Housing and Urban-Rural Development and its competent local branches;

- "notes" refers to 2018 Notes and 2022 Notes, collectively;

- "PBOC" refers to People's Bank of China;

- "RMB" or "Renminbi" refers to the legal currency of China;

- "SAFE" refers to the State Administration of Foreign Exchange and its competent local branches;

- "SAIC" refers to the State Administration for Industry and Commerce and its competent local branches;

- "SAT" refers to the State Administration of Taxation and its competent local branches;

- "SEC" refers to the U.S. Securities and Exchange Commission;

- "Securities Act" refers to the Securities Act of 1933, as amended;

- "shares" or "ordinary shares" refers to our ordinary shares, including both Class A ordinary shares and Class B ordinary shares;

- "sq.m." refers to square meter(s); and

- "U.S. dollars," "US$" or "$" refers to the legal currency of the United States of America.

This annual report includes our audited consolidated statements of comprehensive income (loss) for 2016, 2017 and 2018, our audited consolidated balance sheets as of December 31, 2017 and 2018, our audited consolidated statements of shareholders' equity and our audited consolidated statements of cash flows for 2016, 2017 and 2018.

**FORWARD LOOKING STATEMENTS**

This annual report contains forward-looking statements that involve risks and uncertainties. All statements other than statements of historical facts are forward-looking statements. These forward-looking statements are made under the "safe harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. These statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements.

You can identify these forward-looking statements by words or phrases such as "may," "will," "expect," "is expected to," "anticipate," "aim," "estimate," "intend," "plan," "believe," "are likely to" or other similar expressions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements include, but are not limited to:

- our anticipated business activities and the expected impact of these actions on our results of operations and financial condition;

- expected changes in our revenues and certain cost or expense items;

- our ability to attract clients and further enhance our brand recognition;

- trends and competition in the real estate, home furnishings and improvement sites and online advertising industries;

- PRC laws, regulations and policies relating to the real estate, home furnishings and improvement sites and advertising and financing industries and the use of the Internet to conduct these activities; and

- the separation and distribution of CIH from us.

You should read this annual report and the documents that we refer to in this annual report thoroughly and with the understanding that our actual future results may be materially different from and worse than what we expect. We qualify all of our forward-looking statements by these cautionary statements. Other sections of this annual report, including the section titled "Risk Factors" beginning on page 7, include additional factors which could adversely impact our business and financial performance. Moreover, we operate in an evolving environment. New risk factors and uncertainties emerge from time to time and it is not possible for our management to predict all risk factors and uncertainties, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements.

You should not rely upon forward-looking statements as predictions of future events. Except as required by law, we undertake No obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

**MARKET AND INDUSTRY DATA**

Market data and certain industry forecasts used in this annual report were obtained from internal surveys, market research, publicly available information and industry publications. Industry publications generally state that the information contained therein has been obtained from sources believed to be reliable, but that the accuracy and completeness of such information is not guaranteed. Similarly, internal surveys, industry forecasts and market research, while believed to be reliable, have not been independently verified, and we make No representation as to the accuracy of such information.

PART I

## ITEM 1.  IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS

Not applicable.

## ITEM 2.  OFFER STATISTICS AND EXPECTED TIMETABLE

Not applicable.

## ITEM 3.  KEY INFORMATION

*A. Selected Financial Data*

We have derived our selected consolidated statement of comprehensive income (loss) data (except for ADS information) for 2016, 2017 and 2018 and our selected consolidated balance sheet data as of December 31, 2017 and 2018, from our audited consolidated financial statements included in this annual report. Our selected statement of comprehensive income (loss) data (except for ADS information) for 2014 and 2015 and our selected consolidated balance sheet data as of December 31, 2014, 2015 and 2016, have been derived from our audited consolidated financial statements not included in this annual report. Our financial statements have been prepared in accordance with U.S. GAAP.

You should read the following information in conjunction with our audited consolidated financial statements and related notes and "Item 5. Operating and Financial Review and Prospects" in this annual report. Our historical operating results presented below are not necessarily indicative of the results to be expected for any future fiscal period.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 |
| | (U.S. dollars in thousands, except share data and ADS data) | | | | |
| Consolidated statement of comprehensive income (loss) data: | | | | | |
| **Revenues:** | | | | | |
| E-commerce services | 244,344 | 474,810 | 577,684 | 87,809 | 15,384 |
| Marketing services | 294,484 | 249,862 | 165,437 | 149,267 | 119,680 |
| Listing services | 145,654 | 107,922 | 118,109 | 165,374 | 113,534 |
| Financial services | 3,235 | 29,582 | 29,602 | 12,055 | 18,060 |
| Value-added services | 15,165 | 21,373 | 25,559 | 29,791 | 36,358 |
| **Total revenues** | **702,882** | **883,549** | **916,391** | **444,296** | **303,016** |
| **Cost of revenue:** | | | | | |
| Cost of services | (145,739) | (555,389) | (687,184) | (174,599) | (58,570) |
| **Gross profit** | **557,143** | **328,160** | **229,207** | **269,697** | **244,446** |
| **Operating income (expenses):** | | | | | |
| Selling expenses | (147,874) | (236,603) | (229,817) | (91,250) | (69,532) |
| General and administrative expenses | (100,571) | (125,405) | (151,251) | (135,688) | (138,386) |
| Other income (loss) | 835 | (625) | 415 | (567) | 3,275 |
| **Operating income (loss)** | **309,533** | **(34,473)** | **(151,446)** | **42,192** | **39,803** |

4

| | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| | | | Year Ended December 31, | | |
| | | | (U.S. dollars in thousands, except share data and ADS data) | | |
| Foreign exchange gain (loss) | (44) | 1,464 | (1,882) | 15 | (598) |
| Interest income | 43,857 | 22,221 | 11,367 | 11,322 | 10,302 |
| Interest expense | (17,308) | (16,519) | (20,791) | (16,153) | (21,174) |
| Change in fair value of securities | | | | 518 | (167,402) |
| Realized gain on available-for-sale securities (including accumulated other comprehensive income reclassifications for unrealized gain on available-for-sale securities of US$10,583, US$2,736 and US$1,493 for the years ended December 31, 2016, 2017 and 2018 respectively) | — | — | 10,583 | 2,736 | 1,493 |
| Government grants | 7,205 | 4,936 | 6,469 | 3,154 | 1,435 |
| Investment income, net | — | 1,333 | 3,281 | 6,692 | 6,816 |
| Other non-operating loss | | | | (4,562) | (30) |
| Impairment on investments | (8,417) | — | (2,232) | (2,768) | — |
| **Income (loss) before income taxes and noncontrolling interests** | **334,826** | **(21,038)** | **(144,651)** | **43,146** | **(129,355)** |
| Income tax (expenses) benefit | (81,609) | 5,905 | (24,984) | (21,442) | 14,446 |
| Net income (loss) | 253,217 | (15,133) | (169,635) | 21,704 | (114,909) |
| Net (loss) income attributable to noncontrolling interests | — | (37) | — | (3) | 2 |
| Net income (loss) attributable to Fang Holdings Limited's shareholders | 253,217 | (15,096) | (169,635) | 21,707 | (114,911) |
| **Other comprehensive income (loss), before tax:** | | | | | |
| Foreign currency translation adjustments | (4,323) | (55,928) | (60,732) | 56,571 | (46,648) |
| Unrealized gain (loss) on available-for-sale securities | 10,508 | (4,002) | 7,326 | 212,838 | 1,493 |
| Amounts reclassified from accumulated other comprehensive income | — | — | (10,583) | (2,736) | (1,493) |
| Gain (loss) on intra-entity foreign transactions of long-term-investment nature | — | — | (6,996) | 1,872 | (3,034) |
| **Other comprehensive income (loss), before tax** | **6,185** | **(59,930)** | **(70,985)** | **268,545** | **(49,682)** |
| Income tax expense related to components of other comprehensive income | — | — | — | (49,566) | — |
| **Other comprehensive income (loss), net of tax** | **6,185** | **(59,930)** | **(70,985)** | **218,979** | **(49,682)** |
| **Comprehensive income (loss)** | **259,402** | **(75,063)** | **(240,620)** | **240,683** | **(164,591)** |
| Comprehensive (loss) income attributable to noncontrolling interests | — | (37) | — | (3) | 2 |
| Comprehensive income (loss) attributable to Fang Holdings Limited's shareholders | 259,402 | (75,026) | (240,620) | 240,686 | (164,593) |
| **Earnings (loss) per share for Class A and Class B ordinary shares:** | | | | | |
| Basic | 3.08 | (0.18) | (1.81) | 0.25 | (1.29) |
| Diluted(1) | 2.87 | (0.18) | (1.81) | 0.24 | (1.29) |
| Dividend declared per ordinary share(2) | 1.00 | 0.87 | — | — | — |

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** |
| | **(U.S. dollars in thousands, except share data and ADS data)** | | | | |
| **Earnings (loss) per ADS:** | | | | | |
| Basic | 0.62 | (0.04) | (0.36) | 0.05 | (0.26) |
| Diluted(1) | 0.57 | (0.04) | (0.36) | 0.05 | (0.26) |
| **Weighted average number of Class A and Class B ordinary shares outstanding:** | | | | | |
| Basic | 82,163,135 | 85,170,886 | 93,605,749 | 88,475,665 | 88,749,432 |
| Diluted | 92,208,620 | 85,170,886 | 93,605,749 | 91,585,677 | 88,749,432 |
| **Weighted average number of outstanding ADS:** | | | | | |
| Basic | 410,815,675 | 425,854,430 | 468,028,745 | 442,378,325 | 443,747,158 |
| Diluted | 461,043,100 | 425,854,430 | 468,028,745 | 457,928,385 | 443,747,158 |
| **Share-based compensation expenses included in:** | | | | | |
| Cost of revenues | 782 | 471 | 443 | 364 | 506 |
| Selling expenses | 1,122 | 446 | 512 | 479 | 405 |
| General and administrative expenses | 2,779 | 3,485 | 5,597 | 6,375 | 13,171 |

(1) Earnings (loss) per share for Class A and Class B ordinary shares (diluted) and earnings (loss) per ADS (diluted) for each year from 2014 to 2018 have been computed, after considering the potential dilutive effect of the shares underlying employees' share options, restricted shares and convertible senior notes.

(2) Dividend declared per ordinary share represents the dividend declared divided by the number of outstanding ordinary shares as of the period end.

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** |
| | **(U.S. dollars in thousands)** | | | | |
| **Consolidated balance sheet data:** | | | | | |
| Cash and cash equivalents and short-term investments | 809,944 | 880,480 | 379,457 | 284,077 | 211,151 |
| Total current assets | 1,173,457 | 1,514,738 | 793,210 | 748,412 | 668,837 |
| Total assets | 1,737,805 | 2,292,042 | 1,614,813 | 2,000,255 | 1,824,436 |
| Long term loans | 100,000 | — | 65,190 | 114,109 | 123,215 |
| Convertible senior notes | 393,568 | 287,887 | 295,268 | 291,365 | 254,435 |
| Total Fang shareholder's equity | 632,609 | 853,766 | 487,130 | 739,583 | 594,506 |

**B. Capitalization and Indebtedness**

    Not applicable.

**C. Reasons for the Offer and Use of Proceeds**

    Not applicable.

6

*D. Risk Factors*

*An investment in our ADSs or notes involves risks. You should carefully consider the risks described below, as well as the other information included or incorporated by reference in this annual report, before making an investment decision. Our business, financial condition or results of operations could be materially adversely affected by any of these risks. The market or trading price of our ADSs or notes could decline due to any of these risks, and you may lose all or part of your investment. In addition, the risks discussed below also include forward-looking statements and our actual results may differ substantially from those discussed in these forward-looking statements. You should also review the section of this annual report captioned "Forward-Looking Statements." Please note that additional risks not presently known to us, that we currently deem immaterial or that we have not anticipated may also impair our business and operations.*

**Risks related to our business**

***We may continue to incur losses in the future, and may not be able to return to profitability, which may cause the market price of our ADSs to decline.***

We incurred net loss of US$114.9 million in 2018, primarily due to the combined effect of the decrease in our revenues and the decrease in fair value of our equity investments. Prior to January 1, 2018, such unrealized change in fair value of equity investments was recorded in other comprehensive income or loss, while such unrealized change in fair value of equity investments is recorded in earnings after January 1, 2018 due to the adoption of ASU 2016-01. Our ability to achieve profitability in the future depends on our ability to control costs and to provide products and services to meet the market demands and attract new customers, the competitiveness of our products and services, and the regulatory environment in China's real estate market. Due to the numerous risks and uncertainties associated with the development of our business and the regulatory environment, we cannot guarantee that we may be able to return to profitability in the short-term or long-term, which may cause the market price of our ADSs to decline.

***Our business could be materially and adversely affected by fluctuations in, and government measures influencing, China's real estate industry.***

We conduct our real estate services business primarily in China, and our business depends substantially on conditions of the PRC real estate market. In particular, our new home business, which accounted for 47.2%, 34.2% and 41.8% of our total revenues in 2016, 2017 and 2018, respectively, depends upon growth in the real estate-related industry nationwide and in specific regions in China. Demand for private residential property in China has grown rapidly in recent years, but such growth is often coupled with volatility in market conditions and fluctuation in property prices. Fluctuations of supply and demand in China's real estate market are caused by economic, social, political and other factors. To the extent fluctuations in the real estate market adversely affect the demand for real estate and home-related products and services and for real estate- and home-related advertising and financing, demand for our products and services, as well as the level of our growth and profitability, may be materially reduced.

The real estate market in China is typically affected by changes in government policies affecting the real estate and financial markets and related areas. In the past, the PRC government has adopted various administrative measures to curb what it perceived as unsustainable growth in the real estate market, particularly when the real estate market in China experienced rapid and significant increases in home sales as well as prices. In February 2013, for example, the State Council announced certain plans to address the rapid increase in property prices in certain cities since late 2012, including raising minimum down-payments and loan rates for second home buyers in cities where prices experienced a rapid increase and enforcing a 20% capital gains tax on the sale of existing homes. In part due to these policies, the real estate market in China experienced a slowdown and real estate development declined in 2014. In March 2015, the PRC government issued a new policy to reduce the down-payment requirements and exempt certain home owners from paying sales taxes if they sell after owning the property for two years. Beginning in September 2016, certain cities, such as Beijing and Shanghai, increased the down-payment requirements again and tightened the determination of first home buyers who are often eligible for relaxed regulations. Relevant government authorities have recently also promulgated legislations to ban financings to home buyers for down-payment and ceased granting or renewing real estate broker licenses in certain cities. Beginning in March 2017, certain cities, such as Beijing and Guangzhou, further increased the minimum down-payments for second home buyers.

In addition to government policies aimed specifically at controlling growth in real estate markets in China, our business, financial condition and results of operations may also be negatively affected by other macroeconomic and regulatory measures. Any future policies in the following areas could cause a decline in home sales and prices, which in turn could affect the demand for our services and negatively impact our business, financial condition and results of operation:

- restrictive monetary policies adopted by the PRC government, including any significant increase in interest rates;

- adverse developments in the credit markets and/or mortgage financing markets resulting from PRC government policies;

- policies regarding land supply;

- significant increases in transaction costs as a result of changes in PRC government policies regarding transaction taxes, such as the sales tax on residential property sales by individuals within two years of purchase;

- adverse changes in PRC government policies regarding the acquisition and/or ownership of real estate;

- adverse changes in PRC national or local government policies or practices regarding brokerage, referral or related fees and commissions; or

- other PRC government policies or regulations that burden real estate transactions or ownership.

***Our business depends substantially on revenues from our marketing services, and participants in the real estate and home-related sectors may choose other advertising media over online advertising or other online advertisers, which could lead to a decline in our revenues.***

All of our marketing service revenues are generated through our websites and mobile apps, and we expect to continue to derive a significant portion of our revenues from marketing services. Marketing services accounted for 18.1%, 33.6% and 39.5% of our revenues in 2016, 2017 and 2018, respectively, constituting our largest source of revenues in 2018. In particular, our new home business accounted for 87.4%, 81.4% and 99.7% of our marketing service revenues in 2016, 2017 and 2018, respectively. Our new home business primarily consists of sales of marketing services to residential property developers and their sales agents who are promoting newly developed properties for sale.

Although the online marketing industry in China has been growing, advertisers in the real estate sector in China have typically relied on traditional forms of advertising media, such as newspapers, magazines and outdoor advertising. If we are unable to retain and develop our base of advertising customers, including real estate developers, our business may not grow as quickly as we expect. Moreover, advertisers may not continue to do business with us if they do not perceive our marketing services to be effective or our user demographics to be desirable.

Our ability to continue to generate and maintain marketing service revenues depends on a number of factors, many of which are beyond our control, including:

- overall demand from property developers for online advertising;

- the amount of user traffic on our websites and mobile apps, our ability to achieve user demographic characteristics that are attractive to advertisers, and our ability to demonstrate such user traffic and demographic characteristics through our website traffic tracking tools and reporting systems;

- potential downward pressure on online marketing pricing due to increased competition from other online advertisers and traditional advertising media;

- widespread adoption of technologies that permit Internet users to selectively block unwanted web views, including advertisements on web pages; and

- emergence and user acceptance of new marketing channels, including social networking platforms and "We Media."

If we are unable to remain competitive and provide value to our advertisers, they may stop placing advertisements with us, which would have a material adverse effect on our business, financial condition and results of operations.

***If we are unable to continue to obtain listings from our key customer groups, including real estate developers, agents, brokers and property owners and managers, our business, financial condition and results of operations could be materially and adversely affected.***

We derive a significant portion of our revenues from our listing services. In 2016, 2017 and 2018, listing service revenues represented approximately 12.9%, 37.2% and 37.5% of our total revenues, respectively. The success of the listing service business depends on our ability to persuade real estate developers, real estate agents, brokers, developers and property owners and managers to list their properties on our websites and mobile apps. We believe having large numbers of high-quality listings from such real estate professionals attracts users to our websites and mobile apps, thereby enhancing our attractiveness to advertisers and other real estate market participants. However, substantially all of our listing agreements are nonexclusive. Our listing customers may stop using our listing services and may choose to use the services of one or more of our competitors or seek alternative means of listing, such as real estate magazines or newspapers. If owners of large numbers of property listings, such as major developers or large brokers or property owners in key real estate markets, choose not to renew their existing agreements with us, our websites and mobile apps could become less attractive to users. If we experience reduced user traffic on our websites and mobile apps, advertisers and other real estate market participants may discontinue the use of or be unwilling to pay for our services. In such an event, our competitive position could be significantly weakened and our business, financial condition and results of operations could be materially and adversely affected.

***Our future growth depends in part on our ability to continue to operate the retained business after the proposed separation of CIH.***

On May 10, 2019, CIH publicly filed a registration statement on Form F-1 with SEC to effect its separation from Fang through a dividend distribution of Class A ordinary shares (including those represented by ADSs) in CIH to our equity holders. Upon the completion of the proposed separation and distribution, CIH will have the exclusive right to operate the spun-off business comprising certain portions of our listing and value-added services, and we will have the exclusive right to operate the retained business. CIH plans to cooperate with us to operate its commercial property-related business through our web pages after the proposed separation and distribution and ultimately migrate such business to its own website. For more details, see "Item 4. Information on the Company— B. Business Overview— Separation of CIH."

Whether we can continue to grow the retained business depends on our ability to manage and develop these services effectively. If we are not successful in assuring our employees of our prospects after the proposed separation and distribution, our employees may seek other employment, which could materially and adversely affect our business operation. If we fail to retain our qualified personnel or replace them when they leave, we may be unable to continue our development, which may cause the price of our ADSs to fall.

***We derive a substantial portion of our revenues from several major urban centers in China, in particular, Beijing, Shanghai, Chengdu, Chongqing, Tianjin and Shenzhen and we face market risks due to concentration of our revenues in these major urban areas.***

We derive a substantial portion of our revenues from several major urban centers in China, including Beijing, Shanghai, Chengdu, Chongqing, Tianjin and Shenzhen. In 2016, 2017 and 2018, we generated revenues of US$465.6 million, US$180.5 million and US$152.9 million, respectively, from these six urban centers, representing 51.0%, 41.0% and 50.5%, respectively, of our total revenues. We expect these six urban centers to continue to be important regional sources of revenues in all of our revenue categories. If any of these major urban centers experience events which negatively impact the real estate industry or online advertising, such as a serious economic downturn or contraction, a natural disaster, or slower growth due to adverse governmental policies or otherwise, demand for our services could decline significantly and our business and revenue growth prospects could be materially and adversely impacted.

***We may fail to compete successfully against current or future competitors, which could significantly reduce our market share and materially and adversely affect our business, financial condition and results of operations.***

We face competition from other companies in each of our primary business activities. In particular, the online real estate Internet service market in China is becoming increasingly competitive. For example, in March 2015, 58.com, an online marketplace, acquired Anjuke.com, an online real estate sales and rental service provider in China, which will likely increase competition in our market. The barriers of entry for establishing Internet-based businesses are low, thereby allowing new entrants to emerge rapidly. As the online real estate Internet service industry in China is relatively new and constantly evolving, our current or future competitors may be able to better position themselves to compete as the industry matures. We also face competition from companies in other media that offer online advertising, online listing and similar services. Any of these competitors may offer products and services that provide significant advantages over those offered by us in terms of performance, price, scope, creativity or other advantages. These products and services may achieve greater market acceptance than our service offerings, and thus weaken our brand. Increased competition in the online real estate Internet service industry in China could make it difficult for us to retain existing customers and attract new customers, and could lead to a reduction in our fees. Furthermore, our current competitors include major Internet portals in China that provide real estate Internet services, such as Sina.com and Sohu.com, which may have more established brand names, larger visitor numbers and more extensive Internet distribution channels than we do.

In addition, we have faced and may continue to face strong competition from regionally focused websites and mobile apps providing regional real estate listings together with localized services, as well as other emerging channels, including social network platforms and "We Media." Any of our current or future competitors may also receive investments from or enter into other commercial or strategic relationships with larger, well-established and well-financed companies and obtain significantly greater financial, marketing and content licensing and development resources than us. Furthermore, some of our competitors receive support from local governments, which may place us at a disadvantage when competing with them in their local markets. We cannot assure you that we will be able to compete successfully against our current or future competitors. Any failure to compete effectively in the real estate Internet services market in China would have a material adverse effect on our business, financial condition and results of operations.

***Failure to maintain and enhance brand awareness for our websites and mobile apps could lead to loss of existing customers and qualified personnel.***

We believe maintaining and enhancing our brand name as a leading real estate Internet company in China is a critical part of our strategy. In July 2014, we changed the address of our principal website from www.soufun.com to www.fang.com. "Fang" means "home" in Chinese. In conjunction with our change of web address, we also launched our new "Fang Tian Xia" brand ("房天下" in Chinese, which can be approximately translated as "world of homes" in English). In September 2016, we changed our name to Fang Holdings Limited. We believe that this new and simplified address will be much easier for Chinese users to remember and access, thereby improving our brand recognition. In addition to promoting our websites and brand through our direct sales force, we also intend to continue to pursue other means to enhance brand awareness, including publication of real estate research reports, event sponsorships, portal collaboration arrangements, and advertising and marketing activities. We cannot assure you that our efforts will be successful in maintaining or enhancing our brand awareness. If our brand enhancement strategy is unsuccessful, or if other brands surpass our brand in market recognition in one or more cities in which we operate, we may fail to attract new or retain existing users, customers or qualified personnel, which could materially decrease our revenues and profitability.

***Unauthorized use of our intellectual property by third parties, and the expenses incurred in protecting our intellectual property rights, may materially and adversely affect our business, financial condition, results of operations, reputation and competitive advantage.***

Our copyrights, trademarks, trade secrets, domain names and other intellectual property are important to our business. Unauthorized use of such intellectual property, whether owned by us or licensed to us, may materially and adversely affect our business, financial condition, results of operations, reputation and competitive advantages. We rely on intellectual property laws and contractual arrangements with our key employees and certain of our customers, collaborators and others to protect our intellectual property rights. The measures we take to protect our intellectual property rights may not be adequate and policing the unauthorized use of our intellectual property is difficult and expensive.

In addition, the validity, enforceability and scope of protection of intellectual property in Internet-related industries in China are uncertain and still evolving, and could involve substantial risks. The laws and enforcement procedures in China are not yet well developed, and do not protect intellectual property rights to the same extent as laws and enforcement procedures in the United States and other jurisdictions. Furthermore, litigation may be necessary in the future to enforce our intellectual property rights, which could result in substantial costs and diversion of our resources and have a material adverse effect on our business, financial condition and results of operations. If we are unable to adequately protect the intellectual property rights that we own or use, we may lose these rights and our business, growth prospects and profitability may suffer.

11

***Regulation of the Internet industry in China, including censorship of information distributed over the Internet, may materially and adversely affect our business.***

China has enacted laws, rules and regulations governing Internet access and the distribution of news, information or other content, as well as products and services, through the Internet. In the past, the PRC government has prohibited the distribution of information through the Internet that it deems to be in violation of applicable PRC laws, rules and regulations. In particular, under regulations promulgated by the State Council, the MIIT, the General Administration of Press, Publication , Radio, Film and Television (formerly the State Press and Publications Administration) and the Ministry of Culture, Internet content providers and Internet publishers are prohibited from posting or displaying content over the Internet that, among other things: (1) opposes the fundamental principles of the PRC constitution, (2) compromises state security, divulges state secrets, subverts state power or damages national unity, (3) disseminates rumors, disturbs social order or disrupts social stability, (4) propagates obscenity, pornography, gambling, violence, murder or fear or incites the commission of crimes, or (5) insults or slanders a third party or infringes upon the lawful right of a third party.

If any Internet content we offer through our consolidated controlled entities were deemed by the PRC government to violate any of such content restrictions, we would not be able to continue such offerings and could be subject to penalties, including confiscation of illegal revenues, fines, suspension of business and revocation of required licenses, which could have a material adverse effect on our business, financial condition and results of operations. We may also be subject to potential liability for any unlawful actions of our customers or affiliates or for content we distribute that is deemed inappropriate. It may be difficult to determine the type of content that may result in liability to us, and if we are found to be liable, we may be forced to cease operation of our websites and mobile apps in China.

***If we fail to maintain the applicable licenses and approvals under the complex regulatory environment for Internet-based businesses and online advertising businesses in China, or fail to pass annual government inspection or obtain renewal of the business license, our business, financial condition and results of operations would be materially and adversely affected.***

The Internet and online advertising industries in China are still at a relatively early stage of development and are highly regulated by the PRC government. Various regulatory authorities of the PRC government, such as the State Council, the MIIT, the SAIC, the General Administration of Press, Publication, Radio, Film and Television, and the Ministry of Public Security, are empowered to issue and implement regulations governing various aspects of the Internet and advertising industries. Moreover, new laws, rules and regulations may be adopted, or new interpretations of existing laws, rules and regulations may be released, to address issues that arise from time to time. As a result, substantial uncertainties exist regarding the interpretation and implementation of any current and future PRC laws, rules and regulations applicable to the Internet and online advertising industries.

We are required to obtain applicable licenses or approvals from various regulatory authorities in order to provide advertising and value-added services and products. These licenses or approvals are essential to the operation of our business and are generally subject to annual review by the relevant PRC governmental authorities. For example, each of Beijing Technology, Beijing JTX Technology, Beijing Tuo Shi Hong Ye Technology Development Co., Ltd. ("Beijing Tuo Shi Hong Ye") and Beijing Gu Tian Xia Information Co., Ltd. ("Beijing Gu Tian Xia") currently holds an ICP license, as required under the applicable PRC laws, rules and regulations; and each of Beijing Technology, Beijing JTX Technology and Beijing Gu Tian Xia currently holds an approval for operating electronic bulletin board services as required under the applicable PRC laws, rules and regulations. Beijing Advertising, Shanghai Century JTX Network and certain other consolidated controlled entities are allowed to provide marketing services in accordance with the business scope indicated in each of their respective business licenses.

Some of our consolidated controlled entities, however, may be required to obtain additional licenses. For example, since our websites and mobile apps include online residential communities that allow visitors to post information, including graphics or weblinks to videos, other websites and mobile apps or data in microblogs or online discussion forums, on our websites and mobile apps for discussion with other users, the release of such information on our websites and mobile apps may be deemed as providing Internet publication services and therefore require Internet publication licenses. Similarly, if we or third parties post information that may be viewed as news information, the release of such information on our websites and mobile apps may be deemed as Internet news information services and therefore require Internet news information licenses. We, like many other similarly situated business operators, have been operating our businesses without such licenses. Certain of our relevant consolidated controlled entities have applied to the relevant government authorities for Internet publication licenses again in accordance with applicable PRC laws, rules and regulations, and pursuant to the request by the relevant governmental authorities, we are now preparing the relevant supplementary materials for such application. In addition, we are still in discussions with the relevant government authorities on our application for, and the authorities' issuance of, Internet news information service licenses.

Moreover, certain services licenses, including, for example, the financing guarantee license, the online video recording and broadcasting license and real estate service licenses, held by certain of our subsidiaries, have expired, and the holders have applied for renewals, which are currently awaiting approval from the relevant regulators.

Under the applicable PRC laws, rules and regulations, the failure to obtain and/or maintain business licenses, an Internet publication licenses and/or Internet news information service licenses may subject the entity to various penalties, including confiscation of revenues, imposition of fines and/or restrictions on the entity conducting such activities' business operations, or the discontinuation of their operations. Although our relevant consolidated controlled entities have not received any revenues directly from Internet publication services or Internet news information services, we cannot assure you that the PRC regulatory authorities will not impose any such penalties. Any such disruption in the business operations of our consolidated controlled entities could materially and adversely affect our business, financial condition and results of operations.

***Unexpected network interruptions or security breaches, including "hacking" or computer virus attacks, may cause delays or interruptions of service, resulting in reduced use and performance of our websites and mobile apps and damage our reputation and brands.***

Our business depends heavily on the performance and reliability of China's Internet infrastructure, the continued accessibility of bandwidth and servers on our service providers' networks and the continuing performance, reliability and availability of our technology platform. Any failure to maintain the satisfactory performance, reliability, security and availability of our computer and hardware systems may cause significant harm to our reputation and our ability to attract and maintain customers and visitor traffic. Major risks related to our network infrastructure include:

- any breakdown or system failure resulting in a sustained shutdown of our servers, including failures which may be attributable to sustained power shutdowns, or efforts to gain unauthorized access to our systems causing loss or corruption of data or malfunctions of software or hardware;

- any disruption or failure in the national backbone network, which would prevent our customers and users from accessing our websites and mobile apps;

- any damage from fire, flood, earthquake and other natural disasters; and

- computer viruses, hackings and similar events.

13

Computer viruses and hackings may cause delays or other service interruptions and could result in significant damage to our hardware, software systems and databases, disruptions to our business activities, such as to our e-mail and other communication systems, breaches of security and inadvertent disclosure of confidential or sensitive information, inadvertent transmissions of computer viruses and interruptions of access to our websites and mobile apps through the use of denial-of-service or similar attacks. In addition, the inadvertent transmission of computer viruses could expose us to a material risk of loss or litigation and possible liability. All of our servers and routers, including back-up servers, are currently hosted by third-party service providers in Beijing and Shanghai and all information on our websites and mobile apps is backed up periodically. Any hacking, security breach or other system disruption or failure which occurs in between our backups could disrupt our business or cause us to lose, and be unable to recover, data such as real estate listings, contact information and other important customer information.

We also do not maintain insurance policies covering losses relating to our systems and do not have business interruption insurance. Moreover, the low coverage limits of our property insurance policies may not be adequate to compensate us for all losses, particularly with respect to any loss of business and reputation that may occur. To improve our performance and to prevent disruption of our services, we may have to make substantial investments to deploy additional servers or create one or more copies of our websites and mobile apps to mirror our online resources, either of which could increase our expenses and reduce our net income.

***Breaches of security in connection with our websites could expose us to potential liability and harm our reputation.***

Ensuring secured transmission of confidential information through public networks is essential to maintaining the confidence of our customers and users. Our existing security measures may not be adequate to protect such confidential information. In addition, computer and network systems are susceptible to breaches by computer hackers. Security breaches could expose us to litigation and potential liability for failing to secure confidential customer information, and could harm our reputation and reduce our ability to attract customers and users. Any future security breaches, if any, may result in a material adverse effect on our business, financial condition and results of operations.

***The successful operation of our business depends upon the performance and reliability of the Internet infrastructure and telecommunications networks in China.***

Our business depends on the performance and reliability of the Internet infrastructure in China. Substantially all access to the Internet is maintained through state-controlled telecommunication operators under the administrative control and regulatory supervision of MIIT. In addition, the national networks in China are connected to the Internet through international gateways controlled by the PRC government. These international gateways are generally the only channels through which a domestic user can connect to the Internet. We cannot assure you that more sophisticated Internet infrastructure will be developed in China. We may not have access to alternative networks in the event of disruptions, failures or other problems with China's Internet infrastructure. In addition, the Internet infrastructure in China may not support the demands associated with the continued growth in Internet usage.

14

We also rely on China Telecommunications Corporation ("China Telecom") and China United Network Communications Group Co., Ltd. ("China Unicom") to provide us with data communications capacity primarily through local telecommunications lines and Internet data centers to host our servers. We do not have access to alternative services in the event of disruptions, failures or other problems with the fixed telecommunications networks of China Telecom and China Unicom, or if China Telecom or China Unicom otherwise fails to provide such services. Any unscheduled service interruption could disrupt our operations, damage our reputation and result in a decrease in our revenues. Furthermore, we have No control over the costs of the services provided by China Telecom and China Unicom. If the prices that we pay for telecommunications and Internet services rise significantly, our gross margins could be significantly reduced. In addition, if Internet access fees or other charges to Internet users increase, our user traffic may decrease, which in turn may cause our revenues to decline.

***You should not rely on our quarterly operating results as an indication of our future performance because our quarterly financial results are subject to fluctuations.***

The real estate sector in China is characterized by seasonal fluctuations, which may cause our revenues to fluctuate significantly from quarter to quarter. The first quarter of each year generally contributes the smallest portion of our annual revenues due to reduced advertising and marketing activity of our customers in the PRC real estate industry during and around the Chinese Lunar New Year holiday, which generally occurs in January or February of each year. Furthermore, as we are substantially dependent on sales of listing and marketing, our quarterly revenues and results of operations are likely to be affected by:

- seasonality of the real estate market and real estate consumers' purchasing patterns;

- our ability to retain existing customers and attract new customers for our listing, marketing and e-commerce services;

- our ability to successfully introduce new service offerings on our platform;

- the amount and timing of our operating expenses and capital expenditures;

- the adoption of new, or changes to existing, governmental regulations;

- a shortfall in our revenues relative to our forecasts and a decline in our operating results; and

- economic conditions in general and specific to the real estate industry and to China.

As a result, you should not rely on our quarter-to-quarter comparisons of our results of operations as indicators of likely future performance.

***Failure to continue to develop and expand our content, service offerings and features, and to develop or incorporate the technologies that support them, could jeopardize our competitive position.***

As an Internet portal company, we participate in an industry characterized by rapidly changing technology and new products and services. To remain competitive, we must continue to develop and expand our content and service offerings. We must also continue to enhance and improve the user interface, functionality and features of our websites and mobile apps. These efforts may require us to develop internally, or to license, increasingly complex technologies. In addition, many of our competitors are continually introducing new Internet-related products, services and technologies, which will require us to update or modify our own technology to keep pace. Developing and integrating new products, services and technologies into our existing businesses could be expensive and time-consuming. Furthermore, such new features, functions and services may not achieve market acceptance or serve to enhance our brand loyalty. We may not succeed in incorporating new Internet technologies, or, in order to do so, we may incur substantial expenses. If we fail to develop and introduce or acquire new features, functions, services or technologies effectively and on a timely basis, we may not continue to attract new users and may be unable to retain our existing users, which could affect our marketability as a popular advertising and listing media. If we are not successful in incorporating new Internet technologies, our future profitability and revenue growth could be materially and adversely affected.

15

***Our revenues and profitability could suffer if we are unable to successfully implement our growth strategies or manage our growth effectively.***

We intend to grow our business by rolling out our full suite of services to more cities across China. We also plan to expand into new sectors. We intend to improve our open platform business by introducing a number of cloud products empowered by our big data capabilities. However, some of our growth strategies relate to new services and technologies for which there are No established markets in China or relate to services, technologies, new geographic markets or new businesses in which we have limited or No experience. We do not have experience providing these services and may not select the right third parties to partner with or establish or maintain some business relationship with them at commercially reasonable terms. Moreover, due to the breadth and diversity of the PRC real estate market and the PRC microfinance market as well as other industries and sectors we plan to expand into, our business model may not be successful in new and untested markets as demand and preferences may vary significantly by region. As a result, we may not be able to leverage our experience to expand into other parts of China or to enter into businesses with respect to new products or services. We cannot assure you that we will be able to successfully grow our business in our existing cities. There can be No assurance that we will be able to enter new geographic markets or deliver new services and technologies on a commercially viable basis or in a timely manner, or at all. If we are unable to successfully implement our growth strategies, our revenues and profitability may not grow as we expect, and our competitiveness may be materially and adversely affected.

Increases in the volume of our website traffic as a result of our expansion into new geographic regions could also strain the capacity of our existing computer systems, which could lead to slower response times or system failures. This would cause the number of real estate search inquiries, advertising impressions, other revenue producing offerings and our informational offerings to decline, any of which could significantly reduce our revenue growth and our brand loyalty. We may need to incur additional costs to upgrade our computer systems in order to accommodate increased demand if our systems cannot handle current or higher volumes of traffic. Mismanagement of any of our services in new or existing markets or the deterioration of the quality of our services could significantly damage our brand names and reputation and adversely impact our ability to attract and retain customers and visitor traffic.

Our growth plans place a significant demand on our management, systems and other resources. In addition to training and managing a growing workforce, we will need to continue to develop and improve our financial and management controls and our reporting systems and procedures. We cannot assure you that we will be able to efficiently or effectively manage the growth of our operations, and any failure to do so may limit our future growth and have a material adverse effect on our business, financial condition and results of operations.

16

***We rely on the creditworthiness of our borrowers, which may limit our ability to recover from a defaulting borrower.***

We launched our financial services focusing on the provision of loans to home buyers and other borrowers in 2015. A significant portion of our loan portfolio consists of secured loans. As of December 31, 2018, 3.1% of our outstanding loans receivable were unsecured. We have implemented credit evaluation procedures to enable us to select borrowers based on their creditworthiness. However, we do not have significant experience with assessing creditworthiness and loan underwriting and, as a result, our evaluation may not be reliable. We also do not have experience in collecting loans in default or working with borrowers to resolve payment difficulties with their loans. Our ability to recover payments from defaulting borrowers of unsecured loans may be more limited than those secured by collateral or mortgage. For our secured loans, the value of collateral securing our loans is subject to change, and may fall below the outstanding amount of the loans and thus be insufficient to cover our loss in the event of a customer default.

Our borrowers' ability to repay our loans is affected by a number of factors, including economic development in the regions where these borrowers reside or operate, market conditions in the industries where these borrowers conduct business, development of these borrowers' businesses, borrowers' employment situations and, in particular, as well as the conditions of the real estate market in China. If our borrowers default, we may apply to enforce our claims against the defaulting borrowers and their assets, including the collateral pledged to us, through court proceedings. However, the procedures for enforcing the assets and liquidating or otherwise realizing the value of the assets may be protracted or ultimately unsuccessful, and the enforcement process may be difficult for various reasons. As a result, if our borrowers default for any reason, our business, results of operations and financial condition may be materially and adversely affected.

*Our financial services are subject to various regulatory restrictions.*

We obtained approvals to engage in the microfinancing business from government authorities of four cities, including Beihai, Shanghai, Chongqing and Tianjin. Pursuant to Notice on Regulating the "Cash Loan" Business, issued by Office of the Leading Group for the Special Campaign against Internet Financial Risks and the Office of the Leading Group for the Special Campaign against Peer-to-peer Lending Risks on December 1, 2017, or Notice on Regulating Cash Loan, internet microfinance businesses is strictly regulated. According to the Notice on Regulating Cash Loan, among other requirements, microfinance companies are required to suspend distribution of internet microloans that are not supported by specific scenarios and No specific purpose, gradually reduce the outstanding loan balance within the prescribed time limit and complete rectifications within the prescribed time limit. Our subsidiaries with microfinancing approvals in Shanghai and Chongqing also provide a small amount of unsecured loans for our employees, which may be deemed as "cash loans" and be prohibited under the Notice on Regulating Cash Loan.

According to the Guiding Opinions on the Pilot Operation of Microfinance Companies, or the Guiding Opinions jointly issued by the China Banking Regulatory Commission and the PBOC on May 4, 2008, microfinance companies are limited liability companies or joint stock companies established with the capital contribution from natural persons, legal persons and other organizations, which do not accept public deposits and engage in the microfinance business. To set up a microfinance company, an applicant shall submit a formal application to the competent administrative departments at the provincial level. Upon approval, the applicant shall apply to the local branch of the SAIC to obtain a business license for the microfinance company. In addition, the applicant shall complete certain filings with the local police department, the local office of the China Banking Regulatory Commission and the local branch of the PBOC. According to the Guiding Opinions, a provincial government may launch pilot programs for microfinance companies within prefectural regions of the province only after it designates a department (finance office or other relevant institutions) to be in charge of supervision and administration of microfinance companies and is willing to be responsible for risk management and disposals with respect to microfinance companies. Consequently, microfinance companies are primarily regulated locally by provincial governments under rules and regulations promulgated by the provincial governments.

In November 2009, the provincial government of the Guangxi Zhuang Autonomous Region issued the Management Measures of Microfinance Companies in Guangxi Zhuang Autonomous Region. In 2014, we obtained approvals to engage in the microfinancing business from government authorities of Beihai city, Guangxi Zhuang Autonomous Region. Pursuant to the Management Measures of Microfinance Companies in Guangxi Zhuang Autonomous Region, Beihai Tian Xia Dai Microfinance Co., Ltd. ("Beihai Tian Xia Dai Microfinance") with microfinancing approvals cannot conduct microfinancing business outside Beihai city. However, Beihai Tian Xia Dai Microfinance provided loans outside Beihai city, and as a result, it may face the risk of being rectified by the relevant authorities.

*Changes in the interest rates and spread could negatively affect the revenue generated from our financial services.*

Our financial services generate revenue primarily from interest income. The interest rates we charge the borrowers are linked to the PBOC benchmark rate, which may fluctuate significantly due to changes in the PRC government's monetary policies. If we are required to lower the interest rates we charge our borrowers to reflect the decrease in the PBOC benchmark interest, the interest earned from our loans will decline. Furthermore, we may face fierce price competition, and as a result we may also lower our interest rates. Either case could negatively affect the revenue generated from our financial services.

***The members of our senior management team, in particular, Mr. Vincent Tianquan Mo ("Mr. Mo"), our founding shareholder, director and executive chairman, have played an important role in the growth and development of our business, and if we are unable to continue to retain their services, our business, financial condition and results of operations could be materially and adversely affected.***

Our future success is significantly dependent upon the continued services of our senior management. In particular, Mr. Mo has played an important role in the growth and development of our business. To date, we have relied heavily on the expertise and experience of Mr. Mo and other senior management personnel in our business operations, including their extensive knowledge of the PRC real estate market, their strong reputation in the PRC real estate industry, and their relationships with our employees, relevant regulatory authorities and many of our customers. If Mr. Mo or other senior management personnel are unable or unwilling to continue in their present positions, we may not be able to locate suitable or qualified replacements and may incur additional expenses to identify their successors. In addition, if Mr. Mo or other senior management personnel joins a competitor or forms a competing company, we may lose our customers, and our collaboration arrangements may be disrupted, which would have a material adverse effect on our business, financial condition and results of operations. We do not maintain key-man insurance for Mr. Mo or other senior management personnel.

***Failure to attract and retain qualified personnel could jeopardize our competitive position.***

As our industry is characterized by high demand and intense competition for talent, we may need to offer higher compensation and other benefits in order to attract and retain quality sales, technical and other operational personnel in the future. We have from time to time in the past experienced, and we expect in the future to continue to experience, difficulty in hiring and retaining highly skilled employees with appropriate qualifications. We cannot assure you we will be able to attract or retain the quality personnel that we need to achieve our business objectives. If we fail to successfully attract new personnel or retain and motivate our current personnel, we may lose competitiveness and our business, financial condition and results of operations could be materially and adversely affected.

***We may be subject to intellectual property infringement or misappropriation claims by third parties, which may force us to incur substantial legal expenses and, if determined adversely against us, could materially disrupt our business.***

We cannot be certain that our services and information provided on our websites and mobile apps do not or will not infringe patents, copyrights or other intellectual property rights held by third parties. From time to time, we may be subject to legal proceedings and claims alleging infringement of patents, trademarks or copyrights, or misappropriation of creative ideas or formats, or other infringement of proprietary intellectual property rights.

We have applied to register in China the Chinese and English dual-language "SouFun" trademark as well as "SouFun" in English and "搜房" ("SouFun" in Chinese) individually, and have successfully registered such trademarks in some industry categories, but our applications for certain other industry categories conflict with existing registrations or applications for similar trademarks by another PRC company in such industry categories, which have resulted in litigations. In April 2014, the Higher People's Court of Beijing Municipality reversed a lower court's judgment in favor of us and ordered the PRC Trademark Review and Adjudication Board of SAIC to reconsider another PRC company's trademark application for "SOFANG" that it had previously rejected. In April 2015, the Supreme People's Court of the PRC accepted our application for retrial over the judgment of the Higher People's Court of Beijing Municipality but ultimately denied our application. Nevertheless, in 2015, we obtained new trademarks "Fang.com" in English and "房天下" ("Fang Tian Xia" in Chinese) and began to market our services under these new brands in connection with the transformation of our business model. We therefore do not currently expect our business would be materially and adversely affected even if we lose the right to use the trademark relating to "SouFun" in certain limited industry categories.

Moreover, we have previously been involved in disputes arising from alleged infringement of third parties' copyrights on our websites and mobile apps, such as the use of photos or articles to which we did not have the rights, which led to judgments against us. We could be subject to similar claims, suits or judgments in the future if we post information to which we do not have the rights. Any such claims, regardless of merits, may involve us in time-consuming and costly litigation or investigation and divert significant management and staff resources. If we are found to have violated the intellectual property rights of others, we may be enjoined from using such intellectual property and may also be ordered to pay fines or monetary damages. As a result, we would be required to enter into expensive royalty or licensing arrangements or to develop alternative technologies, business methods, content or other intellectual property. We expect that the likelihood of such claims may increase as the number of competitors in our markets grows and as related patents and trademarks are registered and copyrights are obtained by such competitors. In addition, as we have expanded, and may continue to expand, our business into new geographical markets, we may be exposed to such claims in jurisdictions other than China and the scope of intellectual property protection in these overseas jurisdictions may be different from or greater than that in China. The intellectual property laws in overseas jurisdictions may also impose more stringent compliance requirements and cause more potential damages or penalties than those in China. Such claims in overseas jurisdictions, if successful, could require us to pay significant compensatory and punitive damage awards as well as expose us to costly and time-consuming litigation or investigations, all of which could materially disrupt our business and have a material adverse effect on our growth and profitability.

***We are exposed to potential liability for information on our websites and mobile apps and for products and services sold through our websites and mobile apps and we may incur significant costs and damage to our reputation as a result of defending against such potential liability.***

We provide third-party content on our websites and mobile apps such as real estate listings, links to third-party websites, advertisements and content provided by customers and users of our community-oriented services. We could be exposed to liability with respect to such third-party information. Among other things, we may face assertions that, by directly or indirectly providing such third-party content or links to other websites, we should be liable for defamation, negligence, copyright or trademark infringement, or other actions by parties providing such content or operating those websites. We may also face assertions that content on our websites, including statistics or other data we compile internally, or information contained in websites linked to our websites and mobile apps contains false information, errors or omissions, and users and our customers could seek damages for losses incurred as a result of their reliance upon or otherwise relating to incorrect information. We may also be subject to fines and other sanctions by the government for such incorrect information. Moreover, our relevant consolidated controlled entities, as Internet advertising service providers, are obligated under PRC laws and regulations to monitor the advertising content shown on our websites and mobile apps for compliance with applicable law. Violation of applicable law may result in penalties, including fines, confiscation of advertising fees, orders to cease dissemination of the offending advertisements and orders to publish advertisements correcting the misleading information. In case of serious violations, the PRC authorities may revoke the offending entities' advertising licenses and/or business licenses. In addition, our websites and mobile apps could be used as a platform for fraudulent transactions and third party products and services sold through our websites and mobile apps may be defective. The measures we take to guard against liability for third-party content, information, products and services may not be adequate to exonerate us from relevant civil and other liabilities.

Any such claims, with or without merit, could be time-consuming to defend and result in litigation and significant diversion of management's attention and resources. Even if these claims do not result in liability to us, we could incur significant costs in investigating and defending against these claims and suffer damage to our reputation.

***Potential acquisitions and office, training facility and land purchases, which form part of our strategy, may disrupt our ability to manage our business effectively, including our ability to successfully integrate acquired businesses into our existing operations.***

Potential acquisitions form part of our strategy to further expand and operate our business. Acquisitions and the subsequent integration of new companies or businesses will require significant attention from our management, in particular to ensure that the acquisition does not disrupt any existing collaborations, or affect our users' opinion and perception of our services and customer support. In addition, our management will need to ensure that the acquired business is effectively integrated into our existing operations.

The diversion of our management's attention and any difficulties encountered in integration could have a material adverse effect on our ability to manage our business. In addition, acquisitions could expose us to potential risks, including:

- risks associated with the assimilation of new operations, services, technologies and personnel;

- unforeseen or hidden liabilities;

- the diversion of resources from our existing businesses and technologies;

- the inability to generate sufficient revenues to offset the costs and expenses of acquisitions; and

- potential loss of, or harm to, relationships with employees, customers and users as a result of the integration of new businesses.

In addition, in connection with our business expansion, we have acquired office space and training facilities as well as commercial land and may continue to do so in the future if suitable opportunities arise. For more details on our recent office, training facility and land acquisitions, see "Item 5.D. Operating and Financial Review and Prospects—A. Operating Results" and "Item 4. Information on the Company—Facilities" in this annual report. Acquisition of property has inherent risks, including the fluctuation of property value, which could potentially lead to potential asset write-off if the value of such properties were to substantially decrease.

21

***If we fail to achieve and maintain an effective system of internal control over financial reporting, we may be unable to accurately report our financial results or prevent fraud, which could result in harm to our business, loss of investor confidence in our financial reporting and a lower trading price of our ADSs or notes.***

Effective internal controls are necessary for us to provide accurate and timely financial reports and effectively prevent fraud. We discovered in 2018 and in the past, and may in the future discover, areas of our internal controls involving deficiencies, significant deficiencies or material weaknesses that have required or will require improvements in our procedures on the preparation, review, approval and disclosure of financial reports.

In the course of preparing and auditing our consolidated financial statements for the year ended December 31, 2018, we and our independent registered public accounting firm identified one material weakness in our internal control over financial reporting as of December 31, 2018. A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis. The material weakness identified is that we did not have sufficient financial reporting and accounting personnel to formalize, design, implement and operate key controls over financial reporting process in order to report financial information in accordance with U.S. GAAP and SEC reporting requirements. To remedy our identified material weakness subsequent to December 31, 2018, we plan to undertake steps to strengthen our internal control over financial reporting, including: (1) hiring more qualified resources including financial controller, equipped with relevant U.S. GAAP and SEC reporting experience and qualifications to strengthen the financial reporting function and to set up a financial and system control framework, (2) implementing regular and continuous U.S. GAAP accounting and financial reporting training programs for our accounting and financial reporting personnel, (3) establishing effective oversight and clarifying reporting requirements for non-recurring and complex transactions to ensure consolidated financial statements and related disclosures are accurate, complete and in compliance with SEC reporting requirements, and (4) upgrading our operating and accounting systems to prevent systematic errors.

Our internal control over financial reporting will not prevent or detect all errors and all fraud. A control system, No matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Because of the inherent limitations in all control systems, No evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud will be detected.

A lack of effective internal control over financial reporting in the future could result in the loss of investor confidence in the reliability of our financial statements and negatively impact the trading price of our ADSs. In addition, if we fail to maintain the adequacy of our internal controls, as such standards are modified, supplemented or amended from time to time or as necessary to correct deficiencies or weaknesses in our controls, we may not be able to provide accurate financial statements, which could cause us to fail to meet our reporting obligations or provide accurate financial statements, and cause investors to lose confidence in our reported financial information and have a negative effect on the trading price of our ADSs.

***Certain of our leased property interests may be defective and we may be forced to relocate operations affected by such defects, which could cause significant disruption to our business.***

As of December 31, 2018, we had leased properties in approximately60 cities in China in addition to our principal executive offices in Beijing, China. A number of these leased properties, all of which were used as offices, contained defects in the leasehold interests. Such defects included the lack of proper title or right to lease and the landlords' failure to duly register the leases with the relevant PRC government authority. A number of lease agreements were not renewed timely.

In situations where a tenant lacks evidence of the landlord's title or right to lease, the relevant lease agreement may not be valid or enforceable under PRC laws, rules and regulations, and may also be subject to challenge by third parties. In addition, under PRC laws, rules and regulations, the failure to register the lease agreement will not affect its effectiveness between the tenant and the landlord, however, such lease agreement may be subject to challenge by and unenforceable against a third party who leases the same property from the landlord and has duly registered the lease with the competent PRC government authority. Furthermore, the landlord and the tenant may be subject to administrative fines for such failure to register the lease.

We have taken steps to renew lease agreements and cause our landlords to procure valid evidence as to the title or right to lease, as well as to complete the lease registration procedures. However, we cannot assure you that such defects will be cured in a timely manner or at all. Our business may be interrupted and additional relocation costs may be incurred if we are required to relocate operations affected by such defects. Moreover, if our lease agreements are challenged by third parties, it could result in diversion of management attention and cause us to incur costs associated with defending such actions, even if such challenges are ultimately determined in our favor.

**We have limited business insurance coverage in China.**

The insurance industry in China is still at an early stage of development and PRC insurance companies offer only limited business insurance products. As a result, we do not have any business disruption insurance or litigation insurance coverage for our operations in China. Any business disruption, litigation or natural disaster may cause us to incur substantial costs and result in the diversion of our resources, as well as significantly disrupt our operations, and have a material adverse effect on our business, financial position and results of operations.

**Certain of our loans may be declared immediately repayable.**

Certain of our consolidated controlled entities obtained from a PRC commercial bank loans in the aggregated principal amount of approximately RMB1.1 billion. According to loan agreement, if the borrowers fail to maintain certain financial indicators, the bank will be entitled to declare the loans immediately repayable. Even though we obtained a waiver from the lender indicating that the lender permanently gave up its right to demand payment as a result of the violation as of December 31, 2018, we would be in default at the December 31, 2018 balance sheet date and it is probable that we will be unable to comply with all provisions of the debt agreement for a period of one year from the balance sheet date. As of the date of this annual report, the bank has not indicated its intention for us to immediately repay such loans; however, we cannot assure you that the bank would not change its position and declare such loans immediately repayable in the future, which may adversely affect our liquidity position.

**We may be subject to liabilities as a result of the separation and distribution.**

We have entered into various business, financing and other contracts in the ordinary course of business. Some of the contracts require us to notify or seek prior consent from the counterparties in connection with material changes to our business operations or corporate structure. We believe that we have carried out our contractual obligations and are not otherwise in material default or violation of those contracts. However, if any contractual counterparties find us in default or violation due to failure to notify them or seek their prior consent in connection with the proposed separation of CIH or otherwise, they may terminate their business relationship with us, declare any repayment obligations immediately due and/or pursue legal actions against us, which may materially and adversely affect our business operations, financial condition and results of operations.

**Third party claims, litigation or government investigations to which we may be subject or in which we may be involved may significantly increase our expenses and adversely affect our stock price.**

We may be or may be expected to be a party to various third party claims, lawsuits, or government investigations from time to time. For example, in February 2019, we were served with a subpoena from a court in Beijing, in which a third party claimed that a contract we entered into was invalid. Pursuant to such contract, we received certain assets from a debtor's nominee to discharge its indebtedness. The debtor subsequently alleged that such contract was invalid because the transfer price of such assets was below the fair market value. We intend to vigorously contest the allegation. Any lawsuits or government investigations, whether actual or threatened, in which we may be involved, whether as plaintiff or defendant, could cost us a significant amount of time and money, could distract management's attention away from operating our business, could result in negative publicity and could adversely affect our stock price. In addition, if any claims are determined against us or if a settlement requires us to pay a large monetary amount or take other action that materially restricts or impedes our operations, our profitability could be significantly reduced and our financial position could be adversely affected. Our insurance may not be sufficient to cover any losses we incur in connection with litigation claims.

**Risks related to our corporate structure**

**If the PRC government determines that the structure contracts that establish the structure for our business operations do not comply with applicable PRC laws, rules and regulations, we could be subject to severe penalties or be forced to restructure our ownership structure.**

As we are a Cayman Islands company and our PRC subsidiaries and their branch companies in China are treated as foreign-invested enterprises under applicable PRC laws, we are subject to ownership limitations as well as special approval requirements on foreign investment. We used to operate under a tighter regulatory regime which was restrictive of foreign investment in advertising and Internet content distribution businesses, except for the further lifting up of value-added telecommunication services by foreign enterprises in China (Shanghai) Pilot Free Zone as otherwise provided. Under the current regulatory regime, Internet content distribution is permitted to operators with less than 50.0% foreign investment and advertising is permitted to all qualified operators. We may consider further optimizing our corporate structure in light of the evolving regulatory environment.

23

To comply with applicable PRC laws, rules and regulations, we conduct our operations in China primarily through our wholly-owned PRC subsidiaries and our consolidated controlled entities. Our wholly-owned PRC subsidiaries, our consolidated controlled entities (excluding their subsidiaries) and their respective shareholders have entered into a series of contractual arrangements, which consist of exclusive technical consultancy and service agreements, equity pledge agreements, operating agreements, shareholders' proxy agreements, loan agreements and exclusive call option agreements (collectively, the "Structure Contracts"). See "Item 7.B. Major Shareholders and Related Party Transactions—Related Party Transactions—Structure Contracts" of this annual report. As a result of these contractual arrangements, we exercise the ability to control the consolidated controlled entities through our power to direct the activities of consolidated controlled entities that most significantly impact their economic performance, and the obligation to absorb losses of or the right to all the residual benefits of the consolidated controlled entities that could potentially be significant to these entities. Accordingly, we consolidate their results in our financial statements. Our consolidated controlled entities hold the licenses and approvals that are essential to the operation of our Internet content distribution business. As certain agreements with our customers for Internet content distribution were entered into directly with our PRC subsidiaries and not our consolidated controlled entities, there can be No assurance that the PRC government will not deem our Internet content distribution to be in violation of applicable PRC laws, rules and regulations.

On July 13, 2006, MIIT publicly released the Notice on Strengthening the Administration of Foreign Investment in Operating Value-Added Telecommunications Business (the "MIIT Notice"), which reiterates certain provisions under China's Administrative Rules on Foreign-Invested Telecommunications Enterprises prohibiting, among others, the renting, transferring or sale of a telecommunications license to foreign investors in any form. Under the MIIT Notice, holders of valued-added telecommunications business operating licenses, or their shareholders, must also directly own the domain names and trademarks used by such license holders in their daily operations. To comply with this requirement under the MIIT Notice, we have assigned all registered trademarks, trademark applications and domain names relating to "SouFun," "Jia Tian Xia," "Fang.com" and "Fang Tian Xia" to the relevant majority-owned subsidiary or consolidated controlled entities in order to maintain their respective ICP licenses to operate as value-added telecommunication service providers. Due to a lack of interpretative materials from the authorities, we cannot assure you that MIIT will not consider our corporate structure and the contractual arrangements as a kind of foreign investment in telecommunication services, in which case we may be found in violation of the MIIT Notice.

In 2011, various media sources reported that the CSRC prepared a report proposing pre-approval by a competent central government authority of offshore listings by China-based companies with variable interest entity structures, such as ours, that operate in industry sectors subject to foreign investment restrictions. However, it is unclear whether the CSRC officially issued or submitted such a report to a higher level government authority or what any such report provides, or whether any new PRC laws or regulations relating to variable interest entity structures will be adopted or what they would provide.

On March 15, 2019, the Foreign Investment Law was formally passed by the thirteenth National People's Congress and will take effect on January 1, 2020. For further details of the Foreign Investment Law, please see "—Substantial uncertainties exist with respect to the adoption of new or revised PRC laws relating to our corporate structure, corporate governance and business operations."

If the past or current ownership structures, Structure Contracts and businesses of our company, our PRC subsidiaries and our consolidated controlled entities are found to be in violation of any existing or future PRC laws, rules or regulations, MIIT and other relevant PRC regulatory authorities would have broad discretion in dealing with such violations, including:

- revoking the business and operating licenses of our PRC subsidiaries or consolidated controlled entities, whose business and operating licenses are essential to the operation of our business;

- levying fines and/or confiscating our income or the income of our PRC subsidiaries and/or consolidated controlled entities;

- shutting down our servers or blocking our websites;

- discontinuing or restricting our operations or the operations of our PRC subsidiaries and/or consolidated controlled entities;

- imposing conditions or requirements with which we, our PRC subsidiaries and/or consolidated controlled entities may not be able to comply;

- requiring us, our PRC subsidiaries and/or consolidated controlled entities to restructure the relevant ownership structure, operations or contractual arrangements; and

- taking other regulatory or enforcement actions that could be harmful to our business.

We cannot assure you that the relevant PRC regulatory authorities will not require that we amend our Structure Contracts to comply with the MIIT Notice or that we can restructure our ownership structure without material disruption to our business. In addition, new PRC laws, rules and regulations may be introduced to impose additional requirements that may be applicable to our corporate structure and contractual arrangements. The imposition of any of these penalties and the effect of any new PRC laws, rules and regulations applicable to our corporate structure and contractual arrangements could materially disrupt our ability to conduct our business and have a material adverse effect on our financial condition and results of operations.

We cannot assure you that we will be able to enforce the Structure Contracts. Although we believe we are in compliance with current PRC regulations, we cannot assure you that the PRC government would agree that these contractual arrangements comply with PRC licensing, registration or other regulatory requirements, with existing policies or with requirements or policies that may be adopted in the future. PRC laws and regulations governing the validity of these contractual arrangements are open to varying interpretations and the relevant government authorities have broad discretion in interpreting these laws and regulations.

***Substantial uncertainties exist with respect to the adoption of new or revised PRC laws relating to our corporate structure, corporate governance and business operations.***

On March 15, 2019, the National People's Congress promulgated the Foreign Investment Law, which will become effective on January 1, 2020 and replace the trio of existing laws regulating foreign investment in China, namely, the Sino-foreign Equity Joint Venture Enterprise Law, the Sino-foreign Cooperative Joint Venture Enterprise Law and the Wholly Foreign-invested Enterprise Law. The Foreign Investment Law embodies an expected PRC regulatory trend to rationalize its foreign investment regulatory regime in line with prevailing international practice and the legislative efforts to unify the corporate legal requirements for both foreign and domestic investments. However, since it is relatively new, uncertainties still exist in relation to its interpretation and implementation, and failure to take timely and appropriate measures to cope with the regulatory-compliance challenges could result in material and adverse effect on us. For instance, though the Foreign Investment Law does not explicitly classify contractual arrangements as a form of foreign investment, it contains a catch-all provision under the definition of ''foreign investment'', which includes investments made by foreign investors in China through means stipulated in laws or administrative regulations or other methods prescribed by the State Council. Therefore, it still leaves leeway for future laws, administrative regulations or provisions promulgated by the Stale Council to provide for contractual arrangements as a form of foreign investment, at which time it will be uncertain whether our contractual arrangements will be deemed to be in violation of the market access requirements for foreign investment in the PRC and if yes, how our contractual arrangements should be dealt with. In addition, if future laws, administrative regulations or provisions prescribed by the State Council mandate further actions to be taken by companies with respect to existing contractual arrangements, we may face substantial uncertainties as to whether we can complete such actions in a timely manner, or at all. In the worst-case scenario, we may be required to unwind our existing contractual arrangements and/or dispose of the relevant business operations, which could have a material adverse effect on our current corporate structure, our listing service business and results of operations.

***We may lose the ability to utilize assets held by our consolidated controlled entities that are important to the operation of our business if any of these entities goes bankrupt or becomes subject to a dissolution or liquidation proceeding.***

Our wholly-owned PRC subsidiaries are considered foreign-invested enterprises in China and are, therefore, not permitted under PRC law to hold the ICP licenses and to operate the online advertising businesses that are critical to our operations. As a result, our consolidated controlled entities are the holders of the ICP licenses required for operating our websites and our advertising business in China. We do not have any direct or indirect shareholding interests in these consolidated controlled entities. They are instead held directly or indirectly by Mr. Mo, our founder and executive chairman, together with Richard Jiangong Dai ("Mr. Dai"), our former director and former chief executive officer, or Ms. Yu Huang, the chief executive officer of CIH. Mr. Dai is a nephew of Mr. Mo. Each of Mr. Mo, Mr. Dai and Ms. Huang is a PRC citizen. Through the Structure Contracts, we exercise management, financial and voting control over these consolidated controlled entities through our rights to all the residual benefits of the consolidated controlled entities and our obligation to fund losses of the consolidated controlled entities and also have a contractual right, to the extent permitted by PRC laws, rules and regulations, to acquire the equity interests in these entities. Consequently, if any of these consolidated controlled entities goes bankrupt and all or part of its assets become subject to liens or rights of third-party creditors, we may be unable to continue some or all of our business activities, which could materially and adversely affect our business, financial condition and results of operations. If any of our consolidated controlled entities undergoes a voluntary or involuntary liquidation proceeding, the shareholders or unrelated third-party creditors may claim rights to some or all of these assets, thereby hindering our ability to operate our business, which could materially and adversely affect our business, financial condition and results of operations.

*Contractual or other arrangements among our affiliates may be subject to scrutiny by PRC tax authorities, and a finding that we or our affiliates owe additional taxes could substantially reduce our profitability and the value of your investment.*

As a result of the Structure Contracts, we are entitled to substantially all of the economic benefits of ownership of the consolidated controlled entities and also bear substantially all of the economic risks associated with consolidated controlled entities. If the PRC tax authorities determine that the economic terms, including pricing, of our arrangements with our consolidated controlled entities were not determined on an arm's length basis, we could be subject to significant additional tax liabilities. In particular, the PRC tax authorities may perform a transfer pricing adjustment, which could result in a reduction, for PRC tax purposes, of deductions recorded by our consolidated controlled entities. Such a reduction could increase the tax liabilities of our consolidated controlled entities without reducing the tax liabilities of our PRC subsidiaries. This increased tax liability could further result in late payment fees and other penalties to our consolidated controlled entities for underpaid taxes. Any of these events could materially reduce our net income.

*Contractual arrangements, including voting proxies, with our consolidated controlled entities for our Internet content distribution and marketing businesses may not be as effective in providing operational control as direct or indirect ownership.*

Since the applicable PRC laws, rules and regulations restrict foreign ownership in the Internet content distribution and marketing businesses, we conduct our Internet content distribution and advertising businesses and derive related revenues through the Structure Contracts with our consolidated controlled entities. As we have No direct or indirect ownership interest in our consolidated controlled entities, these Structure Contracts, including the voting proxies granted to us, may not be as effective in providing us with control over these companies as direct or indirect ownership. If we were the controlling shareholders of these companies with direct or indirect ownership, we would be able to exercise our rights as shareholders to effect changes in the board of directors, which in turn could effect change, subject to any applicable fiduciary obligations, at the management level. However, if any of our consolidated controlled entities or their shareholders fail to perform their obligations under these contractual arrangements, or if they were otherwise to act in bad faith towards us, we may be forced to (1) incur substantial costs and resources to enforce such arrangements, including the voting proxies, and (2) rely on legal remedies available under PRC law, including exercising our call option right over the equity interests in our consolidated controlled entities, seeking specific performance or injunctive relief, and claiming monetary damages.

Furthermore, pursuant to the equity interest pledge agreements between certain of our PRC subsidiaries and the individual shareholders of our consolidated controlled entities, each individual shareholder of our consolidated controlled entity agrees to pledge his equity interests in the consolidated controlled entities to our subsidiaries to secure the relevant consolidated controlled entities' performance of their obligations under the exclusive technical consultancy and service agreements of the Structure Contracts. The equity interest pledges of shareholders of consolidated controlled entities under these equity pledge agreements have been registered with the relevant local branch of SAIC. The equity interest pledge agreements with the consolidated controlled entities' individual shareholders provide that the pledged equity interest shall constitute security for consulting and service fees under the exclusive technical consultancy and service agreements. The scope of pledge is not limited by the amount of the registered capital of that consolidated controlled entity. However, it is possible that a PRC court may take the position that the amount listed on the equity pledge registration forms represents the full amount of the collateral that has been registered and perfected. If this is the case, the obligations that are supposed to be secured in the equity interest pledge agreements in excess of the amount listed on the equity pledge registration forms could be determined by the PRC court as unsecured debt, which takes last priority among creditors. Such a decision could materially and adversely affect our liquidity and our ability to fund and expand our business.

In anticipation of our originally proposed acquisition of a controlling stake in Chongqing Wanli New Energy Co., Ltd., a PRC company listed on the Shanghai Stock Exchange (stock code: 600847) ("Wanli") and the sale of a portion of our equity interest in five wholly-owned subsidiaries that operate as our service platforms for online advertising business to Wanli (which was terminated in February 2017), in December 2015, we underwent an internal restructuring, whereby we terminated all of our previous structure contracts and caused Beijing Zhong Zhi Shi Zheng and Jia Tian Xia Network, our wholly-owned PRC subsidiaries, to enter into a series of structure contracts in 2016, or the 2016 Structure Contracts, with our consolidated controlled entities, with terms and conditions substantially similar to those of our previous structure contracts. In February 2017, we terminated the transaction with Wanli in light of substantial regulatory uncertainties in China. Nevertheless, we do not plan to recover the original Structure Contracts before the internal restructuring. Among the 2016 Structure Contracts, Beijing Zhong Zhi Shi Zheng entered into a series of contractual arrangements with certain of our consolidated controlled entities and their nominee shareholders. In anticipation of the separation and distribution in relation to CIH, we terminated the foregoing contractual arrangements between our group and these entities on May 15, 2018, and subsequently caused Beijing Tuo Shi Huan Yu Network Technology Co., Ltd. ("Beijing TuoShi"), our wholly-owned PRC subsidiary, to enter into a new series of contractual arrangements with these consolidated controlled entities in 2018, with terms and conditions substantially similar to the 2016 Structure Contracts. CIH, through its wholly-owned subsidiary, Beijing Zhong Zhi Shi Zheng, has entered into new contractual arrangements with Beijing Zhong Zhi Hong Yuan, which is held by our nominee shareholders, i.e., Vincent Tianquan Mo and Ms. Yu Huang, the chief executive officer of CIH, with terms and conditions substantially similar to those of our previous structure contracts. See "Item 7.B. Major Shareholders and Related Party Transactions—Related Party Transactions—Structure Contracts" of this annual report. We believe that our contractual arrangements with our consolidated controlled entities for our Internet content distribution and marketing businesses are not materially affected by our internal restructuring. We cannot assure you, however, that our current Structure Contracts are as effective as the previous ones in terms of controlling our Internet content distribution and marketing businesses, nor can we assure you that these contractual arrangements will not be further modified. Any modification could potentially adversely affect our control, or result in our loss of control, over the Internet content distribution and marketing businesses. In the event that we are unable to enforce these contractual arrangements, or if we experience significant delays or other obstacles in the process of enforcing these contractual arrangements, our business, financial condition and results of operations could be materially and adversely affected.

***Our business may suffer if we fail to carry out our business arrangements related to online video broadcasting related business with certain consolidated controlled entities of our company.***

Beijing Technology, which holds licenses of online video recording and broadcasting, entered into a cooperation agreement with certain of our wholly-owned subsidiaries, under which Beijing Technology is responsible for the operation of online video broadcasting, while those subsidiaries are responsible for relevant technical support. During its possession of the domain name "fang.com," Beijing Technology published online videos by embedding videos on webpages or placing video links on "fang.com."

Although such business cooperation agreement does not violate current PRC laws and regulations regarding online broadcasting and recording, we cannot assure you that due to any change of laws and regulatory policies, the abovementioned business cooperation agreement will not be deemed void, revocable or unenforceable under then applicable PRC laws amended from time to time or by regulatory authorities in the future. Should any of the above occur, the relevant business of the relevant subsidiaries will be impaired, which would have a material adverse effect on our business, financial condition and results of operations.

Moreover, under the applicable PRC laws, rules and regulations, the failure to maintain licenses of online video recording and broadcasting may subject the entity to various penalties, including confiscation of revenues, imposition of fines and/or restrictions on the entity conducting such activities' business operations, or the discontinuation of their operations.

***The shareholders of our consolidated controlled entities may have potential conflicts of interest with us, and if any such conflicts of interest are not resolved in our favor, our business may be materially and adversely affected.***

We operate through a number of consolidated controlled entities in China. Mr. Mo, Mr. Dai and Ms. Huang, together hold 100.0% of the equity interest in these consolidated controlled entities. The interests of Mr. Mo, Mr. Dai and Ms. Huang as the controlling shareholders of the consolidated controlled entities may differ from the interests of our company as a whole, as what is in the best interests of our consolidated controlled entities may not be in the best interests of us and our other shareholders. We cannot assure you that when conflicts of interest arise, Mr. Mo, Mr. Dai and Ms. Huang will act in the best interests of our company or that conflicts of interest will be resolved in our favor. In addition, Mr. Mo, Mr. Dai and Ms. Huang may breach or cause our consolidated controlled entities and their respective subsidiaries to breach or refuse to renew the existing contractual arrangements with us. We rely on Mr. Mo, Mr. Dai and Ms. Huang to comply with the laws of China, which protect contracts and provide that directors and executive officers owe a duty of loyalty to our company and require them to avoid conflicts of interest and not to take advantage of their positions for personal gains. We also rely on Mr. Mo to abide by the laws of the Cayman Islands, which provide that directors have a duty of care and a duty of loyalty to act honestly in good faith with a view to our best interests. However, the legal frameworks of China and the Cayman Islands do not provide guidance on resolving conflicts in the event of a conflict between the laws of China and the Cayman Islands regarding which corporate governance regime controls. If we cannot resolve any conflicts of interest or disputes between us and Mr. Mo, Mr. Dai or Ms. Huang, we would have to rely on legal proceedings, which could result in disruption of our business and subject us to substantial uncertainty as to the outcome of any such legal proceedings.

In addition, Mr. Dai continued to be a nominee shareholder of our certain consolidated controlled entities following his resignation from our board of directors in February 2016. We did not exercise, nor did we designate any third party to exercise, the call option under the Structure Contracts to acquire from Mr. Dai the equity interests he holds in our consolidated subsidiaries. Although the relevant Structure Contracts to which Mr. Dai is a party remain to be effective and binding, we cannot assure you that we will be able to fully exercise our contractual rights against Mr. Dai (e.g., to request him to sell his equity interests in our consolidated controlled entities to us when permitted by applicable PRC laws). Nor can we assure you that Mr. Dai will not act against the best interests of us and our other shareholders in the future since he No longer owes any fiduciary duties to our company. Should we encounter any difficulties in exercising our contractual rights under the Structure Contracts against Mr. Dai to retain our control over such consolidated controlled entities, our business, financial condition and results of operations will be materially and adversely affected.

28

***We are controlled by our significant shareholders and their affiliated entities, whose interests may differ from our other shareholders.***

As of March 31, 2019, Mr. Mo may be deemed to have voting and dispositive power with respect to: (1) 510,994 Class A ordinary shares and 11,355,645 Class B ordinary shares owned by Media Partner Technology Limited ("Media Partner"), with respect to Mr. Mo and his family members, (2) 1,138,132 Class A ordinary shares and 10,230,645 Class B ordinary shares owned by Next Decade Investments Limited ("Next Decade"), with respect to Mr. Mo and his family members, (3) 957,264 Class A ordinary shares owned by Safari Group Holdings Limited ("Safari"), (4) 1,472,298 Class A ordinary shares owned by IDG Alternative Global Limited ("IDG Alternative"), and (5) 926,461 Class A ordinary shares owned by Karistone Limited, collectively presenting approximately 29.8% of our outstanding share capital and approximately 71.6% of our voting power under our dual-class ordinary share structure. The shares in Media Partner and Next Decade are held in irrevocable discretionary trusts, for which Mr. Mo acts as a protector. Media Partner and Next Decade could exert substantial influence over the outcome of any corporate transaction or other matters submitted to the shareholders for approval, including mergers, consolidations, the sale of all or substantially all of our assets, election of directors and other significant corporate actions. This concentration of ownership may also discourage, delay or prevent a change in control of our company, which could deprive our shareholders of an opportunity to receive a premium for their shares as part of a sale of our company and might reduce the price of our ADSs or notes. These actions may be taken even if they are opposed by our other shareholders, including the investors in the ADSs.

The continuing cooperation of our significant shareholders on an on-going basis, including Media Partner and Next Decade, is important to our businesses. Without their consent or cooperation, we could be prevented from entering into transactions or conducting business that could be beneficial to us. We cannot assure you, however, that the interests of our significant shareholders would not differ from the interests of our other shareholders, including investors in the ADSs.

**Risks related to doing business in China**

***China's economic, political and social conditions, as well as government policies, could have a material adverse effect on our business, financial condition and results of operations.***

Our business and operations are primarily conducted in China. Accordingly, our financial condition and results of operations have been, and are expected to continue to be, affected by the economic, political and social developments in relation to the Internet, online marketing and real estate industries in China. A slowdown of economic growth in China could reduce the sale of real estate and related products and services, which in turn could materially and adversely affect our business, financial condition and results of operations.

The PRC economy differs from the economies of most developed countries in many respects, including: a higher level of government involvement; the on-going development of a market-oriented economy; a rapid growth rate; a higher level of control over foreign exchange; and a less efficient allocation of resources.

29

While the PRC economy has experienced significant growth since the late 1970s, growth has been uneven, both geographically and among various sectors of the economy. Growth rates in China have lowered in recent years. The PRC government has implemented various measures to encourage economic growth and guide the allocation of resources. These measures are intended to benefit the overall PRC economy, but may also have a negative effect on us. For example, our business, financial condition and results of operations could be adversely affected by PRC government control over capital investments or changes in tax regulations that are applicable to us.

The PRC economy has been transitioning from a centrally-planned economy to a more market-oriented economy. Although the PRC government has implemented measures since the late 1970s which emphasize the utilization of market forces for economic reform, the PRC government continues to play a significant role in regulating industry development by imposing industrial policies. The PRC government also exercises significant control over China's economic growth through the allocation of resources, controlling payment of foreign currency-denominated obligations, setting monetary policy and providing preferential treatment to particular industries or companies.

According to the Guiding Opinions on the Pilot Operation of Microfinance Companies (the "Guiding Opinions") jointly issued by the China Banking Regulatory Commission and the PBOC on May 4, 2008, microfinance companies are limited liability companies or joint stock companies established with the capital contribution from natural persons, legal persons and other organizations, which do not accept public deposits and engage in the microfinance business. To set up a microfinance company, an applicant shall submit a formal application to the competent administrative departments at the provincial level. Upon approval, the applicant shall apply to the local branch of the SAIC to obtain a business license for the microfinance company. In addition, the applicant shall complete certain filings with the local police department, the local office of the China Banking Regulatory Commission and the local branch of the PBOC.

According to the Guiding Opinions, a provincial government may launch pilot programs for microfinance companies within prefectural regions of the province only after it designates a department (finance office or other relevant institutions) to be in charge of supervision and administration of microfinance companies and is willing to be responsible for risk management and disposals with respect to microfinance companies. Consequently, microfinance companies are primarily regulated locally by provincial governments under rules and regulations promulgated by the provincial governments.

In November 2009, the provincial government of the Guangxi Zhuang Autonomous Region issued the Management Measures of Microfinance Companies in Guangxi Zhuang Autonomous Region. In 2014, we obtained approvals to engage in the microfinancing business from government authorities of Beihai city, Guangxi Zhuang Autonomous Region.

Pursuant to the Management Measures of Microfinance Companies in Guangxi Zhuang Autonomous Region, Beihai Tian Xia Dai Microfinance Co., Ltd. ("Beihai Tian Xia Dai Microfinance") with microfinancing approvals cannot conduct microfinancing business outside Beihai city. However, Beihai Tian Xia Dai Microfinance has provided loans outside Beihai city. Beihai Tian Xia Dai Microfinance may face the risk of being rectified by relevant authorities.

***The discontinuation of any of the preferential tax treatments currently available to us in China could materially and adversely affect our financial condition and results of operations***

In March 2007, the National People's Congress of China enacted the PRC Enterprise Income Tax Law (the "New EIT Law"), which became effective on January 1, 2008 and was amended in February 2017 and December 2018. In April 2008, the relevant PRC governmental authorities issued the Administrative Measures for Certification of High and New Technology Enterprises which was amended in January 2016. "High and new technology enterprises" would be entitled to a statutory tax rate of 15.0%. Currently, ten of our PRC subsidiaries or consolidated controlled entities are qualified as "high and new technology enterprises." We cannot assure you that our PRC subsidiaries or consolidated controlled entities will continue to be entitled to preferential tax rates as qualified "high and new technology enterprises" under the New EIT Law. We also cannot assure you that the tax authorities will not, in the future, discontinue any of our preferential tax treatments, potentially with retroactive effect. In the event that preferential tax treatment for any of our subsidiaries or consolidated controlled entities is discontinued, the affected entity will become subject to a 25.0% standard enterprise income tax rate, which would increase our income tax expenses and could materially reduce our net income and profitability. See also "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Components of our Results of Operations—Taxation—China" of this annual report.

***We may be treated as a resident enterprise for PRC tax purposes under the New EIT Law and therefore be subject to PRC taxation on our worldwide income.***

We are incorporated under the laws of the Cayman Islands. Under the New EIT Law and its implementation rules, an enterprise incorporated in a foreign country or region may be classified as either a "non-resident enterprise" or a "resident enterprise." If any enterprise incorporated in a foreign country or region has its "de facto management bodies" located within the PRC territory, such enterprise will be considered a PRC tax resident enterprise and thus will normally be subject to enterprise income tax at the rate of 25.0% on its worldwide income. The relevant implementing rules provide that "de facto management bodies" means the bodies which exercise substantial and overall management and control over the manufacturing and business operations, personnel, accounting, properties and other factors of an enterprise. In April 2009, the SAT issued the Notice Regarding the Determination of Chinese-Controlled Offshore-Incorporated Enterprises as PRC Tax Resident Enterprises on the Basis of De Facto Management Bodies ("Circular 82"), which sets forth certain specific criteria for determining whether the "de facto management body" of a Chinese-controlled offshore-incorporated enterprise is located in China. However, Circular 82 only applies to offshore enterprises controlled by PRC enterprises and not those controlled by PRC individuals or foreigners in China, such as our company. See "Item 10.D. Additional Information—Exchange Controls—Regulations relating to Foreign Exchange, Taxation and Dividend Distribution—Taxation and Dividend Distribution" of this annual report. Substantially all of the members of our management are currently located in China and we expect them to continue to be located in China. Due to the lack of clear guidance on the criteria pursuant to which the PRC tax authorities will determine our tax residency under the New EIT Law, it remains unclear whether the PRC tax authorities will treat us as a PRC resident enterprise. As a result, our PRC legal counsel is unable to express an opinion as to the likelihood that we will be subject to the tax applicable to resident enterprises or non-resident enterprises under the New EIT Law. If we are deemed to be a PRC tax resident enterprise, we will be subject to an enterprise income tax rate of 25.0% on our worldwide income, which would have an impact on our effective tax rate and an adverse effect on our net income and results of operations. The New EIT Law provides that dividend income between qualified resident enterprises is exempt income, which the implementing rules have clarified to mean a dividend derived by a resident enterprise on an equity interest it directly owns in another resident enterprise. It is possible, therefore, that dividends we receive through our offshore subsidiaries may be exempt income under the New EIT Law and its implementing rules if our offshore subsidiaries are deemed to be a "resident enterprise." If we are deemed to be a PRC tax resident enterprise, we would then be obliged to withhold PRC withholding income tax on the gross amount of dividends we pay to shareholders who are non-PRC tax residents. The withholding income tax rate is 10.0% for non-resident enterprises and 20.0% for non-resident individuals, unless otherwise provided under the applicable double tax treaties between China and the governments of other jurisdictions.

***We rely primarily on dividends and other distributions on equity paid by our subsidiaries, and any limitation on the ability of our subsidiaries to make payments to us could have a material adverse effect on our ability to conduct our business as well as our liquidity.***

As a holding company, we rely primarily on dividends and other distributions on equity paid by our subsidiaries for our cash and financing requirements, which include funds necessary to pay dividends and other cash distributions to our shareholders, service any debt we may incur and to pay our operating expenses. If our subsidiaries incur debt in the future, the instruments governing the debt may restrict their ability to pay dividends or make other distributions to us.

Our subsidiaries are primarily entities incorporated and established in China and therefore, are subject to certain limitations with respect to dividend payments. PRC regulations currently allow payment of dividends only out of accumulated profits determined in accordance with accounting standards and regulations in China. Each year, our subsidiaries in China and our consolidated controlled entities are required to allocate a portion of their after-tax profits to their respective reserve funds, until the reserves reach 50.0% of their respective registered capital. Allocations to these reserves and funds can only be used for specific purposes and are not transferable to us in the form of loans, advances or cash dividends. Such restrictions on the ability of our subsidiaries and consolidated controlled entities to transfer funds to us could adversely limit our ability to grow, pay dividends, make investments or acquisitions that could benefit our businesses or otherwise fund and conduct our businesses.

Under the relevant PRC tax law applicable to us prior to January 1, 2008, dividend payments to foreign investors made by foreign-invested enterprises were exempted from PRC withholding tax. However, under the New EIT Law and its implementing rules, non-resident enterprises without an establishment in China, or whose income has No connection with their institutions and establishment inside China, are subject to withholding tax at the rate of 10.0% with respect to their PRC-sourced dividend income, subject to applicable tax agreements or treaties between the PRC and other tax jurisdictions. Similarly, any gains realized on the transfer of shares by such investors are also subject to a 10.0% PRC income tax if such gains are regarded as income from sources within China.

According to the Mainland and Hong Kong Special Administrative Region Arrangement on the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income (the "Avoidance of Double Taxation Arrangement"), dividends derived by a Hong Kong resident enterprise from a PRC resident enterprise are subject to withholding tax at the rate of 5.0%, provided that such Hong Kong resident enterprise directly owns at least 25.0% of the equity interest in the PRC resident enterprise. However, under the New EIT Law and its implementation rules, as well as Circular No. 9 issued by SAT in February 2018 ("Circular 9"), dividends from our PRC subsidiaries paid to us through our Hong Kong subsidiaries may be subject to withholding tax at a rate of 10.0% if our Hong Kong subsidiaries cannot be considered as a "beneficial owner" or the main purpose test clause of Avoidance of Double Taxation Arrangement may apply to us.

We hold equity interests in several of our major PRC subsidiaries indirectly through subsidiaries incorporated in Hong Kong. Neither we nor our PRC legal counsel is certain as to whether it is more likely than not that PRC tax authorities would require or permit our Hong Kong-incorporated subsidiaries to be treated as PRC resident enterprises. To the extent that such Hong Kong-incorporated subsidiaries are each considered a "non-resident enterprise" under the Avoidance of Double Taxation Arrangement, dividends derived by such Hong Kong-incorporated subsidiaries from our PRC subsidiaries may be subject to a maximum withholding tax rate of 10.0%. See "Item 10.E. Additional Information—Taxation—Regulation of Foreign Exchange, Taxation and Dividend Distribution—Taxation and Dividend Distribution" of this annual report.

The discontinuation of the previously available exemption from withholding tax as a result of the New EIT Law and its implementing rules have and will increase our income tax expenses and reduce our net income, and may materially reduce our profitability.

***PRC regulations on loans to PRC entities by offshore holding companies may affect our ability to capitalize or otherwise fund our PRC operations.***

On August 29, 2008, SAFE promulgated the Circular on the Relevant Operating Issues Concerning the Improvement of the Administration of the Payment and Settlement of Foreign Currency Capital of Foreign Invested Enterprises ("SAFE Circular 142"), regulating the conversion by a foreign-invested enterprise of foreign currency registered capital into RMB by restricting how the converted RMB may be used. SAFE Circular 142 provides that the RMB capital converted from foreign currency registered capital of a foreign-invested enterprise may only be used for purposes within the business scope approved by the applicable governmental authority and may not be used for equity investments within China. In addition, SAFE strengthened its oversight of the flow and use of the RMB capital converted from foreign currency registered capital of a foreign-invested company. The use of such RMB capital may not be altered without SAFE approval, and such RMB capital may not in any case be used to repay RMB loans if the proceeds of such loans have not been used. Violations of SAFE Circular 142 could result in severe monetary or other penalties.

On March 30, 2015, SAFE promulgated the Circular on the Reform of Administration of the Payment and Settlement of Foreign Currency Capital of Foreign Invested Enterprises ("SAFE Circular 19"), which became effective on June 1, 2015. SAFE Circular 19 abolishes the SAFE Circular 142, providing that the RMB capital converted from foreign currency registered capital of a foreign-invested enterprise shall be used for purposes within its approved business scope, and allows a foreign-invested enterprise to use the RMB capital converted from its foreign currency registered capital for equity investments within China. However, such converted RMB capital still cannot be used to repay RMB loans between enterprises under SAFE Circular 19. However, the Circular of the State Administration of Foreign Exchange on Reforming and Regulating Policies on the Control over Foreign Exchange Settlement of Capital Accounts ("SAFE Circular 16") implemented in June 2016 removes the prohibition of using the RMB capital converted from foreign currency registered capital to repay RMB loans between enterprises.

In light of the various requirements imposed by PRC regulations on loans to PRC entities by offshore holding companies, we may not be able to obtain the necessary government approvals with respect to future loans by us to our wholly-owned subsidiaries or consolidated controlled entities or with respect to future capital contributions by us to our PRC subsidiaries. If we fail to complete such registrations or obtain such approvals, our ability to capitalize or otherwise fund our PRC operations may be negatively affected, which could adversely affect our liquidity and our ability to fund and expand our business.

***We may be subject to fines and legal or administrative sanctions in connection with certain historical intra-group funding transactions.***

We have occasionally engaged in intra-group funding transactions, including dividend distributions from our consolidated controlled entities and payment advances made by one subsidiary on behalf of another. These transactions are typically deemed as non-interest bearing loans and receivables from the relevant "debtors."

Pursuant to the General Lending Code implemented in August 1996 by the PBOC, the central bank of China, commercial lending in China must be made by or through a PRC-qualified financial institution as defined under the General Lending Code. As none of the payors in our intra-group transactions is or was at the relevant time a PRC qualified financial institution as defined under the General Lending Code, the PBOC may impose a fine for non-compliance on each of the payors in an amount equal to one to five times the value of any income received from its non-compliance, and the payors may be required to terminate such loans. On August 6, 2015, the Supreme People's Court issued the Provisions of the Supreme People's Court on Several Issues concerning the Application of Law in the Trial of Private Lending Cases (the "Provisions"), which provide that if the purpose of a lending contract concluded between two enterprises is for their business operation, and the lending contract does not contain the circumstances as stipulated in Article 52 of the PRC Contract Law and Article 14 of the Provisions, i.e., those that will result in contracts being null and void, the people's court shall consider such lending contract to be effective. As the General Lending Code has not been repealed and the Provisions were issued by the Supreme People's Court as guidance for courts' trial in private lending cases, it remains uncertain how the General Lending Code will be interpreted and implemented. If the PBOC and/or other governmental authorities decide to apply the General Lending Code and thereby instruct the payors to terminate such transactions, we have to fully repay the funds advanced in such transactions.

Moreover, pursuant to the PRC Foreign Currency Administration Regulations promulgated by the State Council in January 1996, and amended in August 2008, a PRC entity is required to apply for SAFE approval prior to extending commercial loans to offshore entities such as our company. As there is No specific definition of "commercial loans" under the Foreign Currency Administration Regulations and PRC governmental authorities have not issued any implementation rules with respect to the provision of commercial loans to offshore entities, it is not clear whether such provision will be applied to the non-interest bearing loans described above. Under the Foreign Currency Administration Regulations, an entity may be required to correct the violation and be subject to a warning and/or a fine for the violation of the foreign registration administrative regulations. If SAFE determines that the PRC Foreign Currency Administration Regulations do apply to us, it may require us to register the deemed overseas loans and rectify any prior non-compliance by properly obtaining SAFE approval. SAFE may also impose a warning and/or fine based on the PRC Foreign Currency Administration Regulations. We cannot assure you that we will be able to complete the necessary registration and filing procedures required by the PRC Foreign Currency Administration Regulations. In addition, it is not clear whether SAFE may consider the making of payments in Renminbi which should have been made in foreign currency to be foreign currency arbitrage, which may be deemed a violation and may subject a violator to warnings, penalties or other sanctions. Due to a general uncertainty over the interpretation and implementation of the PRC Foreign Currency Administration Regulations as well as the broad enforcement discretion granted to SAFE, we cannot assure you that we will not be subject to such warnings, penalties or other administrative penalties resulting from our intra-group transactions that may be deemed as overseas loans.

According to the New EIT Law, loan arrangements between related parties without interest are not considered arms-length transactions. Therefore, the PRC taxation authorities could impose enterprise income and VAT on the payors for the deemed interest income that would have been derived from our intra-group transactions. The deemed interest rate would be determined by reference to the lending rate over the relevant period published by the PBOC. We cannot assure you that we will not be subject to fines, or legal or administrative sanctions as a result of non-compliance with the General Lending Code and the Foreign Currency Administration Regulations. Further, we cannot assure you that the PRC taxation authorities will not impose enterprise income and VAT taxes on the payors for any deemed interest income with respect to our intra-group transactions. Because the applicable PRC laws, rules and regulations do not provide clear definitions for several key terms and because the relevant PRC regulatory authorities have significant discretion on the interpretation of such matters, we cannot predict the likelihood that the risks described here will materialize.

34

*The PRC legal system embodies uncertainties, which could limit the legal protections available to you and us.*

In 1979, the PRC government began to promulgate a comprehensive system of laws and regulations governing economic matters in general. The overall effect of such legislation has significantly enhanced the protections afforded to various forms of foreign investment in China. Our PRC operating subsidiaries are subject to laws and regulations applicable to foreign-invested enterprises in China. In particular, they are subject to PRC laws, rules and regulations governing foreign companies' ownership and operation of Internet content distribution and advertising businesses as well as of the real estate and microfinancing sectors. Such laws and regulations are subject to change, and their interpretation and enforcement involve uncertainties, which could limit the legal protections available to us and our investors. In addition, we cannot predict the effect of future developments in the PRC legal system, including the promulgation of new laws, changes to existing laws or the interpretation or enforcement of such laws, or the preemption of local regulations by PRC laws, rules and regulations.

Moreover, China has a civil law system based on written statutes, which, unlike common law systems, is a system in which decided judicial cases have little precedential value. Furthermore, interpretation of statutes and regulations may be subject to government policies reflecting domestic political changes. The relative inexperience of China's judiciary in many cases creates additional uncertainty as to the outcome of litigation. In addition, enforcement of existing laws or contracts based on existing laws may be uncertain and sporadic, and it may be difficult to obtain swift and equitable enforcement within China. All such uncertainties could materially and adversely affect our business, financial condition and results of operations.

*Government control of currency conversion may limit our ability to utilize our revenues effectively.*

Substantially all of our revenues and operating expenses are denominated in Renminbi. Under applicable PRC law, the Renminbi is freely convertible to foreign currencies with respect to "current account" transactions, but not with respect to "capital account" transactions. Current account transactions include ordinary course import or export transactions, payments for services rendered and payments of license fees, royalties, interest on loans and dividends. Capital account transactions include cross-border investments and repayments of the principal of loans.

Accordingly, our PRC subsidiaries currently may purchase foreign currencies for settlement of current account transactions, including payment of dividends to us, without prior SAFE approval by complying with certain procedural requirements. However, we cannot assure you that the relevant PRC governmental authorities will not limit or eliminate the ability of our PRC subsidiaries to purchase and retain foreign currencies in the future. Foreign exchange transactions under the capital account are still subject to limitations and require approvals from or registration with relevant government authorities. This could affect our PRC subsidiaries' ability to obtain debt or equity financing from outside China, including by means of loans or capital contributions from us.

Since substantially all of our revenues are denominated in Renminbi, including fees and payments from our PRC consolidated controlled entities pursuant to the Structure Contracts, existing and future restrictions on currency exchange may limit our ability to utilize revenues generated in Renminbi to fund expenditures denominated in foreign currencies, including any dividends that our PRC subsidiaries may pay to us in the future.

***PRC regulations relating to the establishment of offshore special purpose companies by PRC residents may subject our PRC resident beneficial owners or our PRC subsidiaries to liability or penalties, limit our ability to inject capital into our PRC subsidiaries, limit our PRC subsidiaries' ability to increase their registered capital or distribute profits to us, or may otherwise adversely affect us.***

SAFE promulgated the Circular on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Offshore Investment and Financing and Roundtrip Investment through Special Purpose Vehicles ("SAFE Circular 37") on July 4, 2014, which replaced the former circular commonly known as Circular 75 promulgated by SAFE on October 21, 2005. SAFE Circular 37 requires PRC residents to register with local branches of SAFE in connection with their direct establishment or indirect control of an offshore entity, for the purpose of overseas investment and financing, with such PRC residents' legally owned assets or equity interests in domestic enterprises or offshore assets or interests, referred to in SAFE Circular 37 as a "special purpose vehicle." Pursuant to SAFE Circular 37, "control" refers to the act through which a PRC resident obtains the right to carry out business operation of, to gain proceeds from or to make decisions on a special purpose vehicle by means of, among others, shareholding entrustment arrangement. SAFE Circular 37 further requires amendment to the registration in the event of any significant changes with respect to the special purpose vehicle, such as increase or decrease of capital contributed by PRC individuals, share transfer or exchange, merger, division or other material event. In the event that a PRC shareholder holding interests in a special purpose vehicle fails to fulfill the required SAFE registration, the PRC subsidiaries of that special purpose vehicle may be prohibited from making profit distributions to the offshore parent and from carrying out subsequent cross-border foreign exchange activities, and the special purpose vehicle may be restricted in its ability to contribute additional capital into its PRC subsidiaries. Moreover, failure to comply with the various SAFE registration requirements described above could result in liability under PRC law for evasion of foreign exchange controls. According to the Notice on Further Simplifying and Improving Policies for the Foreign Exchange Administration of Direct Investment released on February 13, 2015 by SAFE, local banks will examine and handle foreign exchange registration for overseas direct investment, including the initial foreign exchange registration and amendment registration, under SAFE Circular 37 from June 1, 2015.

We are aware that Mr. Vincent Tianquan Mo, controlling shareholder of Fang and a PRC resident, has not completed the registration as of the date of this prospectus. We have notified all PRC residents or entities who directly or indirectly hold shares in our Cayman Islands holding company and who are known to us as being PRC residents to complete the foreign exchange registrations. However, we may not be informed of the identities of all the PRC residents or entities holding direct or indirect interest in our company, nor can we compel our beneficial owners to comply with SAFE registration requirements. As a result, we cannot assure you that all of our shareholders or beneficial owners who are PRC residents or entities have complied with, and will in the future make, obtain or update any applicable registrations or approvals required by, SAFE regulations. Failure by such shareholders or beneficial owners to comply with SAFE regulations, or failure by us to amend the foreign exchange registrations of our PRC subsidiaries, could subject us to fines or legal sanctions, restrict our overseas or cross-border investment activities, limit our PRC subsidiaries' ability to make distributions or pay dividends to us or affect our ownership structure, which could adversely affect our business and prospects.

36

*Regulations in China may make it more difficult for us to pursue growth through acquisitions.*

On August 8, 2006, six PRC regulatory agencies jointly promulgated the Regulations on Mergers and Acquisitions of Domestic Companies by Foreign Investors (the "M&A Rules"), which became effective on September 8, 2006 and was amended on June 22, 2009. The M&A Rules and other regulations and rules concerning mergers and acquisitions established additional procedures and requirements that could make merger and acquisition activities by foreign investors more time-consuming and complex. For example, the M&A Rules require that MOFCOM be notified in advance of any change-of-control transaction in which a foreign investor takes control of a PRC domestic enterprise or a foreign company with substantial PRC operations, if certain thresholds under the Provisions on Thresholds for Prior Notification of Concentrations of Undertakings, issued by the State Council on August 3, 2008 and was amended on September 19, 2018, are triggered. According to the Notice regarding the Establishment of the Security Review System for Mergers and Acquisitions of Domestic Enterprises by Foreign Investors issued by the General Office of the State Council in February 2011 and the Implementing Rules Concerning Security Review on the Mergers and Acquisitions by Foreign Investors of Domestic Enterprises issued by MOFCOM in August 2011, mergers and acquisitions by foreign investors involved in an industry related to national security are subject to strict review by MOFCOM. These rules also prohibit any transactions attempting to bypass such security review, including by controlling entities through contractual arrangements. We believe that our business is not in an industry related to national security. However, we cannot preclude the possibility that MOFCOM or other government agencies may publish interpretations contrary to our understanding or broaden the scope of such security review in the future. Although we have No current plans to make any acquisitions, we may elect to grow our business in the future in part by directly acquiring complementary businesses in China. Complying with the requirements of these regulations to complete such transactions could be time-consuming, and any required approval processes, including obtaining any required MOFCOM approvals, may delay or inhibit our ability to complete such transactions.

*We may be subject to fines and legal or administrative sanctions if we or our PRC citizen employees fail to comply with PRC regulations with respect to the registration of such employees' share options and restricted share units.*

In February 2012, SAFE promulgated the Notices on Issues concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Publicly-Listed Company (the "Stock Option Rule"). Under the Stock Option Rule, a Chinese entity's directors, supervisors, senior management officers, other staff, or individuals who have an employment or labor relationship with such Chinese entity and who are granted stock options by an overseas publicly listed company are required, through a PRC agent or PRC subsidiary of such overseas publicly listed company, to register with SAFE and complete certain other procedures. Our local employees who have been granted stock options are subject to these regulations. We have designated our relevant PRC subsidiaries to handle the registration and other procedures required by the Stock Option Rule. If we or our PRC option holders fail to comply with these rules, we and our PRC option holders may be subject to fines and other legal or administrative sanctions. See "Item 4.B. Information on the Company—Business Overview—Regulation—Regulations relating to Employee Share Options" of this annual report.

*We face uncertainties with respect to indirect transfers of equity interests in PRC resident enterprises by their non-PRC holding companies. Enhanced scrutiny over acquisition transactions by the PRC tax authorities may have a negative impact on potential acquisitions we may pursue in the future.*

On February 3, 2015, the SAT issued the Public Notice Regarding Certain Corporate Income Tax Matters on Indirect Transfer of Properties by Non-Tax Resident Enterprises ("Public Notice 7"). According to Public Notice 7, where a non-resident enterprise investor transfers taxable assets through the offshore transfer of a foreign intermediate holding company, the non-resident enterprise investor, being the transfer, may be subject to PRC enterprise income tax, if the indirect transfer is considered to be an abusive use of company structure without reasonable commercial purposes. As a result, gains derived from such indirect transfer may be subject to PRC withholding tax at the rate of up to 10.0%. In addition, Public Notice 7 provides clearer criteria than Circular 698 on how to assess reasonable commercial purposes and has introduced safe harbors for internal group restructurings and the purchase and sale of equity through a public securities market. Public Notice 7 also brings challenges to both the foreign transferor and transferee (or other person who is obligated to pay for the transfer) of the taxable assets. Where a non-resident enterprise conducts an "indirect transfer" by transferring the taxable assets indirectly by disposing of the equity interests of an overseas holding company, the non-resident enterprise being the transferor, or the transferee, or the PRC entity which directly owned the taxable assets may report to the relevant tax authority such indirect transfer. Using a "substance over form" principle, the PRC tax authority may re-characterize such indirect transfer as a direct transfer of the equity interests in the PRC tax resident enterprise and other properties in China. As a result, gains derived from such indirect transfer may be subject to PRC enterprise income tax, and the transferee or other person who is obligated to pay for the transfer is obligated to withhold the applicable taxes, currently at a rate of up to 10.0% for the transfer of equity interests in a PRC resident enterprise. Both the transferor and the transferee may be subject to penalties under PRC tax laws if the transferee fails to withhold the taxes and the transferor fails to pay the taxes.

Pursuant to the Notice on Issues Relevant to Withholding of Non-PRC Resident Enterprises Income Tax at Source ("SAT Circular 37") issued by the SAT, which became effective as of December January 1, 2017, transferees are subject to filing obligations and withholding obligations. Both the transferor and the transferee may be subject to penalties under PRC tax laws if the transferee fails to withhold the taxes and the transferor fails to pay the taxes.

We face uncertainties with respect to the reporting and consequences of private equity financing transactions, share exchange or other transactions involving the transfer of shares in our company by investors that are non-PRC resident enterprises, or sale or purchase of shares in other non-PRC resident companies or other taxable assets by us. Our company and other non-resident enterprises in our group may be subject to filing obligations or being taxed if our company and other non-resident enterprises in our group are transferors in such transactions, and may be subject to filing obligations and withholding obligations if our company and other non-resident enterprises in our group are transferees in such transactions, under SAT Circular 37 and Public Notice 7. For the transfer of shares in our company by investors that are non-PRC resident enterprises, our PRC subsidiaries may be subject to filing obligations and withholding obligations under SAT Circular 37 and Public Notice 7. As a result, we may be required to expend valuable resources to comply with SAT Circular 37 and Public Notice 7 or to request the relevant transferors from whom we purchase taxable assets to comply with these circulars, or to establish that our company and other non-resident enterprises in our group should not be taxed under these circulars. The PRC tax authorities have the discretion under SAT Circular 37 and Public Notice 7 to make adjustments to the taxable capital gains based on the difference between the fair value of the taxable assets transferred and the cost of investment. If the PRC tax authorities make adjustments to the taxable income of the transactions under SAT Circular37 and Public Notice 7, our income tax costs associated with such transactions will be increased, which may have an adverse effect on our financial condition and results of operations. We have made acquisitions in the past and may conduct additional acquisitions in the future. We cannot assure you that the PRC tax authorities will not, at their discretion, adjust any capital gains and impose tax return filing obligations on us or require us to provide assistance to them for the investigation of any transactions we were involved in. Heightened scrutiny over acquisition transactions by the PRC tax authorities may have a negative impact on potential acquisitions we may pursue in the future.

*Our independent registered public accounting firm is located in China, a jurisdiction where PCAOB is currently unable to conduct inspections without the approval of the PRC authorities, and as such, investors may be deprived of the benefits of such inspection.*

Our independent registered public accounting firm, KPMG Huazhen LLP, which issues the audit reports included in our annual reports filed with the SEC, as an auditor of companies that are traded publicly in the United States and a firm registered with the Public Company Accounting Oversight Board (United States), or PCAOB, is required by the laws of the United States to undergo regular inspections by PCAOB to assess its compliance with the laws of the United States and professional standards. Our auditor is located in China, a jurisdiction where PCAOB is currently unable to conduct inspections without the approval of the PRC authorities, our auditor is not currently inspected by the PCAOB. On December 7, 2018, the SEC and the PCAOB issued a joint statement highlighting continued challenges faced by the U.S. regulators in their oversight of financial statement audits of U.S.-listed companies with significant operations in China. The joint statement reflects a heightened interest in an issue that has vexed U.S. regulators in recent years. However, it remains unclear what further actions the SEC and the PCAOB will take to address this issue.

Inspections of other firms that PCAOB has conducted outside of China have identified deficiencies in those firms' audit procedures and quality control procedures, which may be addressed as part of the inspection process to improve future audit quality. The inability of PCAOB to conduct inspections of independent registered public accounting firms operating in China makes it more difficult to evaluate the effectiveness of our auditor's audit procedures or quality control procedures. As a result, investors may be deprived of the benefits of PCAOB inspections.

The inability of the PCAOB to conduct inspections of auditors in China makes it more difficult to evaluate the effectiveness of our auditor's audit procedures or quality control procedures as compared to auditors outside of China that are subject to PCAOB inspections. Investors may lose confidence in our reported financial information and procedures and the quality of our financial statements.

*If additional remedial measures are imposed on the Chinese affiliates of the "big four" accounting firms, including our independent registered public accounting firm, in administrative proceedings brought by the SEC alleging the firms' failure to meet specific criteria set by the SEC, with respect to requests for the production of documents, we could be unable to timely file future financial statements in compliance with the requirements of the Exchange Act.*

Beginning in 2011, the Chinese affiliates of the "big four" accounting firms (including our independent registered public accounting firm) were affected by a conflict between the U.S. and Chinese law. Specifically, for certain U.S.-listed companies operating and audited in China, the SEC and the PCAOB sought to obtain access to the audit work papers and related documents of the Chinese affiliates of the "big four" accounting firms. The accounting firms were, however, advised and directed that, under Chinese law, they could not respond directly to the requests of the SEC and the PCAOB and that such requests, and similar requests by foreign regulators for access to such papers in China, had to be channeled through the CSRC.

In late 2012, this impasse led the SEC to commence administrative proceedings under Rule 102(e) of its Rules of Practice and also under the Sarbanes-Oxley Act of 2002 against the "big four" accounting firms. A first instance trial of these proceedings in July 2013 in the SEC's internal administrative court resulted in an adverse judgment against the firms. The administrative law judge proposed penalties on the firms, including a temporary suspension of their right to practice before the SEC. Implementation of the latter penalty was postponed pending review by the SEC Commissioners. On February 6, 2015, before a review by the Commissioner had taken place, the firms reached a settlement with the SEC. Under the settlement, the SEC accepts that future requests by the SEC for the production of documents will normally be made to the CSRC. The firms will receive matching Section 106 requests, and are required to abide by a detailed set of procedures with respect to such requests, which in substance require them to facilitate production via the CSRC. If the firms fail to follow these procedures and meet certain other specified criteria, the SEC retains the authority to impose a variety of additional remedial measures, including, as appropriate, an automatic six-month bar on a firm's ability to perform certain audit work, commencement of new proceedings against a firm or, in extreme cases, the resumption of the current administrative proceeding against all four firms.

In the event that the SEC restarts administrative proceedings, depending upon the final outcome, listed companies in the U.S. with major PRC operations may find it difficult or impossible to retain auditors in respect of their operations in China, which could result in their financial statements being determined to not be in compliance with the requirements of the Exchange Act, including possible delisting. Moreover, any negative news about any such future proceedings against the firms may cause investor uncertainty regarding China-based, U.S.-listed companies, including our company, and the market price of their shares may be adversely affected.

If our independent registered public accounting firm was denied, even temporarily, the ability to practice before the SEC and we were unable to timely find another registered public accounting firm to audit and issue an opinion on our financial statements, our financial statements could be determined not to be in compliance with the requirements of the Exchange Act. Such a determination could ultimately lead to the delisting of our shares from the New York Stock Exchange or deregistration from the SEC, or both, which would substantially reduce or effectively terminate the trading of our shares in the United States.

***Fluctuations in the exchange rates of the Renminbi could materially and adversely affect the value of our shares, ADSs or notes and result in foreign currency exchange losses.***

Substantially all of our revenues, costs and expenses, are denominated in Renminbi, and the functional currency of our principal operating subsidiaries and consolidated controlled entities is the Renminbi. On the other hand, a portion of our expenditures are denominated in foreign currencies, primarily the U.S. dollar, and we use the U.S. dollar as our reporting currency. The ADSs and our convertible senior notes are also denominated in U.S. dollars. As a result, the value of your investment in our ADSs or notes will be affected by fluctuations in exchange rates, particularly appreciation and depreciation in the value of the Renminbi relative to the U.S. dollar and other foreign currencies, without giving effect to any underlying change in our business or results of operations.

The exchange rates between the Renminbi and the U.S. dollar and other foreign currencies are affected by, among other things, changes in China's political and economic conditions. In July 2005, the PRC government discontinued pegging the Renminbi to the U.S. dollar. However, the PBOC regularly intervenes in the foreign exchange market to prevent significant short-term fluctuations in the exchange rate. Between July 2008 and June 2010, the exchange rate between the Renminbi and the U.S. dollar had been stable and traded within a narrow range. However, the Renminbi fluctuated significantly during that period against other freely traded currencies, in tandem with the U.S. dollar. Since June 2010, the Renminbi had started to slowly appreciate against the U.S. dollar, though there have been periods when the U.S. dollar has appreciated against the Renminbi. On August 11, 2015, the PBOC allowed the Renminbi to depreciate by approximately 2% against the U.S. dollar. Since October 1, 2016, the Renminbi has joined the International Monetary Fund (IMF)'s basket of currencies that make up the Special Drawing Right (SDR), along with the U.S. dollar, the Euro, the Japanese yen and the British pound. In the fourth quarter of 2016, the Renminbi has depreciated significantly in the backdrop of a surging U.S. dollar and persistent capital outflows of China. It is therefore difficult to predict how long such depreciation of Renminbi against the U.S. dollar may last and when and how the relationship between the Renminbi and the U.S. dollar may change again. Under China's current exchange rate regime, the Renminbi may appreciate or depreciate significantly in value against the U.S. dollar in the medium to long term. Moreover, it is possible that in the future the PRC authorities may lift restrictions on fluctuations in the Renminbi exchange rate and lessen intervention in the foreign exchange market.

40

There remains significant international pressure on the PRC government to adopt a flexible currency policy. Any significant appreciation or depreciation of the Renminbi may materially and adversely affect our revenues, earnings and financial position, and the value of, and any dividends payable on, our ADSs in U.S. dollars. For example, to the extent that we need to convert U.S. dollars we receive from offshore financing transactions into Renminbi to pay our operating expenses, appreciation of the Renminbi against the U.S. dollar would have an adverse effect on the Renminbi amount we would receive from the conversion. Conversely, a significant depreciation of the Renminbi against the U.S. dollar may significantly reduce the U.S. dollar equivalent of our earnings, which in turn could adversely affect the price of our ADSs. Fluctuations in the exchange rate will also affect the relative value of any dividend we declare and distribute that will be exchanged into U.S. dollars and earnings from and the value of any U.S. dollar-denominated investments we make in the future. To the extent that we need to convert future financing proceeds into Renminbi for our operations, any appreciation of the Renminbi against the relevant foreign currencies would materially reduce the Renminbi amounts we would receive from the conversion. On the other hand, if we decide to convert our Renminbi into U.S. dollars for the purpose of making payments of dividends on our shares or for other business purposes when the U.S. dollar appreciates against the Renminbi, the amounts of U.S. dollars we would receive from such conversion would be reduced. In addition, any depreciation of our U.S. dollar-denominated monetary assets could result in a charge to our income statement and a reduction in the value of our assets.

In addition, very limited hedging transactions are available in China to reduce our exposure to exchange rate fluctuations. To date, we have not entered into any hedging transactions to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedging transactions may be limited and we may not be able to successfully hedge our exposure at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert Renminbi into foreign currency.

***You may experience difficulties in effecting service of legal process, enforcing foreign judgments or bringing original actions in China based on United States or other foreign laws against us or our management.***

We are a company incorporated under the laws of the Cayman Islands. We conduct our operations in China and substantially all of our assets are located in China. In addition, certain of our directors and executive officers reside in China, and most of the assets of these persons are located within China. As a result, it may not be possible to effect service of process within the United States or elsewhere outside China upon these directors and executive officers, including with respect to matters arising under U.S. federal securities laws or applicable state securities laws. Our PRC legal counsel has advised us that the recognition and enforcement of foreign judgments are provided for under the PRC Civil Procedure Law. PRC courts may recognize and enforce foreign judgments in accordance with the requirements of the PRC Civil Procedure Law based either on treaties between China and the country where the judgment is made or on reciprocity between jurisdictions. Currently, there are No treaties between the United States and China for the recognition or enforcement of U.S. court judgments in China. As a result, recognition and enforcement in China of judgments of a court in the United States or any other jurisdiction in relation to any matter not subject to a binding arbitration agreement may be difficult. Pursuant to the PRC Civil Procedure Law, any matter, including matters arising under U.S. federal securities laws, in relation to assets or personal relationships may be brought as an original action in China, only if the institution of such action satisfies the conditions specified in the PRC Civil Procedure Law. As a result of the conditions set forth in the PRC Civil Procedure Law and the discretion of the PRC courts to determine whether the conditions are satisfied and whether to accept the action for adjudication, there remains uncertainty as to whether an investor will be able to bring an original action in a PRC court based on U.S. federal securities laws. In addition, in the event that foreign judgments contravene the basic principles of laws of China, endanger PRC state sovereignty or security, or are in conflict with the public interest of China, PRC courts will not recognize and enforce such foreign judgments.

**Risks related to our ADSs, ordinary shares and notes**

*The market price movement of our ADSs and notes may be volatile.*

The market prices of our ADSs and/or notes may be volatile and subject to wide fluctuations. Among the factors that could affect the prices of our ADSs and/or notes are risk factors described in this section and other factors, including:

- announcements of competitive developments;

- regulatory developments in our target markets in China which affect us, our users, our customers or our competitors;

- actual or anticipated fluctuations in our quarterly results of operations;

- market acceptance of our existing and new services and our expansion from a media platform to media, transaction and financial platforms;

- failure of our quarterly financial and results of operations to meet market expectations or failure to meet our previously announced guidance;

- changes in financial estimates by securities research analysts;

- changes in the economic performance or market valuations of other online or offline real estate and home-related services companies;

- additions or departures of our executive officers and other key personnel;

- announcements regarding intellectual property litigation (or potential litigation) involving us or any of our directors and officers;

- negative publicity and short seller reports that make allegations against us or our affiliates, even if unfounded;

- fluctuations in the exchange rates between the U.S. dollar and the Renminbi;

- fluctuations in short or long-term interest rates; and

- sales or perceived sales of additional ordinary shares, ADSs or notes, including under the registration statement we have on file with the SEC to enable certain of our affiliates to sell their shares.

In addition, the securities markets have from time to time experienced significant price and volume fluctuations that are not related to the operating performance of particular industries or companies. For example, the capital and credit markets have experienced significant volatility and disruption in recent years. In September 2008, such volatility and disruption reached extreme levels and developed into a global crisis. As a result, stock prices of a broad range of companies worldwide, whether or not they were related to financial services, declined significantly. Future market fluctuations may also have a material adverse effect on the market prices of our ADSs and/or notes.

***We may need additional capital, and the sale of additional ADSs, convertible notes or other equity securities could result in additional dilution to our shareholders, while the incurrence of debt may impose restrictions on our operations.***

We believe that our current cash and cash equivalents and anticipated cash flow from operations will be sufficient to meet our anticipated cash needs for the foreseeable future. We may, however, require additional cash resources due to changed business conditions or other future developments, including any investments or acquisitions we may decide to pursue and the expansion of our financial services. If these resources are insufficient to satisfy our cash requirements, we may seek to sell equity or debt securities or obtain a credit facility. The sale of equity securities would result in dilution to our shareholders. The incurrence of indebtedness would result in increased debt service obligations and could require us to agree to operating and financing covenants that would restrict our operations.

***As a foreign private issuer, we are permitted to, and we rely on exemptions from certain corporate governance standards of The New York Stock Exchange applicable to U.S. issuers, including the requirement that a majority of an issuer's directors consist of independent directors. This may afford less protection to holders of our ordinary shares, ADSs and notes.***

We are a "foreign private issuer" under the securities laws of the United States and the rules of The New York Stock Exchange. Under the securities laws of the United States, "foreign private issuers" are subject to different disclosure requirements than U.S. domiciled registrants, as well as different financial reporting requirements. Under the rules of The New York Stock Exchange, a "foreign private issuer" is subject to less stringent corporate governance requirements. Subject to certain exceptions, the rules of The New York Stock Exchange permit a "foreign private issuer" to follow its home country practice in lieu of the listing requirements of The New York Stock Exchange. The corporate governance practice in our home country, the Cayman Islands, does not require a majority of our board to consist of independent directors or that we have annual meetings to elect directors. We currently rely on the exemptions provided by The New York Stock Exchange to a foreign private issuer and have an audit committee comprised of independent directors, a compensation committee with one non-independent director and a nominating and corporate governance committee with one non-independent director. As a result, you may not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of The New York Stock Exchange.

***As a foreign private issuer, we are exempt from certain disclosure requirements under the Exchange Act, which may afford less protection to our shareholders than they would enjoy if we were a U.S. company.***

As a foreign private issuer, we are exempt from, among other things, the rules prescribing the furnishing and content of proxy statements under the Exchange Act. In addition, our executive officers, directors and principal shareholders are exempt from the reporting and short-swing profit and recovery provisions contained in Section 16 of the Exchange Act. We are also not required under the Exchange Act to file periodic reports and financial statements with the SEC as frequently or as promptly as U.S. companies whose securities are registered under the Exchange Act. As a result, our shareholders may be afforded less protection than they would under the Exchange Act rules applicable to U.S. companies.

***Since shareholder rights under Cayman Islands law differ from those under U.S. law, you may have difficulty protecting your shareholder rights.***

Our corporate affairs are governed by our fifth amended and restated memorandum and articles of association, the Companies Law of the Cayman Islands (the "Cayman Companies Law") and the common law of the Cayman Islands. The rights of shareholders to take action against our directors, actions by minority shareholders and the fiduciary responsibilities of our directors to us and to our shareholders under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from English common law, which has persuasive, but not binding, authority on a court in the Cayman Islands.

The rights of our shareholders and the fiduciary responsibilities of our directors under Cayman Islands law are not as clearly established as they are under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands has a less developed body of securities laws as compared to the United States, and some states, such as Delaware, have more fully developed and judicially interpreted bodies of corporate law. In addition, shareholders of Cayman Islands companies may not have standing to initiate a shareholder derivative action in a federal court of the United States.

As a result, public shareholders of Cayman Islands companies may have more difficulty in protecting their interests in connection with actions taken by management, members of the board of directors or controlling shareholders than they would as public shareholders of a U.S. company.

***The voting rights of holders of ADSs are limited by the terms of the deposit agreement.***

A holder of our ADSs may only exercise the voting rights with respect to the underlying ordinary shares in accordance with the provisions of the deposit agreement. Upon receipt of voting instructions of a holder of ADSs in the manner set forth in the deposit agreement and the restricted deposit agreement pursuant to which ADSs are issuable upon conversion of the notes, the depositary will endeavor to vote the underlying ordinary shares in accordance with these instructions. Under our amended and restated articles of association and Cayman Islands law, the minimum notice period required for convening a general meeting is 10 days. When a general meeting is convened, you may not receive sufficient notice to permit you to withdraw your ordinary shares and allow you to cast your vote as a direct shareholder with respect to any specific matter. In addition, the depositary and its agents may not be able to send voting instructions to you or carry out your voting instructions in a timely manner. We will make all reasonable efforts to cause the depositary to extend voting rights to you in a timely manner, but we cannot assure you that you will receive the voting materials in time to ensure that you can instruct the depositary to vote your shares. Furthermore, the depositary and its agents will not be responsible for any failure to carry out any instructions to vote, for the manner in which any vote is cast or for the effect of any such vote. As a result, you may not be able to exercise your right to vote and you may lack recourse if the ordinary shares underlying your ADSs are not voted as you requested.

***You may not be able to participate in rights offerings and may experience dilution of your holdings.***

We may, from time to time, distribute rights to our shareholders, including rights to acquire securities. We cannot offer or sell securities in the United States unless we register those securities under the Securities Act or unless an exemption from the registration requirements of the Securities Act is available. Under the deposit agreement, the depositary will not distribute rights to holders of ADSs unless the distribution and sale of rights and the securities to which these rights relate are either exempt from registration under the Securities Act with respect to all holders of ADSs, or are registered under the Securities Act. The depositary may, but is not required to, attempt to sell such undistributed rights to third parties in this situation. We can give No assurances that we will be able to establish an exemption from registration under the Securities Act, and we are under No obligation to file a registration statement with respect to these rights or underlying securities or to endeavor to have a registration statement declared effective. Accordingly, holders of ADSs may be unable to participate in any rights offerings and may experience dilution of their holdings as a result.

If the depositary is unable to sell rights that are not exercised or not distributed or if the sale is not lawful or reasonably practicable, it will allow the rights to lapse, in which case you will receive No value for these rights.

***You may not receive distributions on ordinary shares or any value for them if it is illegal or impractical to make them available to you.***

The depositary for our ADSs has agreed to pay to you the cash dividends or other distributions it or its custodian receives on ordinary shares or other deposited securities after deducting its fees and expenses. You will receive these distributions in proportion to the number of ordinary shares your ADSs represent. For example, as of the date of this annual report, five ADSs represent one Class A ordinary share. However, the depositary is not required to make such distributions if it decides that it is unlawful or impractical to make a distribution available to any holder of ADSs. For example, it would be unlawful to make a distribution to holders of ADSs if it consisted of securities that required registration under the Securities Act, but were not properly registered or distributed pursuant to an applicable exemption from registration. It could also be impracticable to make a distribution if doing so would entail fees and expenses that would exceed the value of the distribution or the distribution consisted of property that could not be transported or transferred. We have not undertaken any obligation to register under U.S. securities laws any ADSs, ordinary shares, rights or other securities that may be distributed to our shareholders. We also have not undertaken any obligation to take any other action to permit the distribution of ADSs, ordinary shares, rights or anything else to holders of ADSs. This means that you may not receive any distribution we make on our ordinary shares or any value for it if it is illegal or impractical for us to make such distribution available to you, such as if an exemption from registration under the U.S. securities laws is not available. These restrictions may decrease the value of your ADSs.

***We may be required to withhold PRC income tax on any dividend we pay you, and any gain you realize on the transfer of our ordinary shares and/or ADSs may also be subject to PRC withholding tax.***

Pursuant to the New EIT Law, we and our offshore subsidiaries may be treated as a PRC resident enterprise for PRC tax purposes. See "—Risks related to doing business in China—We may be treated as a resident enterprise for PRC tax purposes under the New EIT Law and therefore be subject to PRC taxation on our worldwide income." If we and our offshore subsidiaries are so treated by the PRC tax authorities, we would be obligated to withhold a 10.0% PRC withholding tax for non-resident enterprises or a 20.0% PRC withholding tax for non-resident individuals, or a withholding tax at a reduced rate as provided under the applicable double tax treaty between China and the governments of other jurisdictions on any dividend we pay to you, subject to completion of the record-filing procedures and approval from the relevant tax authorities, pursuant to a Circular No. 124 issued by SAT in August 2009 ("Circular 124").

On November 1, 2015, Circular 124 was repealed by the Administrative Measures for Tax Convention Treatment for Non-resident Taxpayers issued by SAT ("Circular 60"). Circular 60 provides that non-resident taxpayers are not required to obtain pre-approval from the relevant tax authority in order to enjoy the reduced withholding tax rate. Instead, they may, upon self-assessment that the prescribed criteria are met, submit the relevant statements and materials directly to the competent tax authorities for the tax return filing, which will be subject to post-filing examinations by the relevant tax authorities.

In addition, any gain realized by any investors who are non-resident enterprises or non-resident individuals of China from the transfer of our ordinary shares, ADSs and/or notes could be regarded as being derived from sources within China and be subject to a 10.0% or 20.0% PRC withholding tax, respectively. Such PRC withholding tax would reduce your investment return on our ordinary shares, ADSs and/or notes and may also materially and adversely affect the prices of our ADSs and/or notes.

***Our dual-class ordinary share structure with different voting rights could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial.***

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to 10 votes per share. Five ADSs represent one Class A ordinary share and the number of votes to which each ADS would be entitled to is the number of Class A ordinary shares it represents. A number of our shareholders, including primarily Media Partner and Next Decade, whose shares are held in irrevocable discretionary trusts established by Mr. Mo, hold Class B ordinary shares. We intend to maintain the dual-class ordinary share structure. Each Class B ordinary share is convertible into one Class A ordinary share at any time by its holder and Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any transfer of Class B ordinary shares by a Class B ordinary shareholder to any person or entity which is not a majority-owned and majority-controlled subsidiary of certain of our shareholders as set forth in our amended and restated articles of association, such Class B ordinary shares will be automatically and immediately converted into the equal number of Class A ordinary shares.

Due to the disparate voting powers attached to these classes of shares, our shareholders holding Class B ordinary shares have significant voting power over matters requiring shareholder approval, including election of directors and significant corporate transactions, such as a merger or sale of our company or our assets. This concentrated control could discourage others from pursuing any potential merger, takeover or other change-of-control transactions that holders of Class A ordinary shares and ADSs may view as beneficial.

***Our articles of association contain anti-takeover provisions that could adversely affect the rights of holders of our ordinary shares and ADSs***

We have included certain provisions in our current articles of association that would limit the ability of others to acquire control of our company. These provisions could deprive our shareholders of the opportunity to sell their ordinary shares at a premium over the prevailing market price by discouraging third parties from seeking to obtain control of our company in a tender offer or similar transactions. These provisions include the following:

- A dual-class ordinary share structure; and

- Our board of directors, without further action by our shareholders, may issue preferred shares with special voting rights compared to our ordinary shares.

***Servicing our debt requires a significant amount of cash, and we may not have sufficient cash flow from our business to pay our substantial debt.***

Our ability to make scheduled payments of the principal of, to pay interest on or to refinance our indebtedness, including the notes, depends on our future performance, which is subject to economic, financial, competitive and other factors beyond our control. Our business may not continue to generate cash flow from operations in the future sufficient to service our debt and make necessary capital expenditures. If we are unable to generate such cash flow, we may be required to adopt one or more alternatives, such as selling assets, restructuring debt or obtaining additional equity capital on terms that may be onerous or highly dilutive. Our ability to refinance our indebtedness will depend on the capital markets and our financial condition at such time. We may not be able to engage in any of these activities or engage in these activities on desirable terms, which could result in a default on our debt obligations.

46

*We may incur more debt or take other actions which would intensify the risks discussed above.*

We and our subsidiaries and consolidated controlled entities may incur substantial additional debt in the future, some of which may be secured debt. We will not be restricted under the terms of the indenture governing the notes from incurring additional debt, securing existing or future debt, recapitalizing our debt or taking a number of other actions that are not limited by the terms of the indenture governing the notes that could have the effect of diminishing our ability to make payments on the notes when due.

*We may not have the ability to raise the funds necessary to repurchase the 2022 Notes upon a fundamental change (as defined in the relevant note documents), and our future debt may contain limitations on our ability to repurchase the notes.*

Holders of certain of our outstanding notes will have the right to require us to repurchase their notes upon the occurrence of a fundamental change (as defined in the relevant note documents) at a repurchase price equal to 100.0% of the principal amount of the notes to be repurchased, plus accrued and unpaid interest under certain circumstances. However, we may not have enough available cash or be able to obtain financing at the time we are required to make repurchases of notes surrendered therefor. In addition, our ability to repurchase the notes may be limited by law, by regulatory authority or by agreements governing our future indebtedness. Our failure to repurchase notes at a time when the repurchase is required by the relevant note documents would constitute a default under such documents. A default under the relevant note documents or the fundamental change itself could also lead to a default under agreements governing any future indebtedness. If the repayment of any future indebtedness were to be accelerated after any applicable notice or grace periods, we may not have sufficient funds to repay the indebtedness and repurchase the notes.

*The future sale of substantial amounts of ADSs and/or convertible notes could lower the market price for the ADSs and/or our outstanding notes, as the case may be.*

Sales of substantial amounts of ADSs and/or notes that may be converted or exchanged into ADSs or ordinary shares in the public market, or the perception that these sales could occur, could adversely affect the market price of our ADSs, could materially impair our ability to raise capital through equity offerings in the future and could adversely impact the trading price of the ADSs and/or the notes. The ADSs outstanding not held by our affiliates are freely tradable without restriction or further registration under the Securities Act, and shares held by our affiliates may also be sold in the public market in the future subject to the restrictions in Rule 144 under the Securities Act. We may also issue additional options in the future which may be exercised for additional ordinary shares and additional restricted shares and restricted share units. We cannot predict what effect, if any, market sales of securities held by our significant shareholders or any other shareholder or the availability of these securities for future sale will have on the market price of the ADSs or the trading price of the notes.

47

*We may become a passive foreign investment company ("PFIC"), which could result in adverse U.S. tax consequences to U.S. investors.*

A non-U.S. corporation is deemed a PFIC for any taxable year if either (1) at least 75% of its gross income for such year is passive income, or (2) at least 50% of the value of its assets (based on an average of the quarterly values of the assets) during such year is attributable to assets that produce passive income or are held for the production of passive income. We operate an active real estate Internet portal in China. Based on the market price of our ADSs, the value of our assets, and the composition of our income and assets, we do not believe we were a PFIC for the taxable year ended December 31, 2018. The determination of whether a non-U.S. corporation is a PFIC is made on an annual basis after the close of each tax year. There can be No assurance that we will not be a PFIC for our current taxable year or any future tax year. One consequential factor affecting the outcome of annual PFIC determination in current and future tax years will be our market capitalization. Because items of working capital are generally treated as passive assets for PFIC purposes, accumulating cash, cash equivalents and other assets such as short-term and long-term investments that are readily convertible into cash increases the risk that we will be classified as a PFIC for U.S. federal income tax purposes. A determination that we are a PFIC could result in adverse U.S. tax consequences to you if you are a U.S. taxpayer and own our ADSs or ordinary shares, in the form of increased tax liabilities and burdensome reporting requirements. For example, if we were a PFIC, you would generally be taxed at the higher ordinary income rates, rather than the lower capital gain rates, if you dispose of ADSs or ordinary shares at a gain in a later year, even if we are not a PFIC in that year. In addition, a portion of the tax imposed on your gain would be increased by an interest charge. Certain elections may be available to certain of our holders, however, that would mitigate these adverse tax consequences to varying degrees. Also, if we were classified as a PFIC in any taxable year, you would not be able to benefit from any preferential tax rate (if any) with respect to any dividend distribution that you may receive from us in that year or in the following year. Since our business and assets may evolve over time in ways that are different from what we currently anticipate, we cannot assure you that we will not be a PFIC for our current taxable year or any future taxable year. For more information on the tax consequences to you if we were treated as a PFIC, see "Item 10.E. Additional Information—Taxation—U.S. federal income taxation" of this annual report.

## ITEM 4.  INFORMATION ON THE COMPANY

### A. History and Development of the Company

We were incorporated on June 18, 1999 as Fly High Holdings Limited, under the laws of the British Virgin Islands, and on July 14, 1999, we changed our name to SouFun.com Limited. On June 17, 2004, we changed our corporate domicile to the Cayman Islands, becoming a Cayman Islands exempted company with limited liability. On June 22, 2004, we changed our name to SouFun Holdings Limited. On September 23, 2016, we changed our name to Fang Holdings Limited. Since our inception, we have conducted our operations in China primarily through our PRC subsidiaries and consolidated controlled entities.

On September 17, 2010, we completed our initial public offering and listing of 2,933,238 ADSs, each representing four Class A ordinary shares, on the New York Stock Exchange, which are traded under the symbol "SFUN." Concurrently with our initial public offering, our majority shareholder, Telstra International Holdings Ltd. ("Telstra International"), an indirect, wholly owned subsidiary of Telstra Corporation Limited, a Fortune Global 500 company, sold to General Atlantic Mauritius Limited ("General Atlantic"), Hunt 7-A Guernsey L.P. Inc. ("Hunt 7-A"), Hunt 7-B Guernsey L.P. Inc. ("Hunt 7-B"), Hunt 6-A Guernsey L.P. Inc. ("Hunt 6-A," together with Hunt 7-A and Hunt 7-B, "Apax"), Next Decade and Digital Link Investments Limited ("Digital Link"), all of its remaining shares in our company in a private sale at the initial public offering price.

On February 18, 2011, we changed our ADS share ratio from one ADS representing four Class A ordinary shares to one ADS representing one Class A ordinary share.

On April 7, 2014, we changed our ADS share ratio from one ADS representing one Class A ordinary share to five ADSs representing one Class A ordinary share.

On July 19, 2018, Fang we entered into definitive agreements to acquire a 10% equity interest in Wanli from its controlling shareholder for a cash consideration of RMB500 million, of which RMB200 million will compensate the seller in connection with the Business Disposal (defined below). In connection with the acquisition, the seller agrees agreed (1) to enter into an irrevocable voting proxy agreement with a term of three years to adhere to our action in Wanli's future meetings of shareholders and board of directors and (2) to purchase from Wanli its battery business for a price of No less than RMB680 million within three years after the consummation of the acquisition (the "Business Disposal"). Following the completion of the acquisition on August 10, 2018, we have become the largest shareholder of Wanli.

On May 2, 2019, our board of directors approved our plan to separate CIH into an independent publicly traded company whose business will comprise certain portions of our listing and value-added services. On May 10, 2019, CIH publicly filed its registration statement on Form F-1 with SEC to effect the proposed separation and distribution.

Our principal executive offices are located Tower A, No. 20 Guogongzhuang Middle Street, Fengtai District, Beijing 100070, the People's Republic of China. Our telephone number at this address is +8610 5631 8000. Our website address is www.fang.com. We do not incorporate the information on our website into this annual report.

### B. Business Overview

### Overview

We believe we operate a leading real estate Internet portal in China in terms of the number of page views and visitors to our websites in 2018. Our user-friendly websites and mobile apps support active online communities and networks of users seeking information on, and services for, the real estate and home-related sectors in China. Our service offerings include:

- *Marketing services*: We offer marketing services on our websites and mobile apps, mainly through advertisements, to real estate developers in the marketing phase of new property developments, as well as to real estate agencies and suppliers of home furnishing and improvement and other home-related products and services who wish to promote their products and services. Marketing services were our largest source of revenues in 2018.

- *Listing services*: We offer basic and special listing services on our websites and mobile apps. Our basic listing services are primarily offered to real estate agents, brokers, developers, property owners and managers and suppliers of home furnishing and improvement and other home-related products and services. Our basic listing services allow our customers to post information of their products and services on our websites. Our special listing services offer specialized marketing programs through both online channels and offline themed events. Listing services were our second largest source of revenues in 2018.

- *Financial services*: We provide financial services primarily though our offline micro loan subsidiaries. We provide primarily secured consumer loans to individuals that meet our credit assessment requirements. We launched financial services in August 2014.

- *E-commerce services*: Our e-commerce services primarily include Fang membership services, direct sales services for new homes and online sublease services. We provide both free and paid Fang membership services to our registered members. Our free services include primarily regular updates regarding local property developments, tours to visit property developments and other services relating to property purchases. Our paid services primarily include offers to purchase properties at a discount from our partner developers and dedicated information and related services to facilitate property purchases. We ceased entering into new contracts for our direct sales services for new homes, online home-decorating services and online real estate brokerage services in 2018 due to the change in our business development strategies.

- *Value-added services:* We provide value-added services including subscription services for access to our information database and consulting services for customized and industry-related research reports and indices.

We have built a large and active community of users, who are attracted by the comprehensive real estate and home related content available on our portal that forms the foundation of our service offerings. We currently maintain approximately 65 offices across China to focus on local market needs. Our user base has also attracted numerous customers, which include real estate developers, real estate agents and brokers, property owners, property managers, mortgage brokers, lenders and suppliers of home furnishing and improvement and other home-related products and services. Our diverse offerings and broad geographic coverage have resulted in an active and dynamic online community that provides an effective and targeted channel for advertisers to market their products and services, and serves as a centralized source of information, products and services for consumers in the real estate and home furnishing and improvement and other home-related markets. With our leading Internet portal, we believe that we are well positioned to develop integrated media and financing platforms, increase synergy and capture additional growth opportunities in the real estate market in China.

Following the completion of the proposed separation of CIH from us, CIH will have the exclusive right to operate the spun-off business comprising certain portions of Fang's listing and value-added services, and Fang will have the exclusive right to operate the retained business. In particular, the spun-off business will comprise (1) certain information and analytics services, initially operated as part of our value-added services, and (2) certain marketplace services, initially operated as part of our listing services. Following the proposed separation and distribution, CIH will strategically focus on serving the commercial property sector in China to capture the enormous market opportunity from its rapid development, while we will retain our business operating a real estate Internet portal focusing primarily on serving the residential property sector.

**Our Services**

We provide (1) marketing services, (2) listing services, (3) financial services, (4) e-commerce services and (5) value-added services to participants in the PRC real estate and home-related sectors primarily through our websites and our mobile apps.

*Marketing Services*

We target our marketing services toward participants in China's real estate and home-related sectors. Marketing is one of our most important businesses. Revenues from marketing services were US$165.4 million, US$149.3 million and US$119.7 million in 2016, 2017 and 2018, respectively, representing 18.1%, 33.6% and 39.5% of our revenues, respectively. Our marketing services are delivered through our website www.fang.com and our mobile apps, which can be downloaded for both iOS- and Android-based operating systems, and include traditional Internet advertisements such as banners, links, logos and floating signs, as well as featured promotions, which are specially-tailored packages of traditional online advertising tools. Customers of our marketing services include a broad range of participants in the PRC real estate and home-related sectors, such as:

- real estate developers;

- real estate professionals, such as agents and brokers;

- retailers and other suppliers of home furnishing and improvement products and services; and

- home design, decoration and re-modeling companies.

We also combine traditional online advertising tools with new marketing strategies to create featured promotion packages for our customers. Using the inherent flexibility of website advertising, we create customized marketing and promotional packages with additional features at the request of our customers to meet the different needs of various customers operating in diverse geographic markets in China. We believe that we have the opportunity to provide additional features to generate additional revenues without incurring significant additional costs. Marketing services have been and will continue to be a growth area for us, as we believe that participants in China's real estate and home-related sectors are increasingly looking to the Internet and mobile apps as an additional vehicle through which to attract customers.

We generally enter into two main types of marketing contracts with our customers. The first type is a framework contract prescribing the total payment amount and price of products. The second type is an order contract with payment due within 90 days of the execution of the contract. Our marketing framework contracts generally have a one-year term.

### Listing Services

Our listing services include basic listing services and special listing services on our websites and mobile apps. Our revenues from listing services were US$118.1 million, US$165.4 million and US$113.5 million in 2016, 2017 and 2018, respectively, representing 12.9%, 37.2% and 37.5% of our total revenues in those years, respectively.

*Basic Listing Services.* Basic listing services contributed approximately 78.0%, 85.0% and 74.4% of our listing service revenues in 2016, 2017 and 2018, respectively. Real estate agents, brokers, managers, developers, owners and suppliers of home furnishing and improvement products and services subscribe to our basic listing services for a fee, which allow them to post listings for properties or home furnishing and improvement products and services over the subscription periods. All visitors to our websites and mobile apps have access to listing information free of charge.

Most of our basic listing subscription contracts are one to three months in duration. We typically collect payments for such subscriptions for our basic listing services before the signing of a subscription contract. We also offer longer arrangements, such as to certain large real estate agencies. For subscription contracts with longer terms, the contract prices are generally payable in installments every one to three months until the end of the contract term.

We offer free trials of our basic listing services. These free trials allow users to experience our basic listing services and high user traffic. While there is No time restriction on our free trials, there are incentives for free trial users to upgrade their free trial accounts to paid subscriptions for our basic listing services because listings posted through free trial accounts are featured in less prominent positions and rankings than those of subscribers. The average number of paying subscribers to our listing services was 211,280, 265,649 and 206,250 in 2016, 2017 and 2018, respectively.

In addition, we allow individual property owners to list their own properties for sale or rent on our property listing sections without charge. Such free listings do not enjoy prime positioning and are strictly limited to individual, non-real estate professional home owners. To help prevent real estate professionals from abusing the individual property owner basic listing service, we have created a customer hotline for our users to report any abuse.

Our basic listing services help us build our comprehensive database of information regarding new, secondary and rental properties as well as home furnishing and improvement products and services in major urban centers across China. The large amount of our basic listings attracts significant user traffic on our websites and mobile apps, which we believe can be leveraged to yield more marketing and special listing customers and higher marketing and special listing fees from our institutional customers.

We update the listing data on our websites and mobile apps on a daily basis through our proprietary content management process and software. This proprietary content management process is monitored by our listing monitoring team and allows our customers to submit listing information in a specific format. Our listing monitoring team periodically checks all listing information uploaded to our websites and mobile apps to identify common anomalies in posted information in order to limit unreliable data. Once we discover false information in a listing, we liaise with the real estate agent or broker to rectify the listing immediately. If such listing information is not revised on a timely basis, we will move it into a database that cannot be accessed by our users.

*Special Listing Services.* Special listing services are specialized marketing campaigns provided primarily to developers through online channels and offline themed events. Revenues from special listing services were US$26.4 million, US$24.9 million and US$29.1 million in 2016, 2017 and 2018, respectively, representing 22.0%, 15.0% and 25.6% of our listing service revenues in those years, respectively.

Leveraging our data analytical capabilities, we assess the strengths of the brands of companies in various real estate sectors and create a special listing campaign to recognize the leading companies in those sectors. Once the special listing campaigns are determined, we establish a marketing and promotional program consisting of various online and offline promotional activities, which together collectively promote each special listing campaign. The program includes online marketing platforms such as our websites and WeChat and offline themed events such as conferences, discussion forums and banquets. Prior to the launch of a special listing campaign, our marketing and sales staff directly contact the targeted leading companies to solicit their participation in the special listing programs for a specified fee. We also provide our customers with periodical updates on industry developments to help them formulate brand management strategies. The duration of our special listing services typically lasts one year. Some examples of our special listing campaigns include events and promotions for the top 100 PRC property developers and the China Villa Festival. For details, see "—Brand Awareness and Marketing— Event Sponsorships" below.

### Financial Services

Revenues from financial services were US$29.6 million, US$12.1 million and US$18.1 million in 2016, 2017 and 2018, respectively, representing 3.2%, 2.7% and 6.0% of our revenues, respectively.

We primarily provide secured consumer loans to individuals that meet our credit assessment requirements. We generally charge borrowers both interest and service fees. We assess each individual loan receivable for impairment on a quarterly basis. As part of our impairment assessment, we consider the timeliness of collection to date, changes in the value of collateral provided by the borrowers and expected default rates.

We obtained approvals to engage in the microfinancing business from government authorities of four cities, including Beihai, Shanghai, Chongqing and Tianjin.

### *E-commerce Services*

Our e-commerce services, first launched in 2011, primarily include Fang membership services, direct sales services for new homes and online sublease services. Our revenues generated from e-commerce services were US$577.7 million, US$87.8 million and US$15.4 million in 2016, 2017 and 2018, respectively, representing 63.0%, 19.8% and 5.0% of our revenues, respectively. We ceased entering into new contracts for our direct sales services for new homes, online home-decorating services and online real estate brokerage services in early 2018 due to the change in our business development strategies.

*Fang Membership Services.* We provide both free and paid membership services to the registered members of our Fang cards on our websites and mobile apps. Our free services include primarily regular updates regarding local property developments, tours to visit property developments and other services relating to properties purchases. Our paid services primarily include offers to home buyers to purchase properties with discounts from our partner developers and dedicated information and related services to facilitate property purchases, which we began to offer in 2011. Our membership fees for paid services generally range from RMB5,000 to RMB20,000. The discount is reflected as a fixed amount off, or a percentage discount to, the total purchase price paid by a home buyer for a specified property, or a combination of both, which is determined by us and our partner developers. The discounts are significantly higher than our membership fees, resulting in net savings for our members. Membership fees are refundable until our members use the discounts to purchase properties or pursuant to our refund policy. Our members pay a specified fee each time in order to be eligible for the discount provided for a particular property. To promote our services and reach additional customers, we may promote the property developments through other advertising channels and pay real estate agents for customer referrals. In 2018, we offered paid Fang membership services covering approximately 103 property developments in 30 cities in China. Our revenues from Fang membership services totaled US$114.7 million, US$10.3 million and US$2.8 million in 2016, 2017 and 2018, respectively, or 12.5%, 2.3% and 0.9%, respectively, of our total e-commerce revenues for the same periods.

*Online Real Estate Brokerage Services.* We launched our online real estate brokerage services in January 2015, which were offered in 28 major urban centers in China, such as Beijing, Shanghai, Guangzhou, Shenzhen, Chengdu, Chongqing, Wuhan and Nanjing. We acted as an intermediary between sellers and buyers of secondary real properties, and our services primarily included property listing, advisory services and transaction negotiation and documentation. In addition to property sales, we also assisted property owners and potential renters with leasing transactions. Different from conventional real estate brokers in China, we did not maintain extensive physical sales offices and instead relied primarily on our websites and mobile apps to source customers. Our revenues from online real estate brokerage services totaled US$248.9 million and US$35.8 million in 2016 and 2017, respectively, or 27.2% and 8.1%, respectively, of our total revenues for the same periods. We suspended our online real estate brokerage services in early 2018 due to our transformation back to a technology-driven open platform.

*Direct Sales Services.* We launched our direct sales services in August 2014. We promote property developments of our developer clients primarily through our websites and mobile apps. Different from our Fang membership services, potential individual buyers can register with us free of charge if they are interested in any real estate properties covered by our direct sales services. In addition, individual buyers can enjoy discounted prices for properties that we offer from our developer clients. We charge our developer clients a fee for each property they sold through our direct sales services. Our fee generally is a predetermined percentage of the value of the individual transaction and is refundable pursuant to our refund policy. Our revenues from direct sales services totaled US$152.1 million, US$26.9 million and US$5.3 million in 2016, 2017 and 2018, respectively, or 16.6%, 6.1% and 1.7%, respectively, of our total revenues for the same periods.

*Online Sublease Services.* We launched our online sublease services in the second quarter of 2015. We promote and market real properties leased from third parties on our websites and mobile apps, and sublease such properties to our customers for rental fees.

*Value-added Services*

In addition to listing, marketing, e-commerce and financial services, we also provide value-added services which primarily include subscriptions to our information database and research reports services. Revenues from value-added services were US$25.6 million, US$29.8 million and US$36.4 million in 2016, 2017 and 2018, respectively, representing 2.8%, 6.7% and 12.0% of our total revenues, respectively. We utilize our extensive PRC real estate database, data analytics and research capabilities to provide online content relating to the real estate sector through our websites and mobile apps, such as real estate database access, research services, real estate industry and company-specific research reports. Our customers include PRC real estate enterprises, industry professionals as well as government entities.

**Our Websites**

Our principal website, www.fang.com, is the leading real estate Internet portal and one of the leading home furnishing and improvement websites in China in terms of visitor traffic. As part of our effort to promote our brand recognition, we changed the address of our principal website from www.soufun.com to www.fang.com in July 2014. "Fang" means "home" in Chinese. We believe that this new and simplified address will be much easier for Chinese users to remember and access, thereby improving our brand recognition. According to our own records, www.fang.com received a monthly average of approximately 123 million unique visitors in the fourth quarter of 2018. In addition, we had approximately 96 million registered members of our www.fang.com website and had about 25 million registered members of our free and paid Fang membership services as of December 31, 2018.

As of December 31, 2018, our www.fang.com website contained contents covering more than 658 cities across China, as well as Hong Kong, Taiwan, Singapore, Japan, United States, Canada, Australia, United Kingdom and Spain. This website also contains links to other specialized real estate and home furnishing and improvement websites, including our www.jiatx.com website, our e-commerce transaction and payment platform.

We believe user satisfaction ultimately rests on the appeal, attraction and functionality of our websites. Our Internet technology and sales and marketing teams spend considerable time and resources upgrading and enhancing our websites based on market trends and feedback from users and our marketing and listing customers. We distinguish ourselves from other websites focused on real estate and home-related products and services through the quality and breadth of our content. We also maintain a centralized customer service hotline and e-mail reporting system through which users can obtain assistance or otherwise contact us.

Our www.fang.com website covers a wide spectrum of PRC real estate and home furnishing and improvement and other home-related information and constitutes the foundation and gateway for our primary business activities. We aim at providing a central forum of reliable information regarding China's real estate and home-related markets that is helpful to market participants in the transaction process. Our content, which is generally free to our website users, is designed to assist users with each step of the real estate and home furnishing and improvement and other home-related transaction process. Our extensive home-related content and information is organized into the following sections and categories on our website, which are intended to address the individual needs of our users.

### *Online Property Listings and Search Engines for New Home and Secondary and Rental Properties*

Our www.fang.com website contains databases for new home, secondary and rental properties, and provides search engines on such properties in our databases.

With our on-the-ground capabilities in approximately 65 offices in China, we devote significant resources to collect first-hand real estate market intelligence and listing information in such markets and to update such information on a regular basis. Our user-friendly search engines and website interfaces allow users to tailor their searches to specific types of properties by using search criteria. Users seeking information on properties in specific geographic locations can narrow their searches to a specific city and often to specific districts or areas in the vicinity of a particular subway line within that city by using pull-down menus. Users can further refine their searches using selection criteria, including price range, type of property, number of rooms and size. After selecting search parameters, users are directed to a page listing available properties as well as basic information about each individual property, including location, price, number of rooms and the source of the listing.

### *Information on Home Related Products and Services*

Our www.fang.com website contains information regarding design firms, contractors, do-it-yourself projects, building materials and a wide range of products and services relevant to home decoration and re-modeling, furniture and other home furnishing and services. We provide an efficient platform for companies in the home-related sector, which primarily include suppliers of furnishing and improvement products and services and are usually small in size, to promote their brands and establish their presence on the Internet. We also provide search tools enabling visitors to search for specific businesses by area of expertise, product or service category. For example, a visitor interested in searching for suppliers and installers of window products in Beijing can use our pull-down search tools to focus their search for businesses providing such products and services.

Other pull-down menus allow visitors to view numerous design concepts, model interior decoration plans or other home improvement ideas. After selecting search parameters, users are directed to a page listing applicable home furnishing and improvement products and services as well as basic information about each home furnishing and improvement product or service, including price, product and service information and the source of the information. Much of the content, pictures and graphics are provided by other users of the website, which allows people interested in home decoration and furnishing to share ideas and information online. Users can also use this section to find and compare the work and experience of architects and interior designers.

*Real Estate Database and Information*

Our website provides an extensive database for users to search real estate information, as well as general research reports regarding the PRC real estate industry at both the national and regional levels. The research section of our website provides research coverage of different topics within the PRC real estate industry. For example, our research database contains information on topics such as real estate projects, land information, real estate financing information, real estate-related laws and regulations and real estate public company information. We believe our research section serves to raise our profile as experts on the PRC real estate industry. Supported by a dedicated research team and an advisory board of leading real estate experts and industry professionals, our research section offers a collective body of knowledge that we believe is well-known in the PRC real estate industry.

*Online Residential Communities*

We offer online residential community services through our website, www.fang.com. Such online residential community services provide a forum for visitors to share personal views, anecdotes and other information regarding different aspects of the PRC real estate market, specific property developments and residential communities and other subjects. They also provide a platform for conducting real estate and home furnishing and improvement and other home-related transactions online. We believe our electronic bulletin board forums, blogs and other online community-oriented services are valuable means for enhancing loyalty and brand awareness among our users by creating virtual communities sharing a common interest in PRC real estate and home-related topics. In addition to using such forums to increase website traffic, we are also exploring ways to generate new revenue streams from our online forums and community-oriented services.

**Our Mobile Apps**

We have developed a series of mobile apps to meet the diverse needs of home buyers, renters and real estate agents. As of March 31, 2019, we had approximately ten iOS and seven Android-based mobile apps, respectively. These mobile apps are downloadable through our websites and major app stores in China. At the end of 2018, approximately 76% of the daily active users were accessing our contents through our mobile platform (including WAP and mobile apps).

**Our National Coverage**

Currently we provide real estate-related content, search services, marketing and listing coverage of more than 658 cities across China and have on-the-ground personnel located in approximately 65 offices nationwide. In addition, we began to offer e-commerce services in 2011, and our Fang membership services had already extended to 98 cities as of December 31, 2018. We believe this extensive nationwide coverage enhances our national brand image, and enables us to deliver consistent and quality listing, marketing and e-commerce services to customers. The real estate industry is inherently a local industry, and online listing and online marketing services targeted at the real estate industry are most effective when delivered by personnel familiar with and experienced in the relevant local markets. Our local personnel also provide our central office staff with valuable data regarding these local real estate markets, which contributes to our knowledge and expertise about real estate markets throughout China. In addition, our network of branch offices helps us to tailor our listing, marketing and e-commerce services to local conditions and the needs of local real estate developers and real estate professionals.

We have established a strong presence in 11 major cities, including Beijing and Shanghai, which are our level 1 cities, and Shenzhen, Chongqing, Tianjin, Chengdu, Guangzhou, Hangzhou, Wuhan, Suzhou and Nanjing, which are our level 2 cities. We entered these cities in the early stages of our development, and these cities have contributed and are expected to continue to contribute a majority of our revenues in the near future. In most of these cities, we offer our full line of services and target a full range of customers, including new home developers, agents, brokers, property managers and suppliers of home furnishing and improvement and other home-related products and services.

We also offer limited listing and other information relating to the real estate markets in Hong Kong, Taiwan, Singapore, Japan, United States, Canada, Australia, United Kingdom and Spain, but these markets do not constitute a material part of our business.

**Brand Awareness and Marketing**

We believe our comprehensive content has made www.fang.com a leading destination website for real estate participants in China. In addition, we seek to promote our websites and mobile apps and the related "Fang Tian Xia" and other brands through our directed selling efforts and other means, including our support for research, academic organizations and the publication of various research reports, event sponsorships, portal collaboration arrangements and marketing alliances. As a result, we believe we have become commonly associated with China's growing real estate and home-related sectors.

*Real Estate Research and Reports*

We believe our knowledge of China's real estate and home-related sectors provides a valuable competitive advantage and helps promote our brand name in the PRC real estate and furnishing and improvement market. The attractiveness of our listing, marketing and e-commerce services is rooted in our ability to commercialize various aspects of our databases and industry knowledge to create new and innovative services for our listing, marketing and e-commerce customers. To maintain and extend our leading position in this area, we seek to recruit and retain employees knowledgeable about China's real estate and home-related sectors through a variety of incentive measures, including share-based compensation plans. Members of our research department produce research reports and provide other information services that help promote our reputation as an informed participant in China's real estate and home-related sectors.

*Event Sponsorships*

We regularly sponsor real estate and home furnishing and improvement events attended by industry participants. We organized and hosted, both online and offline, ten consecutive China Villa Festivals from 2004 to 2013, each of which is an annual event that attracts media, real estate professionals, economists and industry academics. This special listing event was coupled with a marketing program which promoted and advertised various villa projects across 100 cities in China. In March 2019, we also hosted our sixteenth annual conference in Beijing to announce the "Top 100 Property Developers in China" together with the Enterprise Economic Research Institute of the Development Research Center of the PRC State Council and the Institute of Real Estate Studies of Tsinghua University, two of China's leading research institutions. Many PRC real estate developers and government agencies involved in the PRC real estate sector attended this conference. The event also attracted broad media attention and interest from the public in each of the past ten years that we held the event.

*Portal Collaboration Arrangements*

We work with well-known Internet portals to attract additional users to our websites and mobile apps. Our portal collaboration arrangements typically have terms ranging from one to three years, with fees paid to our portal collaboration partners in installments every three months.

We currently have portal collaboration arrangements with some of China's large Chinese-language portals to generate user traffic to our website.

*Advertising and Marketing*

We began to conduct general marketing and advertising activities to promote awareness of our new "Fang Tian Xia" and "Fang.com" brands in July 2014. We have also used outdoor advertisements in the Beijing Capital International Airport, bus bulletin boards and subway stations.

## Our Sales Force

We have built a sales and marketing team that is experienced in the online advertising, Internet and real estate industries. As of December 31, 2018, our sales and marketing team consisted of approximately 2,463 persons located in approximately 65 offices across China. We also occasionally engage sales agents for collecting information on local markets or for specific business lines within local markets. Our sales and marketing team, together with these sales agents, work closely with our customers in local markets and help us gain insight into developments in these local markets, the competitive landscape and new market opportunities for each locality.

Our sales and marketing personnel are divided into the new homes, secondary and rental properties, home furnishing and improvements and research product groups. This structure allows our sales and marketing personnel to gain expertise with a specific subset of customers within the market sectors that we target, and to effectively design and market tailored services to customers within each subset.

To motivate our sales and marketing personnel, a majority of their compensation consists of performance incentives such as commissions and bonuses. Sales quotas are assigned to all sales personnel according to monthly, quarterly and annual sales plans. In addition, we apply a merit based promotion system to motivate our sales personnel.

Because sales of online marketing services are highly competitive, we strongly emphasize training programs designed to improve the sales and marketing skills of our staff. We provide three types of training to our sales and marketing personnel: (1) mandatory entrance training for each new sales and marketing employee during a three-month probationary period, (2) rotation training that aims to rotate every sales and marketing employee in different posts for a certain period of time, and (3) regular training in which weekly seminars and case studies are conducted for sales and marketing personnel. Our combination of training, performance-based compensation and a merit based promotion system have been effective in identifying, motivating and retaining strong performers.

We also have key account sales representatives in Beijing that serve our approximately 310 key account customers, which are identified based on their reputation, the scope of their operations as well as the amount of their contracts with us. We appoint one designated contact person to serve each key account customer. Key account customers in our new home business are generally entitled to more benefits than our other customers, such as preferential service fee discounts and preferential positioning within our nationwide real estate listings. We also prepare press release and reports for our key account customers.

**Information Technology Systems and Infrastructure**

We maintain most of our servers and backup servers in Beijing and Shanghai. We believe our server hosting partners provide significant operating advantages, including high-quality bandwidth, constant room temperature and an enhanced ability to protect our systems from power loss, break-ins and other external causes of service interruption. We have not experienced any material system failures over the past 15 years.

To better serve our website visitors, we have utilized our key proprietary technologies and developed a technology platform that is specifically used for our real estate and home related Internet portal services. The key components of our technology platform include:

- *Search platform*. Our search platform is designed to support targeted searches of our listing databases. Besides the key word search function, our search platform provides additional search functions that improve search accuracy with various search criteria, including searches based on the location, price and type of the property. In addition, our search engine is able to refine the search by conditional filtering and aggregation of the search results.

- *Large-scale system infrastructure*. With a combination of proprietary in-house and third-party solutions, we have designed our system to handle large amounts of data flow with a high degree of scalability and reliability. Our distributed architecture uses parallel computing technology and clusters of low-cost computers to handle high-volume visitor traffic and process large amounts of information.

- *Anti-fraud and anti-spam technology*. We have also developed a proprietary anti-fraud and anti-spam system through which we are able to detect fraudulent activities and identify and filter spam messages. We attempt to continuously improve the accuracy and effectiveness of this technology through machine-learning capability and customizable rules.

59

**Seasonality**

The real estate sector in China is characterized by seasonal fluctuations, which may cause our revenues to fluctuate significantly from quarter to quarter. The first quarter of each year generally contributes the smallest portion of our annual revenues due to reduced advertising and marketing activity of our customers in the PRC real estate industry during and around the Chinese Lunar New Year holiday, which generally occurs in January or February of each year. In contrast, the third quarter of each year generally contributes the largest portion of our annual revenues due to increased advertising and marketing activity of our customers in the PRC real estate industry as most property purchases take place in September and October of each year in terms of monthly transaction volumes. See "Item 3.D. Key Information—Risk Factors—Risks related to our business—You should not rely on our quarterly operating results as an indication of our future performance because our quarterly financial results are subject to fluctuations."

**Competition**

We face competition from other companies in each of our primary business activities. We compete with these companies principally on the basis of website traffic volume, the quality and quantity of real estate and home furnishing and improvement listings and other information content, geographic coverage, service offerings and listing, marketing and e-commerce customers. We also compete for qualified employees with sales, real estate, home furnishing and improvement and other home-related products and services and Internet industry experience. We monitor our market share in the online advertising industry in China through market information gathered internally as well as from independent market research institutions such as Analysys and Talkingdata. Due to the nature of online residential real estate listings and the fact that the PRC market for residential real estate is a developing industry, there is limited independent third-party information on the market share of websites and mobile apps that provide residential real estate listings. To help assess our competitiveness and market position, our listing services division gathers information on the number and prices of paid online listing subscription accounts and similar information on our competitors from public sources for our internal records. Based on these internal records, we believe we are currently one of the leading Internet portals for residential real estate listings in China.

Some of our competitors may have greater access to capital markets, more financial and other resources and a longer operating history than us. For instance, major general-purpose Internet portals, such as Sina.com and Sohu.com, which provide real estate and home furnishing and improvement information services, may have an advantage over us due to their more established brand name, larger user base and extensive Internet distribution channels.

Other existing and potential competitors primarily include:

- real estate and home furnishing and improvement websites and mobile apps offering listing and marketing services in China including real estate websites and mobile apps sponsored or supported by local governments in China, which may be able to use such government connections to develop relationships with locally-active real estate developers;

- traditional advertising media such as general-purpose and real estate-focused newspapers, magazines, television and outdoor advertising that compete for overall advertising spending;

- websites and mobile apps focused on real estate research services in China; and

- online listing service providers, including general-purpose Internet portals and regional websites and mobile apps dedicated to online listing. We believe the key players in the markets for online real estate marketing and listing services in China include E-House (China) Holdings, Sohu.com Inc.'s focus.cn, Leju Holdings Limited, Tencent's fangqq.com, 58.com, Anjuke.com (acquired by 58.com in March 2015), Szhome.com and House365.com.

Although the barriers to entry for establishing many types of Internet-based businesses are low, we believe that certain key features of our marketing and listing businesses, together with the complexity of China's real estate and home-related markets, make it difficult for competitors to grow quickly and compete successfully against us. Specifically, we believe our brand name in China's real estate and home related Internet industry, the size and growth of our average daily user traffic, our customized marketing, listing, financial, e-commerce and value-added service offerings, our ownership of what we believe is one of the largest online real estate listing databases in China in terms of geographical coverage, including content coverage of more than 658 urban real estate markets in China as of December 31, 2018, and our relationships and in-depth knowledge of the real estate and home furnishing and improvement sectors provide us with an advantage over our competitors.

We believe that we and other domestic operators are likely to have a competitive advantage over international service providers who lack operational infrastructure and experience in China. We cannot assure you, however, that this competitive advantage will continue to exist, particularly if international operators establish joint ventures with, form alliances with or acquire domestic operators.

**Separation of CIH**

CIH operates a real estate information and analytics service platform in China, providing (1) certain information and analytics services, currently operated as part of our value-added services, and (2) certain marketplace services, currently operated as part of our listing services. CIH offers a wide spectrum of information and analytics services primarily through a proprietary platform, based on its China Real Estate Index System, or CREIS, a comprehensive set of benchmarks and databases widely adopted by industry participants to track, understand and analyze the real estate industry in China. It covers a vast inventory of residential and commercial properties and land plots data across China. The core value of CREIS lies with the underlying proprietary database CIH operates. The database delivers real estate information and research reports regarding properties, land plots as well as real estate industrial regulations and policies in China. CIH employs various advanced technologies to power the database, including geographic information system, artificial intelligence-based search, data mining and cloud computing. CIH also offers certain marketplace services to clients as marketing tools to supplement the database and its associated analytical tools, including promotion services based on influential industry reports on select key topics it disseminates to China's real estate participants and consumers, and listing services to allow clients to list commercial properties in China and utilize advanced marketing and search tools.

On May 2, 2019, our board of directors approved our plan to separate CIH into an independent publicly traded company whose business will comprise certain portions of our listing and value-added services. On May 10, 2019, CIH publicly filed a registration statement on Form F-1 with SEC to effect the proposed separation and distribution. The proposed separation and distribution is expected to commence after the SEC completes its review process, subject to customary closing conditions. There can be No assurance as to the commencement or completion of the proposed separation and distribution.

*Separation and Distribution Related Agreements*

We will enter into a separation and distribution agreement with CIH, which will set forth our agreements with CIH regarding the principal transactions necessary to separate CIH from us. It will also set forth other agreements that govern certain aspects of our relationship with CIH after the completion of the separation and distribution.

*Delineation of business.* According to the separation and distribution agreement, CIH will have the exclusive right to operate the spun-off business comprising certain portions of Fang's listing and value-added services, and we will have the exclusive right to operate the retained business. In particular, the spun-off business will comprise (1) certain information and analytics services, initially operated as part of Fang's value-added services, and (2) certain marketplace services, initially operated as part of Fang's listing services. Following the separation and distribution, CIH will strategically focus on serving the commercial property sector in China to capture the enormous market opportunity from its rapid development, while we will retain our business operating a real estate Internet portal focusing primarily on serving the residential property sector.

*Transfer of assets and assumption of liabilities.* The separation and distribution agreement will identify assets to be transferred, liabilities to be assumed and contracts to be assigned to CIH as part of the separation of Fang into two independent companies, and will describe when and how these transfers, assumptions and assignments will occur.

Except as expressly set forth in the separation and distribution agreement or any ancillary agreement, neither we nor CIH will make any representation or warranty as to the assets, business or liabilities transferred or assumed as part of the separation, as to any approvals or notifications required in connection with the transfers, as to the value of or the freedom from any security interests of any of the assets transferred, as to the absence or presence of any defenses or right of setoff or freedom from counterclaim with respect to any claim or other asset of either us or CIH, or as to the legal sufficiency of any assignment, document or instrument delivered to convey title to any asset or thing of value to be transferred in connection with the separation. All assets will be transferred on an "as is," "where is" basis and the respective transferees will bear the economic and legal risks that any conveyance will prove to be insufficient to vest in the transferee good and marketable title, free and clear of all security interests, that any necessary consents or governmental approval are not obtained or that any requirements of laws, agreements, security interests, or judgments are not complied with.

To the extent that any transfers contemplated by the separation and distribution agreement have not been consummated on or prior to the date of the separation, the parties will agree to cooperate to affect such transfers as promptly as practicable following the date of the separation. In addition, each of the parties will agree to cooperate with each other and use reasonable best efforts to take or to cause to be taken all actions, and to do, or to cause to be done, all things reasonably necessary under applicable law or contractual obligations to consummate and make effective the transactions contemplated by the separation and distribution agreement and the ancillary agreements.

*The distribution.* The separation and distribution agreement will also govern the rights and obligations of the parties regarding the distribution. On the distribution date, we will cause CIH's share registrar and depositary to distribute to our equity holders that hold our ordinary shares or ADSs as of the record date all of CIH's issued and outstanding ordinary shares (including those represented by ADSs) prior to the separation and distribution. No fractional ordinary shares will be distributed in the distribution. Our ADSs holders will receive cash in lieu of any fractional ADSs. The separation and distribution agreement will provide that the distribution is subject to satisfaction (or waiver by us) of certain conditions. We will have the sole and absolute discretion to determine the terms of, and whether to proceed with, the distribution.

### Business Cooperation Agreement

CIH and we will enter into a business cooperation agreement in respect of CIH's cooperation on certain commercial property-related business, particularly CIH's listing services, operated through Fang's website, *Fang.com*, after the separation and distribution. The initial term of this agreement is 10 years commencing from the signing date and may be terminated by mutual written agreement between Fang and us.

*Business Cooperation.* CIH will have the exclusive right to operate all the commercial property-related business, such as the online listing of commercial properties and lands as well as the advertising and marketing services provided through our commercial property-related web pages, for which we will be responsible for operating and maintaining at CIH's expenses, which will include IT system upgrade, servers maintenance and software upgrade. We will have the exclusive right to operate all the residential property-related business, except for those provided by CIH to clients relating to residential property-related business, including the information and analytics services as well as promotion services. CIH plans to cooperate with us to operate CIH's commercial property-related business through our web pages after the separation and distribution and ultimately migrate such business to CIH's own website, 3fang.com and 3fang mobile application after CIH obtains the ICP license required for standalone operation of such business.

*Intellectual Property Cooperation.* We agree to authorize CIH to use for free certain of our trademarks, copyrights, patents and other intellectual properties in connection with the operation of CIH's commercial property-related business.

*Revenue and Expenses Allocation.* During the term of our cooperation, we have the right to receive (1) 100% of the revenue generated by residential property-related business on our residential property-related web pages, (2) 85% of the revenue generated by commercial property-related business on our residential property-related web pages, and (3) 15% of the revenue generated by residential property-related business on our commercial property-related web pages. CIH will have the right to receive (1) 100% of the revenue generated by commercial property-related business on our commercial property-related web pages, for which CIH will bear the cost for operating and maintaining the related web pages and servers, (2) 85% of the revenue generated by residential property-related business on our commercial property-related web pages, and (3) 15% of the revenue generated by commercial property-related business on our residential property-related web pages.

### Data License Agreement

We will enter into a data license agreement with CIH, pursuant to which, we agree to license the right of using certain data to CIH for development of CIH's business, and CIH agrees to provide certain data to us, including property appraisal and transaction data. Each of CIH and us will not pay any royalty fees. The term of the data license agreement is 10 years commencing from the signing date and may be terminated by mutual agreement between CIH and us.

### Software License Agreement

We will enter into a software license agreement with CIH, pursuant to which, We agree to license the right of using certain of our software, at annual royalty fee of RMB500,000, subject to adjustment. The term of the software license agreement is 10 years commencing from the signing date and may be terminated by mutual agreement between CIH and us.

### Intellectual Property License Agreement

In connection with the separation, we will enter into an intellectual property license agreement with CIH, pursuant to which CIH will be granted an non-exclusive and royalty-free right to use certain of Fang's intellectual properties in connection with the operation of CIH's business. The intellectual property license agreement will be valid for a term of 10 years commencing from the signing date and may be terminated by mutual written agreement between CIH and us.

*Lease Framework Agreement*

We and CIH have entered into a lease framework agreement, pursuant to which we agree to lease properties owned by us or our affiliates to CIH at market price. The lessors and lessees have entered into detailed lease agreements in accordance with this framework agreement based on CIH's actual demands. The initial term of this agreement is 10 years commencing from the signing date and may be terminated by mutual written agreement between CIH and us.

**Intellectual Property**

Our copyrights, trademarks, trade secrets, domain names and other intellectual property are important to our business. We rely on intellectual property laws and contractual arrangements with our key employees and certain of our customers, collaborators and others to protect our intellectual property rights. Despite these measures, we cannot assure you that we will be able to prevent unauthorized use of our intellectual property, which would adversely affect our business.

Our applications for the "SouFun" trademark for certain industry categories in China conflict with existing registrations of or applications for similar trademarks, which have resulted in litigations. In April 2014, the Higher People's Court of Beijing Municipality reversed a lower court's judgment in favor of us and ordered the PRC Trademark Review and Adjudication Board of SAIC to reconsider another PRC company's trademark application for "SOFANG" that it had previously rejected. In April 2015, the Supreme People's Court of the PRC accepted our application for retrial over the judgment of the Higher People's Court of Beijing Municipality but ultimately denied our application. See "Item 3.D. Key Information—Risk Factors—Risks related to our business —Unauthorized use of our intellectual property by third parties, and the expenses incurred in protecting our intellectual property rights, may materially and adversely affect our business, financial condition, results of operations, reputation and competitive advantage" and "—We may be subject to intellectual property infringement or misappropriation claims by third parties, which may force us to incur substantial legal expenses and, if determined adversely against us, could materially disrupt our business." In 2015, we obtained new trademarks "Fang.com" in English and "房天下" ("Fang Tian Xia" in Chinese) and began to market our services under these new brands in connection with the transformation of our business model. We therefore do not currently expect our business would be materially and adversely affected even if we lose the right to use the trademark relating to "SouFun" in certain limited industry categories.

As of December 31, 2018, we held 412 registered copyrights and owned or licensed 613 registered trademarks in China. As of the same date, we had 737 trademark applications in various industry categories, pending with the PRC Trademark Office.

We have also filed applications to register certain trademarks in a number of other jurisdictions, including Hong Kong, Macao, Taiwan, Canada, Australia, France, Japan, Singapore, Spain, the United Kingdom and the United States.

As of December 31, 2018, we owned or licensed 1,117 registered domain names, including our official website,www.fang.com, and domain names registered in connection with www.jiatx.com, www.landlist.cn and www.fangtx.com.

As of December 31, 2018, we had four registered patents and four patent applications relating to database maintenance and computer data backup under review by the State Intellectual Property Office of the PRC.

**Facilities**

Our principal executive offices are located at Tower A, No. 20 Guogongzhuang Middle Street, Fengtai District, Beijing 100070, the People's Republic of China, with approximately 69,313 sq.m. of office space. As of December 31, 2018, we leased or owned properties with an aggregate gross floor area of approximately 53,800 sq.m. for our local offices across China in addition to our principal executive offices in Beijing. Our leased properties mainly consist of office premises, all of which are leased from independent third parties. We believe our existing leased and owned premises are adequate for our current business operations and that additional space can be obtained on commercially reasonable terms to meet our future requirements. See "Item 3.D. Key Information—Risk Factors—Risks related to our business—Certain of our leased property interests may be defective and we may be forced to relocate operations affected by such defects, which could cause significant disruption to our business."

We own an office building with a total usable office space of approximately 69,313 sq.m. in Beijing as our headquarters.

We own an office building with a gross floor area of 325,000 square feet at 72 Wall Street, New York. It is currently under major refurnishment work.

We own certain commercial properties of approximately 3,111 sq.m and 22,064.8 sq.m, in Sanya, Hainan province and Wuhan, Hubei province, China, respectively. We also own office space of 46,681 sq.m, together with 373 parking spaces, in an office building in Chengdu, Sichuan province, 1264.67 sq.m, in an office building in Changzhou, Jiangsu province, as well as office space of 30,843 sq.m in an office building in Chongqing. We primarily use these properties as our local offices.

We own certain Meilin lake villa properties of 10,308 sq.m. in Changzhou, Jiangsu province, China.

In addition, we own a portion of a building known as the BaoAn Building located at 800 Dongfang Road, Pudong, Shanghai. The property has usable space of approximately 42,000 sq.m. and is currently used for offices, retail space and a hotel. We acquired the property to support our expansion in Shanghai and the East China region, which consists of 15 cities including Jiangsu provincial capital Nanjing and Zhejiang provincial capital Hangzhou.

64

We also purchased a total net rentable area of 264,964 square feet in an office building in San Francisco. Our San Francisco office is primarily used as our technology and research center in the US.

**Insurance**

We maintain property insurance to cover potential damages to a portion of our property. In addition, we provide medical, unemployment and other insurance to our employees in compliance with applicable PRC laws, rules and regulations. We do not maintain insurance policies covering losses relating to our systems and do not have business interruption insurance.

**Legal Proceedings**

In January 2018, we applied for an arbitration at China International Economic and Trade Arbitration Commission as a claimant for the indebtedness owed to us and breach of contract by a third party. The arbitration procedure is still ongoing.

In April and May 2018, we were involved in suits as one of the defendants for trade mark infringement claimed by a third party, alleging RMB99.9 million, RMB300 million, and RMB500 million, respectively. The suits are still ongoing and we are vigorously contesting the allegations.

In February 2019, we were served with a subpoena from a court in Beijing, in which a third party claimed that a contract we entered into was invalid. Pursuant to such contract, we received certain assets from a debtor's nominee to discharge its indebtedness. The debtor subsequently alleged that such contract was invalid because the transfer price of such assets was below the fair market value. We intend to vigorously contest the allegation.

Saved as disclosed above, we are currently not involved in any material legal or arbitration proceedings. From time to time, we may be subject to claims and legal actions arising in the ordinary course of business, such as intellectual property infringement claims against us for use of others' articles or photographs and employment disputes. Such claims or legal actions, even if without merit, could result in the expenditure of significant financial and management resources and potentially result in civil liability for damages.

**Regulation**

Our business is subject to substantial regulation by the PRC government. This section sets forth a summary of certain significant PRC regulations that affect our business and the industries within which we operate. See "Item 3.D. Key Information—Risk Factors" which discusses risks related to regulation of our business and industry.

*General*

The telecommunications industry, including Internet information services and Internet access services, is highly regulated by the PRC government. Regulations issued or implemented by the State Council, MIIT and other relevant government authorities cover virtually every aspect of telecommunications network operations, including entry into the telecommunications industry, the scope of permissible business activities, interconnection and transmission line arrangements, tariff policy and foreign investment.

MIIT, under the leadership of the State Council, is responsible for, among other things:

- formulating and enforcing telecommunications industry policy, standards and regulations;

- granting licenses to provide telecommunications and Internet services;

- formulating tariff and service charge policies for telecommunications and Internet services;

- supervising the operations of telecommunications and Internet service providers; and

- maintaining fair and orderly market competition among telecommunications and Internet service providers.

In addition to the regulations promulgated by the central PRC government, some local governments have also promulgated local rules applicable to Internet companies operating within their respective jurisdictions.

In 1994, the Standing Committee of the National People's Congress promulgated the PRC Advertising Law. In addition, SAIC and other ministries and agencies have issued regulations that further regulate our advertising business, as discussed below.

### *Restrictions on Foreign Ownership in the Online Advertising Industry*

*Internet Content Provision and Wireless Value-Added Services*

In September 2000, the State Council promulgated the Telecommunications Regulations, which categorize all telecommunications businesses in China as either basic telecommunications businesses or value-added telecommunications businesses. In February 2003, MIIT amended the original classification of telecommunications business with Internet content provision services and wireless value-added services being classified as value-added telecommunications businesses. In December 2015, MIIT further amended the classification of telecommunications business, which sets out in details of the information service business classification under the category of value-added telecommunications businesses. The Telecommunications Regulations also set forth extensive guidelines with respect to different aspects of telecommunications operations in China.

In order to comply with China's commitments with respect to its entry into the World Trade Organization, the State Council promulgated the Administrative Rules on Foreign-invested Telecommunications Enterprises in December 2001, as amended in September 2008 and February 2016. The Administrative Rules on Foreign-invested Telecommunications Enterprises set forth detailed requirements with respect to capitalization, investor qualifications and application procedures in connection with the establishment of a foreign-invested telecommunications enterprise. Pursuant to these administrative rules, the ultimate capital contribution ratio of the foreign investor or investors in a foreign-invested telecommunications enterprise that aims to provide value-added telecommunications services may not exceed 50.0%. In addition, pursuant to the Foreign Investment Industrial Guidance Catalog issued by the PRC government, the permitted foreign investment in value-added telecommunications service providers may not be more than 50.0%. However, for a foreign investor to acquire any equity interest in a value-added telecommunications business in China, it must satisfy a number of stringent performance and operational experience requirements, including demonstrating a track record and experience in operating a value-added telecommunications business overseas. Moreover, foreign investors that meet these requirements must obtain approvals from MIIT and MOFCOM or their authorized local counterparts, which retain considerable discretion in granting approvals.

In July 2006, MIIT publicly released the Circular on Strengthening the Administration of Foreign Investment in Value-Added Telecommunications Services, or the MIIT Notice. According to the MIIT Notice, if any foreign investor intends to invest in a PRC telecommunications business, a foreign-invested telecommunications enterprise must be established and such enterprise must apply for the relevant telecommunications business licenses. Under the MIIT Notice, domestic telecommunications enterprises may not rent, transfer or sell a telecommunications license to foreign investors in any form, nor may they provide any resources, premises, facilities and other assistance in any form to foreign investors for their illegal operation of any telecommunications business in China.

As a result of current PRC laws, rules and regulations that impose substantial restrictions on foreign investment in the Internet business in China, we conduct this portion of our operations through a series of contractual arrangements among our PRC subsidiaries and our consolidated controlled entities.

In the opinion of our PRC legal counsel:

- each of the Structure Contracts is legal, valid and binding on the contracting parties under applicable PRC laws, rules and regulations;

- the execution, delivery, effectiveness, enforceability and performance of each of the Structure Contracts do not violate any published PRC laws, rules and regulations currently in force and effect;

- none of our Structure Contracts contravenes any published PRC laws, rules and regulations currently in force and effect; and

- no filings, registrations, consents, approvals, permits, authorizations, certificates and licenses of any PRC government authorities are currently required in connection with the execution, delivery, effectiveness, performance and enforceability of each Structure Contract, provided that the pledges of equity interests under the Structure Contracts should be registered with competent PRC government authorities, and provided further that the exercise of the call option in the future must be approved and registered by competent PRC government authorities.

However, there are substantial uncertainties regarding the interpretation and application of current or future PRC laws, rules and regulations, including the laws and regulations governing the enforcement and performance of our Structure Contracts in the event of any imposition of statutory liens, bankruptcy and criminal proceedings. Accordingly, we cannot assure you that the PRC regulatory authorities will not ultimately take a contrary view from that of our PRC legal counsel. See "Item 3.D. Key Information—Risk Factors—Risks related to our corporate structure—If the PRC government determines that the structure contracts that establish the structure for our business operations do not comply with applicable PRC laws, rules and regulations, we could be subject to severe penalties or be forced to restructure our ownership structure" and "—Substantial uncertainties exist with respect to the adoption of new or revised PRC laws relating to our corporate structure, corporate governance and business operations."

### *Regulation Relating to Our Business*

*Internet Content Provision Services*

The provision of real estate and home-related and other content on Internet websites is subject to applicable PRC laws, rules and regulations relating to the telecommunications industry and the Internet, and regulated by various government authorities, including MIIT and SAIC. The principal regulations governing the telecommunications industry and the Internet include:

- The Telecommunications Regulations (Revised in 2016);

- The Catalog of Classes of Telecommunications Business (2015);

- The Administrative Measures for Telecommunications Business Operating Licenses (2017); and

- The Internet Information Services Administrative Measures (2011).

Under these regulations, Internet content provision services are classified as value-added telecommunications businesses, and a commercial operator must obtain a telecommunications and information services operating license, or ICP license, from the appropriate telecommunications authority in order to carry out commercial Internet content provision operations in China. If an Internet content provider is not engaged in commercial Internet content operations, it is only required to file a record with the appropriate telecommunications authority. In addition, the regulations also provide that operators involved in Internet content provision in sensitive and strategic sectors, including news, publishing, education, health care, medicine and medical devices, must obtain additional approvals from the relevant authorities in relation to those sectors.

Two of our consolidated controlled entities, Beijing Technology and Beijing JTX Technology, each hold an ICP license issued by the Beijing Telecommunications Administration Bureau, a municipal branch of MIIT.

On December 21, 2013, the State Council promulgated the Decision of the State Council on Temporary Adjustments to the Administrative Approval Items or Special Administrative Measures on Access Prescribed in the Relevant Administrative Regulations or State Council's Documents in China (Shanghai) Pilot Free Trade Zone, which provides that temporary adjustments shall be made to special administrative measures on access in respect of qualification requirements and restrictions on shareholding proportion under the Administrative Rules on Foreign-invested Telecommunications Enterprises.

Pursuant to the Opinions of the MIIT and the People's Government of Shanghai Municipality on Further Opening Up Value-added Telecommunications Business in China (Shanghai) Pilot Free Trade Zone ("Pilot Opinions"), which were jointly issued by the MIIT and People's Government of Shanghai Municipality on January 6, 2014, foreign ownership in telecommunications service business (only include apps stores), which China has committed to opening-up after its WTO entry, may exceed 50% on a pilot basis. Foreign ownership in online data processing and transaction processing (operational electronic commerce) shall not exceed 55%. Except for the Internet connection service business (provision of internet connection service for online users), the scope for other businesses services specified by the Pilot Opinions can be nationwide. On April 15, 2014, MIIT promulgated the Circular on Printing and Distributing the Administrative Measures of China (Shanghai) Pilot Free Trade Zone for the Pilot Operation of Value-added Telecommunications Business by Foreign Investment, which further provides the requirements and procedures for foreign-invested enterprises to apply for and obtain the approval to conduct value-added telecommunications business based in the China (Shanghai) Pilot Free Trade Zone.

On June 19, 2015, MIIT further issued the Circular of the MIIT on Removing the Restrictions on Shareholding Ratio Held by Foreign Investors in Online Data Processing and Transaction Processing (Operational E-commerce) Business, which liberalizes the foreign ownership restrictions in online data processing and transaction processing (operational electronic commerce) business by expanding the business areas from the China (Shanghai) Pilot Free Trade Zone to nationwide, and the foreign ownership may be up to 100%.

The MIIT Notice requires that a value-added telecommunications business operator (or its shareholders) must own domain names and trademarks used by it in the value-added telecommunications business, and have premises and facilities appropriate for such business. To comply with the MIIT Notice, all of our related trademarks and domain names are owned directly by Beijing Technology and Beijing JTX Technology.

68

Furthermore, according to the Administrative Provisions on Online Publishing Services, jointly issued by the MIIT and the State General Administration of Press, Publication, Radio, Film and Television in February 2016, all entities that are engaged in Internet publication services in China must be approved by competent publication administrative department and acquire an Online Publishing Service License. The online publishing services defined in the Administrative Provisions on Online Publishing Services refer to the provision of online publications to the public through information networks while the Online Publications refer to digitized works with characteristics of publishing, such as editing, production or processing provided to the public through information networks.

*Advertising Services*

SAIC is responsible for regulating advertising activities in China. The principal regulations governing advertising in China, including online advertising, include:

- the Advertising Law (Revised in 2018); and

- the Administration of Advertising Regulations.

These regulations stipulate that companies that engage in advertising activities in China must obtain from SAIC or its local branches a business license which specifically includes operating an advertising business within its business scope. Companies conducting advertising activities without such a license may be subject to penalties, including fines, confiscation of illegal revenues and orders to cease advertising operations. The business license of an advertising company is valid for the duration of its existence, unless the license is suspended or revoked due to a violation of any relevant law or regulation.

The business scope of each of Beijing Advertising, Beijing Technology, Beijing JTX Technology, Shanghai Century JTX Network and Beijing Yi Ran Ju Ke includes operating an advertising business, which allows them to engage in the advertising business.

Electronic Bulletin Board Services

In November 2000, MIIT adopted the Administrative Regulations on Internet Electronic Bulletin Board Services, which required that an Internet content service provider providing online bulletin board service register with, and obtain approval from, local telecommunications authorities. The Administrative Regulations on Internet Electronic Bulletin Board Services was abolished by MIIT on September 23, 2014, and the management of Internet electronic bulletin board services is currently governed by the Telecommunications Regulations, the Internet Information Services Administrative Measures and the Administrative Measures for Telecommunications Business Operating Licenses, which provide that an Internet content provider that intends to provide online bulletin board services shall fulfill the approval formalities. On November 6, 2006, the Beijing Telecommunications Administration Bureau issued to Beijing Technology, respectively, an approval for operating electronic bulletin board services on www.fang.com, respectively. Beijing JTX Technology also obtained approval for operating electronic bulletin board services on www.jiatx.com on June 15, 2007. These approvals each have an original validity which is keyed to the corresponding ICP license and their continued validity is subject to the fulfillment of certain conditions and qualifications.

69

Regulations on the Real Estate Service Industry

The principal regulations governing the real estate service industry in China include the Law on the Administration of the Urban Real Estate, as amended in August 2009, the Real Estate Brokerage Administration Measures issued by the MOHURD, the NDRC, and the PRC Ministry of Human Resources and Social Security on January 20, 2011, which became effective on April 1, 2011, and was further amended on March 1, 2016 and became effective on April 1, 2016.

*Real Estate Service Companies*

In accordance with the Law on the Administration of the Urban Real Estate and the Real Estate Brokerage Administration Measures, real estate services refer to services of real estate consultation, appraisal and brokerage. A real estate service company is required to meet certain financial and personnel requirements and register with the SAIC or its local counterpart. To be qualified to engage in real estate services, a company is required to file with the relevant local branch of SAIC. Pursuant to the Real Estate Brokerage Administration Measures, a real estate brokerage company must have a certain number of real estate brokers and real estate broker assistants, and shall file with the local real estate regulatory authority within thirty days following the issuance of its business license. Local authorities have specific requirements on employing such brokers and the registration formalities.

On May 11, 2011, the MOHURD and the NDRC jointly issued the Notice of Strengthening the Real Estate Brokerage Administration and Further Standardizing the Order of Real Estate Transactions. On June 13, 2013, the MOHURD and the SAIC jointly issued the Notice of Focusing on Special Administration on Market of Real Estate Agencies. According to these notices, a real estate brokerage company is forbidden to display any false or unverified information. The real estate brokerage company and its brokers shall not conceal transaction price and other transaction information from the transacting parties. Such entities are also prohibited from obtaining any gains by purchasing or renting a property at a lower price and then selling or leasing such property at a higher price. The real estate brokerage company is also required to establish a separate account for transaction settlement if the real estate brokerage company is responsible to collect and pay the transaction amount on behalf of the transaction parties.

*Real Estate Service Brokers*

In accordance with the Real Estate Brokerage Administration Measures, the PRC government implemented the occupational qualification system for real estate broker personnel.

Pursuant to the Interim Regulations on Professional Qualification for Real Estate Brokerage Professionals and the Implementation Rules on the Examinations of Real Estate Brokerage Professional Qualification issued by the PRC Ministry of Human Resources and Social Security and the MOHURD on December 18, 2001 and the relevant circulars, to practice as a qualified real estate broker, an individual was required to pass an exam and obtain a qualification certificate for real estate brokers, However, the State Council issued the Decision of the State Council on Cancelling and Adjusting a Batch of Administrative Examination and Approval Items on July 22, 2014, which eliminated the qualification certificate requirement for real estate brokers. On June 25, 2015, the PRC Ministry of Human Resources and Social Security and the MOHURD further jointly issued Interim Provisions on the Occupational Qualification System of Professional Real Estate Brokers and the Implementing Measures for Occupational Qualification Exams of Professional Real Estate Brokers, which provide that real estate brokerage professional qualifications are divided into three levels, namely associate real estate broker, real estate broker and senior real estate broker. The associate real estate broker and real estate broker shall pass the examination as a method to evaluate their professional skills.

*Real Estate Service Charges*

According to the Notice on Release of Management of Real Estate Consultant and Brokerage Charges jointly issued by the NDRC and the MOHURD which became effective on July 1, 2014, a real estate service company must display its service charges, or commissions. The commissions for the real estate brokerage services are subject to the regulation of the local branch of the MOHURD and the competent pricing department of people's government at the provincial level, the local authorities may decide to apply "government-guided" prices or "market-adjusted" prices according to the local situation. The commissions for the real estate consulting services shall be based on "market-adjusted" prices, and the real estate consulting service providers may negotiate and determine their commission rates with clients.

Regulations on Microfinance Companies

According to the Guiding Opinions on the Pilot Operation of Microfinance Companies (the "Guiding Opinions") jointly issued by the China Banking Regulatory Commission and the PBOC on May 4, 2008, microfinance companies are limited liability companies or joint stock companies established with the capital contribution from natural persons, legal persons and other organizations, which do not accept public deposits and engage in the microfinance business. To set up a microfinance company, an applicant shall submit a formal application to the competent administrative departments at the provincial level. Upon approval, the applicant shall apply to the local branch of the SAIC to obtain a business license for the microfinance company. In addition, the applicant shall complete certain filings with the local police department, the local office of the China Banking Regulatory Commission and the local branch of the PBOC. According to the Guiding Opinions, the aggregate balance of the loans granted to any single borrower may not exceed 5% of the net capital of the microfinance company. The PBOC is responsible for monitoring the interest rates and fund flows of microfinance companies and record the relevant information into the PBOC's credit information system. Microfinance companies are required to provide information regarding their borrowers, loan amounts, guarantees for loans and loan repayment to the credit information system.

According to the Guiding Opinions, a provincial government may launch pilot programs for microfinance companies within prefectural regions of the province only after it designates a department (finance office or other relevant institutions) to be in charge of supervision and administration of microfinance companies and is willing to be responsible for risk management and disposals with respect to microfinance companies. Consequently, microfinance companies are primarily regulated locally by provincial governments under rules and regulations promulgated by the provincial governments.

Pursuant to Notice on Regulating the "Cash Loan" Business, issued by Office of the Leading Group for the Special Campaign against Internet Financial Risks and the Office of the Leading Group for the Special Campaign against Peer-to-peer Lending Risks on December 1st, 2017 ("Notice on Regulating Cash Loan"), internet microfinance businesses are strictly regulated. According to the Notice on Regulating Cash Loan, among other requirements, microfinance companies are required to suspend distribution of internet microloans that are not supported by specific scenarios and No specific purpose, gradually reduce the inventory business within a time limit and rectification shall be completed within the prescribed time limit. Issuing "campus loans" and "down payment loans" are also prohibited.

According to Notice on Regulating Cash Loan, microfinance companies may not sell, transfer, and disguise the company's credit assets through Internet platforms or local trading venues. Providing real property financing and other debt financing matchmaking services in relation to the purchase of real properties are also prohibited. Violation of these requirements may subject the relevant authorities to various penalties, including restrictions on the entity conducting such activities' business operations, or canceling business qualifications and/or closing the entity.

Regulations on Entrusted Loans

The General Lending Code was promulgated by the PBOC on June 28, 1996 and came into effect on August 1, 1996. The General Lending Code defines a "loan provider" as a PRC owned financial institution established in China that engages in the provision of interest bearing loans. One type of loan defined in and regulated in accordance with the General Lending Code is the entrusted loan. Entrusted loans are arrangements whereby the capital for a loan is supplied by a government department, an enterprise or a natural person (the "capital provider") and entrusted to a financial institution as the loan provider. Entrusted loans are made by the loan provider to a specified borrower for a particular purpose and in an amount, for a term and at an interest rate determined by the capital provider. The term "specified borrower" describes the party specified by the capital provider as the person who will receive the amount of an entrusted loan (the "loan recipient"). While the loan provider exercises supervision over and receives repayment from the loan recipient, the loan provider does not assume any risk of default in repayment by the loan recipient. In accordance with the General Lending Code and the relevant judicial interpretation from the Supreme People's Court of the PRC, in an entrusted loan arrangement, the relationship between the loan provider and the capital provider is that of trustee and trustor; and the relationship between the loan provider and the loan recipient is that of lender and borrower. No creditor/debtor relationship exists between the capital provider and the loan recipient. The General Lending Code requires that loan providers must be authorized by and have been granted a financial institution license or a financial institution operation license from the PBOC; and must have registered with the SAIC. The General Lending Code further stipulates that enterprises which are not authorized and registered as loan providers must not breach the laws of the PRC by engaging in intercompany loan transactions or the provision of loans through unauthorized means. An intercompany loan is a loan provided directly from one company to another where the loan provider is not authorized and registered as a loan provider.

According to the Opinions of the Ministry of Housing and Urban-Rural Development and other Authorities on Strengthening the Administration Over the Real Estate Agencies to Promote the Healthy Development of the Industry issued by the MOHURD, the MIIT, the SAT, the SAIC, the PRC National Development and Reform Commission, the CSRC and the PBOC on July 29, 2016, real estate service companies, which prepare the housing loan applications on behalf of clients, shall not compel clients to choose financial institutions designated by them, nor shall they associate the loan application services with other services. A real estate service company shall not, by itself or cooperating with other entities, offer illegal financial products and services, or receive any commissions from financial institutions. In addition, financial institutions are strictly prohibited from cooperating with real estate service companies which have not gone through the filing formalities with competent real estate authorities.

Pursuant to Notice on Regulating the "Cash Loan" Business, issued by Office of the Leading Group for the Special Campaign against Internet Financial Risks and the Office of the Leading Group for the Special Campaign against Peer-to-peer Lending Risks on December 1st, 2017 ("Notice on Regulating Cash Loan"), internet microfinance businesses shall be under strictly regulated. According to the Notice on Regulating Cash Loan, among other requirements, microfinance companies are required to suspend distribution of internet microloans that are not supported by specific scenarios and No specific purpose, gradually reduce the outstanding loan balance within the prescribed time limit and rectification shall be completed within the prescribed time limit. Issuing "campus loans" and "down payment loans" are also prohibited.

Regulations on Online Peer-to-Peer Lending

Interim Measures for the Administration of the Business Activities of Online Lending Information Intermediary Institutions issued by the PBOC, the MIIT and the Ministry of Public Security on August 24, 2016, Guidelines for the Administration of Recordation and Registration of P2P Lending Information Intermediary Institutions issued by the China Banking Regulatory Commission, the MIIT and the SAIC on October 28, 2016, Guidelines for the Online Lending Fund Depository Business issued by the China Banking Regulatory Commission on February 22, 2017 and Guidelines for the Disclosure of Information on the Business Activities of Online Lending Information Intermediary Institutions issued by the China Banking Regulatory Commission on August 23, 2017 (collectively referred to as "One approach and Three Guidelines"), provide a legal system basis for the standardized development and continuous prudent supervision of the online peer-to-peer lending industry. According to "One approach and Three Guidelines", peer-to-peer lending information intermediary institutions should apply for recordation and registration to the local financial regulatory departments.

The Office of the Leading Group for the Special Campaign against Peer-to-Peer Lending Risks has promulgated the Notice on Compliance Inspection of Peer-to-Peer Network Lending Institutions and the List of Compliance Checking Questions of Online Lending Information Intermediaries on August 13, 2018, which includes several inspection procedures: self-inspection of online lending institutions, self-discipline inspection by local internet finance associations or related institutions, administrative verification by the local office for the special campaign against peer-to-peer lending risks. The Notice on Compliance Inspection of Peer-to-Peer Network Lending Institutions requires that the local office for the special campaign against peer-to-peer lending risks should check the contents of the reports submitted by the online lending institutions. If the contents are untrue, omitted or fraudulent, the office can pursue accountability and exercise vote power for online lending institutions.

Regulations relating to Information Security and Confidentiality of User Identity and Information

Internet content in China is also regulated and restricted from a state security standpoint. Based on the Decision of the Standing Committee of the National People's Congress on Internet Security Protection enacted by the Standing Committee of the National People's Congress, any effort to undertake the following actions may be subject to criminal punishment in China:

- gain improper entry into a computer or system of national strategic importance;

- disseminate politically disruptive information;

- leak government secrets;

- spread false commercial information; or

- infringe intellectual property rights.

The Ministry of Public Security has also promulgated measures that prohibit the use of the Internet in ways that, among other things, result in the leakage of government secrets or the spread of socially destabilizing content. The Ministry of Public Security has supervision and inspection powers in this regard, and we may be subject to the jurisdiction of the local security bureaus. If an ICP license holder violates these measures, the PRC government may revoke its license and shut down its website.

The security and confidentiality of information on the identity of Internet users are also regulated in China. The Internet Information Service Administrative Measures promulgated by the PRC State Council in September 2000 and revised in January 2011 require Internet content service providers to maintain an adequate system that protects the security of user information. In January 2006, the Ministry of Public Security promulgated the Regulations on Technical Measures of Internet Security Protection, requiring Internet service providers to utilize standard technical measures for Internet security protection.

In addition, the Standing Committee of the National People's Congress promulgated the Cyber Security Law of the People's Republic of China, or the Cyber Security Law, effective June 2017, to protect cyberspace security and order. Pursuant to the Cyber Security Law, any individual or organization using the network must comply with the constitution and the applicable laws, follow the public order and respect social moralities, and must not endanger cyber security, or engage in activities by making use of the network that endanger the national security, honor and interests, or infringe on the fame, privacy, intellectual property and other legitimate rights and interests of others. The Cyber Security Law sets forth various security protection obligations for network operators, which are defined as ''owners and administrators of networks and network service providers,'' including, among others, complying with a series of requirements of tiered cyber protection systems, verifying users' real identity, localizing the personal information and important data gathered and produced by key information infrastructure operators during operations within the PRC, and providing assistance and support to government authorities where necessary for protecting national security and investigating crimes. Furthermore, MIIT's Regulations on Protection of Personal Information of Telecommunications and Internet Users, effective September 2013, contain detailed requirements on the use and collection of personal information as well as security measures required to be taken by telecommunications business operators and internet information service providers.

***Regulations relating to Trademarks***

Both the PRC Trademark Law and the Implementation Regulation of the PRC Trademark Law, as currently in effect, provide protection to the holders of registered trademarks and trade names. The PRC Trademark Office handles trademark registrations and grants a renewable term of rights of 10 years to registered trademarks. In addition, trademark license agreements must be filed with the Trademark Office.

After receiving a trademark registration application, the PRC Trademark Office will make a public announcement with respect to the proposed trademark registration application if the relevant trademark passes the preliminary examination. Any person may, within three months after such public announcement, object to such trademark application. The PRC Trademark Office will then decide who is entitled to the trademark registration, and its decisions may be appealed to the PRC Trademark Review and Adjudication Board, whose decision may be further appealed through judicial proceedings. If No objection is filed within three months after the public announcement period or if the objection has been overruled, the PRC Trademark Office will approve the registration and issue a registration certificate, upon which the trademark is registered and will be effective for a renewable 10-year period, unless otherwise revoked.

*Regulations relating to Employee Share Options*

Under the Stock Option Rule promulgated by SAFE in February 2012, a PRC entity's directors, supervisors, senior management officers, other staff or individuals who have an employment or labor relationship with a Chinese entity and are granted stock options by an overseas publicly listed company are required, through a PRC agent or PRC subsidiary of such overseas publicly listed company, to register with SAFE and complete certain other procedures. We and our PRC resident employees who have been granted stock options are subject to these regulations. We have designated our PRC relevant subsidiaries to handle the registration and other procedures required by the Stock Option Rule. If we or our PRC option holders fail to comply with these regulations in the future, we or our PRC option holders may be subject to fines and legal sanctions.

*Regulations relating to Employees*

The principal PRC laws and regulations that govern employment include:

- the PRC Labor Law which became effective on January 1, 1995 and was amended on August 27, 2009 and December 29, 2018; and

- the PRC Labor Contract Law which became effective on January 1, 2008, and its amendments which became effective on July 1, 2013.

Pursuant to the PRC Labor Law and the PRC Labor Contract Law, employers must execute written labor contracts with full-time employees. All employers must compensate their employees with wages equal to at least the local minimum wage standards. All employers are required to establish a system for labor safety and sanitation, strictly abide by state rules and standards and provide employees with workplace safety training. Violations of the PRC Labor Contract Law and the PRC Labor Law may result in the imposition of fines and other administrative liabilities. Criminal liability may arise for serious violations.

In addition, employers in China are obliged to provide employees with welfare schemes covering pension insurance, unemployment insurance, maternity insurance, work-related injury insurance, medical insurance and housing funds.

*Regulations relating to Foreign Investment*

On March 15, 2019, the National People's Congress promulgated the Foreign Investment Law, which will come into effect on January 1, 2020 and replace the trio of existing laws regulating foreign investment in China, namely, the Sino-foreign Equity Joint Venture Enterprise Law, the Sino-foreign Cooperative Joint Venture Enterprise Law and the Wholly Foreign-invested Enterprise Law. The existing foreign-invested enterprises established prior to the effective of the Foreign Investment Law may keep their corporate forms within five years. The implementing rules of the Foreign Investment Law will be stipulated separately by State Council. Pursuant to the Foreign Investment Law, ''foreign investors'' means natural person, enterprise, or other organization of a foreign country; ''foreign-invested enterprises'' means any enterprise established under PRC law that is wholly or partially invested by foreign investors and ''foreign investment'' means any foreign investor's direct or indirect investment in mainland China, including: (1) establishing FIEs in mainland China either individually or jointly with other investors; (2) obtaining stock shares, stock equity, property shares, other similar interests in Chinese domestic enterprises; (3) investing in new projects in mainland China either individually or jointly with other investors; and (4) making investment through other means provided by laws, administrative regulations, or State Council provisions.

The Foreign Investment Law stipulates that China implements the management system of pre-establishment national treatment plus a negative list to foreign investment and the government generally will not expropriate foreign investment, except under special circumstances, in which case it will provide fair and reasonable compensation to foreign investors. Foreign investors are barred from investing in prohibited industries on the negative list and must comply with the specified requirements when investing in restricted industries on that list. When a license is required to enter a certain industry, the foreign investor must apply for one, and the government must treat the application the same as one by a domestic enterprise, except where laws or regulations provide otherwise. In addition, foreign investors or foreign-invested enterprises are required to file information reports and foreign investment which affects or is likely to have effect on the national security shall be subject to the national security review.

*Regulations relating to Foreign Investment in Value-Added Telecommunications Industry*

According to the Administrative Rules on Foreign-invested Telecommunications Enterprises issued by the State Council effective in January 2002, as amended in September 2008 and February 2016, a foreign investor may hold No more than a 50% equity interest in a value-added telecommunications services provider in China and such foreign investor must have experience operating in such industry.

Pursuant to the Opinions of the MIIT and the People's Government of Shanghai Municipality on Further Opening Up Value-added Telecommunications Business in China (Shanghai) Pilot Free Trade Zone ("Pilot Opinions"), which were jointly issued by the MIIT and People's Government of Shanghai Municipality on January 6, 2014, foreign ownership in telecommunications service business (only include apps stores), which China has committed to opening-up after its WTO entry, may exceed 50% on a pilot basis. Foreign ownership in online data processing and transaction processing (operational electronic commerce) shall not exceed 55%. Except for the Internet connection service business (provision of internet connection service for online users), the scope for other businesses services specified by the Pilot Opinions can be nationwide. On April 15, 2014, MIIT promulgated the Circular on Printing and Distributing the Administrative Measures of China (Shanghai) Pilot Free Trade Zone for the Pilot Operation of Value-added Telecommunications Business by Foreign Investment, which further provides the requirements and procedures for foreign-invested enterprises to apply for and obtain the approval to conduct value-added telecommunications business based in the China (Shanghai) Pilot Free Trade Zone.

On June 19, 2015, MIIT further issued the Circular of the MIIT on Removing the Restrictions on Shareholding Ratio Held by Foreign Investors in Online Data Processing and Transaction Processing (Operational E-commerce) Business, which liberalizes the foreign ownership restrictions in online data processing and transaction processing (operational electronic commerce) business by expanding the business areas from the China (Shanghai) Pilot Free Trade Zone to nationwide, and the foreign ownership may be up to 100%.

The MIIT Notice requires that a value-added telecommunications business operator (or its shareholders) must own domain names and trademarks used by it in the value-added telecommunications business, and have premises and facilities appropriate for such business. To comply with the MIIT Notice, all of our related trademarks and domain names are owned directly by Beijing Technology and Beijing JTX Technology.

***Regulations relating to the Establishment of Offshore Special Vehicle by PRC Residents***

Pursuant to the Circular 37 promulgated by SAFE, which became effective on July 4, 2014, a PRC resident, including a PRC resident natural person or a PRC company, shall register with the local SAFE branch before it contributes assets or its equity interests into an overseas SPV established or controlled by the PRC resident for the purpose of investment and financing. When the overseas SPV that fulfilled the initial registration formalities undergoes certain major changes, including but not limited to, the change in the PRC-resident shareholder of the overseas SPV, name of the overseas SPV, term of operation, or any increase or reduction of the registered capital of the overseas SPV, share transfer or swap, and merger or division, the PRC resident shall timely register such change with the local SAFE branch.

We have requested our beneficial owners who are PRC residents to make the necessary applications, filings and amendments required by SAFE. However, we cannot provide any assurances that all of our beneficial owners who are PRC residents will continue to make, obtain or amend any applicable registrations or approvals required by these SAFE regulations. The failure or inability of our PRC resident beneficial owners to comply with the registration procedures set forth therein may subject us to fines and legal sanctions, restrict our cross-border investment activities, or limit our ability to contribute additional capital into our PRC subsidiaries, or limit our PRC subsidiaries' ability to pay dividends or make other distributions to our company or otherwise adversely affect our business. Moreover, failure to comply with the SAFE registration requirements could result in liability under PRC laws for evasion of foreign exchange restrictions.

***C. Organizational Structure***

We conduct substantially all of our operations in China through our PRC subsidiaries and consolidated controlled entities. For more information regarding the contractual arrangements among our PRC subsidiaries and consolidated controlled entities, see "Item 7.B. Major Shareholders and Related Party Transactions—Related Party Transactions—Structure Contracts."

The following is a list of our principal subsidiaries and consolidated controlled entities as of the date of this annual report:

| Name | Place of Formation | Relationship |
|---|---|---|
| Beijing Cun Fang Real Estate Broking Co., Ltd. ("Beijing Cun Fang") | China | Wholly-owned subsidiary |
| Beijing Fang Chao Real Estate Broking Co., Ltd. ("Beijing Fang Chao") | China | Wholly-owned subsidiary |
| Beijing Fang Tian Xia Hong An Network Technology Ltd. (previously known as Beijing Fang Tian Xia Decorative Engineering Co., Ltd.) ("Beijing Fang Tian Xia Hong An Network Technology") | China | Wholly-owned subsidiary |
| Beijing Hong An Tu Sheng Network Technology Co., Ltd. ("Beijing Hong An") | China | Wholly-owned subsidiary |
| Beijing Li Man Wan Jia Network Technology Co., Ltd. ("Beijing Li Man Wan Jia") | China | Wholly-owned subsidiary |
| Beijing SouFun Network Technology Co., Ltd. ("Soufun Network") | China | Wholly-owned subsidiary |

75

| Name | Place of Formation | Relationship |
|---|---|---|
| Beihai Tian Xia Dai Microfinance Co., Ltd. ("Beihai Tian Xia Dai Microfinance") | China | Wholly-owned subsidiary |
| Beijing Tuo Shi Huan Yu Network Technology Co., Ltd. ("Beijing Tuo Shi") | China | Wholly-owned subsidiary |
| Beijing Zhong Zhi Shi Zheng Information Technology Co., Ltd. ("Beijing Zhong Zhi Shi Zheng") | China | Wholly-owned subsidiary |
| Beijing Zhong Zhi Xun Bo Information Technology Co., Ltd. ("Beijing Zhong Zhi Xun Bo") | China | Wholly-owned subsidiary |
| Xinjiang Zhong Zhi Shu Ju Information Technology Co., Ltd. ("Xinjiang Zhong Zhi Shu Ju") | China | Wholly-owned subsidiary |
| Best Work Holdings (New York) LLC | United States | Wholly-owned subsidiary |
| Best Fang Holdings LLC | United States | Wholly-owned subsidiary |
| China Index Holdings Limited ("CIH") | Cayman Islands | Wholly-owned subsidiary |
| China Index Academy Limited | Hong Kong | Wholly-owned subsidiary |
| Chongqing Fang Tian Xia Real Estate Broking Co., Ltd. ("Chongqing Fang Tian Xia") | China | Wholly-owned subsidiary |
| Chongqing Tian Xia Dai Microfinance Co., Ltd. ("Chongqing Tian Xia Dai Microfinance") | China | Wholly-owned subsidiary |
| Guangzhou Fang Tian Xia Real Estate Broking Co., Ltd. ("Guangzhou Fang Tian Xia") | China | Wholly-owned subsidiary |
| Hangzhou Ji Ju Real Estate Agents Co., Ltd. ("Hangzhou Ji Ju") | China | Wholly-owned subsidiary |
| Hangzhou SouFun Network Technology Co., Ltd. ("Hangzhou SouFun Network") | China | Wholly-owned subsidiary |

| Name | Place of Formation | Relationship |
|---|---|---|
| Hong Kong Property Network Limited | Hong Kong | Wholly-owned subsidiary |
| Nanchang Cun Fang Real Estate Broking Co., Ltd. ("Nanchang Cun Fang") | China | Wholly-owned subsidiary |
| Nanjing Cun Fang Real Estate Broking Co., Ltd. ("Nanjing Cun Fang") | China | Wholly-owned subsidiary |
| Shanghai BaoAn Enterprise Co., Ltd. ("Shanghai BaoAn Enterprise") | China | Wholly-owned subsidiary |
| Shanghai BaoAn Hotel Co., Ltd. ("Shanghai BaoAn Hotel") | China | Wholly-owned subsidiary |
| Shanghai SouFun Microfinance Co., Ltd. ("Shanghai SouFun Microfinance") | China | Wholly-owned subsidiary |
| Shanghai SouFun Fang Tian Xia Broking Co., Ltd. ("Shanghai SouFun Fang Tian Xia") | China | Wholly-owned subsidiary |
| SouFun Media Technology (Beijing) Co., Ltd. ("SouFun Media") | China | Wholly-owned subsidiary |
| Tianjin Jia Tian Xia Microfinance Co., Ltd. ("Tianjin Jia Tian Xia Microfinance") | China | Wholly-owned subsidiary |
| Tianjin Jia Tian Xia Network Technology Co., Ltd. ("Jia Tian Xia Network Technology") | China | Wholly-owned subsidiary |
| Tianjin Fang Tian Xia Real Estate Broking Co., Ltd. ("Tianjin Fang Tian Xia") | China | Wholly-owned subsidiary |
| Tianjin SouFun Network Technology Co., Ltd. ("Tianjin SouFun Network") | China | Wholly-owned subsidiary |
| Beijing Century Jia Tian Xia Technology Development Co., Ltd. ("Beijing JTX Technology") | China | Consolidated controlled subsidiary |

| Name | Place of Formation | Relationship |
|---|---|---|
| Beijing Hua Ju Tian Xia Network Technology Co., Ltd. ("Beijing Hua Ju Tian Xia") | China | Consolidated controlled subsidiary |
| Beijing Li Tian Rong Ze Yi Jia Technology Development Co., Ltd. ("Beijing Li Tian Rong Ze") | China | Consolidated controlled subsidiary |
| Beijing SouFun Internet Information Service Co., Ltd. ("Beijing Internet") | China | Consolidated controlled subsidiary |
| Beijing SouFun Science and Technology Development Co., Ltd. ("Beijing Technology") | China | Consolidated controlled subsidiary |
| Fang Tian Xia Financial Information Service (Beijing) Ltd. (previously known as Beijing Tianxia Dai Information service Co., Ltd.) ("Tianxia Dai Information") | China | Consolidated controlled subsidiary |
| Beijing Yi Ran Ju Ke Technology Development Co., Ltd. ("Beijing Yi Ran Ju Ke") | China | Consolidated controlled subsidiary |
| Beijing Zhong Zhi Hong Yuan Data Information Technology Co., Ltd. ("Beijing Zhong Zhi Hong Yuan") | China | Consolidated controlled subsidiary |
| Shanghai Jia Biao Tang Real Estate Broking Co., Ltd. ("Shanghai JBT Real Estate Broking") | China | Consolidated controlled subsidiary |
| Wuhan SouFun Yi Ran Ju Ke Real Estate Agents Co., Ltd. ("Wuhan Yi Ran Ju Ke") | China | Consolidated controlled subsidiary |

The following diagram illustrates our corporate structure including our principal subsidiaries and consolidated controlled entities as of the date of this annual report:



---

\*    The diagram above omits the names of subsidiaries and consolidated controlled entities that are insignificant individually and in the aggregate.

(1)   Each of Shanghai BaoAn Enterprise and Shanghai BaoAn Hotel is owned as to 25.0% by Shanghai China Index, one of our consolidated controlled entities.

(2)   Shanghai SouFun Microfinance is owned as to 20.0% by Beijing Technology and as to 10.0% by Beijing JTX Technology, both of which are our consolidated controlled entities.

(3)   Shanghai JBT Real Estate Broking is owned as to 30.0% by Beijing Jia Tian Xia Advertising Co., Ltd. which is our consolidated controlled entity.

(4)   On May 10, 2019, CIH publicly filed its registration statement on Form F-1 with SEC to effect the proposed separation and distribution. For more details, see "Item 4. Information on the Company— B. Business Overview— Separation of CIH."

### D. Property, Plant and Equipment

See "Item 4.B. Information on the Company—Business Overview—Facilities."

## ITEM 4A. UNRESOLVED STAFF COMMENTS

None.

**ITEM 5. OPERATING AND FINANCIAL REVIEW AND PROSPECTS**

The following discussion of our financial condition and results of operations is based upon and should be read in conjunction with our consolidated financial statements and their related notes included elsewhere in this annual report. This discussion contains forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. See "Forward-Looking Statements." In evaluating our business, you should carefully consider the information provided under "Item 3.D. Key Information—Risk Factors." We caution you that our businesses and financial performance are subject to substantial risks and uncertainties.

**A. OPERATING RESULTS**

**Overview**

We believe we operate a leading real estate Internet portal in China in terms of the number of page views and visitors to our websites in 2018. Our user-friendly websites and mobile apps support active online communities and networks of users seeking information on, and services for, the real estate and home-related sectors in China. Our service offerings include:

·   *Marketing services*: We offer marketing services on our websites and mobile apps, mainly through advertisements, to real estate developers in the marketing phase of new property developments, as well as to real estate agencies and suppliers of home furnishing and improvement and other home-related products and services who wish to promote their products and services.

·   *Listing services*: We offer basic and special listing services on our websites and mobile apps. Our basic listing services are primarily offered to real estate agents, brokers, developers, property owners and managers and suppliers of home furnishing and improvement and other home-related products and services. Our basic listing services allow our customers to post information of their products and services on our websites. Our special listing services offer specialized marketing programs through both online channels and offline themed events.

·   *Financial services*: We provide financial services primarily though our offline micro loan subsidiaries. We provide primarily secured consumer loans to individuals that meet our credit assessment requirements. We launched financial services in August 2014.

·   *E-commerce services*: Our e-commerce services primarily include Fang membership services, direct sales services for new homes and online sublease services. We provide both free and paid Fang membership services to our registered members. Our free services include primarily regular updates regarding local property developments, tours to visit property developments and other services relating to property purchases. Our paid services primarily include offers to purchase properties at a discount from our partner developers and dedicated information and related services to facilitate property purchases. We ceased entering into new contracts for our direct sales services for new homes, online home-decorating services and online real estate brokerage services in 2018 due to the change in our business development strategies.

· *Value-added services*: We provide value-added services including subscription services for access to our information database and consulting services for customized and industry-related research reports and indices.

We have built a large and active community of users who are attracted by the comprehensive real estate and home-related content available on our portal that forms the foundation of our service offerings. According to our own records, in the fourth quarter of 2018, our website, www.fang.com, received a monthly average of approximately 123 million unique visitors and generated a monthly average of approximately 805 million website visits. We currently maintain approximately 65 offices to focus on local market needs.

Our revenues and net loss attributable to our shareholders in 2018 was US$303.0 million and US$114.9 million, respectively. Marketing, listing, financial, e-commerce and value-added services accounted for 39.5%, 37.5%, 6.0%, 5.0% and 12.0%, respectively, of our revenues in 2018.

**Key Operating and Financial Performance Metrics**

We monitor the key operating and financial performance metrics set forth in the tables below to help us evaluate growth trends, establish budgets, measure the effectiveness of our sales and marketing efforts and assess our operational efficiencies.

| | Year Ended December 31 | |
| --- | --- | --- |
| **Selected Metrics** | **2017** | **2018** |
| Average monthly unique visitors (million)* | 115 | 152 |
| Average monthly mobile unique visitors (million)* | 75 | 117 |

---

\*    Source: Google Analytics for data in 2017; internal records for data in 2018

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2016** | **2017** | **2018** |
| | (U.S. dollars in thousands) | | |
| Total revenues | 916,391 | 444,296 | 303,016 |
| Net income (loss) | (169,635) | 21,704 | (114,909) |
| Non-GAAP net income (loss) | (173,212) | 25,057 | 20,604 |
| Adjusted EBITDA | (118,941) | 76,316 | 81,397 |

In evaluating our financial performance, we use non-GAAP net income and adjusted earnings before interest, taxes, depreciation and amortization ("adjusted EBITDA"), which are not measures calculated in accordance with GAAP and should not be considered as an alternative to any measure of financial performance calculated and presented in accordance with GAAP. In addition, these non-GAAP measures may not be comparable to similarly titled measures of other companies because other companies may not calculate them in the same manner that we do.

Non-GAAP net income measures GAAP net income, excluding the impact of share-based compensation expense, change in fair value of securities, realized gain on available-for-sale securities, other non-operating loss, investment income, impairment on investments and one-off tax impact.

Adjusted EBITDA is defined as non-GAAP net income before income tax, excluding interest expenses, interest income, depreciation and amortization. Adjusted EBITDA, while generally a measure of profitability, excludes certain non-cash expenses, interest and other income, income taxes, and certain other items that management believes affect the comparability of operating results.

Non-GAAP net income and adjusted EBITDA are key measures used by our management and board of directors to understand and evaluate our core operating performance and trends. In particular, we believe that the exclusion of the income and expenses in calculating non-GAAP net income and adjusted EBITDA can provide a useful measure for period-to-period comparisons of our core business. Accordingly, we believe that non-GAAP net income and adjusted EBITDA provide useful information to investors and others in understanding and evaluating our operating results in the same manner as our management and board of directors.

These non-GAAP measures have limitations as analytical tools, and you should not consider them in isolation or as substitutes for analysis of our financial results as reported under GAAP. Some of these limitations are:

·   non-GAAP net income does not reflect the potentially dilutive impact of equity-based compensation;

·   although depreciation and amortization are non-cash charges, the assets being depreciated and amortized may have to be replaced in the future, and adjusted EBITDA does not reflect cash capital expenditure requirements for such replacements or for new capital expenditures;

·   adjusted EBITDA does not reflect tax payments that historically have represented a reduction in cash available to us or tax benefits that may arise as a result of generating net losses; and

·   other companies, including companies in our industry, may calculate adjusted EBITDA or similarly titled measures differently, which reduces its usefulness as a comparative measure.

The following tables present reconciliations of net income to non-GAAP net income and net income to adjusted EBITDA from continuing operations for each of the periods indicated:

| Reconciliation of net income and non-GAAP net income | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2017 | 2018 |
| | (U.S. dollars in thousands) | | |
| **GAAP net income (loss)** | **(169,635)** | **21,704** | **(114,909)** |
| | | | |
| **Reconciliation items:** | | | |
| Share-based compensation | 9,477 | 7,218 | 14,082 |
| Impairment on investments | 2,232 | 2,768 | — |
| Other non-operating loss | — | 4,562 | (30) |
| Realized gain on available-for-sale securities | — | (2,736) | (1,493) |
| Investment income | (13,864) | (6,692) | (6,816) |
| Change in fair value of securities | - | (518) | 167,402 |
| **Subtotal** | **(2,155)** | **4,602** | **173,145** |
| | | | |
| **Tax impact of reconciliation items** | **(1,422)** | **(1,249)** | **(37,632)** |
| | | | |
| **Non-GAAP net income (loss)** | **(173,212)** | **25,057** | **20,604** |

| Reconciliation of net income and adjusted EBITDA | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2017 | 2018 |
| | (U.S. dollars in thousands) | | |
| **GAAP net income (loss)** | **(169,635)** | **21,704** | **(114,909)** |
| *Add Back* | | | |
| Share-based compensation | 9,477 | 7,218 | 14,082 |
| Impairment on investments | 2,232 | 2,768 | - |
| Change in fair value of securities | - | (518) | 167,402 |
| Interest expenses | 20,791 | 16,153 | 21,174 |
| Income tax expenses | 24,983 | 21,442 | - |
| Depreciation and amortization expenses | 18,442 | 23,737 | 26,735 |
| *Subtract* | | | |
| Investment income | (13,864) | (6,692) | (6,816) |
| Realized gain on available-for-sale securities | - | (2,736) | (1,493) |
| Interest income | (11,367) | (11,322) | (10,302) |
| Other non-operating loss | - | 4,562 | (30) |
| Income tax benefits | - | - | (14,446) |
| **Adjusted EBITDA** | **(118,941)** | **76,316** | **81,397** |

**Re-election of Directors**

On December 7, 2018, upon approval of our shareholders, Mr. Shaohua Zhang was re-elected as an independent director of our board of directors and a member of the audit committee of the board.

**Factors Affecting Our Results of Operations**

*Economic growth in China and in the PRC real estate market*

We conduct substantially all of our business and operations in China. Accordingly, our results of operations have been, and are expected to continue to be, affected by the general performance of China's economy. As a leading real estate Internet portal, our financial results have also been affected by the performance of the real estate and home furnishing and improvement sectors in China.

*Growth in China's Internet and online marketing sectors*

We are an Internet portal company and a majority of our revenues are generated from our marketing and listing servicesAs such, our results of operations are heavily dependent on the successful and continued development of China's Internet and online marketing sectors. The Internet has emerged as an increasingly attractive and cost-effective advertising channel in China, especially as the number of Internet users, disposable income of urban households and network infrastructure in China have increased.

*Performance of certain geographic areas and urban centers in China*

A substantial portion of our revenues are concentrated in China's major urban centers including Beijing, Shanghai, Chengdu, Chongqing, Tianjin and Shenzhen. Although our percentage of revenues from these six urban centers has decreased as we expanded our operations elsewhere in China, we expect customers in these cities to continue to represent a significant portion of our revenues in the near term. We may also expand into new geographic areas and sectors. As of December 31, 2018, we had established real estate-related content, search services, marketing and listing coverage of more than 658 cities across China, and our Fang membership services, which were launched in 2011, were offered in 98 cities. The financial performance of newly penetrated cities will have a substantial impact on our results of operations as we expand into new markets, as we may incur significant additional operating expenses, including hiring new sales and other personnel, in order to expand our operations.

*Competition in China's online real estate and home-related Internet services*

We face competition from other companies in each of our primary business activities. In particular, the online real estate and home-related Internet service market in China has become increasingly competitive, and such competition may continue to intensify in future periods. As the barriers to entry for establishing Internet-based businesses are typically low, it is possible for new entrants to emerge and rapidly scale up their operations. We expect additional companies to enter the online real estate and home-related Internet service industry in China and a wider range of online services in this area to be introduced.

We expect to face additional competition as we develop and offer new services. For example, we began to offer direct sales services for new homes in August 2014, online real estate brokerage services in January 2015, and online home-decorating services and online sublease services in the second quarter of 2015. Some of our customers offer the same or similar services. Accordingly, we may face competition from these customers. In addition, such competition may adversely affect our relationships with these customers and our business.

*PRC regulations affecting the Internet, online marketing, real estate and financing industries*

The Internet, online marketing, real estate and financing industries in China are heavily regulated. PRC laws, rules and regulations cover virtually every aspect of these industries, including entry into the industry, the scope of permissible business activities and foreign investment. The PRC government also exercises considerable direct and indirect influence over these industries by imposing industry policies and other economic measures. Many of these regulations have recently been implemented and are expected to be refined and adjusted over time. Moreover, the PRC government regulates interest rates, real estate transaction taxes and the acquisition and ownership of real estate. It also regulates Internet access and the distribution of news, information or other content, as well as products and services, through the Internet. The PRC government also levies business taxes, value-added taxes, surcharges and cultural construction fees on advertising-related sales in China, such as sales of our marketing, listing, financial, e-commerce and value-added services. In addition, because certain of our PRC subsidiaries and consolidated controlled entities currently qualify as "high and new technology enterprises" or "Software Enterprise," they enjoy tax holidays or lower rates from the relevant PRC tax authorities or under local governmental policies. If we were to lose such preferential tax treatment, we would be subject to a higher enterprise income tax rate, which would have a material adverse effect on our financial condition, results of operations and profitability. See "Item 4.B. Information on the Company—Business Overview—Regulation." Political, economic and social factors may also lead to further policy refinement and adjustments. The imposition of new laws and regulations, or changes to current laws and regulations, could have a material impact on our business, financial condition and results of operations.

*Our ability to grow financial services while maintaining effective risk management*

We began to offer financial services in the third quarter of 2014. We offer secured entrusted loans, mortgage loans as well as unsecured loans to real estate developers, property buyers and other borrowers and charge interest, service fees and guarantee fees. In 2018, our financial services primarily focused on secured consumer loans to individual borrowers. As of December 31, 2018, we had loans receivable with a principal balance of US$127.7 million. The lending market has historically been dominated by commercial banks and other financial institutions. Compared with these market participants, we have significant less experience in managing the lending business. The growth of our financial services will depend on our ability to develop attractive loan products and services and manage related credit risk.

84

*Demand for home furnishing and improvement information and products*

As China's real estate market has expanded and matured, the ancillary home furnishing and improvement industry has also been growing to meet rising consumer demand. Similarly, we have expanded our marketing and listing services to suppliers of home furnishing and improvement products and services. By adding this category of advertisers and clients, we have been able to expand our sources of marketing and listing service revenues and, accordingly, expect the rate of increase in our revenues to continue to benefit from the continued growth of China's home furnishing and improvement sectors.

*Our ability to grow the retained business following the completion of the proposed separation of CIH from us*

On May 2, 2019, our board of directors approved our plan to separate CIH into an independent publicly traded company whose business will comprise certain portions of our listing and value-added services. Following the completion of the proposed separation and distribution, we will continue to retain our business operating a real estate Internet portal in China and will pursue our strategy of enhancing our online operations and residential property-related business. We anticipate dedicating our managerial attention and resources to developing the retained business in light of the distinct needs of China's residential property market, and whether we can continue to grow the retained business depends on our ability to manage and develop such business effectively.

**Basis of Presentation**

To comply with applicable PRC laws, rules and regulations restricting foreign ownership of companies that operate Internet content provision and online advertising services, we operate our websites and mobile apps and provide such services in China through contractual arrangements with our consolidated controlled entities. Under the current regulatory regime, Internet content distribution is permitted to operators with less than 50.0% foreign investment and advertising is permitted to all qualified operators. We may consider further optimizing our corporate structure in light of the evolving regulatory environment. The equity interests of the consolidated controlled entities are held directly or indirectly by Mr. Mo, our founder, executive chairman and chief executive officer, together with Mr. Dai, a former director and former chief executive officer, or Ms. Huang, the chief executive officer of CIH, but the effective control of the consolidated controlled entities has been transferred to us through a series of Structure Contracts. We have funded these consolidated controlled entities' paid-in capital by extending loans to Mr. Mo, Mr. Dai and Ms. Huang. Pursuant to the terms of the Structure Contracts, we are obligated to bear substantially all of the risk of losses from our consolidated controlled entities' activities and are entitled to receive substantially all of their profits, if any. See "Item 7.B. Major Shareholders and Related Party Transactions—Related Party Transactions—Structure Contracts" and our consolidated financial statements included elsewhere in this annual report.

Based on these Structure Contracts, we believe that, notwithstanding our lack of equity ownership, the arrangements provide us with effective control over our consolidated controlled entities. Accordingly, the financial results of these entities are included in our consolidated financial statements.

We refer to our consolidated controlled entities as PRC entities we control through contractual arrangements together with their subsidiaries, or the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries in our consolidated financial statements and related notes included elsewhere in this annual report.

**Components of our Results of Operations**

*Revenues*

We derive our revenues from marketing services, listing services, financial services, e-commerce services, and value-added services.

*Marketing Services*

Our marketing service revenues consist of revenues derived from the advertising services provided by our new home, secondary and rental properties and home furnishing and improvement businesses. Our marketing services include the deployment on our websites and mobile apps of banners, links, logos and floating signs.

*Listing Services*

Our listing service revenues consist of revenues derived from both basic listing services and special listing services. Basic listing services are targeted at real estate agents, brokers, developers, property owners, property managers and others seeking to sell or rent new and secondary properties and allow visitors to our websites and mobile apps to search for product suppliers and service providers in China's home furnishing and improvement sector. Revenues from basic listing services are predominantly derived from our secondary and rental business. Special listing services are specialized marketing campaigns primarily to promote brands of leading developers. Leveraging our data analytical capabilities, we assess the strengths of the brands of companies in various real estate sectors and create a special listing campaign to recognize the leading companies in those sectors. Once the special listing campaigns are determined, we establish a marketing and promotional program consisting of various online and offline promotional activities, which together collectively promote the special listings. The program includes online marketing platforms such as our websites and WeChat and offline themed events such as conferences, discussion forums and banquets.

*Financial Services*

Our revenues from financial services consist of interest income and service fees from primarily secured consumer loans to individuals that meet our credit assessment requirements.

*E-commerce Services*

Our e-commerce services, first launched in 2011, primarily include Fang membership services, direct sales services for new homes and online sublease services. Our Fang membership services enable paid members to purchase specified properties from our partner real-estate developers at a discount significantly greater than the membership fees charged by us. We ceased entering into new contracts for our direct sales services for new homes, online home-decorating services and online real estate brokerage services in early 2018 due to the change in our business development strategies.

*Value-added services*

We provide value-added services including subscription services for access to our information database and consulting services for customized and industry-related research reports and indices.

### *Cost of Revenues*

Our cost of revenues includes cost of services. Cost of services primarily consists of staff costs, tax surcharges, operating lease expenses, network costs, communication expenses, share-based compensation expenses and other costs directly related to the offering of our listing, marketing, E-commerce, financial and value-added services. Prior to January 1, 2018, value-added taxes were also included in cost of revenues. Staff costs include salary and benefits paid to members of our editorial staff, customer service personnel, personnel dedicated to servicing and designing websites and mobile apps for our customers and personnel in the brokerage function. E-commerce cost refers to the portion of proceeds to be remitted to real estate brokers under our Fang membership services. Operating lease expenses consist primarily of rent for our various office facilities as allocated on the basis of the space occupied by our editorial staff and customer service personnel. Network costs consist of server hosting fees, bandwidth fees and related charges. Communication costs consist of telephone expenses relating to our operations. Cost of revenues also includes share-based compensation expenses in connection with share options and other share-based compensation granted to our editorial and production staff. In 2016, 2017 and 2018, our cost of revenues represented 75.0%, 39.3% and 19.3% of our revenues, respectively. We have adopted the new revenue recognition standards, ASC 606, effective January 1, 2018, which relate to the change in the presentation of value-added tax from gross basis to net basis. For the impact of adopting ASC 606 on our cost of revenues, see "—Recent Accounting Pronouncements."

### *Operating Expenses*

Our operating expenses consist of selling expenses and general and administrative expenses.

### *Selling Expenses*

Our selling expenses primarily consist of staff costs, such as salaries and benefits paid to personnel in our sales and distribution department, costs for promoting our Fang membership services, operating lease expenses, which include rental expenses related to our selling and distribution department, traveling and communication expenses, office expenses and advertising and promotion expenses, including fees we pay to other Internet portals for the purpose of promoting and increasing traffic to our websites and mobile apps. Selling expenses also include other expenses incurred in relation to our selling and distribution activities and share-based compensation costs in connection with share options and other share-based compensation granted to our sales and marketing personnel.

### *General and Administrative Expenses*

General and administrative expenses primarily consist of staff costs, such as salaries and benefits paid to our management and general administrative, product and development personnel, bad debt expense relating to uncollectible accounts and loans receivable, office expenses, communication expenses, professional service fees and other expenses for general and administrative purposes, as well as maintenance expenses. Our general and administrative expenses also include share-based compensation costs in connection with share options and other share-based compensation granted to our general administrative, technical and research personnel.

*Taxation*

We are subject to income tax on an entity basis on profits arising in or derived from the jurisdictions where we, our subsidiaries or our consolidated controlled entities are domiciled or have operations.

*Cayman Islands*

Under the current laws of the Cayman Islands, the company and subsidiaries incorporated in the Cayman Islands are not subject to tax on income or capital gains. In addition, upon payments of dividends by us to our shareholders, No Cayman Islands withholding tax will be imposed.

*British Virgin Islands*

Under the current laws of the British Virgin Islands, or BVI, subsidiaries incorporated in the BVI are not subject to tax on income or capital gains. In addition, upon payments of dividends by these companies to their shareholders, No BVI withholding tax will be imposed.

*Hong Kong*

Under the Hong Kong tax laws, subsidiaries in Hong Kong are subject to the Hong Kong profits tax rate at 16.5% and they are exempted from income tax on their foreign-derived income and there are No withholding taxes in Hong Kong on remittance of dividends. A two-tiered profits tax rates regime was introduced in 2018 where the first HK$2 million of assessable profits earned by a company will be taxed at half of the current tax rate (8.25%) while the remaining profits will continue to be taxed at 16.5%. There is an anti-fragmentation measure where each group will have to nominate only one company in the group to benefit from the progressive rates. No provision for Hong Kong profits tax has been made in the financial statements as the subsidiaries in Hong Kong have No assessable profits for the three years ended December 31, 2018.

*United States*

On December 22, 2017, the Tax Act was enacted and contains significant changes to U.S. income tax law. Effective in 2018, the Tax Act reduces the U.S. statutory tax rate from 35% to 21% and creates new taxes focused on foreign-sourced earnings and related-party payments, including the creation of the base erosion anti-abuse tax and a new tax on global intangible low-taxed income, or GILTI.

The SEC staff issued SAB 118 on December 22, 2017, which allows companies to record provisional amounts during a measurement period not to extend beyond one year of the enactment date.

The Tax Act reduces the U.S. statutory tax rate from 35% to 21% for years after 2017. Accordingly, we re-measured our deferred taxes as of December 31, 2017, to reflect the reduced rate that will apply in future periods when these deferred taxes are settled or realized. As Best Work Holdings (New York) LLC is loss making since incorporated, therefore we recognized a deferred tax asset of US$13,834 to reflect the reduced U.S. tax rate and full valuation allowance is provided and corresponding remeasurement were made to unrecognized tax benefit and valuation allowance.

*Singapore*

Our Singapore-incorporated subsidiary does not conduct any substantive operations of its own. No provision for Singapore profits tax has been made in the financial statements as this entity has No assessable profits for the three years ended December 31, 2018.

*China*

In March 2007, a new enterprise income tax law in China was enacted and then amended in February 2017 and December 2018. The New EIT Law applies a unified 25% enterprise income tax, or EIT, rate to both foreign invested enterprises and domestic enterprises, unless a preferential EIT rate is otherwise stipulated. On April 14, 2008, relevant governmental regulatory authorities issued the Administrative Measures for Certification of High and New Technology Enterprises which was amended in January 2016. High and New Technology Enterprise, or HNTE, status under the New EIT Law would entitle qualified and approved entities to a favorable EIT tax rate of 15%. The SAT issued Circular No. 203 in April 2009 and Circular 24 in June 2017 stipulating that entities which qualified for the HNTE status should apply with competent tax authorities to enjoy the reduced EIT rate of 15% provided under the New EIT Law starting from the year when the new HNTE certificate becomes effective. The HNTE certificate is effective for a period of three years and can be renewed for another three years. Subsequently, an entity needs to re-apply for the HNTE status in order to enjoy the preferential tax rate of 15%.

We obtained HNTE certificates for SouFun Media, Beijing Zhong Zhi Shi Zheng, SouFun Network, Beijing Technology, Beijing JTX Technology and Beijing Hong An Tu Sheng in November 2015 and have subsequently renewed such HNTE certificates in September and October 2018. Therefore, these six subsidiaries can enjoy the preferential tax rate of 15% from 2015 to 2020. We newly applied for the HNTE status for Beijing Tuoshi in 2016 and received the HNTE certificate in December 2016. Beijing Tuoshi can enjoy the preferential tax rate of 15% for 2016, 2017 and 2018. We newly applied for the HNTE status for Beijing Li Man Wan Jia, Beijing Hua Ju Tian Xia and Beijing Zhong Zhi Xun Bo in 2018 and received the HNTE certificates in September and October 2018. Beijing Li Man Wan Jia, Beijing Zhong Zhi Xun Bo and Beijing Hua Ju Tian Xia can enjoy the preferential tax rate of 15% for 2018, 2019 and 2020. We newly applied for the Xinjiang Huoerguosi Economic and Technological Development Zone tax preference status for Xinjiang Zhongzhi in 2017 and received the certificates in September 2017. Xinjiang Zhongzhi can enjoy the preferential tax rate of 0% for 2017, 2018, 2019 and 2020.

If any entities fail to maintain the HNTE qualification under the New EIT Law, they will No longer qualify for the preferential tax rate of 15%, which could have a material and adverse effect on our results of operations and financial position provided that they do not qualify for any other preferential tax treatment. Historically, the abovementioned PRC subsidiaries have successfully obtained or renewed their HNTE certificates when the previous certificates had expired.

Subsequent to government approval in May 2014, Beijing Li Man Wan Jia, Beijing Zhong Zhi Xun Bo and Beijing Hua Ju Tian Xia obtained the Software Enterprise status with effect from January 1, 2013. Accordingly, these three subsidiaries are entitled to the two-year EIT exemption for years 2013 and 2014 and a reduced EIT rate of 12.5% for years 2015, 2016 and 2017.

Dividends paid by our PRC subsidiaries out of the profits earned after December 31, 2007 to non-PRC tax resident investors are subject to PRC withholding tax. The withholding tax on dividends is 10%, unless a foreign investor's tax jurisdiction has a tax treaty with the PRC that provides a lower withholding tax rate and the foreign investor is recognized as the beneficial owner of the income under the relevant tax rules.

Moreover, the New EIT Law treats enterprises established outside of China with "effective management and control" located in China as PRC resident enterprises for tax purposes. The term "effective management and control" is generally defined as exercising overall management and control over the business, personnel, accounting, properties, etc. of an enterprise. Our company, if considered a PRC resident enterprise for tax purposes, would be subject to the PRC EIT at the rate of 25% on our worldwide income for the period after January 1, 2008. As of December 31, 2017 and 2018, we accrued nil and US$50 for PRC tax on such basis.

**Critical Accounting Policies**

We prepare our financial statements in conformity with U.S. GAAP, which requires us to make judgments, estimates and assumptions that affect the reported amounts of our assets and liabilities, disclosure of contingent assets and liabilities on the date of each set of financial statements and the reported amounts of revenues and expenses during each financial reporting period. We continually evaluate these estimates and assumptions based on the most recently available information, our own historical experience and various other assumptions that we believe to be reasonable under the circumstances. Since the use of estimates and assumptions is an integral component of the financial reporting process, actual results could differ from those estimates and assumptions.

89

An accounting policy is considered to be critical if it requires an accounting estimate to be made based on assumptions about matters that are highly uncertain at the time such estimate is made, and if different accounting estimates that reasonably could have been used, or changes in the accounting estimates that are reasonably likely to occur periodically could materially impact the consolidated financial statements. We believe the following critical accounting policies reflect the more significant estimates and assumptions used in the preparation of our consolidated financial statements. The following descriptions of critical accounting policies, judgments and estimates should be read in conjunction with our consolidated financial statements and other disclosures included elsewhere in this annual report.

### *Revenue Recognition*

#### *Periods prior to January 1, 2018*

Revenue recognition for multiple-element arrangements requires judgment to determine if multiple elements exist, whether elements can be accounted for as separate units of accounting, and if so, the fair value for each of the elements.

We enter into arrangements that can include various combinations of services. Where elements are delivered over different periods of time, and when allowed under U.S. GAAP, revenue is allocated to the respective elements based on their relative selling prices at the inception of the arrangement, and revenue is recognized as each element is delivered. We use a hierarchy to determine the fair value to be used for allocating revenue to elements: (1) vendor-specific objective evidence of fair value, or VSOE, (2) third-party evidence, and (3) best estimate of selling price, or ESP. Generally, VSOE is the price charged when the deliverable is sold separately or the price established by management for a product that is not yet sold if it is probable that the price will not change before introduction into the marketplace. ESPs are established as best estimates of what the selling prices would be if the deliverables were sold regularly on a stand-alone basis. The process of determining ESPs requires our judgment and consideration of multiple factors that may vary over time depending upon the unique facts and circumstances related to each deliverable.

#### *Adoption of ASC 606, Revenue from Contracts with Customers*

We adopted the new revenue recognition standards, or ASC 606, effective January 1, 2018 using the modified retrospective method for contracts which were not completed at the date of initial adoption.

Our policy before the adoption of ASC 606 was to require written signed contracts by both us and our customers as persuasive evidence of our revenue arrangements. In certain cases where services are being delivered prior to the receipt of the written signed contracts by both parties, revenue had been deferred until such time the written signed contracts are collected. Under the new revenue standard, revenues may be recognized prior to the receipt of the written signed contracts by both parties (assuming all other revenue recognition criteria are satisfied), as long as the revenue arrangements between us and our customers are legally enforceable. As a result, we made an adjustment to increase the opening balance of retained earnings as of January 1, 2018 by US$2.8 million.

Before the adoption of ASC 606, we assessed whether collectability is reasonably assured at the outset of the arrangement, and subsequently reassessed if there was a substantive change in facts and circumstances. If the collectability of all or a portion of the fee is not reasonably assured, all revenue recognition were deferred until payment was received (assuming all of the other revenue recognition criteria have been met). Upon the adoption of ASC 606, if it is not probable that we will collect substantially all of the consideration to which we will be entitled in exchange for the goods or services that will be transferred to the customer, consideration received from the customer is initially recorded as a liability. We will recognize nonrefundable consideration received as revenue only when one of the following events has occurred:

· we have no remaining obligations to transfer goods or services to the customer and all, or substantially all of the consideration has been received;

· the contract has been terminated; or

· we have transferred control of the goods or services to which the consideration that has been received relates, and has stopped transferring (and have No obligation under the contract to transfer) additional goods or services to the customer, if applicable.

As a result, we made an adjustment to decrease the opening balance of retained earnings as of January 1, 2018 by US$0.5 million.

In addition, our revenues are presented net of value-added tax collected on behalf of governments starting from January 1, 2018. Prior to January 1, 2018, value-added tax collected on behalf of governments was presented as gross in both revenues and cost of revenues. We have elected to adopt the practical expedient for incremental costs to obtain a contract with a customer, with amortization periods of one year or less to be recorded in selling and marketing expenses when incurred. We have elected the practical expedient not to disclose the information about remaining performance obligations which are part of the contracts that have an original expected duration of one year or less.

The disclosure of the impact of adoption on the consolidated balance sheets was as follows:

|  | As of December 31, 2018 | Adjustments | Amounts without adoption of ASC 606 |
|---|---|---|---|
|  | (US$ in thousands) | | |
| Accounts receivable | 60,950 | 379 | 61,329 |
| Deferred revenue | (163,346) | (11,633) | (174,979) |
| Accrued expenses and other liabilities | (131,268) | 9,701 | (121,567) |
| Other non-current liabilities | (153,095) | 555 | (152,540) |

The impact for adoption of ASC 606 to our consolidated statement of comprehensive income (loss) for the year ended December 31, 2018 is as follows:

|  | Year ended December 31, 2018 | Adjustments | Amounts without adoption of ASC 606 |
|---|---|---|---|
|  | (US$ in thousands) | | |
| E-commerce services | 15,384 | 928 | 16,312 |

| | | | |
|---|---|---|---|
| Marketing services | 119,680 | 8,740 | 128,420 |
| Listing services | 113,534 | 5,717 | 119,251 |
| Financial services | 18,060 | 1,068 | 19,128 |
| Value-added services | 36,358 | 2,893 | 39,251 |
| **Total revenues** | **303,016** | **19,346** | **322,362** |
| Cost of services | (58,570) | (18,117) | (76,687) |
| **Operating income** | **39,803** | **1,229** | **41,032** |
| **Net loss** | **(114,909)** | **1,229** | **(113,680)** |
| **Loss per share for Class A and Class B ordinary shares** | | | |
| Basic and Diluted | (1.29) | 0.01 | (1.28) |

Since the adoption of ASC 606 starting from January 1, 2018, we recognize revenues upon the satisfaction of its performance obligation in an amount that reflects the consideration to which we expect to be entitled to in exchange for those goods or services, excluding amounts collected on behalf of third parties, such as value-added taxes. For each performance obligation satisfied over time, we recognize revenue over time by measuring the progress toward complete satisfaction of that performance obligation. If we do not satisfy a performance obligation over time, the performance obligation is satisfied at a point in time.

Our contracts with customers often include promises to transfer multiple products and services. For these contracts, we account for individual performance obligations separately if they are capable of being distinct and distinct within the context of the contract. Determining whether products and services are considered distinct performance obligations may require significant judgment. Judgment is also required to determine the stand-alone selling price, or SSP, for each distinct performance obligation. In instances where SSP is not directly observable, such as when we do not sell the product or service separately, we determine the SSP using information that may include market conditions and other observable inputs.

***Accounts Receivable and Allowance for Doubtful Accounts***

We review the accounts receivable on a periodic basis and makes general and specific allowances when there is doubt as to the collectability of individual balances.

We consider many factors in assessing the collectability of its receivables, such as, the age of the amounts due, the customer's payment history and credit-worthiness. An allowance for doubtful accounts is recorded in the period in which a loss is determined to be probable. Accounts receivable balances are written off after all collection efforts have been exhausted.

*Loans Receivable*

Loans receivable consists primarily of secured consumer loans to individuals that have passed our credit assessment. Such amounts are recorded at the principal amount less impairment as of the balance sheet date. The loan periods extended by us to the borrowers generally range from one to thirty-six months.

An allowance for credit loss is recorded when, based on current information and events, it is probable that we will be unable to collect all amounts due according to the contractual terms of the loan agreement. We assess the allowance for credit loss related to loans receivable on a quarterly basis, either on an individual or collective basis. We consider various factors in evaluating loans receivable for possible impairment on an individual basis. These factors include the amount of the loan, historical experience, value of collateral, if any, credit quality and age of the receivables balances. Impairment is measured on an individual loan basis using either the present value of expected future cash flows discounted at the loan's effective interest rate or the fair value of the collateral if the loan is secured. We evaluate the remainder of our loans receivables portfolio for impairment on a collective basis in accordance with ASC 450-20, "Loss Contingencies" and record an allowance for credit loss at the portfolio segment level.

Loan principal and interest receivables are charged-off when the loan principal and interest receivables are deemed to be uncollectible, which is generally identified if any of the following conditions are met : (1) the borrower is dead, missing or incapacitate and there is No legal heir and presentee or the legal heir and presentee refuse to abide the contract; (2) identification of fraud, and the fraud is officially reported to and filed with relevant law enforcement departments; (3) outstanding amount following 180 days past due after all collection efforts based on management's judgment.

*Income Taxes*

We follow the liability method of accounting for income taxes, whereby deferred tax assets and liabilities are recognized based on the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases, and attributable to operating loss and tax credit carryforwards, if any. We reduce carrying amounts of deferred tax assets by a valuation allowance, if, based on the available evidence, it is "more-likely-than-not" that such assets will not be realized. Accordingly, we assess the need to establish valuation allowances for deferred tax assets at each reporting period based on a "more-likely-than-not" realization threshold. This assessment considers, among other matters, the nature, frequency and severity of current and cumulative losses, forecasts of future profitability, the duration of statutory carryforward periods, our experience with operating loss and tax credit carryforwards, if any, not expiring.

We apply ASC 740, "Income Taxes" to account for uncertainties in income taxes. In accordance with the provisions of ASC 740, we recognize in our financial statements the impact of a tax position if a tax return position or future tax position is "more-likely-than-not" to prevail based on the facts and technical merits of the position. Tax positions that meet the "more-likely-than-not" recognition threshold are measured at the largest amount of tax benefit that has a greater than fifty percent likelihood of being realized upon settlement.

Our estimated liability for unrecognized tax benefits, which is included in "other non-current liabilities," is periodically assessed for adequacy and may be affected by changing interpretations of laws, rulings by tax authorities, changes and/or developments with respect to tax audits and expiration of the statutes of limitation. The outcome for a particular audit cannot be determined with certainty prior to the conclusion of the audit and, in some cases, the appeal or litigation process. The actual benefits ultimately realized may differ from our estimates. As each audit is concluded, adjustments, if any, are recorded in our financial statements. Additionally, in future periods, changes in facts, circumstances and new information may require us to adjust the recognition and measurement estimates with regard to individual tax positions. Changes in recognition and measurement estimates are recognized in the period in which the changes occur.

Interest and penalties arising from underpayment of income taxes are computed in accordance with the relevant tax laws. The amount of interest expense is computed by applying the applicable statutory rate of interest to the difference between the tax position recognized and the amount previously taken or expected to be taken in a tax return. Interest and penalties recognized in accordance with ASC 740 are classified in our consolidated statements of comprehensive income (loss) as income tax expense.

*Recent Accounting Pronouncements*

In February 2016, the Financial Accounting Standards Board, or FASB, established Topic 842, Leases, by issuing ASU No. 2016-02, which requires lessees to recognize leases on-balance sheet and disclose key information about leasing arrangements. Topic 842 was subsequently amended by ASU No. 2018-01, Land Easement Practical Expedient for Transition to Topic 842; ASU No. 2018-10, Codification Improvements to Topic 842, Leases; and ASU No. 2018-11, Targeted Improvements. The new standard establishes a right-of-use model, or ROU, that requires a lessee to recognize a ROU asset and lease liability on the balance sheet for all leases with a term longer than 12 months. Leases will be classified as finance or operating, with classification affecting the pattern and classification of expense recognition in the income statement.

The new standard is effective for public business entities for annual periods beginning after December 15, 2018, and interim periods therein. For all other entities, the standard is effective for fiscal years beginning after December 15, 2019, and interim periods within fiscal years beginning after December 15, 2020. Early adoption is permitted. A modified retrospective transition approach is required, applying the new standard to all leases existing at the date of initial application. We adopted the new standard on January 1, 2019 and used the effective date as the date of initial application. Consequently, financial information will not be updated and the disclosures required under the new standard will not be provided for dates and periods before January 1, 2019.

The new standard provides a number of optional practical expedients in transition. We elected the 'package of practical expedients', which permits us not to reassess under the new standard our prior conclusions about lease identification, lease classification and initial direct costs.

Leases currently classified as operating leases in Note 21 of our consolidated financial statements will be reported on the consolidated balance sheets upon adoption at their net present value, which will increase total assets and liabilities. We expect to recognize the right-of-use assets and lease liability in the amount of approximately US$5.7 million respectively as of January 1, 2019. We used our estimated incremental borrowing rate based on information available at the date of adoption in calculating the present value of our existing lease payments. The adoption of ASC 842 is not expected to have a material impact to our consolidated statements of comprehensive income (loss) or net cash provided by operating activities.

The adoption of ASC 842 is not expected to have a material impact to the accounting and disclosure of sublease services in which we are the lessor.

In June 2016, the FASB issued ASU No. 2016-13, or ASU 2016-13, Financial Instruments – Credit Losses (Topic 326), Measurement of Credit Losses on Financial Instruments. ASU 2016-13 changes the impairment model for most financial assets and certain other instruments. The standard will replace "incurred loss" approach with an "expected loss" model for instruments measured at amortized cost. For available-for-sale debt securities, entities will be required to record allowances rather than reduce the carrying amount, as they do today under the other-than-temporary impairment model. The standard is effective for public business entities for annual periods beginning after December 15, 2019, and interim periods therein. Early adoption is permitted. We are currently evaluating the impact of adopting this standard on our consolidated financial statements.

In August 2018, the FASB issued ASU 2018-13, Fair Value Measurement (Topic 820): Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurement. ASU 2018-13 eliminates, adds and modifies certain disclosure requirements for fair value measurements. The amendments applicable to the disclosures of changes in unrealized gains and losses, the range and weighted average of significant unobservable inputs used to develop Level 3 fair value measurements, and the narrative description of measurement uncertainty should be applied prospectively for only the most recent interim or annual period presented in the initial year of adoption. This ASU is effective for all entities for fiscal years beginning after December 15, 2019, including interim periods therein. All other amendments should be applied retrospectively to all periods presented upon their effective date. Early adoption is permitted, and an entity is also permitted to early adopt any removed or modified disclosures and delay adoption of the additional disclosures until their effective date. We are in the process of evaluating the impact on our consolidated financial statements upon adoption.

**Results of Operations**

The following table sets forth selected financial data from our consolidated statements of comprehensive income for the periods indicated:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | | **2017** | | **2018** | |
| | Amount | Percentage of revenue | Amount | Percentage of revenue | Amount | Percentage of revenue |
| | (US$ in thousands, except percentage) | | | | | |
| **Revenues** | | | | | | |
| E-commerce services | 577,684 | 63.0% | 87,809 | 19.8% | 15,384 | 5.0% |
| Marketing services | 165,437 | 18.1% | 149,267 | 33.6% | 119,680 | 39.5% |
| Listing services | 118,109 | 12.9% | 165,374 | 37.2% | 113,534 | 37.5% |
| Financial services | 29,602 | 3.2% | 12,055 | 2.7% | 18,060 | 6.0% |
| Value-added services | 25,559 | 2.8% | 29,791 | 6.7% | 36,358 | 12.0% |
| **Total revenues** | **916,391** | **100.0%** | **444,296** | **100.0%** | **303,016** | **100.0%** |
| **Cost of revenues** | | | | | | |
| Cost of services | (687,184) | (75.0)% | (174,599) | (39.3)% | (58,570) | (19.3)% |
| **Total cost of revenues** | **(687,184)** | **(75.0)%** | **(174,599)** | **(39.3)%** | **(58,570)** | **(19.3)%** |
| **Gross profit** | **229,207** | **25.0%** | **269,697** | **60.7%** | **244,446** | **80.7%** |
| **Operating income (expenses)** | | | | | | |
| Selling expenses | (229,817) | (25.1)% | (91,250) | (20.5)% | (69,532) | (22.9)% |
| General and administrative expenses | (151,251) | (16.5)% | (135,688) | (30.5)% | (138,386) | (45.7)% |
| Other income (loss) | 415 | – | (567) | (0.1)% | 3,275 | 1.1% |
| **Operating income (loss)** | **(151,446)** | **(16.5)%** | **42,192** | **9.5%** | **39,803** | **13.1%** |
| Foreign exchange gain (loss) | (1,882) | 0% | 15 | – | (598) | (0.2)% |
| Interest income | 11,367 | 1.2% | 11,322 | 2.5% | 10,302 | 3.4% |
| Interest expenses | (20,791) | (2.3)% | (16,153) | (3.6)% | (21,174) | (7.0)% |
| Change in fair value of securities | – | – | 518 | 0.1% | 167,402 | (55.2)% |
| Realized gain on available-for-sale securities (including accumulated other comprehensive income reclassifications for unrealized gain on available-for-sale securities of US$10,583, US$2,736 and US$1,493 for the years ended December 31, 2016, 2017 and 2018, respectively) | 10,583 | 1.2% | 2,736 | 0.6% | 1,493 | 0.5% |
| Government grants | 6,469 | 0.7% | 3,154 | 0.7% | 1,435 | 0.5% |
| Investment income | 3,281 | 0.4% | 6,692 | 1.5% | 6,816 | 2.2% |
| Impairment on investments | (2,232) | (0.2)% | (2,768) | (0.6)% | – | – |
| Other non-operating income | – | – | (4,562) | (1.0)% | (30) | 0.0% |
| **Income (loss) before income taxes and noncontrolling interests** | **(144,651)** | **(15.8)%** | **43,146** | **9.7%** | **(129,355)** | **(42.7)%** |
| Income tax (expenses) benefit | (24,984) | (2.7)% | (21,442) | (4.8)% | 14,446 | 4.8% |
| **Net income (loss)** | **(169,635)** | **(18.5)%** | **21,704** | **4.9%** | **(114,909)** | **(37.9)%** |
| Net income (loss) attributable to noncontrolling interests | — | — | (3) | – | 2 | 0.0% |

| | Year Ended December 31, | | | | | |
| | 2016 | | 2017 | | 2018 | |
| | Amount | Percentage of revenue | Amount | Percentage of revenue | Amount | Percentage of revenue |
| | (US$ in thousands, except percentage) | | | | | |
| Net income (loss) attributable to Fang Holdings Limited's shareholders | (169,635) | (18.5)% | 21,707 | 4.9% | (114,911) | (37.9)% |

*Revenues*

Our revenue decreased 31.8% year-over-year in 2018, primarily due to decline in revenue from e-commerce and listing service. Our revenues decreased 51.5% year-over-year in 2017, primarily due to a significant decline in revenues from e-commerce services as a result of changes in our business strategy.

*Marketing Services.* Our marketing service revenues consist of revenues derived from the advertising services provided by our new home, secondary and rental properties and home furnishing and improvement businesses. Our marketing services include the deployment on our websites respectively, and mobile apps of banners, links, logos and floating signs. Revenues from marketing services decreased 19.8% and 9.8% year-over-year in 2018 and 2017, respectively, primarily due to (1) the revenues are presented net of value-added tax collected on behalf of government due to the adoption of ASC 606 from January 1, 2018, and (2) a slowdown in the real estate market and the increased competition for similar services in China. In 2016, 2017 and 2018, revenues generated from our marketing services represented 18.1%, 33.6% and 39.5% of our revenues, respectively.

The following table presents our marketing service revenues for each of our businesses by amount and percentage of total marketing service revenues for the periods indicated:

| | Year Ended December 31, | | | | | |
| | 2016 | | 2017 | | 2018 | |
| | Amount | Percentage of marketing service revenues | Amount | Percentage of marketing service revenues | Amount | Percentage of marketing service revenues |
| | (US$ in thousands, except percentage) | | | | | |
| New home | 144,631 | 87.4% | 121,497 | 81.4% | 119,352 | 99.7% |
| Home furnishing and improvement | 19,171 | 11.6% | - | - | 328 | 0.3% |
| Secondary and rental | 1,635 | 1.0% | 27,770 | 18.6% | - | - |
| **Total marketing service revenues** | 165,437 | 100.0% | 149,267 | 100.0% | 119,680 | 100.0% |

New home business accounted for 87.4%, 81.4% and 99.7% of our marketing service revenues in 2016, 2017 and 2018, respectively. New home business primarily consists of marketing services for newly developed properties for sale. Our new home customers are largely real estate developers and their sales agents who are promoting newly developed properties for sale.

*Listing Services.* Revenues from our listing services decreased 31.3% in 2018, primarily due to (1) the presentation on a net basis of value-added tax following the adoption of ASC 606 from January 1, 2018, and (2) the decrease in number of paying subscribers. Revenue from our listing services increased 40.0% year-over-year in 2017, primarily due to an increase in the number of customers, in particular those from lower-tier cities, who paid for our services. In 2016, 2017 and 2018, revenues from our listing services represented 12.9%, 37.2% and 37.5% of our revenues, respectively. We believe that listing service revenues will continue to remain a significant source of revenue. However, regulatory efforts to require additional down payments and other actions to dampen the growing market for secondary homes have impacted and may continue to impact our revenues.

The following table sets forth our listing service revenues by amount and percentage of our listing service revenues for the periods indicated:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | | **2017** | | **2018** | |
| | **Amount** | **Percentage of listing service revenues** | **Amount** | **Percentage of listing service revenues** | **Amount** | **Percentage of listing service revenues** |
| | (US$ in thousands, except percentage) | | | | | |
| Basic listing | 91,742 | 77.7% | 140,517 | 85.0% | 84,482 | 74.4% |
| Special listing | 26,367 | 22.3% | 24,857 | 15.0% | 29,052 | 25.6% |
| **Total listing service revenues** | 118,109 | 100.0% | 165,374 | 100.0% | 113,534 | 100.0% |

The average revenue per paying subscriber was US$567, US$623 and US$400 for 2016, 2017 and 2018, respectively.

The following table presents our listing service revenues for each of our businesses by amount and percentage of total listing service revenues for the periods indicated:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | | **2017** | | **2018** | |
| | **Amount** | **Percentage of listing service revenues** | **Amount** | **Percentage of listing service revenues** | **Amount** | **Percentage of listing service revenues** |
| | (US$ in thousands, except percentage) | | | | | |
| Secondary and rental properties | 94,507 | 80.0% | 140,492 | 85.0% | 84,773 | 74.7% |
| Research | 22,959 | 19.4% | 24,522 | 14.8% | 28,748 | 25.3% |
| Other | 643 | 0.5% | 360 | 0.2% | 13 | 0.0% |
| **Total listing service revenues** | 118,109 | 100.0% | 165,374 | 100.0% | 113,534 | 100.0% |

Secondary and rental properties business accounted for 80.0%, 85.0% and 74.7% of our listing service revenues in 2016, 2017 and 2018, respectively.

*Financial Services.* Revenues from financial services increased 49.8% year-over year in 2018, primarily due to (1) increased average balance of loans receivable, partially offset by the presentation on a net basis of value-added tax following the adoption of ASC 606 from January 1, 2018. Revenues from financial services decreased 59.3% year-over year in 2017, primarily due to the decreased transaction volumes of secondary homes. In 2016, 2017 and 2018, revenues from financial services represented 3.2%, 2.7% and 6.0% of our revenues, respectively.

*E-commerce Services.* Revenues from e-commerce services decreased 82.5% year-over-year in 2018, primarily due to (1) our business transformation from a transaction-oriented platform back to a technology-driven open platform, and (2) the presentation on a net basis of value-added tax following the adoption of ASC 606 from January 1, 2018. Revenues from e-commerce services decreased 84.8% year-over-year in 2017, primarily due to our business transformation from a transaction-oriented platform back to a technology-driven open platform. Revenues from e-commerce services represented 63.0%, 19.8% and 5.0% of our revenues in 2016, 2017 and 2018, respectively.

The following table presents our e-commerce service revenues for each of our businesses by amount and percentage of total e-commerce service revenues for the periods indicated:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | | **2017** | | **2018** | |
| | Amount | Percentage of e-commerce service revenues | Amount | Percentage of e-commerce service revenues | Amount | Percentage of e-commerce service revenues |
| | (US$ in thousands, except percentage) | | | | | |
| New home | 265,583 | 46.0% | 36,672 | 41.8% | 7,391 | 48.0% |
| Other | 312,101 | 54.0% | 51,137 | 58.2% | 7,993 | 52.0% |
| **Total e-commerce service revenues** | 577,684 | 100.0% | 87,809 | 100.0% | 15,384 | 100.0% |

Other product groups accounted for an increasing portion of our e-commerce services revenues in 2016 and 2017 as a result of the continued development of our online real estate brokerage services, and decreased in 2018 as we discontinued our online real estate brokerage services.

*Value-Added Services.* Revenues from value-added services increased 22.0% and 16.6% year-over-year in 2018 and 2017, respectively, primarily due to a rising demand for our database and research services, partially offset by the presentation on a net basis of value-added tax following the adoption of ASC 606 from January 1, 2018. In 2016, 2017 and 2018, revenues from value-added services represented 2.8%, 6.7% and 12.0% of our revenues, respectively.

*Cost of Revenues*

Our cost of revenues consists primarily of staff costs, operating lease and sublease costs, and commission fees. Our cost of revenues as a percentage of our revenues was 75.0%, 39.3% and 19.3% in 2016, 2017 and 2018, respectively. Prior to January 1, 2018, cost of revenues also included value-added taxes.

Our cost of revenues decreased significantly year-over-year in 2017 and 2018, primarily due to a decline in staff costs from US$419.3 million in 2016 to US$61.7 million in 2017 and further to US$19.7 million in 2018 as a result of the reduction in staff headcount of our brokerage team for secondary properties and the optimization in our cost structure under the technology-driven open platform model.

*Gross Profit and Gross Margin*

As a result of the foregoing, our gross profit decreased 9.4% year-over-year in 2018 and increased 17.7% year-over-year in 2017. Our gross margin was 25.0%, 60.7% and 80.7% in 2016, 2017 and 2018, respectively.

*Operating Expenses*

Our operating expenses decreased 8.4% year-over-year in 2018, primarily due to the decrease in advertising expenses, management staff costs and bad debt expenses. Our operating expenses decreased 40.4% year-over-year in 2017, primarily due to a significant decrease in our selling expenses. In 2016, 2017 and 2018, our operating expenses represented 41.6%, 51.1% and 68.6% of our revenues, respectively.

The following table sets forth our operating expenses by amount and percentage of our total operating expenses for the periods indicated:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | | 2017 | | 2018 | |
| | Amount | Percentage of operating expenses | Amount | Percentage of operating expenses | Amount | Percentage of operating expenses |
| | (US$ in thousands, except percentage) | | | | | |
| Selling expenses | 229,817 | 60.3% | 91,250 | 40.2% | 69,532 | 33.4% |
| General and administrative expenses | 151,251 | 39.7% | 135,688 | 59.8% | 138,386 | 66.6% |
| **Total** | 381,068 | 100.0% | 226,938 | 100.0% | 207,918 | 100.0% |

*Selling Expenses.* Our selling expenses decreased 23.8% and 60.3% year-over-year in 2018 and 2017, respectively, primarily due to the decrease in selling expenses associated with our e-commerce services and advertising and promotional expenses. Advertising and promotional related expense decreased from US$24.2 million in 2017 to US$7.1 million in 2018, generally consistent with the decrease in our revenues from e-commerce service. Selling expenses associated with our e-commerce services decreased from US$72.4 million in 2016 to US$0.4 million in 2017, which was in line with the decrease in our revenues from e-commerce services. Advertising and promotional expenses decreased from US$61.9 million in 2016 to US$16.8 million in 2017, primarily due to the decrease of promotions for our Fang membership services, our website, new domain name and the Fang mobile applications.

*General and Administrative Expenses.* Our general and administrative expenses increased 2.0% year-over-year in 2018, primarily due to the increase in share-based compensation, operating lease and professional service fee, partially offset by the decrease in bad debt expense. Our general and administrative expenses decreased 10.3 % year-over-year in 2017, primarily due to a decline in staff cost from US$76.8 million in 2016 to US$63.9 million in 2017.

*Other Income (Loss).* Other income in 2018 consisted of rental income of US$2.6 million, income from litigation of US$1.4 million and loss from hotel operation of US$0.7 million. Other loss in 2017 consisted of other revenue of US$12.2 million and other expenses of US$12.8 million of our subsidiaries that operate the hotel and office leasing businesses.

### Operating Income (Loss) and Operating Margin

As a result of the foregoing, we generated operating income of US$39.8 million in 2018 and generated operating income of US$42.2 million in 2017. Our operating margin was negative 16.5%, 9.5% and 13.1% in 2016, 2017 and 2018, respectively.

### Interest Income

Our interest income, consisting primarily of interest income from cash and cash equivalent, restricted cash as well as fixed rate time deposits, remained relatively stable at US$11.3 million and US$10.3 million in 2017 and 2018, respectively.

### Interest Expenses

Our interest expenses consist primarily of interest incurred as a result of our bank borrowings and convertible senior notes. Our interest expenses increased 31.1% year-over-year in 2018, primarily due to additional bank borrowings amounted to US$76.3 million. Our interest expenses decreased 22.3% year-over-year in 2017, primarily due to our repurchase of a total of US$394,300 of the notes.

### Change in Fair Value of Securities

Our change in fair value of securities increased significantly to US$167.4 million in 2018, compared to US$0.6 million in 2017, primarily due to the decrease in fair value of our equity investments.

### Investment Income, Net

Our investment income, which primarily consisted of dividends from the respective long-term investments in companies including Color Life, Hopefluent, and World Union totaled US$3.3 million, US$6.7 million and US$6.8 million in 2016, 2017 and 2018, respectively.

### Impairment on Investments

We had US$2.2 million, US$2.8 million and nil impairment on investments in 2016, 2017 and 2018, respectively. The impairment resulted from the deteriorating financial condition of Sindeo, of which company we held 11.03% equity interest, while Sindeo completed its wind-down procedure in 2017.

### Income Tax (Expenses) Benefit

Our effective tax rate was 17.3%, 56.8% and 11.2% in 2016, 2017 and 2018, respectively. The effective tax rate of 11.2% in 2018 was lower than the statutory income tax rate of 25% primarily because of (1) the effect of international tax rate differences in the amount of US$6.9 million, (2) non-deductible expenses in the amount of US$19.4 million, and (3) provision of withholding tax of PRC subsidiaries in the amount of US$11.7 million based on the dividend tax rate applied to the profits generated by these subsidiaries and expected to be distributed, partially offset by the effect of (1) preferential tax rates of certain PRC entities in the amount of US$6.6 million, and (2) reversal of previously recorded ASC740 (FIN48) income tax and interest liabilities in the amount of US$8.9 million, due to expiration of statutory limitation. In 2016 and 2017, we recorded changes in valuation allowances of US$30.9 million and US$8.8 million, respectively, primarily attributable to operating losses arising from entities operating online real estate brokerage service and not anticipating sufficient taxable income in foreseeable future.

*B. Liquidity and Capital Resources*

Historically, we have financed our liquidity requirements primarily through cash generated from operations, bank borrowings, convertible senior notes and equity financings. As of December 31, 2018, we had US$195.1 million in cash and cash equivalents, US$245.5 million in current portion of restricted cash and US$16.0 million in short-term investments with maturity dates greater than three months but less than one year, compared to US$228.3 million, US$223.0 million and US$55.8 million as of December 31, 2017, respectively. Of our cash and cash equivalents as of December 31, 2018, US$184.3 million was held inside the PRC and US$10.8 million was held outside of the PRC. See "Item 3.D. Key Information—Risk Factors—Risks related to doing business in China—We rely primarily on dividends and other distributions on equity paid by our subsidiaries, and any limitation on the ability of our subsidiaries to make payments to us could have a material adverse effect on our ability to conduct our business as well as our liquidity" and "—Government control of currency conversion may limit our ability to utilize our revenues effectively" for additional discussion. All of our investments with original stated maturities of 90 days or less are classified as cash and cash equivalents. All of our investments with original stated maturities of greater than 90 days and less than 365 days are classified as short-term investments. As of December 31, 2016, 2017 and 2018, we had short-term investments of US$42.9 million, US$55.8 million and US$16.0 million, respectively.

As of December 31, 2018, we had U.S. dollar-denominated short-term borrowings of US$220.0 million and RMB denominated short-term borrowings of US$77.8 million obtained from financial institutions in the United States and the PRC. These bank borrowings are secured by bank deposits of approximately US$245.5 million, placed with financial institutions in China. The cash deposits pledged for these bank borrowings could be released after we repay the bank borrowings in full. These pledged deposits are classified as restricted cash on our consolidated balance sheets. Certain of these bank borrowings included cross default provisions.

As of December 31, 2018, we had U.S.-dollar denominated long-term bank borrowings of US$65.4 million and RMB denominated long-term bank borrowings of US$57.8 million obtained from financial institutions in the United States and PRC, respectively.

These bank borrowings, which initially totaled US$421.0 million, were incurred to satisfy the operating needs of our company and our offshore subsidiaries outside of the PRC, including repurchase of convertible notes, property acquisitions, leasehold improvement and construction.

In December 2013 and January 2014, we sold an aggregate principal amount of US$350.0 million and US$50.0 million, respectively, of convertible senior notes due 2018 (the "2018 Notes"). The 2018 Notes were offered to qualified institutional buyers pursuant to Rule 144A under the Securities Act and certain non-U.S. persons in compliance with Regulation S under the Securities Act. The 2018 Notes may be converted, under certain circumstances, based on the current conversion rate of 50.9709 ADSs per US$1,000 principal amount of 2018 Notes (after the five-for-one ADS ratio change effected in April 2014 and dividend distributions in August 2014 and March 2015, respectively), which is equivalent to a conversion price of approximately US$19.62 per ADS. The net proceeds to us from the issuance of the 2018 Notes were US$390.5 million. We are required to pay cash interest at an annual rate of 2.00% on the 2018 Notes. Interest is payable semiannually in arrears on June 15 and December 15 of each year, beginning on June 15, 2014. We incurred debt issuance costs of US$9.5 million, which are being amortized to interest expense to the first put date of the 2018 Notes. On November 15, 2016, our company delivered a notice of repurchase right at the option of the holder to the holders of the 2018 Notes. Upon completion of the repurchase on December 15, 2016, an aggregate principal amount of US$394.3 million of the notes was tendered for repurchase, representing approximately 98.6% of the outstanding principal amount of the 2018 Notes prior to such repurchase. The 2018 Notes matured in December 2018.

In September and November 2015, we sold an aggregate principal amount of U$100.0 million and US$200.0 million, respectively, of convertible notes due 2022 (the "2022 Notes"). The 2022 Notes were offered to certain non-U.S. persons in compliance with Regulation S under the Securities Act. The 2022 Notes may be converted, under certain circumstances, based on the current conversion rate of 27.9086 Class A ordinary shares per US$1,000 principal amount of the 2022 Notes, which is equivalent to a conversion price of approximately US$35.83 per Class A ordinary share or approximately US$7.166 per ADS. The net proceeds to us from the issuance of the 2022 Notes were US$300.0 million. We are required to pay cash interest at an annual rate of 1.5% on the 2022 Notes. Interest is payable semiannually in arrears on March 31 and September 30 of each year, beginning on March 31, 2016. We incurred debt issuance costs of US$1.1 million, which are being amortized to interest expense to the first put date of the 2022 Notes. In October 2018, we repurchased a total of US$50 million of the 2022 Notes, representing approximately 25% of the outstanding principal amount of the 2022 Notes prior to such repurchase, for a consideration of US$38.9 million, and the difference was recorded in convertible notes as unamortized premium.

The notes are senior unsecured obligations and rank (1) senior in right of payment to any of our indebtedness that is expressly subordinated in right of payment to the relevant notes, (2) equal in right of payment to any of our unsecured indebtedness that is not so subordinated, (3) effectively junior in right of payment to any of our secured indebtedness to the extent of the value of the assets securing such indebtedness, and (4) structurally junior to all indebtedness and other liabilities (including trade payables) of our subsidiaries and consolidated controlled entities.

We believe that our working capital is sufficient for our present requirements. We may, however, seek additional cash resources due to changed business conditions or other future developments, including selling debt securities or additional equity securities or obtaining credit facilities to meet our cash needs. See "Item 3.D. Key Information—Risks Factors— Risks related to our ADSs, ordinary shares and notes—We may need additional capital, and the sale of additional ADSs, notes or other equity securities could result in additional dilution to our shareholders, while the incurrence of debt may impose restrictions on our operations."

**Cash Flows**

The following table sets forth information regarding our cash flows for the periods indicated:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2016** | **2017** | **2018** |
|  | (US$ in thousands) | | |
| **Consolidated statements of cash flows data** |  |  |  |
| Net cash generated from operating activities | 131,240 | 126,889 | 55,005 |
| Net cash used in investing activities | (127,946) | (284,512) | (106,665) |
| Net cash generated from (used in) financing activities | (347,334) | 71,969 | 34,700 |
| Net decrease in cash, cash equivalents and restricted cash | (373,488) | (56,352) | (43,688) |
| Cash, cash equivalents and restricted cash at beginning of year | 921,000 | 547,612 | 491,260 |
| Cash, cash equivalents and restricted cash at end of year | 547,612 | 491,260 | 447,572 |

*The Accounting Standards Update ("ASU") 2016-18 Statement of Cash Flows (Topic 230) required that restricted cash should be included with cash and cash equivalents when reconciling the beginning-of-period and end-of-period total amounts shown on the statement of cash flows. The guidance was effective as of January 1, 2018 and we applied it using a retrospective transition method to each period presented. The adoption of this guidance changed the presentation and classification of restricted cash in our consolidated statements of cash flows. For the years ended December 31, 2016 and 2017, substantially all of the changes in restricted cash of US$107.9 million and US$51.9 million, respectively, were previously reported as part of financing activities in the statement of cash flows.

*Net Cash Generated from Operating Activities*

We had net cash generated from operating activities of US$55.0 million in 2018, which was primarily attributable to non-cash adjustments of (1) change in fair value of securities in amount of US$165.9 million, (2) the depreciation and amortization expense of US$26.7 million and (3) allowance for doubtful accounts of US$24.6 million, partially offset by (1) net loss of US$114.9 million, and (2) a decrease of US$42.9 million in accrued expenses and other liabilities primarily due to a decrease in the amount payable to sales and marketing agents and payroll payables.

We had net cash generated from operating activities of US$126.9 million in 2017, which was primarily attributable to (1) our net income of US$16.3 million during this period, (2) a decrease in loans receivable of US$45.7 million provided to property buyers, real estate developers and other borrowers primarily as a result of bank loans deposited at relevant banks to secure our loans and (3) an increase of deferred revenue of US$30.3 million primarily as a result of an increase in advance from customers, partially offset by (1) a decrease of US$39.3 million in accrued expenses and other liabilities primarily due to a decrease in accrued unrecognized tax benefits and (2) a decrease in customers' refundable fees of US$22.7 million.

We had net cash generated from operating activities of US$131.2 million in 2016, which was primarily attributable to a decrease in loans receivable of US$251.0 million provided to property buyers, real estate developers and other borrowers primarily as a result of bank loans deposited at relevant banks to secure our loans, partially offset by (1) our net loss of US$169.6 million, (2) a decrease in customers' refundable fees of US$27.6 million and (3) a decrease in accrued expenses and other liabilities of US$17.6 million.

*Net Cash Used in Investing Activities*

Our net cash used in investing activities was US$106.7 million in 2018, primarily attributable to (1) acquisition of short -term investment of US$721.7 million, (2) origination of loans receivable of US$134.8 million, (3) acquisition of property and equipment of US$96.1 million and (4) acquisition of long-term investments of US$84.5 million, partially offset by (1) proceeds from short-term investments of US$759.7 million, (2) repayment of loans receivable of US$149.5 million and (3) proceeds from government in connection with the purchase of land use right of US$14.4 million.

Our net cash used in investing activities was US$284.5 million in 2017, primarily attributable to (1) acquisition of short -term investment of US$383.6 million, (2) origination of loans receivable of US$212.8 million, (3) deposits for non- current assets of US$55.5 million, partially offset by (1) proceeds from maturity of fixed-rate time deposits of US$373.4 million and (2) repayment of loans receivable of US$86.9 million.

Our net cash used in investing activities was US$127.9 million in 2016, primarily attributable to (1) deposits for non-current assets of US$128.6 million, (2) acquisition of fixed-rate time deposits of US$73.8 million and (3) acquisition of property and equipment of US$24.6 million, partially offset by (1) proceeds from maturity of fixed-rate time deposits of US$90.0 million and (2) proceeds from disposal of an available-for-sale security of US$13.1 million.

*Net Cash Generated from (Used in) Financing Activities*

Our net cash generated from financing activities was US$4.7 million in 2018, primarily due to (1) proceeds of US$36.3 million from short term loans and (2) proceeds of US$66.8 million from long term loans, partially offset by (1) redemption of convertible senior notes in amount of US$44.6 million and (2) repayment of US$26.9 million loans.

Our net cash generated from financing activities was US$72.0 million in 2017, primarily due to proceeds from long-term loans of US$111.5 million, partially offset by repayment of loans of US$44.0 million.

Our net cash used in financing activities was US$347.3 million in 2016, primarily due to (1) redemption of US$394.3 convertible senior notes million 2018 Notes, (2) repayment of US$182.4 million short-term loans and (3) repurchase of US$136.6 million ordinary shares, partially offset by (1) proceeds of US$296.6 million from short-term loans and (2) proceeds of US$67.7 million from long-term loans.

**Capital Expenditures**

Our capital expenditures were US$104.6 million, US$100.1 million and US$96.1 million in 2016, 2017 and 2018, respectively. There are also constructions as well as development and renovation needs. We bought more land and properties. We expect our capital expenditures to increase in the future as our business continues to develop and expand as we make further improvements to our websites and our services.

**Inflation**

According to the National Bureau of Statistics of China, the change in the consumer price index in China was 2.1%, 1.6% and 2.1% in 2016, 2017 and 2018, respectively. Recent inflation has not had a material impact on our results of operations. However, we cannot assure you that we will not be adversely affected by inflation or deflation in China in the future.

**C. Research and Development, Patents and Licenses, etc.**

We have a team of experienced engineers who are primarily based at our headquarters in Beijing. We recruit most of our engineers locally and have established various recruiting and training programs with leading universities in China. We compete aggressively for engineering talent to help us address challenges such as Chinese language processing, information retrieval and high performance computing. In each of 2016, 2017 and 2018, our research and development expenditures, including share-based compensation expenses for research and development staff, were US$45.8 million, US$39.0 million and US$32.0 million, respectively, representing 5.0%, 8.8% and 10.6% of our total revenues for the same periods.

**D. Trend Information**

See "—A. Operating Results" of this Item 5 and "Item 3.D. Key Information—Risk Factors" of this annual report.

**E. Off-Balance Sheet Arrangements**

We do not currently have any material outstanding off-balance sheet arrangements or commitments. We have No plans to enter into transactions involving, or otherwise form relationships with, unconsolidated entities or financial partnerships established for the purpose of facilitating off-balance sheet arrangements or commitments.

**F. Tabular Disclosure of Contractual Obligations**

The following table sets forth our contractual obligations as of December 31, 2018:

| | | Payment due by period* | | |
|---|---|---|---|---|
| | **Total** | **Less than one year** | **One to three years** | **Three to five years** | **More than five years** |
| | | | (US$ in thousands) | | |
| Convertible senior notes with principal and interest | 265,019 | 3,563 | 261,456 | - | - |
| Operating lease commitments | 6,802 | 4,368 | 2,379 | 55 | - |
| Capital commitment | 10,665 | 10,665 | - | - | - |
| Loan principal and interest expense obligation | 466,303 | 312,395 | 34,719 | 28,429 | 90,760 |

---

\* Our estimated liability for unrecognized tax benefits is included in other non-current liabilities. As of December 31, 2018, we had gross accrued unrecognized tax benefits and related interest and penalties of US$137.9 million. As we are currently unable to make a reasonably reliable estimate of the possible change and the timing of payments in individual years in connection with these tax liabilities, such amounts were not included in the contractual obligation table.

Our 2022 Notes will mature in September and November 2022, respectively, unless earlier repurchased or converted into our ADSs based on the current conversion rate of 27.9086 Class A ordinary shares per US$1,000 principal amount of the 2022 Notes, which is equivalent to a conversion price of approximately US$35.83 per Class A ordinary share or approximately US$7.166 per ADS. The conversion rate is subject to certain corporate events. The interest is payable semiannually in arrears on March 31 and September 30 of each year, beginning on March 31, 2016.

Our payments under operating leases are expensed on a straight-line basis over the periods of the respective leases. Our lease arrangements have No renewal options, rent escalation clauses, restrictions or contingent rents and are all conducted with third parties, except for the building leased from a related party as disclosed in Note 19 to our consolidated financial statements included elsewhere in this annual report. In 2016, 2017 and 2018, total rental expenses for all operating leases were US$66.3 million, US$22.6 million and US$9.7 million, respectively.

Our sublease rental income for 2018 was US$6,402. Future minimum sublease receipts payments expected to be received under non-cancellable sublease agreements as of December 31, 2018 was US$1,222.

Our loan principal and interest expense obligations relate to our U.S.-dollar denominated bank borrowings of US$307,917 and RMB denominated bank borrowings of US$158,386 obtained from financial institutions in the United States and PRC. US$285,427 of bank borrowings are secured by bank deposits of approximately US$252,464 placed with financial institutions in China. These pledged deposits are classified as restricted cash on our consolidated balance sheets.

US$204,218 of bank borrowings were secured by building and construction in progress as of December 31, 2018.

Our capital commitments relate primarily to the construction project of a building in Hangzhou and Tianjin, respectively. These properties will be used as our new branch offices.

**G. Safe Harbor**

See "Forward-Looking Statements."

### ITEM 6. DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES

#### A. Directors and Executive Officers

The following table sets forth certain information relating to our directors and executive officers as of the date of this annual report. The business address of each of our directors and executive officers is Tower A, No. 20 Guogongzhuang Middle Street, Fengtai District, Beijing 100070, the People's Republic of China.

| Name | Age | Position |
|------|-----|----------|
| Vincent Tianquan Mo | 55 | Executive chairman of the board of directors |
| Jian Liu | 43 | Chief executive officer |
| Qian Zhao | 50 | Independent director |
| Sam Hanhui Sun | 46 | Independent director |
| Shaohua Zhang | 55 | Independent director |
| Zhizhi Gong | 39 | Director |
| Frank Hua Lei | 39 | Chief investment officer |
| Zijin Li | 34 | Acting chief financial officer and board secretary |
| Zhihong Zhang | 48 | Chief operations officer |

*Vincent Tianquan Mo* is our founder and has served as our executive chairman of our board of directors since 1999. Mr. Mo had served as our chief executive officer from August 2014 to January 2019. Prior to founding our company, Mr. Mo served as an executive vice president at Asia Development and Finance Corporation from 1996 to 1998 and a general manager for Asia at Teleres, a venture of Dow Jones &Co. and AEGON USA to provide online commercial real estate information services, from 1994 to 1996. He currently serves as a director on the board of directors of Hopefluent Group Holdings Limited, a Hong Kong-listed company, and is the secretary general of the China Real Estate Index System, a real estate research publication operated by us. Mr. Mo holds a bachelor's degree in engineering from South China University of Technology, a master of science degree in business administration from Tsinghua University and a master of arts degree in economics from Indiana University. Mr. Mo is the uncle of Mr. Richard Jiangong Dai, who is a director of our company (until February 2016 when he resigned) and our former president and chief executive officer.

*Jian Liu* has served as our chief executive officer since January 2019. Mr. Liu joined us in April 2000 and was appointed from our chief operations officer to our president on July 1, 2016. Mr. Liu was also our first chief information officer. Prior to joining us, Mr. Liu worked at the information center of Ningbo Economic Committee in Zhejiang Province. Mr. Liu holds a bachelor's degree in computer science from Ningbo University.

*Qian Zhao* has served as an independent director of our company and chairman of our nominating and corporate governance committee since September 2010. Mr. Zhao is a founding partner of CXC China Sustainable Growth Fund, a private equity fund that makes investments in China-based companies. Mr. Zhao was a lawyer by training and is admitted to practice law in both China and New York. Mr. Zhao co-founded Haiwen & Partners in 1992, a preeminent China corporate finance law firm in Beijing. He worked in Sullivan & Cromwell's New York office from 1998 to 2000 and Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates' Beijing office from 2000 to 2003. Mr. Zhao is currently an independent director of Trina Solar Limited, a New York Stock Exchange-listed company. Mr. Zhao was a managing director of CXC Capital, Inc., which was the management company of CXC China Sustainable Growth Fund form 2008 to 2011, and president of Camelot Information Systems Inc., a company listed on NASDAQ, from 2011 to 2013. Mr. Zhao was the general counsel and chief investment officer of BGI Shenzhen from 2014 to 2015. Mr. Zhao received a J.D. degree from the New York University School of Law in 1998 and an LL.B degree from University of International Business & Economics, Beijing, in 1990.

*Sam Hanhui Sun* has served as an independent director of our company and chairman of our audit committee since September 2010. Mr. Sun currently serves as an independent director and audit committee chair of Yirendai Ltd., a New York Stock Exchange-listed company, and an independent director and audit committee chair of CAR Inc., a Hong Kong Stock Exchange-listed company. From January 2010 to September 2015, Mr. Sun assumed a couple of positions at Qunar Cayman Islands Limited, a company listed on NASDAQ, including serving as Qunar's president from May 2015 to September 2015 and its chief financial officer from January 2010 to April 2015. He was chief financial officer of Beijing Ruifeng Co. Ltd. from May 2009 to September 2009 and KongZhong Corporation, a Nasdaq-listed company, from February 2007 to April 2009. Mr. Sun was also an independent director and audit committee member of KongZhong Corporation from July 2005 through January 2007. From 2004 to 2007, Mr. Sun took various financial controller roles at Microsoft China R&D Group, Maersk China Co. Ltd. and our company. From 1995 to 2004, Mr. Sun worked in KPMG's auditing practice, including eight years at KPMG in Beijing where he was an audit senior manager, and two years at KPMG in Los Angeles, California. Mr. Sun earned a bachelor's degree in business administration from the Beijing Institute of Technology in 1993. He is a Certified Public Accountant in China.

*Shaohua Zhang* has served as an independent director of our company and a member of our audit committee since August 2018. Mr. Zhang served as an executive director and the general manager of Shun Cheong Holdings Ltd. (currently known as IDG Energy Investment Limited), a company listed on the Hong Kong Stock Exchange (stock code: 0650), from March 2008 to August 2016. He was an independent non-executive director of Shun Cheong Holdings Ltd. from September 2006 to March 2008. Mr. Zhang is an entrepreneur with over 20 years of experience in starting up, developing and managing businesses in various industries. Mr. Zhang founded Beijing Beyondal Electric Co., Ltd. and has been the managing director since 2003, a company with a good market share in setting up internet data centers in China. He also served as the general manager of GE Digital Energy (China). Mr. Zhang received a bachelor's degree in science from China University of Technology in 1985 and a master's degree in economics (majoring in business administration) from the Capital University of Economics and Business in 1988.

*Zhizhi Gong* has served as a director of our company since May 2016. Ms. Gong is a managing director of the Carlyle Group where she focuses on Asia private equity investment and buyout opportunities. She joined the Carlyle Group in 2010 and is based in Beijing. Ms. Gong also serves as chairwoman of the supervisory board of Focus Media Information Technology Co., Ltd., a company listed on the Shenzhen Stock Exchange. In 2015, Ms. Gong was also a member of the board of directors of Natural Beauty BioTechnology Limited, a company listed on the Hong Kong Stock Exchange. Prior to joining the Carlyle Group, Ms. Gong was a principal at Apax Partners, where she was a founding member of the Greater China team. Prior to that, Ms. Gong worked at the investment banking department at China International Capital Corporate Limited. Ms. Gong received her M.B.A. from Harvard Business School and B.A. in economics from Peking University.

*Frank Hua Lei* has served as our chief investment officer since January 2019. Mr. Lei had served as the acting chief financial officer of our company since September 2016 and as our chief financial officer from November 2016 to January 2019. He joined us in 2009 and has accumulated extensive experience across multiple functions in our company. Prior to the recent appointments, Mr. Lei had been the managing director of our company's investment management division and the deputy chief financial officer in 2015 and 2014, respectively. Mr. Lei holds a Ph.D. in finance from University of the West of England in the United Kingdom, a Master degree in banking and finance from Loughborough University in the United Kingdom and a Bachelor degree in economics from Beijing Forestry University in China.

*Zijin Li* has served as our acting chief financial officer and board secretary since January 2019. Mr. Li joined us in 2018 as a senior director in charge of reporting and internal control, and then served as our deputy chief financial officer. Prior to joining us, Mr. Li worked for Aofan International Group in Australia for 10 years in financial management positions and worked for Fenghui Leasing Ltd. in China for 3 years as its General Manager of Finance Department. Mr. Li holds a master's degree and a bachelor's degree from Sydney University of Technology.

*Zhihong Zhang* has served as our chief operations officer since July 2016. Ms. Zhang served as senior vice president of our company from April 2016 to July 2016 and was in charge of the financial and operation optimization. Prior to that, she served as the financial director, vice president of the resale group and vice president of the sales department of our company. She holds an MBA degree from China Foreign Economic and Trade University.

**B. Compensation**

**Compensation of Directors and Executive Officers**

Our executive directors and executive officers receive compensation in the form of salaries, annual bonuses and share options. Our independent directors receive annual compensation in connection with the performance of their duties. All directors receive reimbursements from us for expenses necessarily and reasonably incurred by them for providing services to us or in the performance of their duties. We have entered into service contracts with our executive officers. None of these service contracts provide benefits to our directors and executive officers upon termination.

In 2018, we paid aggregate cash compensation of approximately US$0.8 million to our directors and executive officers as a group. We do not pay or set aside any amounts for pension, retirement or other similar benefits for our officers and directors.

***Share Options***

*1999 Stock Incentive Plan*

At a meeting held on September 1, 1999, our board of directors reserved a total of 12.0% of our fully diluted share capital for issuance upon the exercise of options to be granted to our executive directors, officers and employees or their affiliated entities from time to time. On September 1, 1999, our shareholders approved the stock-related award incentive plan (the "1999 Stock Incentive Plan"). The number of options awarded to a person was based on the person's potential ability to contribute to our success, the person's position with us and other factors deemed relevant and necessary by our board of directors. Under the 1999 Stock Incentive Plan, we awarded to several of our employees and directors options to purchase 10,226,275 ordinary shares of our company. As of December 31, 2018, options to purchase 2,868,681 ordinary shares remained outstanding. Options generally do not vest unless the grantee remains under our employment or in service with us on the given vesting date. However, the 1999 Stock Incentive Plan provides that in circumstances where there is a change in the control of our company, if No substitution or assumption is provided by the successor corporation, the outstanding options will automatically vest and become exercisable for a period of 30 days, after which such options will terminate. The termination date for the options granted is 10 years after the date of grant.

*a. Standard Stock Options*

From September 1, 1999 to September 30, 2006, we awarded standard stock options exercisable to acquire Class A or Class B ordinary shares of our company. All standard stock options were granted to employees and directors and vested over the requisite service periods of three to four years using a graded vesting. The maturity life of the standard stock options was 10 years originally. On April 20, 2010, our board of directors resolved to extend the maturity life of the standard stock option 10 years to 15 years.

From 2001 to 2003, we awarded 1,739,500 standard stock options, classified as liability awards, with exercise prices ranging from HK$1.00 to HK$5.00. In April 2010, we agreed with the grantees to modify the Hong Kong dollar exercise currency to U.S. dollars. The modified exercise prices of these options range from US$0.13 to US$0.64.

*b. Special Stock Options*

We have awarded 16,229,375 special stock options to our employees and directors, with exercise prices ranging from US$2.50 to US$5.31, since December 31, 2006. Terms for special stock options are the same as standard stock options, except that two special stock options are exercisable into one Class A ordinary share. These special stock options vest 10.0% after the first year of service, 20% after the second year of service, 40.0% after the third year of service and 30.0% after the fourth year of service, except for special stock options granted in September 2010, which vest 20.0% after the first year of service, 20.0% after the second year of service, 30.0% after the third year of service and 30.0% after the fourth year of service. The maturity life of the special stock options is 10 years.

In 2018, we approved to extend the expiration date of an aggregate number of 518,175 share options granted under the 1999 Stock Incentive Plan to certain employees for a term of period ranging from two days to nine years. These stock options had expired prior to December 31, 2017. The awards granted were fully vested as of the extension date. These transactions were accounted for as new grant. The total incremental share-based compensation of US$2.8 million resulting from such new grant is fully recognized in 2018.

Our board of directors may amend, alter, suspend or terminate the 1999 Stock Incentive Plan at any time, provided, however, that our board of directors must first seek the approval of our shareholders and, if such amendment, alteration, suspension or termination would adversely affect the rights of an optionee under any option granted prior to that date, the approval of such optionee. Without further action by our board of directors, our 1999 Stock Incentive Plan has No specified termination date.

*2010 Stock Incentive Plan*

We adopted our 2010 stock incentive plan (the "2010 Stock Incentive Plan") on August 4, 2010.The purpose of our 2010 Stock Incentive Plan is to recognize and acknowledge the contributions made to our company by eligible participants and to promote the success of our business. By providing an opportunity to have a personal stake in our company, our 2010 Stock Incentive Plan aims to:

·   attract and retain the best available personnel;

·   to provide an additional incentive to our employees, directors and consultants; and

·   to promote the success of our business.

As of March 31, 2019, we had awarded options to purchase8,969,792 of our ordinary shares under the 2010 Stock Incentive Plan, with an exercise price per share ranging from US$10.63 to US$30.00.

*a. Eligible Participants*

Under the 2010 Stock Incentive Plan, our board of directors or its designated committee may, at its discretion, offer to grant an option to subscribe for such number of our ordinary shares at an exercise price as our directors may determine to the following parties:

·   any full-time or part-time employees, executives or officers of us, our parent or any of our subsidiaries;

· any directors, including non-executive directors and independent non-executive directors, of us, our parent or any of our subsidiaries;

· any advisers, consultants and agents to us or any of our subsidiaries; and

· such other persons who, in the sole opinion of our board of directors or its designated committee, has made contributions to the business or other development of us.

*b. Maximum Number of Ordinary Shares*

The maximum number of ordinary shares in respect of which options may be granted (including ordinary shares in respect of which options, whether exercised or still outstanding, have already been granted) under the 2010 Stock Incentive Plan may not in the aggregate exceed 10.0% of the total number of ordinary shares in issue from time to time, including ordinary shares issuable upon conversion of any preferred shares in issue from time to time. As of March 31, 2019, there were outstanding options to purchase 2,813,851 of our ordinary shares under the 2010 Stock Incentive Plan, of which options to purchase 2,141,786 ordinary shares were exercisable.

*c. Price of Ordinary Shares*

The determination by our board of directors, or its designated committee, of the exercise price will be by reference to the fair market value of the ordinary shares, and the exercise price may be the same as, higher, or lower than the fair market value, except for options or awards which are incentive stock options or subject to Rule 409A of the Internal Revenue Code. If there exists a public market for our ordinary shares, including our ADSs, the fair market value of our ordinary shares will be (1) the closing price for the last market trading day prior to the time of the determination (or, if No closing price was reported on that date, on the last trading date on which a closing price was reported) on the stock exchange determined by our board of directors, or its designated committee, to be the primary market for our ordinary shares or ADSs, or (2) if the ordinary shares are not traded on any such exchange or national market system, the average of the closing bid and asked prices of an ordinary shares on the New York Stock Exchange for the day prior to the time of the determination (or, if not such prices were reported on that date, on the last date on which such prices were reported), in each case, as reported in The Wall Street Journal or such other source as the board of directors or its designated committee deems reliable. If there is No established market for our ordinary shares, our board of directors, or its designated committee, will determine the fair market value of our ordinary shares in good faith by reference to the placing price of the latest private placement of our ordinary shares and the development of our business operations since such latest private placement.

*d. Performance Criteria*

The 2010 Stock Incentive Plan allows our board of directors, or its designated committee, to establish the performance criteria when granting stock options on the basis of any one of, or combination of, increase in our share price, earnings per share, total shareholder return, return on equity, return on assets, return on investment, net operating income, cash flow, revenue, economic value-added, personal management objectives, or other measures of performance selected by our board of directors, or its designated committee. Partial achievement of the specified criteria may result in a vesting corresponding to the degree of achievement as specified in the award agreement with the relevant optionee.

*e. Time of Exercise of Options*

The time and conditions under which an option may be exercised will be determined by the board of directors, or its designated committee, under the terms of the 2010 Stock Incentive Plan and as specified in the award agreement with a grantee. Notwithstanding the foregoing, in the case of any options granted to an officer, director or consultant that may become exercisable, the award agreement governing such grant may provide that the options may become exercisable, subject to reasonable conditions such as the officer, director or consultant's continuous service at any time or during any period established in the award agreement governing such grant.

*f. Administration*

Our board of directors has established a stock option committee, comprised of a single member, Mr. Mo, to administer the 2010 Stock Incentive Plan with respect to option grants to non-officer/director employees as well as consultants. Our compensation committee has the authority under the 2010 Stock Incentive Plan to determine stock option grants to our officers and directors.

*g. Termination*

Unless terminated earlier, the 2010 Stock Incentive Plan will continue for a term of 10 years. Our board of directors has the authority to amend or terminate the 2010 Stock Incentive Plan subject to shareholder approval with respect to certain amendments. However, No such action may impair the rights of any grantee of any options unless agreed by the grantee.

*2015 Stock Incentive Plan*

We adopted our 2015 stock incentive plan (the "2015 Stock Incentive Plan") on July 3, 2015. The purpose of our 2015 Stock Incentive Plan is to recognize and acknowledge the contributions made to our company by eligible participants and to promote the success of our business. By providing an opportunity to have a personal stake in our company, our 2015 Stock Incentive Plan aims to:

- attract and retain the best available personnel;

- to provide an additional incentive to our employees, directors and consultants; and

- to promote the success of our business.

As of March 31, 2019, we had awarded options to purchase 1,570,200 of our ordinary shares under the 2015 Stock Incentive Plan, with an exercise price per share ranging from US$18.1 to US$27.2, and granted 1,675,570 restricted shares.

*a. Eligible Participants*

Under our 2015 Stock Incentive Plan, our board of directors or its designated committee may, at its discretion, offer to grant an option to subscribe for such number of our ordinary shares at an exercise price as our directors may determine to the following parties:

- any full-time or part-time employees, executives or officers of us, our parent or any of our subsidiaries;

· any directors, including non-executive directors and independent non-executive directors, of us, our parent or any of our subsidiaries;

· any advisers, consultants and agents to us or any of our subsidiaries; and

· such other persons who, in the sole opinion of our board of directors or its designated committee, has made contributions to the business or other development of us.

*b. Maximum Number of Ordinary Shares*

The maximum number of ordinary shares in respect of which options may be granted for each fiscal year during which the 2015 Stock Incentive Plan is effective may be up to 1.5% of our outstanding ordinary shares as of the last day of the previous fiscal year. As of March 31, 2019, there were outstanding options to purchase 396,200 of our ordinary shares under the 2015 Stock Incentive Plan, of which options to purchase 146,380 ordinary shares were exercisable.

*c. Price of Ordinary Shares*

The determination by our board of directors, or its designated committee, of the exercise price will be by reference to the fair market value of the ordinary shares, and the exercise price may be the same as, higher, or lower than the fair market value, except for options or awards which are incentive stock options or subject to Rule 409A of the Internal Revenue Code. If there exists a public market for our ordinary shares, including our ADSs, the fair market value of our ordinary shares will be (1) the closing price for the last market trading day prior to the time of the determination (or, if No closing price was reported on that date, on the last trading date on which a closing price was reported) on the stock exchange determined by our board of directors, or its designated committee, to be the primary market for our ordinary shares or the New York Stock Exchange, whichever is applicable, or (2) if the Ordinary Shares are not traded on any such exchange or national market system, the average of the closing bid and asked prices of an ordinary share on the New York Stock Exchange for the day prior to the time of the determination (or, if No such prices were reported on that date, on the last date on which such prices were reported), in each case, as reported in The Wall Street Journal or such other source as the board of directors or its designated committee deems reliable. If there is No established market for our ordinary shares, our board of directors, or its designated committee, will determine the fair market value of our ordinary shares in good faith by reference to the placing price of the latest private placement of our ordinary shares and the development of our business operations since such latest private placement.

*d. Performance Criteria*

The 2015 Stock Incentive Plan allows our board of directors, or its designated committee, to establish the performance criteria when granting stock options on the basis of any one of, or combination of, increase in our share price, earnings per share, total shareholder return, return on equity, return on assets, return on investment, net operating income, cash flow, revenue, economic value-added, personal management objectives, or other measures of performance selected by our board of directors, or its designated committee. Partial achievement of the specified criteria may result in a vesting corresponding to the degree of achievement as specified in the award agreement with the relevant optionee.

*e. Time of Exercise of Options*

The time and conditions under which an option may be exercised will be determined by the board of directors, or its designated committee, under the terms of the 2015 Stock Incentive Plan and as specified in the award agreement with a grantee. Notwithstanding the foregoing, in the case of any options granted to an officer, director or consultant that may become exercisable, the award agreement governing such grant may provide that the options may become exercisable, subject to reasonable conditions such as the officer, director or consultant's continuous service at any time or during any period established in the award agreement governing such grant.

*f. Dissolution, Liquidation or Change in Control*

In the event of the proposed dissolution or liquidation of our company, our board of directors, or its designated committee, will notify the grantee as soon as practicable prior to the effective date of such proposed transaction. Any options will terminate immediately prior to the consummation of such proposed action. In the event of a change in control or a merger of our company, each option may be assumed or an equivalent stock option or right may be substituted by the successor corporation. In the event that No such substitution or assumption occurs, the outstanding options will automatically vest and become exercisable for a limited period of time as determined by our board of directors, or its designated committee, and such options will terminate upon the expiration of such period.

*g. Termination*

Unless terminated earlier, the 2015 Stock Incentive Plan will continue for a term of five years. Our board of directors has the authority to amend or terminate the 2015 Stock Incentive Plan subject to shareholder approval with respect to certain amendments. However, No such action may impair the rights of any grantee of any options unless agreed by the grantee.

The following table summarizes, as of the date of this annual report, the outstanding options and restricted shares that we granted to our current directors and executive officers:

**Share options**

| Name | Number of Class A ordinary shares to be issued upon exercise of options | Number of Class B ordinary shares to be issued upon exercise of options | Exercise price per ordinary share (US$) | Date of grant | Date of expiration |
|---|---|---|---|---|---|
| Media Partner / Mr. Mo(1) | 112,500 | — | 5.00 | December 30, 2018 | December 30, 2026 |
| | 112,500 | — | 5.00 | December 30, 2018 | December 30, 2027 |
| | 112,500 | — | 5.00 | December 30, 2018 | December 30, 2028 |
| | 112,500 | — | 10.00 | December 31, 2009 | December 30, 2019 |
| | 500,000 | — | 10.625 | September 17, 2010 | September 16, 2020 |
| | 75,000 | — | 12.80 | August 15, 2012 | August 14, 2022 |
| | 50,000 | — | 14.65 | December 1, 2016 | December 1, 2026 |
| Next Decade / Mr. Mo(1) | — | 1,754,500 | 5.00 | September 30, 2006 | September 29, 2021 |
| | 112,500 | — | 5.00 | December 30, 2018 | December 30, 2026 |
| | 112,500 | — | 5.00 | December 30, 2018 | December 30, 2027 |
| | 112,500 | — | 5.00 | December 31, 2008 | December 30, 2028 |
| | 112,500 | — | 5.00 | December 31, 2009 | December 30, 2019 |
| | 500,000 | — | 10.625 | September 17, 2010 | September 17, 2020 |
| | 75,000 | — | 12.80 | August 15, 2012 | August 14, 2022 |
| | 50,000 | — | 14.65 | December 1, 2016 | December 1, 2026 |
| Qian Zhao | * | — | 30.00 | March 31, 2015 | March 31, 2025 |
| | * | — | 27.2 | February 25, 2016 | February 24, 2026 |
| Sam Hanhui Sun | * | — | 30.00 | March 31, 2015 | March 31, 2025 |
| | * | — | 27.2 | February 25, 2016 | February 24, 2026 |

112

| Name | Number of Class A ordinary shares to be issued upon exercise of options | Number of Class B ordinary shares to be issued upon exercise of options | Exercise price per ordinary share (US$) | Date of grant | Date of expiration |
|---|---|---|---|---|---|
| Jian Liu | * | — | 10.625 | September 17, 2010 | September 16, 2020 |
| | * | — | 12.80 | July 26, 2012 | August 14, 2022 |
| | * | — | 27.2 | February 25, 2016 | February 24, 2026 |
| Frank Hua Lei | * | — | 10.00 | December 31, 2009 | December 30, 2019 |
| | * | — | 10.625 | September 17, 2010 | September 16, 2020 |
| | * | — | 12.8 | July 26, 2012 | July 25, 2022 |
| | * | — | 14.65 | December 1, 2016 | December 1, 2026 |
| Zhihong Zhang | * | — | 10.625 | September 17, 2010 | September 16, 2020 |
| | * | — | 12.80 | July 26, 2012 | July 25, 2022 |
| | * | — | 14.65 | December 1, 2016 | December 1, 2026 |

---

\* Upon exercise of all options granted, would beneficially own less than 1.0% of our outstanding ordinary shares.

(1) Represents options granted to Mr. Mo in his capacity as our executive chairman. Pursuant to resolutions passed by our board of directors on August 4, 2010, our board of directors resolved that such options be assigned and allocated to Media Partner and Next Decade.

### Restricted shares

| Name | Restricted Shares | Date of grant | Date of expiration |
|---|---|---|---|
| Media Partner / Mr. Mo[1] | 138,188 | August 29, 2017 | August 28, 2027 |
| Next Decade / Mr. Mo[1] | 138,188 | August 29, 2017 | August 28, 2027 |
| Jian Liu | 61,253 | August 29, 2017 | August 28, 2027 |
| Frank Hua Lei | 22,500 | August 29, 2017 | August 28, 2027 |
| Zhihong Zhang | 30,000 | August 29, 2017 | August 28, 2027 |

---

(1) Represents restricted shares granted to Mr. Mo in his capacity as our executive chairman.

### C. Board Practices

### Board of Directors

Our board of directors currently consists of five members. A director is not required to hold any shares in our company by way of qualification. A director may vote with respect to any contract or transaction in which he or she is materially interested provided the nature of the interest is disclosed prior to its consideration and any vote on such contract or transaction. Our board of directors may exercise all the powers of the Company to borrow money, mortgage its business, property and uncalled capital, and issue debentures or other securities whenever money is borrowed or as security for any obligation of the company or of any third party. None of our non-executive directors has a service contract with us that provides for benefits upon termination of employment.

113

***Duties of Directors***

Under Cayman Islands law, our directors have a duty of loyalty to act honestly in good faith with a view to our best interests. Our directors also have a duty to exercise the care, diligence and skills that a reasonably prudent person would exercise in comparable circumstances. In fulfilling their duty of care to us, our directors must ensure compliance with our fifth amended and restated memorandum and articles of association. We have, in certain circumstances, the right to seek damages against our directors if a duty owed by our directors is breached.

Our board of directors has overall responsibility for managing our operations. The functions and powers of our board of directors include, among others:

· convening shareholders' meetings and reporting its work to shareholders at such meetings;

· implementing shareholders' resolutions;

· determining our business plans and investment proposals;

· formulating our profit distribution plans and loss recovery plans;

· determining our debt and finance policies and proposals for the increase or decrease in our registered capital and the issuance of debentures;

· formulating our major acquisition and disposition plans, and plans for merger, division or dissolution;

· proposing amendments to our fifth amended and restated memorandum and articles of association; and

· exercising any other powers conferred by the shareholders' meetings or under our fifth amended and restated memorandum and articles of association.

***Board Committees***

*Audit Committee.* Our audit committee consists of Sam Hanhui Sun, who chairs our audit committee, Qian Zhao and Shaohua Zhang. Our board of directors has determined that all of our audit committee members are "independent directors" within the meaning of Section 303A of the New York Stock Exchange Listed Company Manual and meet the criteria for independence set forth in Section 10A of the Exchange Act. In addition, our board of directors has determined that Sam Hanhui Sun is qualified as an audit committee financial expert within the meaning of the SEC rules and regulations.

Our audit committee is responsible for, among other things:

· Appointing, retaining, terminating, overseeing and determining compensation of the independent auditor. The independent auditor shall report directly to the Committee. The Committee has the sole authority to approve the hiring and discharging of the independent auditors, all engagement fees and terms thereof and, to the extent permissible under applicable regulatory guidelines, all non-audit engagements of the independent auditors.

· Reviewing the scope and results of the annual audit with the independent auditor.

· Reviewing and discussing, with the internal auditors or the person(s) in the financial department acting as internal auditor(s), the overall scope and plans for their audits and determine whether the internal audit function has the appropriate resources and expertise.

· Reviewing and discussing with management and the independent auditors, the adequacy and effectiveness of our disclosure controls, internal accounting and financial controls, the quality of the financial and accounting personnel, and any relevant recommendations.

· Discussing our guidelines and policies with respect to risk assessment and risk management, reviewing contingent liabilities and risks that may be material to us, and reviewing major legislative, regulatory and accounting developments which could materially impact our contingent liabilities and risks.

· Reviewing and discussing with management and the independent auditors the annual audited financial statements and unaudited quarterly financial statements and proposed filings with the SEC, including reviewing our specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and among others, discussing the following matter with the independent accountants: (1) the quality as well as acceptability of the accounting principles applied in the financial statements, (2) new or changed regulatory or accounting policies (including an analysis of the effect of alternative GAAP methods); off-balance sheet structures; significant estimates, judgments, uncertainties or unusual transactions; and accounting policies relating to significant financial statement items, and (3) financial statement presentations.

· Reviewing the reports prepared by management and by our independent auditors, assessing the adequacy and effectiveness of our internal controls and procedures, prior to the inclusion of such reports in our periodic filings as required under SEC rules. The Committee reviews disclosures regarding our internal controls that are required to be included in SEC reports.

· Reviewing on a regular basis management's assessment (and the basis therefore) of the adequacy and effectiveness of our system of disclosure controls and procedures, including by meeting periodically with our management, independent auditors and legal counsel to review their assessment of such disclosure controls and procedures and to review, before its release, the disclosure regarding such system of disclosure controls and procedures required under SEC rules to be contained in our periodic filings.

· Recommending to our board of directors whether the audited financial statements are satisfactory to be included in our annual or other reports to the SEC.

· At least annually, reviewing any management letters or internal control reports prepared by the independent auditors or our internal auditors and responses to prior management letters, and reviewing with the independent auditors our internal quality control and financial controls, including the budget, staffing and responsibilities of our financial and accounting staff.

· Reviewing and discussing our earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including the type and presentation of information to be included in earnings press releases.

· Periodically meeting in separate sessions with management, with internal auditors (or other personnel responsible for the internal audit function) and with independent auditors.

·   Reviewing with the independent auditor any audit problems or difficulties the independent auditor encountered in the course of audit work (e.g., restrictions on the scope of the independent auditor's activities or access to requested information and any significant disagreements with management) and the management's response. The audit committee shall also be responsible for the resolution of disagreements between management and the independent auditors regarding financial reporting.

·   Setting clear hiring policies for employees or former employees of the independent auditors.

·   Reviewing and approving or prohibiting all proposed related-party transactions in accordance with our related party transaction policy and procedures.

·   Monitoring compliance with and reviewing, and approving or prohibiting, actual and potential conflicts with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of our procedures to ensure proper compliance.

·   Establishing procedures for (1) the receipt, retention and treatment of complaints received by us regarding accounting, internal accounting controls, or auditing matters, and (2) the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters. Review periodically with management and our internal accounting department these procedures and any significant complaints received.

·   Pre-approving all audit services and permissible non-audit services by the independent auditors, as set forth in Section 10A of the Exchange Act and the rules and regulations promulgated thereunder by the SEC. The audit committee may establish pre-approval policies and procedures, as permitted by Section 10A of the Exchange Act and the rules and regulations promulgated thereunder by the SEC, for the engagement of independent auditors to render services to us, including but not limited to policies that would allow the delegation of pre-approval authority to one or more members of the audit committee, provided that any pre-approvals delegated to one or more members of the audit committee are reported to the audit committee at its next scheduled meeting.

·   Evaluating at least annually, the independent auditors' qualifications, performance and independence, which evaluation shall include a review and evaluation of the lead partner of the independent auditor and consideration whether there should be a rotation of the lead partner or independent auditing firm, and take appropriate action to oversee the independence of the independent auditors.

·   At least annually, obtaining and reviewing a report by the independent auditors describing: (1) the audit firm's internal quality-control procedures, (2) any material issues raised by the most recent internal quality-control review, or peer review, of the audit firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the audit firm, and any steps taken to deal with any such issues, (3) all relationships between the independent auditors and us to enable the audit committee to assess the auditors' independence, and (4) any other matters required to be included in a letter from the independent auditors pursuant to applicable requirements of the Public Company Accounting Oversight Board regarding independent auditor's communications with the audit committee concerning independence.

116

·   Reviewing and reassessing, at least annually, the audit committee's performance and the adequacy of its charter and report its conclusion and any recommendations to our board of directors.

·   Reporting regularly to the full board of directors.

·   Investigating matters came to its attention at the company's expenses.

*Nominating and Corporate Governance Committee.* We have established a nominating and corporate governance committee, which is responsible for identifying individuals qualified to become directors and recommends director nominees to be approved by our board of directors. The members of our nominating and corporate governance committee include Qian Zhao, who chairs our nominating and corporate governance committee, and Mr. Mo, our executive chairman.

*Compensation Committee.* Our compensation committee consists of Mr. Mo, who chairs our compensation committee, and Qian Zhao.

Our compensation committee is responsible for:

·   Establishing our general compensation philosophy, and, in consultation with senior management, overseeing the development and implementation of compensation programs.

·   At least annually, reviewing and evaluating and, if necessary, revising our compensation plans, policies and programs adopted by the management.

·   At least annually, reviewing and approving corporate goals and objectives relevant to compensation of the CEO and evaluate the CEO's performance in light of those goals and objectives.

·   At least annually, either as a committee or together with the other independent directors (as directed by our board of directors), determining and approving, based on the evaluation described above, all compensation arrangements with the CEO including, without limitation: (1) the annual base salary level, (2) the annual incentive opportunity level, (3) the long-term incentive opportunity level, (4) employment agreements, severance arrangements and change-in-control agreements/provisions, in each case as, when and if appropriate, and (5) any special or supplemental benefits. In determining the long-term incentive component of the CEO's compensation, the compensation committee shall consider our performance and relative stockholder return, the value of similar incentive awards to chief executive officers at comparable companies, and the awards given to the CEO in past years. The compensation committee may choose to discuss the CEO's compensation with the board of directors.

·   Reviewing and approving, or making recommendations to our board of directors with respect to our non-CEO executive officer compensation, incentive-compensation plans and equity-based plans. The compensation committee shall attempt to ensure that our compensation scheme is effective in retaining and attracting key employees, implements business strategies and objectives for enhanced shareholder value, and is administered in a fair and equitable manner consistent with our compensation philosophy. The compensation committee shall also seek the input of the Chief Executive Officer with respect to the performance evaluation and compensation of executives other than the Chief Executive Officer.

·   Periodically reviewing the compensation of our directors and approving changes or making recommendations to our board of directors with respect thereto.

·   Evaluating periodically the internal equity and external competitiveness of compensation of the CEO, the other executive officers, and key management personnel and initiating actions or recommending changes to our board of directors, as appropriate.

·   Advising on the setting of compensation for officers whose compensation is not subject to the approval of the compensation committee.

·   Managing and reviewing annually and approving any long-term incentive compensation or equity or stock option plans, programs or similar arrangements, annual bonuses, employee pension and welfare benefit plans. With respect to each plan the compensation committee shall have responsibility for:

> ·   setting performance targets under all annual bonus and long-term incentive compensation plans as appropriate;

> ·   certifying that any and all performance targets used for any performance-based equity compensation plans have been met before payment of any executive bonus or compensation;

> ·   approving all amendments to, and terminations of, all compensation plans and any awards under such plans or any inducement grant of options made to a person not previously an employee or director;

> ·   granting any awards under any performance-based annual bonus, long-term incentive compensation and equity compensation plans to executive officers or current employees with the potential to become the CEO or an executive officer, including stock options and other equity rights (e.g., restricted stock or stock purchase rights);

> ·   approving which executive officers are entitled to awards under our stock option plan(s);

> ·   repurchasing securities from terminated employees; and

> ·   conducting an annual review of all compensation plans, including reviewing each plan's administrative costs, reviewing current plan features relative to any proposed new features, and assessing the performance of each plan's internal and external administrators if any duties have been delegated.

·   Reviewing and approving officer and director indemnification and insurance matters.

·   Reviewing and approving any employee loan in an amount equal to or greater than US$250,000 unless such transaction is subject to the approval of the audit committee as a related-party transaction.

·   Reviewing and considering on an annual basis whether the compensation policies and practices for all employees are reasonably likely to have a material adverse effect on us in accordance with SEC rules.

· Providing the compensation committee reports on executive compensation to our board of directors.

· Receiving, reviewing and conferring with the audit committee with respect to any concerns raised by any parties directly or indirectly to the compensation committee and take action in response to such concerns as may be deemed appropriate by the compensation committee.

· Reviewing and approving the annual report on executive compensation for inclusion in our annual report on Form 20-F filed with the SEC.

· Administering, interpreting and taking all other actions necessary or appropriate as granted to the compensation committee under our executive compensation and other plans.

· Directing any officer or employee or request any employee of our advisors, consultants or counsel or such other individual as it may deem appropriate to attend a compensation committee meeting or meet with any compensation committee members.

· Reviewing the compensation committee's charter on an annual basis and recommend changes, as appropriate, to our board of directors.

· Evaluating the performance of the compensation committee on an annual basis. In conducting such self-evaluation, the compensation committee shall evaluate whether its charter appropriately addresses the matters that are or should be within its scope and shall recommend such changes as it deems necessary or appropriate to the board for consideration. The compensation committee shall address all matters that it considers relevant to its performance, including at least, the adequacy, appropriateness and quality of the information and recommendations presented by it to the board of directors, the manner in which they were discussed or debated, and whether the number and length of meetings of the compensation committee were adequate for it to complete its work in a thorough and thoughtful manner.

Our board of directors has established a stock option committee, comprised of a single member, Mr. Mo, to administer the 2010 Stock Incentive Plan with respect to option grants to our non-officer/director employees as well as consultants. Our compensation committee is responsible for administering the 2010 Stock Incentive Plan and the 2015 Stock Incentive Plan with respect to option grants to our executive officers and directors.

No director or officer may be directly involved in decisions regarding his or her own compensation.

Pursuant to the subscription agreement by and among our company, Safari Group Holdings Limited, Safari Group CB Holdings Limited, and Safari Parent Limited, dated September 17, 2015, Safari Parent Limited, an affiliate of the Carlyle Group, is entitled to nominate one director to our board of directors so long as the Carlyle Group beneficially owns at least 1.0% of our total outstanding share capital calculated on a fully diluted basis.

*Terms of Directors and Executive Officers*

Each of our directors holds office until a successor has been duly elected and qualified unless the director was appointed by our board of directors, in which case such director holds office until the following annual meeting of shareholders, at which time such director is eligible for reelection. Officers are elected by and serve at the discretion of our board of directors.

*D. Employees*

We had 18,106, 5,795 and 4,367 employees as of December 31, 2016, 2017 and 2018, respectively. The following table sets forth the number of our employees categorized by function as of December 31, 2018:

| | |
|---|---|
| Editorial and production | 922 |
| Sales and marketing | 2,463 |
| Management and general administrative | 324 |
| Technical and research | 658 |
| **Total** | **4,367** |

We began to downsize our workforce in the fourth quarter of 2016 to transform our online real estate brokerage business to a model of a mix of franchisees and self-owned agencies.

Our employees receive a base salary and are eligible for performance-based bonuses. We have granted share options to certain of our employees. For more information, see "Item 6.B. Directors, Senior Management and Employees—Compensation—Share Options."

As required by PRC regulations, we participate in various employee benefit plans that are organized by municipal and provincial governments, including housing, pension, medical and unemployment benefit plans. We make monthly payments to these plans for each of our employees based on the employee's compensation.

We believe we maintain a good working relationship with our employees and we have not experienced any significant labor disputes. We believe this is primarily attributable to our well-established reputation and brand name within the PRC real estate industry, our strong corporate culture, as well as the positive career development opportunities we provide to our employees. Our employees have not entered into any collective bargaining agreements, and No labor union has been established by our employees.

*E. Share Ownership*

As of March 31, 2019, we had 89,388,643 ordinary shares, consisting of 65,051,993 Class A ordinary shares and 24,336,650 Class B ordinary shares issued and outstanding. The following table sets forth information with respect to the beneficial ownership, within the meaning of Rule 13d-3 of the Exchange Act. Except as specifically noted, the beneficial ownership was as of March 31, 2019:

| | Ordinary shares beneficially owned[1] | | | |
|---|---|---|---|---|
| | Class A No. | Percent | Class B No. | Percent |
| Principal Shareholders: | | | | |
| Media Partner Technology Limited[2] | 1,555,995 | 2.6% | 11,355,645 | 46.7% |
| Next Decade Investments Limited[3] | 2,183,132 | 3.3% | 11,985,145 | 45.9% |
| Digital Link Investments Limited[4] | * | * | 2,750,360 | 11.3% |
| General Atlantic Singapore Fund Pte. Ltd.[5] | 6,860,040 | 10.5% | — | — |
| Safari Group Holdings Limited[6] | 3,418,803 | 5.3% | — | — |
| IDG and its affiliated entities[7] | 11,539,873 | 16.8% | — | — |
| FIL Limited [8] | 3,396,655 | 5.2% | — | — |
| | | | | |
| Directors and Executive Officers[9]: | | | | |
| Mr. Mo[10] | 9,409,889 | 13.5% | 23,340,790 | 89.5% |
| Qian Zhao | * | * | — | — |
| Sam Hanhui Sun | * | * | — | — |
| Jian Liu | * | * | — | — |

| | Ordinary shares beneficially owned[1] | | | |
|---|---|---|---|---|
| | Class A No. | Percent | Class B No. | Percent |
| Zhihong Zhang | * | * | — | — |
| Frank Hua Lei | * | * | — | — |
| Zhizhi Gong | * | * | — | — |
| All directors and executive officers as a group | 9,917,482 | 14.3% | 23,340,790 | 89.5% |

---

\*   Less than 1.0% of total outstanding shares.

(1)   Beneficial ownership is determined in accordance with the rules and regulations of the SEC and includes voting or investment power with respect to our ordinary shares. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, we have included shares that the person has the right to acquire within 60 days, including through the exercise of any option, warrant or other right or the conversion of any other security. These shares, however, are not included in the computation of the percentage ownership of any other person.

(2)   Includes 510,995 Class A ordinary shares, 11,355,645 Class B ordinary shares and options to purchase 1,045,000 Class A ordinary shares within 60 days of March 31, 2019.] All of the shares of Media Partner, a British Virgin Islands company, are held in irrevocable discretionary family trusts established by Mr. Mo, our founder and executive chairman. The address of Media Partner is P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands.

(3)   Includes 1,138,132 Class A ordinary shares, 10,230,645 Class B ordinary shares and options to purchase 1,045,000 Class A ordinary shares and 1,754,500 Class B ordinary shares within 60 days of March 31, 2019.] All of the shares of Next Decade, a British Virgin Islands company, are held in irrevocable discretionary family trusts established by Mr. Mo. The address of Next Decade is P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands.

(4)   The address of Digital Link Investments Limited, a British Virgin Islands company, is Apt 3B, Taggart Tower, 109 Repulse Bay Road, Hong Kong. Shan Li (our director until May 2017 when he resigned) is the sole shareholder of Digital Link Investments Limited.

(5)   Represents Class A ordinary shares (as represented by 34,300,200 ADSs) beneficially owned by General Atlantic Singapore Fund Pte. Ltd. as reported in a Schedule 13D/A filed by it and its affiliates on November 14, 2016. General Atlantic Singapore Fund Pte. Ltd. is a Singapore company and its principal address is Asia Square Tower 1, 8 Marina View, #41-04, Singapore 018960.

(6)   Represents 3,418,803 Class A ordinary shares beneficially owned by Safari Group Holdings Limited. Safari Group Holdings Limited is owned as to 72.0% by Safari Parent Limited, a Cayman Islands company, and as to 28.0% by Ateefa Limited, a British Virgin Islands company. Safari Parent Limited is affiliated with the Carlyle Group. Mr. Mo is the sole shareholder of Ateefa Limited. The address of Safari Group Holdings Limited is the offices of Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.

(7)   Represents Class A ordinary shares beneficially owned by IDG and its affiliates as reported in a Schedule 13D/A filed by it and its affiliates on December 18, 2018, including 11,539,873 Class A ordinary shares held by IDG-Accel China Capital L.P., IDG-Accel China Capital Investors L.P., IDG Alternative Global Limited, Chuang Xi Capital Holdings Limited, Quartz Fortune Limited, IDG Ultimate Global Limited, Velda Power Limited and Clever Sight Limited, including 3,488,696 Class A ordinary shares issuable pursuant to convertible notes beneficially owned by IDG and its affiliated entities. IDG-Accel China Capital L.P. and IDG-Accel China Capital Investors L.P. have the same ultimate general partner, IDG-Accel China Capital GP Associates Ltd., of which Quan Zhou and Chi Sing Ho are directors. Chi Sing Ho is also a director of IDG Alternative Global Limited, Chuang Xi Capital Holdings Limited, Quartz Fortune Limited, IDG Ultimate Global Limited, Velda Power Limited and Clever Sight Limited.

(8)   Represents Class A ordinary shares (as represented by 16,983,275 ADSs) beneficially owned by FIL Limited and its affiliates as reported in a Schedule 13G filed by it on February 13, 2019. The address of FIL Limited is Pembroke Hall, 42 Crow Lane, Hamilton, Bermuda, HM19.

(9)   The address of our current directors and executive officers is c/o Tower A, No. 20 Guogongzhuang Middle Street, Fengtai District, Beijing 100070, the People's Republic of China.

(10) Represents ordinary shares beneficially owned by Media Partner, Next Decade, Ateefa Limited, Deanhale Limited, a British Virgin Islands company, and Karistone Limited, a British Virgin Islands company. All of the shares of Media Partner and Next Decade, including 1,649,127 Class A ordinary shares represented by 8,245,635 ADSs, 21,586,290 Class B ordinary shares and options to purchase 2,090,000 Class A ordinary shares and 1,754,500 Class B ordinary shares within 60 days of March 31, 2019, are held in two irrevocable discretionary family trusts established by Mr. Mo for the benefit of his designated family members. Mr. Mo acts as a protector of these family trusts, and Deutsche Bank International Trust Co. (Cayman) Limited and Credit Suisse Trust Limited act as the trustee of these trusts, respectively. In addition, Mr. Mo, through Ateefa Limited, is deemed to have beneficial ownership of an aggregate of 1,738,706 Class A ordinary shares owned by Safari Group Holdings Limited and Safari Group CB Holdings Limited, and, through Deanhale Limited, is deemed to have beneficial ownership of 3,005,596 Class A ordinary shares owned by IDG Alternative. Furthermore, Mr. Mo, through Karistone Limited, beneficially owns 926,461 Class A ordinary shares.

JPMorgan Chase Bank, N.A., the depositary of our ADSs, has advised us that as of March 31, 2019, of the 89,388,643 issued and outstanding ordinary shares, including both Class A ordinary shares and Class B ordinary shares, approximately 81.1% of our outstanding Class A ordinary shares, were in the form of ADSs. None of our outstanding Class B ordinary shares was held by any record holder with an address in the United States.

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to 10 votes per share. We intend to maintain the dual-class ordinary share structure. Each Class B ordinary share is convertible into one Class A ordinary share at any time by its holder and Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon transfer of any Class B ordinary share by its holder to any person or entity that is not a majority-owned and majority-controlled subsidiary of certain of our shareholders as set forth in our amended and restated articles of association, such Class B ordinary share will be automatically and immediately converted into a Class A ordinary share.

On March 18, 2014, we announced the change of the ratio of our American Depositary Receipts representing Class A ordinary shares from one ADS for one Class A ordinary shares to five ADSs for one Class A ordinary share. The record date for the ratio change was March 28, 2014. For our ADS holders, this ratio change had the same effect as a five-for-one ADS split. There was No change to our Class A ordinary shares or Class B ordinary shares. The effect of the ratio change on the ADS trading price on New York Stock Exchange occurred on April 7, 2014.

Subject to any contractual restrictions and applicable law, we and our subsidiaries, affiliates or significant shareholders may from time to time, in their sole discretion, purchase, repay, redeem or retire any of our outstanding debt or equity securities (including any publicly issued debt or equity securities), in privately negotiated or open market transactions, by tender offer or otherwise.

## ITEM 7. MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS

### A. Major Shareholders

See "Item 6.E. Directors, Senior Management and Employees—Share Ownership."

*B. Related Party Transactions*

*Structure Contracts*

PRC laws and regulations restrict and impose conditions on foreign investment in certain industries in China. We used to operate under a tighter regulatory regime which was restrictive of foreign investment in Internet content distribution and advertising businesses and adopted a series of Structure Contracts with our consolidated controlled entities (excluding their subsidiaries) and their nominee shareholders to operate our businesses. Under the current regulatory regime, Internet content distribution is permitted to operators with less than 50.0% foreign investment and advertising is permitted to all qualified operators. We may consider further optimizing our corporate structure in light of the evolving regulatory environment.

In anticipation of our originally proposed acquisition of a controlling stake in Wanli and the sale of a portion of our equity interest in our subsidiaries to Wanli (which was terminated in February 2017), in December 2015, we underwent an internal restructuring, whereby we terminated all of our previous structure contracts and caused Beijing Zhong Zhi Shi Zheng and Jia Tian Xia Network, our wholly-owned PRC subsidiaries, to enter into the 2016 Structure Contracts with our consolidated controlled entities, with terms and conditions substantially similar to those of our previous structure contracts. Under the 2016 Structure Contracts, the equity interests of our consolidated controlled entities were held by our nominee shareholders, i.e., Vincent Tianquan Mo, executive chairman of our board of directors and chief executive officer, Richard Jiangong Dai, our director (until February 2016 when Mr. Dai resigned) and former chief executive officer, and certain wholly-owned subsidiaries of theirs, and we exercised effective control over our consolidated controlled entities through Beijing Zhong Zhi Shi Zheng and Jia Tian Xia Network.

Among the 2016 Structure Contracts, Beijing Zhong Zhi Shi Zhengentered into a series of contractual arrangements with Shanghai China Index Investment Consulting Co., Ltd., Beijing Yi Ran Ju Ke Technology Development Co., Ltd., Beijing SouFun Technology Development Co., Ltd., Beijing Century Jiatianxia Technology Development Co., Ltd., Shanghai Century Jiatianxia Internet Technology Development Co., Ltd. and their nominee shareholders. In anticipation of the separation and distribution in relation to CIH, we terminated the foregoing contractual arrangements between our group and these entities on May 15, 2018, and subsequently caused Beijing TuoShi, our wholly-owned PRC subsidiary, to enter into a new series of contractual arrangements with these consolidated controlled entities in 2018, with terms and conditions substantially similar to the 2016 Structure Contracts. CIH, through its wholly-owned subsidiary, Beijing Zhong Zhi Shi Zheng, has entered into new contractual arrangements with Beijing Zhong Zhi Hong Yuan, which is held by our nominee shareholders, i.e., Vincent Tianquan Mo and Ms. Yu Huang, the chief executive officer of CIH, with terms and conditions substantially similar to those of our previous structure contracts.

For a detailed description of the regulatory environment that necessitates the adoption of our corporate structure, see "Item 4.B. Information on the Company—Business Overview—Regulation." For a detailed description of the risks associated with our corporate structure, see "Item 3.D. Key Information —Risk Factors—Risks related to our corporate structure."

The Structure Contracts enable us to:

· receive substantially all of the economic benefits from our consolidated controlled entities in consideration of the services provided by our subsidiaries;

· exercise effective control over our consolidated controlled entities; and

· hold an exclusive option to purchase all or part of the equity interests in our consolidated controlled entities when and to the extent permitted by PRC laws.

We did not separately enter into any Structure Contracts with the subsidiaries of the consolidated controlled entities with which we entered into the Structure Contracts. The following is a summary of the material terms under our Structure Contracts among our wholly-owned PRC subsidiaries, our consolidated controlled entities and the nominee shareholders of these consolidated controlled entities.

*Exclusive Technical Consultancy and Services Agreements*

Under the exclusive technical consultancy and service agreements, our wholly-owned PRC subsidiary has the exclusive right to provide our consolidated controlled entities with relevant technical services relating to their business, such as information technology system operations and maintenance services, or technology supporting services for their advertising products. In exchange for these services, each of the consolidated controlled entities has agreed to make monthly payments to the service provider for such services. The original term of each agreement is 10 years, and our wholly-owned PRC subsidiary can unilaterally extend the term of the exclusive technical consultancy and services agreements and such request will be unconditionally agreed to by the consolidated controlled entities.

*Equity Pledge Agreements*

In order to secure the payment obligations of the consolidated controlled entities under the exclusive technical consultancy and services agreements, except as disclosed below, the nominee shareholders have pledged to our wholly-owned PRC subsidiary their entire equity interests in the consolidated controlled entities. Under these agreements, the nominee shareholders may not transfer the pledged equity interest without the prior written consent of our wholly-owned PRC subsidiary. Our wholly-owned PRC subsidiary also has the right to collect dividends of the consolidated controlled entities from their nominee shareholders. These agreements will remain valid for 10 years and can be extended at the sole discretion of our wholly-owned PRC subsidiary.

*Operating Agreements*

Under the operating agreements, our wholly-owned PRC subsidiary has undertaken to enter into guarantee contracts with third parties, as required by third parties, to guarantee the performance of the consolidated controlled entities under their business contracts with third parties. In return, the consolidated controlled entities are required to pledge their accounts receivable and mortgage all of their assets as counter-security to our wholly-owned PRC subsidiary. Each of the consolidated controlled entities and the nominee shareholders has agreed not to enter into any transaction that would substantially affect the assets, rights, obligations or operations of the consolidated controlled entities without the prior written consent of our wholly-owned PRC subsidiary. The original term of each agreement is 10 years. These agreements can be extended prior to expiration with written confirmation from our wholly-owned PRC subsidiary, or can be terminated by our wholly-owned PRC subsidiary, upon 30 days' advance notice.

*Shareholders' Proxy Agreements*

Under the shareholders' proxy agreements, the nominee shareholders agreed to irrevocably entrust our wholly-owned PRC subsidiary to exercise their rights as the registered shareholders of the consolidated controlled entities to attend shareholders' meetings and cast votes. Our wholly-owned PRC subsidiary may assign part or all of these proxy rights to its designated employees, and will be indemnified for any loss under these agreements. These agreements will also be binding upon successors of the parties or transferees of the parties' equity interests. These agreements will remain in effect until terminated upon written consent by all the parties to the agreements or by their successors.

*Loan Agreements*

Under the loan agreements and the related transfer agreements, the nominee shareholders received loans from us to make contributions to the registered capital of the consolidated controlled entities between 2004 and 2015, and agreed to repay the loans, upon request, by transferring their entire equity interests in the consolidated controlled entities to our wholly-owned PRC subsidiary or its respective designees, when permitted by applicable PRC laws, rules and regulations.

*Exclusive Call Option Agreements*

Under the exclusive call option agreements, our wholly-owned PRC subsidiary or any third party designated by it has the right to acquire from the nominee shareholders of the consolidated controlled entities their entire equity interests in such consolidated controlled entities when permitted by applicable PRC laws, rules and regulations. The proceeds from the exercise of the call option will be applied to repay the loans under the loan agreements described above. These agreements each has an original term of 10 years and may be extended for another 10 years at our sole discretion.

***Telstra Private Placement***

In connection with the private placement by Telstra International in September 2010, on August 13, 2010, we entered into an investor's rights agreement with General Atlantic, Apax, Next Decade, Media Partner and Digital Link and a registration rights agreement with General Atlantic and Apax. We terminated these agreements on September 23, 2015.

***2015 Registration Rights Agreements***

On September 24, 2015, we entered into a registration rights agreement with Safari and Safari CB, under which each of Safari and Safari CB has demand registration rights pursuant to which we will be required to effect the registration of all or a portion of its Class A ordinary shares (issuable pursuant to the 2022 Notes in the case of Safari CB), subject to terms and conditions substantially similar to those of the 2014 Registration Rights Agreement. See "—2014 Registration Rights Agreement" above.

On November 4, 2015, we entered into a registration rights agreement with IDG Alternative and China Merchants Bank Co., Ltd. Tianjin Pilot Free Trade Zone Branch ("CMB"), under which we are required to file a registration statement on Form F-3 within 45 days after the closing of the private placement transactions in November 2015, in order to effect the registration of all or a portion of the Class A ordinary shares held by IDG Alternative or CMB in the case it enforces its security interest on the Class A ordinary shares held by IDG Alternative. In addition, promptly after the offering and sale of any of their Class A ordinary shares, we will be required to file a prospectus to be used for such offering and sale in accordance with the Securities Act.

On November 9, 2015, we and Karistone Limited entered into a registration rights agreement with each of IDG-Accel, IDG-Accel Investors, Winning Star Global Limited, Rainbow Zone Enterprise Inc., Chuang Xi Capital Holdings Limited and Wealth Harvest Global Limited, respectively, under which we are required to file a registration statement on Form F-3 within 45 days after the closing of the private placement transactions in November 2015, in order to effect the registration of all or a portion of Class A ordinary shares held by each of Karistone Limited, IDG-Accel, IDG-Accel Investors, Winning Star Global Limited, Rainbow Zone Enterprise Inc., Chuang Xi Capital Holdings Limited and Wealth Harvest Global Limited (collectively, the "Right Holders"). In addition, promptly after the offering and sale of any of their Class A ordinary shares, we will be required to file a prospectus to be used for such offering and sale in accordance with the Securities Act. Each of the Right Holders also has the right to request that its Class A ordinary shares be included in any registration of our Class A ordinary shares, other than registrations on Form F-4 or S-8 or in compensation or acquisition-related registrations. In addition, the underwriters may, for marketing reasons, cut back all or a part of the shares that any of the Right Holders has requested to be registered in any incidental registration and we will have the right to terminate any registration we initiated prior to its effectiveness regardless of any request for inclusion by any of the Right Holders.

*Other Related Party Transactions*

We had relationships with the following related parties in 2018:

| Name of Related Party | Relationship with Fang |
|---|---|
| Vincent Tianquan Mo | Executive chairman of the board of directors and chief executive officer |
| Richard Jiangong Dai | Former director and former chief executive officer of our company |
| Beihai Silver Beach 1 Hotel and Property Management Company, Ltd. ("Beihai Silver Beach") | A company under the control of Vincent Tianquan Mo |
| Che Tian Xia Company Ltd. ("Che Tian Xia") | A company under the control of Vincent Tianquan Mo and Richard Jiangong Dai |
| Guangxi Wharton International Hotel ("Guangxi Wharton") | A company under the control of Vincent Tianquan Mo |
| Research Center on Natural Conservation ("Research Center") | A company under the control of Vincent Tianquan Mo |
| Upsky San Francisco Airport Hotel LLC (formerly known as "Crowne Plaza San Francisco-International Airport") ("Upsky San Francisco") | A company under the control of Vincent Tianquan Mo |
| Upsky Lighthouse Hotel LLC ("Upsky Lighthouse") | A company under the control of Vincent Tianquan Mo |
| Upsky Long Island Hotel LLC ("Upsky Long Island") | A company under the control of Vincent Tianquan Mo |
| Nanning Xuyin Business Co., Ltd. ("Nanning Xuyin") | A company under the control of Vincent Tianquan Mo |
| New York Military Academy ("Military Academy") | A company of which Vincent Tianquan Mo is a director |
| Wall Street Global Training Center, Inc. ("Training Center") | A company under the control of Vincent Tianquan Mo and two other independent directors |

We had the following expenses from related party transactions during 2018:

| | 2018 |
|---|---|
| | (US$ in thousands) |
| Office building leased from: | |
| - Vincent Tianquan Mo | 162 |
| Management fee incurred: | |
| - Beihai Silver Beach | 523 |
| Hotel service fee incurred: | |
| - Upsky San Francisco | - |
| - Upsky Long Island | - |
| -Upsky Lighthouse | - |
| - Beihai Silver Beach | - |
| Training fee incurred: | |
| - Military Academy | - |

126

In 2011, we entered into an agreement with Training Center to lease to it office space of approximately 220 square feet in a building owned by us located in New York City, free of charge.

In February 2012, we entered into an agreement with Mr. Mo, our executive chairman, to lease a building owned by him for a 10-year period from March 1, 2012. The deemed rental expense of US$ 0.2 million and the corresponding shareholder contribution were included in our consolidated financial statements for 2017.

In April 2013, we and Beihai Silver Beach entered into an agreement, pursuant to which Beihai Silver Beach was engaged to manage the hotel and office leasing operations owned by the BaoAn Entities for 10 years. The management fees incurred for 2017 were US$ 0.5 million.

In April 2013, we entered into an agreement with Che Tian Xia to use its domain name for six years free of charge.

In 2016, Upsky San Francisco, Upsky Long Island and Beihai Silver Beach provided hotel accommodations to our employees that amounted to US$17,000, US$81,000 and US$113,000.

In 2016, Military Academy provided training services to us for training fees amounting to US$111,000.

Nanning Xuyin held 73,430,061 shares in Guilin Bank Co., Ltd. on behalf of us, through a nominee arrangement, in 2015, and transferred 30,595,859 shares of Guilin Bank to us in 2016.

On September 25, 2017, additional 42,834,202 shares of Guilin Bank were transferred by the third-party in full satisfaction of its remaining overdue receivables of US$24,695 to us. The total investment constituted a 1.98% and 1.79% ownership in Guilin Bank as of December 31, 2017 and 2018, respectively. In October 2017, we received 7,343,006 shares of Guilin Bank as a stock dividend and our shareholding increased from 73,430,061 to 80,773,067. No impairment on the investment in Guilin Bank was recognized for the year ended December 31, 2018.

For more details of our related party transactions in 2018, see Note19 to our consolidated financial statements included elsewhere in this annual report.

***Stock Incentive Plans***

See "Item 6.B. Directors, Senior Management and Employees—Compensation—Share Options."

***C. Interests of Experts and Counsels***

Not applicable.

---

127

## ITEM 8. FINANCIAL INFORMATION

### A. Consolidated Statements and Other Financial Information

We have appended consolidated financial statements filed as part of this annual report.

### Legal Proceedings

See "Item 4.B. Information on the Company—Business Overview—Legal Proceedings."

### Dividend Policy

Our board of directors has the discretion over whether to pay dividends on our ordinary shares. If our board of directors decides to pay dividends on our ordinary shares, the form, frequency and amount will be based upon our future operations and earnings, capital requirements and surplus, general financial condition, shareholders' interests, contractual restrictions and such other factors as our board of directors may deem relevant. For a description of our corporate structure and its potential impact upon our ability to pay dividends, see "Item 3.D. Key Information—Risk Factors—Risks related to doing business in China—We rely primarily on dividends and other distributions on equity paid by our subsidiaries, and any limitation on the ability of our subsidiaries to make payments to us could have a material adverse effect on our ability to conduct our business as well as our liquidity."

Holders of ADSs are entitled to receiving dividends, subject to the terms of the deposit agreement, to the same extent as the holders of our ordinary shares. Cash dividends, if any, will be paid to the depositary in U.S. dollars and paid to holders of ADSs according to the terms of the deposit agreement. Other distributions, if any, will be paid by the depositary to holders of ADSs in any means it deems legal, fair and practical. Under the deposit agreement, the depositary is required to distribute dividends to holders of ADSs unless such distribution is prohibited by law. The amounts distributed to holders will be net of fees, expenses, taxes and other governmental charges payable by holders under the deposit agreement.

In August 2014, we declared a cash dividend of US$1.00 per share on our ordinary shares (US$0.20 per ADS), or an aggregate of US$82.4 million to holders of our ordinary shares and ADSs, payable to shareholders of record on August 18, 2014. As of December 31, 2014, all the declared dividends had been paid.

In March 2015, we declared a cash dividend of US$1.00 per share on our ordinary shares (US$0.20 per ADS), or an aggregate of US$82.8 million to holders of our ordinary shares and ADSs, payable to shareholders of record on March 13, 2015. As of the date of this annual report, all the declared dividends had been paid.

In May 2019, we declared a stock dividend to holders of our ordinary shares and ADSs to separate CIH into an independent publicly traded company. For details, see "Item 4. Information on the Company—B. Business Overview—Separation of CIH."

### B. Significant Changes

Except as disclosed elsewhere in this annual report, we have not experienced any significant changes since the date of our audited consolidated financial statements included in this annual report.

**ITEM 9. THE OFFER AND LISTING**

*A. Offer and Listing Details*

Our ADSs have been listed for trading on the New York Stock Exchange under the symbol "SFUN" since September 17, 2010.

*B. Plan of Distribution*

Not applicable.

*C. Markets*

Our ADSs have been listed for trading on the New York Stock Exchange under the symbol "SFUN" since September 17, 2010.

*D. Selling Shareholders*

Not applicable.

*E. Dilution*

Not applicable.

*F. Expenses of the Issue*

Not applicable.

**ITEM 10. ADDITIONAL INFORMATION**

*A. Share Capital*

Not applicable.

*B. Memorandum and Articles of Association*

We incorporated by reference into this annual report the description of our fifth amended and restated memorandum and articles of association contained in our current report on Form 6-K originally filed with the SEC on August 3, 2012. Our shareholders adopted our fifth amended and restated memorandum and articles of association by a special resolution on August 1, 2012.

*C. Material Contracts*

Material contracts other than in the ordinary course of business are described in "Item 4. Information on the Company" and in "Item 7. Major Shareholders and Related Party Transactions" and elsewhere in this annual report.

*D. Exchange Controls*

**Regulations relating to Foreign Exchange, Taxation and Dividend Distribution**

*Foreign Exchange*

The principal regulation governing foreign exchange in China is the Foreign Currency Administration Regulations issued by the State Council in January, 1996 and as amended in August, 2008 and the Regulations of Settlement, Sale and Payment of Foreign Exchange, which were promulgated by the PBOC on June 20, 1996, and became effective on July 1, 1996. The Renminbi is freely convertible for current account transactions, such as trade and service-related foreign exchange transactions, but not for capital account transactions, such as direct investments, loans or investments in securities outside China, without the prior approval of the relevant government authorities. Pursuant to the Foreign Currency Administration Regulations, foreign-invested enterprises in China may purchase foreign exchange at authorized commercial banks without the approval of SAFE for trade and service-related foreign exchange transactions by providing commercial documents evidencing these transactions. They may also retain foreign exchange, subject to a cap approved by SAFE, to satisfy foreign exchange liabilities or to pay dividends. However, the relevant PRC government authorities may limit or eliminate the ability of foreign-invested enterprises to purchase and retain foreign currencies in the future. In addition, foreign exchange transactions for capital accounts are still subject to limitations and require approval from or registration with relevant government authorities.

*Taxation and Dividend Distribution*

We are incorporated in the Cayman Islands. Under the current laws of the Cayman Islands, we are not subject to income or capital gains tax. In addition, dividend payments are not subject to withholding tax in the Cayman Islands.

In March 2007, the National People's Congress of China enacted the New EIT Law, which took effect on January 1, 2008, as amended in February, 2017 and December 2018. Under the New EIT Law, foreign-invested enterprises, such as our subsidiaries and consolidated controlled entities, are subject to enterprise income tax at a uniform rate of 25.0% if No tax preferential policy is applicable. In addition, under the New EIT Law, enterprises organized under the laws of jurisdictions outside China may be classified as either "non-resident enterprises" or "resident enterprises." Non-resident enterprises without an establishment or place of business in China are subject to withholding tax at the rate of 10.0% with respect to their PRC-sourced dividend income, which rate can be reduced under applicable double tax treaties or arrangements. As we are incorporated in the Caymans Islands, we may be regarded as a "non-resident enterprise." We hold equity interests in several of our major PRC subsidiaries indirectly through subsidiaries incorporated in Hong Kong. According to the Avoidance of Double Taxation Arrangement between Mainland China and Hong Kong, dividends declared by a resident enterprise in mainland China to a Hong Kong resident enterprise should be subject to withholding tax at a rate of 5.0%, provided, however, that such Hong Kong resident enterprise directly owns at least 25.0% of the equity interest in the PRC resident enterprise. In September 2013, SouFun Media and SouFun Network were granted a reduced withholding tax rate of 5% on earnings to be distributed to their Hong Kong parent entities between 2013 and 2015.

130

In August 2009, SAT issued Circular 124. Pursuant to Circular 124, non-tax residents of China who wish to enjoy a treaty benefit on their China-sourced income under a Sino-foreign double tax agreement have to go through either an "approval application" procedure (for passive income—dividends, interest, royalties and capital gains) or "record filing" procedure (for active income—business profits of a permanent establishment, service fees and personal employment income) in which specific forms attached to Circular 124 have to be submitted to the relevant Chinese tax authorities together with the relevant supporting documentation. On November 1, 2015, Circular 124 was repealed by the Administrative Measures for Tax Convention Treatment for Non-resident Taxpayers issued by SAT ("Circular 60"). Circular 60 abolishes the "approval application" procedure and provides that any non-resident taxpayer filing a tax return shall determine whether such taxpayer is entitled to the treaty benefit, and shall submit the relevant statements and materials to the competent tax authority for the tax return filing. In the case of withholding at source and designated withholding, where a non-resident taxpayer who considers it meets the conditions for enjoying the convention treatment needs to be entitled to the convention treatment, the taxpayer shall take the initiative to propose the same to the withholding agent, and provide the withholding agent with the relevant statements and materials for the withholding declaration. The withholding agent shall withhold tax in accordance with the conventions, and forward the relevant statements and materials to the competent tax authority when making the withholding declaration.

In addition, SAT released Circular 9 in February 2018. Circular 9 provides guidance for the determination of "beneficial ownership" for the purpose of claiming benefits under double taxation arrangements by treaty residents in respect of articles of dividends, royalties and interest under double taxation arrangements. Under Circular 9, a "beneficial owner" shall generally engage in "substantive business activities" which is further referred to as manufacturing, trading and management activities under Article 2 of Circular 9. Circular 9 also sets forth several factors, the existence of which generally does not provide support that the treaty resident is a "beneficial owner." According to Circular9, non-resident enterprises which could not provide valid supporting documents as "beneficiary owners" could not be approved to enjoy treaty benefits. Therefore, dividends from our PRC subsidiaries paid to us through our Hong Kong subsidiaries may be subject to a withholding tax rate of 10.0% if our Hong Kong subsidiaries cannot be considered as a "beneficial owner" under Circular 9.

Despite the above, the New EIT Law also provides that an enterprise incorporated outside China with its "de facto management bodies" located within mainland China should be considered a PRC resident enterprise and therefore be subject to enterprise income tax on its worldwide income at the rate of 25.0%.

The implementing rules for the New EIT Law defines "de facto management organization" as the body that exercises substantial and comprehensive control over the production, operation, personnel, accounting, property and other factors of an enterprise. SAT issued Circular 82 in April 2009. Circular 82 provides certain specific criteria for determining whether the "de facto management bodies" of a Chinese-controlled offshore-incorporated enterprise is located in China. Although Circular 82 only applies to offshore enterprises controlled by PRC enterprises, not those controlled by PRC individuals or foreigners in China, like us, the determining criteria set forth in Circular 82 may reflect SAT's general position on how the "de facto management bodies" test should be applied in determining the tax resident status of offshore enterprises, regardless of whether they are controlled by PRC enterprises, individuals or foreigners.

Substantially all members of our management are currently located in China and we expect them to continue to be located in China for the foreseeable future. Therefore, if we are deemed to be a PRC tax resident enterprise, we will be subject to an enterprise income tax rate of 25.0% on our worldwide income if No preferential tax treatment is applicable. According to the New EIT Law and its implementing rules, dividends are exempted from income tax if such dividends are received by a resident enterprise on an equity interest it directly owns in another resident enterprise. Therefore, it is possible that dividends we derive through our Hong Kong subsidiaries from our PRC subsidiaries would be tax exempt income under the New EIT Law if our Hong Kong subsidiaries are also deemed to be "resident enterprises."

If we are deemed to be a PRC tax resident enterprise, we would then be obliged to withhold PRC withholding income tax on the gross amount of dividends declared to shareholders who are non-PRC tax residents. The withholding income tax rate is 10.0% for non-resident enterprises and 20.0% for non-resident individuals, unless otherwise provided under the applicable double tax treaties between China and governments of other jurisdictions.

Significant uncertainties still exist with respect to the interpretation of the New EIT Law and its implementing rules. Any increase in the enterprise income tax rate applicable to us, the imposition of PRC income tax on our global income or the imposition of withholding tax on dividends declared by our subsidiaries to us could have a material adverse effect on our business, financial condition and results of operations.

**Regulations relating to Foreign Exchange in Certain Onshore and Offshore Transactions**

Pursuant to SAFE Circular 37, a PRC resident must register with the local SAFE branch before such PRC resident contributes assets or equity interests in an Overseas SPV that is established or controlled by the PRC resident for the purpose of conducting investment or financing, and following the initial registration, the PRC resident is required to register with the local SAFE branch for any major change in respect of the Overseas SPV, including, among other things, a change in the PRC resident shareholder of the Overseas SPV, the name of the Overseas SPV, its term of operation, or any increase or reduction in the registered capital of the Overseas SPV, any share transfer or swap, and any merger or division. According to the Notice on Further Simplifying and Improving Policies for the Foreign Exchange Administration of Direct Investment released on February 13, 2015 by SAFE, local banks will examine and handle foreign exchange registration for overseas direct investment, including the initial foreign exchange registration and amendment registration, under SAFE Circular 37 from June 1, 2015. Any failure to comply with these registration procedures may result in penalties, including the imposition of fines, criminal liability, and restrictions on the ability of the PRC subsidiary of the Overseas SPV to distribute dividends to its overseas shareholders.

132

*E. Taxation*

### Cayman Islands taxation

The Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is No taxation in the nature of inheritance tax or estate duty and there are No other taxes likely to be material to us levied by the Government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in, or after execution brought within the jurisdiction of, the Cayman Islands. Although it is unlikely that we will be subject to material taxes, there is No assurance that the Cayman Islands government will not impose taxes in the future, which could be material to us. In addition, there may be tax consequences if we are, for example, involved in any transfer or conveyance of immovable property in the Cayman Islands. The Cayman Islands is not party to any double tax treaties that are applicable to any payments made to or by us and there are No exchange control regulations or currency restrictions in the Cayman Islands.

Under existing Cayman Islands laws, payments of interest and principal on the notes and dividends and capital in respect of our shares will not be subject to taxation in the Cayman Islands and No withholding will be required on the payment of interest and principal or a dividend or capital to any holder of the notes or our shares, as the case may be, nor will gains derived from the disposal of the notes or our shares be subject to Cayman Islands income or corporation tax.

No stamp duty is payable in respect of the issue or conversion of the notes. The notes themselves will be stamp able if they are executed in or brought into the Cayman Islands.

### People's Republic of China taxation

The PRC enterprise income tax is calculated based on the taxable income determined under the PRC laws and accounting standards. Under the New EIT Law, all domestic and foreign- invested companies in China are subject to a uniform enterprise income tax at the rate of 25% and dividends from a PRC subsidiary to its foreign parent company are subject to a withholding tax at the rate of 10%, unless such foreign parent company's jurisdiction of incorporation has a tax treaty with China that provides for a reduced rate of withholding tax, or the tax is otherwise exempted or reduced pursuant to the PRC tax laws. Our subsidiaries in China are considered foreign investment entities ("FIEs"), and certain of these subsidiaries are directly held by our subsidiaries in Hong Kong. According to the currently effective tax treaty between China and Hong Kong, dividends payable by an FIE in China to a company in Hong Kong which directly holds at least 25% of the equity interests in the FIE will be subject to a withholding tax of 5%. In February 2009, SAT issued Circular No. 81. According to Circular No. 81, in order to enjoy the preferential treatment on dividend withholding tax rates, an enterprise must be the "beneficial owner" of the relevant dividend income, and No enterprise is entitled to enjoy preferential treatment pursuant to any tax treaties if such enterprise qualifies for such preferential tax rates through any transaction or arrangement, the major purpose of which is to obtain such preferential tax treatment. The tax authority in charge has the right to make adjustments to the applicable tax rates, if it determines that any taxpayer has enjoyed preferential treatment under tax treaties as a result of such transaction or arrangement. In February 2018, SAT issued Circular No. 9 to provide guidance on the criteria to determine whether an enterprise qualifies as the "beneficial owner" of the PRC sourced income for the purpose of obtaining preferential treatment under tax treaties. Pursuant to Circular No. 9, the PRC tax authorities will review and grant tax preferential treatment on a case-by-case basis and adopt the "substance over form" principle in the review. Circular 9 specifies that a beneficial owner should generally carry out substantial business activities and own and have control over the income, the assets or other rights generating the income. Therefore, an agent or a conduit company will not be regarded as a beneficial owner of such income. Circular 9 provides that the tax authorities shall make the decision based on a comprehensive consideration of all determining factors provided in Circular 9 rather than the status of a single determining factor. Since the two circulars were issued, it has remained unclear how the PRC tax authorities will implement them in practice and to what extent they will affect the dividend withholding tax rates for dividends distributed by our subsidiaries in China to our Hong Kong subsidiary. If the relevant tax authority determines that any of our Hong Kong subsidiaries is a conduit company and does not qualify as the "beneficial owner" of the dividend income it receives from our PRC subsidiaries, the higher 10% withholding tax rate may apply to such dividends.

Under the New EIT Law, an enterprise established outside of China with its "de facto management body" within China is considered a resident enterprise and will be subject to enterprise income tax at the rate of 25% on its worldwide income. The "de facto management body" is defined as the organizational body that effectively exercises overall management and control over production and business operations, personnel, finance and accounting, and properties of the enterprise. It remains unclear how the PRC tax authorities will interpret such a broad definition. If the PRC tax authorities determine that we should be classified as a resident enterprise, our global income will be subject to income tax at a uniform rate of 25%, which may have a material adverse effect on our financial condition and results of operations. Notwithstanding the foregoing provision, the New EIT Law also provides that, if a resident enterprise directly invests in another resident enterprise, the dividends received by the investing resident enterprise from the invested enterprise are exempted from income tax, subject to certain conditions. However, it remains unclear how the PRC tax authorities will interpret the PRC tax resident treatment of an offshore company, like us, having indirect ownership interests in PRC enterprises through intermediary holding vehicles.

If we were treated as a PRC resident enterprise, any interest payable to non-resident enterprise holders of the notes and dividends payable to non-resident enterprise holders of our ordinary shares or ADSs may be treated as income derived from sources within PRC and therefore subject to a 10% withholding tax (or 20% in the case of non-resident individual holders) unless an applicable income tax treaty provides otherwise. In addition, capital gains realized by non-resident enterprise holders upon the disposition of the notes, our ordinary shares or ADSs may be treated as income derived from sources within China and therefore subject to 10% income tax (or 20% in the case of non-resident individual holders) unless an applicable income tax treaty provides otherwise.

**U.S. federal income taxation**

The following discussion describes the material U.S. federal income tax consequences of the ownership and disposition of our ADSs or ordinary shares under currently applicable law. This discussion does not address any U.S. federal consequences other than U.S. federal income tax consequences (such as the gift or estate tax). This discussion also does not address any state, local or non-U.S. tax consequences of an investment in our ordinary shares or ADSs. This discussion applies to you only if you are a U.S. holder (as defined below) and beneficially own our ordinary shares or ADSs as capital assets for U.S. federal income tax purposes. This discussion does not apply to you if you are a member of a class of holders subject to special rules, such as:

· dealers in securities or currencies;

· traders in securities that elect to use a mark-to-market method of accounting for securities holdings;

· banks or other financial institutions;

· insurance companies;

- tax-exempt organizations;

- partnerships and other entities treated as partnerships for U.S. federal income tax purposes or persons holding ordinary shares or ADSs through any such entities;

- real estate investment trusts;

- regulated investment companies;

- persons that hold ordinary shares or ADSs as part of a hedge, straddle, constructive sale, conversion transaction or other integrated investment;

- U.S. holders (as defined below) whose functional currency for tax purposes is not the U.S. dollar;

- certain former citizens or long-term residents of the United States;

- persons subject to special tax accounting rules as a result of any item of gross income with respect to our ordinary shares or ADSs being taken into account in an "applicable financial statement" as defined in Section 451(b) of the Code (as defined below);

- persons liable for alternative minimum tax; or

- persons who actually or constructively own 10.0% or more of the total combined voting power of all classes of our shares (including ADSs) entitled to vote or 10.0% or more of the total value of our shares (including ADSs).

This discussion is based on the U.S. Internal Revenue Code of 1986, as amended, or the Code, its legislative history, existing and proposed regulations promulgated thereunder, published rulings and court decisions, all as currently in effect. These laws are subject to change, possibly on a retroactive basis. In addition, this discussion relies in part on our assumptions regarding the projected value of our shares and the nature of our business. Finally, this discussion is based in part upon the representations of the depositary and the assumption that each obligation in the deposit agreement and any related agreement will be performed in accordance with its terms.

You should consult your own tax advisor concerning the particular U.S. federal income tax consequences to you of the purchase, ownership and disposition of our ordinary shares or ADSs, as well as the consequences to you arising under the laws of any other taxing jurisdiction.

For purposes of the U.S. federal income tax discussion below, you are a "U.S. holder" if you beneficially own our ordinary shares or ADSs and are:

- a citizen or resident of the United States for U.S. federal income tax purposes;

- a corporation, or other entity taxable as a corporation, that was created or organized in or under the laws of the United States or any political subdivision of the United States;

- an estate the income of which is subject to U.S. federal income tax regardless of its source; or

- a trust, if (1) a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all substantial decisions of the trust, or (2) the trust has a valid election in effect to be treated as a U.S. person.

If a partnership or other flow-through entity holds ordinary shares or ADSs, the tax treatment of a partner or other owner will generally depend on the status of the partner or other owner and the activities of the partnership or other flow-through entity. A holder of ordinary shares or ADSs that is a partnership or a partner in such partnership should consult its own tax advisor regarding the U.S. federal income tax consequences of the purchase, ownership and disposition of the ordinary shares or ADSs.

135

*ADSs.* If you hold ADSs, for U.S. federal income tax purposes, you generally will be treated as the owner of the underlying ordinary shares that are represented by such ADSs. Accordingly, deposits or withdrawals of ordinary shares for ADSs will not be subject to U.S. federal income tax.

*Dividends on Ordinary Shares or ADSs.* Subject to the passive foreign investment company, or PFIC, discussion below, the gross amount of any distributions (including amounts withheld to reflect PRC withholding taxes, if any) you receive on your ordinary shares or ADSs are generally treated as dividend income if the distributions are made from our current or accumulated earnings and profits, calculated according to U.S. federal income tax principles. Such income (including any withheld taxes) will be includable in your gross income on the day actually or constructively received by you, in the case of ordinary shares, or by the depositary in the case of ADSs. Distributions in excess of current and accumulated earnings and profits will be treated first as a non-taxable return of capital to the extent of your basis in the ordinary shares or ADSs and thereafter as a capital gain. If you are a non-corporate U.S. holder, including an individual, and have held your ADSs for a sufficient period of time, dividend distributions paid on our ADSs (but not our ordinary shares) will generally constitute qualified dividend income taxed at a preferential rate as long as our ADSs continue to be readily tradable on the New York Stock Exchange. Based on existing guidance, it is not clear whether a dividend on an ordinary share will be treated as a qualified dividend, because the ordinary shares are not themselves listed on a U.S. exchange. If, however, we are treated as a PRC "resident enterprise" under PRC law, we may be eligible for the benefits of the income tax treaty between the United States and the PRC, in which case dividends paid on our ordinary shares and ADSs would both be treated as qualified dividends (subject to the relevant holding period requirements). You should consult your own tax advisor as to the rate of tax that will apply to you with respect to dividend distributions, if any, you receive from us.

We do not intend to calculate our earnings and profits according to U.S. tax accounting principles. Accordingly, notwithstanding the discussion in the preceding paragraph, distributions on our ordinary shares or ADSs, if any, will generally be taxed to you as dividend distributions for U.S. tax purposes. If you are a corporation, you will not be entitled to claim a dividends-received deduction with respect to distributions you receive from us. In the event we are treated as a PRC "resident enterprise" under PRC law, we may be required to withhold PRC income tax on dividends paid to you under the New EIT Law. See "Item 3.D. Key Information—Risk Factors—Risks related to our ADSs, ordinary shares and notes—We may be required to withhold PRC income tax on any dividend we pay you, and any gain you realize on the transfer of our ordinary shares and/or ADSs may also be subject to PRC withholding tax." Subject to generally applicable limitations, you may be eligible to claim a deduction or a foreign tax credit for PRC tax withheld at the appropriate rate. Dividends generally will be categorized as "passive category income" or, in the case of some U.S. holders, as "general category income" for foreign tax credit limitation purposes. The rules governing the use of foreign tax credits are very complex, and you are urged to consult your own tax advisor as to your ability, and the various limitations on your ability, to claim foreign tax credits in connection with the receipt of dividends.

*Sales and Other Dispositions of Ordinary Shares or ADSs.* Subject to the PFIC discussion below, when you sell or otherwise dispose of ordinary shares or ADSs in a taxable transaction, you will generally recognize capital gain or loss in an amount equal to the difference between the amount realized on the sale or other taxable disposition and your adjusted tax basis in the ordinary shares or ADSs, both as determined in U.S. dollars. Any gain or loss you recognize will be long-term capital gain or loss if you have held the ordinary shares or ADSs for more than one year at the time of disposition. If you are an individual, long-term capital gain will be taxed at preferential rates. Your ability to deduct capital losses will be subject to various limitations.

The gain or loss you recognize on a sale or disposition of our ordinary shares or ADSs generally will be treated as arising from sources within the United States for foreign tax credit limitation purposes. However, if gains from the disposition of ordinary shares or ADSs are taxed under the New EIT Law, see "Item 3.D. Key Information—Risk Factors—Risks related to our ADSs, ordinary shares and notes—We may be required to withhold PRC income tax on any dividend we pay you, and any gain you realize on the transfer of our ordinary shares and/or ADSs may also be subject to PRC withholding tax," the income tax treaty between the United States and the PRC may apply, in which case you may elect to treat such gains as arising from sources within China for foreign tax credit limitation purposes. You are urged to consult your own tax advisors regarding the tax consequences to you under your particular circumstances if any PRC withholding tax is imposed on the disposition of ordinary shares or ADSs, including the availability of the foreign tax credit.

*Status as a PFIC.* If we are a PFIC in any taxable year in which you hold ordinary shares or ADSs, you will generally be subject to additional taxes and interest charges on certain "excess distributions" we make and on any gain realized on the disposition or deemed disposition of your ordinary shares or ADSs, regardless of whether we continue to be a PFIC in the year in which you receive an "excess distribution" or dispose of or are deemed to dispose of your ordinary shares or ADSs. Distributions in respect of your ordinary shares or ADSs during a taxable year will generally constitute "excess distributions" if, in the aggregate, they exceed 125% of the average amount of distributions in respect of your ordinary shares or ADSs over the three preceding taxable years or, if shorter, the portion of your holding period before such taxable year.

To compute the tax on excess distributions or any gain, (1) the excess distribution or the gain will be allocated ratably to each day in your holding period, (2) the amount allocated to the current year and any tax year before we first became a PFIC will be taxed as ordinary income in the current year, (3) the amount allocated to other taxable years will be taxable at the highest applicable marginal rate in effect for that year, and (4) an interest charge at the rate for underpayment of taxes for any period described under (3) above will be imposed with respect to any portion of the excess distribution or gain that is allocated to such period. In addition, if we are a PFIC or were in the year prior to a distribution, No distribution that you receive from us will qualify for taxation at the preferential rate discussed in the "—U.S. Federal Income Taxation—Dividends on Ordinary Shares or ADSs" section above.

We will be classified as a PFIC in any taxable year if, after the application of certain look-through rules, either: (1) 75.0% or more of our gross income for the taxable year is passive income (such as certain dividends, interest, rents or royalties), or (2) the average percentage value (determined on a quarterly basis) of our gross assets during the taxable year that produce passive income or are held for the production of passive income is at least 50.0% of the value of our total assets. For purposes of the asset test, any cash, cash equivalents, cash invested in short-term, interest bearing, debt instruments, or bank deposits, and any other current asset that is readily convertible into cash, will generally count as a passive asset.

We operate an active online real estate Internet portal in China and do not believe we were a PFIC for our 2018 taxable year. We have No current intention to change the general manner in which we organize or conduct our business in later taxable years, not taking into account transactions outside of the ordinary course of business. Our expectations are based on assumptions as to our projections of the value of our outstanding shares and of the other cash that we will hold and generate in the ordinary course of our business. We have not conducted a separate appraisal of the values of our assets for this purpose. Although the law in this regard is not entirely clear, we treat our consolidated controlled entities as being owned by us for U.S. federal income tax purposes. Despite our expectations, there can be No assurance that we will not be a PFIC in the current or any future taxable years, as PFIC status is re-tested each year and depends on the actual facts in such year. We could be a PFIC, for example, if our market capitalization (i.e., our share price multiplied by the total number of our outstanding ordinary shares) at any time in the future is lower than projected, if it is determined that we are not the owner of our consolidated controlled entities for U.S. federal income tax purposes, or if our business and assets evolve in ways that are different from what we currently anticipate. In addition, though we believe that our assets and the income derived from our assets do not generally constitute passive assets and income under the PFIC rules, there is No assurance that the Internal Revenue Service, or IRS, will agree with us.

If we are a PFIC in any year, as a U.S. holder, you will generally be required to file a return on IRS Form 8621 regarding your ordinary shares or ADSs on an annual basis. You should consult your own tax adviser regarding reporting requirements with regard to your ordinary shares or ADSs.

If we are a PFIC in any year, so long as the ADSs are and remain "marketable," you will be able to avoid the excess distribution rules described above by making a timely so-called "mark-to-market" election with respect to such U.S. holder's ADSs. The ADSs will be "marketable" as long as they remain regularly traded on a national securities exchange, such as The New York Stock Exchange. If you make this election in a timely fashion, you will generally recognize as ordinary income or ordinary loss (limited to the amount of prior ordinary gain) the difference between the adjusted tax basis of your ADSs on the first day of any taxable year and their value on the last day of that taxable year. Your basis in the ADSs will be adjusted to reflect any such income or loss. A mark-to-market election will be effective for the taxable year for which the election is made and for all subsequent taxable years, unless the ADSs are No longer regularly traded on a qualified exchange or the IRS consents to the revocation of the election. However, because a mark-to-market election cannot be made for any lower-tier PFICs that we may own, you may continue to be subject to the PFIC rules with respect to any indirect interest in any investments held by us that are treated as an equity interest in a PFIC for U.S. federal income tax purposes, including our subsidiaries. In addition, because our ordinary shares are not regularly traded on a national securities exchange, you will not be able to make a mark-to-market election with respect to any ordinary shares held by such U.S. holder. You should consult your own tax advisors with respect to making a mark-to-market election.

In addition, if we are a PFIC in any year, you might be able to avoid the excess distribution rules described above by making a timely so-called "qualified electing fund," or QEF, election to be taxed currently on your pro rata portion of our income and gain. However, we do not intend to provide the information that would be necessary for you to make a QEF election. Accordingly, you will not be able to make or maintain a QEF election with respect to your ADSs or ordinary shares.

You should consult with your tax advisors regarding the U.S. federal income tax consequences of holding ADSs or ordinary shares if we are considered to be a PFIC in any taxable year as well as your eligibility for a "mark-to-market" election and whether making such an election would be advisable to you in your particular circumstances.

*Additional Tax on Net Investment Income*

If you are an individual, estate or trust whose income exceeds certain thresholds, you will be subject to a 3.8% Medicare contribution tax on net investment income, including, among other things, dividends on, and capital gains from, the sale or other taxable disposition of, your ordinary shares or ADSs, subject to certain limitations and exceptions.

*U.S. Information Reporting and Backup Withholding Rules*

In general, dividend payments with respect to the ordinary shares or ADSs and the proceeds received on the sale or other disposition of those ordinary shares or ADSs may be subject to information reporting to the IRS, and to backup withholding (currently imposed at a rate of 24.0%). Backup withholding will not apply, however, if you (1) are a corporation or come within certain other exempt categories and, when required, can demonstrate that fact or (2) provide a taxpayer identification number, certify as to No loss of exemption from backup withholding and otherwise comply with the applicable backup withholding rules. To establish your status as an exempt person, you will generally be required to provide certification on IRS Form W-9. Any amounts withheld from payments to you under the backup withholding rules will generally be allowed as a refund or a credit against your U.S. federal income tax liability, provided that you timely furnish the required information to the IRS.

You may be required to report information with respect to your ordinary shares or ADSs not held through a custodial account with a U.S. financial institution to the IRS. In general, if you hold specified "foreign financial assets" (which generally would include ordinary shares or ADSs) with an aggregate value exceeding $50,000, you will be required to report information about those assets on IRS Form 8938, which must be attached to your annual income tax return. Higher asset thresholds apply if you file a joint tax return or reside abroad. If you fail to report required information, you could become subject to substantial penalties. You should consult your own tax advisor regarding your obligation to file IRS Form 8938.

You should consult your own tax advisor regarding the application of the U.S. federal income tax laws to their particular situations as well as any additional tax consequences resulting from purchasing, holding or disposing of ordinary shares or ADSs, including the applicability and effect of the tax laws of any state, local or foreign jurisdiction and any estate, gift, and inheritance laws.

### F. Dividends and Paying Agents

Not applicable.

### G. Statement by Experts

Not applicable.

### H. Documents on display

We have previously filed with the SEC our registration statement on Form F-1 (File Number 333-169170), as amended, and a prospectus under the Securities Act with respect to our ADSs, as amended. We have also filed with the SEC registration statements on Form S-8 (File Numbers 333-173157 and 333-207182) with respect to our ADSs, as amended. In addition, we have filed with the SEC an automatic shelf registration statement on Form F-3 (File Number 333-208628), as amended, and a prospectus under the Securities Act with respect to our ordinary shares and ADSs.

We are subject to the periodic reporting and other informational requirements of the Exchange Act. Under the Exchange Act, we are required to file reports and other information with the SEC. Specifically, we are required to file annually a Form 20-F within four months after the end of each fiscal year for fiscal years ending on or after December 15, 2011. Copies of reports and other information, when so filed, may be inspected without charge and may be obtained at prescribed rates at the public reference facilities maintained by the SEC at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. The public may obtain information regarding the Washington, D.C. Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains a web site at www.sec.gov that contains reports, proxy and information statements, and other information regarding registrants that make electronic filings with the SEC using its EDGAR system.

As a foreign private issuer, we are exempt from the rules of the Exchange Act prescribing the furnishing and content of quarterly reports and proxy statements, and our executive officers, directors and principal shareholders are exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act. In addition, we are not required under the Exchange Act to file periodic reports and financial statements with the SEC as frequently or as promptly as U.S. companies whose securities are registered under the Exchange Act.

We will furnish JPMorgan Chase Bank, N.A., the depositary, with our annual reports, which include a review of operations and annual audited consolidated financial statements prepared in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP" or "GAAP"), and all notices of shareholders' meeting and other reports and communications that are made generally available to our shareholders. The depositary makes such notices, reports and communications available to holders of ADSs and, upon our request, mails to all record holders of ADSs the information contained in any notice of a shareholders' meeting received by the depositary from us.

### I. Subsidiary Information

Not applicable.

### ITEM 11. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Our primary market risk exposure is interest rate risk associated with short and long-term borrowings bearing variable interest rates. We are also exposed to foreign currency risk, which can adversely affect our operating profits.

The following discussion should be read in conjunction with the notes to our audited consolidated financial statements contained in this annual report, which provide further information on our debt and derivative instruments contained in this annual report.

### Liquidity Risk

The principal method we use to manage liquidity risk arising from liabilities is maintaining an adequate level of cash and cash equivalents with different banks. In 2016, 2017 and 2018, we monitored our liquidity risks by considering the maturity of our financial assets and projected cash flows from operations. Our objective is to maintain a balance between a continuity of funding and flexibility through settlement from customers and subsequent payment to vendors to meet our working capital requirements.

### Interest Rate Risk

Our earnings are affected by changes in interest rates due to the impact of such changes on interest income and expense from interest-bearing financial assets and liabilities. Our interest-bearing financial assets and liabilities are predominately denominated in Renminbi and U.S. dollars. Our financial assets consist primarily of cash deposits with fixed interest rates and receivables.

*Foreign Currency Risk*

Substantially all of our revenues, cash and cash equivalent assets, costs and expenses, are denominated in Renminbi, and the functional currency of our principal operating subsidiaries and consolidated controlled entities is the Renminbi. On the other hand, a portion of our expenditures are denominated in foreign currencies, primarily the U.S. dollar, and we use the U.S. dollar as our functional and reporting currency. The ADSs are also traded in U.S. dollars. As a result, the value of your investment in our ADSs will be affected by fluctuations in exchange rates, particularly appreciation or depreciation in the value of the Renminbi relative to the U.S. dollar and other foreign currencies, without giving effect to any underlying change in our business or results of operations. For example, if the Renminbi had weakened 5.0% against the U.S. dollar with all other variables held constant, our loss for 2016 would have been US$4.1 million lower, our profit for 2017 would have been US$0.8 million lower, and our loss for 2018 would have been US$2.8 million lower. See "Item 3.D. Key Information—Risk Factors—Risks related to doing business in China—Fluctuations in the exchange rates of the Renminbi could materially and adversely affect the value of our shares or ADSs and result in foreign currency exchange losses."

From time to time we manage to convert Renminbi into foreign currencies for purchases of equipment from overseas suppliers and for certain expenses. The Renminbi is not freely convertible into foreign currencies. In July 2005, the PRC government discontinued pegging the Renminbi to the U.S. dollar. However, the PBOC, regularly intervenes in the foreign exchange market to prevent significant short-term fluctuations in the exchange rate. Nevertheless, under China's current exchange rate regime, the Renminbi may appreciate or depreciate significantly in value against the U.S. dollar in the medium to long term.

Very limited hedging transactions are available in China to reduce our exposure to exchange rate fluctuations. To date, we have not entered into any hedging transactions to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedging transactions may be limited and we may not be able to successfully hedge our exposure at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert Renminbi into other currencies.

*Credit Risk*

Assets that potentially subject us to significant concentration of credit risk primarily consist of cash and cash equivalents, restricted cash, fixed-rate time deposits classified as short-term investments, accounts receivable, funds receivable, loans receivable and commitment deposits. As of December 31, 2018, we had US$463.6 million in cash and cash equivalents, restricted cash and short-term investments, 96.2% and 3.8% of which were held by financial institutions in the PRC and financial institutions outside of the PRC, respectively. Under PRC law, it is generally required that a commercial bank in the PRC that holds third-party cash deposits protect the depositors' rights and interests over their deposited money; PRC banks are subject to a series of risk control regulatory standards; and PRC bank regulatory authorities are empowered to take over the operation and management of any PRC bank that faces a material credit crisis. In the event of bankruptcy of one of the financial institutions in which we have deposits or investments, it may be unlikely to claim our deposits or investments back in full. We selected reputable financial institutions with high credit ratings to deposit its assets. We regularly monitor the ratings of the financial institutions in case of any defaults. There has been No recent history of default in relation to these financial institutions.

Accounts receivable are typically unsecured and are derived from revenue earned from customers in the PRC. The risk with respect to accounts receivable is mitigated by credit evaluations we perform on our customers and our ongoing monitoring of outstanding balances. We regularly review the creditworthiness of our customers and require collateral from our customers in certain circumstances when accounts receivables become long overdue.

Funds receivable represent amounts due from third-party payment service providers. We carefully consider and monitor the credit worthiness of the third-party payment service providers to mitigate any risks associated with funds receivable.

We are also exposed to default risk on our loans receivable. We assess the allowance for credit loss related to loans receivable on a quarterly basis, either on an individual or collective basis. As of December 31, 2018, No single borrower comprised a significant portion of our loan portfolio.

We regularly review the creditworthiness of real estate developers and require collateral from real estate developers in certain circumstances when commitment deposits become overdue.

## ITEM 12. DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES

*A. Debt Securities*

Not applicable.

*B. Warrants and Rights*

Not applicable.

*C. Other Securities*

Not applicable.

*D. American Depositary Shares*

On March 18, 2014, we announced the change of the ratio of our American Depositary Receipts representing Class A ordinary shares from one ADS for one Class A ordinary shares to five ADSs for one Class A ordinary share. The record date for the ratio change was March 28, 2014. For our ADS holders, this ratio change had the same effect as a five-for-one ADS split. There was No change to our Class A ordinary shares or Class B ordinary shares. The effect of the ratio change on the ADS trading price on New York Stock Exchange occurred on April 7, 2014.

JPMorgan Chase Bank, N.A., our depositary, may charge each person to whom ADSs are issued, including, without limitation, issuances against deposits of shares, issuances in respect of share distributions, rights and other distributions, issuances pursuant to a stock dividend or stock split declared by us or issuances pursuant to a merger, exchange of securities or any other transaction or event affecting the ADSs or deposited securities, and each person surrendering ADSs for withdrawal of deposited securities in any manner permitted by the deposit agreement or whose ADRs are cancelled or reduced for any other reason, $5.00 for each 100 ADSs (or any portion thereof) issued, delivered, reduced, cancelled or surrendered, the case may be. The depositary may sell (by public or private sale) sufficient securities and property received in respect of a share distribution, rights and/or other distribution prior to such deposit to pay such charge.

The following additional charges shall be incurred by the ADR holders, by any party depositing or withdrawing ordinary shares or by any party surrendering ADSs or to whom ADSs are issued (including, without limitation, issuance pursuant to a stock dividend or stock split declared by us or an exchange of stock regarding the ADRs or the deposited securities or a distribution of ADSs), whichever is applicable:

- a fee of $1.50 per ADR or ADRs for transfers of certificated or direct registration ADRs;

- a fee of up to $0.05 per ADS for any cash distribution made pursuant to the deposit agreement;

- a fee of up to $0.05 per ADS per calendar year (or portion thereof) for services performed by the depositary in administering the ADRs (which fee may be charged on a periodic basis during each calendar year and shall be assessed against holders of ADRs as of the record date or record dates set by the depositary during each calendar year and shall be payable in the manner described in the next succeeding provision);

- reimbursement of such fees, charges and expenses as are incurred by the depositary and/or any of the depositary's agents (including, without limitation, the custodian and expenses incurred on behalf of holders in connection with compliance with foreign exchange control regulations or any law or regulation relating to foreign investment) in connection with the servicing of the ordinary shares or other deposited securities, the delivery of deposited securities or otherwise in connection with the depositary's or its custodian's compliance with applicable law, rule or regulation (which charge shall be assessed on a proportionate basis against holders as of the record date or dates set by the depositary and shall be payable at the sole discretion of the depositary by billing such holders or by deducting such charge from one or more cash dividends or other cash distributions);

- a fee for the distribution of securities (or the sale of securities in connection with a distribution), such fee being in an amount equal to the fee for the execution and delivery of ADSs which would have been charged as a result of the deposit of such securities (treating all such securities as if they were ordinary shares) but which securities or the net cash proceeds from the sale thereof are instead distributed by the depositary to those holders entitled thereto;

- stock transfer or other taxes and other governmental charges;

- cable, telex and facsimile transmission and delivery charges incurred at your request in connection with the deposit or delivery of ordinary shares;

- transfer or registration fees for the registration of transfer of deposited securities on any applicable register in connection with the deposit or withdrawal of deposited securities; and

- expenses of the depositary in connection with the conversion of foreign currency into U.S. dollars.

We will pay all other charges and expenses of the depositary and any agent of the depositary (except the custodian) pursuant to agreements from time to time between us and the depositary. The charges described above may be amended from time to time by agreement between us and the depositary.

Our depositary has agreed to reimburse us for certain expenses we incur that are related to establishment and maintenance of the ADR program, including investor relations expenses and exchange application and listing fees. Neither the depositary nor we can determine the exact amount to be made available to us because (1) the number of ADSs that will be issued and outstanding, (2) the level of fees to be charged to holders of ADSs, and (3) our reimbursable expenses related to the ADR program are not known at this time. The depositary collects its fees for issuance and cancellation of ADSs directly from investors depositing ordinary shares or surrendering ADSs for the purpose of withdrawal or from intermediaries acting for them. The depositary collects fees for making distributions to investors by deducting those fees from the amounts distributed or by selling a portion of distributable property to pay the fees. The depositary may collect its annual fee for depositary services by deduction from cash distributions, or by directly billing investors, or by charging the book-entry system accounts of participants acting for them. The depositary may generally refuse to provide services to any holder until the fees and expenses owing by such holder for those services or otherwise are paid.

**PART II**

**ITEM 13. DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES**

Not applicable.

**ITEM 14. MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS**

*A. Material Modifications to the Rights of Security Holders*

None.

*B. Use of Proceeds*

Not applicable.

**ITEM 15. CONTROLS AND PROCEDURES**

**Disclosure Controls and Procedures**

Our management, with the participation of our chief executive officer and acting chief financial officer, has performed an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report, as required by Rule 13a-15(b) under the Exchange Act.

Based upon that evaluation, our management has concluded that, as of December 31, 2018, our disclosure controls and procedures were not effective in certain respects, primarily due to the material weakness in our internal controls, as discussed below, to ensure that the information required to be disclosed by us in the reports that we file and furnish under the Exchange Act was recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our chief executive officer and acting chief financial officer, to allow timely decisions regarding required disclosure.

***Management's Annual Report on Internal Control over Financial Reporting***

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act. Our management evaluated the effectiveness of our internal control over financial reporting, as required by Rule 13a-15(c) of the Exchange Act, based on criteria established in the Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Based on this evaluation, our management has concluded that our internal control over financial reporting was not effective as of December 31, 2018 due to the existence of a material weakness, as described below.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. In addition, projections of any evaluation of effectiveness of our internal control over financial reporting to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's financial statements will not be prevented or detected on a timely basis. Our material weakness is that we did not have sufficient financial reporting and accounting personnel to formalize, design, implement and operate key controls over financial reporting process in order to report financial information in accordance with U.S. GAAP and SEC reporting requirements.

Notwithstanding the identified material weakness, management, including our chief executive officer and acting chief financial officer, believes the consolidated financial statements included in this annual report on Form 20-F present fairly, in all material respects, our financial condition, results of operations and cash flows in conformity with U.S. GAAP.

*Attestation Report of the Registered Public Accounting Firm*

Our independent registered public accounting firm, KPMG Huazhen LLP, has audited the effectiveness of our internal control over financial reporting as of December 31, 2018, as stated in its report, which appears on page F-2 of this annual report.

*Changes in Internal Control over Financial Reporting*

We are currently in the process of remediating the material weakness described above. In 2019, we will continue to implement additional measures to remediate the existing material weakness as discussed above. However, we cannot assure you that we will remediate our material weakness in a timely manner. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business— If we fail to achieve and maintain an effective system of internal control over financial reporting, we may be unable to accurately report our financial results or prevent fraud, which could result in harm to our business, loss of investor confidence in our financial reporting and a lower trading price of our ADSs or notes."

As disclosed in "Item 15. Controls and Procedures" of our Annual Report on Form 20-F for the year ended December 31, 2017, management previously identified and disclosed a material weakness in our internal control over financial reporting in the design of controls to monitor and timely identify significant legal contingencies, or developments thereto, in order to perform appropriate accounting analysis and review, including related financial statement disclosures, as part of the financial statement close process. With the oversight of management and our audit committee, we have implemented the following remediation actions designed to improve our internal control over financial reporting and to help address our prior material weakness:

- assessed the progress made on legal contingencies in a timely manner by formalizing a litigation inventory and tracking report on a quarterly basis prepared and reviewed by our internal legal group; and
- improved timely communication between accounting team and internal legal group to address impact on the consolidated financial statements as a result of latest developments, if any, on legal contingencies.

Other than as described above, No changes in our internal controls over financial reporting occurred during the period covered by this annual report that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

## ITEM 16A. AUDIT COMMITTEE FINANCIAL EXPERT

Our board of directors has determined that Sam Hanhui Sun is an "audit committee financial expert" as defined by SEC rules, and that he satisfies the independence requirements of Section 303A of the New York Stock Exchange Listed Company Manual and Rule 10A-3 promulgated under the Exchange Act.

## ITEM 16B. CODE OF ETHICS

Our board of directors has adopted our code of conduct and ethics, a code that applies to members of the board of directors including its chairman and other senior officers, including the chief executive officer, the acting chief financial officer and the chief operations officer. This code is publicly available on our website at ir.fang.com.

## ITEM 16C. PRINCIPAL ACCOUNTANT FEES AND SERVICES

The following table sets forth the aggregate fees by categories specified below in connection with certain professional services rendered by our independent registered public accounting firms, Ernst & Young Hua Ming LLP and KPMG Huazhen LLP, for the years ended December 31, 2017 and 2018, respectively. Save as disclosed below, we did not pay any other fees to Ernst & Young Hua Ming LLP and KPMG Huazhen LLP during the periods indicated below.

|  | 2017 | 2018 |
|---|---|---|
|  | (U.S. dollars in thousands) | |
| Audit fees[1] | 1,061 | 1,741 |
| Audit-related fees[2] | 71 | 800 |
| Tax fees[3] | 45 | - |
| Total | 1,177 | 2,541 |

(1) Audit fees are defined as the audit that needs to be performed each year in order to issue opinions on our consolidated financial statements and limited procedures performed in relation to interim financial information. We paid or accrued expenses of USD1,061 and USD541 for the years ended December 31, 2017 and 2018 related to Ernst & Young Hua Ming LLP. We paid or accrued expenses of USD1,200 to KPMG Huazhen LLP related to its audit of our annual financial statements for the year ended December 31, 2018 and limited procedures performed in relation to interim financial information.

(2) Audit-related fees include fees associated with the audit and reviews of carve-out financial statements of CIH for inclusion in the stand-alone SEC filings in connection with the proposed separation of CIH.

(3) Tax fees include those tax services provided by the independent auditor for tax compliance, tax advice and tax planning.

*Policy on Pre-Approval of Audit and Non-Audit Services of Independent Auditors*

Our audit committee is responsible for pre-approving all audit and non-audit services provided by our auditor. These services may include audit services, audit related services, tax services and other services, as described above. Pre-approval is detailed as to the particular service or categories of services, and is subject to a specific budget. Our management and our auditor report to the audit committee regarding the extent of services provided in accordance with this pre-approval and the fees for the services performed to date on an annual basis. The audit committee may also pre-approve additional services on a case-by-case basis.

## ITEM 16D. EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES

Not applicable.

## ITEM 16E. PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS

Not applicable.

## ITEM 16F. CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT

On July 19, 2018, we dismissed Ernst & Young Hua Ming LLP, as our independent registered public accounting firm, and engaged KPMG Huazhen LLP as our independent registered public accounting firm in connection with the audit of our consolidated financial statements for the fiscal year ending December 31, 2018, each effective immediately. The decision to change accountants was approved by the Audit Committee and our Board of Directors on July 19, 2018. The decision was not made due to any disagreements with Ernst & Young Hua Ming LLP.

The audit reports of Ernst & Young Hua Ming LLP on our consolidated financial statements as of and for the two fiscal years ended December 31, 2017 did not contain an adverse opinion or a disclaimer of opinion and was not qualified or modified as to uncertainty, audit scope or accounting principles. However, Ernst & Young Hua Ming LLP issued an adverse report with our internal control over financial reporting as of December 31, 2017 because of a material weakness related to the design of controls to monitor and timely identify significant legal contingencies, or developments thereto, in order to perform appropriate accounting analysis and review, including related financial statement disclosures, as part of the financial statement close process.

During the two fiscal years ended December 31, 2017 and the subsequent interim period through July 19, 2018, there were No (1) disagreements with Ernst & Young Hua Ming LLP on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, any of which, if not resolved to their satisfaction would have caused them to make reference in connection with their opinion to the subject matter of the disagreement, or (2) "reportable events" requiring disclosure, pursuant to Item 16F(a)(1)(v) of the instructions to Form 20-F, except that Ernst & Young Hua Ming LLP having advised us that the internal controls necessary for us to develop reliable financial statements did not exist for the reason stated above.

We provided Ernst & Young Hua Ming LLP with a copy of the foregoing disclosure, and requested that Ernst & Young Hua Ming LLP furnish us with a letter addressed to the SEC stating whether it agrees with the above statements, and if not, stating the respects in which it does not agree. We have received the requested letter from Ernst & Young Hua Ming LLP, a copy of which is filed as Exhibit 16.1 to this Form 20-F.

During the two fiscal years ended December 31, 2017 and the subsequent interim period through July 19, 2018, neither we nor anyone on behalf of us has consulted with KPMG Huazhen LLP regarding (1) the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on our consolidated financial statements, and neither a written report nor oral advice was provided to us that KPMG Huazhen LLP concluded was an important factor considered by us in reaching a decision as to any accounting, auditing, or financial reporting issue, (2) any matter that was the subject of a disagreement pursuant to Item 16F(a)(1)(iv) of the instructions to Form 20-F, or (3) any reportable event pursuant to Item 16F(a)(1)(v) of the instructions to Form 20-F.

**ITEM 16G. CORPORATE GOVERNANCE**

As a foreign private issuer with shares listed on the New York Stock Exchange, we are subject to corporate governance requirements imposed by the New York Stock Exchange. Under Section 303A of the New York Stock Exchange Listed Company Manual, New York Stock Exchange listed non-US companies may, in general, follow their home country corporate governance practices in lieu of some of the New York Stock Exchange corporate governance requirements. A New York Stock Exchange listed non-U.S. company is simply required to provide a general summary of the significant differences to its U.S. investors either on the company website or in its annual report distributed to its U.S. investors.

We are committed to a high standard of corporate governance. As such, we endeavor to comply with most of the New York Stock Exchange corporate governance practices. However, the following are ways in which our current corporate governance practices differ from New York Stock Exchange corporate governance requirements since the laws of Cayman Islands do not require such compliance:

·   We are not required to schedule an executive session at least once a year to be attended by only independent directors and all directors are currently entitled to attend all of our board meetings.

·   We have not yet adopted or disclosed a method for interested parties to communicate directly with the presiding director or with non-management directors as a group.

·   We are not required to obtain shareholder approval for the adoption of, or material revisions to, our equity compensation plans and our directors may amend, materially revise, or terminate our equity compensation plans, but No such action will affect any outstanding award in any manner materially adverse to a participant without the consent of the participant.

·   Our compensation committee and our nominating and corporate governance committee are comprised with a majority of independent directors and not only independent directors. Our executive chairman, Mr. Mo, who serves on both our compensation committee and nominating and corporate governance committee, is not independent under the relevant New York Stock Exchange rules.

None of the above practices conflicts with the laws of the Cayman Islands or our fifth amended and restated memorandum and articles of association.

We may in the future determine to voluntarily comply with one or more of the foregoing provisions.

**ITEM 16H. MINE SAFETY DISCLOSURE**

Not applicable.

148

PART III

## ITEM 17. FINANCIAL STATEMENTS

We have elected to provide financial statements pursuant to Item 18.

## ITEM 18. FINANCIAL STATEMENTS

Our consolidated financial statements are included at the end of this annual report.

## ITEM 19. EXHIBITS

We have filed the following documents as exhibits to this annual report:

| Exhibit No. | Description of Exhibit |
| --- | --- |
| 1.1 | Fifth Amended and Restated Memorandum and Articles of Association (incorporated by reference to Exhibit 99.2 of our Current Report on Form 6-K filed with the SEC on August 3, 2012). |
| 2.1 | Specimen ordinary share certificate (incorporated by reference to our Registration Statement on Form F-1 filed with the SEC on September 2, 2010). |
| 2.2 | Specimen American depositary receipt (incorporated by reference to our Registration Statement on Form F-6 filed with the SEC on March 18, 2014). |
| 2.3 | Form of Deposit Agreement (incorporated by reference to our Registration Statement on Form F-6 filed with the SEC on September 2, 2010). |
| 2.4 | Form of Amendment No. 1 to Deposit Agreement (incorporated by reference to Exhibit (a)(2) of our Registration Statement on Form F-6 filed with the SEC on January 31, 2011). |
| 2.5 | Form of Amendment No. 2 to Deposit Agreement (incorporated by reference to Exhibit (a)(3) of our Registration Statement on Form F-6 filed with the SEC on May 15, 2012). |
| 2.6 | Form of Amendment No. 3 to Deposit Agreement (incorporated by reference to Exhibit (a) of our Registration Statement on Form F-6 filed with the SEC on March 18, 2014). |
| 2.7 | Form of Restricted Deposit Agreement by and among SouFun Holdings Limited, JPMorgan Chase Bank, N.A. and the holders of American depositary receipts issued thereunder (incorporated by reference to Exhibit 99.3 of our Registration Statement on Form 6-K filed with the SEC on December 4, 2013). |
| 2.8 | Form of Indenture by and among SouFun Holdings Limited, JPMorgan Chase Bank, N.A. and the holders of American depositary receipts issued thereunder (incorporated by reference to Exhibit 99.2 of our Current Report on Form 6-K filed with the SEC on December 18, 2013). |
| | Certain instruments which define rights of holders of long-term debt of Fang and its subsidiaries are not being filed because the total amount of securities authorized under each such instrument does not exceed 10% of the total consolidated assets of SouFun and its subsidiaries. We will furnish a copy of each such instrument to the SEC upon request. |
| 4.1 | Registration Rights Agreement among SouFun Holdings Limited, Vincent Tianquan Mo, Next Decade, Media Partner, Digital Link, Shan Li, IDG-Accel China Capital L.P., and IDG-Accel China Capital Investors L.P., dated April 11, 2014 (incorporated by reference to Exhibit 4.2 of our Annual Report on Form 20-F filed with the SEC on April 30, 2014). |
| 4.2 | Termination and Release Agreement among SouFun Holdings Limited, General Atlantic and Apax, dated September 23, 2015 (incorporated by reference to Exhibit 4.3 of our Annual Report 20-F filed with the SEC on May 17, 2016). |
| 4.3 | Termination and Release Agreement among SouFun Holdings Limited, General Atlantic, Apax, Next Decade, Media Partner and Digital Link, dated September 23, 2015 (incorporated by reference to Exhibit 4.4 of our Annual Report 20-F filed with the SEC on May 17, 2016). |
| 4.4 | Registration Rights Agreement among SouFun Holdings Limited, Safari Group Holdings Limited and Safari Group CB Holdings Limited, dated September 24, 2015 (incorporated by reference to Exhibit 99.15 to the Schedule 13D filed with the SEC by Vincent Tianquan Mo on October 9, 2015). |

149

| Exhibit No. | Description of Exhibit |
|---|---|
| 4.5 | Supplemental Agreement among SouFun Holdings Limited, IDG Alternative Global Limited and China Merchants Bank Co., Ltd., Tianjin Pilot Free Trade Zone Branch, dated November 4, 2015 (incorporated by reference to Exhibit 99.19 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.6 | Registration Rights Agreement among SouFun Holdings Limited, Karistone Limited and IDG-Accel China Capital L.P., dated November 10, 2015 (incorporated by reference to Exhibit 99.45 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.7 | Registration Rights Agreement among SouFun Holdings Limited, Karistone Limited and IDG-Accel China Capital Investors L.P., dated November 10, 2015 (incorporated by reference to Exhibit 99.46 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.8 | Registration Rights Agreement among SouFun Holdings Limited, Karistone Limited and Winning Star Global Limited, dated November 10, 2015 (incorporated by reference to Exhibit 99.47 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.9 | Registration Rights Agreement among SouFun Holdings Limited, Karistone Limited and Rainbow Zone Enterprise Inc., dated November 10, 2015 (incorporated by reference to Exhibit 99.48 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.10 | Registration Rights Agreement among SouFun Holdings Limited, Karistone Limited and Chuang Xi Capital Holdings Limited, dated November 10, 2015 (incorporated by reference to Exhibit 99.49 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.11 | Registration Rights Agreement among SouFun Holdings Limited, Karistone Limited and Wealth Harvest Global Limited, dated November 10, 2015 (incorporated by reference to Exhibit 99.50 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.12 | Stock Related Award Incentive Plan of 1999 (incorporated by reference to our Registration Statement on Form F-1 filed with the SEC on September 2, 2010). |
| 4.13 | 2010 Stock Incentive Plan (incorporated by reference to our Registration Statement on Form F-1 filed with the SEC on September 2, 2010). |
| 4.14 | 2015 Stock Incentive Plan (incorporated by reference to Exhibit 99.2 to our Current Report on Form 6-K filed with the SEC on July 6, 2015). |
| 4.15 | Form of Employment Agreement (incorporated by reference to our Registration Statement on Form F-1 filed with the SEC on September 2, 2010). |
| 4.16 | Form of Indemnification Agreement (incorporated by reference to our Registration Statement on Form F-1 filed with the SEC on September 2, 2010). |
| 4.17 | Form of Loan Agreement between and among Beijing Tuo Shi Huan Yu, SouFun Media or SouFun Network, Mr. Mo and/or Mr. Dai as shareholders of a consolidated controlled entity (incorporated by reference to Exhibit 4.19 of our Annual Report 20-F filed with the SEC on May 17, 2016). |
| 4.17.1 | Schedule of Loan Agreements between and among certain PRC subsidiary of Fang Holdings Limited and shareholders of a consolidated controlled entity (incorporated by reference to Exhibit 4.17.1 of our Annual Report on Form 20-F filed with the SEC on May 12, 2017). |
| 4.18 | Form of Creditor's Rights Transfer Agreement among Beijing Zhong Zhi Shi Zheng or Jia Tian Xia Network, Beijing Tuo Shi Huan Yu, SouFun Media or SouFun Network, and Mr. Mo and/or Mr. Dai as shareholders of a consolidated controlled entity (incorporated by reference to Exhibit 4.20 of our Annual Report 20-F filed with the SEC on May 17, 2016). |
| 4.18.1* | Schedule of Creditor's Rights Transfer Agreements among certain PRC subsidiaries of Fang Holdings Limited and shareholders of certain consolidated controlled entity. |

| Exhibit No. | Description of Exhibit |
|---|---|
| 4.19 | Form of Equity Pledge Agreement among Beijing Zhong Zhi Shi Zheng or Jia Tian Xia Network, Mr. Mo and/or Mr. Dai and/or other shareholders of a consolidated controlled entity pledging the shares of the consolidated controlled entity (incorporated by reference to Exhibit 4.21 of our Annual Report 20-F filed with the SEC on May 17, 2016). |
| 4.19.1* | Schedule of Equity Pledge Agreements among certain PRC subsidiary of Fang Holdings Limited and shareholders of a consolidated controlled entity. |
| 4.20 | Form of Shareholders' Proxy Agreement among Beijing Zhong Zhi Shi Zheng or Jia Tian Xia Network, a consolidated controlled entity, Mr. Mo and/or Mr. Dai and/or other shareholders of the consolidated controlled entity (incorporated by reference to Exhibit 4.22 of our Annual Report 20-F filed with the SEC on May 17, 2016). |
| 4.20.1* | Schedule of Shareholders' Proxy Agreements among certain PRC subsidiary of Fang Holdings Limited, a consolidated controlled entity and shareholders of the consolidated controlled entity. |
| 4.21 | Form of Operating Agreement among Beijing Zhong Zhi Shi Zheng or Jia Tian Xia Network, a consolidated controlled entity, Mr. Mo and/or Mr. Dai and/or other shareholders of the consolidated controlled entity (incorporated by reference to Exhibit 4.23 of our Annual Report 20-F filed with the SEC on May 17, 2016). |
| 4.21.1* | Schedule of Operating Agreements among certain PRC subsidiary of Fang Holdings Limited, a consolidated controlled entity and shareholders of the consolidated controlled entity. |
| 4.22 | Form of Exclusive Technical Consultancy and Services Agreement between Beijing Zhong Zhi Shi Zheng or Jia Tian Xia Network and a consolidated controlled entity (incorporated by reference to Exhibit 4.24 of our Annual Report 20-F filed with the SEC on May 17, 2016). |
| 4.22.1* | Schedule of Exclusive Technical Consultancy and Services Agreements between certain PRC subsidiary of Fang Holdings Limited and a consolidated controlled entity. |
| 4.23* | Form of Exclusive Call Option Agreement among Fang Holdings Limited, Mr. Mo and/or Mr. Dai and/or other shareholders of a consolidated controlled entity, the consolidated controlled entity and certain PRC subsidiaries of Fang Holdings Limited. |
| 4.23.1* | Schedule of Exclusive Call Option Agreements among SouFun Holdings Limited, shareholders of a consolidated controlled entity, the consolidated controlled entity and certain PRC subsidiaries of Fang Holdings Limited. |
| 4.24 | Form of Intra-group Memorandum of Understanding between SouFun Network or SouFun Media and a consolidated controlled entity (incorporated by reference to our Registration Statement on Form F-1 filed with the SEC on September 2, 2010). |
| 4.24.1 | Schedule of Intra-group Memorandums of Understanding between certain PRC subsidiary of SouFun Holdings Limited and a consolidated controlled entity (incorporated by reference to Exhibit 4.16.1 of our Annual Report 20-F filed with the SEC on April 26, 2012). |
| 4.25 | Summary Translation of Strategic Cooperation Agreement between Beijing SouFun Network Technology Co., Ltd. and Shenzhen World Union Properties Consultancy Co., Ltd.(incorporated by reference to Exhibit 99.4 of our Current Report on Form 6-K filed with the SEC on July 11, 2014). |
| 4.26 | Summary Translation of Investment and Cooperation Framework Agreement between SouFun Holdings Limited and Hopefluent Group Holdings Limited (incorporated by reference to Exhibit 99.5 of our Current Report on Form 6-K filed with the SEC on July 11, 2014). |
| 4.27 | Summary Translation of Joint Venture Agreement between SouFun Holdings Limited and Tospur Real Estate Consulting Co., Ltd. (incorporated by reference to Exhibit 99.3 of our Current Report on Form 6-K filed with the SEC on November 13, 2014). |

| Exhibit No. | Description of Exhibit |
|---|---|
| 4.28 | Summary Translation of Shareholders Agreement among Beijing China Index Information Co., Ltd., Shanghai SouFun Advertising Co., Ltd., Beijing Tian Xia Dai Information Service Co., Ltd., Beijing RunZe Microfinance Co., Ltd. and certain other parties thereto (incorporation by reference to Exhibit 4.36 of our Annual Report on Form 20-F filed with the SEC on April 28, 2015). |
| 4.29 | Summary Translation of Investment and Cooperation Agreement between SouFun Holdings Limited and Colour Life Services Group Co., Limited (incorporation by reference to Exhibit 4.37 of our Annual Report on Form 20-F filed with the SEC on April 28, 2015). |
| 4.30 | Subscription Agreement between SouFun Holdings Limited and IDG Alternative Global Limited, dated September 17, 2015 (incorporated by reference to Exhibit 99.2 of our Current Report on Form 6-K filed with the SEC on September 21, 2015). |
| 4.31 | Subscription Agreement among SouFun Holdings Limited, Safari Group Holdings Limited, Safari Group CB Holdings Limited and Safari Parent Limited, dated September 17, 2015 (incorporated by reference to Exhibit 99.3 of our Current Report on Form 6-K filed with the SEC on September 21, 2015). |
| 4.32 | Subscription Agreement Supplement among SouFun Holdings Limited, Safari Group Holdings Limited and Safari Group CB Holdings Limited, dated November 23, 2015 (incorporated by reference to Exhibit 99.2 of our Current Report on Form 6-K filed with the SEC on November 23, 2015). |
| 4.33 | Convertible Note (US$28.00 million) by SouFun Holdings Limited, dated September 24, 2015 (incorporated by reference to Exhibit 99.3 to the Schedule 13D filed with the SEC by Vincent Tianquan Mo on October 9, 2015). |
| 4.34 | Convertible Note (US$72.00 million) by SouFun Holdings Limited, dated September 24, 2015 (incorporated by reference to Exhibit 99.4 to the Schedule 13D filed with the SEC by Vincent Tianquan Mo on October 9, 2015). |
| 4.35 | Subscription Agreement Supplement between IDG Alternative Global Limited and SouFun Holdings Limited, dated October 29, 2015 (incorporated by reference to Exhibit 99.17 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.36 | Letter Agreement between IDG Alternative Global Limited and SouFun Holdings Limited, dated November 4, 2015 (incorporated by reference to Exhibit 99.18 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.37 | Supplemental Agreement among the IDG Alternative Global Limited, China Merchants Bank Co., Ltd., Tianjin Pilot Free Trade Zone Branch and SouFun Holdings Limited, dated November 4, 2015 (incorporated by reference to Exhibit 99.19 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.38 | Convertible Note (US$200.00 million) by SouFun Holdings Limited, dated November 4, 2015 (incorporated by reference to Exhibit 99.20 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.39 | Subscription Agreement between SouFun Holdings Limited and Karistone Limited, dated November 9, 2015 (incorporated by reference to Exhibit 99.26 to the Amendment No. 1 to Schedule 13D filed with the SEC by Vincent Tianquan Mo on November 12, 2015). |
| 4.40 | Subscription Agreement between SouFun Holdings Limited and IDG-Accel China Capital L.P., dated November 9, 2015 (incorporated by reference to Exhibit 99.11 of our Current Report on Form 6-K filed with the SEC on November 23, 2015). |
| 4.41 | Subscription Agreement between SouFun Holdings Limited and IDG-Accel China Capital Investors L.P., dated November 9, 2015 (incorporated by reference to Exhibit 99.12 of our Current Report on Form 6-K filed with the SEC on November 23, 2015). |
| 4.42 | Subscription Agreement between SouFun Holdings Limited and Winning Star Global Limited, dated November 9, 2015 (incorporated by reference to Exhibit 99.13 of our Current Report on Form 6-K filed with the SEC on November 23, 2015). |
| 4.43 | Subscription Agreement between SouFun Holdings Limited and Rainbow Zone Enterprise Inc., dated November 9, 2015 (incorporated by reference to Exhibit 99.14 of our Current Report on Form 6-K filed with the SEC on November 23, 2015). |

| Exhibit No. | Description of Exhibit |
|---|---|
| 4.44 | Subscription Agreement between SouFun Holdings Limited and Chuang Xi Capital Holdings Limited, dated November 9, 2015 (incorporated by reference to Exhibit 99.15 of our Current Report on Form 6-K filed with the SEC on November 23, 2015). |
| 4.45 | Subscription Agreement between SouFun Holdings Limited and Wealth Harvest Global Limited, dated November 9, 2015 (incorporated by reference to Exhibit 99.16 of our Current Report on Form 6-K filed with the SEC on November 23, 2015). |
| 4.46 | Summary Translation of Cooperation Framework Agreement among SouFun Holdings Limited, Chongqing Wanli New Energy Co., Ltd. and other relevant parties, dated November 13, 2015 (incorporated by reference to Exhibit 99.3 of our Current Report on Form 6-K filed with the SEC on November 13, 2015). |
| 4.47 | Summary Translation of Share Subscription Agreement among Beijing SouFun Fang Tian Xia Network Technology Co., Ltd., Beijing Fang Tian Xia Network Technology Co., Ltd., Beijing SouFun Decorative Engineering Co., Ltd., Beijing SouFun Science and Technology Development Co., Ltd., Chongqing Wanli New Energy Co., Ltd. and other relevant parties, dated January 19, 2016 (incorporated by reference to Exhibit 99.2 of our Current Report on Form 6-K filed with the SEC on January 22, 2016). |
| 4.48 | Summary Translation of Compensation Agreement among Beijing SouFun Fang Tian Xia Network Technology Co., Ltd., Beijing Fang Tian Xia Network Technology Co., Ltd., Beijing SouFun Decorative Engineering Co., Ltd. and Chongqing Wanli New Energy Co., Ltd., dated January 19, 2016 (incorporated by reference to Exhibit 99.3 of our Current Report on Form 6-K filed with the SEC on January 22, 2016). |
| 4.49 | Summary Translation of the Non-compete Agreement among Vincent Tianquan Mo, SouFun Holdings Limited and Chongqing Wanli New Energy Co., Ltd., dated May 2, 2016 (incorporated by reference to Exhibit 4.58 of our Annual Report 20-F filed with the SEC on May 17, 2016). |
| 4.50 | Summary Translation of Commercial Properties Purchase Agreement between Beijing SouFun Network Technology Co., Ltd. and Beijing Jinyu Dacheng Co., Ltd., dated November 10, 2015 (incorporated by reference to Exhibit 99.3 of our Current Report on Form 6-K filed with the SEC on November 23, 2015). |
| 4.51 | Summary Translation of Share Subscription and Asset Purchase Termination Agreement among Beijing SouFun Fang Tian Xia Network Technology Co., Ltd., Beijing Fang Tian Xia Network Technology Co., Ltd., Beijing SouFun Decorative Engineering Co., Ltd., Beijing SouFun Science and Technology Development Co., Ltd., Chongqing Wanli New Energy Co., Ltd. and other relevant parties, dated February 22, 2017 (incorporated by reference to Exhibit 4.51 of our Annual Report on Form 20-F filed with the SEC on May 12, 2017). |
| 4.52* | Summary Translation of Share Transfer Agreement among Shenzhen Nanfang Tongzheng Investment Co., Ltd., Jia Tian Xia Asset Management Co., Ltd. and Mr. Xicheng Liu in relation to Chongqing Wanli New Energy Co., Ltd, dated July 19, 2018. |
| 4.53* | English Translation of Loan Agreement among Beijing Zhong Zhi Shi Zheng, Mr. Vincent Tianquan Mo and Ms. Yu Huang, dated June 11, 2018 |
| 4.54* | English Translation of Equity Pledge Agreement among Beijing Zhong Zhi Shi Zheng, Mr. Vincent Tianquan Mo and Ms. Yu Huang, dated June 11, 2018 |
| 4.55* | English Translation of Shareholders' Proxy Agreement among Beijing Zhong Zhi Shi Zheng, Beijing Zhong Zhi Hong Yuan, Mr. Vincent Tianquan Mo and Ms. Yu Huang, dated June 11, 2018 |
| 4.56* | English Translation of Operating Agreement among Beijing Zhong Zhi Shi Zheng, Beijing Zhong Zhi Hong Yuan, Mr. Vincent Tianquan Mo and Ms. Yu Huang, dated June 11, 2018 |
| 4.57* | English Translation of Exclusive Technical Consultancy and Services Agreement between Beijing Zhong Zhi Shi Zheng and Beijing Zhong Zhi Hong Yuan, dated June 11, 2018 |
| 4.58* | English Translation of Exclusive Call Option Agreement among Beijing Zhong Zhi Shi Zheng, Beijing Zhong Zhi Hong Yuan, Mr. Vincent Tianquan Mo and Ms. Yu Huang, dated June 11, 2018 |
| 4.59* | English Translation of Supplementary Agreement to the Exclusive Call Option Agreement, among China Index Holdings Limited, Beijing Zhong Zhi Shi Zheng, Beijing Zhong Zhi Hong Yuan, Mr. Vincent Tianquan Mo and Ms. Yu Huang, dated October 1, 2018 |
| 8.1* | List of Principal Subsidiaries and Consolidated Controlled Entities. |

| Exhibit No. | Description of Exhibit |
|---|---|
| 11.1 | Code of Business Conduct and Ethics (incorporated by reference to Exhibit 99.1 of our Registration Statement on Form F-1 filed with the SEC on September 2, 2010). |
| 12.1* | Certification of Chief Executive Officer required by Rule 13a-14(a) (17 CFR 240.13a-14(a)) or Rule 15d-14(a) (17 CFR 240.15d-14(a)). |
| 12.2* | Certification of Chief Financial Officer required by Rule 13a-14(a) (17 CFR 240.13a-14(a)) or Rule 15d-14(a) (17 CFR 240.15d-14(a)). |
| 13.1** | Certification of Chief Executive Officer required by Rule 13a-14(b) (17 CFR 240.13a-14(b)) or Rule 15d-14(b) (17 CFR 240.15d-14(b)) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350). |
| 13.2** | Certification of Chief Financial Officer required by Rule 13a-14(b) (17 CFR 240.13a-14(b)) or Rule 15d-14(b) (17 CFR 240.15d-14(b)) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350). |
| 15.1* | Consent of Jingtian & Gongcheng. |
| 15.2* | Consent of KPMG Huazhen LLP. |
| 15.3* | Consent of Ernst & Young Hua Ming LLP. |
| 16.1* | Letter from Ernst & Young Hua Ming LLP to the Securities and Exchange Commission. |
| 101.INS* | XBRL Instance Document. |
| 101.SCH* | XBRL Taxonomy Extension Schema Document. |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document. |

| | |
|---|---|
| * | Filed herewith |
| ** | Furnished herewith |

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

FANG HOLDINGS LIMITED

By:     /s/ Vincent Tianquan Mo

Name:  Vincent Tianquan Mo

Title:   Executive Chairman

Date: May 14, 2019

155

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and Board of Directors
Fang Holdings Limited:

*Opinion on the Consolidated Financial Statements*

We have audited the accompanying consolidated balance sheet of Fang Holdings Limited and subsidiaries (the "Company") as of December 31, 2018, the related consolidated statements of comprehensive income (loss), shareholders' equity, and cash flows for the year then ended, and the related notes (collectively, the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018, and the results of its operations and its cash flows for the year then ended, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated May 14, 2019 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

*Changes in Accounting Principle*

As discussed in Note 2 to the consolidated financial statements, in 2018, the Company has changed its method of accounting for revenue recognition due to the adoption of Accounting Standards Codification Topic 606, *Revenue from Contracts with Customers*, and has changed its method of accounting for investments in equity securities due to the adoption of Accounting Standards Update No. 2016-01, *Financial Instruments - Overall (Subtopic 825-10), Recognition and Measurement of Financial Assets and Financial Liabilities*.

*Basis for Opinion*

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ KPMG Huazhen LLP

We have served as the Company's auditor since 2018.

Beijing, China
May 14, 2019

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and Board of Directors
Fang Holdings Limited:

*Opinion on Internal Control Over Financial Reporting*

We have audited Fang Holdings Limited and subsidiaries' (the "Company") internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. In our opinion, because of the effect of the material weakness, described below, on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheet of the Company as of December 31, 2018, the related consolidated statements of comprehensive income (loss), shareholders' equity, and cash flows for the year then ended, and the related notes (collectively, the "consolidated financial statements"), and our report dated May 14, 2019 expressed an unqualified opinion on those consolidated financial statements.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. A material weakness related to the lack of sufficient financial reporting and accounting personnel to formalize, design, implement and operate key controls over financial reporting process in order to report financial information in accordance with U.S. GAAP and SEC reporting requirements has been identified and included in management's assessment. The material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2018 consolidated financial statements, and this report does not affect our report on those consolidated financial statements.

*Basis for Opinion*

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

*Definition and Limitations of Internal Control Over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ KPMG Huazhen LLP

Beijing, China
May 14, 2019

Report of Independent Registered Public Accounting Firm

To the Shareholders and the Board of Directors of Fang Holdings Limited

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheet of Fang Holdings Limited (the Company) as of December 31, 2017, the related consolidated statements of comprehensive income (loss), shareholders' equity and cash flows for each of the two years in the period ended December 31, 2017, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2017, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2017, in conformity with U.S. generally accepted accounting principles.

**Adoption of New Accounting Standard**

As discussed in Note 2 to the consolidated financial statements, the accompanying consolidated statements of cash flows for each of the two years in the period ended December 31, 2017 have been adjusted for the retrospective application of the authoritative guidance on the presentation and classification of restricted cash which was adopted by the Company on January 1, 2018.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Ernst & Young Hua Ming LLP

We served as the Company's auditor from 2008 to 2018.

Shenzhen, The People's Republic of China
May 15, 2018
except for Note 2, as to which the date is May 14, 2019, related to the effect of the restatement related to the presentation and classification of restricted cash in the consolidated statements of cash flows

---

F-3

**FANG HOLDINGS LIMITED**

**CONSOLIDATED BALANCE SHEETS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares andper share data)**

| | Notes | As of December 31, 2017 US$ | 2018 US$ |
|---|---|---|---|
| **ASSETS** | | | |
| **Current assets:** | | | |
| Cash and cash equivalents | | 228,276 | 195,108 |
| Restricted cash, current | | 223,002 | 245,474 |
| Short-term investments | 5 | 55,801 | 16,043 |
| Accounts receivable (net of allowance of US$31,127 and US$33,276 as of December 31, 2017 and 2018, respectively) | 6 | 66,884 | 60,950 |
| Funds receivable | | 6,264 | 5,474 |
| Prepayments and other current assets | 7 | 32,704 | 27,995 |
| Commitment deposits (net of allowance of US$206 and nil as of December 31, 2017 and 2018, respectively) | | 5,876 | 191 |
| Loans receivable, current (net of allowance of US$4,810 and US$3,697 as of December 31, 2017 and 2018, respectively) | 8 | 129,438 | 117,602 |
| Amounts due from a related party | 19 | 167 | - |
| **Total current assets** | | 748,412 | 668,837 |
| | | | |
| **Non-current assets:** | | | |
| Property and equipment, net | 9 | 622,145 | 728,312 |
| Land use rights | | 35,728 | 33,153 |
| Loans receivable, non-current (net of allowance of US$106 and US$132 as of December 31, 2017 and 2018, respectively) | 8 | 14,674 | 6,249 |
| Deferred tax assets | 17 | 7,602 | 2,202 |
| Restricted cash, non-current portion | | 39,982 | 6,990 |
| Deposits for non-current assets | 10 | 58,722 | 902 |
| Long-term investments | 5 | 470,964 | 373,233 |
| Other non-current assets | 11 | 2,026 | 4,558 |
| **Total non-current assets** | | 1,251,843 | 1,155,599 |
| | | | |
| **Total assets** | | 2,000,255 | 1,824,436 |

The accompanying notes are an integral part of the consolidated financial statements.

**FANG HOLDINGS LIMITED**
**CONSOLIDATED BALANCE SHEETS (continued)**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares andper share data)**

| | Notes | As of December 31, | |
| --- | --- | --- | --- |
| | | 2017 | 2018 |
| | | US$ | US$ |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | |
| | | | |
| **Current liabilities:** | | | |
| Short-term loans (including short-term loans of the People's Republic of China ("PRC") Domestic Entities and the PRC Domestic Entities' subsidiaries without recourse to the Company of US$59,820 and US$76,267 as of December 31, 2017 and 2018, respectively) | 12 | 236,985 | 297,811 |
| Deferred revenue (including deferred revenue of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries without recourse to the Company of US$27,095 and US$32,816 as of December 31, 2017 and 2018, respectively) | | 168,884 | 163,346 |
| Accrued expenses and other liabilities (including accrued expenses and other liabilities of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries without recourse to the Company of US$54,516 and US$36,266 as of December 31, 2017 and 2018, respectively) | 13 | 158,799 | 131,268 |
| Customers' refundable fees (including customers' refundable fees of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries without recourse to the Company of US$10,986 and US$3,274 as of December 31, 2017 and 2018, respectively) | 14 | 7,070 | 3,976 |
| Income tax payable (including income tax payable of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries without recourse to the Company of US$1,325 and US$1,982 as of December 31, 2017 and 2018, respectively) | | 4,374 | 4,493 |
| Amounts due to a related party | 19 | - | 19 |
| Convertible senior notes | 15 | 5,700 | - |
| | | | |
| **Total current liabilities** | | **581,812** | **600,913** |
| | | | |
| **Non-current liabilities:** | | | |
| Long-term loans (including long-term loans of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries without recourse to the Company of US$55,958 and US$44,891 as of December 31, 2017 and 2018, respectively) | 12 | 114,109 | 123,215 |
| Convertible senior notes | 15 | 291,365 | 254,435 |
| Deferred tax liabilities (including deferred tax liabilities of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries without recourse to the Company of US$51,227 and US$10,488 as of December 31, 2017 and 2018, respectively) | 17 | 126,641 | 97,578 |
| Other non-current liabilities (including other non-current liabilities of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries without recourse to the Company of US$37,936 and US$51,144 as of December 31, 2017 and 2018, respectively) | | 146,053 | 153,095 |
| **Total non-current liabilities** | | **678,168** | **628,323** |
| | | | |
| **Total liabilities** | | **1,259,980** | **1,229,236** |
| | | | |
| Commitments and contingencies | 21 | - | - |

The accompanying notes are an integral part of the consolidated financial statements.

**FANG HOLDINGS LIMITED**
**CONSOLIDATED BALANCE SHEETS (continued)**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

| | Notes | As of December 31, 2017 | As of December 31, 2018 |
|---|---|---|---|
| | | US$ | US$ |
| **Shareholders' equity:** | | | |
| Class A ordinary shares, par value Hong Kong Dollar ("HK$") 1 per share, 600,000,000 shares authorized for Class A and Class B in aggregate, issued shares as of December 31, 2017 and 2018: 71,425,120 and 72,069,645; outstanding shares as of December 31, 2017 and 2018: 64,360,062 and 65,004,587 | 16 | 9,204 | 9,286 |
| Class B ordinary shares, par value HK$1 per share, 600,000,000 shares authorized for Class A and Class B in aggregate, and 24,336,650 shares and 24,336,650 shares issued and outstanding as at December 31, 2017 and December 31, 2018, respectively | 16 | 3,124 | 3,124 |
| Additional paid-in capital | | 500,666 | 517,802 |
| Accumulated other comprehensive income (loss) | | 137,630 | (75,837) |
| Retained earnings | | 225,574 | 276,746 |
| Less: Treasury stock (7,065,058 and 7,065,058 shares as of December 31, 2017 and 2018, respectively.) | | (136,615) | (136,615) |
| **Total Fang Holdings Limited shareholders' equity** | | **739,583** | **594,506** |
| Noncontrolling interests | | 692 | 694 |
| **Total shareholders' equity** | | **740,275** | **595,200** |
| **Total liabilities and shareholders' equity** | | **2,000,255** | **1,824,436** |

The accompanying notes are an integral part of the consolidated financial statements.

**FANG HOLDINGS LIMITED**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

| | Notes | For the Years Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2016 | 2017 | 2018 |
| | | US$ | US$ | US$ |
| **Revenues** | | | | |
| E-commerce services | | 577,684 | 87,809 | 15,384 |
| Marketing services | | 165,437 | 149,267 | 119,680 |
| Listing services | | 118,109 | 165,374 | 113,534 |
| Financial services | | 29,602 | 12,055 | 18,060 |
| Value-added services | | 25,559 | 29,791 | 36,358 |
| **Total revenues** | 4 | **916,391** | **444,296** | **303,016** |
| | | | | |
| **Cost of revenues** | | | | |
| Cost of services | | (687,184) | (174,599) | (58,570) |
| | | | | |
| **Gross profit** | | **229,207** | **269,697** | **244,446** |
| | | | | |
| **Operating (expenses) income** | | | | |
| Selling expenses | | (229,817) | (91,250) | (69,532) |
| General and administrative expenses (including related party amounts of US$897, US$501 and US$685 for the years ended December 31, 2016, 2017 and 2018, respectively) | | (151,251) | (135,688) | (138,386) |
| Other income (loss) | | 415 | (567) | 3,275 |
| | | | | |
| **Operating income (loss)** | | **(151,446)** | **42,192** | **39,803** |
| Foreign exchange (loss) gain | | (1,882) | 15 | (598) |
| Interest income | | 11,367 | 11,322 | 10,302 |
| Interest expense | | (20,791) | (16,153) | (21,174) |
| Change in fair value of securities | 5 | - | 518 | (167,402) |
| Realized gain on sale of available-for-sale securities (including accumulated other comprehensive income reclassifications for unrealized gain on available-for-sale securities of US$10,583, US$2,736 and US$1,493 for the years ended December 31, 2016, 2017 and 2018, respectively) | 5 | 10,583 | 2,736 | 1,493 |
| Government grants | | 6,469 | 3,154 | 1,435 |
| Investment income, net | 5 | 3,281 | 6,692 | 6,816 |
| Other non-operating loss | | - | (4,562) | (30) |
| Impairment on investments | 5 | (2,232) | (2,768) | - |
| | | | | |
| **Income (loss) before income taxes and noncontrolling interests** | | **(144,651)** | **43,146** | **(129,355)** |
| Income tax (expense) benefits | 17 | (24,984) | (21,442) | 14,446 |
| | | | | |
| **Net income (loss)** | | **(169,635)** | **21,704** | **(114,909)** |
| Net income (loss) attributable to noncontrolling interests | | - | (3) | 2 |
| Net income (loss) attributable to Fang Holdings Limited's shareholders | | (169,635) | 21,707 | (114,911) |

The accompanying notes are an integral part of the consolidated financial statements.

**FANG HOLDINGS LIMITED**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS) (continued)**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

| | Notes | For the Years Ended December 31, | | |
|---|---|---|---|---|
| | | 2016 | 2017 | 2018 |
| | | US$ | US$ | US$ |
| **Other comprehensive income (loss), before tax** | | | | |
| Foreign currency translation adjustments | | (60,732) | 56,571 | (46,648) |
| Amounts reclassified from accumulated other comprehensive income | | (10,583) | (2,736) | (1,493) |
| Unrealized gain on available-for-sale securities | | 7,326 | 212,838 | 1,493 |
| Gain (loss) on intra-entity foreign transactions of long-term-investment nature | | (6,996) | 1,872 | (3,034) |
| **Other comprehensive income (loss), before tax** | | **(70,985)** | **268,545** | **(49,682)** |
| Income tax expense related to components of other comprehensive income | | - | (49,566) | - |
| **Other comprehensive income (loss), net of tax** | | **(70,985)** | **218,979** | **(49,682)** |
| **Comprehensive income (loss)** | | **(240,620)** | **240,683** | **(164,591)** |
| Comprehensive income (loss) attributable to noncontrolling interests | | - | (3) | 2 |
| Comprehensive income (loss) attributable to Fang Holdings Limited's shareholders | | **(240,620)** | **240,686** | **(164,593)** |
| | | | | |
| **Earnings (loss) per share for Class A and Class B ordinary shares** | | | | |
| Basic | 23 | (1.81) | 0.25 | (1.29) |
| Diluted | 23 | (1.81) | 0.24 | (1.29) |
| | | | | |
| **Weighted average number of Class A and Class B ordinary shares outstanding:** | | | | |
| Basic | 23 | 93,605,749 | 88,475,665 | 88,749,432 |
| Diluted | 23 | 93,605,749 | 91,585,677 | 88,749,432 |

The accompanying notes are an integral part of the consolidated financial statements.

**FANG HOLDINGS LIMITED**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2016** | **2017** | **2018** |
| | US$ | US$ | US$ |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Net income (loss) | **(169,635)** | **21,704** | **(114,909)** |
| *Adjustments to reconcile net income (loss) to net cash generated from operating activities:* | | | |
|   Share-based compensation | 6,552 | 7,218 | 14,082 |
|   Depreciation of property and equipment and amortization of land use rights | 25,004 | 27,961 | 26,735 |
|   Deferred tax benefits | (2,250) | (317) | (21,271) |
|   Allowance for doubtful accounts and loans receivable | 29,712 | 32,614 | 24,598 |
|   Allowance for funds receivable | 2,322 | - | - |
|   Realized and unrealized loss (gain) related to investment securities | (10,583) | (3,254) | 165,931 |
|   Impairment on investments | 2,232 | 2,768 | - |
|   Amortization of loan origination costs | 1,302 | 191 | - |
|   Amortization of issuance costs and unamortized discount/premium for convertible senior notes | 4,964 | 1,797 | 1,665 |
|   Loss on disposal of property and equipment | 719 | 5,571 | 985 |
|   Deemed rental expense (Note 19) | 154 | 159 | 162 |
|   Allowance of doubtful accounts of commitment deposit | - | 206 | - |
| | | | |
| Changes in operating assets and liabilities: | | | |
|   Accounts receivable | 16,190 | (437) | (18,395) |
|   Funds receivable | 7,769 | 2,330 | 509 |
|   Prepayments and other current assets | 16,730 | 9,405 | 3,405 |
|   Commitment deposits | 4,119 | 816 | 5,608 |
|   Loans receivable, current | 214,824 | 30,901 | - |
|   Loans receivable, non-current | 36,158 | 14,800 | - |
|   Amounts due from a related party | 273 | (445) | 167 |
|   Other non-current assets | (317) | 5,644 | (3,443) |
|   Deferred revenue | (6,535) | 30,260 | 12,644 |
|   Accrued expenses and other liabilities | (17,574) | (39,343) | (42,877) |
|   Customers' refundable fees | (27,580) | (22,651) | (2,861) |
|   Income tax payable | (3,437) | (1,685) | (294) |
|   Other non-current liabilities | 127 | 676 | 2,564 |
| | | | |
| **Net cash generated from operating activities** | **131,240** | **126,889** | **55,005** |

The accompanying notes are an integral part of the consolidated financial statements.

F-9

**FANG HOLDINGS LIMITED**
**CONSOLIDATED STATEMENTS OF CASH FLOWS (continued)**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2017 | 2018 |
| | US$ | US$ | US$ |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| Acquisition of short-term investments | (73,804) | (383,064) | (721,703) |
| Proceeds from maturity and disposal of fixed-rate time deposits and trading securities | 89,952 | 373,363 | 164,350 |
| Proceeds from disposal of available-for-sale securities | 13,074 | 13,931 | 595,363 |
| Acquisition of property and equipment | (24,576) | (65,885) | (96,117) |
| Origination of loans receivable | - | (212,824) | (134,802) |
| Repayment of loans receivable | - | 86,931 | 149,545 |
| Purchase of land use rights | - | (34,263) | - |
| Proceeds from government in connection of purchase of land use rights | - | - | 14,368 |
| Acquisition of long-term investments | (4,902) | (13,000) | (84,544) |
| Proceeds from disposal of property and equipment | 924 | 5,755 | 230 |
| Proceeds from disposal of equity investment with readily determinable fair value | - | - | 6,645 |
| Deposits for non-current assets | (128,614) | (55,456) | - |
| **Net cash used in from investing activities** | **(127,946)** | **(284,512)** | **(106,665)** |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | |
| Proceeds from exercise of share options | 1,664 | 4,785 | 2,974 |
| Proceeds from short-term loans | 296,558 | - | 36,327 |
| Proceeds from long-term loans | 67,721 | 111,475 | 66,843 |
| Repayment of loans | (182,362) | (43,989) | (26,884) |
| Redemption of convertible senior notes | (394,300) | - | (44,560) |
| Repurchase of ordinary shares | (136,615) | - | - |
| Payment of loan origination costs | - | (302) | - |
| **Net cash (used in) generated from financing activities** | **(347,334)** | **71,969** | **34,700** |
| Exchange rate effect on cash, cash equivalents and restricted cash | (29,448) | 29,302 | (26,728) |
| Net decrease in cash, cash equivalents and restricted cash | (373,488) | (56,352) | (43,688) |
| **Cash, cash equivalents and restricted cash at beginning of year** | **921,100** | **547,612** | **491,260** |
| **Cash, cash equivalents and restricted cash at end of year** | **547,612** | **491,260** | **447,572** |
| Supplemental schedule of cash flow information: | | | |
| Income tax paid | 6,664 | 7,979 | 8,218 |
| Interest paid | 19,418 | 16,895 | 12,215 |
| Acquisition of property and equipment through utilization of deposits | 14,345 | 244,568 | 57,102 |
| Acquisition of property and equipment included in accrued expenses and other liabilities | - | 6,121 | 10,438 |
| Long-term investments received in settlement of funds receivable | 13,947 | 12,058 | |

The following table provides a reconciliation of cash, cash equivalents and restricted cash reported within the consolidated balance sheets that sum to the total of the same such amounts shown in the consolidated statements of cash flows.

| | As of December 31, | |
|---|---|---|
| | 2017 | 2018 |
| | US$ | US$ |
| Cash and cash equivalents | 228,276 | 195,108 |
| Restricted cash, current | 223,002 | 245,474 |
| Restricted cash, non-current portion | 39,982 | 6,990 |
| **Total cash, cash equivalents and restricted cash** | **491,260** | **447,572** |

# FANG HOLDINGS LIMITED

## CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

| | Total Fang Holdings Limited's Equity | | | | | | | | | | | |
| | Number of Ordinary Shares | | | | | Accumulated Other Comprehensive Income (Loss) | | | | | | |
| | Class A | Class B | Ordinary Shares | Additional Paid-in Capital | Treasury stock | Foreign currency translation adjustments | Unrealized gain on available-for-sale securities | Intra-entity foreign currency transaction loss | Total | Retained Earnings | Noncontrolling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance as of December 31, 2015** | 70,736,679 | 24,336,650 | 12,234 | 478,391 | - | (16,870) | 6,506 | - | (10,364) | 373,505 | 761 | 854,527 |
| Net loss for the year | - | - | - | - | - | - | - | - | - | (169,635) | - | (169,635) |
| Other comprehensive loss: | | | | | | | | | | | | |
| Foreign currency translation adjustments | - | - | - | - | - | (60,732) | - | - | (60,732) | - | - | (60,732) |
| Unrealized loss on available-for-sale securities | - | - | - | - | - | - | 7,326 | - | 7,326 | - | - | 7,326 |
| Foreign currency transaction losses | - | - | - | - | - | - | - | (6,996) | (6,996) | - | - | (6,996) |
| Amounts reclassified from accumulated other comprehensive income | - | - | - | - | - | - | (10,583) | - | (10,583) | - | - | (10,583) |
| Contribution by noncontrolling interests | - | - | - | - | - | - | - | - | - | - | (66) | (66) |
| Contribution from shareholder (Note 19(b)) | - | - | - | 154 | - | - | - | - | - | - | - | 154 |
| Repurchase of treasury stock | (7,065,058) | - | - | - | (136,615) | - | - | - | - | - | - | (136,615) |
| Share-based compensation | - | - | - | 6,552 | - | - | - | - | - | - | - | 6,552 |
| Excess tax benefits | - | - | - | 470 | - | - | - | - | - | - | - | 470 |
| Exercise of share options | 341,137 | - | 47 | 3,376 | - | - | - | - | - | - | - | 3,423 |
| **Balance as of December 31, 2016** | 64,012,758 | 24,336,650 | 12,281 | 488,943 | (136,615) | (77,602) | 3,249 | (6,996) | (81,349) | 203,870 | 695 | 487,825 |

**FANG HOLDINGS LIMITED**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (continued)**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

| | Total Fang Holdings Limited's Equity | | | | | | | | | | |
| | Number of Ordinary Shares | | | | | Accumulated Other Comprehensive Income (Loss) | | | | | |
| | Class A | Class B | Ordinary Shares | Additional Paid-in Capital | Treasury stock | Foreign currency translation adjustments | Unrealized gain on available-for-sale securities | Intra-entity foreign currency transaction loss | Total | Retained Earnings | Noncontrolling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance as of December 31, 2016 | 64,012,758 | 24,336,650 | 12,281 | 488,943 | (136,615) | (77,602) | 3,249 | (6,996) | (81,349) | 203,870 | 695 | 487,825 |
| Net profit for the year | - | - | - | - | - | - | - | - | - | 21,704 | - | 21,704 |
| Other comprehensive loss: | | | | | | | | | | | | |
| Foreign currency translation adjustments | - | - | - | - | - | 56,571 | - | - | 56,571 | - | - | 56,571 |
| Unrealized loss on available-for-sale securities | - | - | - | - | - | - | 163,272 | - | 163,272 | - | - | 163,272 |
| Foreign currency transaction losses | - | - | - | - | - | - | - | 1,872 | 1,872 | - | - | 1,872 |
| Amounts reclassified from accumulated other comprehensive income | - | - | - | - | - | - | (2,736) | - | (2,736) | - | - | (2,736) |
| Contribution by noncontrolling interests | - | - | - | - | - | - | - | - | - | - | (3) | (3) |
| Contribution from shareholder (Note 19(b)) | - | - | - | 159 | - | - | - | - | - | - | - | 159 |
| Share-based compensation | - | - | - | 7,218 | - | - | - | - | - | - | - | 7,218 |
| Excess tax benefits | - | - | - | - | - | - | - | - | - | - | - | - |
| Exercise of share options | 347,304 | - | 47 | 4,346 | - | - | - | - | - | - | - | 4,393 |
| Balance as of December 31, 2017 | 64,360,062 | 24,336,650 | 12,328 | 500,666 | (136,615) | (21,031) | 163,785 | (5,124) | 137,630 | 225,574 | 692 | 740,275 |

The accompanying notes are an integral part of the consolidated financial statements.

**FANG HOLDINGS LIMITED**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (continued)**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

| | | | | | | Total Fang Holdings Limited's Equity | | | | | | |
| | Number of Ordinary Shares | | | | | | Accumulated Other Comprehensive Income (Loss) | | | | | |
| | Class A | Class B | Ordinary Shares | Additional Paid-in Capital | Treasury stock | Foreign currency translation adjustments | Unrealized gain on available-for-sale securities | Intra-entity foreign currency transaction loss | Total | Retained Earnings | Noncontrolling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance as of December 31, 2017 | 64,360,062 | 24,336,650 | 12,328 | 500,666 | (136,615) | (21,031) | 163,785 | (5,124) | 137,630 | 225,574 | 692 | 740,275 |
| Cumulative effect of adoption of ASC 606 | - | - | - | - | - | - | - | - | - | 2,298 | - | 2,298 |
| Cumulative effect of adoption of ASU 2016-01 | - | - | - | - | - | - | (163,785) | - | (163,785) | 163,785 | - | - |
| Balance as of January 1, 2018 | 64,360,062 | 24,336,650 | 12,328 | 500,666 | (136,615) | (21,031) | - | (5,124) | (26,155) | 391,657 | 692 | 742,573 |
| Net (loss) profit for the year | - | - | - | - | - | - | - | - | - | (114,911) | 2 | (114,909) |
| Other comprehensive loss: | | | | | | | | | | | | |
| Foreign currency translation adjustments | - | - | - | - | - | (46,648) | - | - | (46,648) | - | - | (46,648) |
| Loss on intra-entity foreign transactions of long-term investment nature | - | - | - | - | - | - | - | (3,034) | (3,034) | - | - | (3,034) |
| Unrealized gain on available-for-sale securities | - | - | - | - | - | - | 1,493 | - | 1,493 | - | - | 1,493 |
| Amounts reclassified from accumulated other comprehensive income | - | - | - | - | - | - | (1,493) | - | (1,493) | - | - | (1,493) |
| Contribution from shareholder (Note 19(b)) | - | - | - | 162 | - | - | - | - | - | - | - | 162 |
| Share-based compensation | - | - | - | 14,082 | - | - | - | - | - | - | - | 14,082 |
| Exercise of share options and vesting of unvested shares | 644,525 | - | 82 | 2,892 | - | - | - | - | - | - | - | 2,974 |
| Balance as of December 31, 2018 | 65,004,587 | 24,336,650 | 12,410 | 517,802 | (136,615) | (67,679) | - | (8,158) | (75,837) | 276,746 | 694 | 595,200 |

The accompanying notes are an integral part of the consolidated financial statements.

**FANG HOLDINGS LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

1.    **ORGANIZATION AND BASIS OF PRESENTATION**

The Company was incorporated on June 18, 1999 as Fly High Holdings Limited under the laws of the British Virgin Islands ("BVI"). In June 2004, the Company changed its name to SouFun Holdings Limited and its corporate domicile to the Cayman Islands and became a Cayman Islands company with limited liability under the Companies Law of the Cayman Islands. In 2016, the Company changed its name to Fang Holdings Limited (formerly known as SouFun Holdings Limited). The accompanying consolidated financial statements include the financial statements of (i) Fang Holdings Limited (the "Company"), (ii) its subsidiaries located outside of the People's Republic of China (the "PRC") (the "non-PRC subsidiaries"), (iii) wholly foreign owned entities in the PRC (the "WOFEs") and their subsidiaries, (iv) entities controlled through contractual arrangements (the "PRC Domestic Entities") and (v) the PRC Domestic Entities' subsidiaries. The Company, and where appropriate, the term "Company" also refers to its non-PRC subsidiaries, WOFEs, PRC Domestic Entities and the PRC Domestic Entities' subsidiaries as a whole.

The Company is principally engaged in the provision of marketing services, listing services, financial services, E-commerce services and value-added services to the real estate and home furnishing industries in the PRC. Details of the Company's major subsidiaries, PRC Domestic Entities and the PRC Domestic Entities' subsidiaries as of December 31, 2018 were as follows:

| Company | Date of Establishment | Place of Establishment | Principal Activities |
|---|---|---|---|
| Beijing SouFun Internet Information Service Co., Ltd. ("Beijing Internet") | December 17, 2003 | PRC | Provision of marketing services and listing services |
| SouFun Media Technology (Beijing) Co., Ltd. ("SouFun Media") | November 28, 2002 | PRC | Provision of technology and information consultancy services |
| Beijing SouFun Network Technology Co., Ltd. ("SouFun Network") | March 16, 2006 | PRC | Provision of technology and information consultancy services |
| Beijing SouFun Science and Technology Development Co., Ltd. ("Beijing Technology") | March 14, 2006 | PRC | Provision of marketing services and listing services |
| Beijing Century Jia Tian Xia Technology Development Co., Ltd. ("Beijing JTX Technology") | December 21, 2006 | PRC | Provision of marketing services and listing services |
| Beijing Zhong Zhi Shi Zheng Information Technology Co. Ltd., ("Beijing Zhongzhi") | June 5, 2007 | PRC | Provision of technology and information consultancy services |
| Xinjiang Zhong Zhi Shu Ju Information Technology Co., Ltd. ("Xinjiang Zhong Zhi Shu Ju") | August 10, 2017 | PRC | Provision of technology and information consultancy services |
| Beijing Hong An Tu Sheng Network Technology Co., Ltd. ("Beijing Hong An") | November 15, 2010 | PRC | Provision of technology and information consultancy services |
| Beijing Tuo Shi Huan Yu Network Technology Co., Ltd. ("Beijing TuoShi") | November 19, 2010 | PRC | Provision of technology and information consultancy services |
| Beijing Yi Ran Ju Ke Technology Development Co., Ltd. ("Beijing Yi Ran Ju Ke") | July 8, 2011 | PRC | Provision of marketing services, rental services and real estate agency services |
| Beijing Hua Ju Tian Xia Network Technology Co., Ltd. ("Beijing Hua Ju Tian Xia") | July 25, 2012 | PRC | Provision of technology and information consultancy services |

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**1.   ORGANIZATION AND BASIS OF PRESENTATION (continued)**

| Company | Date of Establishment | Place of Establishment | Principal Activities |
|---|---|---|---|
| Beijing Zhong Zhi Hong Yuan Data Information Technology Co., Ltd. ("Beijing Zhong Zhi Hong Yuan") | June 11, 2018 | PRC | Provision of technology and information consultancy services |
| Beijing Li Man Wan Jia Network Technology Co., Ltd. ("Beijing Li Man Wan Jia") | July 25, 2012 | PRC | Provision of technology and information consultancy services |
| Shanghai Jia Biao Tang Real Estate Broking  Co., Ltd. ("Shanghai JBT Real Estate Broking") | July 7, 2005 | PRC | Provision of real estate agency services, marketing services and listing services |
| Beijing Zhong Zhi Xun Bo Information Technology Co. Ltd., ("Zhongzhi Xun Bo") | January 6, 2012 | PRC | Provision of technology and information consultancy services |
| Tianjin SouFun Network Technology Co., Ltd.("Tianjin SouFun Network") | March 8, 2012 | PRC | Provision of technology and information consultancy services |
| Tianjin Jia Tian Xia Network Technology Co., Ltd. ("Jia Tian Xia Network Technology") | April 15, 2014 | PRC | Provision of technology and information consultancy services |
| Hangzhou SouFun Network Technology Co., Ltd., ("Hangzhou SouFun Network") | August 27, 2013 | PRC | Provision of technology and information consultancy services |
| Wuhan SouFun Yi Ran Ju Ke Real Estate Agents Co., Ltd. ("Wuhan Yi Ran Ju Ke") | December 13, 2013 | PRC | Provision of real estate agency services and  real estate information services |
| Hangzhou Ji Ju Real Estate Agents Co., Ltd. ("Hanzhou Ji Ju") | December 23, 2013 | PRC | Provision of real estate agency services and  real estate information services |
| Fang Tian Xia Financial Information Service (Beijing) Ltd. (previously known as Beijing Tianxia Dai Information service Co., Ltd.) | April 9, 2014 | PRC | Provision of finance information services |
| Shanghai SouFun Microfinance Co.,Ltd.("Shanghai SouFun Microfinance") | January 19, 2015 | PRC | Provision of Microfinance services |
| Beihai Tian Xia Dai Microfinance Co., Ltd.("Beihai Tian Xia Dai Microfinance") | September 12, 2014 | PRC | Provision of microfinance services |
| Shanghai BaoAn Enterprise Co., Ltd. ("Shanghai BaoAn Enterprise") | March 31, 2013 | PRC | Lease, resale and management of property |
| Shanghai BaoAn Hotel Co., Ltd. ("Shanghai BaoAn Hotel") | March 31, 2013 | PRC | Operation and management of hotel, restaurant and other catering business |

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

1.      **ORGANIZATION AND BASIS OF PRESENTATION (continued)**

| Company | Date of Establishment | Place of Establishment | Principal Activities |
|---|---|---|---|
| Beijing Fang Tian Xia Hong An Network Technology Ltd. (previously known as Beijing Fang Tian Xia Decorative Engineering Co., Ltd.) | October 15, 2014 | PRC | Provision of decorative engineering services |
| Chongqing Tian Xia Dai Microfinance Co., Ltd ("Chongqing Tian Xia Dai Microfinance") | December 11, 2014 | PRC | Provision of microfinance services |
| Tianjin Jia Tian Xia Microfinance Co. ,Ltd. ("Tianjin Jia Tian Xia Microfinance") | December 5, 2014 | PRC | Provision of microfinance services |
| Beijing Fang Chao Real Estate Broking Co., Ltd. ("Beijing Fang Chao") | March 6, 2015 | PRC | Provision of real estate agency services |
| Guangzhou Fang Tian Xia Real Estate Broking Co., Ltd. ("Guangzhou Fang Tian Xia") | March 9, 2015 | PRC | Provision of real estate agency services |
| Beijing Cun Fang Real Estate Broking Co., Ltd. ("Beijing Cun Fang") | April 7, 2015 | PRC | Provision of real estate agency services |
| Shenzhen Fang Tian Xia Real Estate Broking Co., Ltd. ("Shenzhen Fang Tian Xia") | April 13, 2015 | PRC | Provision of real estate agency services |
| Tianjin Fang Tian Xia Real Estate Broking Co., Ltd. ("Tianjin Fang Tian Xia") | May 21, 2015 | PRC | Provision of real estate agency services |
| Nanjing Cun Fang Real Estate Broking Co., Ltd. ("Nanjing Cun Fang") | April 30, 2015 | PRC | Provision of real estate agency services |

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

1.    **ORGANIZATION AND BASIS OF PRESENTATION (continued)**

| Company | Date of Establishment | Place of Establishment | Principal Activities |
|---|---|---|---|
| Nanchang Cun Fang Real Estate Broking Co., Ltd. ("Nanchang Cun Fang") | June 3, 2015 | PRC | Provision of real estate agency services |
| Chongqing Fang Tian Xia Real Estate Broking Co., Ltd. ("Chongqing Fang Tian Xia") | May 27, 2015 | PRC | Provision of real estate agency services |
| Shanghai SouFun Fang Tian Xia Broking Co., Ltd. ("Shanghai Fang Tian Xia") | April 16, 2015 | PRC | Provision of real estate agency services |
| Beijing Li Tian Rong Ze Yi Jia Technology Development Co., Ltd. ("Beijing Li Tian Rong Ze") | September 4, 2015 | PRC | Provision of technology and information consultancy services |
| Hong Kong Property Network Limited ("HK Property") | May 19, 2011 | Hong Kong | Investment holding |
| Best Fang Holdings  LLC | Aug 30, 2017 | United States of America | Investment holding |
| Best Work Holdings (New York) LLC ("Best Work") | March 14, 2011 | United States of America | Investment holding |
| China Index Holdings Limited | July 26, 2018 | Cayman | Investment holding |

F-17

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

1.    **ORGANIZATION AND BASIS OF PRESENTATION (continued)**

In order to comply with PRC laws and regulations which restrict foreign control of companies involved in internet content provision ("ICP") and advertising businesses, the Company operates its websites and provides online marketing advertising services in the PRC through its PRC Domestic Entities and the PRC Domestic Entities' subsidiaries.

The equity interests of the PRC Domestic Entities are legally held directly by Vincent Tianquan Mo, executive chairman of the board of directors, Yu Huang, chief executive officer of China Index Holdings Limited ("CIH"), a wholly owned subsidiary of the Company, or Richard Jiangong Dai, a director of the board who resigned from the board effective February 25, 2016. The effective control of the PRC Domestic Entities is held by the Company through three of its WOFEs, namely, SouFun Network, Beijing Zhongzhi and Jia Tian Xia Network Technology as a result of a series of contractual arrangements and their supplementary agreements signed with each of the PRC Domestic Entities which arrangements and agreements contain similar provisions regarding obligations and rights of the Company and the PRC Domestic Entities (hereinafter, together the "Contractual Agreements"). As a result of the Contractual Agreements, the Company maintains the ability to approve decisions made by the PRC Domestic Entities, is entitled to substantially all of the economic benefits from the PRC Domestic Entities and is obligated to absorb all of the PRC Domestic Entities' expected losses.

Therefore, the Company consolidates the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries in accordance with the United States of America Securities and Exchange Commission ("SEC") Regulation S-X Article 3A-02 and Accounting Standards Codification ("ASC") 810, *Consolidation* ("ASC 810").

The following is a summary of the Contractual Agreements:

*Exclusive Technical Consultancy and Service Agreements*

The WOFEs provide the following exclusive technical services to the PRC Domestic Entities: (i) access to information assembled by the WOFEs concerning the real estate industry and companies in this sector to enable the PRC Domestic Entities to target potential customers and provide research services; and (ii) technical information technology system support to enable the PRC Domestic Entities to service the needs of its customers. The agreements can be extended indefinitely at the sole discretion of the WOFEs.

*Operating Agreements*

Pursuant to the operating agreements, each PRC Domestic Entity and its legal shareholders have agreed not to enter into any transaction that would substantially affect the assets, rights, obligations or operations of the PRC Domestic Entity without prior written consent from the WOFEs. In addition, the PRC Domestic Entities will appoint or remove their directors and executive officers based on instruction from the WOFEs. The agreements can be extended indefinitely at the sole discretion of the WOFEs.

*Equity Pledge Agreements, Shareholders Proxy Agreements and Exclusive Call Option Agreements*

In order to secure the payment obligations of each PRC Domestic Entity under the exclusive technical consultancy and service agreements, the legal shareholders have pledged their entire respective ownership interests in each Domestic PRC Entity to the WOFEs. The legal shareholders shall not transfer the pledged ownership interests without the prior written consent from the WOFEs. The WOFEs are entitled to dividends and funds obtained through conversion, auction or sale of the ownership interests that the legal shareholders pledged to the WOFEs. The agreements can be extended at the sole discretion of the WOFEs.

The legal shareholders irrevocably appoint the WOFEs to act as proxy for the legal shareholders to exercise their respective rights as shareholders of the PRC Domestic Entities to attend shareholders' meetings and cast votes. The agreements will remain valid until terminated upon written consent by the WOFEs, the PRC Domestic Entities and their legal shareholders or by their successors.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

1.    **ORGANIZATION AND BASIS OF PRESENTATION (continued)**

The legal shareholders granted the Company or any third party designated by the Company the exclusive right to acquire from the legal shareholders the whole or part of the respective equity interests in each PRC Domestic Entity at a price equivalent to the historical cost when permitted by applicable PRC laws and regulations. The legal shareholders shall not sell, transfer or dispose of the equity interests in the PRC Domestic Entities without the prior written consent of the Company or any third party designated by the Company. The proceeds from the exercise of the call option will be applied to repay the loans under the loan agreements. The Company does not have to make any additional payment to the legal shareholders. The PRC Domestic Entities will not distribute any dividend without the prior written consent from the WOFEs. The agreements can be extended indefinitely at the sole discretion of the Company.

*Loan Agreements*

The WOFEs provided loans to the legal shareholders to enable them to contribute the registered capital of the PRC Domestic Entities. Under the terms of the loan agreements, the legal shareholders will repay the loans by transferring their legal ownership in the PRC Domestic Entities to the WOFEs when permitted by applicable PRC laws and regulations. Any gains from the transfer shall be paid back to the WOFEs or any third party designated by the WOFEs. The legal shareholders shall repay the loan by means of transferring their respective equity interests in the PRC Domestic Entities to the WOFEs or any other person designated by the WOFEs.

*Supplementary Agreements*

In addition to the above contractual agreements, the Company, the WOFEs, the PRC Domestic Entities and their legal shareholders entered into supplementary agreements in March 2010 to memorialize certain terms previously agreed amongst the Company, the WOFEs, the PRC Domestic Entities and their legal shareholders. While these supplementary agreements were signed in 2010, the terms, intent and substance of all the agreements above remained unchanged. Pursuant to the supplementary agreements:

- the WOFEs have unilateral discretion in setting the technical service fees charged to the PRC Domestic Entities;

- the WOFEs are obligated to provide financial support to the PRC Domestic Entities in the event the PRC Domestic Entities incur losses;

- the annual budget of the PRC Domestic Entities should be assessed and approved by the WOFEs;

- the legal shareholders agree to remit any profits distributed from the PRC Domestic Entities to the Company upon request by the Company; and

- the PRC Domestic Entities are obligated to transfer their entire retained earnings, after deduction of PRC income tax, to the WOFEs in the form of a donation upon the WOFEs' request.

All of these provisions have been incorporated into the Contractual Agreements signed subsequent to March 2010.

Furthermore, the WOFEs and the PRC Domestic Entities entered into supplementary agreements in March 2013 to memorialize the following terms previously agreed between the WOFEs and the PRC Domestic Entities when the Exclusive Call Option Agreements were entered into:

- the legal shareholders agreed to remit the purchase consideration received from the exercise of the exclusive right to acquire the equity interests in the PRC Domestic Entities to the WOFEs or any entity designated by the WOFEs.

This provision has been incorporated into the Contractual Agreements signed subsequent to March 2013.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

1.  **ORGANIZATION AND BASIS OF PRESENTATION (continued)**

Through the design of the aforementioned agreements, the legal shareholders of the PRC Domestic Entities effectively assigned their full voting rights to the WOFEs, which give the WOFEs the power to direct the activities that most significantly impact the PRC Domestic Entities' economic performance. The WOFEs obtained the ability to approve decisions made by the PRC Domestic Entities and the ability to acquire the equity interests in the PRC Domestic Entities when permitted by PRC law. The WOFEs are obligated to absorb a majority of the expected losses from the PRC Domestic Entities' activities through providing unlimited financial support to the PRC Domestic Entities and are entitled to receive a majority of profits from the PRC Domestic Entities through the exclusive technical consultancy and service fees. As a result, the Company, through the WOFEs, is the primary beneficiary of the PRC Domestic Entities. Accordingly, in accordance with SEC Regulation S-X Article 3A-02 and ASC 810, the Company, through the WOFEs, has consolidated the operating results of the PRC Domestic Entities in the Company's financial statements. Business taxes ("BT") and value added taxes ("VAT") relating to service fees charged by the WOFEs are recorded as cost of services.

The carrying amounts of the assets, liabilities, the results of operations and cash flows of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries included in the Company's consolidated balance sheets, consolidated statements of comprehensive income (loss) and consolidated statements of cash flows were as follows:

|  | As of December 31, | |
| --- | --- | --- |
|  | 2017 | 2018 |
|  | US$ | US$ |
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | 50,948 | 34,004 |
| Restricted cash, current | 223,002 | 214,876 |
| Short-term investments | 19,838 | 5,586 |
| Accounts receivable (net of allowance of US$13,691 and US$12,913 as of December 31, 2017 and 2018, respectively) | 22,119 | 25,910 |
| Funds receivable | 2,824 | 5,124 |
| Prepayments and other current assets | 16,856 | 25,384 |
| Commitment deposits (net of allowance of US$206 and nil as of December 31, 2017 and 2018, respectively) | 5,876 | 191 |
| **Total current assets** | **341,463** | **311,075** |
| **Non-current assets:** | | |
| Property and equipment, net | 275,601 | 358,432 |
| Land use rights | 34,951 | 32,428 |
| Deferred tax assets, non-current | 2 | 2 |
| Deposits for non-current assets | 41,428 | 95 |
| Long-term investments | 433,894 | 291,808 |
| Other non-current assets | 204 | 1,815 |
| **Total non-current assets** | **786,080** | **684,580** |
| **Total assets** | **1,127,543** | **995,655** |

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

1.    ORGANIZATION AND BASIS OF PRESENTATION (continued)

|  | As of December 31, | |
|---|---|---|
|  | 2017 US$ | 2018 US$ |
| **Current liabilities:** | | |
| Short-term loans | 59,820 | 76,267 |
| Deferred revenue | 27,095 | 32,816 |
| Accrued expenses and other liabilities | 54,516 | 36,266 |
| Customer's refundable fees | 10,986 | 3,274 |
| Income tax payable | 1,325 | 1,982 |
| Intercompany payable to the non PRC Domestic Entities | 431,770 | 445,556 |
| **Total current liabilities** | **585,512** | **596,161** |
| **Non-current liabilities:** | | |
| Long-term loans | 55,958 | 44,891 |
| Deferred tax liabilities | 51,227 | 10,488 |
| Other non-current liabilities | 37,936 | 51,144 |
| **Total non-current liabilities** | **145,121** | **106,523** |
| **Total liabilities** | **730,633** | **702,684** |
| **Net assets** | **396,910** | **292,971** |

Intercompany payable to the non PRC Domestic Entities represents the amounts due to the WOFE and its wholly-owned subsidiaries, which are eliminated upon consolidation.

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | 2016 US$ | 2017 US$ | 2018 US$ |
| Total revenues | 287,475 | 91,087 | 89,111 |
| Net loss | (24,135) (6,484) | | (79,229) |

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | 2016 US$ | 2017 US$ | 2018 US$ |
| Net cash generated from (used in) operating activities | (790) | 122,327 | 26,241 |
| Net cash used in investing activities | (3,763) | (99,946) | (9,851) |
| Net cash (used in) generated from financing activities | 90,828 | 8,565 | (25,220) |

The PRC Domestic Entities had No intercompany amounts payable to the WOFEs for accrued service fees as of December 31, 2017 and 2018. The WOFEs did not charge the PRC Domestic Entities, technology consultancy service fees during the years ended December 31, 2016, 2017 and 2018.

As of December 31, 2018, except for the current restricted cash of US$214,876, accounts receivable of US$2,988 and property and equipment of US$324,564 pledged to secure bank borrowings (Note 12), there was No other pledge or collateralization of the assets of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

1. **ORGANIZATION AND BASIS OF PRESENTATION (continued)**

Creditors of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries have No recourse to the general credit of their respective primary beneficiary. The amounts of liabilities of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries have been parenthetically presented on the consolidated balance sheets. The PRC Domestic Entities held certain registered copyrights, trademarks and registered domain names, which are used for the Company's business operations. All of these revenue-producing assets were internally developed, for which the Company did not incur significant development costs. There were No other assets of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries that can only be used to settle their own obligations except for restricted cash of US$214,876, accounts receivable of US$2,988 and property and equipment of US$324,564 pledged to secure bank borrowings. The WOFEs have not provided any financial support that they were not previously contractually required to provide to the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries during the years presented.

*Basis of Presentation*

The accompanying consolidated financial statements have been prepared in accordance with the United States generally accepted accounting principles ("U.S. GAAP").

2. **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Use of Estimates*

The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the balance sheet dates and the reported amounts of revenues and expenses during the reporting periods. Significant estimates and assumptions reflected in the Company's financial statements include, but are not limited to, estimated stand-alone selling prices of performance obligations, customer refunds, allowance for doubtful accounts, allowance for credit losses, useful lives of property and equipment, realization of deferred tax assets, impairment of long-lived assets, share-based compensation expense, uncertain income tax positions, fair value of the embedded derivatives in the convertible senior notes and fair value of long term investments. Changes in facts and circumstances may result in revised estimates. Actual results could materially differ from those estimates.

*Principles of Consolidation*

The consolidated financial statements include the financial statements of the Company, its non-PRC subsidiaries, WOFEs, the PRC Domestic Entities in which the Company, through its WOFEs, has a controlling financial interest, and the PRC Domestic Entities' subsidiaries. The Company has determined that it has a controlling financial interest, even though it does not hold a majority of the voting equity interest in an entity, because the Company has the ability to control the PRC Domestic Entities through the WOFEs' rights to all the residual benefits of the PRC Domestic Entities and the WOFEs' obligation to fund losses of the PRC Domestic Entities. As a result, the PRC Domestic Entities are included in the consolidated financial statements. All significant intercompany balances and transactions between the Company, its subsidiaries, the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries have been eliminated in consolidation.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.     SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Foreign Currency Translation and Transactions*

The functional currency of the Company and its non-PRC subsidiaries is the United States dollars ("US$"). The WOFEs, PRC Domestic Entities and PRC Domestic Entities' subsidiaries determine their functional currency to be the Chinese Renminbi ("RMB") based on the criteria of ASC 830, *Foreign Currency Matters.* The Company uses US$ as its reporting currency. The Company uses the monthly average exchange rate for the year and the exchange rate at the balance sheet date to translate the operating results and financial position, respectively. Translation differences are recorded in accumulated other comprehensive income (loss), a component of shareholders' equity.

Transactions denominated in foreign currencies are remeasured into the functional currency at the exchange rates prevailing on the transaction dates. Foreign currency denominated financial assets and liabilities are remeasured at the exchange rates prevailing at the balance sheet date. Exchange gains and losses are included in the consolidated statements of comprehensive income (loss).

The assets and liabilities of the Company's PRC subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries are translated into US$ at the exchange rates prevailing at the balance sheet date. The consolidated statements of comprehensive income (loss) of these entities are translated into US$ at the weighted average exchange rates for the year. The resulting translation gains (losses) are recorded in accumulated other comprehensive income (loss) as a component of shareholders' equity.

For the purpose of the consolidated statements of cash flows, cash flows of the Company's PRC subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries are translated into US$ at the exchange rates prevailing on the dates of the cash flows. Frequently recurring cash flows of these entities which arise throughout the year are translated into US$ at the weighted average exchange rates for the year.

Transaction gains and losses are recognized in the consolidated statements of operations. Gains and losses on intra-entity foreign currency transactions that are of a long-term-investment nature (that is, settlement is not planned or anticipated in the foreseeable future) between consolidated entities are not recognized in earnings, but are included as a component of other comprehensive income.

*Cash and Cash Equivalents*

Cash and cash equivalents represent cash on hand and demand deposits placed with banks or other financial institutions with original maturity of 90 days or less at the date of purchase which are unrestricted as to withdrawal and use. In addition, all highly liquid investments with original stated maturity of 90 days or less are classified as cash equivalents.

*Restricted Cash*

Restricted cash represents cash pledged to financial institutions as collateral for the Company's bank loans. The restricted cash is not available for withdrawal or the Company's general use until after the corresponding bank loans are repaid.

The Accounting Standards Update ("ASU") 2016-18, *Statement of Cash Flows (Topic 230): Restricted Cash,* required that restricted cash should be included with cash and cash equivalents when reconciling the beginning-of-period and end-of-period total amounts shown on the consolidated statements of cash flows. The guidance was effective as of January 1, 2018 and the Company applied it using a retrospective transition method to each period presented. The adoption of this guidance changed the presentation and classification of restricted cash in the Company's consolidated statements of cash flows. For the years ended December 31, 2016 and 2017, substantially all of the changes in restricted cash of US$107,905 and US$51,900, respectively, were previously reported as part of financing activities in the consolidated statements of cash flows.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Investments*

*Periods prior to January 1, 2018*

All highly liquid investments with original maturities of greater than 90 days but less than 365 days are classified as short-term investments which are stated at their approximate fair value.

The Company accounts for its investments in accordance with ASC 320, *Investments-Debt and Equity Securities* ("ASC 320"). The Company classifies the investments in debt and equity securities as "held-to-maturity", "trading" or "available-for-sale", whose classification determines the respective accounting methods stipulated by ASC 320. Dividend and interest income, including amortization of the premium and discount arising at acquisition, for all categories of investments in securities are included in earnings. Any realized gains or losses on the sale of the investments are determined on a specific identification method, and such gains and losses are reflected in the consolidated statements of comprehensive income (loss).

The securities that the Company has positive intent and ability to hold to maturity are classified as held-to-maturity securities and stated at amortized cost. For individual securities classified as held-to-maturity securities, the Company evaluates whether a decline in fair value below the amortized cost basis is other-than-temporary in accordance with the Company's policy and ASC 320. If the Company concludes that it does not intend or is not required to sell an impaired debt security before the recovery of its amortized cost basis, the impairment is considered temporary and the held-to-maturity securities continue to be recognized at the amortized costs. When the Company intends to sell an impaired debt security or it is more likely than not that it will be required to sell prior to recovery of its amortized cost basis, an other-than-temporary impairment is deemed to have occurred. In these instances, the other-than-temporary impairment loss is recognized in the consolidated statements of comprehensive income (loss) equal to the entire excess of the debt security's amortized cost basis over its fair value at the balance sheet date of the reporting period for which the assessment is made.

The securities that are bought and held principally for the purpose of selling them in the near term are classified as trading securities. Unrealized holding gains and losses for trading securities are included in earnings.

Investments not classified as trading or as held-to-maturity are classified as available-for-sale securities. Available-for-sale securities are reported at fair value, with unrealized gains and losses recorded in accumulated other comprehensive income (loss) in shareholders' equity. Realized gains or losses are charged to earnings during the period in which the gain or loss is realized. An impairment loss on the available-for-sale securities are recognized in the consolidated statements of comprehensive income (loss) when the decline in value is determined to be other-than-temporary. No impairment loss was recognized for the year ended December 31, 2017.

In accordance with ASC 325 *Investments-Other*, for investments in an investee over which the Company does not have significant influence and which do not have readily determinable fair value, the Company carries the investment at cost and only adjusted for other-than-temporary declines in fair value and distributions of earnings that exceed the Company's share of earnings since its investment. Management regularly evaluates the impairment of the cost method investments based on performance and financial position of the investee as well as other evidence of market value. Such evaluation included, but is not limited to, reviewing the investee's cash position, recent financing, projected and historical financial performance, cash flow forecasts and financing needs. An impairment loss is recognized in earnings equal to the excess of the investment's cost over its fair value at the balance sheet date of the reporting period for which the assessment is made. The fair value would then become the new cost basis of investment. An impairment loss of US$2,232 and US$2,768 was recognized for the years ended December 31, 2016 and 2017, respectively.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Period commencing January 1, 2018*

The Company adopted ASU 2016-01, *Financial Instruments—Overall (Subtopic 825-10), Recognition and Measurement of Financial Assets and Liabilities* from January 1, 2018, which requires all equity securities with readily determinable fair values, other than those accounted for under equity method of accounting or those that result in consolidation of the investee, to be measured at fair value with changes in the fair value recognized through net income. Change in fair value of available-for-sale equity securities are reported in earnings. Upon the adoption of ASU 2016-01, accumulated unrealized gain, net of income taxes, of US$163,785 was reclassified from accumulated other comprehensive income to retained earnings as of January 1, 2018.

(1)   Debt Securities

The Company accounts for its debt investments in accordance with ASC 320, *Investments-Debt Securities* ("ASC 320"). The Company classifies the debt investments as "held-to-maturity", "trading" or "available-for-sale", whose classification determines the respective accounting methods stipulated by ASC 320. Interest income, including amortization of the premium and discount arising at acquisition, for all categories of debt investments are included in earnings. Any realized gains or losses on the sale of the debt investments are determined on a specific identification method, and such gains and losses are reflected in the consolidated statements of comprehensive income (loss).

The debt securities that the Company has positive intent and ability to hold to maturity are classified as held-to-maturity securities and stated at amortized cost. For individual securities classified as held-to-maturity securities, the Company evaluates whether a decline in fair value below the amortized cost basis is other-than-temporary in accordance with the Company's policy and ASC 320. If the Company concludes that it does not intend or is not required to sell an impaired debt security before the recovery of its amortized cost basis, the impairment is considered temporary and the held-to-maturity securities continue to be recognized at the amortized costs. When the Company intends to sell an impaired debt security or it is more likely than not that it will be required to sell prior to recovery of its amortized cost basis, an other-than-temporary impairment is deemed to have occurred. In these instances, the other-than-temporary impairment loss is recognized in the consolidated statements of comprehensive income (loss) equal to the entire excess of the debt security's amortized cost basis over its fair value at the balance sheet date of the reporting period for which the assessment is made.

The debt securities that are bought and held principally for the purpose of selling them in the near term are classified as trading securities. Unrealized holding gains and losses for trading securities are included in earnings. All highly liquid investments with original maturities of greater than 90 days but less than 365 days are classified as short-term investments which are stated at their approximate fair value.

Investments not classified as trading or as held-to-maturity are classified as available-for-sale securities. Available-for-sale debt securities are reported at fair value, with unrealized gains and losses recorded in accumulated other comprehensive income (loss) in shareholders' equity. Realized gains or losses are charged to earnings during the period in which the gain or loss is realized. An impairment loss on the available-for-sale securities are recognized in the consolidated statements of comprehensive income (loss) when the decline in value is determined to be other-than-temporary. No impairment loss was recognized for the year ended December 31, 2018.

(2)   Equity Securities

All equity investments with readily determinable fair values, other than those accounted for under equity method of accounting or those that result in consolidation of the investee, are measured at fair value with changes in the fair value recognized through net income.

Equity investments without readily determinable fair values which do not qualify for net asset value per share (or its equivalent) practical expedient and over which the Company does not have the ability to exercise significant influence through the investments in common stock, are accounted for under the measurement alternative. The carrying values of equity investments without readily determinable fair values are measured at cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for identical or similar investments of the same issuer. All gains and losses on these investments, realized and unrealized, are recognized in the consolidated statements of comprehensive income (loss). The Company makes assessment of whether an investment is impaired at each reporting date, and recognizes an impairment loss equal to the difference between the carrying value and fair value in earnings. No impairment loss was recognized for the year ended December 31, 2018. As a result of adoption of ASU 2016-01, the Company is not required to disclose the fair value for equity investments without readily determinable fair value.

(3)   Equity method investments

In accordance with ASC 323 *Investments-Equity Method and Joint Ventures*, the Company applies the equity method of accounting to equity investments in common stock over which it has significant influence but does not own a majority equity interests or otherwise control. Under the equity method, the Company initially records its investment in the common stock of an investee at cost. The excess of the carrying amount of the investment over the underlying equity in net assets of the equity investee represents goodwill and intangible assets acquired. The Company adjusts the carrying amount of an investment for its share of the earnings or losses of the investee after the date of investment and reports the recognized earnings or losses in the consolidated statements of comprehensive income (loss). When the Company's share of losses in the equity investee equals or exceeds its interest in the equity investee, the Company does not recognize further losses, unless the Company has incurred obligations or made payments or guarantees on behalf of the equity investee, or the Company holds other investments in the equity investee.

The equity method investments are subject to periodic testing for other-than-temporary impairment, by considering factors including, but not limited to, stock prices of public companies in which the Company has an equity investment, current economic and market conditions, operating performance of the investees such as current earnings trends and undiscounted cash flows, and other company-specific information, such as recent financing rounds. Changes in these estimates and assumptions could affect the calculation of the fair value of the investments and the determination of whether any identified impairment is other-than-temporary. If any impairment is considered other-than-temporary, the Company will write down the asset to its fair value and take the corresponding charge to the consolidated statements of comprehensive income (loss). No impairment was recorded for equity method investments for the year ended December 31 2018.

### Funds Receivable

Funds receivable represents cash collection through third-party payment service providers. The Company carefully considers and monitors the credit worthiness of the third-party payment service providers used. An allowance for doubtful accounts is recorded in the period in which a loss is determined to be probable. Funds receivable balances are written off after all collection efforts have been exhausted.

### Commitment deposits

Commitment deposits represent cash paid to real estate developers for the right to provide sales agency services for their real estate projects. The commitment deposits are refundable at specified dates and are classified accordingly.

In accordance with relevant contract terms, in the event of default, the Company is normally entitled to collateral or other forms of security from the real estate developers, which it can then resell to recover its original commitment deposit. The Company's recovery of its original commitment deposit is dependent on market conditions.

The Company considers many factors in assessing the collectability of commitment deposits, such as the age of the amounts due, the market value of collaterals, as well as the real estate developer's payment history and credit-worthiness. An allowance for doubtful accounts is recorded in the period in which a loss is determined to be probable. Commitment deposits are written off after all collection efforts have been exhausted.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

2.     **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Loans receivable*

Loans receivable consists primarily of secured loans in the form of mortgage loans and unsecured loans to borrowers that have passed the Company's credit assessment. Such amounts are recorded at the principal amount less impairment as of the balance sheet date. The loan periods extended by the Company to the borrowers generally range from 1 to 36 months.

An allowance for credit loss is recorded when, based on current information and events, it is probable that the Company will be unable to collect all amounts due according to the contractual terms of the loan agreement. The Company assesses the allowance for credit loss related to loans receivable on a quarterly basis, either on an individual or collective basis. The Company considers various factors in evaluating loans receivable for possible impairment on an individual basis. These factors include the amount of the loan, historical experience, value of collateral, if any, credit quality and age of the receivables balances. Impairment is measured on an individual loan basis using either the present value of expected future cash flows discounted at the loan's effective interest rate or the fair value of the collateral if the loan is secured. The Company evaluates the remainder of its loans receivables portfolio for impairment on a collective basis in accordance with ASC 450-20, *Loss Contingencies* and records an allowance for credit loss at the portfolio segment level.

Loan principal and interest receivables are charged-off when the loan principal and interest receivables are deemed to be uncollectible. In general, loan principal and interest receivables are identified as uncollectible if any of the following conditions are met : 1) the borrower is dead, missing or incapacitate and there is No legal heir and presentee or the legal heir and presentee refuse to abide the contract; 2) identification of fraud, and the fraud is officially reported to and filed with relevant law enforcement departments; 3) outstanding amount following 180 days past due after all collection efforts based on management's judgment.

*Property and Equipment, Net*

Property and equipment are stated at cost and are depreciated using the straight-line method over the estimated useful lives of the assets, as follows:

| Category | Estimated Useful Life |
|---|---|
| Office equipment | 3 - 5 years |
| Motor vehicles | 5 - 10 years |
| Leasehold improvement | shorter of lease term or economic lives |
| Buildings | 12 -45 years |

Land is stated at cost and is not depreciated.

Construction in progress represents buildings and related premises under construction, which is stated at actual construction cost less any impairment loss. Construction in progress is transferred to the respective category of property and equipment when completed and ready for its intended use.

Interest associated with major development and construction projects is capitalized and included in the cost of the project. The capitalization of interest cease when the project is substantially completed or the development activity is suspended for more than a brief period. The amount to be capitalized is determined by applying the capitalization rate to the average amount of accumulated qualifying capital expenditures for assets under construction during the year.

Repair and maintenance costs are charged to expense as incurred, whereas the cost of renewals and betterments that extend the useful lives of property and equipment are capitalized as additions to the related assets. Retirements, sales and disposals of assets are recorded by removing the cost and accumulated depreciation from the asset and accumulated depreciation accounts, respectively, with any resulting gain or loss reflected in the consolidated statements of comprehensive income (loss).

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Land Use Rights*

Land use rights are recorded at cost less accumulated amortization. Amortization is provided on a straight-line basis over the estimated terms of the land use rights which are 40-50 years.

*Impairment of Long-Lived Assets*

The Company evaluates its long-lived assets or asset group with finite lives for impairment whenever events or changes in circumstances, such as a significant adverse change to market conditions that will impact the future use of the assets, indicate that the carrying amount of an asset group may not be fully recoverable. When these events occur, the Company evaluates the impairment by comparing the carrying amount of the assets to future undiscounted cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flows is less than the carrying amount of the assets, the Company recognizes an impairment loss based on the excess of the carrying amount of the asset group over its fair value, but not below the fair values of the individual long-lived assets within the asset group. No impairment charge was recognized for any of the years presented. Asset groups to be disposed of would be reported at the lower of the carrying amount or fair value less costs to sell, and No longer depreciated. The assets and liabilities of a disposal group classified as held for sale would be presented separately in the appropriate asset and liability sections of the consolidated balance sheets.

*Fair Value of Financial Instruments*

Financial instruments of the Company primarily include cash and cash equivalents, restricted cash, accounts receivable, commitment deposits, funds receivable, short-term and long-term investments, loans receivable, short-term and long-term loans, convertible senior notes (Note 15) and related derivative liabilities. As of December 31, 2017 and 2018, the carrying values of these financial instruments, other than long-term investments, long-term loans, convertible senior notes and related derivative liabilities, approximate their fair values due to the short-term maturity of these instruments. The fair value method investments and trading securities were recorded at fair value based on the quoted price in active markets as of December 31, 2017 and 2018. The carrying values of the long-term loans approximate their fair values, as the loans bear interest at rates determined based on the prevailing interest rates in the market. The convertible senior notes were recognized based on residual proceeds after allocation to the derivative liabilities at fair market value. The estimated fair values of the convertible senior notes based on a market approach were approximately US$301,036 and US$199,172 as of December 31, 2017 and 2018, respectively, and represents a Level 3 valuation in accordance with ASC 820, *Fair Value Measurements and Disclosures* ("ASC 820"). When determining the estimated fair value of the convertible senior notes, the Company used a commonly accepted valuation methodology and market-based risk measurements that are indirectly observable, such as credit risk. The fair value of the bifurcated derivative liabilities was insignificant for the years ended December 31, 2016, 2017 and 2018. Prior to January 1, 2018, the Company determined that it was not practicable to estimate the fair value of its cost method investments as of December 31, 2017 and measures the cost method investment at fair value on a nonrecurring basis only if an impairment charge were to be recognized.

The Company applies ASC 820 in measuring fair value. ASC 820 defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements.

ASC 820 establishes a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value as follows:

Level 1 - Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets.

Level 2 - Include other inputs that are directly or indirectly observable in the marketplace.

Level 3 - Unobservable inputs which are supported by little or No market activity.

ASC 820 describes three main approaches to measuring the fair value of assets and liabilities: (1) market approach; (2) income approach and (3) cost approach. The market approach uses prices and other relevant information generated from market transactions involving identical or comparable assets or liabilities. The income approach uses valuation techniques to convert future amounts to a single present value amount. The measurement is based on the value indicated by current market expectations about those future amounts. The cost approach is based on the amount that would currently be required to replace an asset.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

Assets measured at fair value on a recurring basis as of December 31, 2017 and 2018 are summarized below.

| | Fair Value Measurement as of December 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) US$ | Significant Other Observable Inputs (Level 2) US$ | Unobservable Inputs (Level 3) US$ | Fair Value at December 31, 2017 US$ |
| Available-for-sale securities | 52,283 | 318,065 | - | 370,348 |
| Trading securities | 15,833 | - | - | 15,833 |

| | Fair Value Measurement as of December 31, 2018 | | | |
| --- | --- | --- | --- | --- |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) US$ | Significant Other Observable Inputs (Level 2) US$ | Unobservable Inputs (Level 3) US$ | Fair Value at December 31, 2018 US$ |
| Equity investments | 181,483 | - | - | 181,483 |
| Trading securities | 1,773 | - | - | 1,773 |

*Revenue Recognition*

Revenues are derived from marketing services, listing services, E-commerce services, value-added services and financial services.

*Periods prior to January 1, 2018*

Revenues for each type of service sales were recognized only when the following criteria were met: (a) persuasive evidence of an arrangement exists; (b) price is fixed or determinable; (c) delivery of services has occurred; and (d) collectability is reasonably assured.

*Listing Services*

Listing services revenues consist of revenues derived from both basic listing services and special listing services.

The Company's basic and special listing services are provided to agents, brokers, property developers, property owners, property managers and others seeking to sell or rent new or secondary residential and commercial properties.

(1)   Basic listing services

Basic listing services entitle customers to post and make changes to information for properties, home furnishings and other related products and services in a particular area on the website and mobile apps for a specified period of time, which typically range from 1 to 36 months, in exchange for a fixed fee. Written contracts, containing all significant terms, signed by the Company and its customers provide persuasive evidence of the arrangement. The amount of fee to be paid is not subject to change once the contract has been signed. The contracts generally do not contain any specific performance target or refund guarantee. Delivery of services occurs by making access to the websites and mobile apps available for posting by the customers over the specified listing period. The Company performs credit assessments of its customers prior to signing the written contract to ensure collectability is reasonably assured. In accordance with ASC 605, revenues were recognized ratably over the duration of the service period as the basic listing services were being delivered.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

(2)  Special listing services

Special listing services consist of promotional activities associated with themed marketing campaigns, each generally over a one year duration and designed to recognize the leading companies within a specific real estate sector. For each special listing campaign, targeted leading companies participate in a collective marketing and promotional program for a specified fee, consisting of various online and offline promotional activities tied to the specialized theme of the campaign. Each revenue arrangement may include one or multiple special listing campaigns.

The Company evaluated its special listing revenue arrangements in accordance with ASC 605-25, *Revenue recognition–Multiple-element arrangements*. The promotional services within a special listing program were accounted for as one combined unit of accounting, as each promotional deliverable did not have standalone value to the customer since all the deliverables were tied to the specialized theme of the campaign, and were not sold separately. For contractual arrangements that contain multiple special listing campaigns, the program for each campaign was accounted for as a separate unit of accounting. ASC 605-25 required revenues to be allocated to each unit of accounting on a relative fair value basis based on a selling price hierarchy. The selling price for a deliverable was based on vendor-specific objective evidence ("VSOE") if available, third party evidence ("TPE") if VSOE was not available, or best estimate of selling price ("BESP") if neither VSOE nor TPE was available. The Company allocated total arrangement consideration to each unit of accounting based on its relative selling price, which was determined based on its BESP for that deliverable since neither VSOE nor TPE exist. In determining the BESP for each deliverable, the Company considered its overall pricing model and objectives when sold separately, as well as market or competitive conditions that may impact the price at which the Company would transact if the deliverable were sold regularly on a standalone basis. The Company monitored the conditions that affect its determination of selling price for each deliverable and reassess such estimates periodically. In accordance with ASC 250, "Accounting Changes and Error Corrections," changes in the determination of the BESP were considered a change in accounting estimate and were accounted for on a prospective basis. The effect of changes in the BESP on the allocation of arrangement consideration was insignificant for all periods presented.

Written contracts, containing all significant terms, signed by the Company and its customers provide persuasive evidence of the arrangement. The amount of fee to be paid is not subject to change once the contract has been signed. The contracts do not contain any specific performance, cancellation, termination or refund provisions. The Company performs credit assessments of its customers prior to signing the written contract to ensure collectability is reasonably assured. In accordance with ASC 605, "Revenue Recognition," revenues were recognized ratably over the duration of the campaign period as the special listing services were being delivered.

*Marketing Services*

The Company offers marketing services on the Company's websites and mobile apps, primarily through banner advertisements, floating links, logos and other media insertions. These marketing services are offered to real estate developers and to a lesser extent provider of products and services for home decoration and improvement. Marketing services allow customers to place advertisements on particular areas of the Company's websites and mobile apps, in particular formats and over particular periods of time. Written contracts, containing all significant terms, signed by the Company and its customers provide persuasive evidence of the arrangement. The contracts generally do not contain any specific performance target or refund guarantee.

The service fee is negotiated between the customer and the Company but once a price is agreed to and the written contract is signed by both parties, the price is fixed and not subject to change. The service fee is due and payable in installments over the service period. The marketing services typically last from several days to one year. Delivery of the service occurs upon displaying the agreed forms of services on the Company's websites and mobile apps over the specified service period. The Company performs credit assessments on its customers prior to signing the written contract to ensure collectability is reasonably assured. Revenues were recognized ratably over the contract period, as there was persuasive evidence of an arrangement, the fee is fixed or determinable and collection was reasonably assured, as prescribed by ASC 605.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.      SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

Beginning in 2015, the Group began to enter into marketing service agreements with certain real estate developers, where the Company may elect to collect the contractually stated marketing service fee in the form of (i) a designated real estate property, if transferred to the Company or sold to a third-party buyer designated by the Company prior to a pre-determined date, which typically falls at the end of the marketing service period, or (ii) cash, if the Company elects not to take the designated real estate property as settlement consideration by the pre-determined date. The Company determines the contractually stated marketing service fee under the new payment arrangements with reference to the cash price of the comparable services offered by the Company under the sole cash payment arrangements. The designated real estate property is typically a specifically identified residential unit within a residential community developed by the real estate developer and its fair value is generally commensurate with the contractually stated marketing service fee as of the date of the marketing service agreement. If the Company elects settlement through the sale of the designated real estate property to a third-party buyer, the Company is entitled to retain the entire sales proceeds. In this scenario, the Company has the sole discretion in setting the sales price of the designated real estate property to the third-party buyer but has No incentive to permit such real estate property to be sold at a price lower than the contractually stated marketing service fee, which serves as a de-facto minimal selling price, because the Company would instead accept the cash payment of the stated marketing service fee. Prior to the pre-determined date, the real estate developer is obligated not to sell, encumber or otherwise dispose of the designated real estate property without the consent of the Company.

Under these arrangements, the Company initially recognizes the marketing service revenue up to the amount of the contractually stated marketing service fee. Any excess is contingent upon the sale of the designated real estate properties and is accounted for as contingent marketing service revenues, if and when the sale is consummated and all other revenue recognition criteria are met. For the years ended December 31, 2016 and 2017, the Company recognized marketing service revenue of US$9,730 and nil under such arrangement. Since 2016, the Company ceased entering into these arrangements with real estate developers and collected all the marketing service fees in the form of (i) cash, or (ii) a designated real estate property transferred to the Company, from real estate developers.

Instead, the Company began to provide marketing services whereby the sole consideration for the services is in the form of a specifically identified unit of a development. The Company accounts for these arrangements pursuant to ASC 845, *Nonmonetary transactions*, and have determined that the fair value of consideration received, i.e. the specifically identified real estate property, is more readily determinable than the marketing services surrendered. Accordingly, the fair value of property is used for measurement and revenues are recognized ratably over the service period. Revenue recognized under such arrangement was US$728 and US$1,361 for the years ended December 31, 2016 and 2017.

For certain arrangements, the Company provides marketing services that contain multiple deliverables, that is, different forms of services to be delivered over different periods of time.

The Company accounted for each deliverable in the arrangement as separate unit of accounting. Revenues were allocated to each unit of accounting on a relative fair value basis based on a selling price hierarchy and was recognized ratably over the duration of the service period. The selling price for a deliverable was based on its vendor-specific objective evidence ("VSOE") if available, third party evidence ("TPE") if VSOE is not available, or BESP if neither VSOE nor TPE is available. The total arrangement consideration was allocated to each unit of accounting based on its relative selling price which is determined based on the Company's BESP for that deliverable because neither VSOE nor TPE exist. In determining its BESP for each deliverable, the Company considered its overall pricing model and objectives, as well as market or competitive conditions that may impact the price at which the Company would transact if the deliverable were sold regularly on a standalone basis. The Company monitored the conditions that affect its determination of selling price for each deliverable and reassesses such estimates periodically

***E-commerce service***

E-commerce service revenues consist of revenues derived from:

(1)  Fang membership services

The Company enters into arrangements with real-estate developers, pursuant to which the Company charges its customers RMB5,000 to RMB20,000 in order for them to purchase specified properties from the real estate developers at a discount significantly greater than the face value of the fees charged by the Company. The discount is either a fixed amount off or a fixed percentage to the price of the specified property. The fees paid by the customers to the Company are refundable before a purchase of the specified properties at a discount is made by the customers or if after the purchase, only if the customers can fulfil certain requirements under the refund policy. The Company chose to analogize to rights of return guidance in ASC 605-15 when accounting for refundable fees as reliable estimates of refunds can be made based on company-specific historical evidence. Revenues were recognized by the Company when cash consideration of the fees was received and the discount has been applied by the customers to pay for the purchase price of the specified properties, net of estimated refunds. Cash received in advance of the purchase of specified properties and provision for refunds were recorded as "customers' refundable fees" (Note 14). The provision of refunds was insignificant for the years ended December 31, 2016 and 2017.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

Additionally, the Company, real-estate developers and marketing agencies entered into tri-party cooperation arrangements for certain Fang membership services. When customers use their Fang membership cards to purchase specified properties in selected advertisements published by the marketing agents, a portion of the proceeds from the Fang membership services is remitted to the marketing agents. The Company recognized revenues from this type of Fang membership services on a net basis, representing the portion of proceeds received from customers that is ultimately retained by the Company as it is an agent in the arrangement. Commencing in 2014, the Company also entered into cooperation arrangements directly with real-estate developers for Fang membership services. The Company either engages third-party real estate agents or places advertisements with marketing agents to promote the real-estate projects. The Company recognized revenues from this type of Fang membership services on a gross basis, representing the proceeds received from the real-estate developers, as the Company is the primary obligor in the arrangement. Payments to third-party real estate agents are recorded as cost of sales, while payments to marketing agents are recorded as selling expenses. The portion to be remitted to third-party real estate agents and marketing agents was recorded as amounts payable to sales and marketing agents in "accrued expenses and other liabilities" on the consolidated balance sheets (Note 13).

(2)   Direct sales services

The Company promotes property developments of its developer clients primarily through its websites and mobile applications ("mobile apps"). Potential buyers can register with the Company free of charge if they are interested in any real estate properties covered by its direct sales services. After the registration, the Company provides the buyers with additional information about the properties and related services, such as tours to visit the property developments and other services to facilitate property purchases. By using the direct sales services, individual buyers can enjoy discounted prices for properties that the Company offers from its developer clients. The Company charges its developer clients a fee for each property it sold through its direct sales services at a predetermined percentage of the value of the individual transaction. Thereafter, the real estate developers can request for refund only if they can fulfil certain requirements under the refund policy. The Company chose to analogize to rights of return guidance in ASC 605-15 when accounting for refundable fees as reliable estimates of refunds can be made based on company-specific historical evidence. Revenues were recognized by the Company based on total of successful purchase transactions made, net of estimated refunds. The provision of refunds was insignificant for the years ended December 31, 2016 and 2017.

(3)   Sublease services

Beginning in 2015, the Company began to provide sublease service through its websites. The Company identifies suitable properties and initially enters into lease agreements with the property owners. The lease agreements allow the Company to sublease the properties. Regardless whether the leased property is subsequently sub-leased by the Company, the lease agreement between the Company and the property owner remains in effect, including the Company's obligation to make fixed rental payments over the non-cancellable lease term. The property owner is not a party to, and therefore not entitled to, any rights or obligations under the sublease agreement. Sublease rental income was recorded as revenue from subleasing services and recognized on a gross basis as the Company is the principal to the sublease arrangements. The sublease income was recognized on a straight-line basis over the lease term. Sublease rental income for the years ended December 31, 2016 and 2017 was US$31,929 and US$15,085, respectively.

(4)   Real estate online brokerage services

Commencing in 2015, the Company provided brokerage services for sellers and buyers of secondary properties. Brokerage services may include property listing services, advisory services, transaction negotiation services and administration services. In addition to secondary property sales, the Company also assists property owners and potential tenants with leasing transactions. Commission revenues derived from brokerage services is recognized upon the execution, fulfillment of all performance obligations specified on the tri-party transaction agreement that is entered into between the seller, buyer and the Company in its capacity as broker, and cash receipt.

F-32

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

(5)    Online decoration services

Beginning in 2015, the Company launched online decoration services, which includes interior design, remodeling, renovation, furnishing and other home improvement services. The Company generally charges the customers a fixed fee. The Company recognized revenues based on the percentage-of-completion method and measures progress using input measures, i.e., cost-to-cost, in accordance with ASC 605-35, *Revenue Recognition Construction-Type and Production-Type Contracts.* Estimated losses, if any, were recognized during the period in which the loss becomes probable and reasonably estimable.

*Financial Services*

Financial services are provided through the Company's online financial platform www.fangtx.com and offline micro loan subsidiaries. The Company provides secured loans in the form of entrusted loans, mortgage loans and unsecured loans, primarily to borrowers that meet the Company's credit assessment requirements. The Company ceased to provide entrusted loans since 2017. Revenues derived from loan interest income and annual service fees are recognized using the effective interest rate method. The Company does not accrue interest on loans receivable that are considered impaired or more than 90 days past due unless either the receivable has not been collected due to administrative reasons or the receivable is well secured and in the process of collection. Unsecured loans stop accruing interest when 60 days past due and are classified as impaired loan.

*Value-added Services*

The Company generates revenues from value-added services including subscription services for access to the Company's information database and consulting services for customized and industry-related research reports and indices. Revenues derived from subscription services for access to the Company's information database are recognized ratably over the subscription period. Revenues derived from consulting services for customized and industry-related research reports and indices were recognized when the relevant services were completed.

The Company's business was subject to VAT, surcharges or cultural construction fees levied on advertising-related sales in the PRC. In accordance with ASC 605-45, *Revenue Recognition-Principal Agent Considerations*, all such VAT, surcharges and cultural construction fees were presented as cost of revenues in the consolidated statements of comprehensive income (loss). VAT, surcharges and cultural construction fees for the years ended December 31, 2016 and 2017 were US$68,007 and US$33,320, respectively.

All service fees received in advance of the provision of services were initially recorded as deferred revenues and subsequently recognized as revenues when the related services were performed by the Company.

*Period commencing January 1, 2018*

The Company adopted ASC 606, *Revenue from Contracts with Customers* ("ASC 606"), from January 1, 2018, applying the modified retrospective method to those contracts which were not completed as of January 1, 2018. Accordingly, revenues for the year ended December 31, 2018 were presented under ASC 606, while revenues for the years ended December 31, 2016 and 2017 were not adjusted and continued to be reported under ASC 605. Upon the adoption of the ASC 606, the Company recognized the cumulative effect of US$2.3 million, net of income taxes, as an increase to the opening retained earnings as of January 1, 2018. The cumulative effect of adoption is primarily related to the following reasons:

(1) Before the adoption of ASC 606, the Company assessed whether collectability is reasonably assured at the outset of the arrangement, and subsequently reassessed if there was a substantive change in facts and circumstances. If the collectability of all or a portion of the fee is not reasonably assured, all revenue recognition were deferred until payment was received (assuming all of the other revenue recognition criteria have been met). Upon the adoption of ASC 606, if it is not probable that the Company will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer, consideration received from the customer is initially recorded as a liability. The Company will recognize nonrefundable consideration received as revenue only when one of the following events has occurred:

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

2.    **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

·    the Company has No remaining obligations to transfer goods or services to the customer and all, or substantially all of the consideration has been received;

·    the contract has been terminated; or

·    the Company have transferred control of the goods or services to which the consideration that has been received relates, and has stopped transferring (and has No obligation under the contract to transfer) additional goods or services to the customer, if applicable.

As a result, the Company made an adjustment to decrease the opening balance of retained earnings as of January 1, 2018 by US$ 0.5 million.

(2) The Company's policy before the adoption of ASC 606 was to require written signed contracts by both the Company and its customers as persuasive evidence of its revenue arrangements. In certain cases where services are being delivered prior to the receipt of the written signed contracts by both parties, revenue had been deferred until such time the written signed contracts are collected. Under the new revenue standard, revenues may be recognized prior to the receipt of the written signed contracts by both parties (assuming all other revenue recognition criteria are satisfied), as long as the revenue arrangements between the Company and its customers are legally enforceable. As a result, the Company made an adjustment to increase the opening balance of retained earnings as of January 1, 2018 by USD 2.8 million.

In addition, the Company's revenues are presented net of value-added tax collected on behalf of governments starting from January 1, 2018. Prior to January 1, 2018, value-added tax collected on behalf of governments were presented as gross in both revenues and cost of revenues. The Company has elected to adopt the practical expedient for incremental costs to obtain a contract with a customer, i.e. sales commissions, with amortization periods of one year or less to be recorded in selling expenses when incurred. The Company has elected the practical expedient not to disclose the information about remaining performance obligations which are part of the contracts that have an original expected duration of one year or less.

The disclosure of the impact of adoption on the consolidated balance sheets was as follows:

|  | As of December 31, 2018 USD'000 | Adjustments USD'000 | Amounts without adoption of ASC 606 USD'000 |
|---|---|---|---|
| Accounts receivable | 60,950 | 379 | 61,329 |
| Deferred revenue | (163,346) | (11,633) | (174,979) |
| Accrued expenses and other liabilities | (131,268) | 9,701 | (121,567) |
| Other non-current liabilities | (153,095) | 555 | (152,540) |

The impact for adoption of ASC 606 to the Company's consolidated statement of comprehensive income (loss) for the year ended December 31, 2018 is as follows:

|  | Year ended December 31, 2018 USD'000 | Adjustments USD'000 | Amounts without adoption of ASC 606 USD'000 |
|---|---|---|---|
| E-commerce services | 15,384 | 928 | 16,312 |
| Marketing services | 119,680 | 8,740 | 128,420 |
| Listing services | 113,534 | 5,717 | 119,251 |
| Financial services | 18,060 | 1,068 | 19,128 |
| Value-added services | 36,358 | 2,893 | 39,251 |
| **Total revenues** | **303,016** | **19,346** | **322,362** |
| Cost of services | (58,570) | (18,117) | (76,687) |
| **Operating income** | **39,803** | **1,229** | **41,032** |
| **Net loss** | **(114,909)** | **1,229** | **(113,680)** |
| **Loss per share for Class A and Class B ordinary shares** |  |  |  |
| Basic and Diluted | (1.29) | 0.01 | (1.28) |

F-34

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

2.    **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

Since the adoption of ASC 606 starting from January 1, 2018, the Company recognizes revenues upon the satisfaction of its performance obligation (upon transfer of control of promised goods or services to customers) in an amount that reflects the consideration to which the Company expects to be entitled to in exchange for those goods or services, excluding amounts collected on behalf of third parties (for example, value-added taxes). For each performance obligation satisfied over time, the Company recognizes revenue over time by measuring the progress toward complete satisfaction of that performance obligation. If the Company does not satisfy a performance obligation over time, the performance obligation is satisfied at a point in time.

The Company's contracts with customers often include promises to transfer multiple products and services. For these contracts, the Company accounts for individual performance obligations separately if they are capable of being distinct and distinct within the context of the contract. Determining whether products and services are considered distinct performance obligations may require significant judgment. Judgment is also required to determine the stand-alone selling price ("SSP") for each distinct performance obligation. In instances where SSP is not directly observable, such as when the Company does not sell the product or service separately, the Company determines the SSP using information that may include market conditions and other observable inputs.

*Marketing Services*

The Company offers marketing services on the Company's websites and mobile apps, primarily through banner advertisements, floating links, logos and other media insertions. These marketing services are offered to real estate developers and to a lesser extent provider of products and services for home decoration and improvement. Marketing services allow customers to place advertisements on particular areas of the Company's websites and mobile apps, in particular formats and over particular periods of time. The marketing services typically last from several days to one year. The Company determines that the customer simultaneously receives and consumes benefits provided by the Company's performance as the Company performs during the term of the contract. Revenues from marketing services are recognized ratably over the service period.

*Listing Services*

Listing services revenues consist of revenues derived from both basic listing services and special listing services.

(1)   Basic listing services

Basic listing services entitle customers to post and make changes to information for properties, home furnishings and other related products and services in a particular area on the website and mobile apps for a specified period of time, which typically range from one to 12 months, in exchange for a fixed fee. Revenues are recognized on a straight line basis over the service period. The Company determines that its performance pattern to be straight line since the customer simultaneously receives and consumes the benefits provided by the Company as the Company performs during the term of the contract and the earning process is straight line.

(2)   Special listing services

The Company offers special listing services, consisting of a number of online and offline themed events, including industry forums, periodic updates and online promotions to its customers to promote their brands. The special listing services contain a number of defined but not identical or similar activities to be performed over the period of one year. These activities are to fulfill the special listing service and are not separate promises in the contract. The Company determines that each day of the promotion service is distinct because the customer can benefit from each increment of service on its own (that is, it is capable of being distinct) and each increment of service is separately identifiable because No day of service significantly modifies or customizes another and No day of service significantly affects either the Company's ability to fulfill another day of service or the benefit to the customer of another day of service. The Company determines that it is providing a series of distinct goods or services because the services provided each day are substantially the same, the customer simultaneously receives and consumes the benefits provided by the Company as the Company performs, and the same measure of progress would be used to measure the Company's progress toward satisfying its promise to provide the promotion services. Revenues of special listing services are recognized on a straight-line basis over the period of one year.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

*Value-added Services*

Value-added services consist of revenues derived from:

(1)   Data services

The Company derives revenues by providing access and analytics tools, including appraisal and rating modules, and city maps, based on its proprietary database of commercial real estate information, typically through a fixed monthly fee for its data services. The Company determines that the customer simultaneously receives and consumes benefits provided by the Company's performance as the Company performs during the term of the contract and the earning process is straight-line. Revenues from data services are recognized on a straight-line basis over the subscription period.

(2)   Analytics services

The Company derives revenues by providing customized research reports to customers. There are No contractual customer acceptance provisions. Revenues from customized research reports are recognized when the Company delivers the reports to customers, which is when the control over the report has been transferred to customers.

The Company provides data monitoring and survey services over a period of time, generally less than one year. Revenues are recognized on a straight-line basis over the term of the agreement since the customer simultaneously receives and consumes benefits provided by the Company's performance as the Company performs during the term of the contract and the earning process is straight-line.

*Financial Services*

The Company provides secured loans in the form of mortgage loans and unsecured loans, primarily to borrowers that meet the Company's credit assessment requirements. Revenues derived from loan interest income and annual service fees are recognized using the effective interest rate method. The Company does not accrue interest on loans receivable that are considered impaired or more than 90 days past due unless either the receivable has not been collected due to administrative reasons or the receivable is well secured and in the process of collection. Unsecured loans stop accruing interest when 60 days past due and are classified as impaired loan.

*E-Commerce Services*

E-commerce service revenues consist of revenues derived from:

(1) Fang membership services

For the year ended December 31, 2018, the Company enters into arrangements with real-estate developers, pursuant to which the Company charges individual buyers who are interested to purchase specified properties from the real estate developers at a discount significantly greater than the face value of the fees charged by the Company. The discount is either a fixed amount or a fixed percentage to the price of the specified property. The fees paid by the individual buyers to the Company are refundable before a purchase of the specified properties is consummated by the individual buyers. Upon the successful purchase of the specified properties by the individual buyers, a portion of the proceeds from the Fang membership services is remitted to the real-estate developers or its designated marketing agents.

The Company determines real-estate developers as its customers and identifies one single performance obligation as the referral service. The Company determined the referral service to be satisfied at a point in time only when the purchase of the specified properties have been consummated by the individual buyers. Consideration payable to the real-estate developers or its designated marketing agents are accounted for as a reduction of the transaction price.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

2.    **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

(2) Direct sales services

The Company promotes properties of its property developer customers primarily through its websites and mobile applications by providing the potential individual buyers with additional information about the properties and related services, such as tours to visit the properties and other services to facilitate property purchases. In return, the Company charges its property developer customers a fee for each property it sells at a predetermined percentage of the value of the individual transaction. The Company determines real-estate developers as its customers and identifies one single performance obligation as the referral service. The Company determined the referral service to be satisfied at a point in time only when the purchase of the specified properties have been consummated by the individual buyers. Revenues were recognized by the Company based on total of successful purchase transactions made.

(3) Sublease services

The Company identifies suitable properties and initially enters into lease agreements with the property owners. The lease agreements allow the Company to sublease the properties. Regardless whether the leased property is subsequently sub-leased by the Company, the lease agreement between the Company and the property owner remains in effect, including the Company's obligation to make fixed rental payments over the non-cancellable lease term. The property owner is not a party to, and therefore not entitled to, any rights or obligations under the sublease agreement. Sublease rental income is recorded as revenue from subleasing services and recognized on a gross basis. The sublease income is recognized on a straight-line basis over the lease term.

Sublease rental income for the year ended December 31, 2018 was US$6,402. Future minimum sublease rental incomes expected to be received under noncancellable sublease agreements as of December 31, 2018 are as follows:

|  | US$ |
|---|---|
| 2019 | 1,125 |
| 2020 | 97 |
| 2021 and thereafter | - |
|  | 1,222 |

*Contract Balances*

The timing of revenue recognition, billings and cash collections result in accounts receivable and contract liabilities (i.e. deferred revenue). Accounts receivable are recognized in the period when the Company has provided services to its customers and when its right to consideration is unconditional. The Company reviews the accounts receivable on a periodic basis and makes general and specific allowances when there is doubt as to the collectability of individual balances.

The Company considers many factors in assessing the collectability of its receivables, such as the age of the amounts due, the customer's payment history and credit-worthiness. An allowance for doubtful accounts is recorded in the period in which a loss is determined to be probable. Accounts receivable balances are written off after all collection efforts have been exhausted.

Amounts collected on accounts receivable are included in net cash provided by operating activities in the consolidated statements of cash flows.

Deferred revenue (a contract liability) is recognized when the Company has an obligation to transfer goods or services to a customer for which the Company has received consideration from the customer, or for which an amount of consideration is due from the customer. The majority of the balance as of January 1, 2018 were recognized as revenue during the year ended December 31, 2018.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

*Cost of Revenues*

Cost of revenues consists of employee costs, tax surcharges, rental costs incurred in relation to sublease services, server and bandwidth leasing fees, payments to third-party real estate agents and other direct costs incurred in providing the related services. Prior to January 1, 2018, VAT was also included in cost of revenues. These costs are expensed when incurred.

*Advertising Expenses*

Advertising expenses are expensed when incurred and are included in selling expenses in the consolidated statements of comprehensive income (loss). For the years ended December 31, 2016, 2017 and 2018, the advertising expenses were US$61,762, US$16,869 and US$7,110, respectively.

*Leases*

Leases are classified at the inception date as either a capital lease or an operating lease. A lease is a capital lease if any of the following conditions exists: (a) ownership is transferred to the lessee by the end of the lease term, (b) there is a bargain purchase option, (c) the lease term is at least 75% of the property's estimated remaining economic life or (d) the present value of the minimum lease payments at the beginning of the lease term is 90% or more of the fair value of the leased property to the lessor at the inception date. A capital lease is accounted for as if there was an acquisition of an asset and an incurrence of an obligation at the inception of the lease. All other leases are accounted for as operating leases wherein rental payments are expensed as incurred. The Company had No capital leases for any of the years presented.

*Income Taxes*

The Company follows the liability method of accounting for income taxes, whereby deferred tax assets and liabilities are recognized based on the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases, and attributable to operating loss and tax credit carryforwards, if any. The Company reduces the carrying amounts of deferred tax assets by a valuation allowance, if based on the available evidence, it is "more-likely-than-not" that such assets will not be realized. Accordingly, the need to establish valuation allowances for deferred tax assets is assessed at each reporting period based on a "more-likely-than-not" realization threshold. This assessment considers, among other matters, the nature, frequency and severity of current and cumulative losses, forecasts of futures profitability, the duration of statutory carryforward periods, the Company's experience with operating loss and tax credit carryforwards, if any, not expiring.

The Company applies ASC 740, *Income taxes* ("ASC 740"), to account for uncertainties in income taxes. In accordance with the provisions of ASC 740, the Company recognizes in its financial statements the impact of a tax position if a tax return position or future tax position is "more-likely-than-not" to prevail based on the facts and technical merits of the position. Tax positions that meet the "more-likely-than-not" recognition threshold are measured at the largest amount of tax benefit that has a greater than fifty percent likelihood of being realized upon settlement.

The Company's estimated liability for unrecognized tax benefits, which is included in "other non-current liabilities", is periodically assessed for adequacy and may be affected by changing interpretations of laws, rulings by tax authorities, changes and/or developments with respect to tax audits, and expiration of the statutes of limitation. The outcome for a particular audit cannot be determined with certainty prior to the conclusion of the audit and, in some cases, appeal or litigation process. The actual benefits ultimately realized may differ from the Company's estimates. As each audit is concluded, adjustments, if any, are recorded in the Company's financial statements. Additionally, in future periods, changes in facts, circumstances, and new information may require the Company to adjust the recognition and measurement estimates with regard to individual tax positions. Changes in recognition and measurement estimates are recognized in the period in which the changes occur.

Interest and penalties arising from underpayment of income taxes are computed in accordance with the related PRC tax law. The amount of interest expense is computed by applying the applicable statutory rate of interest to the difference between the tax position recognized and the amount previously taken or expected to be taken in a tax return. Interest and penalties recognized in accordance with ASC 740 are classified in the consolidated statements of comprehensive income (loss) as income tax expense.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

*Government Grants*

Government grants primarily consist of financial subsidies received from provincial and local governments for operating a business in their jurisdictions and compliance with specific policies promoted by the local governments. For certain government grants, there are No defined rules and regulations to govern the criteria necessary for companies to receive such benefits, and the amount of financial subsidy is determined at the discretion of the relevant government authorities. The government grants of non-operating nature with No further conditions to be met are recorded as non-operating income in "Other income, net" when received. The government grants with certain operating conditions are recorded as liabilities when received and will be recorded as operating income when the conditions are met. Government grants related to the acquisition of property and equipment and land use rights are recorded as other non-current liabilities on the consolidated balance sheets when the grants become receivable, and recognized as other income in the consolidated statements of comprehensive income (loss) on a straight-line basis over the estimated useful lives of those assets. For the years ended December 31, 2016, 2017 and 2018, US$6,469 and US$3,154, US$1,435 respectively, of government grants were recognized in the consolidated statements of comprehensive income (loss).

*Share-based Compensation*

The Company's employees and directors participate in the Company's share-based award incentive plan which is more fully discussed in Note 18. The Company applies ASC 718, *Compensation-Stock Compensation* ("ASC 718"), to account for its employee share-based payments. There were No share-based payments made to non-employees for any of the years presented.

In accordance with ASC 718, the Company determines whether a share option should be classified and accounted for as a liability award or an equity award. All grants of share-based awards to employees classified as equity awards are recognized in the financial statements based on their grant date fair values which are calculated using an option pricing model. All grants of share-based awards to employees and directors classified as liabilities are remeasured at the end of each reporting period with an adjustment for fair value recorded to the current period expense in order to properly reflect the cumulative expense based on the current fair value of the vested rewards over the vesting periods. The Company has elected to recognize compensation expense using the straight-line method for all employee equity awards granted with graded vesting based on service conditions, which were not subject to performance vesting conditions.

Meanwhile, the Company uses the accelerated attribution method for equity awards with performance conditions on a tranche-by-tranche basis based on the probable outcome of the performance conditions. To the extent the required vesting conditions are not met resulting in the forfeiture of the share-based awards, previously recognized compensation expense relating to those awards is reversed.

Cancellation of an award accompanied by the concurrent grant of a replacement award is accounted for as a modification of the terms of the cancelled award ("modified awards"). The compensation costs associated with the modified awards are recognized if the new vesting condition is achieved. Total recognized compensation cost for the awards is at least equal to the fair value of the awards at the grant date unless at the date of the modification the performance or service conditions of the original awards are not expected to be satisfied. The incremental compensation cost is measured as the excess of the fair value of the replacement award over the fair value of the cancelled award at the cancellation date. Therefore, in relation to the modified awards, the Company recognizes share-based compensation over the vesting periods of the replacement award, which comprises, (i) the amortization of the incremental portion of share-based compensation over the remaining vesting term and (ii) any unrecognized compensation cost of the original award over the original term.

In March 2016, the Financial Accounting Standards Board ("FASB") issued a new accounting standard update on simplifying the accounting for share-based payment transactions, including the income tax consequences, classification of awards as either equity or liabilities, and classification on the statement of cash flows. The new guidance also allows an entity to account for forfeitures when they occur. This guidance became effective for reporting periods beginning after December 15, 2016. The Company adopted this new guidance on January 1, 2017. In prior years, excess tax benefits were recognized in additional paid-in capital; tax deficiencies were recognized either as an offset to accumulated excess tax benefits, if any, or in the consolidated statement of comprehensive income (loss). Excess tax benefits were not recognized until the deduction reduces taxes payable. Upon adoption, all excess tax benefits and tax deficiencies are recognized as income tax expense or benefit in the consolidated statement of comprehensive income (loss). This change was adopted prospectively and did not have a material impact on the Company's consolidated financial statements. The Company elected to account for forfeitures as they occur, rather than estimate expected forfeitures. These changes were adopted on a modified retrospective basis, and resulted in No material cumulative effect adjustment to retained earnings.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Earnings per Share*

The Company computes earnings per Class A and Class B ordinary shares in accordance with ASC 260, *Earnings Per Share* ("ASC 260"), using the two class method. Under the provisions of ASC 260, basic net income per share is computed using the weighted average number of ordinary shares outstanding during the period except that it does not include unvested ordinary shares subject to repurchase or cancellation. Diluted net income per share is computed using the weighted average number of ordinary shares and, if dilutive, potential ordinary shares outstanding during the period. Potentially dilutive securities have been excluded from the computation of diluted net income per share if their inclusion is anti-dilutive. Potential ordinary shares consist of the incremental ordinary shares issuable upon the exercise of stock options, contracts that may be settled in the Company's stock or cash and the conversion of the convertible senior notes. The dilutive effect of outstanding stock options and convertible senior notes is reflected in diluted earnings per share by application of the treasury stock method and the if-converted method, respectively. The computation of the diluted net income per share of Class A ordinary shares assumes the conversion of Class B ordinary shares, while the diluted net income per share of Class B ordinary shares does not assume the conversion of those shares.

The liquidation and dividend rights of the holders of the Company's Class A and Class B ordinary shares are identical, except with respect to voting. The Class B ordinary shareholders do not have the legal ability to cause the Company's board of directors to declare unequal dividends to the holders of Class A and Class B ordinary shares. As a result, and in accordance with ASC 260, the undistributed earnings for each year are allocated based on the contractual participation rights of the Class A and Class B ordinary shares as if the earnings for the year had been distributed. As the liquidation and dividend rights are identical, the undistributed earnings are allocated on a proportionate basis. Further, as the conversion of Class B ordinary shares is assumed in the computation of the diluted net income per share of Class A ordinary shares, the undistributed earnings are equal to net income for that computation. For the purposes of calculating the Company's basic and diluted earnings per Class A and Class B ordinary shares, the ordinary shares relating to the options that were exercised are assumed to have been outstanding from the date of exercise of such options.

*Derivative Instruments*

ASC 815, *Derivatives and Hedging*, requires all contracts which meet the definition of a derivative to be recognized on the balance sheet as either assets or liabilities and recorded at fair value. Changes in the fair value of derivative financial instruments are either recognized periodically in earnings or in other comprehensive income (loss) depending on the use of the derivative and whether it qualifies for hedge accounting. Changes in fair values of derivatives not qualified as hedges are reported in earnings. The estimated fair values of derivative instruments are determined at discrete points in time based on the relevant market information. These estimates are calculated with reference to the market rates using industry standard valuation techniques. The fair value of the derivative instruments held by the Company was insignificant for all of the years presented.

*Comprehensive Income (Loss)*

Comprehensive income (loss) is defined as the change in equity of the Company during a period from transactions and other events and circumstances excluding transactions resulting from investments from owners and distributions to owners. Accumulated other comprehensive income (loss), as presented on the consolidated balance sheets, includes (i) the cumulative foreign currency translation adjustments, and (ii) gains and losses on intra-entity foreign currency transactions that are of a long-term-investment nature (that is, settlement is not planned or anticipated in the foreseeable future) between consolidated entities. Comprehensive income (loss) also included changes in unrealized gains (losses) on available-for-sale equity securities for the years ended December 31, 2016 and 2017, before the adoption of ASU 2016-01.

*Contingencies*

The Company records accruals for certain of its outstanding legal proceedings or claims when it is probable that a liability will be incurred and the amount of loss can be reasonably estimated. The Company evaluates, on a quarterly basis, developments in legal proceedings or claims that could affect the amount of any accrual, as well as any developments that would make a loss contingency both probable and reasonably estimable. The Company discloses the amount of the accrual if it is material.

**FANG HOLDINGS LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.      SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

When a loss contingency is not both probable and estimable, the Company does not record an accrued liability but discloses the nature and the amount of the claim, if material. However, if the loss (or an additional loss in excess of the accrual) is at least reasonably possible, then the Company discloses an estimate of the loss or range of loss, if such estimate can be made and material, or states that such estimate is immaterial if it can be estimated but immaterial, or discloses that an estimate cannot be made. The assessments of whether a loss is probable or reasonably possible, and whether the loss or a range of loss is estimable, often involve complex judgments about future events. Management is often unable to estimate the loss or a range of loss, particularly where (i) the damages sought are indeterminate, (ii) the proceedings are in the early stages, or (iii) there is a lack of clear or consistent interpretation of laws specific to the industry-specific complaints among different jurisdictions. In such cases, there is considerable uncertainty regarding the timing or ultimate resolution of such matters, including eventual loss, fine, penalty or business impact, if any.

*Recent accounting pronouncements*

In February 2016, the FASB established Topic 842, *Leases,* by issuing ASU No. 2016-02, which requires lessees to recognize leases on balance sheet and disclose key information about leasing arrangements. Topic 842 was subsequently amended by ASU No. 2018-01, *Land Easement Practical Expedient for Transition to Topic 842*; ASU No. 2018-10, *Codification Improvements to Topic 842, Leases*; and ASU No. 2018-11, *Targeted Improvements*. The new standard establishes a right-of-use model (ROU) that requires a lessee to recognize a ROU asset and lease liability on the balance sheet for all leases with a term longer than 12 months. Leases will be classified as finance or operating, with classification affecting the pattern and classification of expense recognition in the income statement.

The new standard is effective for public business entities for annual periods beginning after December 15, 2018, and interim periods therein. For all other entities, the standard is effective for fiscal years beginning after December 15, 2019, and interim periods within fiscal years beginning after December 15, 2020. Early adoption is permitted. A modified retrospective transition approach is required, applying the new standard to all leases existing at the date of initial application. The Company adopted the new standard on January 1, 2019 and used the effective date as the date of initial application. Consequently, financial information will not be updated and the disclosures required under the new standard will not be provided for dates and periods before January 1, 2019.

The new standard provides a number of optional practical expedients in transition. The Company elected the 'package of practical expedients', which permits the Company not to reassess under the new standard its prior conclusions about lease identification, lease classification and initial direct costs.

Leases currently classified as operating leases in note 21 will be reported on the consolidated balance sheets upon adoption at their net present value, which will increase total assets and liabilities. The Company expects to recognize the right-of-use assets and lease liability in amount of approximately US$5.7 million respectively as of January 1, 2019. The Company used its estimated incremental borrowing rate based on information available at the date of adoption in calculating the present value of its existing lease payments. The adoption of ASC 842 is not expected to have a material impact to the Company's consolidated statements of comprehensive income (loss) or net cash provided by operating activities.

The adoption of ASC 842 is not expected to have a material impact to the accounting and disclosure of sublease services in which the Company is the lessor.

In June 2016, the FASB issued ASU No. 2016-13 ("ASU 2016-13"), *Financial Instruments – Credit Losses (Topic 326), Measurement of Credit Losses on Financial Instruments*. ASU 2016-13 changes the impairment model for most financial assets and certain other instruments. The standard will replace "incurred loss" approach with an "expected loss" model for instruments measured at amortized cost. For available-for-sale debt securities, entities will be required to record allowances rather than reduce the carrying amount, as they do today under the other-than-temporary impairment model. The standard is effective for public business entities for annual periods beginning after December 15, 2019, and interim periods therein. Early adoption is permitted. The Company is currently evaluating the impact of adopting this standard on its consolidated financial statements.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**2.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measureme*nt. ASU No. 2018-13 eliminates, adds and modifies certain disclosure requirements for fair value measurements. The amendments applicable to the disclosures of changes in unrealized gains and losses, the range and weighted average of significant unobservable inputs used to develop Level 3 fair value measurements, and the narrative description of measurement uncertainty should be applied prospectively for only the most recent interim or annual period presented in the initial year of adoption. This ASU is effective for all entities for fiscal years beginning after December 15, 2019, including interim periods therein. All other amendments should be applied retrospectively to all periods presented upon their effective date. Early adoption is permitted, and an entity is also permitted to early adopt any removed or modified disclosures and delay adoption of the additional disclosures until their effective date. The Company is in the process of evaluating the impact on its consolidated financial statements upon adoption.

**3.   CONCENTRATION OF RISKS**

*Concentration of Credit Risk*

Assets that potentially subject the Company to significant concentration of credit risk primarily consist of cash and cash equivalents, restricted cash, fixed-rate time deposits classified as short-term investments, accounts receivable, funds receivable, loans receivable and commitment deposits. As of December 31, 2018, the Company had US$463,615 in cash and cash equivalents, restricted cash and short-term investments, 96.2% and 3.8% of which were held by financial institutions in the PRC and financial institutions outside of the PRC, respectively. Under PRC law, it is generally required that a commercial bank in the PRC that holds third-party cash deposits protect the depositors' rights and interests over their deposited money; PRC banks are subject to a series of risk control regulatory standards; and PRC bank regulatory authorities are empowered to take over the operation and management of any PRC bank that faces a material credit crisis. In the event of bankruptcy of one of the financial institutions in which the Company has deposits or investments, it may be unlikely to claim its deposits or investments back in full. The Company selected reputable financial institutions with high credit ratings to deposit its assets. The Company regularly monitors the ratings of the financial institutions in case of any defaults. There has been No recent history of default in relation to these financial institutions.

Accounts receivable are typically unsecured and are derived from revenue earned from customers in the PRC. The risk with respect to accounts receivable is mitigated by credit evaluations the Company performs on its customers and its ongoing monitoring of outstanding balances. The Company regularly reviews the creditworthiness of its customers, and requires collateral from its customers in certain circumstances when accounts receivables become long overdue.

Funds receivable represent amounts due from third-party payment service providers. The Company carefully considers and monitors the credit worthiness of the third-party payment service providers to mitigate any risks associated with funds receivable.

The Company is exposed to default risk on its loans receivable. The Company assesses the allowance for credit loss related to loans receivable on a quarterly basis, either on an individual or collective basis. As of December 31, 2018, No single borrower comprised a significant portion of the Company's loan portfolio.

The Company regularly reviews the creditworthiness of real estate developers, and requires collateral from real estate developers in certain circumstances when commitment deposits become overdue.

*Concentration of Customers*

There were No revenues from customers which individually represented greater than 10% of the total revenues for any of the years ended December 31, 2016, 2017 and 2018.

*Current Vulnerability Due to Certain Other Concentrations*

The Company's operations may be adversely affected by significant political, economic and social uncertainties in the PRC. Although the PRC government has been pursuing economic reform policies for more than 30 years, No assurance can be given that the PRC government will continue to pursue such policies or that such policies may not be significantly altered, especially in the event of a change in leadership, social or political disruption or unforeseen circumstances affecting the PRC's political, economic and social conditions. There is also No guarantee that the PRC government's pursuit of economic reforms will be consistent or effective.

The Company almost transacts all of its business in RMB, which is not freely convertible into foreign currencies. On January 1, 1994, the PRC government abolished the dual rate system and introduced a single rate of exchange as quoted daily by the People's Bank of China (the "PBOC"). However, the unification of the exchange rates does not imply that the RMB may be readily convertible into United States dollars or other foreign currencies. All foreign exchange transactions continue to take place either through the PBOC or other banks authorized to buy and sell foreign currencies at the exchange rates quoted by the PBOC.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**3.     CONCENTRATION OF RISKS (continued)**

Approval of foreign currency payments by the PBOC or other institutions requires submitting a payment application form together with suppliers' invoices, shipping documents and signed contracts. Additionally, the value of the RMB is subject to changes in central government policies and international economic and political developments affecting supply and demand in the PRC foreign exchange trading system market.

Internet and advertising related businesses are subject to significant restrictions under current PRC laws and regulations. Specifically, foreign investors are not allowed to own more than a 50% equity interest in any ICP business. In 2016, a foreign invested entity mainly owned and ultimately controlled by our WFOE obtained the ICP to operate www.fang.com.

The Company conducts its operations in the PRC through contractual arrangements entered into between the WOFEs and the PRC Domestic Entities. The relevant regulatory authorities may find the current contractual arrangements and businesses to be in violation of any existing or future PRC laws or regulations. If the Company or any of its current or future PRC Domestic Entities or subsidiaries are found in violation of any existing or future laws or regulations, or fail to obtain or maintain any of the required permits or approvals, the relevant regulatory authorities would have broad discretion in dealing with such violations, including levying fines, confiscating the income of WOFEs, PRC Domestic Entities and the PRC Domestic Entities' subsidiaries, revoking the business licenses or operating licenses of WOFEs, PRC Domestic Entities and the PRC Domestic Entities' subsidiaries, shutting down the Company's servers or blocking the Company's websites, discontinuing or placing restrictions or onerous conditions on the Company's operations, requiring the Company to undergo a costly and disruptive restructuring, or enforcement actions that could be harmful to the Company's business. Any of these actions could cause significant disruption to the Company's business operations and severely damage the Company's reputation, which would in turn materially and adversely affect the Company's business and results of operations. In addition, if the imposition of any of these penalties causes the Company to lose the rights to direct the actives of PRC Domestic Entities or the Company's right to receive their economic benefits, the Company would No longer be able to consolidate the PRC Domestic Entities.

In addition, if the WOFEs, PRC Domestic Entities and the PRC Domestic Entities' subsidiaries or their shareholders fail to perform their obligations under the Contractual Agreements, the Company may have to incur substantial costs and expend resources to enforce the Company's rights under the contracts. The Company may have to rely on legal remedies under PRC law, including seeking specific performance or injunctive relief and claiming damages, which may not be effective. All of these Contractual Agreements are governed by PRC law and provide for the resolution of disputes through arbitration in the PRC. Accordingly, these contracts would be interpreted in accordance with PRC law and any disputes would be resolved in accordance with the PRC legal procedures. The legal system in the PRC is not as developed as in other jurisdictions, such as the United States. As a result, uncertainties in the PRC legal system could limit the Company's ability to enforce these Contractual Agreements. Under PRC law, rulings by arbitrators are final, parties cannot appeal the arbitration results in courts, and prevailing parties may only enforce the arbitration awards in PRC courts through arbitration award recognition proceedings, which would incur additional expenses and delay. In the event the Company is unable to enforce these Contractual Agreements, the Company may not be able to exert effective control over its PRC Domestic Entities, and the Company's ability to conduct its business may be negatively affected.

The Company believes that its corporate structure and Contractual Agreements of the Company's PRC Domestic Entities and WFOEs in China are in compliance with all existing PRC laws and regulations. Therefore, in the opinion of management, (i) the ownership structure of the Company and the PRC Domestic Entities are in compliance with existing PRC laws and regulations; (ii) the Contractual Agreements with PRC Domestic Entities and their nominee shareholder are valid and binding, and will not result in any violation of PRC laws or regulations currently in effect; and (iii) the Company's business operations are in compliance with existing PRC law and regulations in all material respects.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

4.    **REVENUE**

The following table presents revenue disaggregated by nature of services:

| | For the Year Ended December 31, 2018 |
|---|---:|
| E-commerce services | |
| - Fang membership services | 2,752 |
| - Direct sales services | 5,294 |
| - Sub lease services | 6,402 |
| - Other | 936 |
| **Subtotal** | **15,384** |
| | |
| **Marketing services** | **119,680** |
| | |
| Listing services | |
| - Basic listing services | 84,482 |
| - Special listing services | 29,052 |
| **Subtotal** | **113,534** |
| | |
| **Financial services** | **18,060** |
| | |
| Value-added services | |
| - Data services | 18,905 |
| - Analytics services | 12,220 |
| - Other | 5,233 |
| **Subtotal** | **36,358** |
| **Total revenues** | **303,016** |

The following table presents revenue disaggregated by categories of customers:

| | For the Year Ended December 31, 2018 |
|---|---:|
| **E-commerce services** | |
| - New home (a) | 7,391 |
| - Other | 7,993 |
| **Subtotal** | **15,384** |
| | |
| **Marketing services** | |
| - New home (a) | 119,352 |
| - Home furnishing and improvement | 328 |
| **Subtotal** | **119,680** |
| | |
| **Listing services** | |
| - Secondary and rental (b) | 84,773 |
| - Research (c) | 28,748 |
| - Other | 13 |
| **Subtotal** | **113,534** |
| | |
| **Financial services** | **18,060** |
| | |
| **Value-added services** | **36,358** |
| | |
| **Total revenues** | **303,016** |

(a)  New home business primarily consists of sales to residential property developers and their sales agents who are promoting newly developed properties for sale.

(b)  Secondary and rental business primarily consists of sales to real estate agents who are promoting secondary properties for sale or rental.

(c)  Research primarily consists of online and offline themed marketing campaigns provided to customers.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**5. INVESTMENTS**

Short-term investments and long-term investments consisted of the following:

| | 2017 | As of December 31, 2018 |
|---|---|---|
| | US$ | US$ |
| Short-term investments | | |
| Trading securities | 15,833 | 1,773 |
| Fixed-rate time deposits | 39,968 | 14,270 |
| | 55,801 | 16,043 |
| | | |
| Long-term investments: | | |
| Equity Investments with Readily Determinable Fair Values: | | |
| - Color Life Service Company ("Color Life") | 4,554 | - |
| - Hopefluent Company Holdings Limited ("Hopefluent") | 47,729 | 30,733 |
| - Shenzhen World Union Properties Consultancy Co., Ltd. ("World Union") | 318,065 | 150,750 |
| | 370,348 | 181,483 |
| Equity Investments without Readily Determinable Fair Values: | | |
| - Guilin Bank | 38,817 | 47,664 |
| - Xian Chuangdian Quancheng Real Estate Consultant Limited ("Chuangdian") | 3,498 | 3,330 |
| - Tospur Real Estate Consulting Co., Ltd. ("Tospur") | 58,301 | 55,507 |
| - Foshan Nature Lvke Science | - | 729 |
| | 100,616 | 107,230 |
| Equity method investments | | |
| - Chongqing Wanli New Energy Co., Ltd. ("Wanli") | - | 84,520 |
| | | |
| | 470,964 | 373,233 |

As of December 31, 2017 and 2018, the Company held fixed-rate time deposits purchased from commercial banks and financial institutions with maturities of less than one year.

In October 2017, the Company invested US$15,299 in PRC mutual funds, which were classified as trading securities as they were held principally for the purpose of selling in the near term. As of December 31, 2017, the market price increases to US$15,833 and an unrealized gains of US$518 was included in earnings. In 2018, the Company sold majority of such trading securities in the amount of US$11,705, and recognized a loss of US$2,091 in the consolidated statements of change in fair value of trading securities.

Interest income on the fixed-rate time deposits and cash and cash equivalents and restricted cash of US$11,367, US$11,322 and US$10,302 were recognized for the years ended December 31, 2016, 2017 and 2018, respectively.

Dividends from the long-term investments of US$3,281, US$6,692 and US$6,838 were recognized as investment income in the consolidated statements of comprehensive income (loss) for the years ended December 31, 2016, 2017 and 2018, respectively.

F-45

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**5.      INVESTMENTS (continued)**

On June 27, 2014, the Company acquired 27,551,733 shares of Color Life, a Hong Kong listed company, for US$13,583. The investment constituted a 2.76% ownership in Color Life and was classified as an available-for-sale security. As of December 31, 2016, the market price further declined to US$20,606 and an unrealized loss of US$3,097 was recorded in other comprehensive income (loss). In 2017, the Company sold 20,705,000 shares for a total consideration of US$12,317, and recognized a gain of US$ 2,110 in the consolidated statements of comprehensive income (loss). As of December 31, 2017, the market price of the remaining shares declined to US$4,554. Total fair value decrease of US$3,735 was recorded in other comprehensive income (loss) and US$2,110 gain related to the sale was reclassified out of accumulated other comprehensive income for the year ended December 31, 2017. In 2018, the Company sold 6,846,733 shares for a total consideration of US$6,645, and recognized a gain of US$2,091 in the consolidated statements of comprehensive income (loss). The Company received cash dividends in the amount of US$440 distributed by Color Life in 2018.

In November 2014, the Company acquired an aggregate of 111,935,037 shares of Hopefluent, a Hong Kong listed company, for US$43,361. The investment constituted a 17.26% ownership in Hopefluent and was classified as an available-for-sale security. As of December 31, 2016, an unrealized loss of US$306 was recorded in other comprehensive income (loss) for the year ended December 31, 2016. In 2017, the Company sold 3,164,000 shares for a total consideration of US$1,614, and recognized a gain of US$626 in the consolidated statements of comprehensive income (loss). As of December 31, 2017, the market price of the remaining shares increased to US$47,729. Total fair value increase of US$18,309 was recorded in other comprehensive income and US$626 gain related to the sale was reclassified out of accumulated other comprehensive income for the year ended December 31, 2017. In 2018, the Company received cash dividends in the amount of US$1,711 distributed by Hopefluent. As of December 31, 2018, the market price of the shares declined to US$30,733. Total fair value decrease of US$16,996 was recorded in change in fair value of securities for the year ended December 31, 2018

On May 29, 2015, the Company acquired an aggregate of 145,376,744 shares of World Union, a PRC listed company, at a total consideration of US$121,393. The investment constituted a 10.06% ownership in World Union. The investment in World Union was classified as a cost method investment upon acquisition, as the Company could not freely sell the shares due to a lock-up provision of 36 months. On April 8, 2016, World Union declared a stock dividend whereby four shares were distributed to shareholders for every ten shares held. As a result, the Company's shareholding increased from 145,376,744 shares to 203,527,442 shares. As of December 31, 2017, as the lock-up restriction will terminate within one year, the classification of the investment changed from a cost method to an available for sale security, and the fair value of the investment was measured based on the market price, adjusted for the effect of the remaining restriction, in accordance with ASC 820. As of December 31, 2017, the fair value of World Union was US$318,065 and the related tax effect of US$49,566 were recorded in other comprehensive income for the year ended December 31, 2017. As of December 31, 2017 and 2018, the investment constituted a 9.96% ownership in World Union. The Company received cash dividends distributed by World Union in amount of US$2,417 and US$2,445 in 2017 and 2018 respectively. As of December 31, 2018, the fair value of World Union was US$150,750, total fair value decrease of US$161,039 was recorded in change in fair value of securities for the year ended December 31, 2018.

On October 29, 2015, the Company acquired 11.03% of the share capital of Sindeo, a non-listed company, for US$5,000. The investment in Sindeo was classified as a cost method investment, as the Company does not have significant influence over Sindeo and because there is No readily determinable fair value. During the year ended December 31, 2016 and 2017, the impairment loss of US$2,232 and US$2,768, respectively, was recorded in the statement of comprehensive income (loss) as Sindeo's financial condition had deteriorated as evidenced by significant operating losses.

On July 12, 2016, 30,595,859 shares of Guilin Bank, a PRC non-listed company, was transferred by a third-party to repay a portion of its overdue receivables of US$12,173 owed to the Company. The investment constituted a 1.02% ownership in Guilin Bank. The investment was classified as equity securities without readily determinable fair values, as the Company does not have significant influence over Guilin Bank and because there is No readily determinable fair value. On September 25, 2017, additional 42,834,202 shares of Guilin Bank was transferred by the third-party in full satisfaction of its remaining overdue receivables of US$24,695 to the Company. In October 2017, the Company received 7,343,006 shares of Guilin Bank as a stock dividend and the Company's shareholding increased from 73,430,061 to 80,773,067. The total investment constituted a 1.98% and 1.79% ownership in Guilin Bank as of December 31, 2017 and 2018 respectively. No impairment on the investment in Guilin Bank was recognized for the year ended December 31, 2017 and 2018. The Company received cash dividends distributed by Guilin Bank in amount of US$1,308 and US$1,402 in 2017 and 2018 respectively. In 2018, Guilin Bank entered into a new financing agreement with a group of new investors. The new financing provided the observable price for the Company's investment. The Company evaluated this investment's carrying amount based on the observable price, and recognized a gain of US$10,633 in change in fair value of securities. The Company accounts for the investment in Guilin Bank at cost adjusted for observable price changes for the years ended December 31, 2018.

On January 21, 2016, the Company acquired an aggregate of 4,411,765 shares of Chuangdian, which is listed on the National Equities Exchange and Quotations ("NEEQ") in the PRC, for a total consideration of US$3,294. The investment constituted a 15% ownership in Chuangdian and was classified as equity securities without readily determinable fair values, as the Company does not have significant influence and because there is No readily determinable fair value, as the breadth and scope of NEEQ is not comparable to equivalent U.S markets. The Company received 2,766,177 and 1,378,165 shares as dividends in 2016 and 2017, respectively. The Company received cash dividends in the amount of US$96 and US$113 in 2017 and 2018 respectively. No impairment on the investment in Chuangdian was recognized for the year ended December 31, 2017 and 2018.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**5.    INVESTMENTS (continued)**

On December 10, 2014, the Company acquired 16% of the share capital of Tospur, a non-listed company, for US$62,257. The investment in Tospur was classified as equity securities without readily determinable fair values, as the Company does not have significant influence over Tospur and because there is No readily determinable fair value. No impairment on the investment in Tospur was recognized for the year ended December 31, 2018. The Company received US$649 and US$619 cash dividends in 2017 and 2018 respectively.

In July 2018, the Company has entered into definitive agreements (the Agreement) to acquire a 10% equity interest in Chongqing Wanli New Energy Co., Ltd. ("Wanli"), a company listed on the Shanghai Stock Exchange, from its controlling shareholder for a cash consideration of US$72,852, of which US$29,141 will compensate the seller in connection with the Business Disposal (defined below). The difference between the cash consideration of the investment and the amount of underlying equity in net assets of Wanli was US$60,980 as of August 10, 2018, the closing date of the acquisition. In connection with the acquisition, the seller agrees (1) to enter into an irrevocable acting-in-concert agreement with a term of three years to adhere to the Company's action in Wanli's future meetings of shareholders and board of directors, (2) to purchase from Wanli its battery business for a price of No less than US$99,758 within three years after the consummation of the proposed acquisition, and (3) to ensure the profitability of Wanli measured by the lower of net profit or net profit excluding extraordinary items in three years subsequent to the Agreement. Following the consummation of the acquisition, the Company became the largest shareholder of Wanli.

During September to December in 2018, the Company acquired additional 4.67% equity interest in Wanli through daily transactions in the secondary market with total consideration of US$11,667. As at December 31, 2018, the Company holds 14.67% equity interest in Wanli.

The investment is accounted for under equity method as the Company can exercise significant influence over operating and financial policies of Wanli.

The following is a summary of the available-for-sale securities as of December 31, 2017. Due to the adoption of ASU 2016-01, change in fair value of available-for-sale equity securities are recorded in change in fair value of securities in the consolidated financial statement of comprehensive income (loss).

|  | Original Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value (Net Carrying Amount) |
|---|---|---|---|---|
|  | US$ | US$ | US$ | US$ |
| December 31, 2017 |  |  |  |  |
| - Color Life | 3,376 | 1,178 | - | 4,554 |
| - Hopefluent | 33,956 | 13,773 | - | 47,729 |
| - World Union | 121,393 | 196,672 | - | 318,065 |
|  |  |  |  |  |
|  | 158,725 | 211,623 | - | 370,348 |

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

6.    **ACCOUNTS RECEIVABLE**

Accounts receivable and the related allowance for doubtful accounts were summarized as follows:

| | As of December 31, | |
| --- | --- | --- |
| | **2017** | **2018** |
| | **US$** | **US$** |
| Accounts receivable | 98,011 | 94,226 |
| Allowance for doubtful accounts | (31,127) | (33,276) |
| | | |
| **Accounts receivable, net** | **66,884** | **60,950** |

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2016** | **2017** | **2018** |
| | **US$** | **US$** | **US$** |
| Movement in allowance for doubtful accounts: | | | |
| Balance at beginning of year | 31,064 | 34,336 | 31,127 |
| Additional provision charged to expenses | 30,025 | 31,695 | 28,050 |
| Write-offs | (24,250) | (38,351) | (23,442) |
| Foreign currency translation adjustments | (2,473) | 3,417 | (2,459) |
| | | | |
| **Balance at end of year** | **34,366** | **31,127** | **33,276** |

The recoveries of amounts previously charged off were US$2,568 in 2018.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

7. **PREPAYMENTS AND OTHER CURRENT ASSETS**

Prepayments and other current assets consisted of the following:

| | As of December 31, | |
|---|---|---|
| | **2017** | **2018** |
| | **US$** | **US$** |
| Prepaid expenses | 5,845 | 5,999 |
| Advance to employees | 903 | 603 |
| Receivable from a broker for exercise of employee stock options | 808 | 65 |
| Rental deposits and others | 4,876 | 2,325 |
| Interest receivable | 2,902 | 3,801 |
| Rent paid to original lessors for sublease services | 5,590 | 346 |
| Properties held for sale | 5,429 | 9,906 |
| Others | 6,351 | 4,950 |
| | **32,704** | **27,995** |

8. **LOANS RECEIVABLE**

Beginning in August 2014, the Company initially provided secured and unsecured loans to both individuals and businesses, but ceased to provide loans to businesses by end of 2015. Loans made to individuals consist of loans secured by pledged properties for consumption and property renovations use, as well as unsecured loans.

**Secured loans**

As of December 31, 2017 and 2018, the duration of secured loans ranged from 3 to 36 months, and had interest rates ranging from 6% to 21.6% per annum and 7.8% to 18% per annum, respectively. As of December 31, 2017 and 2018, the total outstanding balance is US$132,841 and US$123,673.

**Unsecured loans**

As of December 31, 2017 and 2018, the duration of unsecured loans ranged from 1 to 36 months, and had interest rates ranging from 1% to 28% per annum and 5.4% to 18% per annum. As of December 31, 2017 and 2018, the total outstanding balance is US$16,187 and US$4,007.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**8.    LOANS RECEIVABLE (continued)**

The Company assesses the allowance for credit loss related to loans receivable on a quarterly basis, either on an individual or collective basis. The Company considers various factors in evaluating loans receivable for possible impairment on an individual basis. These factors include the amount of the loan, historical experience, value of collateral, if any, credit quality and age of the receivables balances. This evaluation is inherently subjective as it requires material estimates that may be susceptible to significant revision as more information becomes available. When the evaluation indicates that it is probable that the scheduled interest and principal payments due per the loan agreement are unlikely to be collected, such loan receivable is considered impaired. Impairment is measured on an individual loan basis using either the present value of expected future cash flows discounted at the loan's effective interest rate or the fair value of the collateral if the loan is secured. The Company evaluates the remainder of its loans receivables portfolio for impairment on a collective basis in accordance with ASC 450-20, *Loss Contingencies*, and records an allowance for credit loss at the portfolio level. When evaluating the loans receivable on a collective basis, the Company applies a formula-based percentage utilizing historical loss data to calculate the collective allowance.

The Company's internal credit risk ratings are categorized into three categories: pass, special attention and non-performing. A "pass" rating represents the highest quality loans receivable. Typically, the Company considers loans receivable with a risk rating of non-performing to be fully impaired, or up to the fair value of collateral, if any.

The Company derives internal credit risk rating by taking into consideration various customer-specific factors, such as the Company's specific historical experience with the borrower. Such credit risk rating is updated when facts or circumstances change. Loans receivable are written off at the point when they are considered uncollectible, and all outstanding balances, including any previously earned but uncollected interest income, will be reversed and charged against the allowance for credit loss.

The internal credit risk rating considerations are as follows:
• Pass: Loans for which borrowers are expected to honor the terms of the contracts. There are No indicators to question the borrowers' ability to repay the principal and accrued interest in full and on a timely basis.
• Special attention: Loans for which borrowers are currently able to repay the principal and No interests are accrued when considered impaired or overdue more than 90 days, the repayment of loans might be adversely affected by some factors.
• Non-performing: Loans for which borrowers may not able to repay the principal and accrued interest in full. These loans are fully provided for unless secured by collateral

The Company does not accrue interest on loans receivable that are considered impaired or more than 90 days past due unless either the receivable has not been collected due to administrative reasons or the receivable is well secured and in the process of collection. After an impaired loans receivable has been placed on nonaccrual status, interest will be recognized when cash is received on a cash basis method-cost recovery. A loan receivable may be returned to accrual status after all of the borrower's delinquent balances of principal and interest have been settled, and the borrower remains current for an appropriate period. The outstanding balance of nonaccrual loans as of December 31, 2017 and 2018 were US$3,996 and US$5,749.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**8.    LOANS RECEIVABLE (continued)**

A summary of the Company's loans receivables is presented as follows:

| | As of December 31, 2017 US$'000 | As of December 31, 2018 US$'000 |
|---|---|---|
| Personal loans | 149,028 | 127,680 |
| Total Loans receivable | 149,028 | 127,680 |
| | | |
| Allowance for loan losses | | |
| Individually assessed | 574 | 546 |
| Collectively assessed | 4,342 | 3,283 |
| **Loans receivable, net** | **144,112** | **123,851** |
| | | |
| Current portion | 129,438 | 117,602 |
| Non-current portion | 14,674 | 6,249 |

For the years ended December 31, 2016, 2017 and 2018, a provision of US$80 and US$1,180, and a reversal of provision of US$884, were recorded to the consolidated statements of comprehensive income (loss) respectively, while No charge-offs against provisions occurred.

Analysis of loans by credit quality indicator

The following table summarizes the Company's loan portfolio by credit quality indicator as of December 31, 2018 and 2017, respectively:

| Internal credit risk rating | As of December 31, 2017 US$ | % | As of December 31, 2018 US$ | % |
|---|---|---|---|---|
| Pass | 144,908 | 97.2 | 121,931 | 96.0 |
| Special attention | 763 | 0.5 | 1,383 | 1.0 |
| Non-performing | 3,357 | 2.3 | 4,366 | 3.0 |
| | | | | |
| **Total** | **149,028** | **100** | **127,680** | **100** |

The following tables represent the aging of loans by portfolio segment as of December 31, 2017 and 2018, respectively:

| As of December 31,2018 | 90-179 days past due US$'000 | 180-365 days past due US$'000 | Over 1 year past due US$'000 | Total US$'000 | Current US$'000 | Total loans US$'000 |
|---|---|---|---|---|---|---|
| Personal loans | 1,717 | 164 | 3,345 | 5,226 | 122,454 | 127,680 |
| | | | | | | |
| **Total** | **1,717** | **164** | **3,345** | **5,226** | **122,454** | **127,680** |

| As of December 31,2017 | 90-179 days past due US$'000 | 180-365 days past due US$'000 | Over 1 year past due US$'000 | Total US$'000 | Current US$'000 | Total loans US$'000 |
|---|---|---|---|---|---|---|
| Personal loans | 245 | 180 | 3,445 | 3,870 | 145,158 | 149,028 |
| | | | | | | |
| Total | **245** | **180** | **3,445** | **3,870** | **145,158** | **149,028** |

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

8.  **LOANS RECEIVABLE (continued)**

Allowance for loan losses

The following tables present the activity in the allowance for loan losses in loans receivable by loan portfolio as of and for the year ended December 31, 2017 and 2018, respectively:

| For the year ended December 31, 2018 | Personal loans |
|---|---:|
| Beginning balance | 4,916 |
| Provision | 2,776 |
| Reversal | (3,660) |
| Foreign currency translation adjustments | (203) |
| | |
| Ending balance | **3,829** |
| Ending balance: individually evaluated for impairment | 546 |
| Ending balance: collectively evaluated for impairment | 3,283 |
| Loans | |
| Of which individually evaluated for impairment | 546 |
| Of which collectively evaluated for impairment | 127,134 |

| For the year ended December 31, 2017 | Personal |
|---|---:|
| Beginning balance | 3,736 |
| Provision | 1,180 |
| Write offs | - |
| Ending balance | **4,916** |
| Ending balance: individually evaluated for impairment | 574 |
| Ending balance: collectively evaluated for impairment | 4,342 |
| Loans | |
| Of which individually evaluated for impairment | 4,477 |
| Of which collectively evaluated for impairment | 144,551 |

9.  **PROPERTY AND EQUIPMENT, NET**

Property and equipment consisted of the following:

| | As of December 31, | |
|---|---:|---:|
| | 2017 | 2018 |
| | US$ | US$ |
| Buildings | 576,467 | 701,413 |
| Office equipment | 24,892 | 21,358 |
| Motor vehicles | 1,408 | 1,427 |
| Leasehold improvement | 16,244 | 18,152 |
| Land | 50,731 | 50,731 |
| | | |
| Total | **669,742** | **793,081** |
| Less: Accumulated depreciation | (78,187) | (99,340) |
| | | |
| Construction in progress | 30,590 | 34,571 |
| | | |
| | **622,145** | **728,312** |

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**9.     PROPERTY AND EQUIPMENT, NET (continued)**

Depreciation of property and equipment and amortization of land use rights were US$25,004, US$27,961 and US$26,735 for the years ended December 31, 2016, 2017 and 2018, respectively.

As of December 31, 2018, the Company is still in the process of obtaining the property ownership certificates for certain buildings with aggregate net carrying values of US$14,796. As the transfer of ownership of the buildings have been legally registered with the applicable government authority and the purchase consideration has been fully paid by the Company, the Company has the ability to obtain and control the future economic benefits of the buildings. As a result, these buildings were recognized as assets in the consolidated balance sheets as of December 31, 2017 and 2018.

As of December 31, 2018, certain buildings with aggregate net carrying value of US$406,738 were pledged for bank borrowings.

The Company capitalized interest cost as a component of the cost of construction in progress as follows:

|  | As of December 31, | |
|---|---|---|
|  | **2017** | **2018** |
|  | **US$** | **US$** |
| Interest cost capitalized | 756 | - |
| Interest cost charged against income | 16,153 | 21,174 |
| Total interest cost incurred | 16,909 | 21,174 |

**10.     DEPOSIT FOR NON-CURRENT ASSETS**

Deposit for non-current assets consisted of the following:

|  | As of December 31, | |
|---|---|---|
|  | **2017** | **2018** |
|  | **US$** | **US$** |
| Buildings | 55,364 | - |
| Others | 3,358 | 902 |
| **Total** | **58,722** | **902** |

As of December 2017, deposits for buildings represent interest-free non-refundable deposits for the purchases of certain office buildings: (i) an office building in Wuhan in the PRC for US$41,107; (ii) two floors of an office building in Chongqing, Sichuan province in the PRC for US$13,758; and (iii) one floor of an office building in Changzhou, Jiangsu province in the PRC for US$499. In 2018, deposits for buildings were reclassified to property and equipment as the Company obtained the control of these buildings. As of December 31, 2018, deposits for others represent deposits for the purchase of office equipment.

As of December 31, 2017, US$41,107 of deposits for non-current assets have been pledged for US$18,403 bank borrowings from financial institutions in China. No deposits for non-current assets have been pledged in 2018.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**11.     OTHER NON-CURRENT ASSETS**

Other non-current assets consisted of the following:

| | As of December 31, | |
| --- | --- | --- |
| | **2017** | **2018** |
| | **US$** | **US$** |
| Rental and other deposits | 852 | 1,861 |
| Rental deposits paid to lessors for sublease services | 409 | 85 |
| Others | 765 | 2,612 |
| | **2,026** | **4,558** |

**12.     SHORT-TERM AND LONG-TERM LOANS**

Short-term and long-term loans consisted of the following:

| | As of December 31, | |
| --- | --- | --- |
| | **2017** | **2018** |
| | **US$** | **US$** |
| Short-term loans | 236,985 | 297,811 |
| Long-term loans | 114,109 | 123,215 |

Short-term loans as of December 31, 2017 and 2018 represents US$ denominated bank borrowings of US$190,000 and US$190,000, respectively obtained from financial institutions in the United States and the current-portion of long-term loans of US$46,985 and US$107,811, respectively. The short-term loan of US$190,000 are repayable on demand and bear interest rates of three month London Interbank Offered Rate ("LIBOR") plus 1.25% (2017: 3-month LIBOR plus 1.25%). The short-term bank borrowings were secured by RMB denominated bank deposits placed with financial institutions in the PRC of US$223,002 and US$245,474 as of December 31, 2017 and 2018, respectively, and were classified as restricted cash, current on the consolidated balance sheets. The weighted average interest rate for the short-term borrowings for the years ended December 31, 2017 and 2018 was approximately 2.32% and 3.64%, respectively.

The long-term loan of US$26,808 as of December 31, 2017 represents US$ denominated bank borrowing obtained from financial institutions in China. The long-term loan is repayable on demand and bear interest rates of three month LIBOR plus 2.8%. The bank borrowing was secured by RMB denominated bank deposits placed with financial institutions in the PRC of US$32,139 as of December 31, 2017, and was classified as "restricted cash, non-current" on the consolidated balance sheets. US$26,808 of the bank loan was re-classified to short term loans because it was repayable within twelve months. The bank deposits placed with financial institutions in the PRC to secure the loan were re-classified as "restricted cash, current".

The long-term loan of US$31,353 as of December 31, 2018 represents US$ denominated bank borrowing obtained from financial institutions in the United States. The long-term loan is repayable by installments from October 6, 2017 to November 11, 2027 and bears interest rate of 4.1% for the first 3 years; thereafter the interest rate will be floating at Industrial and Commercial Bank of China (USA) NA Prime plus 1.0%. US$3,218 of the bank loan was re-classified to short term loans because it was repayable within twelve months. The loan is secured by land and building in the United States with carrying value of US$43,230 as of December 31, 2018. Certain bank account was funded from the loan proceeds and was restricted for use to pay for the tenant improvements of the collateral property and the loan payments. As of December 31, 2018, the balance of the account of US$5,989 was classified as restricted cash (non-current) on the consolidated balance sheets.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**12.    SHORT-TERM AND LONG-TERM LOANS (continued)**

The long-term loans of US$83,771 and US$70,640 as of December 31, 2017 and 2018 represent RMB denominated bank borrowings from financial institutions in China for the purchase of buildings in Beijing, PRC. The long-term loans are repayable by installments from September 23, 2016 to September 22, 2026 and bear interest rate of 4.9%. As of December 31, 2018, US$70,640 of the bank loans were classified as short term loans because the Company did not meet certain loan covenants. Even though the Company obtained a waiver from the lender indicating that the lender permanently gave up its right to demand payment as a result of the violation as of December 31, 2018, the loan was classified as current because without the waiver, the Company would be in default at the December 31, 2018 balance sheet date and it is probable that the Company will be unable to comply with all provisions of the debt agreement for a period of one year from the balance sheet date. The loans were secured by building in the PRC with carrying value of US$214,798 as of December 31, 2018. As of December 31, 2017, US$43,333 of the bank loans were re-classified to short term loans because i) US$31,904 was repayable on demand as the Company did not meet certain loan covenants, and ii) US$11,429 was repayable within twelve months. The loans were secured by building and construction in progress in the PRC with carrying value of US$237,055 as of December 31, 2017.

The long-term loan of US$19,644 as of December 31, 2018 represents RMB denominated bank borrowings from financial institutions in China for the purchase of buildings in Wuhan, PRC. The long-term loan is repayable by installments from March 21, 2017 to March 21, 2027 and bears interest rate of 4.9%. US$2,381 of the bank loan was re-classified to short term loans because it was repayable within twelve months. The loan was secured by accounts receivable with carrying amount of US$2,988 and building in the PRC with carrying value of US$45,398 as of December 31, 2018.

The long-term loan of US$45,315 as of December 31, 2018 represents RMB denominated bank borrowings from financial institutions in China for the purchase of buildings in Chongqing, PRC. The long-term loan is repayable by installments from August 2, 2018 to August 1, 2028 and bears interest rate of 6.86%. US$4,764 of the bank loan was re-classified to short term loans because it was repayable within twelve months. The loan was secured by buildings in the PRC with carrying value of US$94,077 as of December 31, 2018.

The long-term loan of US$37,266 as of December 31, 2018 represents US$ denominated bank borrowing obtained from financial institutions in Taiwan. The principal of the long-term loan, in the amount of US$40,000, is repayable by 10% on October 23, 2020 and by 90% on October 23, 2021. The loan bears an annual interest rate of 2.35% plus LIBOR of three months. US$2,820 was paid to the bank as service charges and accounted for as reduction of the long-term loan. The loan was secured by building in the United States with carrying value of US$9,235. Certain bank account was restricted for use to pay for interest payments. As of December 31, 2018, the balance of the account of US$1,001 was classified as restricted cash (non-current) on the consolidated balance sheets. The Company met certain covenants in the loan agreement.

**13.    ACCRUED EXPENSES AND OTHER LIABILITIES**

Accrued expenses and other liabilities consisted of the following:

|  |  | As of December 31, | |
|---|---|---|---|
|  |  | 2017 | 2018 |
|  |  | US$ | US$ |
| Payroll and welfare benefit |  | 19,152 | 14,265 |
| Other taxes and surcharges payable | (1) | 38,669 | 40,676 |
| Amounts payable to employees |  | 2,794 | 2,269 |
| Amounts payable to sales and marketing agents |  | 46,529 | 38,304 |
| Amounts due to foremen and suppliers of decoration services |  | 3,693 | 2,562 |
| Amounts due to Tianxiajin investors |  | 357 | 860 |
| Down payments collected on behalf of secondary home sellers |  | 1,806 | 1,202 |
| Cash incentives payable to home buyers | (2) | 12,018 | 5,893 |
| Others |  | 33,781 | 25,237 |
|  |  | 158,799 | 131,268 |

(1)   Other taxes and surcharges payable consist of VAT, cultural construction fee ("CCF"), city construction tax ("CCT") and withholding individual income tax ("IIT").

(2)   Cash incentives payable to home buyers, are payable when home buyers successfully purchase new properties through the Company's platform and successfully registers on the Company's website.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**14.     CUSTOMERS' REFUNDABLE FEES**

Roll-forward of customers' refundable fees:

|  | As of December 31, | |
|---|---|---|
|  | 2017 | 2018 |
|  | US$ | US$ |
| Balance at beginning of year | 28,630 | 7,070 |
| Cash received from customers during the year | 69,148 | 20,512 |
| Revenue recognized during the year | (30,998) | (13,563) |
| Payments to sales and marketing agents during the year | (36,836) | (7,313) |
| Refunds paid during the year | (23,941) | (2,128) |
| Foreign currency translation adjustments | 1,067 | (602) |
| **Balance at end of year** | **7,070** | **3,976** |

**15.     CONVERTIBLE SENIOR NOTES**

On December 4, 2013, the Company issued US$400,000, including an US$50,000 overallotment option (the "Overallotment Option") which was exercised on January 3, 2014, of convertible senior notes which would mature on December 15, 2018 (collectively the "December 2018 Notes"). The total net proceeds from the December 2018 Notes were US$390,455. The investors may convert the December 2018 Notes to Class A ordinary shares at any time in whole or in part at specified conversion prices. The conversion rate for the December 2018 Notes was initially 9.6839 ADSs per US$1,000 principal amount of notes (equivalent to an initial conversion price of approximately US$103.26 per ADS), subject to adjustment as described in the respective Subscription Agreement.

Investors of the December 2018 Notes had the right to require the Company to repurchase for cash all or part of their notes on December 15, 2016, and this was exercised accordingly. The Company repurchased a total of US$394,300 of the December 2018 Notes, which represents approximately 98.6% of the outstanding principal amount of the Notes prior to such repurchase. In 2018, the Company repurchased the remaining balance of US$5,700 of the December 2018 Notes.

On September 24, 2015, the Company issued (i) 3,418,803 Class A ordinary shares for US$100,000 and (ii) US$100,000 of convertible notes which will mature on September 24, 2022 (the "September 2022 Notes") to Safari Company. The Safari Company is beneficially owned by the Carlyle Company ("Carlyle") (72%) and Ateefa Limited, a company owned by Vincent Tianquan Mo (28%). A representative of Carlyle is entitled to hold a seat on the Company's board of directors so long as Carlyle continues to beneficially own at least 1% of the Company's total outstanding share capital calculated on a fully-diluted basis. The total net proceeds from the Class A ordinary shares and the September 2022 Notes were US$199,645. The investors may convert the September 2022 Notes to Class A ordinary shares at any time in whole or in part at specified conversion prices. The conversion rate for the September 2022 Notes is initially 27.9086 Class A Shares per US$1,000 principal amount of the Note (equivalent to an initial conversion price of approximately US$35.83 per Class A Share), subject to adjustment as described in the respective Subscription Agreement.

On November 4, 2015, the Company issued (i) an aggregate of 8,436,581 Class A shares for an total consideration of US$246,770 and (ii) US$200,000 of convertible notes which will mature on November 3, 2022 (the "November 2022 Notes"). The total net proceeds from the Class A ordinary shares and the November 2022 Notes were US$446,059. The investors may convert the November 2022 Notes to Class A ordinary shares at any time in whole or in part at specified conversion prices. The conversion rate for the November 2022 Notes is initially 27.9086 Class A Shares, representing Class A ordinary shares at par value HK$1.00 per share, per US$1,000 principal amount of the Note (equivalent to an initial conversion price of approximately US$35.83 per Class A Share), subject to adjustment as described in the respective Subscription Agreement.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**15.    CONVERTIBLE SENIOR NOTES (continued)**

On October 25, 2018, the Company and the note holder entered into a Note Repurchase Agreement pursuant to which the Company issued five replacement notes in the total amount of US$150,000 to the same note holder ("New November 2022 Notes"), together with US$38,860 paid in cash in satisfaction of the November 2022 Notes.  The New November 2022 Notes have the same terms as the November 2022 Notes, except for the change of principal amount from US$200,000 to US$150,000.

The December 2018 Notes, the September 2022 Notes, the November 2022 Notes and the New November 2022 Notes bear interest at the rate of 2.00%, 1.50%, 1.50% and 1.50% per annum, respectively, payable semi-annually. The December 2018 Notes, September 2022 Notes, November 2022 Notes and New November 2022 Notes are collectively referred to as the "Notes".

The Company intends to use the proceeds of the Notes for general corporate purposes, including development of new products and services, working capital, capital expenditures, business expansion and potential business acquisitions, technologies and/or products.

The Notes are senior unsecured obligations and rank (i) senior in right of payment to any of the Company's indebtedness that is expressly subordinated in right of payment to the Notes; (ii) equal in right of payment to any of the Company's unsecured indebtedness that is not so subordinated; (iii) effectively junior in right of payment to any of the Company's secured indebtedness to the extent of the value of the assets securing such indebtedness; and (iv) structurally junior to all indebtedness and other liabilities of the subsidiaries or consolidated controlled entities of the Company.

The issuance costs of US$9,545, US$355 and US$711 of the December 2018 Notes, the September 2022 Notes and the November 2022 Notes, respectively, were amortized as interest expense using the effective interest rate method through the maturity date of the respective Notes.

The principal amount and unamortized discount/premium and debt issuance costs as of December 31, 2017 and 2018 were as follows:

|  | As of December 31, | |
|---|---|---|
|  | **2017** | **2018** |
|  | **US$** | **US$** |
| Principal amount | 305,700 | 250,000 |
| Unamortized (discount)/premium and debt issuance costs | (8,635) | 4,435 |
|  | **297,065** | **254,435** |

The effective interest rate was 2.86%, 1.56%, 2.46% and 0.69% for the December 2018 Notes, the September 2022 Notes, the November 2022 Notes and the New November 2022 Notes, respectively. For the years ended December 31, 2016, 2017 and 2018, the Company recognized interest expense related to the Notes of US$17,001, US$6,395 and US$6,154, respectively.

*Accounting treatment*

The Notes were originally recorded as long-term debt. The conversion option was not required to be bifurcated because the conversion options of the December 2018 Notes, the September 2022 Notes, the New November 2022 Notes are indexed to the Company's ADSs and Class A ordinary shares, respectively, and meet all additional conditions for equity classification. Since the conversion options were not required to be bifurcated, the Company then determined if there were any beneficial conversion features ("BCF") in accordance with ASC 470-20. The Company assessed the embedded conversion option feature of the December 2018 Notes and the September 2022 Notes and concluded that there is No BCF because the effective conversion price of the December 2018 Notes and the September 2022 Notes exceeded the fair value of the Company's ADSs and Class A ordinary shares at their respective commitment dates. For the November 2022 Notes, the Company recognized a BCF of US$12,113 through a credit to additional paid-in capital because the fair value per Class A ordinary share of US$38.00 exceeded the most favorable conversion price of US$35.83 at the commitment date on November 4, 2015. The resulting discount of US$12,113 to the November 2022 Notes is then accreted to the redemption value as interest expense using the effective interest method through the consolidated statements of comprehensive income (loss) over the term of the November 2022 Notes. The Company did not reassess the BCF upon the exchange of the November 2022 Notes with the New November 2022 Notes since the exchange is not accounted for as an extinguishment.

In connection with the make-whole fundamental change provision within the Notes agreements, the number of ADSs and Class A ordinary shares issuable upon conversion of the Notes will be increased if the Holders decide to convert. As (i) the fair value of the ADSs into which the December 2018 Notes is convertible plus the make-whole ADSs and (ii) the fair value of the Class A ordinary shares into which the September 2022 Notes, the November 2022 Notes and the New November 2022 Notes are convertible plus the make-whole Class A ordinary shares, respectively, do not approximate the fair value at the settlement date, the make-whole features are not indexed to the Company's ADSs and Class A ordinary shares for the December 2018 Notes and Class A ordinary shares for the September 2022, the November 2022 Notes and the New November 2022 Notes, and are required to be bifurcated. The fair values of the make-whole features were insignificant for the years ended December 31, 2016, 2017 and 2018.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**15.    CONVERTIBLE SENIOR NOTES (continued)**

The Company evaluated the embedded contingent redemption features contained in the Notes in accordance with ASC 815. The contingent redemption features were not required to be bifurcated because they are considered to be clearly and closely related to the debt host, as the Notes were not issued at a substantial discount and are puttable at par.

The Company evaluated the contingent interest features contained in the Notes in accordance with ASC 815 to determine if these features require bifurcation. Certain embedded contingent interest features are not considered to be clearly and closely related to the debt host and met the definition of a derivative. Accordingly, these embedded contingent interest features were bifurcated from the Notes on the issuance date, and their fair values were insignificant for the years ended December 31, 2016, 2017 and 2018. For the embedded contingent interest features not bifurcated from the December 2018 Notes, the September 2022 Notes, the November 2022 Notes and the New November 2022 Notes, the Company determined whether the additional interest payments need to be accrued as a liability in accordance with ASC 450. Since the likelihood of occurrence of such default events is remote, the Company determined that a liability was not probable and No accrual was made as of December 31, 2017 and 2018. The Company will continue to assess the accrual for these additional interest payment liabilities at each reporting date.

The Company evaluated the contemporaneous exchange of cash between the Company and the note holder from issuance of New November 2022 Notes and satisfaction of the November 2022 Notes pursuant to ASC 470-50 and concluded that they are not substantially different. The Company determined a new effective interest rate at the repurchase date based on the carrying amount and the revised cash flows.

As of December 31, 2018, aggregate future principal payments for long-term debt, including short-term and long-term loans (Note 12), and convertible senior notes, were as follows:

|  | US$ |
|---|---|
| 2019 | 297,811 |
| 2020 | 14,363 |
| 2021 | 10,363 |
| 2022 | 260,363 |
| 2023 and thereafter | 90,862 |
|  | 673,762 |

**16.    SHAREHOLDERS' EQUITY**

*Ordinary Shares*

Upon completion of the Company's initial public offering ("IPO") in September 2010, the Company's ordinary shares were converted into 50,767,426 Class A ordinary shares and 25,298,329 Class B ordinary shares. The Memorandum and Articles of Association were amended and restated such that the authorized share capital consisted of 600,000,000 ordinary shares at a par value of HK$1.00 per share.

In 2015, the Company completed various follow-on offerings which resulted in 70,736,679 Class A ordinary shares issued and outstanding as of December 31, 2015.

The rights of the holders of Class A and Class B ordinary shares are identical, except with respect to voting rights. Each Class A ordinary share is entitled to one vote per share whereas each Class B ordinary share is entitled to 10 votes per share. Each Class B ordinary share is convertible into one Class A ordinary share at any time by its holder, but Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any transfer of Class B ordinary shares by a Class B ordinary shareholder to any person or entity which is not an affiliate of such holder, such Class B ordinary shares will be automatically and immediately converted into the equal number of Class A ordinary shares.

No class B ordinary shares were converted into Class A ordinary shares for the years ended December 31, 2016, 2017 and 2018.

*Treasury stock*

Treasury stock represents shares repurchased and held by the Company. Treasury stock is accounted for under the cost method. As of December 31, 2017 and 2018, under the repurchase plan, the Company has repurchased an aggregate of 7,065,058 Class A ordinary shares on the open market for a total cash consideration of US$136,615. The repurchased shares are classified as "treasury stock" in shareholders' equity on the Company's consolidated balance sheets.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**16.    SHAREHOLDERS' EQUITY (continued)**

*Restricted net assets*

The Company's ability to pay dividends is primarily dependent on the Company receiving distributions of funds from its subsidiaries. Relevant PRC statutory laws and regulations permit payments of dividends by the Company's PRC subsidiaries only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. The results of operations reflected in the consolidated financial statements prepared in accordance with U.S. GAAP differ from those reflected in the statutory financial statements of the Company's PRC subsidiaries.

In accordance with the PRC Regulations on Enterprises with Foreign Investment and its articles of association, a foreign invested enterprise established in the PRC is required to provide certain statutory reserves, namely general reserve fund, the enterprise expansion fund and staff welfare and bonus fund which are appropriated from net profit as reported in the enterprise's PRC statutory accounts. A foreign invested enterprise is required to allocate at least 10% of its annual after-tax profit to the general reserve until such reserve has reached 50% of its respective registered capital based on the enterprise's PRC statutory accounts. Appropriations to the enterprise expansion fund and staff welfare and bonus fund are at the discretion of the board of directors for all foreign invested enterprises. The aforementioned reserves can only be used for specific purposes and are not distributable as cash dividends. The WOFEs were established as foreign invested enterprises and therefore are subject to the above mandated restrictions on distributable profits.

Additionally, in accordance with the Company Law of the PRC, a domestic enterprise is required to provide a statutory common reserve of at least 10% of its annual after-tax profit until such reserve has reached 50% of its respective registered capital based on the enterprise's PRC statutory accounts. A domestic enterprise is also required to provide a discretionary surplus reserve, at the discretion of the board of directors, from the profits determined in accordance with the enterprise's PRC statutory accounts. The aforementioned reserves can only be used for specific purposes and are not distributable as cash dividends. The PRC Domestic Entities and the PRC Domestic Entities' subsidiaries were established as domestic invested enterprises and therefore are subject to the above mentioned restrictions on distributable profits.

As a result of these PRC laws and regulations that require annual appropriations of 10% of after-tax income to be set aside prior to payment of dividends as general reserve fund, the Company's PRC subsidiaries are restricted in their ability to transfer a portion of their net assets to the Company. Amounts restricted are net assets of the Company's PRC subsidiaries, as determined pursuant to PRC generally accepted accounting principles, totaling US$983,333 and US$885,152 as of December 31, 2017 and 2018, respectively. Therefore, in accordance with Rules 504 and 4.08(e)(3) of Regulation S-X, the condensed parent company only financial statements as of December 31, 2017 and 2018 and for each of the three years in the period ended December 31, 2018 are disclosed in Note 24.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

17.    **TAXATION**

*Cayman Islands*

Under the current laws of the Cayman Islands, the Company and subsidiaries incorporated in the Cayman Islands are not subject to tax on income or capital gains. In addition, upon payments of dividends by the Company to its shareholders, No Cayman Islands withholding tax will be imposed.

*British Virgin Islands ("BVI")*

Under the current laws of the BVI, subsidiaries incorporated in the BVI are not subject to tax on income or capital gains. In addition, upon payments of dividends by these companies to their shareholders, No BVI withholding tax will be imposed.

*Hong Kong*

Under the Hong Kong tax laws, subsidiaries in Hong Kong are subject to the Hong Kong profits tax rate at 16.5% and they are exempted from income tax on their foreign-derived income and there are No withholding taxes in Hong Kong on remittance of dividends. A two-tiered profits tax rates regime was introduced in 2018 where the first HK$2 million of assessable profits earned by a company will be taxed at half of the current tax rate (8.25%) whilst the remaining profits will continue to be taxed at 16.5%. There is an anti-fragmentation measure where each group will have to nominate only one company in the group to benefit from the progressive rates. No provision for Hong Kong profits tax has been made in the financial statements as the subsidiaries in Hong Kong have No assessable profits for the three years ended December 31, 2018.

*United States of America*

On December 22, 2017, the Tax Act was enacted and contains significant changes to U.S. income tax law. Effective in 2018, the Tax Act reduces the U.S. statutory tax rate from 35% to 21% and creates new taxes focused on foreign-sourced earnings and related-party payments, including the creation of the base erosion anti-abuse tax and a new tax on global intangible low-taxed income ("GILTI").

The Securities and Exchange Commission (SEC) staff issued SAB 118 on December 22, 2017, which allows companies to record provisional amounts during a measurement period not to extend beyond one year of the enactment date.

The Tax Act reduces the U.S. statutory tax rate from 35% to 21% for years after 2017. Accordingly, the Company re-measured its deferred taxes as of December 31, 2017, to reflect the reduced rate that will apply in future periods when these deferred taxes are settled or realized. As Best Work Holdings (New York) LLC. is loss making since incorporated therefor the Company recognized a deferred tax asset of US$13,834 to reflect the reduced U.S. tax rate and full valuation allowance is provided and corresponding remeasurement were made to unrecognized tax benefit and valuation allowance.

*Singapore*

A subsidiary was incorporated in Singapore in November 2014 and does not conduct any substantive operations of its own. No provision for Singapore profits tax has been made in the financial statements as this entity has No assessable profits for the three years ended December 31, 2018.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**17.   TAXATION (continued)**

*China*

In March 2007, a new enterprise income tax law (the "New EIT Law") in the PRC was enacted which became effective on January 1, 2008. The New EIT Law applies a unified 25% enterprise income tax ("EIT") rate to both foreign invested enterprises and domestic enterprises, unless a preferential EIT rate is otherwise stipulated. On April 14, 2008, relevant governmental regulatory authorities released further qualification criteria, application procedures and assessment processes for meeting the High and New Technology Enterprise ("HNTE") status under the New EIT Law which would entitle qualified and approved entities to a favorable EIT tax rate of 15%. In April 2009 and June 2017, the State Administration for Taxation ("SAT") issued Circular Guoshuihan [2009] No. 203 ("Circular 203") and SAT Announcement [2017] No. 24 ("Announcement 24") stipulating that entities which qualified for the HNTE status should apply with in-charge tax authorities to enjoy the reduced EIT rate of 15% provided under the New EIT Law starting from the year when the new HNTE certificate becomes effective. The HNTE certificate is effective for a period of three years and can be renewed for another three years. Subsequently, an entity needs to re-apply for the HNTE status in order to be able to enjoy the preferential tax rate of 15%.

The Company obtained new HNTE certificates for its various subsidiaries i.e. SouFun Media, Beijing Zhong Zhi Shi Zheng, SouFun Network, Beijing Technology, Beijing JTX Technology and Hong An Tu Sheng in November 2015 and subsequently renewed in September and October 2018. Therefore, these six subsidiaries can enjoy the preferential tax rate of 15% in years 2015, 2016 and 2017. The Company newly applied for the HNTE status for Beijing Tuoshi in 2016 and received the new HNTE certificates in December 2016. Beijing Tuoshi can enjoy the preferential tax rate of 15% for the three years ended December 31, 2018. The Company newly applied for the HNTE status for Beijing Li Man Wan Jia, Beijing Hua Ju Tian Xia and Beijing Zhong Zhi Xun Bo in 2018 and received the new HNTE certificates in September, September and October 2018, respectively. Beijing Li Man Wan Jia, Beijing Zhong Zhi Xun Bo and Beijing Hua Ju Tian Xia can enjoy the preferential tax rate of 15% in 3 years since 2018. The Company newly applied for the Xinjiang Huoerguosi Economic and Technological Development Zone tax preference status for Xinjiang Zhongzhi in 2017 and received the certificates in September 2017. Xinjiang Zhongzhi can enjoy the preferential tax rate of 0% in 4 years since 2017.

If any entities fail to maintain the HNTE qualification under the New EIT Law, they will No longer qualify for the preferential tax rate of 15%, which could have a material and adverse effect on the Company's results of operations and financial position provided that they do not qualify for any other preferential tax treatment. Historically, the abovementioned PRC subsidiaries have successfully obtained or renewed the HNTE certificates when the previous certificates had expired.

Subsequent to government approval in May 2014, Beijing Li Man Wan Jia, Beijing Zhong Zhi Xun Bo and Beijing Hua Ju Tian Xia obtained the Software Enterprise status with effect from January 1, 2013. Accordingly, these three subsidiaries are entitled to the two-year EIT exemption for years 2013 and 2014 and a reduced EIT rate of 12.5% for years 2015, 2016 and 2017.

Moreover, the current EIT Law treats enterprises established outside of China with "effective management and control" located in the PRC as PRC resident enterprises for tax purposes. The term "effective management and control" is generally defined as exercising overall management and control over the business, personnel, accounting, properties, etc. of an enterprise. The Company, if considered a PRC resident enterprise for tax purposes, would be subject to the PRC EIT at the rate of 25% on its worldwide income for the period after January 1, 2008. As of December 31, 2017 and 2018, the Company had not accrued for PRC tax on such basis. We will continue to monitor our tax status.

F-61

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**17.    TAXATION (continued)**

Income (loss) before income taxes consisted of:

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | **2016** | **2017** | **2018** |
|  | **US$** | **US$** | **US$** |
| PRC | (136,773) | 56,101 | (89,670) |
| Non-PRC | (7,878) | (12,995) | (39,685) |
|  | (144,651) | 43,146 | (129,355) |

Income tax expenses (benefits) comprised:

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | **2016** | **2017** | **2018** |
|  | **US$** | **US$** | **US$** |
| Current tax expense | 27,685 | 21,759 | 6,825 |
| Deferred tax benefit | (2,701) | (317) | (21,271) |
|  | 24,984 | 21,442 | (14,446) |

A reconciliation between the amount of income tax expenses (benefits) and the amount computed by applying the PRC statutory tax rate to income (loss) before income taxes was as follows:

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | **2016** | **2017** | **2018** |
|  | **US$** | **US$** | **US$** |
| Income (loss) before income taxes | (144,651) | 43,146 | (129,355) |
| Income tax at applicable tax rate of 25% | (36,163) | 10,786 | (32,339) |
| Effect of international tax rate differences | (598) | 472 | 6,891 |
| Non-deductible expenses | 24,135 | 7,360 | 19,427 |
| Non-taxable income | - | - | (1,145) |
| Effect of tax holidays or preferential tax rates | (5,759) | (12,001) | (6,557) |
| Effect of tax rate changes | - | (1,725) | - |
| Investment basis difference in the PRC Domestic Entities | (2,757) | 2,696 | - |
| Withholding tax | - | - | 11,720 |
| Research and development super-deduction | - | - | (3,260) |
| Changes in valuation allowance | 30,856 | 8,849 | (1,707) |
| Expiration of loss carry forwards | | | 101 |
| Unrecognized tax benefits | - | (4,302) | (8,881) |
| Interest and penalties on unrecognized tax benefits | 15,270 | 9,307 | 1,304 |
|  | 24,984 | 21,442 | (14,446) |

F-62

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**17.    TAXATION (continued)**

A roll-forward of unrecognized tax benefits, exclusive of related interest and penalties, was as follows:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2018 |
| | US$ | US$ | US$ |
| Balance at beginning of year | 70,296 | 78,933 | 79,436 |
| Increase relating to prior year tax positions | 5,070 | 4,192 | 577 |
| Increase relating to current year tax positions | 4,769 | 10,666 | 9,183 |
| Decrease relating to reversal of prior years' tax position | - | (14,102) | (1,821) |
| Decrease relating to expiration of applicable statute of limitations | - | (4,586) | (9,220) |
| Foreign currency translation adjustments | (1,202) | 4,333 | (3,160) |
| Balance at end of year | 78,933 | 79,436 | 74,995 |

As of December 31, 2017 and 2018, the Company had recorded US$144,915 and US$137,904 as an accrual for unrecognized tax benefits and related interest and penalties, respectively, which is included in the account of "Other non-current liabilities". As of December 31, 2017 and 2018, unrecognized tax benefits of US$77,561 and US$72,608 respectively, would impact the effective tax rate if recognized. The final outcome of the tax uncertainty is dependent upon various matters including tax examinations, interpretation of tax laws or expiration of statute of limitations. However, due to the uncertainties associated with the status of examinations, including the protocols of finalizing audits by the relevant tax authorities, there is a high degree of uncertainty regarding the future cash outflows associated with these tax uncertainties. The amount of unrecognized tax benefits may change in the next twelve months, pending clarification of current tax law or audit by the tax authorities. However, a reliable estimate of the range of the possible change cannot be made at this time.

For the years ended December 31, 2016, 2017, and 2018, the Company recognized US$15,270, US$9,593 and US$1,304 in income tax expenses for interest and penalties related to uncertain tax positions. Accrued interest and penalties related to unrecognized tax benefits were US$67,355 and US$65,296 as of December 31, 2017 and 2018, respectively.

The Company's PRC entities have been subject to the New EIT Law since January 1, 2008. The PRC tax authorities, US tax authorities and Hong Kong tax authorities have up to five years, three years and six years, respectively, to conduct examinations of the Company's tax filings. Accordingly, the PRC subsidiaries' tax years 2013 through 2018, the US subsidiaries' tax years 2015 through 2018 and the Hong Kong subsidiaries' tax years 2012 through 2018 remain open to examination by the respective taxing jurisdictions.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**17.    TAXATION (continued)**

The aggregate amount and per share effect of tax holidays and preferential tax rates were as follows:

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2016** | **2017** | **2018** |
| | **US$** | **US$** | **US$** |
| The aggregate amount | (5,759) | (12,001) | (6,557) |
| The aggregate effect on basic and diluted earnings per share for Class A and Class B ordinary shares: | | | |
| -Basic | 0.06 | 0.14 | 0.07 |
| -Diluted | 0.06 | 0.13 | 0.07 |

The components of deferred taxes were as follows:

| | As of December 31, | |
| --- | --- | --- |
| | **2017** | **2018** |
| | **US$** | **US$** |
| Deferred tax assets | | |
| Net operating losses | 74,040 | 71,308 |
| Impairment of loans receivable | 274 | 933 |
| Overcharged advertising and promotion fee | 87 | 1,061 |
| Fixed assets depreciation | 49 | 208 |
| Share based compensation | 6,167 | - |
| Less: Valuation allowance | (73,015) | (71,308) |
| | | |
| Total deferred tax assets, net | 7,602 | 2,202 |
| | | |
| Deferred tax liabilities | | |
| Investment basis in the PRC entities | (61,961) | (72,088) |
| BaoAn Acquisition – Property | (13,309) | (12,191) |
| Investments | (51,229) | (13,160) |
| Interest capitalization | (142) | (139) |
| | | |
| Deferred tax liabilities | (126,641) | (97,578) |

As of December 31, 2018, the Company had net operating losses of US$37,243 from the Company's subsidiaries incorporated in the US, which can be carried forward indefinitely to offset future taxable income. The remaining accumulated net operating losses of US$238,577 arose from several of its PRC entities, which can be carried forward to offset future taxable profit and will expire in years 2019 to 2023 if not utilized.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**17.    TAXATION (continued)**

*Deferred tax liabilities arising from undistributed earnings*

As of December 31, 2017 and 2018, a portion of the aggregate undistributed earnings of the PRC subsidiaries that were available for distribution to non-PRC parent companies was not considered to be indefinitely reinvested under ASC 740-30, "Income Taxes: Other Consideration or Special Areas". In accordance with the New EIT Law, a withholding income tax will be imposed on the PRC subsidiaries when dividends are distributed to their non-PRC parent companies. The withholding tax rate is 10% unless a foreign investor's tax jurisdiction has a tax treaty with the PRC that provides for a lower withholding tax rate and the foreign investor is recognized as the beneficial owner of the income under the relevant tax rules. Deferred tax liabilities amounting to US$28,716 and US$40,436 were provided for the withholding tax of the PRC entities as of December 31, 2017 and 2018, respectively.

The deferred tax liabilities arising from the aggregate undistributed earnings of the PRC Domestic Entities and the PRC Domestic Entities' subsidiaries that are available for distribution to the PRC tax resident parent companies, that is, the WOFEs, amounted to US$33,246 and US$31,652 as of December 31, 2017 and 2018, respectively.

As of December 31, 2017 and 2018, the Company did not provide for deferred tax liabilities and foreign withholding taxes on certain undistributed earnings of its PRC subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries that were available for distribution to non-PRC parent companies on the basis of its intent to permanently reinvest these foreign subsidiaries' earnings. The cumulative amount of such temporary difference was US$338,695 and US$319,483 as of December 31, 2017 and 2018, respectively. The amount of the unrecognized deferred tax liability for temporary differences related to investments in PRC subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries that are essentially permanent in duration was US$33,869 and US$31,948 as of December 31, 2017 and 2018, respectively.

**18.    SHARE-BASED PAYMENTS**

*Stock related award incentive plan of 1999*

On September 1, 1999, the Company's shareholders approved the 1999 Stock Related Award Incentive Plan (the "1999 Plan"). Under the 1999 Plan, the Company may issue up to 12% of the fully diluted ordinary shares of the Company to its directors and employees. The purpose of the 1999 Plan is to provide additional incentive and motivation to its directors and employees, through an equity interest in the Company, to work towards increasing the value of the Company. The 1999 Plan provides for accelerated vesting, subject to certain conditions, if there is a change in control. The 1999 Plan has No stated expiry date.

The exercise price, vesting and other conditions of individual awards are determined by the executive chairman of the board of directors. The awards are typically subject to a three-year to a four-year service vesting condition and expire 10 or 15 years after the grant date. In addition, the grantee must return all awards and any proceeds from the sale of the awards if he/she violates certain provisions including a non-compete condition for a period of 2 years after cessation of employment with the Company. The non-compete condition does not give rise to an in-substance service condition.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

18.   **SHARE-BASED PAYMENTS (continued)**

*Stock related award incentive plan of 2010*

On August 4, 2010, the Company's board of directors and shareholders approved the 2010 Stock Related Award Incentive Plan (the "2010 Plan"). Under the 2010 Plan, the Company may issue up to 10% of the total number of ordinary shares, including ordinary shares issuable upon conversion of any preferred shares to its directors and employees. The purpose of the 2010 Plan was to recognize and acknowledge the contributions made to the Company by eligible employees and to promote the success of the Company's business. The 2010 Plan allows the board of directors, or its designated committee, to establish the performance criteria when granting stock options on the basis of any one of, or combination of, increase in share price, earnings per share, total shareholder return, return on equity, return on assets, return on investment, net operating income, cash flow, revenue, economic value added, personal management objectives, or other measures of performance selected by the Company's board of directors, or its designated committee. Partial achievement of the specified criteria may result in a vesting corresponding to the degree of achievement as specified in the detail rules.

The exercise price, vesting and other conditions of individual awards are determined by the executive chairman of the board of directors, except for awards to officers which are determined by the board of directors or the compensation committee. The awards are typically subject to a four-year service vesting condition and multiple performance conditions with a contractual life of ten years. In addition, the grantee must return all awards and any proceeds from the sale of the awards if he/she violates certain provisions.

*Stock related award incentive plan of 2015*

On June 4, 2015, the Company's board of directors and shareholders approved the 2015 Stock Related Award Incentive Plan (the "2015 Plan"). Under the 2015 Plan, the Company may issue up to 1.5% of the total number of ordinary shares, including ordinary shares issuable upon conversion of any preferred shares to its directors and employees. The purpose of the 2015 Plan was to recognize and acknowledge the contributions made to the Company by eligible employees and to promote the success of the Company's business. The 2015 Plan allows the board of directors, or its designated committee, to establish the performance criteria when granting stock options on the basis of any one of, or combination of, increase in share price, earnings per share, total shareholder return, return on equity, return on assets, return on investment, net operating income, cash flow, revenue, economic value added, personal management objectives, or other measures of performance selected by the Company's board of directors, or its designated committee. Partial achievement of the specified criteria may result in a vesting corresponding to the degree of achievement as specified in the detail rules.

The exercise price, vesting and other conditions of individual awards are determined by the executive chairman of the board of directors, except for awards to officers which are determined by the board of directors or the compensation committee. The awards are typically subject to a four-year service vesting condition and multiple performance conditions with a contractual life of ten years. In addition, the grantee must return all awards and any proceeds from the sale of the awards if he/she violates certain provisions.

On August 29, 2017 (the "2017 Replacement Date"), the Company's board of directors approved to replace 1,377,730 share options granted during the years ended December 31, 2015 and 2016 under the 2015 Plan to 200 employees with 153,036 options and 1,224,694 restricted shares (the "Replacement Awards"). The exercise price of 153,036 options was reduced from US$27.2~US$30.0 per share to US$18.1 per share. The replacement awards were subject to graded vesting over four years from the Replacement Date, in which 25% of the awards vest at the end of each of the next four years. The total incremental share-based compensation of US$12,537 resulting from the modification is recognized ratably over the new requisite service period. The total unamortized share-based compensation of US$7,447 resulting from the modification is recognized ratably over the original requisite service period.

On December 30, 2018 (the "2018 Replacement Date"), the Company's board of directors approved to replace 252,500 share options granted during the year ended December 31, 2008 under the 1999 Plan to 5 employees with 252,500 options (the "2018 Replacement Awards"). The expiration date of 252,500 options was extended from December 30, 2018 to December 30, 2028. The replacement awards were fully vested as of the replacement date. The total incremental share-based compensation of US$619 resulting from the modification is fully recognized during the year ended December 31, 2018.

During 2018, the Company approved to extend the expiration date of an aggregate number of 518,175 share options granted under the 1999 Plan to 10 employees for terms between 2 days and nine years. These stock options expired prior to December 31, 2017. The awards granted are fully vested as of the grant date. These transactions were accounted for as new grant. The total share-based compensation of US$2,764 resulting is fully recognized during the year ended December 31, 2018.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**18.     SHARE-BASED PAYMENTS (continued)**

A summary of the equity award activity under the 1999 Plan, 2010 Plan and 2015 Plan for the year ended December 31, 2018 was stated below:

| Options Granted to Employees and Directors | Number of Shares | Weighted-Average per Share Exercise Price | Weighted-Average Grant-date Fair Value per Share | Weighted Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value | |
|---|---|---|---|---|---|---|
| Outstanding, December 31, 2017 | 7,241,667 | 11.93 | 5.51 | 5.01 | US$ | 136,242 |
| Granted (new options) | 518,175 | 4.77 | 5.33 | - | | |
| Granted (replacement options) | 252,500 | 5.00 | 4.20 | | | |
| Forfeited | (312,156) | 21.17 | 8.55 | - | | |
| Expired | (1,125,301) | 11.27 | 5.22 | - | | |
| Exercised | (288,331) | 10.31 | 4.33 | - | | |
| Replaced | (252,500) | 5.00 | 3.75 | | | |
| Outstanding, December 31, 2018 | 6,034,054 | 10.92 | 4.57 | 4.50 | US$ | 5,919 |
| Vested and expected to vest at December 31, 2018 | 6,034,054 | 10.92 | 4.57 | 4.50 | US$ | 5,919 |
| Exercisable at December 31, 2018 | 5,160,774 | 9.55 | 3.97 | 3.98 | US$ | 5,919 |

The aggregate intrinsic value as of December 31, 2018 in the table above represents the difference between the fair value of the Company's ordinary share at December 31, 2018 and the exercise price.

Total intrinsic value of options exercised for the years ended December 31, 2016, 2017 and 2018 was US$10,011, US$ 2,953 and US$3,979 respectively.

As of December 31, 2018, there was US$4,447 of unrecognized share-based compensation cost related to equity awards that are expected to be recognized over a weighted-average vesting period of 1.53 years.

The fair value for stock options granted during the year ended December 31, 2018 under the 1999 and 2015 Plan was estimated using the Black-Scholes option pricing model. The volatility assumption was estimated based on the price volatility of the shares of the Company and comparable companies in the internet media business. The expected term was estimated based on the resulting output of the Black-Scholes option pricing model. The risk-free rates were based on the market yield of US Treasury Bonds and Notes with maturity terms equal to the expected term of the option awards. Forfeitures were estimated based on historical experience. The dividend yield of nil are based on the Company's estimated dividend distribution for the stock options granted during the year ended December 31, 2018.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**18.    SHARE-BASED PAYMENTS (continued)**

The assumptions used to estimate the fair values of the share options granted were as follows:

|  | For the Years Ended December 31, 2018 |
| --- | --- |
| Risk-free interest rate | 2.19% to 2.54% |
| Dividend yield | nil |
| Expected volatility range | 48.22% to 49.24% |
| Weighted average expected life | 0.01 to 5.50 years |
| Estimated forfeiture rate | - |
| Fair value of ordinary share | US$6.00 to US$27.90 |

Restricted Shares

A summary of the restricted shares for the year ended December 31, 2018 was stated below:

| Restricted Shares Granted to Employees and Directors | Number of Shares | Weighted-Average Grant date Fair Value per Share |
| --- | --- | --- |
| Outstanding, December 31, 2017 | 1,604,768 | 17.55 |
| Granted | 19,500 | 25.05 |
| Forfeited | (201,439) | 17.91 |
| Vested | (356,194) | 17.55 |
| Unvested, December 31, 2018 | 1,066,635 | 17.62 |

Total intrinsic value of restricted shares vested for the year ended December 31, 2018 was US$4,119.

As of December 31, 2018, there was US$9,527 of unrecognized share-based compensation cost related to restricted shares that are expected to be recognized over a weighted-average vesting period of 2.67 years.

Total share-based compensation expense of share-based awards granted to employees and directors was as follows:

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2018 |
| | US$ | US$ | US$ |
| Cost of revenues | 443 | 364 | 506 |
| Selling expenses | 512 | 479 | 405 |
| General and administrative expenses | 5,597 | 6,375 | 13,171 |
| | 6,552 | 7,218 | 14,082 |

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

19. **RELATED PARTY TRANSACTIONS**

a) **Related Parties**

| Name of Related Parties | Relationship with the Company |
|---|---|
| Vincent Tianquan Mo | Executive chairman of the board of directors and chief executive officer |
| Richard Jiangong Dai | Director of the board up until February 25, 2016 |
| Wall Street Global Training Center, Inc. | A company under the control of Vincent Tianquan Mo and two other independent directors |
| Beihai Silver Beach 1 Hotel and Property Management Company, Ltd. ("Beihai Silver Beach") | A company under the control of Vincent Tianquan Mo |
| Che Tian Xia Company Ltd. | A company under the control of Vincent Tianquan Mo and Richard Jiangong Dai |
| Guangxi Wharton International Hotel ("Guangxi Wharton") | A company under the control of Vincent Tianquan Mo |
| Research Center on Natural Conservation, Inc. ("Research Center") | A company under the control of Vincent Tianquan Mo |
| Upsky Long Island Hotel LLC ("Upsky Long Island") | A company under the control of Vincent Tianquan Mo |
| Upsky San Francisco Airport Hotel LLC (formerly known as "Crowne Plaza San Francisco-International Airport") ("Upsky San Francisco") | A company under the control of Vincent Tianquan Mo |
| Upsky Lighthouse Hotel LLC ("Upsky Lighthouse") | A company under the control of Vincent Tianquan Mo |
| Nanning Xuyin Business Co., Ltd. ("Nanning Xuyin") | A company under the control of Vincent Tianquan Mo |
| New York Military Academy | A company of which Vincent Tianquan Mo is a director |

b) **The Company had the following related party transactions for the years ended December 31, 2016, 2017 and 2018:**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | **2016** | **2017** | **2018** |
| | US$ | US$ | US$ |
| Office building leased from: | | | |
| -Vincent Tianquan Mo | 154 | 159 | 162 |
| Management fee incurred: | | | |
| -Beihai Silver Beach | 421 | 501 | 523 |
| Hotel service fee incurred: | | | |
| - Beihai Silver Beach | | 113 | - |
| - Upsky San Francisco | | 17 | - |
| - Upsky Long Island | | 81 | - |
| Training fee incurred | | | |
| - New York Military Academy | | 111 | - |

Free rental space to Wall Street Global Training Center, Inc.

Starting from 2011, the Company provided Wall Street Global Training Center, Inc. with office space of approximately 220 square feet in the Company's building located in New York City, United States of America, free of charge. The estimated fair value of the free office space was insignificant for each of the years ended December 31, 2016, 2017 and 2018.

Office building leased from Vincent Tianquan Mo

The Company entered into an agreement with Vincent Tianquan Mo to lease a building owned by him for a 10-year period for nil consideration starting from March 1, 2012. The deemed rental expense of US$154 and US$159 and US$162, and the corresponding shareholder contribution were included in the consolidated financial statements for the years ended December 31, 2016, 2017 and 2018, respectively.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**19.     RELATED PARTY TRANSACTIONS (continued)**

Management service provided by Beihai Silver Beach

On April 1, 2013, the Company and Beihai Silver Beach entered into a contract, pursuant to which Beihai Silver Beach was engaged to manage the hotel and office leasing operations owned by the BaoAn Entities for ten years. The management fees incurred for the years ended December 31, 2016, 2017 and 2018 were US$421 and US$501, and US$523 respectively.

Hotel service fee

In the year ended December 31, 2016, Upsky San Francisco, Upsky Long Island and Beihai Silver Beach provided hotel accommodation to the Company amounting to US$17, US$81 and US$113. No such services were provided for the years ended December 31, 2017 and 2018.

Training service fee

In the year ended December 31, 2016, New York Military Academy, a company of which Vincent Tianquan Mo is a director, provided training service to the Company in the amount of US$111. No such services were provided for the years ended December 31, 2017 and 2018.

Use of domain name of Che Tian Xia Company Ltd.

In April 2013, the Company entered into a contract with Che Tian Xia Company Ltd. to use the latter's domain name www.youtx.com for six years at nil consideration.

Nanning Xuyin holds shares of Guilin Bank Co., Ltd ("Guilin Bank")

As of December 31, 2015, Nanning Xuyin, which is 80% owned by Vincent Tianquan Mo, held 73,430,061 shares of Guilin Bank that were pledged by a third-party for its overdue receivables to the Company through an entrustment agreement. In 2016, 30,595,859 shares of Guilin Bank have been transferred to the Company from Naning Xuying. In 2017, the rest of shares of Guilin Bank have been transferred to the Company from Naning Xuying.

**c)   The Company had the following related party balances as of December 31, 2017 and 2018:**

|  | As of December 31, | |
| --- | --- | --- |
|  | **2017** | **2018** |
|  | **US$** | **US$** |
| Amounts due from a related party: | | |
| - Beihai Silver Beach | 167 | - |

|  | As of December 31, | |
| --- | --- | --- |
|  | **2017** | **2018** |
|  | **US$** | **US$** |
| Amounts due to a related party: | | |
| - Beihai Silver Beach | - | 19 |

The balances as of December 31, 2017 and 2018 represented outstanding management fees which were unsecured and interest-free.

**20.     EMPLOYEE DEFINED CONTRIBUTION PLAN**

Full time employees of the Company in the PRC participate in a government mandated defined contribution plan, pursuant to which certain pension benefits, medical care, employee housing fund and other welfare benefits are provided to employees. Chinese labor regulations require that the PRC subsidiaries of the Company make contributions to the government for these benefits based on certain percentages of the employees' salaries. The Company has No legal obligation for the benefits beyond the contributions made. The total amounts for such employee benefits, which were expensed as incurred, were US$79,676, US$21,583 and US$20,093 for the years ended December 31, 2016, 2017 and 2018, respectively.

F-70

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

21.    **COMMITMENTS AND CONTINGENCIES**

*Capital commitment*

The Company has commitments for the acquisition and construction of fixed assets of US$10,665 as of December 31, 2018, which are scheduled to be paid within one year.

*Operating lease commitments*

As of December 31, 2018, the Company had future minimum lease payments under non-cancellable operating leases with initial terms in excess of one year as follows:

|  | US$ |
|---|---|
| 2019 | 4,368 |
| 2020 | 2,198 |
| 2021 | 181 |
| 2022 | 18 |
| 2023 and thereafter | 37 |
|  | 6,802 |

Payments under operating leases are expensed on a straight-line basis over the periods of the respective leases.The Company's lease arrangements have no renewal options, rent escalation clauses, restrictions or contingent rents and are all conducted with third parties, except for the building leased from a related party as disclosed in Note 19. For the years ended December 31, 2016, 2017 and 2018, total rental expenses for all operating leases were US$66,330, US$27,832 and US$9,678, respectively.

*Contingencies*

In April and May 2018, the Company was sued as one of the defendants for trade mark infringement by a third party, alleging the claim of damage in the amount of RMB 99.9 million, RMB 300 million, and RMB 500 million, respectively. The cases are still ongoing at the Beijing Intellectual Property Court. The Company is vigorously contesting the allegations. In February 2019, the Company was served with a subpoena from a court in Beijing, in which a third party claimed that a contract the Company entered into was invalid. Pursuant to such contract, the Company received shares of Guilin Bank from a debtor's nominee to discharge its indebtedness (See Note 5). The debtor subsequently alleged that such contract was invalid because the transfer price of such assets was below the fair market value. The Company intends to vigorously contest the allegation.

In accordance with ASC Topic 450, No accrual of loss contingency was accrued as of December 31, 2018 since it is not probable that a liability has been incurred because of these legal proceedings and the amount of loss cannot be reasonably estimated.

*Income taxes*

As of December 31, 2018, the Company had accrued US$137,904 for unrecognized tax benefits (Note 17). The final outcome of the tax uncertainty is dependent upon various matters including tax examinations, interpretation of tax laws or expiration of statute of limitations. However, due to the uncertainties associated with the status of examinations, including the protocols of finalizing audits by the relevant tax authorities, there is a high degree of uncertainty regarding the future cash outflows associated with these tax uncertainties.

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**22.   SEGMENT REPORTING**

In accordance with ASC 280, "Segment Reporting", the Company's chief operating decision maker has been identified as the executive chairman of the board of directors and chief executive officer, who makes resource allocation decisions and assesses performance based on the Company's consolidated results. As a result, the Company has only one reportable segment.

*Geographic disclosures*

As the Company generates substantially all of its revenues from customers domiciled in the PRC, No geographical segments are presented. All of the Company's long-lived assets are located in the PRC except for buildings and land (i.e. including the construction in progress) with net book values of US$104,327 and US$112,713 as of December 31, 2017 and 2018, respectively, which are located in the United States of America.

**23.   EARNINGS (LOSS) PER SHARE**

Basic and diluted earnings (loss) per share for each of the years presented are calculated as follows:

|  | For the Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | **2016** | | **2017** | | **2018** | |
|  | US$ Class A | US$ Class B | US$ Class A | US$ Class B | US$ Class A | US$ Class B |
| Earnings (loss) per share - basic: | | | | | | |
| Numerator: | | | | | | |
| Allocation of net income (loss) attributable to ordinary shareholders used in calculating income (loss) per ordinary share-basic | (125,531) | (44,104) | 15,736 | 5,971 | (83,400) | (31,511) |
| Denominator: | | | | | | |
| Weighted average number of ordinary shares outstanding used in calculating basic earnings (loss) per share | 69,269,099 | 24,336,650 | 64,139,015 | 24,336,650 | 64,412,782 | 24,336,650 |
| Denominator used for basic earnings (loss) per share | 69,269,099 | 24,336,650 | 64,139,015 | 24,336,650 | 64,412,782 | 24,336,650 |
| Earnings (loss) per share - basic | (1.81) | (1.81) | 0.25 | 0.25 | (1.29) | (1.29) |
|  | | | | | | |
| Earnings (loss) per share - diluted: | | | | | | |
| Numerator: | | | | | | |
| Allocation of net income (loss) attributable to ordinary shareholders used in calculating income (loss) per ordinary share | (125,531) | (44,104) | 15,736 | 5,971 | (83,400) | (31,511) |
| Allocation of net income (loss) attributable to ordinary shareholders used in calculating income (loss) per ordinary share-diluted after assumed conversion | (125,531) | (44,104) | 15,736 | 5,971 | (83,400) | (31,511) |
| Reallocation of net income (loss) attributable to ordinary shareholders as a result of conversion of Class B to Class A shares | (44,104) | - | 5,971 | - | (31,511) | - |
| Net income (loss) attributable to ordinary shareholders | (169,635) | (44,104) | 21,707 | 5,971 | (114,911) | (31,511) |
| Denominator: | | | | | | |
| Weighted average number of ordinary shares outstanding used in calculating basic earnings (loss) per share | 69,269,099 | 24,336,650 | 64,139,015 | 24,336,650 | 64,412,782 | 24,336,650 |
| Conversion of Class B to Class A ordinary shares | 24,336,650 | - | 24,336,650 | - | 24,336,650 | - |
| Employee stock options | - | - | 3,110,012 | - | - | - |
| Denominator used for diluted earnings (loss) per share | 93,605,749 | 24,336,650 | 91,585,677 | 24,336,650 | 88,749,432 | 24,336,650 |
| Earnings (loss) per share -diluted | (1.81) | (1.81) | 0.24 | 0.24 | (1.29) | (1.29) |

F-72

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**23.    EARNINGS (LOSS) PER SHARE (continued)**

The repurchased but not retired ordinary shares are accounted as treasury stock which are not considered outstanding and excluded from the calculation of basic earnings (loss) per share since the date of repurchase.

Options to purchase 6,034,054 shares of common stock at US$1.95~US$30 per share and 1,066,635 restricted shares were outstanding in 2018 but were not included in the computation of diluted EPS due to anti-dilutive effect. In addition, 2,790,860 related to the Company's September 2022 Notes and 4,186,290 related to the Company's New November 2022 Notes were not included in the calculation of diluted earnings (loss) per share because the impact of inclusion would be anti-dilutive.

In 2017, the number of securities that were not included in the calculation of diluted earnings (loss) per share because the impact of inclusion would be anti-dilutive were as follows: 2,961,570 share options, 290,534 related to the Company's December 2018 Notes, 2,790,860 related to the Company's September 2022 Notes and 5,581,720 related to the Company's November 2022 Notes. As of December 31, 2017, the conversion prices for the December 2018 Notes, the September 2022 Notes and the November 2022 Notes were US$19.62 per ADS, US$7.166 per ADS and US$7.166 per ADS, respectively, as of December 31, 2017. There is No cash conversion rate.

In 2016, the number of securities that were not included in the calculation of diluted earnings (loss) per share because the impact of inclusion would be anti-dilutive were as follows: 5,763,088 employee stock options, 4,153,642 related to the Company's December 2018 Notes, 2,790,860 related to the Company's September 2022 Notes and 5,581,720 related to the Company's November 2022 Notes.  As of December 31, 2016, the conversion prices for the December 2018 Notes, the September 2022 Notes and the November 2022 Notes were US$19.62 per ADS, US$7.166 per ADS and US$7.166 per ADS, respectively, as of December 31, 2016. There is No cash conversion rate.

F-73

**FANG HOLDINGS LIMITED**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

24.     PARENT COMPANY ONLY CONDENSED FINANCIAL INFORMATION

*Condensed balance sheets*

|  | As of December 31, | |
|---|---|---|
|  | 2017 US$ | 2018 US$ |
| **ASSETS** | | |
| Cash and cash equivalents | 11,801 | 2,529 |
| Prepayments and other current assets | 1,485 | 98 |
| Amounts due from subsidiaries | 8,835 | 17,056 |
| **Total current assets** | **22,121** | **19,683** |
| **Non-current assets:** | | |
| Long-term investments | 52,283 | 30,733 |
| Investment in subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries | 992,902 | 869,895 |
| Restricted cash, non-current | - | 1,001 |
| **Total non-current assets** | **1,045,185** | **901,629** |
| **Total assets** | **1,067,306** | **921,312** |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current liabilities:** | | |
| Short-term loans | - | 26,808 |
| Accrued expenses and other liabilities | 3,850 | 2,575 |
| Amounts due to subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries | - | 5,722 |
| Convertible notes- current | 5,700 | - |
| **Total current liabilities** | **9,550** | **35,105** |
| **Non-current liabilities:** | | |
| Convertible senior notes | 291,365 | 254,435 |
| Long-term loans | 26,808 | 37,266 |
| **Total non-current liabilities** | **318,173** | **291,701** |
| **Total liabilities** | **327,723** | **326,806** |
| **Commitments and contingencies** | - | - |
| **Shareholders' equity:** | | |
| Class A ordinary shares, par value HK$1.00 per share, 600,000,000 shares authorized for Class A and Class B in aggregate, issued shares as of December 31, 2017 and 2018: 71,425,120 and 72,069,645; outstanding shares as of December 31, 2017 and 2018: 64,360,062 and 65,004,587 | 9,204 | 9,286 |
| Class B ordinary shares, par value HK$1.00 per share, 600,000,000 shares authorized for Class A and Class B in aggregate, 24,336,650 shares and 24,336,650 shares issued and outstanding as of December 31, 2017 and 2018, respectively | 3,124 | 3,124 |
| Additional paid-in capital | 500,666 | 517,802 |
| Accumulated other comprehensive income (loss) | 137,630 | (75,837) |
| Retained earnings | 225,574 | 276,746 |
| Treasury stock (7,065,058 and 7,065,058 shares as of December 31, 2017 and 2018, respectively.) | (136,615) | (136,615) |
| **Total shareholders' equity** | **739,583** | **594,506** |
| **Total liabilities and shareholders' equity** | **1,067,306** | **921,312** |

**FANG HOLDINGS LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**24.    PARENT COMPANY ONLY CONDENSED FINANCIAL INFORMATION (continued)**

*Condensed statements of comprehensive income (loss)*

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016<br>US$ | 2017<br>US$ | 2018<br>US$ |
| Revenues | - | - | - |
| Cost of revenues | - | - | - |
| Gross profit | - | - | - |
| General and administrative (expenses) income | 3,610 | (998) | (9,348) |
| **Operating (loss) income** | **3,610** | **(998)** | **(9,348)** |
| | | | |
| Equity in profits (losses) of subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries | (167,967) | 27,339 | (85,190) |
| Foreign exchange gain | 832 | 211 | 7 |
| Interest income | 1,775 | 196 | 73 |
| Interest expenses | (17,807) | (7,233) | (7,700) |
| Change in fair value of securities | 10,583 | 2,736 | (14,904) |
| Investment income | 1,571 | 2,221 | 2,151 |
| Other-than-temporary impairment on available-for-sale securities | (2,232) | (2,768) | - |
| | | | |
| **Income (loss) before income taxes** | **(169,635)** | **21,704** | **(114,911)** |
| | | | |
| Income tax expenses | - | - | - |
| | | | |
| **Net income (loss)** | **(169,635)** | **21,704** | **(114,911)** |
| | | | |
| **Other comprehensive income (loss), net of tax** | | | |
| Foreign currency translation adjustments | (60,732) | 56,571 | (46,648) |
| Amounts reclassified from accumulated other comprehensive income | (10,583) | (2,736) | (1,493) |
| Unrealized gain on available-for-sale securities | 7,326 | 14,575 | 1,493 |
| Other comprehensive income recorded by subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries | - | 198,263 | - |
| | | | |
| Gain (loss) on intra- entity foreign transactions of long-term-investment nature | (6,996) | 1,872 | (3,034) |
| | | | |
| **Other comprehensive income (loss), before tax** | **(70,985)** | **268,545** | **(49,682)** |
| Income tax expense related to components of other comprehensive income | - | (49,566) | - |
| | | | |
| **Other comprehensive income (loss), net of tax** | **(70,985)** | **218,979** | **(49,682)** |
| **Comprehensive income (loss)** | **(240,620)** | **240,683** | **(164,593)** |

**FANG HOLDINGS LIMITED**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of United States Dollars ("US$"), except for number of shares and per share data)**

**24.   PARENT COMPANY ONLY CONDENSED FINANCIAL INFORMATION (continued)**

*Condensed statements of cash flows*

| | 2016 | 2017 | 2018 |
|---|---|---|---|
| | US$ | US$ | US$ |
| Net cash provided by (used in) operating activities | 117,398 | (67,381) | (3,302) |
| Net cash provided by investing activities | 11,575 | 13,931 | 8,272 |
| Net cash used in financing activities | (522,057) | (31,179) | (13,241) |
| Net decrease in cash and cash equivalents | (393,084) | (22,271) | (8,271) |
| Cash and cash equivalents and restricted cash at beginning of year | 427,156 | 34,072 | 11,801 |
| Cash and cash equivalents and restricted cash at end of year | 34,072 | 11,801 | 3,530 |

*Basis of Presentation*

For the presentation of the parent company only condensed financial information, the Company records its investment in subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries which it effectively controls through contractual agreements, under the equity method of accounting as prescribed in ASC 323, *Investments-Equity Method and Joint Ventures*. Such investments are presented on the condensed balance sheets as "Investment in subsidiaries, PRC Domestic Entities, and PRC Domestic Entities' subsidiaries" and the subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries' profit or loss as "Equity in profits (losses) of subsidiaries, PRC Domestic Entities and PRC Domestic Entities' subsidiaries" on the condensed statements of comprehensive income (loss). The parent company only condensed financial information should be read in conjunction with the Company's consolidated financial statements.

**25.   SUBSEQUENT EVENTS**

On January 21, 2019, the Company announced its intention to separate into two publicly traded companies: the spun-off business that will comprise certain portions of the Company's listing and value-added services, and the retained business that will comprise the Company's remaining operations, which will continue to be operated by Fang. On May 2, 2019, the board of directors approved the plan to separate CIH, which operates the spun-off business, into an independent publicly traded company. The Company expects the spun-off be completed in the second quarter of 2019.

End of Document

# Exhibit 6

# November 14, 2016
# RCNC Form 990

Form **990**

## Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

▶ Do not enter social security numbers on this form as it may be made public

▶ Information about Form 990 and its instructions is at www.IRS.gov/form990

OMB No 1545-0047

**2015**

Open to Public Inspection

Department of the Treasury
Internal Revenue Service

**A** For the 2015 calendar year, or tax year beginning 01-01-2015 , and ending 12-31-2015

| **B** Check if applicable | **C** Name of organization<br>RESEARCH CENTER ON NATURAL CONSERVATION<br>INC | **D** Employer identification number |
|---|---|---|
| ☐ Address change | | 45-3641847 |
| ☐ Name change | Doing business as | |
| ☐ Initial return | | |
| ☐ Final return/terminated | Number and street (or P O box if mail is not delivered to street address) Room/suite<br>1 ARDEN ROAD | **E** Telephone number<br>(212) 967-1100 |
| ☐ Amended return | City or town, state or province, country, and ZIP or foreign postal code<br>HARRIMAN, NY  10926 | |
| ☐ Application pending | | **G** Gross receipts $ 166,108 |

| **F** Name and address of principal officer<br>VINCENT TIANQUAN MO<br>1 ARDEN ROAD<br>HARRIMAN, NY  10926 | **H(a)** Is this a group return for subordinates? ☐ Yes ☑ No |
|---|---|
| **I** Tax-exempt status ☑ 501(c)(3) ☐ 501(c) ( ) ◀ (insert no ) ☐ 4947(a)(1) or ☐ 527 | **H(b)** Are all subordinates included? ☐ Yes ☐ No<br>If "No," attach a list (see instructions) |
| **J** Website: ▶ N/A | **H(c)** Group exemption number ▶ |
| **K** Form of organization ☑ Corporation ☐ Trust ☐ Association ☐ Other ▶ | **L** Year of formation 2011 **M** State of legal domicile NY |

### Part I  Summary

| | | |
|---|---|---|
| Activities & Governance | **1** Briefly describe the organization's mission or most significant activities<br>TO ENCOURAGE INTEREST FOR ENVIRONMENTAL PROTECTION AND PRESERVE NATURAL CONSERVATION | |
| | **2** Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets | |
| | **3** Number of voting members of the governing body (Part VI, line 1a) . . . . . | **3** | 3 |
| | **4** Number of independent voting members of the governing body (Part VI, line 1b) . . . . . | **4** | 0 |
| | **5** Total number of individuals employed in calendar year 2015 (Part V, line 2a) . . . | **5** | 0 |
| | **6** Total number of volunteers (estimate if necessary) . . . . . . . . . | **6** | 0 |
| | **7a** Total unrelated business revenue from Part VIII, column (C), line 12 . . . . . | **7a** | 0 |
| | **b** Net unrelated business taxable income from Form 990-T, line 34 . . . . . | **7b** | 0 |

| | | Prior Year | Current Year |
|---|---|---|---|
| Revenue | **8** Contributions and grants (Part VIII, line 1h) . . . . . . . . . | 74,459 | 117,660 |
| | **9** Program service revenue (Part VIII, line 2g) . . . . . . . . . | 0 | 0 |
| | **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d ) . . . | 0 | 0 |
| | **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 47,616 | 48,448 |
| | **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 122,075 | 166,108 |

| | | | |
|---|---|---|---|
| Expenses | **13** Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) . . . | 0 | 0 |
| | **14** Benefits paid to or for members (Part IX, column (A), line 4) . . . . | 0 | 0 |
| | **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 0 | 0 |
| | **16a** Professional fundraising fees (Part IX, column (A), line 11e) . . . . . | 0 | 0 |
| | **b** Total fundraising expenses (Part IX, column (D), line 25) ▶0 | | |
| | **17** Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) . . . . | 1,003,556 | 1,117,415 |
| | **18** Total expenses  Add lines 13–17 (must equal Part IX, column (A), line 25) | 1,003,556 | 1,117,415 |
| | **19** Revenue less expenses  Subtract line 18 from line 12 . . . . . . | -881,481 | -951,307 |

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| Net Assets or Fund Balances | **20** Total assets (Part X, line 16) . . . . . . . . . . . . . | 6,460,515 | 23,120,664 |
| | **21** Total liabilities (Part X, line 26) . . . . . . . . . . . . | 7,737,777 | 25,349,233 |
| | **22** Net assets or fund balances  Subtract line 21 from line 20 . . . . | -1,277,262 | -2,228,569 |

### Part II  Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete  Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| Sign Here | ▶ ****** <br>Signature of officer | 2016-11-14<br>Date |
|---|---|---|
| | ▶ VINCENT TIANQUAN MO OFFICER<br>Type or print name and title | |

| Paid Preparer Use Only | Print/Type preparer's name<br>WILLIAM SKODY | Preparer's signature<br>WILLIAM SKODY | Date<br>2016-11-14 | Check ☐ if self-employed | PTIN<br>P00631754 |
|---|---|---|---|---|---|
| | Firm's name  ▶ SKODY SCOT & CO CPAS PC | | | Firm's EIN ▶ 13-3597814 | |
| | Firm's address ▶ 520 EIGHTH AVE SUITE 2200<br>NEW YORK, NY  10018 | | | Phone no  (212) 967-1100 | |

May the IRS discuss this return with the preparer shown above? (see instructions) . . . . . . . . . ☑ Yes ☐ No

Form 990 (2015)                                                                                                          Page **2**

**Part III**  **Statement of Program Service Accomplishments**

Check if Schedule O contains a response or note to any line in this Part III . . . . . . . . . . . . . ☑

**1**   Briefly describe the organization's mission

TO CREATE, FORM AND ESTABLISH AN ORGANIZATION TO RESEARCH INNOVATIVE NATURAL CONSERVATION METHODS, TO HOLD, CONDUCT AND ORGANIZE MEETINGS, DISCUSSIONS AND FORUMS TO CONSIDER COMMUNITY OPINION OR CONTEMPORARY ISSUES PERTAINING TO THE PRESERVATION OF THE ENVIRONMENT, TO FOSTER AND ENCOURAGE INTEREST AND SUPPORT FOR ENVIRONMENTAL PROTECTION ISSUES, TO STUDY THE EFFECTS OF GLOBAL WARMING ON THE ENVIRONMENT IN THE FUTURE, TO PROMOTE, FOSTER AND ADVANCE INTEREST IN THE PRESERVATION OF THE ENVIRONMENT FOR FUTURE GENERATION  NOTHING HEREIN SHALL AUTHORIZE THE CORPORATION TO OPERATE, MAINTAIN OR MANAGE A CHARTER SCHOOL, A NURSERY SCHOOL, AN ELEMENTARY SCHOOL, A SECONDARY SCHOOL, A COLLEGE, UNIVERSITY OR TO ADVERTISE OR OFFER CREDIT-BEARING COURSES OR DEGREES IN NEW YORK STATE

**2**   Did the organization undertake any significant program services during the year which were not listed on
the prior Form 990 or 990-EZ? . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**
If "Yes," describe these new services on Schedule O

**3**   Did the organization cease conducting, or make significant changes in how it conducts, any program
services? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**
If "Yes," describe these changes on Schedule O

**4**   Describe the organization's program service accomplishments for each of its three largest program services, as measured by
expenses  Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others,
the total expenses, and revenue, if any, for each program service reported

**4a**   (Code           ) (Expenses $      1,116,951   including grants of $        0 ) (Revenue $        0 )
RESEARCH AND EDUCATION PROGRAM - COLLECT OPINIONS ABOUT THE RESEARCH CENTER AND SURROUNDING ENVIRONMENT, HOW TO PRESERVE, AND EFFECTIVE USE OF THE PROPERTY  COLLECT OPINIONS ABOUT THE IMPORTANT OF PRESERVING ENVIRONMENT, COLLECT INFORMATION AND FEASIBLITY TO ATTEND ENVIRONMENTAL SEMINARS OR ACTIVITIES, AND TO PROMOTE ENVIRONMENT ISSUES FOR FUTURE

**4b**   (Code           ) (Expenses $              including grants of $            ) (Revenue $            )

**4c**   (Code           ) (Expenses $              including grants of $            ) (Revenue $            )

**4d**   Other program services (Describe in Schedule O )
(Expenses $              including grants of $            ) (Revenue $            )

**4e**   **Total program service expenses ▶**      1,116,951

Form **990** (2015)

**Part IV**   Checklist of Required Schedules

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? If "Yes," complete Schedule A | **1** | Yes | |
| 2 | Is the organization required to complete Schedule B, Schedule of Contributors (see instructions)? | **2** | Yes | |
| 3 | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? If "Yes," complete Schedule C, Part I | **3** | | No |
| 4 | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? If "Yes," complete Schedule C, Part II | **4** | | No |
| 5 | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Revenue Procedure 98-19? If "Yes," complete Schedule C, Part III | **5** | | No |
| 6 | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? If "Yes," complete Schedule D, Part I | **6** | | No |
| 7 | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? If "Yes," complete Schedule D, Part II | **7** | Yes | |
| 8 | Did the organization maintain collections of works of art, historical treasures, or other similar assets? If "Yes," complete Schedule D, Part III | **8** | | No |
| 9 | Did the organization report an amount in Part X, line 21 for escrow or custodial account liability, serve as a custodian for amounts not listed in Part X, or provide credit counseling, debt management, credit repair, or debt negotiation services? If "Yes," complete Schedule D, Part IV | **9** | | No |
| 10 | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent endowments, or quasi-endowments? If "Yes," complete Schedule D, Part V | **10** | | No |
| 11 | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable | | | |
| a | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? If "Yes," complete Schedule D, Part VI | **11a** | Yes | |
| b | Did the organization report an amount for investments—other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? If "Yes," complete Schedule D, Part VII | **11b** | | No |
| c | Did the organization report an amount for investments—program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? If "Yes," complete Schedule D, Part VIII | **11c** | Yes | |
| d | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? If "Yes," complete Schedule D, Part IX | **11d** | | No |
| e | Did the organization report an amount for other liabilities in Part X, line 25? If "Yes," complete Schedule D, Part X | **11e** | Yes | |
| f | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? If "Yes," complete Schedule D, Part X | **11f** | | No |
| 12a | Did the organization obtain separate, independent audited financial statements for the tax year? If "Yes," complete Schedule D, Parts XI and XII | **12a** | | No |
| b | Was the organization included in consolidated, independent audited financial statements for the tax year? If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional | **12b** | | No |
| 13 | Is the organization a school described in section 170(b)(1)(A)(ii)? If "Yes," complete Schedule E | **13** | | No |
| 14a | Did the organization maintain an office, employees, or agents outside of the United States? | **14a** | | No |
| b | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? If "Yes," complete Schedule F, Parts I and IV | **14b** | | No |
| 15 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? If "Yes," complete Schedule F, Parts II and IV | **15** | | No |
| 16 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? If "Yes," complete Schedule F, Parts III and IV | **16** | | No |
| 17 | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? If "Yes," complete Schedule G, Part I (see instructions) | **17** | | No |
| 18 | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? If "Yes," complete Schedule G, Part II | **18** | | No |
| 19 | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? If "Yes," complete Schedule G, Part III | **19** | | No |
| 20a | Did the organization operate one or more hospital facilities? If "Yes," complete Schedule H | **20a** | | No |
| b | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? | **20b** | | |

**Part IV** Checklist of Required Schedules *(continued)*

| | | | | Yes | No |
|---|---|---|---|---|---|
| **21** | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or domestic government on Part IX, column (A), line 1? *If "Yes," complete Schedule I, Parts I and II* . . . . | **21** | | | No |
| **22** | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* . . . . | **22** | | | No |
| **23** | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* . . . . . . . . . . . . . . . . . . . . . . . . . | **23** | | | No |
| **24a** | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K If "No," go to line 25a* . . . . . . . . . . . . . . . . | **24a** | | | No |
| **b** | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? . . . | **24b** | | | |
| **c** | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? . . . . . . . . . . . . . . . . . . . . . . | **24c** | | | |
| **d** | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? . . . | **24d** | | | |
| **25a** | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L, Part I* . . . . . . . . . . . . . . . . . . . . . . | **25a** | | | No |
| **b** | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L, Part I* . . . . . . . . . . . . . . . . . . . . . | **25b** | | | No |
| **26** | Did the organization report any amount on Part X, line 5, 6, or 22 for receivables from or payables to any current or former officers, directors, trustees, key employees, highest compensated employees, or disqualified persons? *If "Yes," complete Schedule L, Part II* . . . . . . . . . . . . . . . . . . . | **26** | | | No |
| **27** | Did the organization provide a grant or other assistance to an officer, director, trustee, key employee, substantial contributor or employee thereof, a grant selection committee member, or to a 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part III* . . . . . . . . . | **27** | | | No |
| **28** | Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions) | | | | |
| **a** | A current or former officer, director, trustee, or key employee? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **28a** | | | No |
| **b** | A family member of a current or former officer, director, trustee, or key employee? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **28b** | | | No |
| **c** | An entity of which a current or former officer, director, trustee, or key employee (or a family member thereof) was an officer, director, trustee, or direct or indirect owner? *If "Yes," complete Schedule L, Part IV* . . . | **28c** | | Yes | |
| **29** | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* . . | **29** | | | No |
| **30** | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* . . . . . . . . . . . . . . . | **30** | | | No |
| **31** | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* . | **31** | | | No |
| **32** | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* . . . . . . . . . . . . . . . . . . . | **32** | | | No |
| **33** | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301 7701-2 and 301 7701-3? *If "Yes," complete Schedule R, Part I* . . . . . . . . . | **33** | | | No |
| **34** | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* . . . . . . . . . . . . . . . . . . . . . . . . . . | **34** | | Yes | |
| **35a** | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | **35a** | | | No |
| **b** | If 'Yes' to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* . . . | **35b** | | | |
| **36** | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* . . . . . . . . . . . . . . . | **36** | | | No |
| **37** | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* | **37** | | | No |
| **38** | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11b and 19? **Note.** All Form 990 filers are required to complete Schedule O . . . . . . . . . . . . . | **38** | | Yes | |

**Part V** Statements Regarding Other IRS Filings and Tax Compliance

Check if Schedule O contains a response or note to any line in this Part V . . . . . . . . . . ▢

|  |  |  | Yes | No |
|---|---|---|---|---|
| **1a** Enter the number reported in Box 3 of Form 1096 Enter -0- if not applicable . . | **1a** | 0 | | |
| **b** Enter the number of Forms W-2G included in line 1a Enter -0- if not applicable | **1b** | 0 | | |
| **c** Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? . . . . . . . . . . . . . | | **1c** | | |
| **2a** Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return . . . . . . . . . . . . . . . . | **2a** | 0 | | |
| **b** If at least one is reported on line 2a, did the organization file all required federal employment tax returns? **Note.**If the sum of lines 1a and 2a is greater than 250, you may be required to e-file (see instructions) | | **2b** | | |
| **3a** Did the organization have unrelated business gross income of $1,000 or more during the year? . . | | **3a** | | No |
| **b** If "Yes," has it filed a Form 990-T for this year?If "No" to line 3b, provide an explanation in Schedule O . . . | | **3b** | | |
| **4a** At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? . . | | **4a** | | No |
| **b** If "Yes," enter the name of the foreign country ▶_____ See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR) | | | | |
| **5a** Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? . . | | **5a** | | No |
| **b** Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | | **5b** | | No |
| **c** If "Yes," to line 5a or 5b, did the organization file Form 8886-T? . . | | **5c** | | |
| **6a** Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? . . . | | **6a** | | No |
| **b** If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? | | **6b** | | |
| **7** **Organizations that may receive deductible contributions under section 170(c).** | | | | |
| **a** Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? . . . . . . . . . . . . . . . | | **7a** | | No |
| **b** If "Yes," did the organization notify the donor of the value of the goods or services provided? . . . . . | | **7b** | | |
| **c** Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? . . . . . . . . . . . . . . . . . . | | **7c** | | No |
| **d** If "Yes," indicate the number of Forms 8282 filed during the year . . . . | **7d** | | | |
| **e** Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | | **7e** | | No |
| **f** Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . . | | **7f** | | No |
| **g** If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? . . . . . . . . . . . . . . . . . . . . | | **7g** | | |
| **h** If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? . . . . . . . . . . . . . . . . . . . . | | **7h** | | |
| **8** **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? . . . . . . . . . . . . . . . . . . . | | **8** | | |
| **9a** Did the sponsoring organization make any taxable distributions under section 4966? . . . | | **9a** | | |
| **b** Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? . . . . | | **9b** | | |
| **10** **Section 501(c)(7) organizations.** Enter | | | | |
| **a** Initiation fees and capital contributions included on Part VIII, line 12 . . . | **10a** | | | |
| **b** Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | **10b** | | | |
| **11** **Section 501(c)(12) organizations.** Enter | | | | |
| **a** Gross income from members or shareholders . . . . . . . . . . | **11a** | | | |
| **b** Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them ) . . . . . . . . | **11b** | | | |
| **12a** **Section 4947(a)(1) non-exempt charitable trusts.**Is the organization filing Form 990 in lieu of Form 1041? | | **12a** | | |
| **b** If "Yes," enter the amount of tax-exempt interest received or accrued during the year | **12b** | | | |
| **13** **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | | |
| **a** Is the organization licensed to issue qualified health plans in more than one state?**Note.** See the instructions for additional information the organization must report on Schedule O | | **13a** | | |
| **b** Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans . . . . | **13b** | | | |
| **c** Enter the amount of reserves on hand . . . . . . . . . . . . | **13c** | | | |
| **14a** Did the organization receive any payments for indoor tanning services during the tax year? . . . . . | | **14a** | | No |
| **b** If "Yes," has it filed a Form 720 to report these payments?If "No," provide an explanation in Schedule O . . | | **14b** | | |

| **Part VI** | Governance, Management, and Disclosure |
|---|---|

*For each "Yes" response to lines 2 through 7b below, and for a "No" response to lines 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.*

Check if Schedule O contains a response or note to any line in this Part VI . . . . . . . . . . . . . . . ☑

### Section A. Governing Body and Management

| | | | | Yes | No |
|---|---|---|---|---|---|
| **1a** | Enter the number of voting members of the governing body at the end of the tax year | **1a** | 3 | | |
| | If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O | | | | |
| **b** | Enter the number of voting members included in line 1a, above, who are independent | **1b** | 0 | | |
| **2** | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? | | | **2** | Yes | |
| **3** | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? . | | | **3** | | No |
| **4** | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **4** | | No |
| **5** | Did the organization become aware during the year of a significant diversion of the organization's assets? . | | | **5** | | No |
| **6** | Did the organization have members or stockholders? . . . . . . . . . . . . . . . | | | **6** | | No |
| **7a** | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? . . . . . . . . . . . . . . . . . . | | | **7a** | | No |
| **b** | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? . . . . . . . . . . . . . . . . | | | **7b** | | No |
| **8** | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following | | | | | |
| **a** | The governing body? . . . . . . . . . . . . . . . . . . . . . . . | | | **8a** | Yes | |
| **b** | Each committee with authority to act on behalf of the governing body? . . . . . . . . . . | | | **8b** | Yes | |
| **9** | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O* . . . . . . | | | **9** | | No |

### Section B. Policies *(This Section B requests information about policies not required by the Internal Revenue Code.)*

| | | | Yes | No |
|---|---|---|---|---|
| **10a** | Did the organization have local chapters, branches, or affiliates? . . . . . . . . . . . . | **10a** | | No |
| **b** | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | **10b** | | |
| **11a** | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? . . . . . . . . . . . . . . . . . . . . . . . . . . | **11a** | Yes | |
| **b** | Describe in Schedule O the process, if any, used by the organization to review this Form 990 | | | |
| **12a** | Did the organization have a written conflict of interest policy? *If "No," go to line 13* . . . . . . . . | **12a** | Yes | |
| **b** | Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? . . . . . . . . . . . . . . . . . . . . . . . . | **12b** | Yes | |
| **c** | Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe in Schedule O how this was done* . . . . . . . . . . . . . . . . . . . . | **12c** | | No |
| **13** | Did the organization have a written whistleblower policy? . . . . . . . . . . . . . . | **13** | Yes | |
| **14** | Did the organization have a written document retention and destruction policy? . . . . . . . . | **14** | Yes | |
| **15** | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| **a** | The organization's CEO, Executive Director, or top management official . . . . . . . . . . | **15a** | | No |
| **b** | Other officers or key employees of the organization . . . . . . . . . . . . . . . | **15b** | | No |
| | If "Yes" to line 15a or 15b, describe the process in Schedule O (see instructions) | | | |
| **16a** | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . . . . . . . . . . . . . . . . . . . | **16a** | | No |
| **b** | If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? . . . . . . . . . . . . | **16b** | | |

### Section C. Disclosure

**17** List the States with which a copy of this Form 990 is required to be filed▶

NY

**18** Section 6104 requires an organization to make its Form 1023 (or 1024 if applicable), 990, and 990-T (501(c)(3)s only) available for public inspection Indicate how you made these available Check all that apply

☐ Own website    ☐ Another's website    ☑ Upon request    ☐ Other (explain in Schedule O)

**19** Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year

**20** State the name, address, and telephone number of the person who possesses the organization's books and records
▶THE ORGANIZATION 1 ARDEN ROAD HARRIMAN, NY 10926 (212) 967-1100

Case 2:20-v-02333-KJD-BNW Document 51 Filed 06/03/21 Page 494 of 521

**Part VII** **Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors**

Check if Schedule O contains a response or note to any line in this Part VII . . . . . . . . . . . . . . . . . . ☐

**Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed  Report compensation for the calendar year ending with or within the organization's tax year

● List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation  Enter -0- in columns (D), (E), and (F) if no compensation was paid

● List all of the organization's **current** key employees, if any  See instructions for definition of "key employee "

● List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations

● List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations

● List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations

List persons in the following order  individual trustees or directors, institutional trustees, officers, key employees, highest compensated employees, and former such persons

☑ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) VINCENT TIANQUAN MO ................... DIRECTOR | 1 00 | X | | X | | | | 0 | 0 | 0 |
| (2) JING CAO ................... DIRECTOR | 1 00 | X | | | | | | 0 | 0 | 0 |
| (3) KATHERINE MO ................... DIRECTOR | 1 00 | X | | | | | | 0 | 0 | 0 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Case 2:20-cv-02333-KJB-BNW Document 51 Filed 06/03/21 Page 495 of 521

**Part VII** Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)*

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **1b** | **Sub-Total** . . . . . . . . . . . . . . ▶ | | | | |
| **c** | **Total from continuation sheets to Part VII, Section A** . . . . ▶ | | | | |
| **d** | **Total (add lines 1b and 1c)** . . . . . . . . . . ▶ | | 0 | 0 | 0 |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶ 0

| | | Yes | No |
|---|---|---|---|
| **3** | Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . . . . . . **3** | | No |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4** | | No |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If "Yes," complete Schedule J for such person* . . . . . . . . . **5** | | No |

### Section B. Independent Contractors

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization Report compensation for the calendar year ending with or within the organization's tax year

| (A) Name and business address | (B) Description of services | (C) Compensation |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶ 0

| Part VIII | Statement of Revenue |
|---|---|

Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . . . . . . . . . . . □

| | | | | (A) Total revenue | (B) Related or exempt function revenue | (C) Unrelated business revenue | (D) Revenue excluded from tax under sections 512-514 |
|---|---|---|---|---|---|---|---|
| **Contributions, Gifts, Grants and Other Similar Amounts** | **1a** | Federated campaigns . . | **1a** | | | | |
| | **b** | Membership dues . . . . | **1b** | | | | |
| | **c** | Fundraising events . . . . | **1c** | | | | |
| | **d** | Related organizations . . . | **1d** | | | | |
| | **e** | Government grants (contributions) | **1e** | | | | |
| | **f** | All other contributions, gifts, grants, and similar amounts not included above | **1f** | 117,660 | | | |
| | **g** | Noncash contributions included in lines 1a-1f $ | | | | | |
| | **h** | **Total.** Add lines 1a-1f . . . . . . . ▶ | | 117,660 | | | |
| **Program Service Revenue** | | | Business Code | | | | |
| | **2a** | | | | | | |
| | **b** | | | | | | |
| | **c** | | | | | | |
| | **d** | | | | | | |
| | **e** | | | | | | |
| | **f** | All other program service revenue | | | | | |
| | **g** | **Total.** Add lines 2a–2f . . . . . . ▶ | | | | | |
| **Other Revenue** | **3** | Investment income (including dividends, interest, and other similar amounts) . . . . . . ▶ | | | | | |
| | **4** | Income from investment of tax-exempt bond proceeds . . ▶ | | | | | |
| | **5** | Royalties . . . . . . . . . . . . ▶ | | | | | |
| | | | (i) Real | (ii) Personal | | | |
| | **6a** | Gross rents | 48,448 | | | | |
| | **b** | Less rental expenses | 0 | | | | |
| | **c** | Rental income or (loss) | 48,448 | | | | |
| | **d** | Net rental income or (loss) . . . . . . ▶ | | 48,448 | | | 48,448 |
| | | | (i) Securities | (ii) Other | | | |
| | **7a** | Gross amount from sales of assets other than inventory | | | | | |
| | **b** | Less cost or other basis and sales expenses | | | | | |
| | **c** | Gain or (loss) | | | | | |
| | **d** | Net gain or (loss) . . . . . . . . . ▶ | | | | | |
| | **8a** | Gross income from fundraising events (not including $ of contributions reported on line 1c) See Part IV, line 18 . . **a** | | | | | |
| | **b** | Less direct expenses . . . **b** | | | | | |
| | **c** | Net income or (loss) from fundraising events . . ▶ | | | | | |
| | **9a** | Gross income from gaming activities See Part IV, line 19 . . **a** | | | | | |
| | **b** | Less direct expenses . . . **b** | | | | | |
| | **c** | Net income or (loss) from gaming activities . . . ▶ | | | | | |
| | **10a** | Gross sales of inventory, less returns and allowances . **a** | | | | | |
| | **b** | Less cost of goods sold . . **b** | | | | | |
| | **c** | Net income or (loss) from sales of inventory . . ▶ | | | | | |
| | | Miscellaneous Revenue | Business Code | | | | |
| | **11a** | | | | | | |
| | **b** | | | | | | |
| | **c** | | | | | | |
| | **d** | All other revenue . . . . . | | | | | |
| | **e** | **Total.** Add lines 11a–11d . . . . . ▶ | | | | | |
| | **12** | **Total revenue.** See Instructions . . . . . ▶ | | 166,108 | 0 | 0 | 48,448 |

Case 2:20-cv-02333-KJD-BNW   Document 51   Filed 06/03/21   Page 497 of 521

**Part IX**   **Statement of Functional Expenses**

Section 501(c)(3) and 501(c)(4) organizations must complete all columns  All other organizations must complete column (A)

Check if Schedule O contains a response or note to any line in this Part IX   . . . . . . . . . . . ☑

| Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII. | | (A) Total expenses | (B) Program service expenses | (C) Management and general expenses | (D) Fundraising expenses |
|---|---|---|---|---|---|
| **1** | Grants and other assistance to domestic organizations and domestic governments  See Part IV, line 21 . . . . . | | | | |
| **2** | Grants and other assistance to domestic individuals  See Part IV, line 22 . . . . | | | | |
| **3** | Grants and other assistance to foreign organizations, foreign governments, and foreign individuals  See Part IV, lines 15 and 16 . . . . . . . . . . . . | | | | |
| **4** | Benefits paid to or for members . . . . | | | | |
| **5** | Compensation of current officers, directors, trustees, and key employees . . . . | | | | |
| **6** | Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) . . . . | | | | |
| **7** | Other salaries and wages . . . . . | | | | |
| **8** | Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) . . . . | | | | |
| **9** | Other employee benefits . . . . . . . | | | | |
| **10** | Payroll taxes . . . . . . . . . . | | | | |
| **11** | Fees for services (non-employees) | | | | |
| **a** | Management . . . . . . . . | | | | |
| **b** | Legal . . . . . . . . . . . | | | | |
| **c** | Accounting . . . . . . . . . . | | | | |
| **d** | Lobbying . . . . . . . . . . | | | | |
| **e** | Professional fundraising services  See Part IV, line 17 | | | | |
| **f** | Investment management fees . . . . . . | | | | |
| **g** | Other (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O) . . . . | 132,932 | 132,932 | | |
| **12** | Advertising and promotion . . . . . | | | | |
| **13** | Office expenses . . . . . . . . | 464 | | 464 | |
| **14** | Information technology . . . . . . | | | | |
| **15** | Royalties . . | | | | |
| **16** | Occupancy . . . . . . . . . | 619,296 | 619,296 | | |
| **17** | Travel . . . . . . . . . . | | | | |
| **18** | Payments of travel or entertainment expenses for any federal, state, or local public officials . . . . . . . | | | | |
| **19** | Conferences, conventions, and meetings . . . . | | | | |
| **20** | Interest . . . . . . . . . . . | | | | |
| **21** | Payments to affiliates . . . . . . | | | | |
| **22** | Depreciation, depletion, and amortization . . . . . | 25,362 | 25,362 | | |
| **23** | Insurance . . . . . . . . . . . . . | 52,782 | 52,782 | | |
| **24** | Other expenses  Itemize expenses not covered above (List miscellaneous expenses in line 24e  If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O ) | | | | |
| **a** | REPAIRS AND MAINTENANCE | 286,579 | 286,579 | | |
| **b** | | | | | |
| **c** | | | | | |
| **d** | | | | | |
| **e** | All other expenses | | | | |
| **25** | **Total functional expenses.** Add lines 1 through 24e | 1,117,415 | 1,116,951 | 464 | 0 |
| **26** | **Joint costs.**Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation  Check here ▶ ☐ if following SOP 98-2 (ASC 958-720) | | | | |

| **Part X** | **Balance Sheet** |

Case 2:20-cv-02333-KJD-BNW   Document 51   Filed 06/03/21   Page 498 of 521

Check if Schedule O contains a response or note to any line in this Part X . . . . . . . . . . . . . . ▢

|   |   |   | **(A)** Beginning of year |   | **(B)** End of year |
|---|---|---|---:|---|---:|
| **Assets** | **1** | Cash–non-interest-bearing . . . . . . . . . . | 47,608 | **1** | 83,368 |
| | **2** | Savings and temporary cash investments . . . . . . . | | **2** | |
| | **3** | Pledges and grants receivable, net . . . . . . . . | | **3** | |
| | **4** | Accounts receivable, net . . . . . . . . . . . . | | **4** | |
| | **5** | Loans and other receivables from current and former officers, directors, trustees, key employees, and highest compensated employees  Complete Part II of Schedule L . . . . . . . . . . . . . . | | **5** | |
| | **6** | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), persons described in section 4958(c)(3)(B), and contributing employers and sponsoring organizations of section 501(c)(9) voluntary employees' beneficiary organizations (see instructions) Complete Part II of Schedule L | | **6** | |
| | **7** | Notes and loans receivable, net . . . . . . . . . . | | **7** | 1,000 |
| | **8** | Inventories for sale or use . . . . . . . . . . | | **8** | |
| | **9** | Prepaid expenses and deferred charges . . . . . . . | | **9** | |
| | **10a** | Land, buildings, and equipment  cost or other basis Complete Part VI of Schedule D  **10a** 6,727,842 | | | |
| | **b** | Less  accumulated depreciation . . . . .  **10b** 340,297 | 6,412,907 | **10c** | 6,387,545 |
| | **11** | Investments—publicly traded securities . . . . . . . | | **11** | |
| | **12** | Investments—other securities  See Part IV, line 11 . . . . . | | **12** | |
| | **13** | Investments—program-related  See Part IV, line 11 . . . . | | **13** | 16,648,751 |
| | **14** | Intangible assets . . . . . . . . . . . . . . | | **14** | |
| | **15** | Other assets  See Part IV, line 11 . . . . . . . . . | | **15** | |
| | **16** | **Total assets.** Add lines 1 through 15 (must equal line 34) . . . . . . . | 6,460,515 | **16** | 23,120,664 |
| **Liabilities** | **17** | Accounts payable and accrued expenses . . . . . . . . | | **17** | 42,705 |
| | **18** | Grants payable . . . . . . . . . . . . . . | | **18** | |
| | **19** | Deferred revenue . . . . . . . . . . . . . . | | **19** | 220,000 |
| | **20** | Tax-exempt bond liabilities . . . . . . . . . . . | | **20** | |
| | **21** | Escrow or custodial account liability  Complete Part IV of Schedule D . . | | **21** | |
| | **22** | Loans and other payables to current and former officers, directors, trustees, key employees, highest compensated employees, and disqualified persons  Complete Part II of Schedule L . . . . . . . . . . | | **22** | |
| | **23** | Secured mortgages and notes payable to unrelated third parties . . . | | **23** | |
| | **24** | Unsecured notes and loans payable to unrelated third parties . . . . | | **24** | |
| | **25** | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17-24) Complete Part X of Schedule D . . . . . . . . . . . . . . | 7,737,777 | **25** | 25,086,528 |
| | **26** | **Total liabilities.** Add lines 17 through 25 . . . . . . . . . . . . | 7,737,777 | **26** | 25,349,233 |
| **Net Assets or Fund Balances** | | **Organizations that follow SFAS 117 (ASC 958), check here** ▶ ☑ **and complete lines 27 through 29, and lines 33 and 34.** | | | |
| | **27** | Unrestricted net assets . . . . . . . . . . . . | -1,277,262 | **27** | -2,228,569 |
| | **28** | Temporarily restricted net assets . . . . . . . . . . | | **28** | |
| | **29** | Permanently restricted net assets . . . . . . . . . | | **29** | |
| | | **Organizations that do not follow SFAS 117 (ASC 958), check here** ▶ ▢ **and complete lines 30 through 34.** | | | |
| | **30** | Capital stock or trust principal, or current funds . . . . . . . | | **30** | |
| | **31** | Paid-in or capital surplus, or land, building or equipment fund . . . . . | | **31** | |
| | **32** | Retained earnings, endowment, accumulated income, or other funds | | **32** | |
| | **33** | Total net assets or fund balances . . . . . . . . . . | -1,277,262 | **33** | -2,228,569 |
| | **34** | Total liabilities and net assets/fund balances . . . . . . . . . | 6,460,515 | **34** | 23,120,664 |

Form **990** (2015)

Case 3:20-cv-02333-KJD-BNW   Document 51   Filed 06/03/21   Page 499 of 521

**Part XI** Reconciliation of Net Assets

Check if Schedule O contains a response or note to any line in this Part XI . . . . . . . . . . . ☐

| | | | |
|---|---|---|---|
| 1 | Total revenue (must equal Part VIII, column (A), line 12) . . . . . . . . . . . | **1** | 166,108 |
| 2 | Total expenses (must equal Part IX, column (A), line 25) . . . . . . . . . | **2** | 1,117,415 |
| 3 | Revenue less expenses Subtract line 2 from line 1 . . . . . . . . . . | **3** | -951,307 |
| 4 | Net assets or fund balances at beginning of year (must equal Part X, line 33, column (A)) . . | **4** | -1,277,262 |
| 5 | Net unrealized gains (losses) on investments . . . . . . . . . . . | **5** | |
| 6 | Donated services and use of facilities . . . . . . . . . . . | **6** | |
| 7 | Investment expenses . . . . . . . . . . . . . . . | **7** | |
| 8 | Prior period adjustments . . . . . . . . . . . | **8** | |
| 9 | Other changes in net assets or fund balances (explain in Schedule O) . . . . . . . . | **9** | 0 |
| 10 | Net assets or fund balances at end of year Combine lines 3 through 9 (must equal Part X, line 33, column (B)) | **10** | -2,228,569 |

**Part XII** **Financial Statements and Reporting**

Check if Schedule O contains a response or note to any line in this Part XII . . . . . . . . . . . ☐

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Accounting method used to prepare the Form 990 ☐ Cash ☑ Accrual ☐ Other _____ <br> If the organization changed its method of accounting from a prior year or checked "Other," explain in Schedule O | | | |
| 2a | Were the organization's financial statements compiled or reviewed by an independent accountant? | **2a** | | No |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both <br> ☐ Separate basis ☐ Consolidated basis ☐ Both consolidated and separate basis | | | |
| **b** | Were the organization's financial statements audited by an independent accountant? | **2b** | | No |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both <br> ☐ Separate basis ☐ Consolidated basis ☐ Both consolidated and separate basis | | | |
| **c** | If "Yes," to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? | **2c** | | |
| | If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O | | | |
| **3a** | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? | **3a** | | No |
| **b** | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits | **3b** | | |

OMB No 1545-0047

**SCHEDULE A**
**(Form 990 or 990EZ)**

# Public Charity Status and Public Support

Complete if the organization is a section 501(c)(3) organization or a section
4947(a)(1) nonexempt charitable trust.
▶ **Attach to Form 990 or Form 990-EZ.**
▶ **Information about Schedule A (Form 990 or 990-EZ) and its instructions is at**
***www.irs.gov/form990.***

# 2015

**Open to Public
Inspection**

Department of the
Treasury
Internal Revenue Service

| Name of the organization<br>RESEARCH CENTER ON NATURAL CONSERVATION INC | Employer identification number<br>45-3641847 |
|---|---|

**Part I** **Reason for Public Charity Status** (All organizations must complete this part.) See instructions.

The organization is not a private foundation because it is (For lines 1 through 11, check only one box )

1 ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

2 ☐ A school described in **section 170(b)(1)(A)(ii).**(Attach Schedule E (Form 990 or 990-EZ))

3 ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

4 ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the
hospital's name, city, and state _____

5 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170(b)(1)(A)(iv).** (Complete Part II )

6 ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

7 ☑ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II )

8 ☐ A community trust described in **section 170(b)(1)(A)(vi)** (Complete Part II )

9 ☐ An organization that normally receives (1) more than 331/3% of its support from contributions, membership fees, and gross
receipts from activities related to its exempt functions—subject to certain exceptions, and (2) no more than 331/3% of its support
from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the
organization after June 30, 1975 See**section 509(a)(2).** (Complete Part III )

10 ☐ An organization organized and operated exclusively to test for public safety See **section 509(a)(4).**

11 ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of
one or more publicly supported organizations described in section 509(a)(1) or section 509(a)(2) See **section 509(a)(3).** Check
the box in lines 11a through 11d that describes the type of supporting organization and complete lines 11e, 11f, and 11g

a ☐ **Type I.** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the
supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting
organization **You must complete Part IV, Sections A and B.**

b ☐ **Type II.** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or
management of the supporting organization vested in the same persons that control or manage the supported organization(s) **You
must complete Part IV, Sections A and C.**

c ☐ **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its
supported organization(s) (see instructions) **You must complete Part IV, Sections A, D, and E.**

d ☐ **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is
not functionally integrated The organization generally must satisfy a distribution requirement and an attentiveness requirement
(see instructions) **You must complete Part IV, Sections A and D, and Part V.**

e ☐ Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally
integrated, or Type III non-functionally integrated supporting organization

f Enter the number of supported organizations . . . . . . . . . . . . . . . . . . . . . . . . _____

g Provide the following information about the supported organization(s)

| (i)<br>Name of supported organization | (ii)EIN | (iii)<br>Type of<br>organization<br>(described on lines<br>1- 9 above (see<br>instructions)) | (iv)<br>Is the organization<br>listed in your governing<br>document? | | (v)<br>Amount of<br>monetary support<br>(see instructions) | (vi)<br>Amount of other<br>support (see<br>instructions) |
|---|---|---|---|---|---|---|
| | | | **Yes** | **No** | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **Total** | | | | | | |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990EZ.** Cat No 11285F **Schedule A (Form 990 or 990-EZ) 2015**

Case 2:20-cv-02323-K JD-BNW Document 51 Filed 06/03/21 Page 501 of 521

| **Part II** | Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi) |
|---|---|

(Complete only if you checked the box on line 5, 7, or 8 of Part I or if the organization failed to qualify under Part III. If the organization fails to qualify under the tests listed below, please complete Part III.)

### Section A. Public Support

| Calendar year<br>(or fiscal year beginning in) ▶ | **(a)**2011 | **(b)**2012 | **(c)**2013 | **(d)**2014 | **(e)**2015 | **(f)**Total |
|---|---|---|---|---|---|---|
| **1** Gifts, grants, contributions, and membership fees received (Do not include any unusual grants ) | | | | 74,459 | 117,660 | 192,119 |
| **2** Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| **3** The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| **4** **Total.** Add lines 1 through 3 | | | | 74,459 | 117,660 | 192,119 |
| **5** The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f) | | | | | | |
| **6** **Public support.** Subtract line 5 from line 4 | | | | | | 192,119 |

### Section B. Total Support

| Calendar year<br>(or fiscal year beginning in) ▶ | **(a)**2011 | **(b)**2012 | **(c)**2013 | **(d)**2014 | **(e)**2015 | **(f)**Total |
|---|---|---|---|---|---|---|
| **7** Amounts from line 4 | | | | 74,459 | 117,660 | 192,119 |
| **8** Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources | 2,969 | 49,100 | 55,558 | 47,616 | 48,448 | 203,691 |
| **9** Net income from unrelated business activities, whether or not the business is regularly carried on | | | | | | |
| **10** Other income Do not include gain or loss from the sale of capital assets (Explain in Part VI ) | | | | | | |
| **11** **Total support.** Add lines 7 through 10 | | | | | | 395,810 |
| **12** Gross receipts from related activities, etc (see instructions) | | | | | **12** | 1,483,000 |

**13** **First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☑

### Section C. Computation of Public Support Percentage

| | | | |
|---|---|---|---|
| **14** Public support percentage for 2015 (line 6, column (f) divided by line 11, column (f)) | | **14** | |
| **15** Public support percentage for 2014 Schedule A, Part II, line 14 | | **15** | |

**16a** **33 1/3% support test—2015.** If the organization did not check the box on line 13, and line 14 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . ▶ ☐

**b** **33 1/3% support test—2014.** If the organization did not check a box on line 13 or 16a, and line 15 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . ▶ ☐

**17a** **10%-facts-and-circumstances test—2015.** If the organization did not check a box on line 13, 16a, or 16b, and line 14 is 10% or more, and if the organization meets the facts-and-circumstances test, check this box and **stop here.** Explain in Part VI how the organization meets the "facts-and-circumstances" test The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**b** **10%-facts-and-circumstances test—2014.** If the organization did not check a box on line 13, 16a, 16b, or 17a, and line 15 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part VI how the organization meets the "facts-and-circumstances" test The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**18** **Private foundation.** If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

Case 3:20-cv-06333-KJD-BNW Document 51 Filed 06/03/21 Page 502 of 521

**Part III**   **Support Schedule for Organizations Described in Section 509(a)(2)**
(Complete only if you checked the box on line 9 of Part I or if the organization failed to qualify under Part II. If the organization fails to qualify under the tests listed below, please complete Part II.)

## Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | (a)2011 | (b)2012 | (c)2013 | (d)2014 | (e)2015 | (f)Total |
|---|---|---|---|---|---|---|
| **1** Gifts, grants, contributions, and membership fees received (Do not include any "unusual grants") | | | | | | |
| **2** Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose | | | | | | |
| **3** Gross receipts from activities that are not an unrelated trade or business under section 513 | | | | | | |
| **4** Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| **5** The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| **6** **Total.** Add lines 1 through 5 | | | | | | |
| **7a** Amounts included on lines 1, 2, and 3 received from disqualified persons | | | | | | |
| **b** Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of $5,000 or 1% of the amount on line 13 for the year | | | | | | |
| **c** Add lines 7a and 7b | | | | | | |
| **8** **Public support.** (Subtract line 7c from line 6) | | | | | | |

## Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | (a)2011 | (b)2012 | (c)2013 | (d)2014 | (e)2015 | (f)Total |
|---|---|---|---|---|---|---|
| **9** Amounts from line 6 | | | | | | |
| **10a** Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources | | | | | | |
| **b** Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975 | | | | | | |
| **c** Add lines 10a and 10b | | | | | | |
| **11** Net income from unrelated business activities not included in line 10b, whether or not the business is regularly carried on | | | | | | |
| **12** Other income Do not include gain or loss from the sale of capital assets (Explain in Part VI) | | | | | | |
| **13** **Total support.** (Add lines 9, 10c, 11, and 12) | | | | | | |

**14** **First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here**                                                    ▶ ☐

## Section C. Computation of Public Support Percentage

| | | |
|---|---|---|
| **15** Public support percentage for 2015 (line 8, column (f) divided by line 13, column (f)) | **15** | |
| **16** Public support percentage from 2014 Schedule A, Part III, line 15 | **16** | |

## Section D. Computation of Investment Income Percentage

| | | |
|---|---|---|
| **17** Investment income percentage for **2015** (line 10c, column (f) divided by line 13, column (f)) | **17** | |
| **18** Investment income percentage from **2014** Schedule A, Part III, line 17 | **18** | |

**19a** **33 1/3% support tests—2015.** If the organization did not check the box on line 14, and line 15 is more than 33 1/3%, and line 17 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization        ▶ ☐

**b** **33 1/3% support tests—2014.** If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33 1/3% and line 18 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization        ▶ ☐

**20** **Private foundation.** If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions        ▶ ☐

Case 2:20-cv-02333-KJD-BNW    Document 51    Filed 06/03/21    Page 503 of 521

**Part IV**    **Supporting Organizations**

(Complete only if you checked a box on line 11 of Part I  If you checked 11a of Part I, complete Sections A and B  If you checked 11b of Part I, complete Sections A and C  If you checked 11c of Part I, complete Sections A, D, and E  If you checked 11d of Part I, complete Sections A and D, and complete Part V )

**Section A. All Supporting Organizations**

| | | Yes | No |
|---|---|---|---|
| **1** | Are all of the organization's supported organizations listed by name in the organization's governing documents? *If "No," describe in **Part VI** how the supported organizations are designated  If designated by class or purpose, describe the designation  If historic and continuing relationship, explain*    **1** | | |
| **2** | Did the organization have any supported organization that does not have an IRS determination of status under section 509(a)(1) or (2)? *If "Yes," explain in **Part VI** how the organization determined that the supported organization was described in section 509(a)(1) or (2)*    **2** | | |
| **3a** | Did the organization have a supported organization described in section 501(c)(4), (5), or (6)? *If "Yes," answer (b) and (c) below*    **3a** | | |
| **b** | Did the organization confirm that each supported organization qualified under section 501(c)(4), (5), or (6) and satisfied the public support tests under section 509(a)(2)? *If "Yes," describe in **Part VI** when and how the organization made the determination*    **3b** | | |
| **c** | Did the organization ensure that all support to such organizations was used exclusively for section 170(c)(2)(B) purposes? *If "Yes," explain in **Part VI** what controls the organization put in place to ensure such use*    **3c** | | |
| **4a** | Was any supported organization not organized in the United States ("foreign supported organization")? *If "Yes" and if you checked 11a or 11b in Part I, answer (b) and (c) below*    **4a** | | |
| **b** | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? *If "Yes," describe in Part VI how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations*    **4b** | | |
| **c** | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? *If "Yes," explain in Part VI what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes*    **4c** | | |
| **5a** | Did the organization add, substitute, or remove any supported organizations during the tax year? *If "Yes," answer (b) and (c) below (if applicable)  Also, provide detail in Part VI, including (i) the names and EIN numbers of the supported organizations added, substituted, or removed, (ii) the reasons for each such action, (iii) the authority under the organization's organizing document authorizing such action, and (iv) how the action was accomplished (such as by amendment to the organizing document)*    **5a** | | |
| **b** | **Type I or Type II only.** Was any added or substituted supported organization part of a class already designated in the organization's organizing document?    **5b** | | |
| **c** | **Substitutions only.** Was the substitution the result of an event beyond the organization's control?    **5c** | | |
| **6** | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (a) its supported organizations, (b) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (c) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? *If "Yes," provide detail in **Part VI**.*    **6** | | |
| **7** | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (defined in IRC 4958(c)(3)(C)), a family member of a substantial contributor, or a 35-percent controlled entity with regard to a substantial contributor? *If "Yes," complete Part I of Schedule L (Form 990)*    **7** | | |
| **8** | Did the organization make a loan to a disqualified person (as defined in section 4958) not described in line 7? *If "Yes," complete Part II of Schedule L (Form 990)*    **8** | | |
| **9a** | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons as defined in section 4946 (other than foundation managers and organizations described in section 509(a)(1) or (2))? *If "Yes," provide detail in **Part VI**.*    **9a** | | |
| **b** | Did one or more disqualified persons (as defined in line 9(a)) hold a controlling interest in any entity in which the supporting organization had an interest? *If "Yes," provide detail in **Part VI**.*    **9b** | | |
| **c** | Did a disqualified person (as defined in line 9(a)) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? *If "Yes," provide detail in **Part VI**.*    **9c** | | |
| **10a** | Was the organization subject to the excess business holdings rules of IRC 4943 because of IRC 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? *If "Yes," answer b below*    **10a** | | |
| **b** | Did the organization have any excess business holdings in the tax year? *(Use Schedule C, Form 4720, to determine whether the organization had excess business holdings)*    **10b** | | |
| **11** | Has the organization accepted a gift or contribution from any of the following persons? | | |
| **a** | A person who directly or indirectly controls, either alone or together with persons described in (b) and (c) below, the governing body of a supported organization?    **11a** | | |
| **b** | A family member of a person described in (a) above?    **11b** | | |
| **c** | A 35% controlled entity of a person described in (a) or (b) above? *If "Yes" to a, b, or c, provide detail in Part VI*    **11c** | | |

**Part IV** Case 2:20-cv-02333-KJD-BNW   Document 51   Filed 06/03/21   Page 504 of 521 Supporting Organizations (continued)

### Section B. Type I Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| **1** | Did the directors, trustees, or membership of one or more supported organizations have the power to regularly appoint or elect at least a majority of the organization's directors or trustees at all times during the tax year? *If "No," describe in Part VI how the supported organization(s) effectively operated, supervised, or controlled the organization's activities If the organization had more than one supported organization, describe how the powers to appoint and/or remove directors or trustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to such powers during the tax year* | **1** | | |
| **2** | Did the organization operate for the benefit of any supported organization other than the supported organization(s) that operated, supervised, or controlled the supporting organization? *If "Yes," explain in Part VI how providing such benefit carried out the purposes of the supported organization(s) that operated, supervised or controlled the supporting organization* | **2** | | |

### Section C. Type II Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| **1** | Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees of each of the organization's supported organization(s)? *If "No," describe in Part VI how control or management of the supporting organization was vested in the same persons that controlled or managed the supported organization(s)* | **1** | | |

### Section D. All Type III Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| **1** | Did the organization provide to each of its supported organizations, by the last day of the fifth month of the organization's tax year, (1) a written notice describing the type and amount of support provided during the prior tax year, (2) a copy of the Form 990 that was most recently filed as of the date of notification, and (3) copies of the organization's governing documents in effect on the date of notification, to the extent not previously provided? | **1** | | |
| **2** | Were any of the organization's officers, directors, or trustees either (i) appointed or elected by the supported organization(s) or (ii) serving on the governing body of a supported organization? *If "No," explain in Part VI how the organization maintained a close and continuous working relationship with the supported organization(s)* | **2** | | |
| **3** | By reason of the relationship described in (2), did the organization's supported organizations have a significant voice in the organization's investment policies and in directing the use of the organization's income or assets at all times during the tax year? *If "Yes," describe in Part VI the role the organization's supported organizations played in this regard* | **3** | | |

### Section E. Type III Functionally-Integrated Supporting Organizations

**1** Check the box next to the method that the organization used to satisfy the Integral Part Test during the year **(see instructions)**

  **a** ☐ The organization satisfied the Activities Test Complete **line 2** below

  **b** ☐ The organization is the parent of each of its supported organizations Complete **line 3** below

  **c** ☐ The organization supported a governmental entity Describe in Part VI how you supported a government entity (see instructions)

| | | | Yes | No |
|---|---|---|---|---|
| **2** | Activities Test **Answer (a) and (b) below.** | | | |
| **a** | Did substantially all of the organization's activities during the tax year directly further the exempt purposes of the supported organization(s) to which the organization was responsive? *If "Yes," then in Part VI identify those supported organizations and explain how these activities directly furthered their exempt purposes, how the organization was responsive to those supported organizations, and how the organization determined that these activities constituted substantially all of its activities* | **2a** | | |
| **b** | Did the activities described in (a) constitute activities that, but for the organization's involvement, one or more of the organization's supported organization(s) would have been engaged in? *If "Yes," explain in Part VI the reasons for the organization's position that its supported organization(s) would have engaged in these activities but for the organization's involvement* | **2b** | | |
| **3** | Parent of Supported Organizations **Answer (a) and (b) below.** | | | |
| **a** | Did the organization have the power to regularly appoint or elect a majority of the officers, directors, or trustees of each of the supported organizations? *Provide details in Part VI* | **3a** | | |
| **b** | Did the organization exercise a substantial degree of direction over the policies, programs and activities of each of its supported organizations? *If "Yes," describe in Part VI the role played by the organization in this regard* | **3b** | | |

**Part V** Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations

Case 2:20-cv-02333-KJD-BNW   Document 51   Filed 06/03/21   Page 505 of 521

**1** Check here if the organization satisfied the Integral Part Test as a qualifying trust on Nov 20, 1970 **See instructions.** All other
Type III non-functionally integrated supporting organizations must complete Sections A through E ☐

| Section A – Adjusted Net Income | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| **1** Net short-term capital gain | **1** | | |
| **2** Recoveries of prior-year distributions | **2** | | |
| **3** Other gross income (see instructions) | **3** | | |
| **4** Add lines 1 through 3 | **4** | | |
| **5** Depreciation and depletion | **5** | | |
| **6** Portion of operating expenses paid or incurred for production or collection of gross income or for management, conservation, or maintenance of property held for production of income (see instructions) | **6** | | |
| **7** Other expenses (see instructions) | **7** | | |
| **8** **Adjusted Net Income** (subtract lines 5, 6 and 7 from line 4) | **8** | | |

| Section B – Minimum Asset Amount | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| **1** Aggregate fair market value of all non-exempt-use assets (see instructions for short tax year or assets held for part of year) | **1** | | |
| **a** Average monthly value of securities | **1a** | | |
| **b** Average monthly cash balances | **1b** | | |
| **c** Fair market value of other non-exempt-use assets | **1c** | | |
| **d** **Total** (add lines 1a, 1b, and 1c) | **1d** | | |
| **e** **Discount** claimed for blockage or other factors (explain in detail in Part VI) _____ | | | |
| **2** Acquisition indebtedness applicable to non-exempt use assets | **2** | | |
| **3** Subtract line 2 from line 1d | **3** | | |
| **4** Cash deemed held for exempt use Enter 1-1/2% of line 3 (for greater amount, see instructions) | **4** | | |
| **5** Net value of non-exempt-use assets (subtract line 4 from line 3) | **5** | | |
| **6** Multiply line 5 by 035 | **6** | | |
| **7** Recoveries of prior-year distributions | **7** | | |
| **8** **Minimum Asset Amount** (add line 7 to line 6) | **8** | | |

| Section C – Distributable Amount | | Current Year |
|---|---|---|
| **1** Adjusted net income for prior year (from Section A, line 8, Column A) | **1** | |
| **2** Enter 85% of line 1 | **2** | |
| **3** Minimum asset amount for prior year (from Section B, line 8, Column A) | **3** | |
| **4** Enter greater of line 2 or line 3 | **4** | |
| **5** Income tax imposed in prior year | **5** | |
| **6** **Distributable Amount.** Subtract line 5 from line 4, unless subject to emergency temporary reduction (see instructions) | **6** | |
| **7** Check here if the current year is the organization's first as a non-functionally-integrated Type III supporting organization (see instructions) ☐ | | |

Case 2:20-cv-02333-KJD-BNW　Document 51　Filed 06/03/21　Page 506 of 521

| **Part V** | Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations *(continued)* | |

| **Section D – Distributions** | **Current Year** |
|---|---|
| **1** Amounts paid to supported organizations to accomplish exempt purposes | |
| **2** Amounts paid to perform activity that directly furthers exempt purposes of supported organizations, in excess of income from activity | |
| **3** Administrative expenses paid to accomplish exempt purposes of supported organizations | |
| **4** Amounts paid to acquire exempt-use assets | |
| **5** Qualified set-aside amounts (prior IRS approval required) | |
| **6** Other distributions (describe in Part VI) See instructions | |
| **7** **Total annual distributions.** Add lines 1 through 6 | |
| **8** Distributions to attentive supported organizations to which the organization is responsive (provide details in Part VI) See instructions | |
| **9** Distributable amount for 2015 from Section C, line 6 | |
| **10** Line 8 amount divided by Line 9 amount | |

| **Section E – Distribution Allocations (see instructions)** | **(i)** **Excess Distributions** | **(ii)** **Underdistributions Pre-2015** | **(iii)** **Distributable Amount for 2015** |
|---|---|---|---|
| **1** Distributable amount for 2015 from Section C, line 6 | | | |
| **2** Underdistributions, if any, for years prior to 2015 (reasonable cause required--see instructions) | | | |
| **3** Excess distributions carryover, if any, to 2015 | | | |
| **a** | | | |
| **b** | | | |
| **c** | | | |
| **d** From 2013. . . . . . . _____ | | | |
| **e** From 2014. . . . . . . _____ | | | |
| **f** **Total** of lines 3a through e | | | |
| **g** Applied to underdistributions of prior years | | | |
| **h** Applied to 2015 distributable amount | | | |
| **i** Carryover from 2010 not applied (see instructions) | | | |
| **j** Remainder Subtract lines 3g, 3h, and 3i from 3f | | | |
| **4** Distributions for 2015 from Section D, line 7 $ _____ | | | |
| **a** Applied to underdistributions of prior years | | | |
| **b** Applied to 2015 distributable amount | | | |
| **c** Remainder Subtract lines 4a and 4b from 4 | | | |
| **5** Remaining underdistributions for years prior to 2015, if any Subtract lines 3g and 4a from line 2 (if amount greater than zero, see instructions) | | | |
| **6** Remaining underdistributions for 2015 Subtract lines 3h and 4b from line 1 (if amount greater than zero, see instructions) | | | |
| **7** **Excess distributions carryover to 2016.** Add lines 3j and 4c | | | |
| **8** Breakdown of line 7 | | | |
| **a** | | | |
| **b** | | | |
| **c** Excess from 2013. . . . . . . . | | | |
| **d** From 2014. . . . . . . . _____ | | | |
| **e** From 2015. . . . . . . . _____ | | | |

Case 2:20-cv-02333-KJD-BNW    Document 51    Filed 06/03/21    Page 507 of 521

**Part VI**    **Supplemental Information.** Provide the explanations required by Part II, line 10; Part II, line 17a or 17b; Part III, line 12; Part IV, Section A, lines 1, 2, 3b, 3c, 4b, 4c, 5a, 6, 9a, 9b, 9c, 11a, 11b, and 11c; Part IV, Section B, lines 1 and 2; Part IV, Section C, line 1; Part IV, Section D, lines 2 and 3; Part IV, Section E, lines 1c, 2a, 2b, 3a and 3b; Part V, line 1; Part V, Section B, line 1e; Part V Section D, lines 5, 6, and 8; and Part V, Section E, lines 2, 5, and 6. Also complete this part for any additional information. (See instructions).

| Facts And Circumstances Test |
|---|
| |

| Return Reference | Explanation |
|---|---|

**SCHEDULE D**
(Form 990)

Department of the Treasury
Internal Revenue Service

## Supplemental Financial Statements

▶ Complete if the organization answered "Yes," on Form 990,
Part IV, line 6, 7, 8, 9, 10, 11a, 11b, 11c, 11d, 11e, 11f, 12a, or 12b.
▶ Attach to Form 990.
Information about Schedule D (Form 990) and its instructions is at *www.irs.gov/form990*.

OMB No 1545-0047

# 2015

**Open to Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| RESEARCH CENTER ON NATURAL CONSERVATION INC | 45-3641847 |

## Part I — Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts.
Complete if the organization answered "Yes" on Form 990, Part IV, line 6.

|   |   | (a) Donor advised funds | (b) Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year | | |
| 2 | Aggregate value of contributions to (during year) | | |
| 3 | Aggregate value of grants from (during year) | | |
| 4 | Aggregate value at end of year | | |

5  Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds are the organization's property, subject to the organization's exclusive legal control?   ☐ Yes   ☐ No

6  Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only for charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring impermissible private benefit?   ☐ Yes   ☐ No

## Part II — Conservation Easements. Complete if the organization answered "Yes" on Form 990, Part IV, line 7.

1  Purpose(s) of conservation easements held by the organization (check all that apply)

☑ Preservation of land for public use (e g , recreation or education)

☑ Protection of natural habitat

☑ Preservation of open space

☑ Preservation of an historically important land area

☑ Preservation of a certified historic structure

2  Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last day of the tax year

|   |   |   | Held at the End of the Year |
|---|---|---|---|
| a | Total number of conservation easements | 2a | 1 |
| b | Total acreage restricted by conservation easements | 2b | 450 00 |
| c | Number of conservation easements on a certified historic structure included in (a) | 2c | |
| d | Number of conservation easements included in (c) acquired after 8/17/06, and not on a historic structure listed in the National Register | 2d | |

3  Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the tax year ▶

4  Number of states where property subject to conservation easement is located ▶ _____1_____

5  Does the organization have a written policy regarding the periodic monitoring, inspection, handling of violations, and enforcement of the conservation easements it holds?   ☑ Yes   ☐ No

6  Staff and volunteer hours devoted to monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
▶ _____

7  Amount of expenses incurred in monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
▶ $ _____

8  Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i) and section 170(h)(4)(B)(ii)?   ☑ Yes   ☐ No

9  In Part XIII, describe how the organization reports conservation easements in its revenue and expense statement, and balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes the organization's accounting for conservation easements

## Part III — Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.
Complete if the organization answered "Yes" on Form 990, Part IV, line 8.

1a  If the organization elected, as permitted under SFAS 116 (ASC 958), not to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide, in Part XIII, the text of the footnote to its financial statements that describes these items

b  If the organization elected, as permitted under SFAS 116 (ASC 958), to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the following amounts relating to these items

(i)  Revenue included on Form 990, Part VIII, line 1   ▶ $ _____

(ii) Assets included in Form 990, Part X   ▶ $ _____

2  If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide the following amounts required to be reported under SFAS 116 (ASC 958) relating to these items

a  Revenue included on Form 990, Part VIII, line 1   ▶ $ _____

b  Assets included in Form 990, Part X   ▶ $ _____

| **Part III** | **Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets** *(continued)* |

**3** Using the organization's acquisition, accession, and other records, check any of the following that are a significant use of its collection items (check all that apply)

**a** ☐ Public exhibition

**b** ☐ Scholarly research

**c** ☐ Preservation for future generations

**d** ☐ Loan or exchange programs

**e** ☐ Other

**4** Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIII

**5** During the year, did the organization solicit or receive donations of art, historical treasures or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection?  ☐ **Yes**  ☐ **No**

| **Part IV** | **Escrow and Custodial Arrangements.** Complete if the organization answered "Yes" on Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21. |

**1a** Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included on Form 990, Part X?  ☐ **Yes**  ☐ **No**

**b** If "Yes," explain the arrangement in Part XIII and complete the following table

|  |  | **Amount** |
|---|---|---|
| **c** Beginning balance | **1c** | |
| **d** Additions during the year | **1d** | |
| **e** Distributions during the year | **1e** | |
| **f** Ending balance | **1f** | |

**2a** Did the organization include an amount on Form 990, Part X, line 21, for escrow or custodial account liability?  ☐ **Yes**  ☐ **No**

**b** If "Yes," explain the arrangement in Part XIII  Check here if the explanation has been provided in Part XIII . . . . . . . ☐

| **Part V** | **Endowment Funds.** Complete if the organization answered "Yes" to Form 990, Part IV, line 10. |

|  | **(a)**Current year | **(b)**Prior year | **b (c)**Two years back | **(d)**Three years back | **(e)**Four years back |
|---|---|---|---|---|---|
| **1a** Beginning of year balance . . . . | | | | | |
| **b** Contributions . . . . . . . . . | | | | | |
| **c** Net investment earnings, gains, and losses | | | | | |
| **d** Grants or scholarships . . . . . | | | | | |
| **e** Other expenditures for facilities and programs | | | | | |
| **f** Administrative expenses . . . . | | | | | |
| **g** End of year balance . . . . . | | | | | |

**2** Provide the estimated percentage of the current year end balance (line 1g, column (a)) held as

**a** Board designated or quasi-endowment ▶

**b** Permanent endowment ▶

**c** Temporarily restricted endowment ▶
The percentages on lines 2a, 2b, and 2c should equal 100%

**3a** Are there endowment funds not in the possession of the organization that are held and administered for the organization by

|  |  | Yes | No |
|---|---|---|---|
| **(i)** unrelated organizations . . . . . . . . . . . . . . . . . . | **3a(i)** | | |
| **(ii)** related organizations . . . . . . . . . . . . . . . . . . . | **3a(ii)** | | |
| **b** If "Yes" on 3a(ii), are the related organizations listed as required on Schedule R? . . . . . . . . . | **3b** | | |

**4** Describe in Part XIII the intended uses of the organization's endowment funds

| **Part VI** | **Land, Buildings, and Equipment.** Complete if the organization answered 'Yes' to Form 990, Part IV, line 11a.See Form 990, Part X, line 10. |

| Description of property | **(a)** Cost or other basis (investment) | **(b)** Cost or other basis (other) | Accumulated **(c)** depreciation | **(d)** Book value |
|---|---|---|---|---|
| **1a** Land . . . . . . . . . . . . . . | | 3,650,000 | | 3,650,000 |
| **b** Buildings . . . . . . . . . . . . | | 3,004,225 | 318,211 | 2,686,014 |
| **c** Leasehold improvements . . . . . . | | | | |
| **d** Equipment . . . . . . . . . . . | | 73,617 | 22,086 | 51,531 |
| **e** Other . . . . . . . . . . . . . | | | | |
| **Total.** Add lines 1a through 1e *(Column (d) must equal Form 990, Part X, column (B), line 10(c) )* . . . . . . . . . ▶ | | | | 6,387,545 |

**Part VII** **Investments—Other Securities.** Complete if the organization answered 'Yes' on Form 990, Part IV, line 11b.
See Form 990, Part X, line 12.

| (a) Description of security or category (including name of security) | (b)Book value | (c)Method of valuation Cost or end-of-year market value |
|---|---|---|
| **(1)**Financial derivatives | | |
| **(2)**Closely-held equity interests | | |
| **(3)**Other | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total.** (Column (b) must equal Form 990, Part X, col (B) line 12 )         ▶ | | |

**Part VIII** **Investments—Program Related.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 11c. See Form 990, Part X, line 13.

| (a) Description of investment | (b) Book value | (c) Method of valuation Cost or end-of-year market value |
|---|---|---|
| **(1)** LAND & BUILDING  78 ACADEMY AVE, CORNWALL-ON-HUDSON,NY | 16,648,751 | C |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total.** (Column (b) must equal Form 990, Part X, col (B) line 13 )      ▶ | 16,648,751 | |

**Part IX** **Other Assets.** Complete if the organization answered 'Yes' on Form 990, Part IV, line 11d See Form 990, Part X, line 15

| (a) Description | (b) Book value |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total.** (Column (b) must equal Form 990, Part X, col (B) line 15 )           ▶ | |

**Part X** **Other Liabilities.** Complete if the organization answered 'Yes' on Form 990, Part IV, line 11e or 11f.
See Form 990, Part X, line 25.

| **1.** (a) Description of liability | (b) Book value |
|---|---|
| Federal income taxes | |
| LOAN FROM RELATED ENTITIES | 1,783,552 |
| MORTGAGE FROM RELATED ENTITIES | 23,302,976 |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total.** (Column (b) must equal Form 990, Part X, col (B) line 25 )    ▶ | 25,086,528 |

**2.** Liability for uncertain tax positions  In Part XIII, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FIN 48 (ASC 740)  Check here if the text of the footnote has been provided in Part XIII ☐

| **Part XI** | **Reconciliation of Revenue per Audited Financial Statements With Revenue per Return** |
|---|---|
| | Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a. |

| | | | | |
|---|---|---|---|---|
| **1** | Total revenue, gains, and other support per audited financial statements . . . . . . . . . | | **1** | |
| **2** | Amounts included on line 1 but not on Form 990, Part VIII, line 12 | | | |
| **a** | Net unrealized gains (losses) on investments . . . . | **2a** | | |
| **b** | Donated services and use of facilities . . . . . . . . . | **2b** | | |
| **c** | Recoveries of prior year grants . . . . . . . . . . | **2c** | | |
| **d** | Other (Describe in Part XIII ) . . . . . . . . . . . . . | **2d** | | |
| **e** | Add lines **2a** through **2d** . . . . . . . . . . . . . . . . . . . | | **2e** | |
| **3** | Subtract line **2e** from line **1** . . . . . . . . . . . . . . . . . . | | **3** | |
| **4** | Amounts included on Form 990, Part VIII, line 12, but not on line **1** | | | |
| **a** | Investment expenses not included on Form 990, Part VIII, line 7b . | **4a** | | |
| **b** | Other (Describe in Part XIII ) . . . . . . . . . . . | **4b** | | |
| **c** | Add lines **4a** and **4b** . . . . . . . . . . . . . . . . . . . | | **4c** | |
| **5** | Total revenue  Add lines **3** and **4c.**(This must equal Form 990, Part I, line 12 ) . . . . . . . | | **5** | |

| **Part XII** | **Reconciliation of Expenses per Audited Financial Statements With Expenses per Return.** |
|---|---|
| | Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a. |

| | | | | |
|---|---|---|---|---|
| **1** | Total expenses and losses per audited financial statements . . . . . . . . . . . . . | | **1** | |
| **2** | Amounts included on line 1 but not on Form 990, Part IX, line 25 | | | |
| **a** | Donated services and use of facilities . . . . . . . . . | **2a** | | |
| **b** | Prior year adjustments . . . . . . . . . . . . . | **2b** | | |
| **c** | Other losses . . . . . . . . . . . . . . . . | **2c** | | |
| **d** | Other (Describe in Part XIII ) . . . . . . . . . . . . . | **2d** | | |
| **e** | Add lines **2a** through **2d** . . . . . . . . . . . . . . . . . | | **2e** | |
| **3** | Subtract line **2e** from line **1** . . . . . . . . . . . . . . . . . . | | **3** | |
| **4** | Amounts included on Form 990, Part IX, line 25, but not on line **1:** | | | |
| **a** | Investment expenses not included on Form 990, Part VIII, line 7b . . | **4a** | | |
| **b** | Other (Describe in Part XIII ) . . . . . . . . . . . | **4b** | | |
| **c** | Add lines **4a** and **4b** . . . . . . . . . . . . . . . . . . . | | **4c** | |
| **5** | Total expenses  Add lines **3** and **4c.** (This must equal Form 990, Part I, line 18 ) . . . . . . . | | **5** | |

| **Part XIII** | **Supplemental Information** |
|---|---|

Provide the descriptions required for Part II, lines 3, 5, and 9, Part III, lines 1a and 4, Part IV, lines 1b and 2b, Part V, line 4, Part X, line 2, Part XI, lines 2d and 4b, and Part XII, lines 2d and 4b  Also complete this part to provide any additional information

| Return Reference | Explanation |
|---|---|
| | |

**Part XIII**   **Supplemental Information** *(continued)*

| Return Reference | Explanation |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

# Schedule L
**(Form 990 or 990-EZ)**

## Transactions with Interested Persons

► **Complete if the organization answered**
**"Yes" on Form 990, Part IV, lines 25a, 25b, 26, 27, 28a, 28b, or 28c,**
**or Form 990-EZ, Part V, line 38a or 40b.**
► **Attach to Form 990 or Form 990-EZ.**
►**Information about Schedule L (Form 990 or 990-EZ) and its instructions is at**
***www.irs.gov/form990.***

OMB No 1545-0047

# 2015

**Open to Public Inspection**

Department of the Treasury
Internal Revenue Service

| Name of the organization | Employer identification number |
|---|---|
| RESEARCH CENTER ON NATURAL CONSERVATION INC | 45-3641847 |

## Part I — Excess Benefit Transactions (section 501(c)(3), section 501(c)(4), and 501(c)(29) organizations only)
Complete if the organization answered "Yes" on Form 990, Part IV, line 25a or 25b, or Form 990-EZ, Part V, line 40b

| 1 | (a) Name of disqualified person | (b) Relationship between disqualified person and organization | (c) Description of transaction | (d) Corrected? | |
|---|---|---|---|---|---|
| | | | | Yes | No |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**2** Enter the amount of tax incurred by organization managers or disqualified persons during the year under section 4958 . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► $ _____

**3** Enter the amount of tax, if any, on line 2, above, reimbursed by the organization . . . . . . . . ► $ _____

## Part II — Loans to and/or From Interested Persons.
Complete if the organization answered "Yes" on Form 990-EZ, Part V, line 38a, or Form 990, Part IV, line 26, or if the organization reported an amount on Form 990, Part X, line 5, 6, or 22

| (a) Name of interested person | (b) Relationship with organization | (c) Purpose of loan | (d) Loan to or from the organization? | | (e) Original principal amount | (f) Balance due | (g) In default? | | (h) Approved by board or committee? | | (i) Written agreement? | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | To | From | | | Yes | No | Yes | No | Yes | No |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

Total ► $ _____

## Part III — Grants or Assistance Benefiting Interested Persons.
Complete if the organization answered "Yes" on Form 990, Part IV, line 27.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of assistance | (d) Type of assistance | (e) Purpose of assistance |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.    Cat No 50056A    **Schedule L (Form 990 or 990-EZ) 2015**

**Part IV** **Business Transactions Involving Interested Persons.**

Complete if the organization answered "Yes" on Form 990, Part IV, line 28a, 28b, or 28c.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of transaction | (d) Description of transaction | (e) Sharing of organization's revenues? | |
|---|---|---|---|---|---|
| | | | | **Yes** | **No** |
| (1) VINCENT TIANQUAN MO | SERVES AS PRESIDENT OF THE ORGANIZATION | 1,083,552 | RECEIVED A LOAN FROM UPSKY INTERNATIONAL HOLDING, A CORPORATION WHICH VINCENT TIANQUAN MO IS PRESIDENT | | No |
| (2) VINCENT TIANQUAN MO | SERVES AS PRESIDENT OF THE ORGANIZATION | 700,000 | RECEIVED A LOAN FROM UPSKY INTERNATIONAL HOLDING - SAN FRANCISCO, A CORPORATION WHICH VINCENT TIANQUAN MO IS PRESIDENT | | No |
| (3) VINCENT TIANQUAN MO | SERVES AS PRESIDENT OF THE ORGANIZATION | 6,654,225 | RECEIVED A MORTGAGE LOAN FROM NEXT DECADE ALL OF THE SHARES OF NEXT DECADE ARE HELD IN THE KM&KM TRUST, AN IRREVOCABLE DISCRETIONARY FAMILY TRUST ESTABLISHED BY MR MO UNDER THE LAWS OF SINGAPORE, FOR WHICH CREDIT SUISSE SERVES AS TRUSTEE | | No |
| (4) VINCENT TIANQUAN MO | SERVES AS PRESIDENT OF THE ORGANIZATION | 16,648,751 | RECEIVED A MORTGAGE LOAN FROM UPSKY ENTERPRISES, A CORPORATION WHICH VINCENT TIANQUAN MO IS PRESIDENT | | No |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Part V** **Supplemental Information**

Provide additional information for responses to questions on Schedule L (see instructions)

| **Return Reference** | **Explanation** |
|---|---|

efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | DLN: 93493319038616



**SCHEDULE O**
**(Form 990 or 990-EZ)**

Department of the Treasury
Internal Revenue Service

## Supplemental Information to Form 990 or 990-EZ

Complete to provide information for responses to specific questions on
Form 990 or 990-EZ or to provide any additional information.
▶ Attach to Form 990 or 990-EZ.
▶ Information about Schedule O (Form 990 or 990-EZ) and its instructions is at
www.irs.gov/form990.

OMB No 1545-0047

**2015**

**Open to Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| RESEARCH CENTER ON NATURAL CONSERVATION INC | 45-3641847 |

## 990 Schedule O, Supplemental Information

| Return Reference | Explanation |
|---|---|
| FORM 990, PART VI, SECTION A, LINE 2 | ALL BOARD MEMBERS ARE FAMILY MEMBERS |
| FORM 990, PART VI, SECTION B, LINE 11 | FORM 990 WILL BE REVIEWED A BOARD MEMBER |

| Return Reference | Explanation |
|---|---|
| FORM 990, PART VI, SECTION C, LINE 19 | FINANCIALS ARE AVAILABLE UPON REQUEST |
| FORM 990, PART IX, LINE 11G | CONTRACTORS FOR PROPERTY  PROGRAM SERVICE EXPENSES 132,932  MANAGEMENT AND GENERAL EXPENSE<br>S 0  FUNDRAISING EXPENSES 0  TOTAL EXPENSES 132,932 |

Case 2:20-cv-02333-RJD-BNW Document 51 Filed 06/03/21 Page 517 of 521

**SCHEDULE R**
**(Form 990)**

**Related Organizations and Unrelated Partnerships**

▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 33, 34, 35b, 36, or 37.

OMB No 1545-0047

# 2015

▶ Attach to Form 990.  ▶ Information about Schedule R (Form 990) and its instructions is at www.irs.gov/form990.

Department of the Treasury
Internal Revenue Service

**Open to Public Inspection**

Name of the organization
RESEARCH CENTER ON NATURAL CONSERVATION INC

Employer identification number
45-3641847

**Part I**  **Identification of Disregarded Entities** Complete if the organization answered "Yes" on Form 990, Part IV, line 33.

| (a) Name, address, and EIN (if applicable) of disregarded entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Total income | (e) End-of-year assets | (f) Direct controlling entity |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Part II**  **Identification of Related Tax-Exempt Organizations** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related tax-exempt organizations during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Exempt Code section | (e) Public charity status (if section 501(c)(3)) | (f) Direct controlling entity | (g) Section 512(b) (13) controlled entity? Yes | No |
|---|---|---|---|---|---|---|---|
| (1)WALL STREET GLOBAL TRAINING CENTER 72 WALL STREET NEW YORK, NY 10005 45-2198895 | TO PROVIDE TRAINING OPPORTUNITIES | NY | 501(C)(4) | | | | No |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990.  Cat No 50135Y  Schedule R (Form 990) 2015

**Part III** **Identification of Related Organizations Taxable as a Partnership** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related organizations treated as a partnership during the tax year.

| (a)<br>Name, address, and EIN of related organization | (b)<br>Primary activity | (c)<br>Legal domicile (state or foreign country) | (d)<br>Direct controlling entity | (e)<br>Predominant income(related, unrelated, excluded from tax under sections 512-514) | (f)<br>Share of total income | (g)<br>Share of end-of-year assets | (h)<br>Disproportionate allocations? | | (i)<br>Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j)<br>General or managing partner? | | (k)<br>Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Yes | No | | Yes | No | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

**Part IV** **Identification of Related Organizations Taxable as a Corporation or Trust** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related organizations treated as a corporation or trust during the tax year.

| (a)<br>Name, address, and EIN of related organization | (b)<br>Primary activity | (c)<br>Legal domicile (state or foreign country) | (d)<br>Direct controlling entity | (e)<br>Type of entity (C corp, S corp, or trust) | (f)<br>Share of total income | (g)<br>Share of end-of-year assets | (h)<br>Percentage ownership | (i)<br>Section 512 (b)(13) controlled entity? | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Yes | No |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**Part V** **Transactions With Related Organizations** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, 35b, or 36.

| | | | Yes | No |
|---|---|---|---|---|
| **Note.** Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule | | | | |
| **1** During the tax year, did the orgranization engage in any of the following transactions with one or more related organizations listed in Parts II-IV? | | | | |
| **a** Receipt of **(i)** interest, **(ii)** annuities, **(iii)** royalties, or **(iv)** rent from a controlled entity . . . . . . . . . . . . . | **1a** | | | No |
| **b** Gift, grant, or capital contribution to related organization(s) . . . . . . . . . . . . . . . . | **1b** | | | No |
| **c** Gift, grant, or capital contribution from related organization(s) . . . . . . . . . . . . . . . | **1c** | | | No |
| **d** Loans or loan guarantees to or for related organization(s) . . . . . . . . . . . . . . . . | **1d** | | | No |
| **e** Loans or loan guarantees by related organization(s) . . . . . . . . . . . . . . . . | **1e** | | | No |
| | | | | |
| **f** Dividends from related organization(s) . . . . . . . . . . . . . . . . . . . | **1f** | | | No |
| **g** Sale of assets to related organization(s) . . . . . . . . . . . . . . . . . . . | **1g** | | | No |
| **h** Purchase of assets from related organization(s) . . . . . . . . . . . . . . . . . . | **1h** | | | No |
| **i** Exchange of assets with related organization(s) . . . . . . . . . . . . . . . . . | **1i** | | | No |
| **j** Lease of facilities, equipment, or other assets to related organization(s) . . . . . . . . . . . . . | **1j** | | | No |
| | | | | |
| **k** Lease of facilities, equipment, or other assets from related organization(s) . . . . . . . . . . . . | **1k** | | | No |
| **l** Performance of services or membership or fundraising solicitations for related organization(s) . . . . . . . . . . . . . . . . . | **1l** | | | No |
| **m** Performance of services or membership or fundraising solicitations by related organization(s) . . . . . . . . . . . | **1m** | | | No |
| **n** Sharing of facilities, equipment, mailing lists, or other assets with related organization(s) . . . . . . . . | **1n** | | | No |
| **o** Sharing of paid employees with related organization(s) . . . . . . . . . . . . . . . | **1o** | | | No |
| | | | | |
| **p** Reimbursement paid to related organization(s) for expenses . . . . . . . . . . . . . . | **1p** | | | No |
| **q** Reimbursement paid by related organization(s) for expenses . . . . . . . . . . . . . . | **1q** | | | No |
| | | | | |
| **r** Other transfer of cash or property to related organization(s) . . . . . . . . . . . . . . | **1r** | | | No |
| **s** Other transfer of cash or property from related organization(s) . . . . . . . . . . . . . . | **1s** | | | No |

**2** If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds

| (a)<br>Name of related organization | (b)<br>Transaction<br>type (a-s) | (c)<br>Amount involved | (d)<br>Method of determining amount involved |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| **Part VI** | **Unrelated Organizations Taxable as a Partnership** Complete if the organization answered "Yes" on Form 990, Part IV, line 37. |
|---|---|

Provide the following information for each entity taxed as a partnership through which the organization conducted more than five percent of its activities (measured by total assets or gross revenue) that was not a related organization See instructions regarding exclusion for certain investment partnerships

| (a)<br>Name, address, and EIN of entity | (b)<br>Primary activity | (c)<br>Legal domicile (state or foreign country) | (d)<br>Predominant income (related, unrelated, excluded from tax under sections 512-514) | (e)<br>Are all partners section 501(c)(3) organizations? | | (f)<br>Share of total income | (g)<br>Share of end-of-year assets | (h)<br>Disproprtionate allocations? | | (i)<br>Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j)<br>General or managing partner? | | (k)<br>Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Yes | No | | | Yes | No | | Yes | No | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Case 2:20-cv-02333-KJD-BNW   Document 51   Filed 06/03/21   Page 521 of 521

**Part VII**  **Supplemental Information**

Provide additional information for responses to questions on Schedule R (see instructions)

| Return Reference | Explanation |
|---|---|
|  |  |